UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated | ) ) ) ) | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | Case Number: |
| JP Morgan Chase & Co. | ) ) ) | |
| Defendant. | ) ) / | |

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Jane Doe 1 files this individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. §§ 1591-95, et seq.—the Trafficking Victim Protection Act ("TVPA")—and for intentional and negligent acts and omissions under the New York Adult Survivors Act, N.Y. CPLR §214-j. The suit arises from Defendant, JP Morgan Chase & Co. (hereinafter "JP Morgan"), financially benefitting from participating in Jeffrey Epstein's sex trafficking by providing the requisite financial support for the continued operation of Epstein's international sex trafficking organization from 1998 through August 2013.

JP Morgan knowingly and intentionally benefited and received things of value for assisting, supporting, facilitating, and otherwise providing the most critical

1

service for the Jeffrey Epstein sex trafficking organization to successfully rape, sexually assault, and coercively sex traffic Plaintiff Jane Doe 1 and the numerous other members of the Class proposed below (the "Class"). JP Morgan knew that Epstein was regularly committing violations of New York Penal Law Art. 130, including, and especially, New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66, and acted in a negligent manner so as to enable Epstein to commit such offenses against countless young women.

JP Morgan also knew that Epstein would use means of force, threats of force, fraud, abuse of legal process, exploitation of power disparity, and a variety of other forms of coercion to cause young women and girls to engage in commercial sex acts. Knowing that they would earn millions of dollars from facilitating Epstein's sex abuse and trafficking, JP Morgan chose profits over following the law. Specifically, JP Morgan chose facilitating a sexual abuse and sex trafficking operation for many years, including through the criminal investigation and incarceration of Jeffrey Epstein, in order to churn profits.

Plaintiff makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I. JURISDICTION, VENUE, AND TIMELINESS

1.      This action is brought pursuant to various federal and state statues,

2

including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. §1331, because Jane Doe 1—individually and on behalf of the other Class members—proceeds under the federal TVPA statute.

2.      This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

3.      This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Epstein, his co-conspirators, and JP Morgan all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe 1 and members of the Class is this District.

4.      Often these acts of sexual abuse and commercial sex acts, committed by Jeffrey Epstein and certain select friends of his, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street in New York City.  Epstein also used his New York mansion to harbor his victims and as a base from which to transport them to other locations outside of New York.

5.      A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

6.      This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking. This action is also timely under New York's Adult Survivor's Act, N.Y. CPLR § 214-j.

## II. PARTIES

7.      Jane Doe 1 is a U.S. citizen and was at all relevant times a resident of and domiciled in the State of New York.

8.      Plaintiff Jane Doe 1 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

9.      Jane Doe 1 is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

10.     Jane Doe 1's safety, right to privacy, and security outweigh the public interest in her identification.

11.     Jane Doe 1's legitimate concerns outweigh any prejudice to Defendant by allowing her to proceed anonymously. Accordingly, Jane Doe will be filing a Motion to Proceed Anonymously.

12.     As discussed below, many other women are similarly situated to Jane Doe 1 and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendant.

13.     Defendant JP Morgan is a global financial institution headquartered in New York, New York.

14.     Defendant JP Morgan is licensed by the New York State Department of Financial Services to operate a foreign bank branch in the State of New York.

15.     Defendant JP Morgan currently conducts substantial business in this District and conducted substantial business at the time of events covered in this complaint.

16.     As one example of business conducted in this District, JP Morgan ordinarily shares trade on the New York Stock Exchange, located in this District. As another example, JP Morgan maintains branch banks within this District.

17.     JP Morgan's financial activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails,

interstate telephone communications, and the facilities of national securities markets.

18.     JP Morgan is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this complaint.

## III. INTRODUCTION

19.     Jeffrey Epstein's sex-trafficking venture operated in many respects as a sex-themed cult designed to ensnare vulnerable young women and indoctrinate them into Epstein's carefully constructed world in which Epstein was their messiah. Epstein and his co-conspirators preached the gospel of Epstein. Epstein's victims were taught to do what he said, and he would protect them; but disobey him, and he would punish them; and continue to disobey, and he would cause them serious harm from which they could never recover.

20.     Once in Epstein's clutches, each victim was taught and understood that she must be completely compliant with every wish or demand Epstein had for her; otherwise, she would certainly suffer serious reputational, financial, and psychological harm. By using these and other means of force, threats of force, fraud, threats of abuse of the legal process and coercion, Epstein and his co-conspirators sexually trafficked and sexually abused Plaintiff Jane Doe 1 and the other members of the Class.

21.     The Epstein sex-trafficking venture originated in the early 1990's. From its inception until Jeffrey Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the venture operated primarily for the purpose of luring young women and girls into a position where Jeffrey Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. His venture also operated to conceal its sex trafficking from law enforcement organizations.

22.     The Epstein sex-trafficking venture was well-structured from the beginning and grew increasingly more complex and powerful as it victimized more young women and as its relationship with Defendant JP Morgan grew.

23.     Epstein did not act alone.  He created and maintained his sex-trafficking venture with the assistance of other influential individuals and entities who knew he was sexually abusing and sexually trafficking young women and girls and provided support to facilitate his sexual abuse and sex trafficking operation.

24.     Epstein's sex-trafficking venture was not possible without the assistance and complicity of a financial institution—specifically, banking institution—which provided special treatment to the sex-trafficking venture, thereby ensuring its continued operation and sexual abuse and sex-trafficking of young women and girls.  Without the financial institution's participation, Epstein's sex trafficking scheme could not have existed.

25.     Epstein's victims were young women and girls, who suffered severe abuse as Epstein's sex-trafficking victims and who believed they had to remain loyal to the venture at all costs in order to survive. Epstein victimized hundreds of young women and girls.

26.     Epstein's sexual abuse and sex trafficking scheme was supported by virtually unlimited wealth, derived from select wealthy individuals who acted as the financial engine behind the sex-trafficking operation.

27.     Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims.  He then closed the trap on his victims with offers of money, food, shelter, medical care for them or family members, travel, schooling, and career opportunities. Epstein groomed the young women and girls, indoctrinating them to believe that the sexual abuse was normal.

28.     Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, others, as well as to create the opportunity for Epstein to sexually abuse them.

29.     The Epstein sex-trafficking venture's purpose included enticing, obtaining, harboring, and transporting the young victims without drawing unwanted attention from law enforcement. The venture had everything a sex-trafficking organization needed—funding, infrastructure, the appearance of legitimacy, and a

complicit banking institution.  It was by many accounts the most powerful and wealthiest sex-trafficking venture ever created.

30.     The Epstein sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause Jane Doe 1, and many dozens of others similarly situated women to engage in commercial sex acts.

31.     The Epstein sex-trafficking venture operated in and affected interstate and foreign commerce. Epstein recruited, solicited, coerced, harbored, transported, and enticed some of his victims, including Jane Doe 1 and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York), Florida, the U.S. Virgin Islands, New Mexico, England, and France.

32.     The Epstein sex-trafficking venture operated throughout the world from in and around the early 1990's through in and around August 10, 2019, when Epstein died by apparent suicide.

33.     Thereafter, to and including the date of this complaint, members of the sex-trafficking venture continued to further the venture by concealing the activities and extent of the venture.

34.     The manner of operation for Epstein's particular sexual abuse and sex trafficking operation was widely publicized.  He would lure young girls or women

to one of his luxurious mansions, under the guise of being a wealthy philanthropist, able to advance careers, education, or provide other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would cause each of his unsuspecting victims to engage in a variety of commercial sex acts.

35.     Once in his presence, each victim knew it was no option to disobey Epstein. It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims and also capable and willing to hurt any of his victims.

36.     While the first sexual abuse was discovered to have likely occurred in the early 1990's with the use of his then paramour, Ghislaine Maxwell, his appetite for sexual abusing young women and girls grew over the years.

37.     By 2000, each victim was being directed to bring other victims and being paid handsomely in cash for recruiting other victims.

38.     The Florida criminal investigation uncovered that Epstein's sex-trafficking operation grew its number of victims exponentially in the late 1990's and early 2000's.

39.     One major reason why Epstein's sex-trafficking venture accumulated new victims at an alarming rate in the late 1990's and accelerating even faster by 2000 was his access to unlimited amounts of cash.

