**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE 1, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK AG NEW YORK BRANCH, AND DEUTSCHE BANK TRUST COMPANY AMERICAS, <br><br> Defendants. | Case No. 22-cv-10018 (JSR) |
| JANE DOE 1, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> JP MORGAN CHASE & CO., <br><br> Defendant. | Case No. 22-cv-10019 (JSR) |

**JPMORGAN CHASE & CO.'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS[1]**

---

[1] Pending before the Court at ECF No. 29 is a Proposed Stipulation and Order to substitute the party JPMorgan Chase & Co. with JPMorgan Chase Bank, N.A.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .........................................................................................................................1

ARGUMENT ...............................................................................................................................3

I.      The Complaint Does Not State A Claim Against JPMC That Has Been Revived By
        The New York Adult Survivors Act (Count I) ...............................................................3

        A.      JPMC Did Not Owe Plaintiff A Duty To Protect Her From Its Customers ...........3

        B.      No Intentional Or Negligent Act Or Omission By JPMC Proximately
                Caused The Harms That Epstein Inflicted On Plaintiff...........................................6

II.     The Complaint Does Not Plead A TVPA Claim Against JPMC ........................................8

        A.      The Complaint Does Not State A Claim For Beneficiary Liability For
                A Violation Of §1591(a) (Count II).........................................................................9

                1.      The Complaint does not plead facts sufficient to show that JPMC
                        participated in Epstein's sex-trafficking venture .......................................10

                2.      The Complaint does not plead facts sufficient to show that
                        JPMC knew that Plaintiff or any specific person was trafficked
                        by means of force, fraud, or coercion ........................................................14

                3.      The Complaint does not plead facts sufficient to show that any
                        benefit to JPMC arose from the sex-trafficking venture............................16

        B.      The Complaint Does Not State A Beneficiary Liability Claim For
                Attempt (Count IV) Or Conspiracy (Count III)......................................................18

                1.      Section 1595's civil cause of action does not apply to attempt or
                        conspiracy to knowingly benefit from a sex-trafficking venture...............18

                2.      The Complaint fails to plead attempt (Count IV) ......................................20

                3.      The Complaint fails to plead conspiracy (Count III)................................21

III.    Plaintiff's TVPA Claims Are Time-Barred ........................................................................25

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.B. v. Hilton Worldwide Holdings Inc.*,
  484 F. Supp. 3d 921 (D. Or. 2020) .......................................................................................14

*A.B. v. Marriott Int'l, Inc.*,
  455 F. Supp. 3d 171 (E.D. Pa. 2020) ...................................................................................13

*A.D. v. Wyndham Hotels & Resorts, Inc.*,
  2020 WL 8674205 (E.D. Va. July 22, 2020)....................................................................19, 20

*Aiken v. Interglobal Mergers & Acquisitions*,
  2006 WL 1878323 (S.D.N.Y. July 5, 2006) ...........................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................1

*Canosa v. Ziff*,
  2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ...................................... 10-11, 15, 17, 18

*David v. Weinstein Co. LLC*,
  431 F. Supp. 3d 290 (S.D.N.Y. 2019)......................................................................................3

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)...................................................................................................12

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ...................................................................9, 10, 13, 14, 17, 20

*Doe v. Fitzgerald*,
  2022 WL 2784805 (C.D. Cal. May 13, 2022) ........................................................................19

*Fleites v. MindGeek S.A.R.L.*,
  2022 WL 4456077 (C.D. Cal. July 29, 2022)....................................................................14, 24

*G.G. v. Salesforce.com, Inc.*,
  2022 WL 1541408 (N.D. Ill. May 16, 2022).................................................10, 11, 12, 14, 15

*Geiss v. Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019)................................................10, 13, 16, 17, 18, 19, 20

*Giuffre v. Andrew*,
  579 F. Supp. 3d 429 (S.D.N.Y. 2022)......................................................................................3

*H.H. v. G6 Hosp., LLC*,
  2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ........................................................................15

*Hain v. Jamison*,
    68 N.E.3d 1233 (N.Y. 2016)................................................................................6, 7

*In re Agape Litig.*,
    681 F. Supp. 2d 352 (E.D.N.Y. 2010) .................................................................5, 6

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) ..............7

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013)............................................................................4, 7, 8

*In re Terrorist Attacks on Sept. 11, 2001*,
    740 F. Supp. 2d 494 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 118 (2d Cir. 2013) .............8

*Kelly v. Chase Manhattan Bank*,
    717 F. Supp. 227 (S.D.N.Y. 1989)........................................................................4

*Lauer v. City of New York*,
    733 N.E.2d 184 (N.Y. 2000)..................................................................................3

*Lawson v. Rubin*,
    2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018) ......................................................13

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)...........................................................................4, 7, 8

*Linde v. Arab Bank PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y 2005) ...............................................................7, 8

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ...............................................................15

*Marlin v. Moody Nat'l Bank, N.A.*,
    2006 WL 2382325 (S.D. Tex. Aug. 16, 2006), *aff'd*, 248 F. App'x 534 (5th Cir. 2007)..........6

*Mizrahi v. Gonzales*,
    492 F.3d 156 (2d Cir. 2007)................................................................................20

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)............................................................10, 13

*Pincover v. J.P. Morgan Chase Bank, N.A.*,
    592 F. Supp. 3d 212 (S.D.N.Y. 2022)...............................................................4, 5

*Ratha v. Phatthana Seafood Co.*,
    35 F.4th 1159 (9th Cir. 2022), *cert. denied*, 2022 WL 17408202 (U.S. Dec. 5, 2022) ..........19

*Rothstein v. UBS AG*,
    647 F. Supp. 2d 292 (S.D.N.Y. 2009), *aff'd*, 708 F.3d 82 (2d Cir. 2013) ............................... 8

*S.J. v. Choice Hotels Int'l, Inc.*,
    473 F. Supp. 3d 147 (E.D.N.Y. 2020) ...................................................................... 13, 14, 16

*Silverman Partners, L.P. v. First Bank*,
    687 F. Supp. 2d 269 (E.D.N.Y. 2010) ............................................................................ 5, 6

*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*,
    56 Cal. Rptr. 2d 756 (Ct. App. 1996) ................................................................................. 5

*Tzaras v. Evergreen Int'l Spot Trading, Inc.*,
    2003 WL 470611 (S.D.N.Y. Feb. 25, 2003) ....................................................................... 5

*United States v. Anderson*,
    747 F.3d 51 (2d Cir. 2014) ...................................................................................... 21, 22

*United States v. Espinoza-Valdez*,
    889 F.3d 654 (9th Cir. 2018) ......................................................................................... 23

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011) ............................................................................... 18, 20, 21

*United States v. Gibbs*,
    190 F.3d 188 (3d Cir.1999) ............................................................................................ 22

*United States v. Maxwell*,
    No. 1:20-CR-00330-AJN (S.D.N.Y. Aug. 10, 2022), ECF 751 ............................................ 12

*United States v. Smith*,
    294 F.3d 473 (3d Cir. 2002) ...................................................................................... 22, 24

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003) ...................................................................................... 19, 21

*United States v. Torres*,
    604 F.3d 58 (2d Cir. 2010) ............................................................................................ 21

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ................................................................................ 22

*United States v. Wesley*,
    417 F.3d 612 (6th Cir. 2005) ......................................................................................... 21

