**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>       v.<br><br>Deutsche Bank Akteingesellschaft, et. al.,<br><br>    Defendants. | Case No. 1:22-CV-10018 (JSR) |
| Jane Doe 1, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>       v.<br><br>JPMorgan Chase Bank, N.A.,<br><br>    Defendant. | Case No. 1:22-CV-10019 (JSR) |

**PLAINTIFF JANE DOE 1'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JP MORGAN CHASE BANK, N.A.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL OVERVIEW ..................................................................................................... 1

ARGUMENT ....................................................................................................................... 4

   I.      DOE HAS PROPERLY PLED HER TORT CLAIMS (COUNTS I–IV). .................... 5

     A.   The FAC States a Claim for Aiding and Abetting Battery (Count I).............................. 5

     B.   The FAC States a Claim for Intentional Infliction of Emotional Distress (Count II). ..... 8

     C.   The FAC States Two Negligence Claims (Counts III– IV). ........................................ 11

   II.     DOE HAS PROPERLY PLED SIX TVPA CLAIMS (COUNTS V-X). .................... 17

     A.   Doe's TVPA Claims Are Not Time-Barred. ................................................................. 18

     B.   The FAC States a Claim for TVPA Beneficiary Liability (Count V). ........................... 19

     C.   The FAC States a Claim for TVPA Perpetrator Liability (Count VI). ......................... 28

     D.   The FAC States a Claim for Aiding and Abetting TVPA Violations (Count VII). ....... 29

     E.   The FAC States a Claim for Obstruction of TVPA Enforcement (Count X). .............. 30

     F.   The FAC States a Claim for TVPA Conspiracy (Count VIII). ...................................... 31

     G.   The FAC States a Claim for Attempt to Violate the TVPA (Count IX). ....................... 35

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.B. v. Marriott Int'l, Inc.*,
  455 F. Supp. 3d 171 (E.D. Pa. 2020) .......................................................................... 18, 22, 25

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010) .............................................................................. 7

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019) .................................................................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 5

*Bonner v. Guccione*,
  916 F. Supp. 271 (S.D.N.Y. 1996) .................................................................................. 9

*Brown v. Thompson*,
  374 F.3d 253 (4th Cir. 2004) ......................................................................................... 32

*C.S. v. Wyndham Hotels & Resorts, Inc.*,
  538 F. Supp. 3d 1284 (M.D. Fla. 2021) .................................................................... 21, 27

*Canosa v. Ziff*,
  2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) .......................................................... 9, 18, 21, 28

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ...................................................................................................... 29

*Childers v. New York & Presbyterian Hosp.*,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014) .............................................................................. 18

*Collins v. Willcox, Inc.*,
  600 N.Y.S.2d 884 (Sup. Ct. 1992) .................................................................................. 9

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011) ....................................................................................... 32

*Doe v. Alsaud*,
  12 F. Supp. 3d 674 (S.D.N.Y. 2014) .............................................................................. 34

*Elmaliach v. Bank of China Ltd.*,
  110 A.D.3d 192 (N.Y. App. Div. 2013) .......................................................................... 13

*Eskridge v. Diocese of Brooklyn*,
 210 A.D.3d 1056 (N.Y. App. Div. 2022) ........................................................ 8, 10, 11

*Fleites v. MindGeek S.A.R.L.*,
 2022 WL 4456077 (C.D. Cal. July 29, 2022) .................................................... 25, 31

*Ford v. Grand Union Co.*,
 197 N.E. 266 (N.Y. 1935) ............................................................................. 12

*Ford v. Grand Union Co.*,
 268 N.Y. 243 (N.Y. 1935) ............................................................................ 12, 13

*G.G. v. Salesforce.com, Inc.*,
 603 F. Supp. 3d 626 (N.D. Ill. 2022) ............................................................. 21

*Galasso, Langione & Botter, LLP v. Galasso*,
 176 A.D.3d 1176 (N.Y. App. Div. 2019) ......................................................... 17

*Geiss v. Weinstein Co. Holdings LLC*,
 383 F. Supp. 3d 156 (S.D.N.Y. 2019) ............................................................. 22, 27

*H.H. v. G6 Hosp., LLC*,
 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) .................................................. 22, 27

*Harris v. City of New York*,
 186 F.3d 243 (2d Cir. 1999) .......................................................................... 19

*Herman v. Wesgate*,
 94 A.D.2d 938 (N.Y. App. Div. 1983) ............................................................. 7

*Herrick v. Grindr, LLC*,
 306 F. Supp. 3d 579 (S.D.N.Y. 2018) ............................................................. 10

*In re Agape Litig.*,
 681 F. Supp. 2d 352 (E.D.N.Y. 2010) ............................................................. 15

*In re Skat Tax Refund Scheme Litig.*,
 356 F. Supp. 3d 300 (S.D.N.Y. 2019) ............................................................. 10

*In re Terrorist Attacks on Sept. 11*,
 2001, 740 F. Supp. 2d 494 (S.D.N.Y. 2010) .................................................... 16

*J.C. v. I Shri Khodiyar, LLC*,
 2022 WL 4482736 (N.D. Ga. Aug. 29, 2022) .................................................. 22

*J.L. v. Best W. Int'l, Inc.*,
 521 F. Supp. 3d 1048 (D. Colo. 2021) ............................................................ 21

iv

*Jean-Charles v. Perlitz,*
  937 F. Supp. 2d 276 (D. Conn. 2013) ...................................................................... 24

*Johnson v. U.S. Dep't of Hous. & Urb. Dev.,*
  911 F.2d 1302 (8th Cir. 1990) ................................................................................ 32

*Kashef v. BNP Paribas S.A.,*
  2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) ............................................................ 6

*Kashef v. BNP Paribas S.A.,*
  925 F.3d 53 (2d Cir. 2019) ...................................................................................... 5

*Katz v. United Synagogue of Conservative Judaism,*
  135 A.D.3d 458 (N.Y. App. Div. 2016) .................................................................. 11

*Lerner v. Fleet Bank, N.A.,*
  459 F.3d 273 (2d Cir. 2006) ........................................................................ 6, 16, 17

*Licci v. Am. Exp. Bank Ltd.,*
  704 F. Supp. 2d 403 (S.D.N.Y. 2010) .................................................................... 14

*M.A. v. Wyndham Hotels & Resorts, Inc.,*
  425 F. Supp. 3d 959 (S.D. Ohio 2019) ...................................................... 23, 25, 26

*Matvejs v. Martin County Sheriff's Office,*
  2006 WL 3755202 (S.D. Fla. 2006) ......................................................................... 9

*Maurizi v. Callaghan,*
  2022 WL 1446500 (W.D.N.Y. Feb. 25, 2022) ......................................................... 6

*Midwest Feeders, Inc. v. Bank of Franklin,*
  886 F.3d 507 (5th Cir. 2018) .................................................................................. 14

*Noble v. Weinstein ,*
  335 F. Supp. 3d 504 (S.D.N.Y. 2018) ............................................................... 22, 29

*Norsoph v. Riverside Resort & Casino, Inc.,*
  2020 WL 641223 (D. Nev. Feb. 11, 2020) .............................................................. 32

*Ortiz v. Cornetta,*
  867 F.2d 146 (2d Cir. 1989) ................................................................................... 18

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
  286 F. Supp. 3d 430 (E.D.N.Y. 2017) .................................................................... 33

*Pinkerton v. United States,*
  328 U.S. 640 (1946) ............................................................................................... 33

*Pinks v. Turnbull,*
  2009 WL 4931802 (N.Y. Sup. Ct. Dec. 11, 2009) ................................................. 11

*Ratha v. Phatthana Seafood Co.,*
  35 F.4th 1159 (9th Cir. 2022) ......................................................................... 32

*Ricchio v. McLean,*
  853 F.3d 553 (1st Cir. 2017) .................................................................... 22, 33

*Rodland v. Judlau Contracting, Inc.,*
  844 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................ 13

*Rosner v. Bank of China,*
  2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ................................................... 16

*S.J. v. Choice Hotels Int'l, Inc.,*
  473 F. Supp. 3d 147 (E.D.N.Y. 2020) .................................................. 20, 25, 26

*S.Y. v. Best Western Int'l, Inc.,*
  2021 WL 2315073 (M.D. Fla. June 7, 2021) ................................................... 22

*S.Y. v. Naples Hotel Co.,*
  476 F. Supp. 3d 1251 (M.D. Fla. 2020) .......................................................... 21

*Scollo ex rel. Scollo v. Nunez,*
  60 A.D.3d 840 (N.Y.App. Div. 2009) .............................................................. 7

*Scollo ex rel. Scollo v. Nunez,*
  847 N.Y.S.2d 899 (Sup. Ct. 2007) .................................................................. 5

*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.,*
  56 Cal. Rptr. 2d 756 (Ct. App. 1996) ............................................................ 14

*SPV OSUS Ltd v. AIA LLC,*
  2016 WL 3039192 (S.D.N.Y. 2016) ................................................................. 8

*Stagl v. Delta Airlines, Inc.,*
  52 F.3d 463 (2d Cir. 1995) ......................................................................... 12

*Steinberg v. Goldstein,*
  27 A.D.2d 955 (N.Y. App. Div. 1967) .............................................................. 7

*Taggart v. Costabile,*
  14 N.Y.S.3d 388 (App. Div. 2015) ................................................................ 10

*Turley v. ISG Lackawanna, Inc.,*
  774 F.3d 140 (2d Cir. 2014) ...................................................................... 9, 10

*United States v. Afyare*,
632 F. App'x 272 (6th Cir. 2016) .......................................................... 25

*United States v. Ben Zvi*,
242 F.3d 89 (2d Cir. 2001) .................................................................. 19

*United States v. Gershman*,
31 F.4th 80 (2d Cir. 2022) .................................................................. 33

*United States v. Haggard*,
41 F.3d 1320 (9th Cir. 1994) .............................................................. 30

*United States v. Hoover*,
175 F.3d 564 (7th Cir. 1999) .............................................................. 30

*United States v. Leslie*,
658 F.3d 140 (2d Cir. 2011) ............................................................... 19

*United States v. The Boeing Co.*,
2022 WL 13829875 (S.D. Tex. Oct. 21, 2022) ..................................... 30

*Velez v. Sanchez*,
693 F.3d 308 (2d Cir. 2012) ............................................................... 32

*Weldon v. Rivera*,
301 A.D.2d 934 (N.Y. App. Div. 2003) ................................................. 7

*Williams v. Sidley Austin Brown & Wood, L.L.P.*,
38 A.D.3d 219 (N.Y. App. Div. 2007) ................................................... 7

**Statutes**

18 U.S.C. § 1591 .......................................................................... *passim*

18 U.S.C. § 1594 ......................................................................... 31, 53

18 U.S.C. § 1595 ......................................................................... 29, 32

18 U.S.C. § 2 ...................................................................................... 29

*Abolish Trafficking Reauthorization Act of 2022*,
P.L. 117-347, 136 Stat. 6199 (2023) ................................................... 32

Trafficking Victims' Protection Act of 2000,
P.L. 106-386, 114 Stat.1466 (2000) ...................................................... 1

**Rules**

Fed. R. Civ. P. 8(d)(2) ....................................................................... 10

**Other Authorities**

Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) .................................................... 12

Plaintiff Jane Doe 1 ("Doe") submits this memorandum of law in opposition to JP Morgan Chase Bank, N.A.'s ("JPMC") Motion to Dismiss her First Amended Complaint ("FAC").

