# EXHIBIT 19

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

TERESA HELM,

       Plaintiff,                          CASE NO:

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN,

       Defendants.

_____

## **COMPLAINT**

BOIES SCHILLER FLEXNER LLP

Plaintiff Teresa Helm, by her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants, Darren K. Indyke and Richard D. Kahn in their capacities as the executors of the Estate of Jeffrey Edward Epstein ("Epstein"), avers upon personal knowledge as to her own acts and status and upon information and belief and to all other matters as follows:

## NATURE OF THE ACTION

1.      This suit arises out of Jeffrey Epstein's sexual abuse of Plaintiff.

2.      Teresa was sexually trafficked by Epstein, Sarah Kellen, and Ghislaine Maxwell as part of Epstein's organized ring of procuring young women for sex.  She was recruited by a woman who worked for Epstein and who offered Teresa the opportunity to become a traveling masseuse. As Teresa was studying massage at the California Healing Arts College, this seemed like a dream opportunity, but her hopes were dashed when it quickly turned into sexual assault.

3.      Epstein's trafficking scheme involved recruiting young females by making false promises and using his wealth, power and threats to intimidate the females into submission to his demands.  This same pattern was repeated numerous times with numerous young women.

4.      As United States District Judge Kenneth Marra found, "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually.  Epstein used paid employees to find and bring minor girls to him.  Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

5.      Epstein organized this sex trafficking network to obtain hundreds of young females for himself for sex, and also lent these females out to other powerful and wealthy individuals to be sexually abused.

6.      Epstein conspired with others and hired staff to maintain and keep secret this network of sexual abuse for years, which sprawled throughout Epstein's residences in New York, Florida, New Mexico, the United States Virgin Islands, and Paris.  Epstein's preference was to have three different young females a day for his sexual pleasure.

7.       Despite his significant criminal activity, in 2008 Epstein received a shockingly minimal charge, pleading guilty to a single Florida state law charge of procuring a minor for prostitution and a non-prosecution agreement (a "NPA") with the U.S. Attorney for the Southern District of Florida.  Unknown to the public and the victims at the time, Epstein's lawyers were pressuring the Government to commit to the NPA without informing the victims.  Epstein's multiple victims were kept in the dark and told to be "patient" while Epstein's lawyers worked to protect him and other potential co-conspirators from prosecution.  Epstein served one year in jail, but was afforded the privilege of being able to leave the jail to go to work for twelve hours per day, six days per week.

8.      The NPA allowed Epstein to escape proportionate punishment for his actions and to continue operating his sex trafficking enterprise with liberty.

9.      A few years later, Epstein flippantly referred to his sexual abuse of multiple minors, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City – and making wisecracks about his just-ended jail stint for having sex with an underage girl. 'I am not a sexual predator, I'm an offender,' the financier told The Post yesterday. 'It's the difference between a murderer and a

3

person who steals a bagel,' said Epstein."  Amber Sutherland, *Billionaire Jeffrey Epstein:  I'm a Sex Offender Not a Predator*, N.Y. Post (Feb. 25, 2011),

https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/.

10.     In August 2018, just one year before his death, Epstein told a New York Times reporter "that criminalizing sex with teenage girls was a cultural aberration and that at times in history it was perfectly acceptable."  James B. Stewart, *The Day Jeffrey Epstein Told Me He Had Dirt on Powerful People*, N.Y. Times (Aug. 12, 2019),

https://www.nytimes.com/2019/08/12/business/jeffrey-epstein-interview.html.

11.     When Plaintiff was 22 years old, Epstein added her to his long list of victims by committing sexual assault and battery against her.  As such, Epstein is responsible for battery and intentional infliction of emotional distress pursuant to New York common law. The damage to Plaintiff has been severe and lasting.

12.     This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides that a plaintiff shall have at least one year from the termination of a criminal action against the same defendant to commence an action with respect to the event or occurrence from which the criminal action arose.  A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

13.     Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims, including Plaintiff.  Epstein's actions deprived Plaintiff of the opportunity to commence this lawsuit before his death.  Until his death, Plaintiff feared that Epstein and his co-conspirators would harm her or her family, or ruin her life, if she came forward.