40.     Without exorbitantly large amounts of cash, Epstein's operation could not run, as newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.

41.     Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on that promise of large cash payments.

42.     The public documents and articles stemming from the 2006 arrest made abundantly clear that Epstein was doling out thousands of dollars in cash every single day as hush money to victims he was sexually abusing and to victims he was using to recruit additional victims.

43.     If Epstein paid every victim with wire transfers and left a documented money trail, his illegal sexual abuse and sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash, Epstein was able to commit the most egregious sexual crimes many times a day without leaving a paper trail.

44.     This constant expansion of sexual abuse and sex trafficking victims required cash on hand for Epstein to pay each victim as hush money for the abuse she was suffering as well as each victim's finder's fee for bringing another victim.

45.     Because Epstein's vast wealth, said to have been more than a billion dollars, was maintained in seemingly legitimate financial institutions, he needed a

complicit financial institution that would allow large, regular cash withdrawals in order to operate his sex-trafficking operation.

46.     In order to access the large amount of cash needed to maintain his active sexual abuse of young women, it was essential that the financial institution where he banked be complicit in his operation, and more specifically that Epstein bank at a financial institution that would allow him to constantly withdraw cash from his accounts without following anti-money laundering and reporting laws.

47.     To put it plainly, Epstein needed a bank that knew he was engaging in illegal activity and did not care—because the bank only cared about the money that it was making from its relationship with Epstein.

48.     This scheme of paying victims to bring other victims worked effectively because it not only allowed expansion through the recruitment of other victims in a pyramid scheme fashion, but it also allowed each victim a possibility to avoid future sexual abuse—she could bring someone else who would get abused in her place.

49.     Epstein's aptitude as a sex-trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008. Even while he was in jail in Florida, Epstein continued to sexually abuse young girls and women from his work release office.

50.     Once out of jail and off work release, Epstein continued to collect

young women and lure them through force, fraud, or coercion into one of his mansions, primarily his townhouse located at 9 East 71 Street, New York, NY, where he would sexually abuse each one.

51.     His sexual abuse and sex trafficking operation continued as it had in the past, although it became more elaborate, creating more phony companies, opening more bank accounts, withdrawing excessive amounts of cash, and delivering money to victims through wires, payroll, direct deposits, and other means known to his financial institution as evidence of the continuation of his criminal sex trafficking scheme.

52.     As time went by, the news articles and lawsuits continued to mount, and more information became publicly available that Epstein was continuing to abuse young women and was using professionals on his payroll to help him conceal his illegal activity and give him ostensible cover as a well-connected money manager.

53.     As a registered sex offender discovered to be sexually abusing multiple young women each day through a pyramid-type recruiting scheme that required the transfer of millions of dollars to continue the operation, a complicit bank became more important than ever.

54.     As is more detailed below, Defendant JP Morgan worked closely with Epstein through every step of Epstein's sex trafficking operation's expansion and

growth in its most prolific of years—between 2000 and 2013.

## IV. THE TRAFFICKING VICTIMS' PROTECTION ACT

55.     The Trafficking Victims Protection Act (TVPA) outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

56.     The TVPA forbids the following sex-trafficking conduct:

(a) Whoever knowingly—

> (1)     in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, orsolicits by any means a person; or

> (2)     benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

> knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in acommercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b). 18 U.S.C. § 1591(a).

57.     The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (e.g., 18 U.S.C. §§ 1591-95) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from

participation in an illegal sex-trafficking venture. 18 U.S.C. § 1595(a).

58.     Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a). This expansive provision is known as the "constructive knowledge" provision, which provides an alternative to proving actual knowledge as part of civil damages claim.

59.     In the paragraphs that follow, wherever Plaintiff alleges that the Defendant acted with actual knowledge, or in reckless disregard of the fact, that the Epstein sex-trafficking venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in commercial sex acts, the Plaintiff also allege that, at a bare minimum, the Defendant should have known that the Epstein sex-trafficking venture had used such means to engage in illegal sex trafficking in violation of 18 U.S.C. §§ 1591-94—i.e., that they had constructive knowledge of Epstein's sex trafficking.

## V. FACTUAL ALLEGATIONS

A.     **The Epstein Sex-Trafficking Venture.**

60.     During all times relevant to this complaint, Jeffrey Epstein was an

extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a Palm Beach mansion, and an island in the U.S. Virgin Island.

61.     Beginning in the early 1990s and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture in violation of 18 U.S.C. §§ 1591-95. As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them.

62.     In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.

63.     In this District and elsewhere, Epstein perpetuated this abuse in similar ways. Epstein and his co-conspirators used Epstein vast (yet mysterious) wealth and connections to other rich and powerful individuals to lure new victims into his home for seemingly innocuous activity. Victims were initially recruited to speak with an alleged philanthropic Epstein and provide "massages" to him.

16

64.     Once at the home and trapped in Epstein's bedroom the victims would be instructed to remove their clothing. Epstein would then force the massages to become increasingly sexual in nature, typically including one or more forced sex acts. Epstein would use means of force, threats of force, or fraud to coerce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him. Epstein and his associates then paid his victims hundreds of dollars in cash for each sexual encounter.

65.     Moreover, Epstein actively encouraged his victims to recruit additional girls to be similarly sexually abused, causing the number of victims to grow exponentially. Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein. In so doing, Epstein, through this system of paying victims to recruit others whom he would also pay for being sexually abused as well as for recruiting, created a sexual abuse and sex trafficking spider web and maintained a steady supply of new victims to exploit.

66.     Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

67.     Among other things, Epstein sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which

his victims received things of value, including cash, promises of educational and career advancement, and promises that Epstein would provide various forms of assistance.

68.      Epstein provided things of value to his victims in order to cause them to engage sex acts with him and on occasion his friends, co-conspirators, or other victims.

69.      As one means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

70.      As another means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises were a quid pro quo for the sex acts that occurred.

71.      As one means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the assault or as a "finder's fee" for bringing other young women or provide them with living accommodations, clothing, education, or other necessities.

72.      Throughout most of the 1990's through about July 2019, the Epstein's sex-trafficking venture recruited, solicited, enticed, harbored, obtained, provided, and transported hundreds of victims to cause them to engage in commercial sex acts

with Epstein and Epstein's friends.

73.     In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, FL mansion.   During that investigation, it was concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of 18 U.S.C §§ 2422 (b), 2422 (2), 2423 (f), 2423 (b), 2424 (e), 18 U.S.C § 371, 18 U.S.C § 1591 (c) (1) and 1591 (a) (1) and (2), as well as state crimes in violation of Florida Statute §§ 796.07 and 796.03, against dozens of young women.

74.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008.

75.     Epstein's criminal case in Florida and the many related news reports left no doubt about Jeffrey Epstein and his extraordinary penchant for sex abuse and trafficking of young females.   For instance, it was revealed that until the time of his Florida arrest, Jeffrey Epstein was sexually abusing three to four young females per day; it was a full-time job for him.

76.     Beginning with his Florida arrest and for years moving forward, Epstein was embroiled in dozens of public lawsuits pertaining to his sexual abuse of females and hundreds if not thousands of news stories circulated worldwide about his illegal sexual proclivities.

77.     In addition to the many civil lawsuits seeking damages for sexual abuse, Epstein's victims also filed a public lawsuit against the Unites States under 18 U.S.C 3771, the Crime Victim's Rights Act (CVRA), further exposing Epstein's sexual crimes as well as a secret Non-Prosecution Agreement he entered into with the Federal Government.

78.     Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cellular telephones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

79.     Epstein transported his victims in interstate and foreign commerce, including transportation to and from his mansion in this District.

80.     The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, and the U.S. Virgin Islands and elsewhere, and in foreign commerce to places, especially Eastern Europe.

81.     At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking venture referred to it as "The Organization."

82.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of Sex Trafficking Conspiracy and one count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street.  See United States v. Jeffrey Epstein, Case No. 1:19-cr-480 (S.D.N.Y.).

83.     On July 8, 2019, Jeffrey Epstein was arrested pursuant to the New York Indictment.

84.     On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

85.     In July 2020, Epstein's co-conspirator in the origin of the sex-trafficking venture, Ghislaine Maxwell, was arrested on federal sex trafficking charges filed in this Court. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. See United States v. Maxwell, Case No. 1:20-cr-00330 (S.D.N.Y.).