## STATUTES

18 U.S.C. § 1591 ................................................................................................................... 9

18 U.S.C. § 1594..............................................................................................................9

18 U.S.C. § 1595.......................................................................................................... *passim*

Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311, et seq..................................................6

Child Victims Act, N.Y. C.P.L.R. § 214-g ...................................................................3

New York Adult Survivors Act, N.Y. C.P.L.R. § 214-j ............................................1, 3

Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1591-95, et seq. ................... *passim*

## OTHER AUTHORITIES

Brown, *How a Future Trump Cabinet Member Gave a Serial Sex Abuser the Deal of a Lifetime*, Miami Herald (Nov. 28, 2018), https://web.archive.org/web/20181128153832/https://www.miamiherald.com/news/local/article220097825.html.............................................................................................. 1-2

de la Merced & Goldstein, *James Staley, Barclays C.E.O., Steps Down After A Jeffrey Epstein Inquiry*, N.Y. Times (Nov. 1, 2021), https://www.nytimes.com/2021/10/24/business/james-staley-barclays-jeffrey-epstein.html...............................................................................5

Dep't of Just., *Executive Summary of Report: Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of its 2006-2008 Federal Criminal Investigation of Jeffrey Epstein and its Interactions with Victims during the Investigation* (Nov. 2020), https://www.justice.gov/opa/press-release/file/1336416/download .........................................2

## PRELIMINARY STATEMENT

In November 2018—five years after JPMorgan Chase & Co. (JPMC) decided to sever its banking relationship with Jeffrey Epstein—a bombshell *Miami Herald* report exposed the shocking details of his sex trafficking. Jane Doe 1 is a survivor of Epstein's sexual abuse, and she is entitled to justice—especially after Epstein's death, before his trial on sex-trafficking charges, deprived her of the chance to see him face criminal consequences. But this lawsuit against JPMC is directed at the wrong party, is legally meritless, and should be dismissed.

As to Plaintiff's claim under the New York Adult Survivors Act, black-letter New York law holds that a bank owes non-customers like Plaintiff no duty to protect them from its customers' wrongful acts. Nor can Plaintiff plausibly allege that her injuries directly resulted from JPMC's conduct rather than Epstein's crimes against her. Plaintiff's claims under the Trafficking Victims Protection Act (TVPA) fail because JPMC did not participate in Epstein's sex-trafficking venture, did not knowingly receive benefits from any alleged participation, and did not have actual or constructive knowledge that this venture criminally trafficked Plaintiff. Similarly, Plaintiff's claims based on an alleged attempt to benefit, or conspire to benefit, from a sex-trafficking venture fail because there are no such causes of actions under the TVPA and, in any event, JPMC did not attempt or conspire to knowingly benefit from Epstein's sex-trafficking venture. Finally, Plaintiff's TVPA claims are barred by the ten-year statute of limitations. The Complaint should be dismissed.

## BACKGROUND[2]

The November 2018 *Miami Herald* report exposed the shocking details of Epstein's

---

[2] For purposes of this motion, JPMC accepts the Complaint's factual allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), including those concerning Epstein's abuse of Jane Doe, Epstein's other sexual misconduct, and JPMC's alleged involvement.

criminal operation, *see* Brown, *How a Future Trump Cabinet Member Gave a Serial Sex Abuser the Deal of a Lifetime*, Miami Herald (Nov. 28, 2018), and led to intense public scrutiny that would culminate in his July 2019 arrest, *see* Dep't of Just., *Executive Summary of Report: Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of its 2006-2008 Federal Criminal Investigation of Jeffrey Epstein and its Interactions with Victims during the Investigation* at iii-iv (Nov. 2020); Compl. ¶¶ 82-83. Epstein's arrest came roughly six years after JPMC decided to terminate its banking relationship with Epstein in 2013. Compl. ¶ 166. The Complaint seeks to hold JPMC liable based on alleged acts and omissions by JPMC that occurred earlier still, beginning when Plaintiff met Epstein in 2006. *See id.* ¶ 87.

According to the Complaint, before JPMC decided to terminate its relationship with Epstein in 2013, Epstein used JPMC accounts to make wire transfers and withdraw cash to further his sex-trafficking venture. Compl. ¶¶ 106, 111, 114, 120, 121, 127, 129, 201, 205, 218, 219, 220. The only connection alleged between JPMC and Plaintiff is that Epstein paid her with "large sums of cash" from his JPMC accounts. *Id.* ¶¶ 101, 104, 160, 212. The Complaint alleges that in permitting Epstein to make large withdrawals and transfers typical of high net-worth accounts, the bank ignored "red flags" of his illicit conduct, *id.* ¶¶ 106, 111, 131, and "knowingly and intentionally participated" in his sex-trafficking venture, *id.* ¶ 107.

The Complaint offers no specific factual allegations to support the implausible inference that JPMC knew Epstein's "virtually unlimited wealth," Compl. ¶ 26, was tied up in sex trafficking, or that the numerous "business entities" that Epstein oversaw, each with their own respective staffs, *id.* ¶ 99, were somehow all fronts for sex trafficking. Not only is the allegation that "none of [Epstein's] companies … had any legitimate business structure or purpose" a vague and unsupported legal conclusion, but it is also implausible on the face of the Complaint, which

alleges that Epstein's wealth came from legitimate sources, including managing the funds of billionaire Les Wexner.  Compl. ¶¶ 110, 153.  In fact, the Complaint itself disproves its conclusory allegation that Epstein "had no documented expertise that would provide the requisite skill or knowledge to amass his vast wealth" by alleging that, following his 2008 incarceration, Epstein used "professionals on his payroll to help him conceal his illegal activity and give him ostensible cover as a well-connected money manager."  *Id.* ¶¶ 52, 153.

## ARGUMENT

I.    **THE COMPLAINT DOES NOT STATE A CLAIM AGAINST JPMC THAT HAS BEEN REVIVED BY THE NEW YORK ADULT SURVIVORS ACT (COUNT I)**

The Complaint labels Count I as a claim "under the New York Adult Survivors Act," N.Y. C.P.L.R. § 214-j, but that statute does not provide a cause of action.  *See Giuffre v. Andrew*, 579 F. Supp. 3d 429, 451 (S.D.N.Y. 2022) (under Child Victims Act).  Rather, Section 214-j is a revival statute that revives otherwise time-barred tort claims for injuries resulting from sexual offenses.  N.Y. C.P.L.R. § 214-j.  Count I identifies no such claim and should be dismissed.

To the extent the Complaint can be read to assert a negligence claim, it does not plead one.  A negligence claim must plead "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."  *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 305 (S.D.N.Y. 2019).  But the Complaint fails to allege the existence of a legal duty that JPMC owed to Plaintiff or that a breach of any such duty proximately caused Plaintiff's injuries.  Accordingly, the Court should dismiss Count I.