## PRELIMINARY STATEMENT

Jeffrey Epstein would not have been able to commit the horrific crimes the world has come to know without constant access to cash flowing from a bank willing to ignore the law and help conceal Epstein's conduct, all just to make a significant profit. When Epstein was first growing his sex-trafficking enterprise, JPMC was that bank. In her complaint, on behalf of herself and a class of victims, Doe has alleged that JPMC aided and abetted Jeffrey Epstein's sex-trafficking venture. She has also alleged that JPMC knowingly benefitted from participating in the sex-trafficking venture, in violation of the Trafficking Victims' Protection Act of 2000 ("TVPA").

In response, JPMC claims it did not participate in or abet Epstein's sex trafficking, and (incredibly) contends that it did not know that Epstein—a convicted pedophile who was constantly withdrawing large sums of cash and facing public scrutiny for paying children for massages—was a trafficker at all. JPMC's arguments willfully ignore the serious, specific, and well-pled allegations in the FAC in an effort to paint itself as an innocent bystander to Epstein's conduct. The reality is that JPMC not only participated in the trafficking, but it was *essential* to Epstein's scheme and is one of the primary reasons he was able to continue harming young girls for decades. The Court should reject JPMC's efforts to escape liability for its conduct at this early stage in the litigation given the detailed allegations in the FAC, and it should deny JPMC's motion in full.

## FACTUAL OVERVIEW

As set forth in the FAC, from 1998 through 2013 (and beyond), JPMC knowingly and intentionally participated in Jeffrey Epstein's sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture. FAC ¶ 124. From its inception until

Epstein's arrest and subsequent death, the venture operated primarily for the purpose of luring young women and girls (like Doe) into a position where Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. *Id.* ¶ 21. Epstein's sex-trafficking venture was not possible without the assistance and complicity of a bank to provide special treatment to the sex-trafficking venture, thereby ensuring its continued operation. *Id.* ¶ 24. Specifically, Epstein needed a reliable bank that would provide the necessary legitimate appearance for his operation, allow him to open accounts for illegitimate companies, ignore red flags and banking laws, permit him to transfer money without question, allow him access to abundant cash, and otherwise knowingly facilitate his sex-trafficking enterprise. *Id.* ¶ 123. Epstein found all of those things in JPMC. *Id.*

Around 2000, Epstein began working with James "Jes" Staley, then-head of JPMC's private banking division who was later promoted to CEO of JPMC Asset Management in 2001. *Id.* ¶¶ 125, 131. The relationship between Epstein and Staley was mutually beneficial: Epstein agreed to bring many ultra-high wealth clients to JPMC, and, in exchange, Staley used his clout within JPMC to make Epstein untouchable. *Id.* ¶ 132. Acting on behalf of JPMC, Staley assured Epstein that the two were close friends and he would help Epstein and his operation in any way he could. *Id.* ¶ 157. One such example of JPMC and Staley's benefit from assisting Epstein was the acquisition of Highbridge Capital Management, run by billionaire Glenn Dubin—a highly profitable deal for JPMC. *Id.* ¶¶ 165, 167. Highbridge, as a subsidiary of JPMC, even trafficked young women and girls on its own private jet from Florida to Epstein in New York. *Id.* ¶ 170.

JPMC, through Staley and publicly available information, (1) knew that Epstein was always surrounded by young women and girls; (2) knew Epstein's stated public profession of "financial advisor" was false; (3) knew Epstein had no real expertise in business investing;

(4) knew that his accounts, including many business accounts, had no underlying legitimate business activity; (5) facilitated Epstein's regular, suspicious, and large cash withdrawals; (6) facilitated Epstein's frequent payments to known co-conspirators; (7) knew that Epstein was funding a modeling agency with Jean-Luc Brunel (an already exposed sexual abuser); (8) knew that Epstein was making regular transfers in even, hundred-dollar increments; (9) knew that Epstein was arrested in Florida and was required to register as a sex-offender; (10) knew that Epstein's co-conspirators had bank accounts at JPMC associated with his accounts; and (11) knew that Epstein's madame, Ghislaine Maxwell, was paid millions of dollars by Epstein. *Id.* ¶ 231.

And Staley, one of Epstein's closest friends, was well aware that Epstein was running a sex-trafficking venture, based on that fact that he: (1) went to Epstein's house in New York many times; (2) personally spent time with young girls whom he met through Epstein on several occasions; (3) personally visited young girls at Epstein's apartments located in New York City; (4) personally visited Epstein on his island; (5) frequently called and emailed Epstein; (6) personally observed Epstein around young girls; (7) personally observed Epstein sexually grab young women in front of him; and (8) visited Epstein in Florida while Epstein was serving a jail sentence for soliciting a minor for prostitution. *Id.* ¶ 227.

Over many years, some JPMC executives lobbied within JPMC to sever ties with Epstein due to the sex-trafficking allegations against him. *Id.* ¶ 172. But JPMC's leadership ignored their pleas and ultimately decided each time to maintain the relationship with Epstein. *Id.* JPMC decided that, because it was receiving such large monetary benefits from Epstein, it would continue participating in the Epstein sex-trafficking venture by providing its financial infrastructure. *Id.* Epstein offered his business, and the many millions it generated, exclusively to JPMC because JPMC was willing to knowingly aid Epstein's sex-trafficking operation and to help conceal it. *Id.*

¶ 173. JPMC knew that if it stopped aiding and concealing the operation, it would lose Epstein's accounts and the substantial financial benefits resulting from handling those accounts. *Id.*

JPMC financially benefited by earning millions of dollars for its participation in the Epstein sex-trafficking venture. *Id.* ¶ 177. Throughout its relationship with Epstein, JPMC violated numerous banking laws and regulations to conceal and continue its lucrative venture facilitating Epstein's sex-trafficking scheme. *Id.* ¶ 178. For example, JPMC allowed Epstein and his agents to "structure" cash withdrawals to further the sex-trafficking venture. *Id.* ¶ 179. As another example, in the face of multiple red flags, JPMC failed to file suspicious activity reports with the Financial Crimes Enforcement Network, which it was required to do for suspected cases of money laundering or fraud. *Id.* ¶¶ 180–82, 187.

In 2006, during JPMC's relationship with Epstein, Epstein began abusing Doe and trafficking her to his friends for commercial sex acts. *Id.* ¶¶ 99–100. Epstein used JPMC to withdraw large sums of cash to pay Doe. *Id.* ¶¶ 108–09. Staley, a frequent visitor at Epstein's New York mansion, personally observed that Doe was a trafficking victim. *Id.* ¶ 115.

In 2013, due to overwhelming publicity about Epstein's illegal sexual activities and the departure of Staley from JPMC, JPMC realized that its façade of ignorance about the trafficking was no longer plausible. *Id.* ¶ 185. Accordingly, and reluctantly, JPMC stopped being Epstein's banker. *Id.* While JPMC stopped being Epstein's banker, it continued to take actions to promote the venture and conspiracy. *Id.* ¶ 187. For example, it deliberately and willfully continued to fail to timely file suspicious activity reports about the suspicious activities it had seen. *Id.* And it continued to recommend Epstein as good client to others who inquired. *Id.*

## ARGUMENT

The Court should deny JPMC's motion to dismiss Doe's claims. "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019). Drawing all reasonable inferences in Doe's favor, JPMC has failed to demonstrate that Doe has failed to state a claim.

## I.    DOE HAS PROPERLY PLED HER TORT CLAIMS (COUNTS I–IV).

### A.    The FAC States a Claim for Aiding and Abetting Battery (Count I).

The FAC adequately alleges that JPMC aided and abetted Epstein's batteries against her. To allege a cause of action for aiding and abetting an assault and battery, the plaintiff must allege: "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant's knowing and substantial assistance in the principal violation." *Scollo ex rel. Scollo v. Nunez*, 847 N.Y.S.2d 899 (Sup. Ct. 2007), *aff'd*, 60 A.D.3d 840 (N.Y. App. Div. 2009).

Doe has adequately alleged each element: (1) Doe was sexually abused by Epstein and his friends for years, amounting to battery (FAC ¶¶ 98–101); (2) JPMC was aware of its role in Epstein's overall illegal activity, his sex-trafficking venture (*see, e.g.*, *id.* ¶¶ 110, 115, 151–53, 229–30; *infra* at 23–26 (detailing knowledge of sex-trafficking venture)); and (3) JPMC provided knowing and substantial assistance (*see, e.g., id.* ¶¶ 108, 155 (JPMC provided cash to further the venture); *id.* ¶ 170 (JPMC subsidiary Highbridge trafficked victims to Epstein); *id.* ¶ 178 (JPMC concealed Epstein's sex trafficking); *id.* ¶ 179 (JPMC allowed Epstein to "structure" cash withdrawals); *id.* ¶¶ 156, 180–87 (JPMC failed to timely file reports about suspicious activity);

*infra* at 20–23 (detailing participation in sex-trafficking venture)). *See Maurizi v. Callaghan*, 2022 WL 1446500, at \*14 (W.D.N.Y. Feb. 25, 2022) (denying motion to dismiss aiding and abetting claims where complaint alleged that defendant knew coach was engaging in sexual activity with skaters, yet endorsed him for a coaching position where his abuse continued); *Kashef v. BNP Paribas S.A.*, 2021 WL 603290, at \*9 (S.D.N.Y. Feb. 16, 2021) (denying motion to dismiss aiding and abetting claims against financial institution where plaintiffs alleged that institution contributed to Sudanese Regime's human rights abuses).