14.     Defendants are equitably estopped from asserting a statute of limitations defense.

Allowing Defendants to do so would be unjust.  Epstein and his co-conspirators intimidated each

of his victims into silence by threatening their lives and their livelihoods.  They therefore

prevented Plaintiff from commencing this lawsuit before his death.  By using threats, along with

his wealth and power, Epstein was able to escape punishment for his intolerable and brutal

crimes against countless young women and underage girls for the duration of his life.

## PARTIES

15.     Plaintiff Teresa Helm is a citizen and resident of Ohio.

16.     Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate

of Jeffrey E. Epstein.

17.     Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate

of Jeffrey E. Epstein.

## JURISDICTION AND VENUE

18.     Jeffrey Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at

the time of his death.  Jeffrey Epstein maintained a residence in the Southern District of New

York.  As the legal representatives of the Estate of Jeffrey E. Epstein, Darren K. Indyke and

Richard D. Kahn are deemed citizens of the U.S. Virgin Islands.

19.     The amount in controversy in this action exceeds the sum or value of $75,000.00

excluding interests and costs and is between citizens of different states. Accordingly, jurisdiction

is proper under 28 U.S.C. § 1332.

20.     Venue is proper in this Court as Epstein's sexual abuse of Plaintiff occurred in New

York, New York, where he recruited her at the age of 22, physically molested her, and began

grooming her for sex in his organized sex trafficking ring.

5

21.     Many of the events giving rise to these causes of action occurred in the Southern District of New York, where a substantial amount of Epstein's property is located. Thus, venue in this district is proper. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

A.     **Epstein's Sex Trafficking Enterprise**

22.      Jeffrey Epstein was widely renowned as a billionaire who used his vast connections to powerful individuals, and seemingly unlimited wealth and resources, to create a web of transcontinental sex trafficking that served himself, his co-conspirators, and some of the most powerful people in the world.

23.     Epstein owned multiple residences and frequently travelled between them, including at 9 East 71st Street, New York, New York 10021, where the illegal sexual crimes against Plaintiff occurred.  Epstein conservatively valued his New York townhome at $55,931,000.00.  Epstein conservatively valued his ranch at 49 Zorro Ranch Road, Stanley, New Mexico 87056, at $17,246,208.00.  In addition, Epstein owned residences in the Virgin Islands, Florida, France, and even on his own island, Great St. James Island, where his transcontinental sex trafficking of hundreds of young females servicing him, his co-conspirators, and wealthy and powerful individuals around the world occurred.

24.     The allegations herein concern Epstein's tortious acts against Plaintiff while in New York, where Epstein was staying at his 71st Street mansion.

25.     At all times material to this cause of action, Jeffrey Epstein utilized his seemingly unlimited power, wealth, and resources, as well as his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse.

26.     Epstein and his co-conspirators had perfected a scheme for manipulation and abuse of young females.  As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose.  The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed.  At times the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.  Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house.  They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse.  They would also normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur.  Once abused, Epstein and his co-conspirators continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

**B.     The Arrest, Prosecution, and Death of Epstein**

27.     The sexual trafficking ring described herein started at least as early as 1995 and continued up until at least July 2, 2019, when the U.S. Attorney's Office for the Southern District of New York ("SDNY") charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591.  He was arrested on July 8, 2019, pursuant to the SDNY's Sealed Two Count Indictment, which is attached as Exhibit A.

7

28.     The Indictment described Epstein's conduct and his abuse and trafficking of females in the same trafficking operation he used to abuse and traffic Plaintiff.

29.     Epstein's last will and testament (the "Will") was executed on August 8, 2019, at the Metropolitan Correctional Center. The witnesses were Mariel Colón Miró and Gulnora Tali.  The Will included affidavits from Darren K. Indyke and Richard D. Kahn, in which they swear an "Oath of Willingness to Serve as Executor and Appointment of Local Counsel."

30.     Epstein was found dead in his cell at the Metropolitan Correctional Center on August 10, 2019.

31.     Epstein's last will and testament was filed on August 15, 2019, in the Probate Division of the Superior Court of the Virgin Islands.

32.     Darren K. Indyke and Richard D. Kahn filed a Certificate of Trust in the Superior Court of the Virgin Islands for Epstein's 1953 Trust on August 26, 2019.  *See* Certificate of Trust, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Aug. 26, 2019).