86.     On December 29, 2021, Maxwell was found guilty in this Court on five federal sex trafficking counts in this Court and is now serving close to 20 years in federal prison for these crimes.

**B.      Consistent with His Uniform Pattern and Practice, Jane Doe 1 Was Forced to Engage in Commercial Sex Acts with Epstein by Means of Force, Fraud, and Coercion.**

87.      Jane Doe 1 was living with her mother when she met Jeffrey Epstein in 2006.

88.      Jane Doe 1 was a ballet dancer in New York when she was recruited to meet Jeffrey Epstein by another young female who had also fallen prey to Jeffrey Epstein's sex trafficking scheme.

89.      Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 1. Epstein and his co-conspirators constantly reminded Jane Doe 1 how powerful and important Epstein was. Jane Doe 1 was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her with her career and education. She came to believe what she was told.

90.      The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe 1 and other victims by Jeffrey Epstein and his co-conspirators that: (1) Jeffery Epstein possessed extraordinary wealth, power and influence; (2) Jeffrey Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Jeffrey Epstein had the ability to advance or destroy nearly anyone financially,

reputationally, and otherwise; (4) medical and normal life necessities would be denied victims if they, including Jane Doe 1, failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 1's and other victims' life needs such as shelter or housing if she or they failed to perform those acts.

91.     Jane Doe 1 was exceptionally vulnerable to being victimized by Epstein. His sex-trafficking venture targeted vulnerable young women and Jane Doe 1 was soon indoctrinated and unable to extricate herself. Jane Doe 1 was sexually abused and trafficked by Epstein for several years. Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, and other important people, were aware of the sex abuse, Jane Doe 1 was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

92.     Over the ensuing years, from 2006 through 2013, Epstein sexually abused Jane Doe 1 on a number of occasions in direct violation of New York Penal Law 130, including but not limited to the following:

    a.  Sexual misconduct as defined in §130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

    b.  Rape in the first degree as defined in §130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

    c.  Criminal sexual act in the first degree as defined in §130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Plaintiff by forcible compulsion;

d. Forcible touching as defined in §130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in §130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Plaintiff by forcible compulsion.

93. Jane Doe 1 was also trafficked to Jeffrey Epstein's friends for commercial sex acts in this District.

94. Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Doe 1 to engage in commercial sex acts.

95. Epstein's recruited Jane Doe 1 to cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cellular telephones and means of interstate transportation (such as aircraft that he owned or controlled).

96. Epstein transported Jane Doe 1 from New York to other states to cause her to engage in commercial sex acts.

97. Jane Doe 1 wanted to escape from the Epstein sex trafficking venture, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

24

98.     Jeffrey Epstein controlled Jane Doe 1 financially, emotionally, and psychologically.   He used his knowledge of Jane Doe 1's aspirations, fears and problems to manipulate her until she was completely controlled by and dependent upon him.

99.     When Epstein went to jail for sex offenses in Florida, he maintained contact with Jane Doe 1.   He and employees of his business entities, which were created to support and legitimize Epstein's sexual abuse and sex trafficking enterprise, including HBRK, NES, Financial Trust, and Florida Science Foundation, caused Jane Doe 1 to be transported to Florida in order to engage in commercial sex with Epstein in his Florida residence while on so-called "work release" from jail, while he was still wearing his ankle monitor.

100.     There came a time when Epstein forced Jane Doe 1 to give massages to his powerful friends. During some of these massages she was sexually abused, by force and against her will, by Epstein's friends whom she had been required to massage. At least one of Epstein's friends used aggressive force in his sexual assault of her and informed Doe 1 that he had Epstein's permission to do what he wanted to her. Out of fear, Jane Doe 1 has still not named this powerful financial executive publicly.

101.     Epstein and his co-conspirators withdrew large sums of cash from JP Morgan to make cash payments to victims, including Jane Doe 1, in furtherance of

the sex-trafficking operation.

102.    JP Morgan knew that its accounts were being used for this trafficking based on a number of factors, including but not limited to, the identity of the individuals making the withdrawals and wire transfers, the identity of the recipients, the account opening activity, the pattern of the financial activity, and Epstein's well documented criminal history and involvement in trafficking.

103.    Over the ensuring years, Epstein threatened Jane Doe 1 in many ways including threatening that if she did not abide by his demands, she would lose contact with people she cared about.

104.    Epstein would alternate promises and threats to secure Jane Doe 1's compliance with his demands, including demands that she engage in commercial sex acts with him and others. In some instances, Epstein would pay Jane Doe 1 directly in cash obtained from JP Morgan for sex acts.

105.    Epstein and his co-conspirators continued to coerce Jane Doe 1 in various ways until her ultimate escape around the end of 2013.

**C.    JP Morgan**

**1**.  **JP Morgan's participation in the venture.**

106.   In or about 1998, in furtherance of his rapidly growing sexual abuse and sex trafficking operation, Jeffrey Epstein realized that he needed a reliable banking institution that would provide the necessary legitimate appearance for his

operation, allow him to open many accounts for illegitimate companies, ignore red flags, ignore federal banking laws, allow him to transfer money without questioning, allow him access to abundant cash, and to otherwise facilitate the commercial aspect of his commercial sex trafficking enterprise. Epstein found all of those things in JP Morgan.

107.    From about 2000 through 2013, JP Morgan knowingly and intentionally participated in the Epstein sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture. There can be no doubt that JP Morgan's conduct, as described below, was outrageous and intentional.

108.    Around 2000, Epstein developed a key relationship to expanding exploitative sexual abuse and his sex trafficking operation when he began working with James "Jes" Staley ("Staley"), the then-head of JP Morgan's private banking division.

109.    Before meeting Staley, Epstein was a serial sexual abuser of young girls and women, with an insatiable desire to sexually abuse females that were, in his words, "the younger, the better."

110.    Before Staley, Epstein relied heavily on the massive wealth bestowed upon him by one individual, Leslie Herbert Wexner ("Wexner"), to give him the appearance of grand importance while relying on his madame, Ghislaine Maxwell

("Maxwell"), to find and groom young women to be abused by Epstein.

111.    However, Epstein could not expand his operation to the level it ultimately reached without a complicit financial banking institution that would ignore red flags to the point of allowing him to pay hundreds of young females in wire transfers and allow him access to hundreds of thousands of dollars in cash to pay hush money to his growing number of victims.

112.    Staley was the key to making all of Epstein's depraved dreams of sexual abuse and sex trafficking of countless young women possible. With his help, the number of victims of the Epstein sex trafficking operation began to grow on a vertical trajectory beginning in 2000.

113.    When Epstein and Staley first teamed up, in or about 2000, Staley was the head of JP Morgan's private banking division and was later promoted to CEO of JP Morgan Asset Management in 2001.

114.    The relationship between Epstein and Staley was symbiotic. Epstein agreed to bring many ultra-high wealth clients to JP Morgan, and in exchange, Staley would use his clout within JP Morgan to make Epstein untouchable. This meant that JP Morgan would keep Epstein on as a client at all costs, including failing to act on any red flags and ultimately allowing him the ability to run and grow what to the bank was obviously an operation designed to sexually abuse and traffic countless young women.

115.    There were several key figures who created Epstein's international sex trafficking operation, most notably Ghislaine Maxwell, Les Wexner, and Jes Staley through JP Morgan.

116.    In later years, Deutsche Bank picked up where JP Morgan left off and provided the necessary complicit financial institution for the operation.

117.    Without Maxwell, Epstein would never have been able to recruit his first victims and been able to bring them into his abusive lair.  She approached young, vulnerable victims and spread the word that Epstein was this altruistic messiah who could help them. One they were in Epstein's clutches, she groomed them to make them feel comfortable being sexually exploited and abused.

118.    Without Wexner, Epstein's sex trafficking operation and sexual abuse of women could never have occurred to the extent that it did, as Epstein needed the appearance of extraordinary wealth to attract his victims and force them to stay silent.

119.    However, even with Wexner's funding of Epstein's operation, Epstein's sexual abuse of hundreds of women would have been limited because the money trail from Epstein's accounts to the many victims and recruiters would have exposed the illegality of the operation quickly.