### A.    JPMC Did Not Owe Plaintiff A Duty To Protect Her From Its Customers

The Complaint's allegations "do not establish the threshold element of duty."  431 F. Supp. 3d at 305; *Lauer v. City of New York*, 733 N.E.2d 184, 187 (N.Y. 2000).  The Second Circuit has long recognized that "'banks and other financial institutions do not owe non-

customers a duty to protect them from the intentional torts of their customers.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 126 (2d Cir. 2013) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006)) (cleaned up).  Consistent with that settled law, courts routinely dismiss negligence claims against banks for lack of duty owed to third parties.  *E.g.*, *Pincover v. J.P. Morgan Chase Bank, N.A.*, 592 F. Supp. 3d 212, 228 (S.D.N.Y. 2022).[3]

Plaintiff's negligence claim fails under this black-letter rule, and the Complaint's allegations that JPMC overlooked "red flags" associated with Epstein's accounts, *e.g.*, Compl. ¶ 106, do not support a departure.  First, banks do not owe a duty to non-customers to investigate and address alleged red flags, even when the account has dishonored transactions and suspicious transfers.  *Lerner* explains why.  There, the Second Circuit considered negligence allegations brought by investors against banks that failed to act on "red flags."  459 F.3d at 277, 294.  It concluded that the banks owed no legal duty to non-customers to protect them from the torts of customers, even with allegations that the banks failed to address overdrafts, dishonored checks, and suspicious transfers in the customer's accounts.  *Id.* at 294.  Permitting third parties to bring negligence claims would "unreasonably expand banks' orbit of duty."  *Id.* at 286 (omitting internal quotation marks and citation).

Second, whether considered individually or together, none of the alleged "red flags" imposed a duty on JPMC by alerting it to the fact that Epstein's accounts were being used to facilitate Plaintiff's sex-trafficking, even if they were relevant to any duty JPMC could owe to Plaintiff—which they are not.  The Complaint asserts that JPMC neglected two types of "red flags" related to Epstein's account activity:  large wire transfers and large cash withdrawals.  *See*

---

[3] Nor does the Complaint establish the "unique facts where a special duty is owed" to plead negligent infliction of emotional distress.  *Kelly v. Chase Manhattan Bank*, 717 F. Supp. 227, 235 (S.D.N.Y. 1989).

Compl. ¶¶ 106, 111, 131.[4]  But "[a]ccount activity, whether in large sums or small, whether frequent or infrequent, is the nature of the beast—far from being suspicious, it is expected, routine behavior."  *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756, 763 (Ct. App. 1996).  Large-scale, facially innocuous transactions are commonplace in the accounts of customers who have access to "vast wealth," Compl. ¶ 45, and courts routinely hold that allegedly suspicious account activity does not somehow give rise to a duty to non-customers.  *See Pincover*, 592 F. Supp. 3d at 228; *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 279-282 (E.D.N.Y. 2010) (no duty to non-customer to investigate suspicious large withdrawals on multimillion dollar line of credit); *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, 2003 WL 470611, at *5-7 (S.D.N.Y. Feb. 25, 2003) (no duty to non-customer to address suspicious transfers of $1.7 million).  It makes no difference that an employee of the bank allegedly shares a close relationship with the customer or facilitated the transactions under scrutiny.  *See In re Agape Litig.*, 681 F. Supp. 2d 352, 358 (E.D.N.Y. 2010) (bank employee "dedicated solely to [the] 'needs and purposes'" of customer running Ponzi scheme).[5]

The Complaint also pushes the theory that Epstein's 2008 conviction for solicitation necessarily transmutes this banking activity—ordinary for a customer of his wealth—into a series of transactions that JPMC knew to be tainted.  It does not.  *See In re Agape Litig.*, 681 F. Supp. 2d at 358-359 (dismissing allegations that account activity raised "'red flags' or badges of fraud that should have induced [the bank] to investigate" the perpetrator of a Ponzi scheme "in

---

[4] And yet, the Complaint also alleges that "cash deposits and withdrawals *below* customer identification thresholds," which "avoid triggering additional scrutiny or bank reporting requirements," are hallmarks of sex trafficking organizations.  Compl. ¶ 195 (emphasis added).

[5] Barclays conducted a nearly two-year investigation into James Staley's relationship to Epstein, covering Staley's tenure at JPMC, and "did not make any findings that Mr. Staley 'saw, or was aware of, any of Mr. Epstein's alleged crimes.'"  de la Merced & Goldstein, *James Staley, Barclays C.E.O., Steps Down After A Jeffrey Epstein Inquiry*, N.Y. Times (Nov. 1, 2021).

light of [his] criminal history").  Many millions of Americans have felony convictions, and

hundreds of thousands are registered sex offenders.  Those individuals are permitted access to

U.S. financial institutions.  A bank's obligation is to report suspicious activity to the

government—that does not include reporting every large cash transaction by a former felon.

Likewise, the reporting obligation is not to eliminate those with criminal histories from the

banking system or to protect non-customers from what former felons may or may not do with

their finances.  Moreover, JPMC owes no duties *to Plaintiff* under the Bank Secrecy Act

("BSA") or "Know Your Customer" rules.  *See* Compl. ¶¶ 172-176; *see Marlin v. Moody Nat'l*

*Bank, N.A.*, 2006 WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006) ("The obligation under [the

BSA] is to the government rather than [a] remote victim."), *aff'd*, 248 F. App'x 534 (5th Cir.

2007).  Under these laws, "banks do not become guarantors of the integrity of the deals of their

customers."  *Id.*  Courts have thus uniformly held that the regulations cited by Plaintiff "cannot

form the basis for a negligence claim," *Silverman Partners*, 687 F. Supp. 2d at 282 (no duty

based on KYC rules); *In re Agape Litig.*, 681 F. Supp. 2d at 360 (no duty under BSA), and have

rejected calls for "an expansion of the scope of the duty of care based upon the monitoring and

reporting requirements imposed under the Bank Secrecy Act."  *Aiken v. Interglobal Mergers &*

*Acquisitions*, 2006 WL 1878323, at *1-2 (S.D.N.Y. July 5, 2006) (citation omitted).

### B.  No Intentional Or Negligent Act Or Omission By JPMC Proximately Caused The Harms That Epstein Inflicted On Plaintiff

Even if JPMC did owe a duty to Plaintiff—and it did not—Count I independently fails

for lack of proximate cause.  Alleged negligence "is not enough by itself to establish liability";

rather, it must be "a proximate, or legal, cause" of Plaintiff's harm.  *Hain v. Jamison*, 68 N.E.3d

1233, 1236-37 (N.Y. 2016).  Where the alleged injury was caused by an intervening criminal act,

as it was here, that act must be "a natural and foreseeable consequence of a circumstance created

by [the] defendant." *Hain*, 68 N.E.3d at 1237-38.  Because "manageable limits" must be placed "upon the liability that flows from negligent conduct," proximate cause imposes a demanding limitation.  *Id.* at 1237.

The Complaint does not establish that Plaintiff's injuries were a foreseeable consequence of the bank's alleged failure to monitor Epstein's account activity, and it fails to substantiate its legal conclusion that JPMC knew Epstein used its banking services to facilitate sex trafficking. *See infra* Part II.A.2.  More immediately, nowhere does the Complaint allege—even in conclusory fashion—what is required here:  that JPMC knew of or should have known of Epstein's alleged sex trafficking of Plaintiff.  The only alleged link is that "Epstein used [JPMC] accounts to pay for coerced commercial sex acts by [Plaintiff]."  Compl. ¶ 212.