Here, JPMC challenges only the third element, arguing that Doe has failed to allege knowing and substantial assistance. MTD at 5. JPMC first argues that, to establish aiding and abetting liability, the FAC must allege that JPMC had "actual knowledge" that Epstein battered Doe specifically. MTD at 5. But JPMC cites no authority for this proposition. The Second Circuit case it cites involved a claim that a bank aided and abetted fraud, which was subject to Rule 9(b)'s heightened pleading requirements. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006). In this case, no such heightened pleading standard applies.

Moreover, in *Lerner*, the court found that the bank lacked any knowledge that the lawyer was directly "looting" client funds. *Id.* at 293. Here, the FAC is replete with allegations that JPMC (including the CEO of JPMC Asset Management, Staley) knew exactly how Epstein was abusing his victims. *See, e.g.*, FAC ¶ 226 (Staley visited Epstein's stash house and "personally observed the sexual abuse of young women," including Doe); *infra* at 23–26 (detailing JPMC's knowledge of sex-trafficking venture). The FAC even alleges that a subsidiary of JPMC (Highbridge) "trafficked young women and girls on its own private jet from Florida to Epstein in New York . . . ." FAC ¶ 170. JPMC tellingly does not mention these allegations of direct participation

in Epstein's sex trafficking.[1] Doe has pled the requisite knowledge for aiding and abetting. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 443 (S.D.N.Y. 2010) (conscious avoidance "is sufficient to satisfy the knowledge requirement of" aiding and abetting); *Williams v. Sidley Austin Brown & Wood, L.L.P.*, 38 A.D.3d 219, 220 (N.Y. App. Div. 2007) (denying motion to dismiss aiding and abetting claim where defendant must have known loans were a sham).

Further, under New York law, tort liability for a sexual assault can rest "upon the principle that [all] those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him." *Weldon v. Rivera*, 301 A.D.2d 934, 935 (N.Y. App. Div. 2003) (internal quotation marks omitted). There need not be a formal agreement to commit the battery; "act[ing] tortiously pursuant to a tacit agreement to assault or batter" the victim is enough to create a triable issue of fact. *Scollo*, 60 A.D.3d at 840. And whether multiple wrongdoers "acted in concert is generally a question for the jury." *Herman v. Wesgate*, 94 A.D.2d 938, 939 (N.Y. App. Div. 1983) (participation in concerted activity is equivalent to participation in the activity).

JPMC also contends that the FAC fails to allege that the bank provided "substantial assistance" to Epstein with overt acts. MTD at 6. But, as explained above and throughout this brief, the FAC is replete with such allegations, including those listed above and more. JPMC provided cash to help Epstein pay victims and recruiters, permitted Epstein to structure cash withdrawals to avoid getting flagged, actively trafficked young women to Epstein through Highbridge, and helped Epstein conceal the trafficking from authorities which allowed him to abuse girls for a long stretch

---

[1]     The other case that JPMC cites—*Steinberg v. Goldstein*, 27 A.D.2d 955 (N.Y. App. Div. 1967)—cites no case law and involved a readily distinguishable claim against an attacker's wife, based solely on the fact that she drove an automobile up to the participants in a quarrel to take her husband away from the scene. *Id.* at 48.

of time. *See, e.g.*, FAC ¶¶ 155, 159, 170, 178, 179, 187. These allegations go well beyond failing to stop Epstein's actions or failing to act on warning signs as JPMC suggests, MTD at 5, and allege that JPMC overtly encouraged and enabled Epstein's behavior.

Finally, JPMC argues that providing Epstein with financial resources is insufficient to establish substantial assistance. MTD at 7. The only case JPMC cites is *SPV OSUS Ltd v. AIA LLC*, 2016 WL 3039192 (S.D.N.Y. 2016), in which this Court considered allegations that one of Bernie Madoff's victims brought against financial institutions that funneled money into the Ponzi scheme. But the plaintiff failed to even plead that it "had any dealings whatsoever with the [defendants] . . ., let alone invested in Madoff through them," and thus the Court held that the plaintiff failed to allege *proximate cause*. *Id.* at *6. Nowhere did the Court hold that providing financial resources can never amount to substantial assistance for an aiding and abetting claim. The case is also factually distinguishable—here, Doe has alleged numerous "dealings" between her abuser (Epstein) and JPMC, and has alleged that JPMC directly participated in causing her injuries. *See, e.g.*, FAC ¶¶ 108–110, 112, 115, 125, 132, 151–153, 157, 164, 171, 174, 176, 182.

### B. The FAC States a Claim for Intentional Infliction of Emotional Distress (Count II).

Doe has adequately alleged the elements of an intentional infliction of emotional distress ("IIED") claim. "The elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct; (2) the intent to cause, or the disregard of a substantial likelihood of causing, severe emotional distress; (3) causation; and (4) severe emotional distress." *Eskridge v. Diocese of Brooklyn*, 210 A.D.3d 1056, 1057 (N.Y. App. Div. 2022). Here, JPMC's conduct in directly facilitating and concealing Epstein's trafficking was extreme and outrageous, and it caused Doe severe emotional distress.

First, JPMC argues that its involvement in Epstein's sex trafficking was not so extreme and

outrageous as to justify an IIED claim. But that question of degree is best left for factual development in the case—not for summary disposition on the pleadings. *See, e.g., Matvejs v. Martin County Sheriff's Office*, 2006 WL 3755202, at *4 (S.D. Fla. 2006) (question of outrageousness could not be decided at the motion to dismiss stage). The detailed factual allegations throughout the FAC about JPMC facilitating Epstein's sex trafficking with endless access to cash to pay his victims and recruiters while knowing about his criminal conduct, while one of its chief executives directly participated in and observed trafficking, and while internal JPMC employees begged JPMC to cut ties with Epstein, are far from conclusory and are more than sufficient to state a claim for intentional infliction of emotional distress.[2]

JPMC also contends that a mere "failure to affirmatively intervene" to stop Epstein's sex trafficking cannot serve as the basis for liability. MTD at 8. But, under New York law, an IIED claim does not turn on a distinction between action and omission; the "ultimate question remains whether the conduct proven at trial, in light of all the circumstances, was utterly intolerable in a civilized community." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 161 (2d Cir. 2014). Here, the FAC contains not only allegations that JPMC failed to act, but also that it affirmatively

---

[2] Further, the extreme and outrageous element of an intentional infliction of emotional distress claim is satisfied where a plaintiff alleges a continuous nature of abusive conduct. *Canosa v. Ziff*, 2019 WL 498865, at *8 (S.D.N.Y. Jan. 28, 2019); *Bonner v. Guccione*, 916 F. Supp. 271, 276–78 (S.D.N.Y. 1996) (entire course of conduct alleged in the aggregate constituted IIED, not any given individual act); *Turner v. Manhattan Bowery Mgmt. Corp.*, 28 N.Y.S.3d 651, at *10 (Sup. Ct. 2015) (while each individual act committed by defendants was not actionable, "when aggregated over time, the continuous nature of the conduct may make it sufficiently outrageous that a jury could reasonably find in plaintiffs' favor on the emotional distress allegation"); *Collins v. Willcox, Inc.*, 600 N.Y.S.2d 884, 886 (Sup. Ct. 1992) (same). For example, in *Canosa*, the court found an actionable IIED claim based on plaintiff's allegations of a "course of intimidating and abusive conduct by [the defendant] spanning August 2010 to August 2017." 2019 WL 498865, at *8. Just as in *Canosa* here JPMC's actions, even if not actionable alone, in the aggregate present a claim for IIED.

committed abhorrent conduct. *See infra* at 20–23 (detailing participation in sex-trafficking scheme). And JPMC's participation in Epstein's sex-trafficking venture was clearly directed at Doe, one of Epstein's victims. FAC ¶ 303.[3]

The cases JPMC cites are devoid of these kind of affirmative allegations. *See Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 594 (S.D.N.Y. 2018) (IIED claim based solely on defendant's lack of action dismissed where Grindr's involvement was limited to "neutral assistance"); *Taggart v. Costabile*, 14 N.Y.S.3d 388, 394 (App. Div. 2015) (IIED claim alleged no more than landlord defendants "failed to rein in" tenants' tortious behavior). *Turley*, on the other hand (which JPMC also cites) shows that a combination of actions and omissions is actionable on an IIED claim if the conduct is sufficiently outrageous—as is it here. 774 F.3d at 161 (evidence supported IIED verdict where defendant failed to stop workplace discrimination and blocked efforts to investigate).

JPMC also insists that the FAC fails to allege that it "had the power to stop, but instead ignored or concealed, Epstein's crimes." MTD at 9. But the FAC alleges that JPMC had multiple opportunities to end its relationship with Epstein at the urging of others within the bank and thus cut off the financial lifeblood of the sex-trafficking venture, but refused to do so. *See, e.g.*, FAC ¶¶ 161, 172, 184. It also alleges that JPMC obstructed investigations into Epstein that could have stopped the trafficking (*id.* ¶ 183) and that JPMC concealed Epstein's crimes by, for example, failing to file suspicious activity reports (*id.* ¶ 224). Accordingly, the cases JPMC cites for this proposition cut against its position because they also involved defendants in a position to stop sexual abuse, but failed to do so. *Eskridge*, 210 A.D.3d at 1058 (IIED claim well-pled where

---

[3]     Somewhat at odds with its position that the Count II is defective, JPMC also contends that it is "duplicative" of other counts. MTD at 8 n.3. But a plaintiff "may plead claims that provide alternative bases for relief," and "[a] claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other." *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 325 (S.D.N.Y. 2019); *see also* Fed. R. Civ. P. 8(d)(2).

defendant had knowledge of sexual abuse, concealed it, and permitted it to continue); *c.f. Pinks v. Turnbull*, 2009 WL 4931802, at *6 (N.Y. Sup. Ct. Dec. 11, 2009) (IIED claim survived where defendant had notice of sexual abuse).