33.     Epstein's will was entered into probate on September 6, 2019, and the Superior Court of the Virgin Islands accordingly authorized Darren K. Indyke and Richard D. Kahn to administer Epstein's estate.  *See* Order for Probate, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019); Letters Testamentary, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019).

34.     The Will's first article directs Epstein's executors "to pay from my estate all expenses of my last illness, my funeral and burial expenses, the administration expenses of my estate and all of my debts duly proven and allowed against my estate."  The Will further directs that "after the

payments and distributions provided in Article FIRST," Epstein "give[s] all of my property, real and personal, wherever situated . . . to the then acting Trustees of The 1953 Trust."

35.     Following Epstein's death, SDNY submitted a proposed nolle prosequi order in the criminal matter against him because it was required by law to do so after Epstein was deceased. On August 29, 2019, U.S. District Judge Richard Berman formally dismissed SDNY's indictment against Epstein, terminating the criminal action against him.  Plaintiff's claims are therefore timely under N.Y. C.P.L.R. § 215(8)(a).

**C.     Teresa Helm**

36.     In or around September 2002, Teresa was 22 years old and living in Santa Monica, California.  She was working towards obtaining her certificate in massage therapy at the California Healing Arts College.  A fellow massage therapy student approached Teresa and asked her if she would be interested in a traveling masseuse position.  The student explained to Teresa that the position involved traveling around the world on a private jet with a wealthy couple.  Teresa expressed interest.

37.     The student arranged for Teresa to meet an employee of the couple at Santa Monica beach.  That woman was Sarah Kellen, one of Epstein's co-conspirators and recruiters.

38.     Teresa and Kellen discussed the position for about an hour.  Kellen made the job sound like a dream, explaining that Teresa would be working for a highly educated and worldly couple in New York with their own private jet.  Kellen told Teresa that she would be taken to lavish parties, receive expensive clothes, travel all over the world in luxury, and receive the best education available all around the world.

39.     About two weeks after her initial interview with Kellen, Kellen told Teresa that the couple wanted to fly her to New York for another interview.  The couple bought her a ticket for a flight from California to New York City.

40.     When she arrived, a driver brought Teresa to an apartment building in Manhattan, where he said Teresa would be staying.  Upon information and belief, that apartment building was on 66th Street and is where Epstein housed many of the models and other young women he was abusing.

41.     Once she arrived, Teresa received instructions by telephone to go to Ghislaine Maxwell's home the following day.  Maxwell is a British socialite and was one of Epstein's primary "recruiters" of young women.  Teresa did as she was told and went to Maxwell's home the next day.  She was greeted by a butler and shown into a large sitting room.  She noticed a framed photograph of Maxwell and a former high U.S. government official in the bathroom.

42.     When Teresa went back into the sitting room, Maxwell came in wearing only a bathrobe.  She and Teresa spoke for about an hour.  She had set up a massage table and Teresa proceeded to give Maxwell a massage as she had been trained to do.

43.     After the massage, Maxwell informed Teresa that she would be meeting Epstein for a massage and interview.  Maxwell bragged about Epstein's mansion and called it the largest brownstone in Manhattan.  She then paid Teresa $100 for the massage and told her to give Epstein "whatever he wants" during his massage because Epstein "always gets what he wants."

44.     When Teresa returned to the 66th Street apartment building, she received a call with instructions to go to Epstein's mansion.  She walked to Epstein's mansion as instructed and was overwhelmed by its lavishness.  She was told to wait in what appeared to be an office.

45.     Eventually, Epstein led Teresa upstairs and down a hallway to his personal office.

46.     Epstein asked Teresa to sit down and began asking her personal questions.  He eventually asked her to give him a foot massage.  She agreed and placed his foot in her lap so that she could begin the massage.  As Teresa began massaging Epstein's foot, he started pressing his foot against intimate parts of Teresa's body.  Teresa became uncomfortable, adjusted her position, and moved Epstein's foot up to keep it away from her body.  But Epstein continued pushing his foot into her body.

47.     Teresa tried to remain calm and professional despite Epstein's nonconsensual touching.  She asked Epstein to change his position so she could massage him at a different angle, but Epstein continued to push his foot into her intimate parts of Teresa's body.