120.    Therefore, the final essential ingredient Epstein needed to expand his sexual abuse of young women and sex trafficking enterprise was a financial

institution that would not care that Epstein was sexually abusing women on a daily basis and paying out millions in hush money.

121.    JP Morgan provided the final component Epstein needed, and Staley made sure Epstein and his illegal sexual abuse organization was absolutely protected by the bank.

122.    From the beginning of the Epstein/Staley relationship, Staley understood that Epstein's money was only a part of the incentive to protect Epstein's operation.

123.    As long as Epstein's money stayed at the bank, Staley also knew that Wexner, Epstein's client who had turned over a power of attorney to Epstein, would likewise keep his money with JP Morgan. Wexner's money was said to amount to over a billion dollars.



124.    It did not stop there. Epstein made clear that he "collected people" and was close with many ultra-wealthy individuals that he could bring into the bank. These new customers made JP Morgan even more profitable. Along the way, Epstein gave credit for these new bank customers to Staley, which made Staley enormously wealthy.

125.    Epstein controlled Staley like he did his many victims, by flaunting

his power and connections to the extremely wealthy. Epstein made it clear to Staley that if JP Morgan ever decided to terminate its relationship with Epstein, e the bank would lose Wexner and the other wealthy connections Epstein had promised JP Morgan.

126.     Staley was enamored with Epstein and driven by greed, which made Epstein one of the most coveted clients of JP Morgan.  Through the years, Staley helped accumulate other protectors of Epstein within JP Morgan (such as Mary Erdoes) who were also willing to turn a blind eye to Epstein's blatantly illegal operation.

127.     With JP Morgan's complicity, Epstein was free to sexually abuse hundreds of women, paying millions in hush money, without the fear of detection by law enforcement. Epstein used the support from a reputable institution—JP Morgan—to help cover up his criminal activity.

128.     JP Morgan cared about one thing—profit—and showed absolute loyalty to Epstein, including a willingness to violate banking laws and ignore multiple red flags of criminality to enable Epstein to fulfill his abusive sexual appetite at the expense of countless vulnerable young women.

129.     As Epstein's criminal sex trafficking venture expanded and he needed more protection and support from JP Morgan, Epstein continued to grow closer to Staley.

130.    As another example of JP Morgan and Staley's benefit from assisting Epstein, another highly profitable deal for JP Morgan was the Highbridge deal.

131.    In 2004, at the height of Epstein's sex trafficking and abuse operation, when he was transferring massive amounts of hush money to his victims and recruiters and withdrawing hundreds of thousands of dollars in cash so that all the payments were not traceable (the most obvious red flag for any criminal enterprise), Epstein served up another big financial payday for JP Morgan.

132.    Epstein was close friends with Glenn Dubin, the billionaire who ran Highbridge Capital Management, whom he introduced to Staley.

133.    Through Epstein's connection, it has been reported that Staley arranged for JP Morgan to buy a majority stake in Dubin's fund, which resulted in a sizeable profit for JP Morgan. This arrangement was profitable for both Staley and JP Morgan, further incentivizing JP Morgan to ignore the suspicious activity in Epstein's accounts.

134.    In addition to Epstein, JP Morgan also housed accounts for Epstein's main sex trafficking madame, Ghislaine Maxwell, who is now serving 20 years in prison for sex trafficking related to her participation in Epstein's operation.

135.    In 2022, JP Morgan representative, Patrick McHugh, testified in Maxwell's criminal sex-trafficking trial that between 1999 and 2007, Epstein transferred approximately $31M to Maxwell, an amount believed to be payment for

her role in Epstein's sex trafficking venture.

136.    Between 2000 and 2005, Epstein provided clients to JP Morgan and, in exchange, JP Morgan allowed Epstein to do as he pleased with his JP Morgan accounts. JP Morgan allowed Epstein to engage in structuring violations and other financial maneuvers required to maintain a criminal enterprise. The relationship continued without much of a question from outsiders. JP Morgan financially benefitted from allowing Epstein to use his JP Morgan accounts to run his sex trafficking venture.

137.    However, in 2006, Epstein's relationship with JP Morgan hit a snag when Epstein was publicly exposed for sexually abusing dozens of young girls and women, several as young as 14 years old. There were hundreds of pages of police reports and news articles revealing that Epstein was a serial sexual abuser and trafficker, and that his operation depended on his accessing nearly unlimited cash to use as payments to his victims.

138.    With respect to the specific discoveries, the United States Attorney's Office for the Southern District of Florida found that some of the victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

139.    It was publicly revealed in the investigation that Epstein was sexually abusing three to four young females every single day of his life and that he was paying each victim hundreds of dollars in hush money, usually in cash.

140.    The criminal investigation also revealed that Epstein was paying countless recruiters to constantly bring him more victims, making clear that quick access to cash at a financial institution was the lifeblood for his sex-trafficking venture.

141.    The money trail into Epstein's accounts was a dead giveaway that Epstein was engaging in crimes and the recipients of his money exposed the type of crimes.

142.    To the extent JP Morgan could feign plausible deniability before Epstein's arrest in 2006, thereafter its ability to play dumb was eviscerated when Epstein registered as a sex offender and the details of his daily sexual abuse of young females came to public light.

143.    Because Epstein was so publicly exposed as a sex trafficker and abuser, one of his primary financial engines, Les Wexner, abandoned him and separated himself from Epstein.

144.    In 2008, around the same time Epstein was pleading guilty to felony sex offenses and registering as a lifetime sex offender, it was discovered that another of JP Morgan's high value clients, Bernie Madoff, was running the largest Ponzi-scheme in modern history through his accounts at JP Morgan, causing JP Morgan to review its clientele with the directive of severing ties with any problematic customers.

145.    With this indisputable knowledge that Epstein was a sexual offender who was using his wealth for only one purpose—to run a sexual abuse and trafficking operation—any responsible bank would have cut ties, if only to attempt to maintain the not-so-plausible deniability that it had not known of Epstein's illegal sexual abuse operation earlier.

146.    However, rather than cut ties with Epstein, it has been reported that Staley, acting on behalf of JP Morgan, personally visited Epstein when he was serving his jail sentence in Florida.

147.    No matter the cost, the bank made clear to Epstein that he could continue to fund his sexual abuse operation through JP Morgan.

148.    When executives on the board at JP Morgan recommended cutting ties with Epstein, Staley made strong and successful arguments for JP Morgan keeping Epstein as a customer.

149.    In support, JP Morgan's CEO of private banking, Mary Erdoes, argued that Epstein was too valuable of a client to let go and played a pivotal role in maintaining JP Morgan's relationship with Epstein.

150.    After Staley went to visit Epstein in Florida while Epstein was incarcerated on sex offenses, Epstein and Staley's relationship continued to grow. Ultimately, after Epstein's release from jail, Staley and Epstein spent significant time together at Epstein's townhouse in New York City. Staley also visited Epstein

on his private island in the United States Virgin Islands—an island commonly
dubbed "Pedophile Island."

151.    After his arrest in 2008, dozens of public lawsuits mounted against
Epstein, revealing greater details of Epstein's sexual abuse of young women, each
of which also detailed millions in payments that Epstein was making to recruiters,
co-conspirators, cover-guys such as his longtime fixer/lawyer and fixer/accountant,
and to his victims.

152.    Through the civil lawsuits, evidence such as message pads taken from
Epstein's trash by police or through prior search warrants, as well as flight logs
began to publicly surface, shedding further public light on the expansiveness of
Epstein's sex-trafficking operation.

153.    In addition to the inner workings of Epstein's sex trafficking scheme
becoming public when he was arrested and served his jail time in Florida, other
relevant information also became public and was widely published: Epstein had no
college degree, he had never obtained any specialized license, none of the companies
with whom he was associated had any legitimate business structure or purpose, and
he had no documented expertise that would provide the requisite skill or knowledge
to amass his vast wealth.

154.    Despite the false rumors he had created to conceal his true "business,"
Jeffrey Epstein was exposed as literally nothing other than a sex trafficker and abuser

of young females, a fact easily discernible by any responsible financial institution with whom he was banking.