The Complaint's case for proximate cause is simply that JPMC should be held strictly liable for any harm inflicted through routine banking transactions, including large cash withdrawals and large wire transfers from high net-worth customers.[6]  But that connection is too attenuated to satisfy proximate cause.  Indeed, the Second Circuit has held that non-customers such as Plaintiff are not foreseeable victims of a bank's alleged negligence even in failing to act on "red flags" associated with the use of customer accounts.  *See Lerner*, 459 F.3d at 287.  A bank's lapses in monitoring a customer's non-fiduciary accounts are "too far removed from the damages [the customer] subsequently cause[s] to persons" like Plaintiff to support a finding of

---

[6] The Complaint does not establish that JPMC offered Epstein *non-routine* services that the bank knew would facilitate his venture.  Banking services are non-routine where the bank intentionally "play[ed] a central role in a well-publicized plan to reward terrorists" as by serving as the "exclusive administrator of the death and dismemberment benefit plan" for martyrs.  *Linde v. Arab Bank PLC*, 384 F. Supp. 2d 571, 577, 588 (E.D.N.Y 2005).  But there is "no basis for a bank's liability for … routine banking business," even when the bank "continues to maintain [a customer's] accounts" despite warnings that the customer's assets are being used for illicit ends. *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831-33 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) and *aff'd*, 714 F.3d 118 (2d Cir. 2013).

7

proximate cause.  *Lerner*, 459 F.3d at 287.  And JPMC "cannot be held liable for the wrongdoing" of a customer "based solely on the allegations that [he] utilized the banking and financial services offered to all bank customers."  *In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 518 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 118 (2d Cir. 2013); *see also In re Terrorist Attacks*, 714 F.3d at 124 (bank did not cause injuries resulting from 9/11 attacks by "providing routine banking services" to organizations affiliated with al Qaeda).

At most, the Complaint establishes that JPMC was a "mere unknowing conduit for the unlawful acts of others."  *See Linde*, 384 F. Supp. 2d at 588.  The Complaint, with the benefit of hindsight, asserts that Epstein was obviously using his JPMC accounts to facilitate sex trafficking, Compl. ¶ 204, but it does not—and cannot—plausibly allege that Epstein had *no* legitimate uses for the routine banking services JPMC provided.  More is required to establish proximate cause.  *See Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009) ("cash dollars have multiple legitimate uses," so banks providing routine services to customers do not proximately cause injuries suffered if money used for illicit ends), *aff'd*, 708 F.3d 82, 97 (2d Cir. 2013) (bank transfers to Iran, a "state sponsor of terrorism," did not proximately cause injuries from terrorist attacks Iran allegedly funded, because Iran also had legitimate uses for the money).

## II.    THE COMPLAINT DOES NOT PLEAD A TVPA CLAIM AGAINST JPMC

Plaintiff brings three causes of action under Section 1595 of the TVPA, which permits a victim of sex trafficking to bring a civil action for a violation of the statute's substantive criminal provisions against either "the perpetrator" (perpetrator liability) or "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter" (beneficiary liability).  18 U.S.C. § 1595(a).

A plaintiff pleading a Section 1595(a) beneficiary claim must demonstrate a predicate "violation of this chapter."  18 U.S.C. § 1595(a).  Count II pleads a Section 1595(a) beneficiary claim against JPMC for a violation of Section 1591(a), which prohibits both direct participation in sex trafficking (*e.g.*, recruiting or transporting a victim), and knowingly benefitting from participation in a sex-trafficking venture.  Counts III and IV bring Section 1595 claims for attempt (18 U.S.C. § 1594(a)) and conspiracy (18 U.S.C. § 1594(c)) to violate Section 1591. Each of Plaintiff's TVPA Counts fails to state a claim for relief and should be dismissed.

### A.  The Complaint Does Not State A Claim For Beneficiary Liability For A Violation Of §1591(a) (Count II)

To state a claim for beneficiary liability under 18 U.S.C. § 1595(a), a plaintiff must allege that the defendant (1) knowingly received benefits that arose from (2) participation in a venture (3) that the defendant knew or should have known violated the TVPA as to Plaintiff.  *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 719 (11th Cir. 2021).[7]  Count II, alleging that JPMC benefited as a participant in Epstein's "sex-trafficking venture," should be dismissed because the Complaint fails to plausibly allege that (1) JPMC participated in Epstein's sex-trafficking venture; (2) JPMC knew that the sex-trafficking venture violated the TVPA as to Plaintiff by using force, fraud, or coercion to induce her into commercial sex; or (3) JPMC received benefits in exchange for participation in Epstein's sex-trafficking venture.

---

[7] If Plaintiff means to plead a perpetrator liability claim under § 1595(a) against JPMC for violation of an alleged *criminal* violation of § 1591(a)(2), *see* Compl. ¶ 261, her pleading burden is higher—and she necessarily fails to meet it for the reasons that follow.  To plead a claim under § 1591(a)(2), Plaintiff would need to show, among other things, that JPMC "*knowingly* assist[ed], support[ed], or facilitat[ed]" a criminal violation of § 1591(a)(1) and that JPMC knew or recklessly disregarded that Plaintiff was trafficked.  18 U.S.C. § 1591(e)(4) (emphasis added).  Because she cannot meet the non-criminal standard for a beneficiary claim, any criminal-perpetrator theory claim would fail too and must be dismissed.

### 1. The Complaint does not plead facts sufficient to show that JPMC participated in Epstein's sex-trafficking venture

Count II fails to plead sufficient facts to support a claim that JPMC participated in Epstein's sex-trafficking venture. As used in Section 1595, "'participation' itself requires more than just passive facilitation, but some level of active engagement." *G.G. v. Salesforce.com, Inc.*, 2022 WL 1541408, at *12 (N.D. Ill. May 16, 2022). And "liability" under the TVPA's beneficiary provision "cannot be established by association alone." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018). Instead, the plaintiff must allege that the defendant engaged in "specific conduct that furthered the sex trafficking venture" and "some participation in the sex trafficking act itself." *Id.*[8] The Complaint's allegations are insufficient to meet that standard.

It is insufficient to allege that a supposed beneficiary knew or should have known of a sex-trafficking venture and then provided its normal business services to the perpetrator. *See Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) ("The participation … must be participation in a sex-trafficking venture, not participation in other activities engaged in by the sex traffickers[.]"). By contrast, participation has been sufficiently alleged where—unlike here—the defendant took actions to further the sex-trafficking venture that were entirely inconsistent with their ordinary job duties. *Canosa v. Ziff*, 2019 WL 498865,

---

[8] As used in Section 1595, "participation in a venture" is defined by its ordinary meaning: "Participate" means "to take part in or share with others in common or in an association," and "venture" means "an undertaking or enterprise involving risk and potential profit." *Red Roof Inns, Inc.*, 21 F.4th at 724-25. Like the plaintiffs in *Red Roof Inns*, Plaintiff "chose to frame the venture[] at issue as [a] sex trafficking venture[]," *id.* at 727. *See, e.g.*, Compl. ¶¶ 107, 160, 199, 200, 202, 203, 207, 208, 214, 223, 224, 261, 262, 263, 264, 265. Thus, because Plaintiff's theory depends on her allegation that JPMC participated in a *sex-trafficking* venture, she must establish that JPMC "took part in the common undertaking of sex trafficking." *Red Roof Inns., Inc*., 21 F.4th at 727. That requires sufficient factual allegations not only that JPMC had actual or constructive knowledge of sex trafficking, but also that JPMC participated in the sex trafficking itself. *See id.* ("[O]bserving something is not the same as participating in it.").

at *4 (S.D.N.Y. Jan. 28, 2019) (production company employee alleged to have given Harvey Weinstein medications and other paraphernalia to perform sexual acts).