JPMC also argues that the FAC does not establish that JPMC's conduct was intentionally directed towards Doe and thus lacks the "requisite intent." MTD at 9. But it does: the FAC pleads allegations that JPMC intentionally worked with Epstein to create bank accounts, facilitate cash withdrawals used to directly pay Doe for sex acts, and even acquire Highbridge for the specific purpose for trafficking—all with the full knowledge that this was the purpose of Epstein's business with the bank. *See, e.g.*, FAC ¶¶ 108–110, 112, 115, 168, 170. Nothing more needs to be alleged to survive an IIED claim at the motion-to-dismiss stage under New York law. *See Eskridge*, 210 A.D.3d at 1058 (reversing order granting motion to dismiss and finding IIED claim well-pled where defendants' employee-priest sexually abused plaintiff).

Finally, JPMC contends that Doe has not established a causal connection between its outrageous conduct and Doe's injuries. But, again, it has. Without JPMC's financial support for (and direct participation with) Epstein and his sex-trafficking venture, Doe would never have been harmed by Epstein and thus suffered emotional distress. FAC ¶¶ 108–110, 112. And (as explained more below), it was entirely foreseeable that JPMC's active participation in the sex-trafficking venture would harm Doe. The Court should deny JPMC's motion to dismiss Doe's IIED claim.

### C.   The FAC States Two Negligence Claims (Counts III– IV).

Doe has also properly pled both of her negligence counts. To state a claim for negligence under New York law, "a plaintiff must show that the defendant owed the plaintiff a duty and breached that duty, and that the breach proximately caused the plaintiff harm." *Katz v. United Synagogue of Conservative Judaism*, 135 A.D.3d 458, 459 (N.Y. App. Div. 2016). JPMC argues that Doe has failed to properly plead a negligence claim because it owed no duty to Doe and the

FAC fails to allege that JPMC proximately caused her injuries. Both arguments should be rejected.

### 1.  Doe Adequately Alleges a Duty Sufficient to State a Negligence Claim.

First, JPMC contends that New York law generally imposes no duty to control the conduct of third parties absent a special relationship. MTD at 10–11. But any person or entity—including a bank—"ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010); *see also id.* § 19 ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 469 (2d Cir. 1995); *Ford v. Grand Union Co.*, 197 N.E. 266, 268–69 (N.Y. 1935) (citing to Restatement of Torts in discussing duties). While "[o]rdinarily a person owes no duty to members of the public at large," there is an "except[ion] to avoid injury to them by forces set in motion by such person or those acting as his [or her] agents." *Ford*, 197 N.E. at 269.

That is exactly what Doe has alleged: JPMC (through its agent-employee, Staley, and others) "set [the] forces [] in motion," *id.*, that injured Doe, as its financial support was critical to Epstein's sex-trafficking venture. The FAC makes clear that his venture "*was not possible*" without the assistance and complicity of JPMC, which could provide special treatment to Epstein and ensure the venture's continued operation, sexual abuse, and sex-trafficking of young women and girls. FAC ¶ 24 (emphasis added). JPMC (through Staley and others) provided accounts and other financial services which were almost exclusively used for Epstein to pay living and travel expenses; expenses related to Epstein's criminal activity; attorney's fees for criminal and civil lawsuits and sex-abuse settlements; private investigators to investigate sex abuse victims; and extravagant lifestyles for Epstein and his co-conspirators. *Id.* at ¶ 230. And, as already explained, JPMC provided cash to help Epstein pay victims and recruiters, permitted Epstein to structure cash withdrawals to avoid being flagged by the authorities, actively trafficked young women to Epstein

12

through its subsidiary Highbridge, and helped Epstein conceal the trafficking from authorities which allowed him to abuse girls for a long stretch of time. *See, e.g., id.* ¶¶ 155, 159, 170, 178, 179, 187. Because JPMC set these events into motion, it had a duty to not cause harm to members of the public like Doe and other Class Members. *See Ford*, 268 N.Y. at 248.

JPMC also contends that banks owe no duty to non-customers. MTD at 11. But one New York court has stated: "We do not find case law to support the argument that . . . a bank can *never* be held liable to non-customers and particularly when addressing allegations such as those before us in this action." *Elmaliach v. Bank of China Ltd.*, 110 A.D.3d 192, 206 (N.Y. App. Div. 2013) (emphasis in original). *Elmaliach* illustrates how New York law recognizes a cause of action against bank institutions in appropriate cases. In *Elmaliach*, the plaintiffs were victims of terrorist attacks. *Id.* at 195. They alleged that the acts of a Chinese bank were a proximate cause of their injuries in that the bank helped facilitate the transfer of millions of dollars between organized terrorist leadership outside Israel and their operatives inside Israel, enabling acts of terrorism in Israel. *See id.* While the court ultimately applied foreign law to the case, it applied *New York law* in recognizing that a bank may have a duty to non-customers in certain situations. *Id.* at 206 ("[A] tortfeasor's compliance with relevant laws and regulations will not insulate it from liability if it fails to act objectively reasonably"); *id.* at 207 ("Although New York does not generally recognize a duty on the part of banks to non-customers, that does not mean that New York policy would prohibit recovery under the alleged facts, if proven.").[4]

---

[4]    As this Court has explained, "[w]here the New York Court of Appeals has not ruled on an issue, federal courts are bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." *Rodland v. Judlau Contracting, Inc.*, 844 F. Supp. 2d 359, 363 (S.D.N.Y. 2012) (internal quotations omitted). JPMC's motion fails to cite *any* New York state authority regarding bank liability. As a result, there is no "persuasive evidence" to divert from the principles enunciated in *Elmaliach*.

Other courts have also recognized that banks can face tort liability to non-customers in non-routine cases. *See, e.g.*, *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) (suggesting that bank could be liable for negligence relating to terrorist attacks if plaintiff alleged bank "had any ties to Hezbollah, or that they knew or had reason to believe that the monies at issue would be used to carry out terrorist attacks on civilian targets"); *c.f. Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 518 (5th Cir. 2018) (in applying New York law and citing *Lerner*, recognizing that the rule that banks owe no duty to non-customers "is not without exception").

The FAC carefully lays out precisely the type of non-routine situation that New York courts would find imposes duties on a bank to non-customers.  By way of just a few examples, JPMC (1) deliberately assisted Epstein in "structuring" cash withdrawals (FAC ¶ 189); (2) helped cover up the sex-trafficking by failing to file required suspicious activity reports (*id.* ¶ 224); (3) through its wholly owned subsidiary, Highbridge, *actually trafficked* young girls from Florida to New York for Epstein (*id.* ¶ 170); and (4) had a top executive visit Epstein to nurture their relationship while he was in jail for soliciting a minor for prostitution (*id.* ¶ 203). These types of allegations (coupled with those that the bank did not comply with banking laws and regulations, *see id.* ¶ 271) are the exact type that the *Elmaliach* and *Licci* courts were looking for.[5]

---

[5]     JPMC insists that it owed no duty to Doe to address the many "red flags" under Epstein's account. MTD at 11. In a similar vein, it argues that it owed no duty to Doe under the Bank Secrecy Act ("BSA") or "Know Your Customer" rules, and that any violation of those regulations cannot form the basis for negligence claims "where no pre-existing duty" exists. MTD at 13. But that is exactly what Doe has alleged: JPMC had a pre-existing duty to not perform non-routine banking services, which it breached by participating in Epstein's sex-trafficking venture. *See Licci*, 704 F. Supp. 2d at 410. While the "red flags" and BSA violations alone may not impose a duty, here, they are not alone—they are coupled with numerous allegations about all the non-routine services JPMC performed as Epstein's bank, such as direct participation in sex trafficking. These unique allegations render JPMC's cases distinguishable. In *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, a California case, there were no allegations of non-routine services or out-of-the-ordinary banking activity. 56 Cal. Rptr. 2d 756, 763 (Ct. App. 1996). And in *In re Agape Litig.*, a Ponzi-scheme case, the fact that the bank's employee was dedicated solely to the needs and

2.   <u>Doe Adequately Alleges Causation Sufficient to State a Negligence Claim.</u>

Doe has adequately alleged that JPMC was the direct and proximate cause of her injuries. As already explained, Epstein's venture was not possible without JPMC to provide special treatment to Epstein and ensure the sex-trafficking venture's continued operation, sexual abuse, and sex-trafficking. FAC ¶ 24. It provided cash, permitted structuring, actively trafficked young women to Epstein through Highbridge, and helped Epstein conceal the trafficking from authorities, allowing him to abuse girls for a long stretch of time. *See, e.g.*, *id.* ¶¶ 155, 159, 170, 178, 179, 187. Not only are these but-for causes of Doe's injuries, but it was highly foreseeable that JPMC's participation in a sex-trafficking venture would result in injuries to victims.

Still, JPMC maintains that (1) the FAC fails to plead that Doe's injuries were a foreseeable consequence of JPMC's conduct; (2) its "support for routine banking services," like large cash withdrawals and wire transfers, is "too attenuated" from the harm those transactions inflicted; and (3) the FAC fails to plead that it offered non-routine banking services that it knew would facilitate Epstein's venture. MTD at 13–16. But these arguments are squarely addressed in the FAC.

As to foreseeability, JPMC and its officers and employees (including Jes Staley) had actual knowledge of Epstein's conduct—they even discussed internally Epstein's specific sex trafficking and the large amounts of cash that JPMC was giving him. FAC ¶¶ 360–61. The bank did not simply fail to adequately detect signs of Epstein's sex trafficking; it *did* detect multiple signs of Epstein's coercive sex-trafficking venture and continued to participate in the venture. *Id.* ¶ 360. JPMC's senior executive, Staley, even "visited the Epstein-owned victim stash house apartments at 301 East 66 Street," where he "personally observed the sexual abuse of young women, including Jane Doe 1." *Id.* ¶ 226. Some executives at JP Morgan pleaded for the bank to end its support of Epstein.

---

purposes of one customer had no bearing on the court's decision to not impose a duty on the banks. 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010).