48.     While still on the couch in Epstein's office, Epstein got close to Teresa, grabbed her chin with his hand, turned her face towards him, and said that he knew he could trust Teresa.  Specifically, he said, "I know I can always trust a woman who shows her gums when she smiles."  Epstein's actions terrified Teresa.

49.     Epstein then got up to walk Teresa out of the room.  Teresa was walking in front of Epstein when he abruptly grabbed her and proceeded to sexually assault her against her will.  Teresa stopped walking and Epstein then forcefully grabbed her and sexually assaulted her again.  Teresa was frozen with shock and fear.  Once Epstein released her she continued walking towards the front door of the mansion.

50.     Just before Teresa stepped out the front door, Epstein grabbed her buttocks and said, "Don't do anything I wouldn't do."  Teresa proceeded to leave Epstein's mansion, and went back to the 66th Street apartment building.

51.     Teresa was devastated that the traveling masseuse position was not what she had anticipated.  She was also scared because she recognized that Epstein was a very powerful

11

person based on what Kellen told her and the photographs and other clear displays of wealth in his home.

52.     Epstein made very clear to Teresa that he was incredibly wealthy, powerful, and regularly in contact with world leaders.  In fact, in his New York mansion he had photographs displayed of significant political figures to ensure that any young female entering the home would know that he had extensive government connections.  Epstein was not to be disobeyed and he made clear by his words and actions that there would be consequences if Teresa did not comply with his demands.

53.     When Teresa got back to California, she received an e-mail from one of Epstein's co-conspirators thanking her for visiting New York and letting her know that Epstein and his co-conspirators would need to decide whether or not they wanted to hire her.  She did not respond to the e-mail.

54.     Due to the distress caused by Epstein's assault, Teresa did not finish massage therapy school with the same certification that she initially set out to achieve.  Teresa also ended up leaving California and moving back to Ohio a few short months after the assault.

55.     Teresa was deeply affected by the assault and she suffers severe emotional distress from an experience that has affected her for her entire life.

56.     Epstein's sexual assault and battery of Teresa continues to cause her significant distress and harm.

## FIRST CAUSE OF ACTION

### (Battery)

57.     Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–56 as if fully set forth herein.

58.     Epstein intentionally committed battery by sexually assaulting Plaintiff when she was a

young woman.  As described above, Epstein intentionally touched intimate parts of Plaintiff's

body in an offensive and sexual manner without her consent.

59.     A criminal action against Epstein with respect to the same sex trafficking enterprise from

which Plaintiff's first cause of action arises was terminated on August 29, 2019, less than one

year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

60.     As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in

the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma,

loss of dignity and self-esteem, and invasion of her privacy.

## SECOND CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

61.     Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–56 as if fully

set forth herein.

62.     As a direct result of these allegations as stated, Epstein committed intentional infliction of

emotional distress against Plaintiff.

63.     Epstein's actions, described above, constitute extreme and outrageous conduct that

shocks the conscience.  Epstein's plan to recruit, entice, and assault Plaintiff goes beyond all

possible bounds of decency and is intolerable in a civilized community.

64.     Epstein knew or disregarded the substantial likelihood that these actions would cause

Plaintiff severe emotional distress.

65.     A criminal action against Epstein with respect to the same sex trafficking enterprise from

which Plaintiff's second cause of action arises was terminated on August 29, 2019, less than one

year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

66.     As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated:  November 12, 2019.

/s/ Joshua I. Schiller

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Joshua I. Schiller
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

Sigrid McCawley
(Pro Hac Vice Pending)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                   :

UNITED STATES OF AMERICA      :    SEALED

                       :    INDICTMENT

       - v. -             :    19 Cr.

                       :

JEFFREY EPSTEIN,           :    **19 CRIM 490**

     Defendant.          :

                       :

- - - - - - - - - - - - - - - x

## COUNT ONE
### (Sex Trafficking Conspiracy)

The Grand Jury charges:

### OVERVIEW

1. As set forth herein, over the course of many years, JEFFREY EPSTEIN, the defendant, sexually exploited and abused dozens of minor girls at his homes in Manhattan, New York, and Palm Beach, Florida, among other locations.