155.    For JP Morgan, a sophisticated financial institution legally responsible for complying with Know Your Customer laws and other banking obligations, the details of Epstein's sexual abuse and trafficking were not a surprise. Even so, JP Morgan never cooperated in any civil or criminal case against Epstein, because to do so would reveal JP Morgan's complicity in Epstein's operation.

156.    Fearful that Epstein could turn on the bank for its willful blindness, JP Morgan and Staley remained incentivized to maintain and grow the relationship and to assist in concealing Epstein's illegal and questionable banking practices.

157.    When a subpoena was served on JP Morgan in 2009 by one of Jeffrey Epstein's sexual abuse victims, JP Morgan refused to comply with the subpoena, making it abundantly clear whose side JP Morgan was on.

158.    After Epstein was released from his Florida incarceration, he picked up right where he left off—abusing young women on a daily basis, paying recruiters, and paying hush money to victims. JP Morgan also picked right up right where it left off—protecting Epstein's operation and allowing it to flourish once again.

159.    With the encouragement of Staley, JP Morgan knowingly and intentionally participated in the Epstein sex-trafficking venture by (among other things) providing the financial underpinnings for Epstein to have ready and reliable

access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations.

160.   JP Morgan assisted and participated in Epstein's sex-trafficking venture by knowingly enabling him to make payments to victims, including directly or indirectly Jane Doe 1, and others similarly situated, and obtain large sums of cash from his various accounts in violation of structuring laws in order to finance his well-known cash-driven sexual abuse and sex trafficking venture.

161.   JP Morgan participated in Epstein's violations of the Trafficking Victims Protection Act (TVPA) by knowingly and intentionally facilitating, assisting, and enabling Epstein's illegal sexual abuse and sex-trafficking venture, including in particular his coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

162.   JP Morgan's conduct knowingly and intentionally violated the TVPA, which forbids benefiting financially by participating in a sex trafficking venture knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, abuse of process, and combination of those means have been used to cause young women and girls to engage in commercial sex acts.

163.   Ultimately, JP Morgan financially benefitted by earning millions of dollars for its participation in the Epstein sex-trafficking venture.

164.    Throughout its relationship with Epstein, JP Morgan violated numerous regulations in order to continue its lucrative venture facilitating the Epstein sexual abuse and sex trafficking scheme.

165.    It was later revealed that Staley and Epstein exchanged more than 1,200 emails between 2008 and the end of Staley's tenure at JP Morgan, which speaks volumes to the close personal and business relationship that the two shared.

166.    Due to the extensive publicity about Jeffrey Epstein's illegal sexual activities, and the departure of Staley from JP Morgan, the bank finally severed ties with Epstein in 2013.

167.    After losing Staley, Epstein no longer had his primary protector at JP Morgan. In order to continue to operate, Epstein would need to find a new bank.

168.    Fortunately for Epstein, former JP Morgan banker, Paul Morris, joined Deutsche Bank in November 2012. Soon after joining Deutsche Bank, Morris suggested to senior management that Epstein was a potential client who could generate millions of dollars of revenue as well as leads for other lucrative clients to Deutsche Bank. Morris and Epstein began discussions in the spring of 2013 about a potential relationship between Deutsche Bank and Epstein.

169.    Shortly thereafter, Morris on-boarded Epstein's accounts to Deutsche Bank and instantly Epstein had a new bank willing to circumvent banking laws to make profits from Epstein's widely known sex trafficking venture.

170.    JP Morgan enabled Epstein to have ready and reliable access to resources—including cash—to recruit, solicit, entice, harbor, obtain, provide, and transport young women and girls (including the plaintiffs bringing this action) to cause them to engage in commercial sex acts and to sexually abuse them.

171.    Deutsche Bank then took over exactly where JP Morgan left off, with the complete acquired knowledge of Epstein's history of sexual abuse and his sex trafficking operation.

## 2. Banking Regulations Exist to Help Prevent Funding of Criminal Ventures.

172.    The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York state law requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

173.    All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

174.    In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions'

facilities.

175.     As part of preventing criminal activity, Know Your Customer
("KYC") and customer due diligence are critically important, and financial
institutions must collect customer information at the time of establishing new
relationships with clients, including as necessary to assess the risks associated with
the client. To properly consider these risks, financial institutions must consider
relevant factors such as the nature of the client's business, the purpose of the client's
accounts, and the nature and duration of the relationship.

176.     Financial institutions must also conduct KYC reviews for each client
relationship at intervals commensurate to the AML risks posed by the client,
including reviewing account activity to determine whether such activity fits with
what would have been expected given the nature of the account. Each client's AML
risk should also be re-assessed if material new information or unexpected account
activity is identified.

177.     Financial institutions must also establish criteria for determining
when a client relationship poses too high of a risk and therefore must be terminated.
A financial institution may be liable under applicable laws if it maintains such a
relationship despite repeated indications of facilitation of improper transactions.

**3.  JP Morgan's Knowledge about the Epstein Venture.**

178.     JP Morgan failed in various respects to meet its Know Your Customer

and other obligations fully with respect to its relationship with Jeffrey Epstein and entities related to Epstein.

179.     JP Morgan was aware that Epstein was a wealthy man with hundreds of millions of dollars in assets and an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires.

180.     JP Morgan was aware that Epstein also had a well-publicized reputation for sexually trafficking and abusing young women. Allegations against him began appearing in the press as early as March 2005, with the accusation that he paid a 14-year-old girl for a "massage."

181.     That year, the Palm Beach (Florida) Police Department began an investigation into allegations against Epstein related to his sexual abuse in Palm Beach. The investigation quickly uncovered dozens of other Epstein sex abuse victims. The investigation also identified the Epstein sex-trafficking venture, which included a number of individuals who were responsible for recruiting young women to come to Epstein's Palm Beach mansion to give "massages" or otherwise furthering his abuse.

182.     In 2006, the State Attorney handling the case, after meeting privately with an attorney representing Epstein, referred the case to a state grand jury instead of charging Epstein and his co-conspirators for crimes for which local police believed there was abundant evidence. As a result, the Palm Beach Police Chief

publicly denounced the State Attorney and referred the case to the Federal Bureau of Investigation, which subsequently opened its own investigation and interviewed potential witnesses and victims.

183.    In September 2007, Epstein agreed to plead guilty to two "prostitution" charges in state court, including the solicitation of a minor to engage in prostitution, in exchange for a federal non-prosecution agreement (NPA) providing him and his co-conspirators (including Lesley Groff, Sarah Kellen, Adriana Ross, and Nadia Marcinkova) with immunity from federal prosecution for extensive federal sex-trafficking charges in Florida. The deal included an 18-month sentence and Epstein was also required to register as a sex offender upon his release. Epstein ultimately served only 13 months of his 18-month sentence in the Palm Beach County jail and was allowed work release privileges that enabled him to leave jail six days a week for twelve hours a day.

184.    In the summer of 2008, Epstein's non-prosecution agreement (NPA) with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the NPA by two of his victims. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including charges that Epstein conspired to use a means of interstate commerce to induce minors to engage in prostitution, to engage in illicit sexual conduct with minors, conspiring with others to do the same, and

trafficking minors. That agreement also noted that the United States had compiled "a list of individuals whom it [had] identified as victims," and that Epstein would pay for legal representation for these alleged victims.

185.   Court proceedings involving the challenge to Epstein's NPA continued between 2008 and 2013 (and beyond) and attracted significant media attention.

186.   Indeed, between 2005 and 2013, press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Sarah Kellen, and Nadia Marcinkova.

187.   Some articles reported that Lesley Groff and Sarah Kellen had invoked their Fifth Amendment right against self-incrimination, and others reported that Nadia Marcinkova had allegedly recruited underage girls to give Epstein "massages."

188.   Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

189.   At all times material hereto, JP Morgan was aware of the foregoing information and more about Epstein's sex trafficking activities.

190.    It is well known—and JP Morgan did know—that a large number of cash transactions by a customer can be an indicator of criminal activity generally and sex trafficking in particular.

191.    Payments to victims of sex trafficking are often made in cash to avoid leaving a "paper trail" for law enforcement or other investigators to follow

192.    Forced sexual exploitation of victims has been estimated to generate approximately $100 billion in yearly illicit profits, according to a recent study (2018) by the Financial Action Task Force entitled "Financial Flows from Human Trafficking."