The Complaint's allegations are, at bottom, that JPMC's provision of banking services to Epstein, which he used for sex trafficking, amounts to JPMC's participation in the sex-trafficking venture itself.  It does not.  As described in the Complaint, JPMC allegedly participated in Epstein's sex-trafficking venture by providing him access to cash and banking services essential to keep the venture going.  Compl. ¶¶ 111, 114, 120, 121, 127, 160, 199, 201, 205, 218, 219.  Even if perpetuation of Epstein's venture "would not be possible" without his JPMC accounts—which was not the case, as his post-2013 conduct, after JPMC terminated his banking relationship, shows—and even if it were true that Epstein's access to JPMC "played a critical role" in the venture, that still would not constitute JPMC's participation.  *Salesforce.com* shows why.  There, the plaintiff alleged that Salesforce participated in a sex-trafficking venture because its software allowed Backpage, a website advertising commercial sex, "to cultivate and expand a customer base of sex traffickers," by enabling it "to scale its operations and increase the trafficking conducted on Backpage."  2022 WL 1541408, at *14.  The court held this was insufficient to plead participation because the allegations concerned only "actions that Backpage took using Salesforce's CRM software."  *Id.* at *15.  "The mere fact that Salesforce's software played a critical role in Backpage's expansion, indeed, even if such expansion would not be possible without the capabilities provided by that software, is not enough to demonstrate Salesforce's own participation in any venture with Backpage."  *Id.*  So too here.  Citing the provision of regular business services that a trafficker used in the venture does not sufficiently allege "participation" in the venture itself.  The Complaint's allegations that JPMC maintained accounts from which Epstein withdrew cash do not constitute the requisite "active engagement"

11

in his sex-trafficking venture to show participation.  *See Salesforce.com, Inc.*, 2022 WL 1541408, at *12.

Nor do the Complaint's allegations about Epstein's use of his JPMC accounts tie JPMC's alleged awareness *to participation in the sex-trafficking venture*.  The Complaint alleges that JPMC "allow[ed Epstein] the ability to run and grow what to the bank was obviously an operation designed to sexually abuse and traffic countless young women," because Epstein's account activity was cash-intensive and "a large number of cash transactions by a customer *can be* an indicator of criminal activity generally and sex trafficking in particular."  Compl. ¶¶ 114, 190 (emphasis added); *see also id.* ¶¶ 191, 194-195.  It then concludes, with no factual support, that JPMC "was aware that the recipients of some of these wire transfers … were to Epstein's co-conspirators and that the wire transfers were in furtherance of the Epstein sex-trafficking venture."  *Id.* ¶ 211.[9]  But such allegations about Epstein's use of money drawn from JPMC accounts do not connect JPMC's services *to the sex-trafficking venture*.  *See* Compl. ¶¶ 106, 111, 201, 205, 210.  And simply reciting that JPMC "knew" where the cash was going, *see id.* ¶ 199, or asserting that it is, in hindsight, clear where the money was going, *see id.* ¶¶ 101, 102, 111, 141, does not sufficiently allege that JPMC knowingly participated in the sex-trafficking venture.

---

[9] One passing allegation in the Complaint appears to vaguely suggest that during Ghislaine Maxwell's 2021 criminal trial, a JPMC representative testified that $31 million transferred from Epstein to accounts in Maxwell's name between 1999 and 2007 constituted payment for her role in Epstein's exploits.  *See* Compl. ¶ 135.  That suggestion misstates the actual testimony; the JPMC representative did not say anything about the purpose of those payments.  Dec. 6, 2021 Trial Tr. at 1348:6-14, *United States v. Maxwell*, No. 1:20-CR-00330-AJN (S.D.N.Y. Aug. 10, 2022), ECF 751 (JPMC representative Patrick McHugh testified that he did not "know the nature of the transactions" and that he did not think bank records facially indicated that those transactions were improper); *see DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (court can consider "documents incorporated by reference in the complaint").  The Complaint also fails to allege that JPMC knew or should have known at the time—though it may be clear in hindsight—that Maxwell was Epstein's "main sex trafficking madame."  Compl. ¶ 134.

Awareness of an ongoing sex-trafficking venture that relates to a defendant's otherwise normal business activities is simply not enough to allege participation in that venture. *Red Roof Inns*, 21 F.4th at 725; *see also Geiss*, 383 F. Supp. 3d at 168 n.4 (dismissing claim where defendant was alleged to have made "hush payments"); *Noble*, 335 F. Supp. 3d at 524 (dismissing claim where defendant was alleged to have "'facilitated' [perpetrator's] travel by virtue of his job responsibilities at TWC"); *Lawson v. Rubin*, 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018) (dismissing claim against lawyer paid by defendant to draft non-disclosure agreements between plaintiffs and perpetrator). Here, the Complaint's allegations that JPMC participated in Epstein's sex trafficking are even more deficient than the allegations deemed insufficient in *Geiss*, *Noble*, and *Lawson*. For example, the Complaint does not—and cannot—offer any well-pleaded allegations that JPMC itself made "hush" payments, "settlement" payments, or any payments at all. JPMC was at least one step removed because Epstein made such payments himself.

Finally, the Complaint passingly suggests that JPMC had an affirmative duty to police and prevent sex trafficking, and therefore "participated" in the venture by "turn[ing] a blind eye to Epstein's blatantly illegal operation." Compl. ¶ 126. But this argument is a non-starter, despite JPMC's obligations to monitor Epstein's account activity under federal banking regulations. The TVPA does not require any "businesses or professions possibly earning money from trafficking[] to affirmatively stop the trafficking." *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 182 (E.D. Pa. 2020); *see also S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) (TVPA does not impose responsibility to affirmatively "train hotel staff about the warning signs of sex trafficking and what to do if they appear").

Plaintiff's allegations establish nothing more than the fact that JPMC maintained Epstein as a client.  There is no authority for the claim that maintaining bank accounts and processing cash payments constitutes participation in a sex-trafficking venture.

> **2.     The Complaint does not plead facts sufficient to show that JPMC knew that Plaintiff or any specific person was trafficked by means of force, fraud, or coercion**

Count II also fails for the independent reason that Plaintiff fails to plead that JPMC had either "constructive or actual knowledge that the undertaking or enterprise violated the TVPRA *as to the plaintiff*."  *Red Roof Inns*, 21 F.4th at 726 (emphasis added).  Section 1595 "speaks in singular terms—participation in *a* venture which that person … should have known *has* engaged in *an* act in violation of this chapter."  *Choice Hotels*, 473 F. Supp. 3d at 154 (emphasis in original).  Plaintiff thus must sufficiently allege that JPMC knew or should have known that it facilitated a violation of Section 1591(a) "*as to* [*her*]."  *See Red Roof Inns*, 21 F.4th at 725.  It is not enough to allege that JPMC purportedly knew of (and participated in) "sex trafficking generally."  *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 938 (D. Or. 2020).