*Id.* ¶ 213. But, for JPMC's senior leadership, Epstein's money was too tempting to resist. *Id.* ¶ 214.

As for its other two arguments, JP Morgan continues to argue that it merely provided "routine" banking support for Epstein, and not any "non-routine" services. MTD at 14, 15. But Doe has already addressed this, *see supra* at 14–15—the FAC repeatedly alleges that Epstein and JPMC forged a "special relationship" (FAC ¶ 145) specifically to provide exceptional and non-routine support for the sex-trafficking venture. *Id.* ¶¶ 144, 222–44. While large cash withdrawals and wire transfers could conceivably be routine in some circumstances, here they were specifically done for the purpose of sex trafficking and were coupled with clear, non-routine services (*e.g.*, structuring, concealment of illicit activities, direct trafficking through Highbridge, etc.). All of these allegations, taken together, stand in stark contrast to the cases JPMC cites where the allegations were merely conclusory. *See Rosner v. Bank of China*, 2008 WL 5416380, at *12 (S.D.N.Y. Dec. 18, 2008) ("The Second Amended Complaint gives no evidence that BoC was doing anything more than providing its usual banking services to a customer"), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 518 (S.D.N.Y. 2010) (defendant bank merely provided banking and financial services "offered to all bank customers"). As for *Lerner*, as explained above, the Second Circuit found that failure to report overdrafts was "too far removed" to find proximate cause between that conduct and plaintiffs' injuries. 459 F.3d at 287. Here, not only were JPMC's supposed "routine" services of cash withdrawals and wire transfers directly connected to sex trafficking, but they were coupled with many non-routine services, as well.

Finally, JPMC's actual knowledge extended to the fact that specific individual women and girls were being coercively trafficked by Epstein between the time of his onboarding and the termination of its relationship with Epstein. FAC ¶ 364. Even if JPMC did not know all the names

of Epstein's victims, it knew that specific victims (including Doe) of a specific trafficker (Epstein) during a specific time period (between 2000–2013 and following) existed and were being forced to engage in commercial sex acts. *Id.* And, as explained already, all of this amounts to JPMC providing non-routine banking services "by setting up the necessary financial structure to operate [Epstein's] sex-trafficking venture." *Id.* ¶ 154. These allegations are more than sufficient to plead proximate cause at the pleading stage. *Lerner*, 459 F.3d at 290 (vacating dismissal and finding proximate cause existed where bank facilitated attorney's illicit activities); *c.f. Galasso, Langione & Botter, LLP v. Galasso*, 176 A.D.3d 1176, 1180 (N.Y. App. Div. 2019) ("There are triable issues of fact as to whether Signature was negligent in knowingly permitting Anthony—a nonattorney— to be a signatory on the Baron escrow account, and as to whether any such negligence was a proximate cause of the loss of funds deposited in the Baron escrow account").

## II.   DOE HAS PROPERLY PLED SIX TVPA CLAIMS (COUNTS V-X).

The TVPA provides a civil cause of action for sex-trafficking victims against those, like JPMC, who participate in a sex-trafficking venture. In her FAC, Doe brings six causes of action against JPMC under the TVPA, and the Court should deny JPMC's motion to dismiss each of those causes of action. JPMC does not contest that Doe is a sex-trafficking victim, that Jeffrey Epstein ran a sex-trafficking venture, or that the TVPA includes a private right of action. JPMC argues only (1) that Doe's TVPA claims are time barred, (2) that Doe's allegations about JPMC's involvement with Epstein are insufficient to allege that it participated in a sex-trafficking venture, (3) that Doe's allegations are insufficient to demonstrate that it knew or should have known about the venture, and (4) that Doe's aiding and abetting, conspiracy, attempt, and obstruction claims are not viable. The Court should reject each of these arguments as to Doe's six TVPA claims.[6]

---

[6]      In the interests of avoiding duplicative briefing, Doe adopts the USVI's arguments in opposition to JPMC's motion to dismiss its § 1591(a)(2) count in the related, consolidated case the

This Court must construe the applicable TVPA provisions broadly because remedial provisions, like Section 1595 of the TVPA, require broad interpretation. *See, e.g.*, *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020); *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019); *Canosa v. Ziff*, 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019).

### A. Doe's TVPA Claims Are Not Time-Barred.

JPMC concedes that the TVPA has a ten-year statute of limitations, which extends its TVPA liability back to November 24, 2012. And it concedes that the FAC alleges both injury to Doe and action by JPMC within that time frame, including that JPMC continued to provide the financial underpinnings for the venture, such as access to cash for victims and recruiters, through 2013. *See* FAC ¶ 114 (alleging coerced sex acts "through the end of 2013"); *id.* ¶ 356 (alleging concrete steps by JPMC to aid Epstein's sex-trafficking venture "continuing through about August 2013"); *id.* ¶ 124 (JPMC provided financial support through 2013 and following). In fact, JPMC's motion seemingly acknowledges that there was "a period of approximately nine months" (*i.e.*, between November 24, 2012, through about August 2013) where JPMC's banking relationship with Epstein continued that falls within the limitations period. MTD at 17.

Because timeliness is an affirmative defense, JPMC bears the burden of proving that Doe's claims are untimely. *See Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014). "[A] complaint does not need to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Id.* at 315 (internal quotation marks omitted). A motion to dismiss based on timeliness "should not be granted unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989)

---

USVI filed against JPMC. *See* USVI's Mem. of Law in Opp. to JPMC's Motion to Dismiss, Case No. 1:22-cv-10904 (Feb. 15, 2023), Dkt. 48 at 10–19.

(internal quotation marks omitted); *see also Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) ("dismissal is appropriate only if a complaint clearly shows the claim is out of time"). In this case, Doe alleges coercive sex trafficking through 2013, *see, e.g.*, FAC ¶¶ 99, 113–15, 124, 274, 364, and JPMC cites no authority for the proposition that Doe needed to plead around its timeliness defense by explaining what happened during the "tail end of the banking relationship" with more specificity or list the dates of each instance of abuse. *See* MTD at 17.[7]

Further, the FAC alleges that JPMC's culpability extended beyond the time when it ended its formal banking relationship with Epstein in August 2013. For example, as to the TVPA conspiracy count (Count VIII), Doe need only prove "one overt act in furtherance of the conspiratorial agreement . . . performed within that period [of the statute of limitations]." *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001). And once JPMC joined in Epstein's sex-trafficking conspiracy, it remained liable for acts of the conspiracy until it made a clean break and affirmatively communicated its abandonment of the conspiracy. *See United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (withdrawal from conspiracy requires proof of "making of a clean [break] to the authorities" or "communication of the abandonment in a manner reasonably calculated to reach co-conspirators"). And yet, as alleged in the FAC, JPMC did no such thing (FAC ¶ 186) and continued to support the conspiracy (*id.* ¶ 187).

### B.  The FAC States a Claim for TVPA Beneficiary Liability (Count V).

The elements of a beneficiary liability claim under § 1591(a) are: "(1) the person or entity must 'knowingly benefit, financially or by receiving anything of value,' (2) from participating in

---

[7]     JPMC relies on materials outside the FAC to suggest that Doe previously alleged trafficking through 2012 (which is still inside the limitations period), as opposed to through 2013. MTD at 17. JPMC cites no authority for the proposition that the Court should discard Doe's good faith allegations in *this case* based on a filing in a different case, especially given that the Court must take Doe's allegations in the FAC as true.

a venture, (3) that the 'person knew or should have known has engaged in an act in violation of this chapter.'" *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 152–53 (E.D.N.Y. 2020). Doe has adequately alleged that JPMC did, indeed, participate in a sex-trafficking venture in violation of the TVPA, knew or should have known about the sex-trafficking venture, and financially benefited from it. FAC ¶¶ 122–88, 347–89. JPMC's arguments to the contrary are meritless.

1. JPMC Participated in Epstein's Sex-Trafficking Venture.

JPMC contends that the FAC merely alleges "passive facilitation" of Epstein's sex-trafficking venture, rather than "active engagement." MTD at 18.  The FAC, however, contains specific allegations demonstrating that JPMC was an active participant in Epstein's trafficking venture. As just a few examples, JPMC paid funds to victims of trafficking, co-conspirators, and recruiters from Epstein-related accounts (FAC ¶¶ 155, 252, 256); permitted Epstein and his co-conspirators to withdraw large sums of cash to pay victims, including Doe (*id*. ¶¶ 108–09, 112, 253); housed accounts for known co-conspirators to which Epstein transferred tens of millions of dollars (*id*. ¶¶ 174, 240, 255); deliberately failed to file reports in the face of red flags because the reports might result in government intervention in the sex-trafficking venture (*id*. ¶¶ 156, 180–82, 187); permitted Epstein to withdraw thousands of dollars in hush money after Doe was brutally raped (*id*. ¶ 159); trafficked girls on a private jet owned by subsidiary Highbridge (*id.* ¶¶ 170, 176); refused to cut ties with Epstein despite the pleas of certain JPMC executives, enabling his trafficking for many more years (*id.* ¶¶ 161, 172, 184); assisted with transporting trafficking victims on a private jet (*id.* ¶ 176); and funded a modeling agency that funneled girls to Epstein for abuse (*id.* ¶ 241).[8]

JPMC predictably argues that it cannot be liable for a TVPA claim because the FAC alleges

---

[8]     The USVI has likewise made numerous allegations of active participation by JPMC. *See* FAC Ex. 1 ¶¶ 52–91.

it was simply providing normal business services that happened to facilitate sex-trafficking, and that Doe must further allege "specific conduct that furthered the sex trafficking venture." MTD at 18. But this is a misreading of the FAC and its many allegations about non-routine banking services *designed* to facilitate sex-trafficking.[9] For example, JPMC ignores the allegation that (through Highbridge), JPMC *actually trafficked* women and girls for Epstein. FAC ¶¶ 170, 176. It ignores that JPMC helped to cover up the conspiracy by failing to file required reports despite many red flags. *Id.* ¶¶ 180–82, 187, 224. And it ignores that JPMC deliberately assisted in "structuring" cash withdrawals. *Id.* ¶¶ 179, 189. This conduct is not merely evidence of a "normal banking" relationship, and any argument to the contrary is frivolous. MTD at 19.