2. In particular, from at least in or about 2002, up to and including at least in or about 2005, JEFFREY EPSTEIN, the defendant, enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence") to engage in sex acts with him, after which he would give the victims hundreds of dollars in cash. Moreover, and in order to maintain and increase his supply of victims, EPSTEIN also paid certain of his victims to recruit additional girls to be similarly abused by EPSTEIN. In

this way, EPSTEIN created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach.

    3.    The victims described herein were as young as 14 years old at the time they were abused by JEFFREY EPSTEIN, the defendant, and were, for various reasons, often particularly vulnerable to exploitation. EPSTEIN intentionally sought out minors and knew that many of his victims were in fact under the age of 18, including because, in some instances, minor victims expressly told him their age.

    4.    In creating and maintaining this network of minor victims in multiple states to sexually abuse and exploit, JEFFREY EPSTEIN, the defendant, worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, contacting victims and scheduling their sexual encounters with EPSTEIN at the New York Residence and at the Palm Beach Residence.

## FACTUAL BACKGROUND

    5.    During all time periods charged in this Indictment, JEFFREY EPSTEIN, the defendant, was a financier with multiple residences in the continental United States, including the New York Residence and the Palm Beach Residence.

    6.    Beginning in at least 2002, JEFFREY EPSTEIN, the defendant, enticed and recruited, and caused to be enticed and

recruited, dozens of minor girls to engage in sex acts with him, after which EPSTEIN paid the victims hundreds of dollars in cash, at the New York Residence and the Palm Beach Residence.

7.   In both New York and Florida, JEFFREY EPSTEIN, the defendant, perpetuated this abuse in similar ways.  Victims were initially recruited to provide "massages" to EPSTEIN, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts.  EPSTEIN paid his victims hundreds of dollars in cash for each encounter.  Moreover, EPSTEIN actively encouraged certain of his victims to recruit additional girls to be similarly sexually abused.  EPSTEIN incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to EPSTEIN.  In so doing, EPSTEIN maintained a steady supply of new victims to exploit.

### The New York Residence

8.   At all times relevant to this Indictment, JEFFREY EPSTEIN, the defendant, possessed and controlled a multi-story private residence on the Upper East Side of Manhattan, New York, i.e., the New York Residence.  Between at least in or about 2002 and in or about 2005, EPSTEIN abused numerous minor victims at the New York Residence by causing these victims to be recruited to engage in paid sex acts with him.

9.    When a victim arrived at the New York Residence,
she typically would be escorted to a room with a massage table,
where she would perform a massage on JEFFREY EPSTEIN, the
defendant.  The victims, who were as young as 14 years of age,
were told by EPSTEIN or other individuals to partially or fully
undress before beginning the "massage."  During the encounter,
EPSTEIN would escalate the nature and scope of physical contact
with his victim to include, among other things, sex acts such as
groping and direct and indirect contact with the victim's
genitals.  EPSTEIN typically would also masturbate during these
sexualized encounters, ask victims to touch him while he
masturbated, and touch victims' genitals with his hands or with
sex toys.

10.    In connection with each sexual encounter, JEFFREY
EPSTEIN, the defendant, or one of his employees or associates,
paid the victim in cash.  Victims typically were paid hundreds
of dollars in cash for each encounter.

11.    JEFFREY EPSTEIN, the defendant, knew that many of
his New York victims were underage, including because certain
victims told him their age.  Further, once these minor victims
were recruited, many were abused by EPSTEIN on multiple
subsequent occasions at the New York Residence.  EPSTEIN
sometimes personally contacted victims to schedule appointments
at the New York Residence.  In other instances, EPSTEIN directed

employees and associates, including a New York-based employee

("Employee-1"), to communicate with victims via phone to arrange

for these victims to return to the New York Residence for

additional sexual encounters with EPSTEIN.

12.  Additionally, and to further facilitate his

ability to abuse minor girls in New York, JEFFREY EPSTEIN, the

defendant, asked and enticed certain of his victims to recruit

additional girls to perform "massages" and similarly engage in

sex acts with EPSTEIN.  When a victim would recruit another girl

for EPSTEIN, he paid both the victim-recruiter and the new

victim hundreds of dollars in cash.  Through these victim-

recruiters, EPSTEIN gained access to and was able to abuse

dozens of additional minor girls.