193.    Given the illegal nature of sex trafficking, individuals perpetrating the crime, as well as laundering the proceeds of that crime, may be identifiable by observing financial transactions and information obtained by financial institutions in the course of conducting their customer due diligence and the behavior of offenders.

194.    Sex trafficking organizations have the need for large amounts of cash, because many illegal transactions are often necessary to keep the organization functioning. The techniques that financial institutions use to detect other criminal enterprises using their services can also be employed to detect sex trafficking. For example, sex trafficking organizations often use assets for money laundering (such as cash, real estate, cars, etc.) that other sex trafficking organizations use.

195.    Sex trafficking organizations may also make cash deposits and

withdrawals below customer identification thresholds to avoid triggering additional scrutiny or bank reporting requirements. Sex trafficking organizations may also use multiple accounts to disguise the nature of their illegal transactions, thereby "laundering" the funds involved.

196.    One indicator of sex trafficking can be media coverage of an account holder's activities relating to sex trafficking.

197.    Another indicator of sex trafficking can be recurring payments for transportation of logistics service in the late night or early morning. A similar indicator can be significant payments for transportation or logistics (car rental, taxi, and ride sharing service transactions).

198.    JP Morgan participated in Epstein's violations of the TVPA by knowingly and intentionally assisting, supporting, facilitating, and enabling Epstein's illegal conduct and sex-trafficking venture, including in particular his coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1). JP Morgan's conduct violated the TVPA, which forbids benefitting financially from participating in a venture that, in or affecting interstate or foreign commerce, has recruited, solicited, enticed, transported, harbored, provided, or obtained a person knowing, or in reckless disregard of the fact, that the person has been caused to engage in a commercial sex act by means of force, threats of force, fraud, coercion, abuse of process, or a combination of such means.

199.    JP Morgan's actions knowingly and intentionally furthered the Epstein sex-trafficking venture, including specifically Epstein's sex trafficking. For example, JP Morgan provided cash to Epstein knowing that he would use the cash to pay for commercial sex acts—including sexualized massages during which Epstein penetrated Jane Doe 1, forcing her to engage in sexual activity.

200.    JP Morgan also aided and abetted Epstein's sex-trafficking venture by (among other things) providing the financial underpinnings for the venture.

201.    JP Morgan enabled Epstein to have ready and reliable access to resources—including cash and a variety of bank accounts and other financial tools—to recruit, entice, solicit, harbor, provide, obtain, and transport young women and girls to cause them to engage in commercial sex acts.

202.    JP Morgan knowingly and intentionally benefitted financially and in other ways from its participation in Epstein's sex-trafficking venture with knowledge, or with reckless disregard to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls into engaging in commercial sex acts.

203.    As recounted throughout this complaint, JP Morgan financially benefitted by earning millions of dollars from its participation in the Epstein-sex-trafficking venture. The benefits that JP Morgan received came directly from its participation in the sex-trafficking venture and because of its participation in that

47

venture. In other words, there was a causal relationship between JP Morgan's conduct furthering Epstein's sex-trafficking venture and its receipt of the financial benefits with actual (and constructive) knowledge of that causal relationship.

204.    JP Morgan knowingly and intentionally financed Epstein's illegal sex-trafficking venture. JP Morgan knew that if it did not finance Epstein's illegal sex-trafficking venture, then it would lose valuable Epstein-related accounts. Faced with the choice between profiting from Epstein's sex-trafficking venture or following the law, JP Morgan chose to profit.

205.    In violation of various banking laws and regulations, including various "Know Your Customer" laws, JP Morgan regularly authorized cash withdrawals and deposits for the Epstein sex-trafficking venture, which allowed Epstein, his co-conspirators, and those they directed to conduct the business of the sex-trafficking venture.

206.    JP Morgan's knowing and intentional banking law violations allowed Epstein and his various corporations to stay "under the radar" and continue the sex trafficking operation without close scrutiny or interference.

207.    JP Morgan knowingly and intentionally benefited financially from Epstein's sex-trafficking venture. By facilitating and financing Epstein's commercial sex acts in interstate and foreign commerce, JP Morgan earned interest, commissions, service fees, and other financial benefits directly from its connection

with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to JP Morgan precisely because it was facilitating his sex-trafficking venture—and JP Morgan knew that was the reason that Epstein was providing them with those financial benefits.

208.   JP Morgan benefitted by receiving things of value from its participation in the Epstein sex-trafficking venture. Among the various things of value it received were (1) connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the opportunity to earn financial benefits from the funds that had been deposited with it. JP Morgan knowingly and intentionally received these things of value as a direct result of its participation in the Epstein sex-trafficking venture and because it was furthering Epstein's sex-trafficking venture.

209.   Among the women and girls whose sex trafficking and sex abuse JP Morgan furthered was Jane Doe 1.

## 4. Epstein Uses JP Morgan Accounts for the Sex-Trafficking Venture.

210.   Over the course of the relationship, Epstein and his representatives used JP Morgan accounts to send dozens of wires, directly and indirectly, to co-conspirators in the sex-trafficking venture.

211.   JP Morgan was aware that the recipients of some of these wire

transfers described in the previous paragraph were to Epstein's co-conspirators and that the wire transfers were in furtherance of the Epstein sex-trafficking venture.

212.    Epstein used JP Morgan accounts to pay for coerced commercial sex acts by Jane Doe 1.

213.    Given JP Morgan's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims to engage in commercial sex acts.

214.    In addition to actual knowledge that it was facilitating the Epstein sex-trafficking venture, JP Morgan benefitted financially by participating in a venture that it should have known had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a).

215.    If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. JP Morgan knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

216.    The Bank was well aware not only that Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public

allegations that his conduct was facilitated by several named co-conspirators.

217.    Despite this knowledge, the Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Epstein was using hundreds of thousands of dollars per year in cash.

218.    Hush money, financial compensation to recruiters, and compensation to victims was integral to Epstein's scheme, without which his sex trafficking operation could not exist.  The ability to obtain exorbitant amounts of money, send wires to young females, and obtain unlimited cash was critical to Epstein's operation.

219.    Suspicious wire transfers and withdrawals of millions of dollars in cash are basic hallmarks of any major criminal enterprise.  A bank that would allow Epstein to operate in this blatant criminal fashion was necessary for the growth of his trafficking operation and for the continued abuse of hundreds of young women.

220.    Before JP Morgan facilitated Epstein's operation without question, Epstein was able to abuse young women sporadically and in fear of being caught. JP Morgan eliminated that fear, making sure that the suspicious money trail that would unveil Epstein's operation as the criminal sexual abuse machine that it was would be covered up and not lead to his downfall.

221.    The negligence of JP Morgan is clear. The complicity, though, far

exceeded negligence, as JP Morgan acted with a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. And JP Morgan also acted outrageously and intentionally.

222.    JP Morgan knew Epstein had no college degree, no ongoing legitimate business, and was engaging in sexual abuse of females on a daily basis. JP Morgan recognized its importance to Epstein as the exclusive financial institution that was willing to allow Epstein to engage in obvious criminal financial activities to fund his sex trafficking venture. JP Morgan, acting through Staley, was a criminal co-conspirator of the operation. There came a time when the JP Morgan absolutely knew Epstein was running a sex trafficking venture.  And JP Morgan choose to remain Epstein's banking partner to receive financial benefits in exchange for ensuring the venture's continued operation.

223.    In order to make hundreds of millions of dollars off of Epstein and his contacts, JP Morgan facilitated Epstein's sex trafficking venture, which caused billions of dollars in damages from the pain and suffering of hundreds of Epstein's sexual abuse and sex trafficking victims.

224.    JP Morgan's desire to maintain its profitable relationship with Epstein led it to avoid taking steps that would have documented its involvement in Epstein's sex-trafficking venture.

### D.   The Statute of Limitations

225.     The statute of limitations under the TVPA is ten years after the cause of action arose, or ten years after the victim reaches eighteen years of age, if the victim was a minor at the time of the alleged offense. 18 U.S.C. § 1595(c)(1), (2). The TVPA causes of actions for Jane Doe 1, and the other Class Members, all arose within ten years of the filing of this complaint.