Plaintiff does not plead that JPMC knew or should have known that she or any other specific person was trafficked or knew that any such trafficking was done by means of force, fraud, or coercion.  The absence of such an allegation requires dismissal.  In *Fleites v. MindGeek S.A.R.L.*, for example, the court dismissed a beneficiary liability claim against Visa because there were no allegations that Visa had direct interaction with the plaintiff or the pornographic video at issue:  "[H]aving not had any interaction with Plaintiff and her videos, how can it be said that Visa knew or should have known that Plaintiff was a victim of sex trafficking?"  2022 WL 4456077, at *9 (C.D. Cal. July 29, 2022).  Likewise, in *Salesforce.com*, the Court found that Plaintiffs "failed to allege plausibly that Salesforce knew, or should have known, about G.G.'s

14

specific trafficking or any of the advertisements trafficking her on Backpage," and dismissed their claims accordingly.  *G.G.*, 2022 WL 1541408, at *14.

In contrast, cases that permit beneficiary liability claims to proceed past the pleading stage require that the alleged beneficiary knew (1) of a specific victim and (2) that force, fraud, or coercion was being used.  *See, e.g.*, *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *1–3 (S.D. Ohio Dec. 6, 2019) (hotel defendant allegedly saw "bottles of lubricants, boxes of condoms, excessive requests for towels and linens, cash payments," and "physical signs of human trafficking including 'branding, restraints, bruises, physical deterioration'"; hotel cleaning staff saw plaintiff "tied to the guest room bed" and "chained up in the bathroom," and heard "her desperate pleas for help"); *Canosa*, 2019 WL 498865, at *3 (corporate defendant's employees "falsely assured Canosa that she would not be alone with Weinstein but then deserted her, gave Weinstein medications … that he needed to perform sexual acts, and cleaned up after the sexual assaults to avoid detection by others"); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 962, 967, 971 (S.D. Ohio 2019) (hotel defendant saw victim and relevant evidence on multiple occasions, including her "physical deterioration," "bottles of lubricants, boxes of condoms, used condoms in the trash," and "desperate pleas and screams for help, after being beaten or choked at the Defendants' hotel properties").

The contrast between the facts alleged in those cases and the facts alleged here is stark. While the Complaint alleges that Epstein used cash from his accounts at JPMC to pay Plaintiff, *see* Compl. ¶¶ 101, 104, 160, 212, the Complaint does not allege that JPMC knew or should have known that she or any other specific person would be a victim of Epstein's sex-trafficking venture by force, fraud, or coercion, *see also id.* ¶ 209.  On the contrary, the Complaint's conclusory allegations that, by processing Epstein's banking transactions, JPMC "knew of, or

participated in, [his] alleged violation[s] of Section 1591," as against Plaintiff, do not set forth any facts to allege JPMC's knowledge as to the trafficking of Plaintiff or another person specifically, including JPMC's knowledge that force, fraud, or coercion was being used.

Beyond allegations that JPMC provided Epstein with banking services, the Complaint fails to connect a scattershot of otherwise unrelated events to argue that JPMC might have been generally aware of Epstein's sex-trafficking.  For example, the Complaint alleges that JPMC's James Staley personally visited Epstein when he was serving his jail sentence in Florida and that, around the same time, some unidentified board at JPMC recommended no longer servicing Epstein.  Compl. ¶ 146,148.  More generally, the Complaint alleges that Epstein had a "well-publicized reputation for sexually trafficking and abusing young women."  *Id.* ¶ 180; *see also id.* ¶¶ 184-188.  But these general allegations do not support that JPMC was aware that Plaintiff was being forced or coerced to engage in a commercial sex act, or that JPMC knew its services were being used to force or coerce Plaintiff to engage in commercial sex acts—both of which Plaintiff must allege to state a claim.  Just as "knowledge or willful blindness of a general sex trafficking problem" in the hotel cases did not suffice, so too here any knowledge of Epstein's generalized reputation for sexual abuse "does not satisfy the *mens rea* requirements of the TVPRA."  *Choice Hotels*, 473 F.Supp.3d at 154.

### 3.    The Complaint does not plead facts sufficient to show that any benefit to JPMC arose from the sex-trafficking venture

Finally, Plaintiff must allege facts sufficient to show a "causal relationship" between JPMC's alleged "affirmative conduct furthering the sex-trafficking venture and [its] receipt of a benefit" such that JPMC was receiving the benefit *because of* its facilitation of sex-trafficking.  *Geiss*, 383 F. Supp. 3d at 169.  It is not enough for JPMC to have benefitted generally from its relationship with Epstein.  Rather, Plaintiff must allege that JPMC received benefits *in return for*

its assistance, support, or facilitation of Epstein's sex-trafficking venture, and that JPMC knew this was the case. *See Red Roof Inns*, 21 F.4th at 724. Consider *Geiss*, where the court agreed that The Weinstein Company (TWC) "undoubtedly benefited from H. Weinstein's continued employment at TWC. His movies and influence generated revenue, and some of that revenue flowed to TWC's officers and directors." 383 F. Supp. 3d at 169. Even still, the "controlling question" was "whether H. Weinstein provided any of those benefits to TWC *because of* TWC's facilitation of H. Weinstein's sexual misconduct." *Id.* On that score, the court found that the Complaint failed. *Id.* at 170.

Here, Plaintiff alleges that JPMC received benefits from its relationship with Epstein, including "earning millions of dollars," *see, e.g.*, Compl. ¶ 163, Epstein's agreement to "bring many ultra-high wealth clients to" JPMC, *see, e.g.*, *id.* ¶ 114, and a "highly profitable deal," *id.* ¶ 130. What is missing, fatally, is any allegation that JPMC knew it received those benefits *because* it was providing banking services that facilitated Epstein's sex-trafficking venture.[10] There is no plausible allegation, for example, that Epstein threatened to pull business if the bank did not ignore the alleged red flags, or that Epstein offered his business as a reward for JPMC's alleged facilitation. The allegations that attempt to get to this essential point are conclusory at best, s*ee* Compl. ¶¶ 136, 203, 204, 207, 208, 224, and fail to contain facts supporting the causal relationship required, as shown in *Geiss*, 383 F. Supp. 3d at 169, and *Red Roof Inns*, 21 F.4th at 724. JPMC is only alleged to have received benefits typical of working with a well-connected

---

[10] The Complaint alleges that "Epstein agreed to bring many ultra-high wealth clients to JP Morgan, and, in exchange, Staley would use his clout within JP Morgan to make Epstein untouchable." Compl. ¶ 114. This is not the sort of "symbiotic relationship" adverted to in *Canosa*. 2019 WL 498865 at *24. Here, there is no allegation that Epstein would not have conferred these benefits on JPMC unless the bank "knowingly participated" in the sex-trafficking venture. Many high-value clients confer these sorts of benefits on their banks without any sordid arrangement of the type alleged in the Complaint.

and wealthy individual; beyond reciting a legal conclusion, the Complaint does not set forth facts to support the inference that JPMC knew it was receiving those benefits for a different reason, namely its facilitation of Epstein's illicit venture.

Comparing *Geiss* and this Complaint to the one in *Canosa* is instructive.  In *Canosa*, the defendant directors engaged in conduct atypical of directors of a production company (*e.g.*, signing non-disclosure agreements with victims, paying employees to be responsible for covering up Weinstein's assaults), the purpose of which could only have been to conceal Weinstein's behavior and retain him.  2019 WL 498865, at *24.  Unlike TWC, JPMC is alleged to have taken actions that are entirely consistent with normal banking activity for a wealthy client.  The Complaint does not plausibly suggest that JPMC could not have believed these benefits were consistent with those it received from banking a variety of high-wealth individuals.