This case is akin to a case JPMC cites—*Canosa v. Ziff*—where the defendant's actions to further the sex-trafficking venture "were entirely inconsistent with their ordinary job duties." MTD at 19. In that case, which involved a TVPA claim against Harvey Weinstein-controlled companies, the complaint alleged "specific means and methods used by multiple company employees to facilitate Weinstein's sexual assaults and to cover them up afterwards . . . with the predictable effect of enabling future assaults by Weinstein." 2019 WL 498865, at *24. Here, the same is true: JPMC provided the cash that paid for and facilitated Epstein's sex trafficking, including trafficking of Doe (*see, e.g.*, FAC ¶ 273) and helped to conceal the conspiracy (*see, e.g.*, *id.* ¶ 243). Thus, just as in *Canosa,* Doe has alleged an ongoing "pattern of facilitation and cover-up"—*e.g.*, delivering cash and then covering it up—that is sufficient "to state a claim of participation against" JPMC. *See* 2019 WL 498865, at *24. For the same reason, JPMC's attempt to analogize this case to *G.G.*

---

[9]     Further, most courts have rejected the argument that an overt act in furtherance of sex-trafficking is required to state a beneficiary liability claim. *See, e.g.*, *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1296 (M.D. Fla. 2021); *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1062 (D. Colo. 2021); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020).

*v. Salesforce.com, Inc.*, 603 F. Supp. 3d 626 (N.D. Ill. 2022), where the plaintiff had *only* alleged that Salesforce provided its standard software to sex-trafficking website Backpage and nothing more, fails.[10]

In addition to including specific examples of the ways in which JPMC participated in the sex-trafficking venture, the FAC also alleges a long-term relationship between JPMC (and particularly its executive, Jes Staley) and Epstein. FAC ¶¶ 252–73. As another district court recently explained, the factor that "appears to differentiate plaintiffs who adequately state [TVPA] beneficiary claims from those who do not is that the successful plaintiffs 'connect the dots' between the plaintiff's traffickers and the specific defendant in the case." *J.C. v. I Shri Khodiyar, LLC*, 2022 WL 4482736, at *5 (N.D. Ga. Aug. 29, 2022). "One way to connect the dots is to allege a 'continuous business relationship' between a defendant hotel and a sex trafficker where the defendant rented rooms to people it knew or should have known were engaged in sex trafficking." *Id.*; *see also Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017); *S.Y. v. Best Western Int'l, Inc.*, 2021 WL 2315073, at *4 (M.D. Fla. June 7, 2021); *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *5 (S.D. Ohio Dec. 6, 2019). Here, just like the hotel owners who provided rooms for sex trafficking, JPMC continuously and knowingly provided cash and other direct financial support for Epstein and his co-conspirators to propel the venture forward for more than a decade. *See A.B.*, 455 F. Supp. 3d at 191 (denying motion to dismiss beneficiary liability claim against hotel that

---

[10]    JPMC also suggests that Doe's allegations are even more deficient than those in *Geiss* and *Noble*. MTD at 20 n.8. *Noble v. Weinstein* involved only allegations that the defendant facilitated the perpetrator's travel without linking that travel to the plaintiff's trafficking. 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018). Here, as alleged and already explained, JPMC provided financial assistance that directly enabled ongoing sex-trafficking by Epstein, including the trafficking of Doe, and helped him cover it up until 2013. In *Geiss*, another Weinstein case, the *only* allegation of participation in a sex-trafficking venture was payment of hush money, which could not have facilitated the trafficking because it occurred after the trafficking. *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 n.4 (S.D.N.Y. 2019).

"financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex"); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) (denying motion to dismiss beneficiary liability claim against hotel operator because "M.A. alleges that the hotels repeatedly rented rooms" and alleged "a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement"). Accordingly, Doe has sufficiently alleged JPMC's participation in the sex-trafficking venture.

2. JPMC Both Knew and Should Have Known About Epstein's
   Sex-Trafficking Venture.

JPMC next contends that the FAC does not allege that JPMC knew or should have known about Epstein's particular sex-trafficking venture, or that it knew that any specific victim was being trafficked. MTD at 16.  But the FAC plainly includes specific allegations that JPMC knew about Epstein's specific sex-trafficking venture. In 2006, Epstein was convicted of soliciting a minor for prostitution, received immunity for sex-trafficking charges, and registered as a sex offender. FAC ¶ 195. Epstein's immunity deal was made public in 2008, and received widespread attention detailing the sex-trafficking charges that Epstein could have been charged with, the trafficking conduct underlying the investigation (including that he was abusing three to four girls *per day* and paying them and recruiters in cash), and the names of co-conspirators. *Id.* ¶¶ 190–99. After his arrest, dozens of public lawsuits were filed against Epstein, which detailed further instances of abuse and trafficking and received significant media attention. *Id.* ¶¶ 207–08, 211–12. JPMC cannot credibly contend that this public information did not put it on notice of Epstein's trafficking venture—indeed, many of Epstein's lawyers representing him were paid from JPMC accounts. *Id.* ¶¶ 200, 230. JPMC's only response is that these public reports do not establish JPMC's *actual knowledge* of a sex-trafficking venture (MTD at 23), but "actual knowledge" is not what is required

to plead a TVPA claim—all that is required is an allegation that the defendant knew or should have known about the venture, as further explained below.

In any event, JPMC did have actual knowledge of the sex-trafficking venture through Epstein's "close pal" Jes Staley. Staley, as part of his efforts to nurture the lucrative business relationship with Epstein, personally visited Epstein in jail after his conviction, frequented Epstein's New York mansion (a site of sexual abuse), visited Epstein's stash house and observed Doe there, often called Epstein at his home, flew on Epstein's plane with known co-conspirators, and visited Epstein's "Pedophile Island." FAC ¶¶ 115, 148, 153, 203, 205, 226–27; *see Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288 (D. Conn. 2013) (allegations that priest knew student was living at abuser's home and witnessed abuser show student pornographic video sufficient to raise plausible inference that priest knew or should have known school was violating § 1591, and knowledge was imputed to university). Even putting aside Staley, the FAC contains multiple other specific allegations of JPMC's actual knowledge of Epstein's sex-trafficking venture, including allegations that JPMC executives knew about Epstein's trafficking and lobbied for the bank to cut ties with him, but it refused. *See, e.g.,* FAC ¶¶ 161, 172, 184, 213–14, 226–45. Such allegations are more than enough to show that JPMC had direct and specific knowledge about the sex-trafficking venture, particularly because even Rule 9(b) permits "knowledge, and other conditions of a person's mind" to "be alleged generally."

JPMC next suggests that a TVPA claim requires an allegation that the defendant knew that the plaintiff specifically was being trafficked. MTD at 21. But nothing in the TVPA's language requires that a defendant have specific knowledge of the identity of the plaintiff. Under the plain text of the statute, the victim need only allege "that (1) the person or entity . . . knowingly benefit[ted], financially or by receiving anything of value, (2) from participating in a venture, [and]

(3) that the person knew or should have known [he] has engaged in an act in violation of this chapter." *Choice Hotels*, 473 F. Supp. 3d at 152–53 (internal quotation marks omitted). *Nothing* in the language of the TVPA requires specific knowledge of a particular victim, and JPMC cites no controlling precedent imposing such a pleading requirement.[11]

A district court within this Circuit has effectively rejected the argument that a TVPA defendant must have specific knowledge of the identity of a specific trafficking victim. In *Choice Hotels*, the court considered the argument that the defendant must have had knowledge of "some participation in the sex trafficking act itself." 473 F. Supp. 3d at 153. This requirement was adopted in *Noble*, which in turn relied on an unpublished Sixth Circuit decision in a criminal case, *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016). But as *Choice Hotels* explained, *Afyare* was analyzing a criminal provision of the TVPA, and "thus several courts have rejected this further element as inapplicable to a distinct" civil provision, § 1595. *Choice Hotels*, 473 F. Supp. 3d at 153; *see also A.B.*, 455 F. Supp. 3d at 188–89; *M.A.*, 425 F. Supp. 3d at 969, 971.

The *Choice Hotels* court held that not requiring specific knowledge of a sex trafficking act in civil cases was "correct, not only because of the inherent differences between civil and criminal liability, but because Congress intended to broaden the behavior that can form the basis of civil liability when it amended the [TVPA] in 2008." 473 F. Supp. 3d at 153 (internal quotations

---

[11]        The only case JPMC cites for this proposition is an unpublished case from the Central District of California. MTD at 21 (citing *Fleites v. MindGeek S.A.R.L.*, 2022 WL 4456077, at *9 (C.D. Cal. July 29, 2022)). But JPMC leaves out key details of the court's holding in *MindGeek*. In the claim at issue, the plaintiff alleged that Visa was liable for beneficiary liability in allowing the operator of a pornography website, which displayed explicit videos of the plaintiff when she was a minor, to use its payment network. *Id.* at *4. The court did not reject this claim merely because Visa did not directly interact with the plaintiff or know she was a victim, as JPMC suggests, but also because Visa was not alleged to have had any direct interaction with the plaintiff's "direct traffickers." *Id.* at *9. Thus, even if *MindGeek* were controlling, it would be inapplicable here, where the FAC alleges a substantial, continuous relationship between Doe's direct trafficker (Epstein) and JPMC. *See supra* at 22.

omitted). Congress did so by including the "knew or *should have known*" language in § 1595, the civil provision, while the TVPA's criminal provision does not contain the "should have known" language and thus requires actual knowledge. 18 U.S.C. § 1591 (emphasis added). "In effect, the broader understanding of § 1591 means that a person may be held liable if he *should have known* that he was facilitating a sex trafficking venture, even if his participation [was] not direct participation in the sex trafficking." *Choice Hotels*, 473 F. Supp. 3d at 153 (emphasis added). Here, the FAC alleges that JPMC was knowingly providing cash and other financial support to "people it knew or should have known were engaged in sex trafficking"—that is, Jeffrey Epstein and his co-conspirators.