13.  In particular, certain recruiters brought dozens

of additional minor girls to the New York Residence to give

massages to and engage in sex acts with JEFFREY EPSTEIN, the

defendant.  EPSTEIN encouraged victims to recruit additional

girls by offering to pay these victim-recruiters for every

additional girl they brought to EPSTEIN.  When a victim-

recruiter accompanied a new minor victim to the New York

Residence, both the victim-recruiter and the new minor victim

were paid hundreds of dollars by EPSTEIN for each encounter.  In

addition, certain victim-recruiters routinely scheduled these

encounters through Employee-1, who sometimes asked the
recruiters to bring a specific minor girl for EPSTEIN.

<u>The Palm Beach Residence</u>

14. In addition to recruiting and abusing minor girls
in New York, JEFFREY EPSTEIN, the defendant, created a similar
network of minor girls to victimize in Palm Beach, Florida,
where EPSTEIN owned, possessed and controlled another large
residence, *i.e.*, the Palm Beach Residence. EPSTEIN frequently
traveled from New York to Palm Beach by private jet, before
which an employee or associate would ensure that minor victims
were available for encounters upon his arrival in Florida.

15. At the Palm Beach Residence, JEFFREY EPSTEIN, the
defendant, engaged in a similar course of abusive conduct.
When a victim initially arrived at the Palm Beach Residence, she
would be escorted to a room, sometimes by an employee of
EPSTEIN's, including, at times, two assistants ("Employee-2" and
"Employee-3") who, as described herein, were also responsible
for scheduling sexual encounters with minor victims. Once
inside, the victim would provide a nude or semi-nude massage for
EPSTEIN, who would himself typically be naked. During these
encounters, EPSTEIN would escalate the nature and scope of the
physical contact to include sex acts such as groping and direct
and indirect contact with the victim's genitals. EPSTEIN would
also typically masturbate during these encounters, ask victims

to touch him while he masturbated, and touch victims' genitals
with his hands or with sex toys.

16. In connection with each sexual encounter, JEFFREY
EPSTEIN, the defendant, or one of his employees or associates,
paid the victim in cash. Victims typically were paid hundreds
of dollars for each encounter.

17. JEFFREY EPSTEIN, the defendant, knew that certain
of his victims were underage, including because certain victims
told him their age. In addition, as with New York-based
victims, many Florida victims, once recruited, were abused by
JEFFREY EPSTEIN, the defendant, on multiple additional
occasions.

18. JEFFREY EPSTEIN, the defendant, who during the
relevant time period was frequently in New York, would arrange
for Employee-2 or other employees to contact victims by phone in
advance of EPSTEIN's travel to Florida to ensure appointments
were scheduled for when he arrived. In particular, in certain
instances, Employee-2 placed phone calls to minor victims in
Florida to schedule encounters at the Palm Beach Residence. At
the time of certain of those phone calls, EPSTEIN and Employee-2
were in New York, New York. Additionally, certain of the
individuals victimized at the Palm Beach Residence were
contacted by phone by Employee-3 to schedule these encounters.

19.  Moreover, as in New York, to ensure a steady stream of minor victims, JEFFREY EPSTEIN, the defendant, asked and enticed certain victims in Florida to recruit other girls to engage in sex acts.  EPSTEIN paid hundreds of dollars to victim-recruiters for each additional girl they brought to the Palm Beach Residence.

## STATUTORY ALLEGATIONS

20.  From at least in or about 2002, up to and including in or about 2005, in the Southern District of New York and elsewhere, JEFFREY EPSTEIN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, sex trafficking of minors, in violation of Title 18, United States Code, Section 1591(a) and (b).

21.  It was a part and object of the conspiracy that JEFFREY EPSTEIN, the defendant, and others known and unknown, would and did, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, and obtain, by any means a person, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing that the person had not attained the age of 18 years and would be caused to engage in a

commercial sex act, in violation of Title 18, United States
Code, Sections 1591(a) and (b)(2).