226.     The New York Adult Survivor's Act has opened up a one-year revival window for the statute of limitations.

## VI. CLASS ACTION ALLEGATIONS

227.     Plaintiff Jane Doe 1 brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were sexually trafficked by Jeffrey Epstein during the time when JP Morgan maintained bank accounts for Epstein and/or Epstein related-entities, which was in or about 2000 through in or about August 2013, both dates inclusive (the "Class Period").

228.     Plaintiff reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

229.     <u>Numerosity</u>: The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records

maintained by the Epstein estate and the Defendant, including but not limited to JP Morgan's records for Epstein-related accounts (e.g., account ledgers reflecting payments from Epstein to Class members).

230.    Typicality: Plaintiff's claims are typical of the claims of the other Class members she seeks to represent. The claims of Plaintiff and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendant's participation in and funding of the Epstein's sexual abuse and Epstein's sex-trafficking venture.

231.    Commonality: There are many questions of law and fact common to the claims of Plaintiff and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

232.    Common questions of fact and law affecting Class members include, but are not limited to, the following:

   a.    Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

   b.    Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

   c.    Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means,

to sexually abuse the victims and to cause victims to engage in commercial sex acts;

     d.    Whether JP Morgan knowingly and intentionally assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

     e.    Whether JP Morgan benefitted financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

     f.    Whether JP Morgan knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a); and

     g.    Whether JP Morgan committed negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such persons who were eighteen years of age or older.

233.    Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

234.    <u>Adequacy</u>: Jane Doe 1 will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. Jane Doe 1 has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do

so. Neither Plaintiff nor her counsel have any interests adverse to those of the other Class members.

235.    This action has been brought and may properly be maintained as a class action against Defendant pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendant's records.

236.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

a.  Joinder of all Class Members is impracticable;

b.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

c.  Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d.  Absent a class action, Class Members will continue to suffer losses and be aggrieved and Defendant will continue to violate New York and federal law without remedy;

e.  Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.  Plaintiff and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g.  The forum is desirable because the Defendant conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h.  This action presents no difficulty that would impede its management by the Court as a class action.

## VII. CAUSES OF ACTION

### COUNT I
### INTENTIONAL AND NEGLIGENT ACTS AND OMISSIONS
### UNDER THE NEW YORK ADULT SURVIVORS ACT
### NEW YORK CPLR § 214-j.

237.    Plaintiff Jane Doe 1 realleges and incorporates by paragraphs 1 - 236, as if fully set forth in this Count.

238.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members they respectively seek to represent.

239.    Pursuant to New York Civil Practice Law and Rules § 214-j, this Count for intentional and negligent acts and omissions has been timely filed, as every civil claim or cause of action brought against any party alleging intentional and

negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older was revived effective November 24, 2022.

240.    Intentional and negligent actions and omissions committed by JP Morgan within this District and elsewhere directly and proximately resulted in sexual offenses by Epstein and his co-conspirators under the laws of the State of New York (e.g., New York Penal Law Art. 130, including New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66), which injured Plaintiff Jane Doe 1 and the other Class Members.

241.    As a financial institution operating within this District and within the State of New York, JP Morgan owed legal duties to Plaintiff Jane Doe 1 and the Class Members to exercise reasonable care to monitor JP Morgan's customers (including Jeffrey Epstein) for the purpose of preventing them from facilitating and engaging in foreseeable criminal activity using the Bank's facilities that could harm the Plaintiff and the Class Members.

242.    The legal duties of JP Morgan described in the two preceding paragraphs also extended to the other Class members whom Plaintiff Jane Doe 1 seeks to represent.

243.    The legal duties of JP Morgan include, but are not limited to, following the Know Your Customer ("KYC") laws and related regulations described above.

244.    Under KYC laws, banks have special duties to inquire about possible crimes being committed by their customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who are being harmed. The regulations establish a duty of care that must be followed by banks, including JP Morgan.

245.    But for JP Morgan, Epstein could not have successfully run and expanded his sexual abuse organization. While would have wanted to sexually abuse women, he could not have abused the hundreds of victims that he did without JP Morgan.

246.    JP Morgan breached its legal duties to Plaintiff Jane Doe 1 and the Class Members by failing to discharge its legal duties to prevent Jeffrey Epstein and others from using the Bank's facilities to facilitate and commit criminal activity harming Jane Doe 1 and the Class Members. The criminal activity that harmed Plaintiff and Class Members included foreseeable federal crimes committed by the Epstein sex trafficking enterprise described above, as well as the state sex offense crimes.

247.    As a direct and proximate result of the breach of legal duties by JP

Morgan, Plaintiff Jane Doe 1 and the Class Members repeatedly suffered foreseeable injuries from Epstein and his co-conspirators, including federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries. The breaches of legal duties were the direct—i.e., the but-for-cause—of these injuries. Without JP Morgan's breaches of its legal duties, those injuries would not have occurred.

248.    The breaches of legal duties were the direct—i.e., the but-for—cause of these injuries. Without Defendant's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to JP Morgan.

249.    The injuries that Plaintiff Jane Doe 1 and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present in this District. These injuries are permanent in nature and Jane Doe 1 and the other class members will continue to suffer these losses in the future.

250.    The injuries that Plaintiff Jane Doe 1 and the Class Members suffered included injuries directly and proximately suffered as a result of sex offenses committed by Epstein and other co-conspirators and criminalized under article 130 of the New York Penal Laws. The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20. The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50,

130.52, and 130.66.

251.    The breaches of legal duties by JP Morgan proximately caused Plaintiff Jane Doe 1 and the Class Members to repeatedly suffer injuries from Epstein and his co-conspirators, including sexual assaults and resulting emotional distress, mental pain and suffering, and other physical and psychological trauma. These injuries were easily foreseeable, because JP Morgan knew, and acted in reckless disregard of the fact, that their actions and omissions supporting and facilitating Epstein would lead to (among other crimes) sex offenses by Epstein and his co-conspirators forbidden by article 130 of New York Penal Law against his victims, including Jane Doe 1 and the Class Members.

252.    In the exercise of reasonable care, JP Morgan and its employees knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximately harm that would be caused by his likely sexual crimes and various violations of article 130 of New York Penal Law.

253.    JP Morgan could reasonably foresee that its actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to sex offenses against Jane Doe 1 and the Class Members. Among other things, the Defendant was specifically aware that Epstein had previously been prosecuted for similar sex crimes and previously paid numerous civil settlements associated with similar sex crimes. Indeed, Defendant was aware, and should have been aware, that Epstein was a high

risk to commit sex offenses against young women and girls.

254.   Plaintiff Jane Doe 1 and the Class Members were easily within the zone of foreseeable harm from JP Morgan's intentional and negligent acts and omissions. JP Morgan's intentional and negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe 1 and the Class Members fell within that zone.

255.   The sex offenses Jeffrey Epstein committed against Jane Doe 1 and the Class Members were easily within the zone of foreseeable risks that the JP Morgan created with its intentionally and negligent actions and omissions. Those actions and omissions foreseeably risked further sex crimes by Jeffrey Epstein and his co-conspirators—which is exactly and tragically the harm that he inflicted on Jane Doe 1 and the Class Members.

256.   While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendant's tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendant's tortious conduct was directed specifically at Jane Doe 1

and the Class Members, who were the victims of Epstein's sexual abuse and sex trafficking organization.

257.    As a result of the intentional and negligent actions and omissions described in this Count, Plaintiff Jane Doe 1 and the Class Members have sustained both general and specifical damages in substantial amounts.

258.    By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendant is liable to Jane Doe 1 and other members of the class for punitive damages.

## COUNT II
## PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

259.    Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 236, as if fully set forth in this Count.

260.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members she seeks to represent.

261.    JP Morgan knowingly and intentionally participated in, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

262.    JP Morgan knowingly and intentionally benefited financially from, and

received value for, its participation in the sex-trafficking venture, in which Epstein, with JP Morgan's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to sexually abuse Jane Doe 1, as well as other Class members, and cause Jane Doe 1, as well as other Class members, to engage in commercial sex acts. Some of Epstein's victims were under the age of 18.