### B.  The Complaint Does Not State A Beneficiary Liability Claim For Attempt (Count IV) Or Conspiracy (Count III)[11]

Counts III and IV each fail as a matter of law because Section 1595 does not create a civil cause of action for attempt or conspiracy to knowingly benefit from a sex-trafficking venture.  Even if these claims were theoretically available, the Complaint fails to plausibly allege either.

### 1.  Section 1595's civil cause of action does not apply to attempt or conspiracy to knowingly benefit from a sex-trafficking venture

Counts III and IV seek to hold JPMC liable for attempt to violate Section 1591 and for conspiracy to violate Section 1591.  But Section 1595(a) authorizes only civil suits against the "perpetrator" or "whoever knowingly benefits, financially or by receiving anything of value from

---

[11] Because the Complaint fails to sufficiently allege a violation of Section 1591, *see supra* Section A, Counts III and IV should also be dismissed because both conspiracy and attempt require the specific intent to commit the underlying violation.  *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011).

participation in a venture" which that person knows or should have known has engaged in a

TVPA violation.  18 U.S.C. § 1595(a).  It does not authorize civil lawsuits against parties who

have only attempted or conspired to knowingly benefit from a sex-trafficking venture.

The Complaint could be interpreted as pursuing either a "perpetrator" or "beneficiary"

theory for Plaintiff's attempt and conspiracy claims, but the claims would fail either way.  To the

extent Plaintiff is pursuing a "beneficiary" theory, the Ninth Circuit has squarely precluded

attempt claims.  *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1176 (9th Cir. 2022), *cert.*

*denied*, 2022 WL 17408202 (U.S. Dec. 5, 2022).  As the court explained, "attempt to benefit"

does not satisfy Section 1595(a)'s requirement that a civil defendant who is not a perpetrator

"knowingly benefit[]" from participation in a venture that violated the TVPA.  *Id.* at 1176.

The same reasoning applies to conspiracy.  Like attempt, alleging (or being liable for)

conspiracy does not require completion of the underlying predicate act:  the "gist" of conspiracy

is the "agreement," not the completion of the underlying crime.  *United States v. Svoboda*, 347

F.3d 471, 476 (2d Cir. 2003).  Thus, a defendant who conspires to violate the TVPA is not

someone who "knowingly benefits" from a TVPA violation, but rather is someone who "agrees

to knowingly benefit."  In short, inchoate offenses like attempt and conspiracy do not necessarily

produce a benefit, defeating any "beneficiary" theory.

Pursuing these claims through a "perpetrator" theory fares no better.  When trafficking

under § 1591(a) is at issue, civil "perpetrator" liability under § 1595(a) refers to those who have

actually committed criminal violations of § 1591(a).  *See, e.g.*, *A.D. v. Wyndham Hotels &*

*Resorts, Inc.*, 2020 WL 8674205, at *2 (E.D. Va. July 22, 2020); *Geiss*, 383 F. Supp. 3d at 167

n.3; *Doe v. Fitzgerald*, 2022 WL 2784805, at *3 (C.D. Cal. May 13, 2022).  Accordingly, a

"perpetrator" is *not* someone who merely attempts to violate § 1591(a) (for purposes of

19

§ 1594(a)) or conspires to do so (for purposes of § 1594(c)).  That person has not "committed a criminal offense under § 1591 of the TVPRA" and thus is not subject to "perpetrator liability." *A.D.*, 2020 WL 8674205, at *2.

The limitation follows from the statute's provision of a civil cause of action only to "a victim of a violation of this chapter."  § 1595(a).  But just like inchoate offenses like attempt and conspiracy do not necessarily produce benefits, so too they do not necessarily produce victims. *See Mizrahi v. Gonzales*, 492 F.3d 156, 160 (2d Cir. 2007) (describing attempt and conspiracy as inchoate offenses the law "generally recognizes").  Sometimes "[a]n attempt fails" and "a conspiracy comes to nothing."  *Id.* at 161 (citation omitted); *see also id.* ("The object offense need not be consummated….").  As a result, a TVPA victim's status as such must come from the underlying violation "of some *other* law" defining the substantive offense of criminal trafficking. *Id.* at 161.

## 2.  The Complaint fails to plead attempt (Count IV)

Even if Section 1595 applied to those who attempt to knowingly benefit from sex trafficking—and it does not—that claim requires allegations that a defendant (a) intended to commit the underlying offense (knowingly benefitting from a sex-trafficking venture) and (b) "engaged in conduct amounting to a substantial step towards" that offense.  *United States v. Farhane*, 634 F.3d at 145.  The Complaint does not plead either.

*First*, the Complaint fails to plead the required element of specific intent to commit the underlying violation.  *See id.*  It does not contain plausible allegations that JPMC *knew* that it received any financial benefits because it was providing banking services that facilitated Epstein's sex-trafficking venture—let alone that it *intended* to do so.  *See Geiss*, 383 F. Supp. 3d at 169; *Red Roof Inns*, 21 F.4th at 724.

*Second*, the Complaint fails to plausibly allege that JPMC engaged in conduct that amounted to a "substantial step" toward benefitting from participation in a sex-trafficking venture. A "substantial step" must be conduct "'planned to culminate' in the commission of the substantive crime being attempted." *Farhane*, 634 F.3d at 147; *see also United States v. Wesley*, 417 F.3d 612, 618-619 (6th Cir. 2005). But the Complaint simply describes the ordinary course of JPMC's banking practices, *see* Compl. ¶¶ 299, 300, not conduct "planned to culminate" in a TVPA violation. And the allegations certainly do not "unequivocally corroborate" that JPMC intended to knowingly benefit from Epstein's sex trafficking. *Wesley*, 417 F.3d at 619.

### 3.    The Complaint fails to plead conspiracy (Count III)

Similarly, even if Section 1595's civil cause of action applied to those who conspire to knowingly benefit from sex trafficking—and again, it does not— that claim requires Plaintiff to allege "that the defendant and other alleged coconspirators entered into a joint enterprise" to knowingly benefit from a sex-trafficking venture "with consciousness of its general nature and extent" and "with the specific intent to aid in the accomplishment of those unlawful ends." *Svoboda*, 347 F.3d at 477. The Complaint does not.

### a)    The Complaint does not plead specific intent

To state a conspiracy claim, the Complaint must plausibly allege that the defendant possessed the specific intent to commit the underlying crime—*i.e.*, the specific intent to knowingly benefit from participation in a sex-trafficking venture in violation of Section 1591(a)(2). *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014); *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). The Complaint's factual allegations are insufficient to infer that JPMC knew it received a benefit from its banking relationship with Epstein in exchange for an agreement to engage in Epstein's sex-trafficking venture. Count III should thus be dismissed.

21

In addition, allegations that a defendant has general knowledge of potentially criminal conduct are not sufficient to state a conspiracy claim. *Anderson*, 747 F.3d at 61. Thus, while the Complaint alleges that "[s]uspicious wire transfers and withdrawals of millions of dollars in cash are basic hallmarks of any major criminal enterprise," Compl. ¶ 219, this and similar allegations are not sufficient where they support no specific inference that JPMC agreed to knowingly benefit from a *sex-trafficking* venture, *see Anderson*, 747 F.3d at 61. The Complaint offers no specific factual allegations to support the inference that Epstein was in fact using his wealth for only one purpose (the sex-trafficking venture), such that JPMC knew that its services were being used for sex trafficking. *See* Compl. ¶¶ 145, 153, 154, 155, 179-180. The Complaint's suggestions that JPMC knew or should have known that Epstein's wealth was coming from sex trafficking, *see id.* ¶¶ 153, 222, are insufficient—and also contradict the Complaint's allegation that Epstein's wealth came from Les Wexner, *see id.* ¶ 110.