Even if knowledge that the particular plaintiff was trafficked is required under § 1595, which it is not, the "knew or should have known" language in § 1595's civil liability provision establishes a negligence/constructive knowledge standard. *See M.A.*, 425 F. Supp. 3d at 966. Under this standard, a defendant "need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the [TVPA], otherwise the 'should have known' language in § 1595(a) would be meaningless." *Id.* at 971. Here, Doe has more than adequately pled JPMC's negligence on this particular point, as she alleges in conjunction with the many trafficking red flags that JPMC ignored and all of the publicly available information about Epstein's scheme, Epstein used JPMC to make cash payments and hush payments directly to Doe (FAC ¶¶ 108–09, 112, 159), and Staley personally met her and observed her being abused (*id.* ¶¶ 115, 226). Again, JPMC's argument that Staley did not have *actual knowledge* that Doe had been abused because she was over 18 and he did not see her being physically forced into commercial sex ignores the "should have known" language. MTD at 23.

### 3. JPMC Benefitted from Participation in Epstein's Sex-Trafficking Venture.

Doe has adequately alleged that JPMC benefited from its participation in Epstein's

sex-trafficking venture by, for example, earning millions of dollars in revenue, interest, and fees from the JPMC accounts it knew Epstein used for trafficking, from the additional wealthy clients that Epstein brought JPMC, and from lucrative business opportunities that Epstein offered. FAC ¶¶ 132, 150, 151, 168, 267–69; *see, e.g.*, *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1297 (M.D. Fla. 2021) (complaint adequately alleged the hotel knowingly benefited from trafficking by receiving payment for the rooms and food and beverage sales, and franchisor knowingly benefited by receiving franchise fee and continuous royalties). JPMC does not dispute this, but claims that Doe failed to allege any "causal relationship" between JPMC's "affirmative conduct furthering the sex-trafficking venture and [its] receipt of" benefits.[12] MTD at 24. Not so. The FAC explains in great detail the quid pro quo between Epstein and JPMC, including that (1) JPMC knew that, if it stopped participating in the venture, it would lose the substantial financial benefits that Epstein was providing (FAC ¶¶ 152, 173, 214) and (2) JPMC executives specifically lobbied to keep Epstein as a client despite the reports about his trafficking because of how lucrative JPMC's assistance in Epstein's trafficking was (*id.* ¶¶ 132–33, 161, 172, 184, 213–14).

Contrary to JPMC's argument, this case is more akin to *Canosa* then *Geiss*. MTD at 24–25. This case is not like *Geiss*, where the plaintiff alleged the production company defendant benefited from participating in sex trafficking simply due to Harvey Weinstein's continued employment, which generated revenue for the company "in spite of"—not because of—the facilitation of trafficking. 383 F. Supp. 3d at 169–70. Here, the FAC alleges in detail the quid pro quo between Epstein and JPMC, and the benefits JPMC received in direct exchange for its facilitation and participation in the venture—such as millions of dollars in revenue, interest, and

---

[12]     Some courts have held that no such "causal relationship" between the benefit and participation and sex trafficking is required. *See HH v. G6 Hospitality, Inc.*, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019). The Second Circuit has not decided this issue, but in any event, such a causal relationship is clearly alleged in the FAC.

fees it earned on the accounts Epstein used for trafficking. FAC ¶¶ 268–69. These allegations are similar to those in *Canosa*, where the complaint alleged "a symbiotic relationship between the [companies] and Weinstein, in which the companies affirmatively enabled and concealed Weinstein's predations as a means of keeping him happy, productive, and employable" which led to benefits for the company. 2019 WL 498865, at *24.[13]

### C.   The FAC States a Claim for TVPA Perpetrator Liability (Count VI).

Doe has also properly alleged a claim against JPMC as a direct perpetrator of sex trafficking under 18 U.S.C. § 1591(a)(1), because it knowingly perpetrated, assisted, supported, and facilitated a sex-trafficking venture with Epstein. JPMC contends that Doe failed to include allegations that anyone other than Epstein and his co-conspirators directly participated in the trafficking itself, but ignores entirely, for example, that JPMC actually "transport[ed]" sex-trafficking victims. *See* FAC ¶¶ 170, 176. JPMC also ignores the allegations that a "powerful financial executive" at JPMC "used aggressive force in his sexual assault of [Doe] and informed [Doe] that he had Epstein's permission to do what he wanted to her." *Id.* ¶ 107; *see also id.* ¶ 115 (alleging that the head of JPMC's private banking division "was a regular visitor of Epstein's during that period of time, through and beyond 2013, and personally observed Jane Doe 1 as a sexual trafficking and abuse victim"); *id.* Ex. 1 ¶¶ 52–62 (describing procurement of "Snow White" and "Beauty and the Beast" in conversations between Epstein and a JPMC executive). The Court should deny JPMC's motion to dismiss Count VI.

---

[13]   Count V also alleges a perpetrator liability claim (although the FAC's central allegations on perpetrator liability are found in Count VI). *See* FAC ¶ 349. JPMC moves for dismissal of this claim. MTD at 25. For the reasons explained in the next section of this response in connection with the Count VI perpetrator claim, that aspect of JPMC's motion to dismiss regarding Count V should also be denied.

### D.  The FAC States a Claim for Aiding and Abetting TVPA Violations (Count VII).

Doe has properly alleged a claim under the TVPA that JPMC aided and abetted a sex-trafficking venture in Count VII. JPMC maintains that aiding and abetting (and certain other claims) are not actionable civil claims under TVPA's "civil remedy" provision, 18 U.S.C. § 1595(a). MTD at 26. The civil remedy provision provides a remedy for any violation of "this chapter." 18 U.S.C. § 1595(a). JPMC reads this broad language as permitting civil actions for only certain limited violations of "this chapter"—specifically, only for § 1591(a). If Congress wanted to limit the TVPA's civil remedy to a few select subsections of "this chapter" (*i.e.*, Chapter 77, 18 U.S.C. §§ 1581–97), it could have said so.

Regarding Count VII (aiding and abetting), JPMC argues that civil liability for aiding and abetting does not exist under § 1595, citing, *e.g.*, *Noble*, 335 F. Supp. 3d at 525. In turn, *Noble* cites as authority *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that there is no civil liability for aiding and abetting a violation of § 10(b) of the 1934 Securities Act. *Id.* at 186–92. But that case involved an "implied cause of action." *See id.* at 191.  Here, in clear contrast, Congress has explicitly provided a statutory civil cause of action for "a victim of a violation of *this chapter* . . . against the perpetrator . . . ." 18 U.S.C. § 1595(a). And, under 18 U.S.C. § 2, anyone who aids and abets a violation of the chapter is "punishable as a principal"—thereby making that person a perpetrator of a violation of the chapter. *Noble* did not consider this argument—and, accordingly, it reached the wrong conclusion.

JPMC also claims that Doe failed to make sufficient allegations of substantial assistance. But, as discussed above (*supra* at 20–23) Doe has pled substantial and intentional assistance, including paying funds to victims and to known Epstein co-conspirators (FAC ¶ 155); deliberately failing to file reports that might result in government intervention (*id.* ¶ 156); trafficking girls on

29

a jet (*id.* ¶ 170); refusing to cut ties with Epstein, enabling his trafficking for many more years (*id.* ¶¶ 172, 184, 213–14); and assisting with transporting trafficking victims (*id.* ¶ 176).

### E.   The FAC States a Claim for Obstruction of TVPA Enforcement (Count X).

JPMC next argues that the Court should dismiss Count X, which alleges obstruction of TVPA enforcement. JPMC claims that the only "victim" of obstruction is the government. MTD at 28. While it is true that the government is the direct "victim" of obstruction of TVPA enforcement, sex-trafficking victims can also be directly and proximately harmed. That is exactly what Doe alleges here—if JPMC had been cooperative in trafficking investigations into Epstein instead of simply enabling him and helping him conceal his conduct, his abuse of Doe likely would have ceased much earlier than it did. *See, e.g.*, FAC ¶¶ 432, 471, 479. Federal courts recognize government process crimes can harm not only the government, but also individuals. *See United States v. The Boeing Co.*, 2022 WL 13829875, at *7–9 (S.D. Tex. Oct. 21, 2022) (finding that those killed in Boeing crashes were "victims" under Crime Victims Rights Act of Boeing's conspiracy to defraud FAA because conspiracy "directly and proximately" caused crashes).[14]

JPMC also contends that the FAC fails to allege that JPMC knew about a government investigation. MTD at 28–29 (regarding obstruction claim), *id.* at 43 (regarding conspiracy claim). But the FAC specifically alleges JPMC was aware it was obstructing several criminal investigations in the Southern District of Florida[15] and in this District, and that it purposefully

---

[14]   *See also*, *e.g.*, *United States v. Hoover*, 175 F.3d 564, 566–69 (7th Cir. 1999) (finding university was "victim" of false statement offense because it provided tuition loan money based on defendant's misrepresentations); *United States v. Haggard*, 41 F.3d 1320, 1325 (9th Cir. 1994) (holding that the mother of child kidnapping victim, in a prosecution for making false statements to the FBI, was herself a victim of defendant's crimes for restitution purposes, arising from the defendant leading the FBI on wild goose chase for the victim's body).

[15]   JPMC notes that § 1591(d) was amended in 2008. MTD at 29 n.11. But the FAC alleges obstruction of the investigation of the U.S. Attorney's Office for the Southern District of Florida from "in and around 2006 to 2008" (FAC ¶ 183)—an overlapping time period.

refused to comply with a subpoena in connection with a 2009 civil case. FAC ¶¶ 80–81, 89–92, 180–83, 212–13, 223, 231, 432–33, 448–87. In addition, unlike other cases not involving financial institutions, JPMC was required to file reports with the federal government. The FAC explains in detail how JPMC's willful failure to file those reports obstructed TVPA enforcement and harmed Doe. *Id*. ¶¶ 187, 224, 296, 356, 368, 397, 432, 438–40.[16]

### F.   The FAC States a Claim for TVPA Conspiracy (Count VIII).

JPMC also moves for dismissal of Count VIII, which alleges that JPMC conspired to violate the TVPA—a conspiracy prohibited by 18 U.S.C. § 1594 ("Whoever conspires with another to violate section 1591" is guilty of an offense). Under section 1594(c), Doe has adequately alleged that JPMC conspired with Epstein to violate section 1591(a)(2). Here, as explained above, Epstein was engaged in a criminal, sex-trafficking venture (which JPMC does not dispute), and JPMC knowingly and intentionally agreed to provide Epstein with the means to effectuate and continue that criminal venture with the accounts, cash, and other tools it provided him, and to help Epstein conceal the venture from authorities by deliberately failing to file reports of suspicious activity. Such is sufficient to state a claim for conspiracy under the TVPA, as JPMC's own authority makes clear. *See MindGeek*, 2022 WL 4456077, at *10 (plaintiff adequately alleged TVPA conspiracy claim based on "Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos, like those featuring Plaintiff").