Overt Acts

22. In furtherance of the conspiracy and to effect
the illegal object thereof, the following overt acts, among
others, were committed in the Southern District of New York and
elsewhere:

a. In or about 2004, JEFFREY EPSTEIN, the
defendant, enticed and recruited multiple minor victims,
including minor victims identified herein as Minor Victim-1,
Minor Victim-2, and Minor Victim-3, to engage in sex acts with
EPSTEIN at his residences in Manhattan, New York, and Palm
Beach, Florida, after which he provided them with hundreds of
dollars in cash for each encounter.

b. In or about 2002, Minor Victim-1 was
recruited to engage in sex acts with EPSTEIN and was repeatedly
sexually abused by EPSTEIN at the New York Residence over a
period of years and was paid hundreds of dollars for each
encounter. EPSTEIN also encouraged and enticed Minor Victim-1
to recruit other girls to engage in paid sex acts, which she
did. EPSTEIN asked Minor Victim-1 how old she was, and Minor
Victim-1 answered truthfully.

c. In or about 2004, Employee-1, located in the
Southern District of New York, and on behalf of EPSTEIN, placed

9

a telephone call to Minor Victim-1 in order to schedule an appointment for Minor Victim-1 to engage in paid sex acts with EPSTEIN.

      d.  In or about 2004, Minor Victim-2 was recruited to engage in sex acts with EPSTEIN and was repeatedly sexually abused by EPSTEIN at the Palm Beach Residence over a period of years and was paid hundreds of dollars after each encounter.  EPSTEIN also encouraged and enticed Minor Victim-2 to recruit other girls to engage in paid sex acts, which she did.

      e.  In or about 2005, Employee-2, located in the Southern District of New York, and on behalf of EPSTEIN, placed a telephone call to Minor Victim-2 in order to schedule an appointment for Minor Victim-2 to engage in paid sex acts with EPSTEIN.

      f.  In or about 2005, Minor Victim-3 was recruited to engage in sex acts with EPSTEIN and was repeatedly sexually abused by EPSTEIN at the Palm Beach Residence over a period of years and was paid hundreds of dollars for each encounter.  EPSTEIN also encouraged and enticed Minor Victim-3 to recruit other girls to engage in paid sex acts, which she did.  EPSTEIN asked Minor Victim-3 how old she was, and Minor Victim-3 answered truthfully.

      g.    In or about 2005, Employee-2, located in the Southern District of New York, and on behalf of EPSTEIN, placed a telephone call to Minor Victim-3 in Florida in order to schedule an appointment for Minor Victim-3 to engage in paid sex acts with EPSTEIN.

      h.    In or about 2004, Employee-3 placed a telephone call to Minor Victim-3 in order to schedule an appointment for Minor Victim-3 to engage in paid sex acts with EPSTEIN.

      (Title 18, United States Code, Section 371.)

### COUNT TWO
### (Sex Trafficking)

The Grand Jury further charges:

23.    The allegations contained in paragraphs 1 through 19 and 22 of this Indictment are repeated and realleged as if fully set forth within.

24.    From at least in or about 2002, up to and including in or about 2005, in the Southern District of New York, JEFFREY EPSTEIN, the defendant, willfully and knowingly, in and affecting interstate and foreign commerce, did recruit, entice, harbor, transport, provide, and obtain by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act, and did aid and abet the same, to wit, EPSTEIN recruited, enticed, harbored, transported, provided, and obtained numerous

individuals who were less than 18 years old, including but not limited to Minor Victim-1, as described above, and who were then caused to engage in at least one commercial sex act in Manhattan, New York.

(Title 18, United States Code, Sections 1591(a), (b)(2), and 2.)

## FORFEITURE ALLEGATIONS

25.   As a result of committing the offense alleged in Count Two of this Indictment, JEFFREY EPSTEIN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594(c)(1), any property, real and personal, that was used or intended to be used to commit or to facilitate the commission of the offense alleged in Count Two, and any property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense alleged in Count Two, or any property traceable to such property, and the following specific property:

a.   The lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 9 East 71st Street, New York, New York, with block number 1386 and lot number 10, owned by Maple, Inc.

**Substitute Asset Provision**

26. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 1594; Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

13

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

### v.

### JEFFREY EPSTEIN,

Defendant.

---

### INDICTMENT

(18 U.S.C. §§ 371, 1591(a), (b)(2), and 2)

GEOFFREY S. BERMAN
United States Attorney

Foreperson

---