263.   Among the financial benefits that JP Morgan received for participating in and facilitating Epstein's sex-trafficking venture were the deposit of funds that Epstein and Epstein-controlled entities made to JP Morgan. JP Morgan profited from the use of these deposits. Epstein and Epstein-controlled entities deposited these funds in exchange for JP Morgan's facilitation and participation in the sex trafficking venture.

264.   Among the financial benefits that the Defendant received for participating in Epstein's sex-trafficking venture was referral of business opportunities from Epstein and his co-conspirators. JP Morgan profited from these referred business opportunities. Epstein referred business entities and business opportunities to JP Morgan in exchange for its facilitation and participation in the sex trafficking venture.

265.   JP Morgan financially profited from the deposits made by Epstein and Epstein-controlled entities and from the business opportunities referred to JP

Morgan by Epstein in exchange for its facilitation and participation in Epstein's sex trafficking venture.

266.   JP Morgan knew, and recklessly disregarded the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

267.   JP Morgan and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe 1 as well as other members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

268.   Despite such knowledge, JP Morgan intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendant knew, and was in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe 1, as well as other members of the Class, to engage in commercial sex acts.

269.   JP Morgan, through its employees and agents, actively participated in the sex trafficking conspiracy and led Jane Doe 1, as well as other members of the Class, to believe that they would be rewarded if they cooperated and acquiesced to

Epstein's demands.

270.   JP Morgan's affirmative conduct was committed knowing, or in reckless disregard of the facts, that Epstein would use cash and financial supported provided by JP Morgan as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other members of the Class. Defendant's conduct was outrageous and intentional.

271.   In addition to actual knowledge that they were participating in and facilitating the Epstein sex-trafficking venture, JP Morgan also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

272.   In exchange for facilitating and covering up Epstein's commercial sex trafficking, JP Morgan's employees advanced in their careers at JP Morgan and received financial benefits there from.

273.   Facilitating and covering up Epstein's sexual misconduct was a means of obtaining economic success and promotion within the JP Morgan hierarchy.

274.   JP Morgan's knowing and intentional conduct has caused Jane Doe 1 and the other members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

275.   JP Morgan's knowing and intentional conduct has caused Jane Doe 1 and the other members of the Class harm that is sufficiently serious, under all the

surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

276.   This case does not involve mere fraud. Instead, JP Morgan's tortious conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. JP Morgan's tortious conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. JP Morgan's tortious conduct was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

277.   By virtue of these violations knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, JP Morgan is liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

278.   By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, JP Morgan is liable to Jane Doe 1 and other members of the class for punitive damages.

## COUNT III
## CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c),1595

279.   Plaintiff Jane Doe 1 realleges and incorporates by reference

paragraphs 1 – 236, as if fully set forth in this Count.

280.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members she respectively seeks to represent.

281.    JP Morgan intentionally conspired with others, by agreement and understanding, to violate 18 U.S.C. § 1591(a), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class members, all in violation of 18 U.S.C. § 1594(c). JP Morgan employees conspired with Epstein himself to further the sex trafficking venture.

282.    JP Morgan conspired with Epstein and his co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking.

283.    JP Morgan intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing Jane Doe 1 and other Class members to engage in commercial sex acts, through providing financial support for the Epstein sex-trafficking venture.

284.    Among the many overt acts intentionally committed by JP Morgan in furtherance of the sex-trafficking venture were creating and maintaining a financial relationship between JP Morgan and Epstein within this District.

285.     It was part of the conspiracy that JP Morgan would financially benefit from providing financial support for the Epstein sex-trafficking venture. JP Morgan did financially benefit from its participation in the venture, including receiving valuable deposits from Epstein and Epstein-related entities into JP Morgan.

286.     JP Morgan's participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, JP Morgan intentionally and willfully caused Epstein's commission of the commercial sex acts with Jane Doe 1 and other Class members through its affirmative and overt acts supporting Epstein.

287.     JP Morgan knew, or acted in reckless disregard of the fact, that its acts and conduct supporting and facilitating Epstein would lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class members.

288.     JP Morgan conspired with Epstein through their affirmative acts and provided substantial support to Epstein committing commercial sex acts upon Jane Doe 1 and other Class members.

289.     In addition to acting with knowledge that they were supporting the Epstein sex-trafficking venture, JP Morgan benefitted financially from participating in the Epstein sex-trafficking venture which JP Morgan also should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

290.     Defendant's conduct has caused Jane Doe 1 and other Class members

serious harm, including, without limitation, physical, psychological, financial, and reputational harm.

291.     Defendant's conduct has caused Jane Doe 1 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

292.     This case does not involve mere fraud. Instead, Defendant's tortious conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendant's tortious conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendant's tortious conspiracy was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sex trafficking organization.

293.     By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, Defendant is liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

294.     By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendant is liable to Jane Doe 1 and other members of the class for punitive damages.

## <u>COUNT IV</u>
**ATTEMPT TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(a), 1595**

295.    Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 - 236, as if fully set forth in this Count.

296.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members she respectively seeks to represent.

297.    JP Morgan intentionally attempted to violate 18 U.S.C. § 1591(a), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class members, all in violation of 18 U.S.C. § 1594(a).

298.    JP Morgan employees deliberately took substantial steps to attempt to violate 18 U.S.C. § 1591(a) within this District.

299.    JP Morgan deliberately took substantial steps toward attempting to violate 18 U.S.C. § 1591(a) providing financial support for the Epstein sex-trafficking venture.

300.    Among the many substantial steps taken by JP Morgan to deliberately attempt to violate 18 U.S.C. § 1591(a) were creating a financial relationship between JP Morgan and Epstein within this District.

301.    It was part of the attempt to violate 18 U.S.C. 1591(a) that JP Morgan would financially benefit from providing financial support for the Epstein sex-trafficking venture. JP Morgan did financially benefit from its participation in the

71

venture, including receiving valuable deposits from Epstein and Epstein-related entities into JP Morgan.

302.    Defendant's attempt to violate the TVPA by furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendant's intentionally and willfully caused Epstein's commission of sexual abuse and commercial sex acts with Jane Doe 1 and other Class members through its affirmative and overt acts supporting Epstein.

303.    Defendant knew and acted in reckless disregard of the fact, that its acts and conduct supporting and facilitating Epstein would lead to sexual abuse and unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class members.

304.    In addition to acting intentionally and with knowledge that they were supporting the Epstein sex-trafficking venture, Defendant benefitted financially from participating in the Epstein sex-trafficking venture which Defendant should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

305.    This case does not involve mere fraud. Instead, Defendant's tortious conduct in attempting to violate the TVPA was outrageous and intentional, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendant's tortious attempts also evinced a

high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendant's tortious attempt was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sex trafficking organization.

306.    Defendant's conduct has caused Jane Doe 1 and other Class members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.

307.    By virtue of these violations of 18 U.S.C. §§ 1594(a), 1595(a), Defendant is liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

308.    By virtue of its intentional and outrageous attempt to violate 18 U.S.C. §§ 1594(a), 1595, Defendant is liable to Jane Doe 1 and other members of the class for punitive damages.

## VIII. REQUEST FOR RELIEF

Jane Doe 1 respectfully requests that the Court enter judgment in her favor, and against JP Morgan, as follows:

a.  That the Court certify the Class, name Jane Doe 1 as Class Representative, and appoint her lawyers as Class Counsel;

b.  That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages

73

against Defendant in an amount to be determined at trial;

c.   That the Court award punitive and exemplary damages against Defendant

in an amount to be determined at trial;

d.   That the Court award to Plaintiff the costs and disbursements of the

action, along with reasonable attorneys' fees, costs, and expenses;

e.   That the Court award pre- and post-judgment interest at the maximum

legal rate; and

f.   That the Court grant all such other and further relief as it deems just and

proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  November 24, 2022

Respectfully Submitted,
EDWARDS POTTINGER, LLC

By:  */s/ Bradley Edwards*
Bradley J. Edwards
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954)-524-2820
Fax: (954)-524-2822
Email: brad@epllc.com

EDWARDS POTTINGER
Brittany N. Henderson
1501 Broadway
Floor 12
New York, NY

74

(954)-524-2820
Fax : (954)-524-2820
Email : brittany@epllc.com

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
E-mail: dboies@bsfllp.com

Sigrid McCawley
*Pro Hac Vice*
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: smccawley@bsfllp.com