> **b)** **The Complaint does not plead facts sufficient to show that JPMC agreed to enter into a joint enterprise to knowingly benefit from participation in a sex-trafficking venture**

To plead conspiracy, Plaintiff must also allege that JPMC *agreed* to enter into a joint enterprise with Epstein to knowingly benefit from participation in a sex-trafficking venture. This requires a "meeting of the minds" as to the "essential nature" of the plan. *United States v. Ulbricht*, 31 F. Supp. 3d 540, 551 (S.D.N.Y. 2014). Agreement to further a joint criminal enterprise requires more than "association" with other parties and is not sufficiently alleged unless the "reasonable and logical inference" is that "the activities of the participants *could not have been carried out* except as the result of a preconceived scheme or common understanding" to engage in criminal conduct. *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (citing *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999)). While the Complaint advances a number of allegations about Epstein's use of JPMC's banking services for his sex-trafficking

22

venture, it does not preclude the most reasonable and logical inference—that JPMC conducted its activities in the ordinary course of providing banking services to customers, and not as the result of some agreement to engage in a joint enterprise to knowingly benefit from participation in a sex-trafficking venture.  Just as allegations about a defendant's ordinary business activities are not enough to show participation in a venture for purposes of TVPA beneficiary liability, such allegations are insufficient to plausibly allege *agreement* for purposes of TVPA conspiracy.

*First*, the Complaint's unadorned allegations that JPMC or its employees "conspired" (*e.g.*, Compl. ¶¶ 222, 281-282) are conclusory legal assertions; broad references to association with Epstein are too close to "guilt by association" to infer that JPMC agreed to any specific venture to knowingly benefit from Epstein's sex trafficking.  *See United States v. Espinoza-Valdez*, 889 F.3d 654, 657 (9th Cir. 2018).

*Second*, the Complaint's allegations that JPMC provided banking services to Epstein, which he in turn used for sex trafficking, do not plausibly suggest that JPMC *agreed* to engage in a joint criminal enterprise.  *See, e.g.*, Compl. ¶¶ 128, 147, 158, 204, 207, 208, 224.  These and other allegations that JPMC "provid[ed] the essential financial underpinnings" for the sex-trafficking venture speak only to Epstein's use of the services, not to JPMC's intent in providing them.  *See id.* ¶¶ 107, 159, 200.  Without alleging a factual link between the bank's agreement to provide ordinary banking services and an agreement to provide banking services *for the sex-trafficking venture specifically*, these allegations do not plausibly allege that JPMC *agreed* to engage in a joint criminal enterprise to knowingly benefit from the sex-trafficking venture.

Relatedly, the Complaint's allegations that Epstein needed a bank—and could not have conducted his venture without JPMC's financial services—also lack the requisite factual link to an alleged agreement to provide banking services *for the sex-trafficking venture specifically*.

*See, e.g.*, Compl. ¶¶ 106, 111, 114, 120, 121, 127, 129, 201, 205, 218, 219, 220.  The reasonable and logical inference is instead that JPMC's conduct was part of its ordinary banking activities— not because of a "preconceived scheme" or "common understanding" to knowingly benefit from participation in the sex-trafficking venture.  *Smith*, 294 F.3d at 477.

The conspiracy allegations here are thus unlike those in *Fleites*, where the court declined to dismiss a conspiracy claim against Visa.  2022 WL 4456077, at *9-11.  As a threshold matter, Visa did not argue that a Section 1595 beneficiary claim cannot be premised upon a conspiracy violation and so the court did not consider that argument.  *See supra* 18-20.  In any event, the alleged conspiracy in *Fleites* was based on Visa's payment processing for MindGeek, a company that operates pornographic websites, allegedly including illegal child pornography.  *Id.* at *2, *9-11.  The court concluded that because of the complaint's specific factual allegations that Visa continued processing payments for MindGeek after MindGeek removed 80% of its content in response to child porn allegations, and that Visa processed payments for the ads MindGeek regularly placed alongside its videos, it could infer a conspiratorial agreement.  *Id.* at *10.  The court also relied on the allegation that Visa knew it was providing MindGeek with the essential tool to complete its crime to conclude that Visa agreed to enter into a joint enterprise with MindGeek to knowingly benefit from sex trafficking.  *Id.* at *11.

Nothing comparable is pled here.  The Complaint alleges that JPMC "provided the final component Epstein needed," namely a bank.  *See, e.g.*, Compl. ¶ 121.  But that does not show that JPMC knew it was providing Epstein the essential tool for his sex-trafficking venture, let alone with specific intent to accomplish the venture's aims.  And the Complaint does not plausibly allege that Epstein's criminal acts and JPMC's alleged conduct were sufficiently "intertwined" so as to conclude that JPMC agreed to the essential nature of Epstein's venture.

24

2022 WL 4456077, at *11.  Without some particularized allegation that JPMC knew it was providing the essential tool for Epstein to commit his crimes, that JPMC's provision of banking services was "intertwined" with his criminal activities, and that JPMC knew this and specifically intended the underlying sex-trafficking venture to occur, the Court cannot infer that JPMC "agreed" to any joint venture to knowingly benefit from Epstein's sex trafficking.

## III.   PLAINTIFF'S TVPA CLAIMS ARE TIME-BARRED

A TVPA claim must be brought by an adult sex-trafficking victim "not later than … 10 years after the cause of action arose[.]"  18 U.S.C. § 1595(c)(1).  The Complaint contains no specific allegation that Plaintiff was trafficked after November 24, 2012, or that JPMC financially benefited, participated, attempted, or conspired after that date.  Plaintiff's TVPA claims are barred by the statute of limitations and should be dismissed.

The Complaint does not identify any specific act or omission by JPMC that injured Plaintiff on or after November 24, 2012.  Instead, Plaintiff alleges generally that the banking relationship between JPMC and Epstein existed approximately from 2000 to August 2013.  *See* Compl. ¶¶ 107, 227.  This means that only the very tail end of the banking relationship overlaps with Plaintiff's non-time-barred claims.  And the Complaint says nothing about what happened in that months-long period; the allegations around this time period are, in fact, notably nonspecific.  Plaintiff alleges generally that she was involved with Epstein and his sex-trafficking venture "from 2006 through 2013," *see id.* ¶ 92, "until her ultimate escape around the end of 2013," *id.* ¶ 105.  These allegations do not plausibly allege any non-time-barred trafficking, much less show how JPMC contributed to any injury Plaintiff suffered between November 24, 2012, and the end of its banking relationship with Epstein.

## CONCLUSION

The Complaint should be dismissed with prejudice.

25

Dated: December 30, 2022

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth
60 State Street
Boston, MA 02109
(t) (617) 526-6000
(f) (617) 526-5000
felicia.ellsworth@wilmerhale.com

Boyd M. Johnson III
Robert L. Boone
Hillary Chutter-Ames
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
boyd.johnson@wilmerhale.com
robert.boone@wilmerhale.com
hillary.chutter-ames@wilmerhale.com

*Attorneys for JPMorgan Chase & Co.*