JPMC first argues that there is no private right of action for a TVPA conspiracy claim. MTD at 30. But conspiracy in violation of § 1594(c) falls within the ambit of the civil liability

---

[16]     JPMC complains that Doe's obstruction allegations involves a "string of counterfactuals." MTD at 29. But, of course, an obstruction claim necessarily involves some discussion of what would have happened if a defendant (such as JPMC) had complied with the law. Moreover, JPMC's obstruction by (for example) failing to file required Suspicious Activity Reports is not a "counterfactual" but a well-pleaded allegation in the FAC. *See, e.g.,* FAC ¶¶ 438–39.

provision of § 1595 because it is within "*this chapter*" (*e.g.*, Chapter 77 of Title 18, §§ 1581–97). Further, a few weeks ago, Congress passed the *Abolish Trafficking Reauthorization Act of 2022*, P.L. 117-347, 136 Stat. 6199 (2023), which added a "technical and clarifying update to [the] civil remedy" provision in § 1595, adding explicit liability for a person who "attempts or conspires to benefit" from a TVPA violation. *Id.* § 102 (emphasis added). Because Congress viewed this amendment as a "clarifying" amendment, it applies to this case even though it was passed after this lawsuit was filed. *Norsoph v. Riverside Resort & Casino, Inc.*, 2020 WL 641223, at *9 (D. Nev. Feb. 11, 2020) ("Clarifying legislation is not subject to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment." (cleaned up)); *see also Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) (by placing the term "technical" in the title of a law "Congress intended . . . a clarifying amendment, not a substantive change"); *Johnson v. U.S. Dep't of Hous. & Urb. Dev.*, 911 F.2d 1302, 1308 (8th Cir. 1990) ("The clarifying amendment . . . is evidence of what Congress intended when it passed the [earlier-enacted statute].").[17] Congress's recent clarifying amendment is therefore not only retroactive, but it affirms that liability for attempt or conspiracy was *always* part of the statute.[18]

---

[17]     Despite this well-recognized approach to "clarifying" and "technical" amendments, JPMC claims that this Court must ignore those words and treat the 2023 amendment as evidence that the TVPA did not previously cover conspiracy. MTD at 31 n.13. But under this approach, Congress could never try to clarify existing laws to prevent an unduly restrictive interpretation because its very effort to do so would then be used by litigants in support of an unduly restrictive interpretation. Further, the only cases JPMC cites for the proposition that the amendment is not retroactive (MTD at 32) are cases holding that the 2003 amendment to the TVPA creating the civil cause of action did not apply retroactively, but that amendment was plainly not merely clarifying or technical—it created an entirely new statutory right. *Velez v. Sanchez*, 693 F.3d 308, 324–325 (2d Cir. 2012); *Ditullio v. Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011).

[18]     JPMC cites the out-of-circuit case *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1176 (9th Cir. 2022), which was decided before Congress passed the January 5, 2023, clarifying amendment to the TVPA. MTD at 31. But that is a case assessing whether TVPA "attempt" liability exists. *Ratha* rests on the textual argument that an "attempt to benefit" is not the same as "benefitting." *Id.* Yet that textual argument does not apply cleanly to conspiracy, where a conspiracy can result in a benefit.

Next, JPMC suggests that because it was handling the financial side of the venture, it cannot be responsible for the sex-trafficking side of the venture. MTD at 33. Of course, in a far-flung conspiracy, not every conspirator will have knowledge as to every detail of the conspiracy's day-to-day operations. And yet it is well-settled law that a person, by virtue of being a party to a conspiracy, may be held responsible for the actions of his "partner[s] in crime" even if he or she did not participate in or know about those actions. *Pinkerton v. United States*, 328 U.S. 640, 647 (1946); *see also United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (discussing "*Pinkerton* liability" under which a defendant may be held responsible for crime he did not personally commit); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D.N.Y. 2017) (conspiracy can be inferred if the co-conspirators "entered into a joint enterprise with consciousness of its general nature and extent"). Under this established principle, once JPMC agreed with Epstein to further his sex-trafficking venture in violation of the TVPA, it became liable for Epstein's actions in furtherance of the conspiracy. And given the quid pro quo allegations in the FAC—that it was only because JPMC was taking the high risk of funding the sex trafficking that Epstein was willing to provide high reward financial benefits in return—the FAC's allegations of the bank's scienter are far more than plausible. JPMC is thus properly subject to a civil claim for TVPA conspiracy. *See, e.g.*, *Ricchio*, 853 F.3d at 555–58.

JPMC also glosses over the allegations in the FAC that undergird the conspiracy count. For example, JPMC claims that the FAC lacks sufficient allegations that it specifically intended to knowingly benefit from the conspiracy. MTD at 32–33. But—once again—the FAC repeatedly alleges a direct quid pro quo between Epstein and the bank. *See* FAC ¶¶ 160–77, 213–14, 350, 373. The FAC plausibly alleges that the exceptionally high rewards JPMC received were due to the exceptionally high risks it ran in handling the financial side of the illegal sex-trafficking

venture—a "special relationship" (through Staley, among others) that was necessary for the venture to operate successfully. *Id.* ¶¶ 145, 327, 457. Indeed, when other JPMC executives recommended cutting ties with Epstein because of his sex trafficking, Staley, JPMC's CEO of private banking (Mary Erdoes), and others at very senior levels prevented that from happening, arguing that Epstein was too valuable to the bank. *Id.* ¶¶ 168, 172, 184, 213–14.[19]

JPMC also ignores the serious allegations that give rise to the plausible inference of an agreement to participate in the sex-trafficking venture. For example, a "powerful financial executive" at JPMC "used aggressive force in his sexual assault of [Doe] and informed [Doe] that he had Epstein's permission to do what he wanted to her" (*id*. ¶ 107); the head of JPMC's private banking division "was a regular visitor of Epstein's during that period of time, through and beyond 2013, and personally observed Jane Doe 1 as a sexual trafficking and abuse victim" (*id*. ¶¶ 88, 115); a JPMC subsidiary trafficked girls from Florida to New York for Epstein (*id*. ¶ 170); an executive referred to victims using code names like "Snow White" in emails with Epstein from his JPMC email address (*id*. Ex. 1 ¶¶ 52–62); and JPMC used accounts of "charitable organizations to make payments to young women with no conceivable relationship to the charities' stated purposes" (*id*. ¶¶ 68–69, 77). The commission of a crime by members of an organization, regular presence at locations where the crimes were committed, and the use of code words to avoid detection are all tell-tale signs of both participation and an agreement to participate.

---

[19]     JPMC cites *Doe v. Alsaud*, 12 F. Supp. 3d 674 (S.D.N.Y. 2014), for the proposition that an employee's "sexual misconduct" cannot be imputed to his employer. MTD at 34 n.14. But *Alsaud* involved a "negligent supervision and retention" claim. *Id.* at 677 (discussing organizational liability for rape committed by lower level employee). Here, of course, Doe is presenting a TVPA claim that JPMC was knowingly benefitting from its participation in a sex-trafficking venture— and doing so through the actions of its senior executives, such as Jes Staley—actions that were approved at the highest levels of JPMC. FAC ¶¶ 213–18.

**G.  The FAC States a Claim for Attempt to Violate the TVPA (Count IX).**

JPMC rehashes similar, unpersuasive arguments in asking the Court to dismiss Count IX, which alleges attempt liability. MTD at 30–32. The same reasons for rejecting JPMC's motion to dismiss the conspiracy count also apply to the attempt count. For example, as explained above, any doubt about the existence of civil liability for a TVPA attempt claim was eliminated in Congress's "technical and clarifying" amendment to § 1595, clarifying that civil liability exists for a person who "attempts" to benefit from a TVPA violation. *See supra* at 31–32. And even before that technical amendment, attempt liability existed under § 1595(a) because attempting to violate the TVPA was prohibited within the "chapter" regarding TVPA crimes. *See* 18 U.S.C. § 1594(a).

The FAC adequately alleges both that (1) JPMC intended to knowingly benefit from the sex-trafficking venture and (2) JPMC's conduct amounted to a substantial step towards the TVPA offense. MTD at 32. The FAC makes clear JPMC's direct quid pro quo between Epstein and the bank, demonstrating that it intended to benefit from the sex-trafficking through the millions of dollars it received in exchange for facilitating and enabling the trafficking. *See* FAC ¶¶ 160–77, 213–14, 350, 373. The FAC also alleges countless "substantial steps" that JPMC took to "facilitate Epstein's sex-trafficking venture" with the intent of financially benefiting, *id.* ¶ 457, including paying funds to victims of trafficking and to known Epstein co-conspirators and recruiters (*id.* ¶ 155); deliberately failing to file reports that might result in government intervention (*id.* ¶¶ 156, 180–82, 187); trafficking girls on a Highbridge jet (*id.* ¶ 170); refusing to cut ties with Epstein despite the pleas of certain JPMC executives, enabling his trafficking for many more years (*id.* ¶¶ 172, 184, 213–14); and assisting with transporting trafficking victims (*id.* ¶ 176). JPMC addresses none of the allegations, which are, once again, not ordinary "banking practices." MTD at 32.

## <u>CONCLUSION</u>

The Court should deny JPMC's Motion to Dismiss Doe's FAC in its entirety.

Dated: February 21, 2023

Respectfully Submitted,

*/s/ David Boies*

David Boies
Andrew Villacastin
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com

Sigrid McCawley
*Pro Hac Vice*
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com

Bradley J. Edwards
Edwards Pottinger LLP
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954)-524-2822
Email: brad@epllc.com

Brittany N. Henderson
Edwards Pottinger LLP
1501 Broadway
Floor 12
New York, NY
Telephone: (954) 524-2820
Fax: (954) 524-2820
Email: brittany@epllc.com

*Counsel for Plaintiff Jane Doe 1*