# EXHIBIT 42

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                 19 CR 490 (RMB)

5   JEFFREY EPSTEIN,

6          Defendant.

7   ------------------------------x

8                              New York, N.Y.
                              August 27, 2019
9                              10:30 a.m.

10

11   Before:

12               HON. RICHARD M. BERMAN,

                              District Judge

13

14                   APPEARANCES

15   GEOFFREY S. BERMAN
        United States Attorney for the
16        Southern District of New York
   BY:  MAURENE R. COMEY
17        ALISON MOE
        Assistant United States Attorneys
18

19   MARTIN G. WEINBERG, PC
        Attorney for Defendant
   BY:  MARTIN G. WEINBERG
20

21   STEPTOE & JOHNSON, LLP
        Attorneys for Defendant
   BY:  REID WEINGARTEN
22        MICHAEL MILLER

23

24

25

1          (Case called)

2          THE COURT:  Good morning, everybody.  Please be

3    seated.

4          So just some housekeeping.  We have a podium here for

5    both attorneys and others who may be speaking, and so we would

6    like you, attorneys and others who are speaking, to come up to

7    the podium.  This room is a little cavernous.  We thought the

8    podium over there would be more comfortable.

9          For starters, and for this you don't have to go up to

10   the podium, if you could just indicate your names.  This table

11   in front to my left, your right, are defense counsel, and that

12   table to my right, your left, are government attorneys.

13         If we could just ask the attorneys to introduce

14   themselves.

15         MS. COMEY:  Good morning, your Honor.  Maureen Comey

16   and Alison Moe for the government.  Joining us at counsel table

17   are Special Agent Amanda Young of the FBI and Detective Paul

18   Byrne of the NYPD.

19         MR. WEINGARTEN:  Good morning, your Honor.

20         Reid Weingarten.

21         MR. WEINBERG:  Martin Weinberg.

22         Good morning, your Honor.

23         THE COURT:  Good morning.

24         MR. MILLER:  Good morning, your Honor.

25         Michael Miller from Steptoe & Johnson on behalf of the

1    defendant.

2            THE COURT:  Great.

3            Again, good morning to all of you.  This hearing that

4    we're having today considers the government's motion to dismiss

5    the indictment in this case.

6            I must add that it also serves as the opportunity for

7    me to thank all of you, the attorneys and the victims who are

8    here today, among others, for your very hard work and

9    dedication in this case.

10            We also have here today the U.S. Attorney for the

11    Southern District of New York, Geoffrey Berman, who has also

12    been very helpful and indispensable in this matter.

13            The news on August 10, 2019, that Jeffrey Epstein had

14    been found dead in his cell at the Metropolitan Correctional

15    Center, at the MCC, was certainly shocking.  Most of you, and

16    myself for that matter, were anticipating that the next steps

17    in this case would be defense motion practice, including a

18    motion to dismiss, followed by a trial on the merits before a

19    jury, if the motions were not successful, and through which the

20    accusers and the accused would come face to face, allowing

21    everyone to get their day in court.  Mr. Epstein's death

22    obviously means that a trial in which he is a defendant cannot

23    take place.  It is a rather stunning turn of events.

24            The government's motion to dismiss the indictment

25    because of Jeffrey Epstein's death on August 10, 2019, is

relatively straightforward.  In my view, a public hearing

clearly is nevertheless the preferred vehicle for its

resolution.

Incidentally, while I'm on this subject, I got some

help today from the New York Law Journal from two professors

who write that a hearing is -- let me tell you exactly what

they said.  They say, in part, that this is an odd moment for

transparency in a criminal case.  I think that is an odd

sentence to hear about, transparency in a criminal case.

They go on to say that normally, if a prosecutor seeks

to dismiss an indictment for such an obviously worthy reason,

the court would simply grant the request.  As to that

statement, I respectfully say it is incorrect as a matter of

law.

They go on to say the judge would not schedule a

hearing and he definitely would not allow the victims to speak.

If he did hold a hearing, whatever informational interests the

victims may have would be served by affording them a chance to

attend the hearing, not by giving them a speaking role.

I read it.  It was incredulous.  I'm still

incredulous.  I don't quite understand at all.  There is a

suggestion in the article that the reason they are making these

suggestions has to do with minimization of drama in this case.

In the Jeffrey Epstein case, there has not been much a

minimization of drama, and what little drama might happen

1    today, I don't think it would be very significant.

2           On a somewhat more serious note, don't quote me on

3    this, but it is my understanding that one of the authors of

4    that article is himself counsel in one of the Epstein-related

5    cases.  I was surprised to learn that very recently.  I'm

6    certain it is true.  I was also surprised that that aspect was

7    not disclosed in the Law Journal.

8           But in any event, I think you know where I'm heading.

9    I respectfully disagree with the Law Journal piece.  I was

10   saying that the government's motion is relatively

11   straightforward, and in my view, a public hearing is clearly,

12   nevertheless, the preferred vehicle for its resolution.  I'm

13   still convinced of that.

14          A few may differ on this, but public hearings are

15   exactly what judges do.  Hearings promote transparency and they

16   provide the court with insights and information which the court

17   may not otherwise be aware of.

18          The victims have been included in the proceeding today

19   both because of their relevant experiences and because they

20   should always be involved before rather than after the fact.

21          Indictment 19 CR 490 charges Jeffrey Epstein with sex

22   trafficking and with conspiracy to commit sex trafficking.  The

23   U.S. Attorney, on August 19, 2019, requested that the court

24   approve the government's proposed order of *nolle prosequi*.  I

25   think that's a rough justice.  That means *nolle prosequi*,

discontinuance by the prosecutor of all or of a part of the

case that he or she has commenced.

The government in its motion concludes that Epstein's

death abates these proceedings.  In accordance with Federal

Rule of Criminal Procedure 57(b), I determined to hold a public

hearing and I notified the victims that they would be given the

opportunity to be heard before any final action on the motion.

That is the purpose also of today's proceeding.  I would do

that every time.

Also, recognized that Epstein, Mr. Epstein died before

any judgment of conviction against him had been obtained, and

that the government's proposed order appears, in form and

substance, to be appropriate.

Federal Rule of Criminal Procedure 48(a) codifies the

*nolle prosequi* process.  It is entitled dismissal, and it

states in relevant part that the government may, with leave of

the court, dismiss an indictment, information, or complaint,

and that leave of the court proviso, you should know, was added

as an amendment to the original draft of Rule 48, which had

originally provided for automatic dismissal upon the motion of

the government.

This proviso, in my judgment, is clearly directed

toward an independent judicial assessment of the public

interest in dismissing the indictment.  Thus, even whereas, in

this case, the standard of court review is deferential, the

1    court must still make its own independent determination.  A

2    conclusory statement from the government that dismissal is

3    appropriate does not satisfy the court's obligations.

4         It is also, in my view, required that the court

5    consider the views of the victims in the case at the hearing

6    and before deciding whether to grant the motion.  This is being

7    done here both as a matter of law and as a measure of respect

8    that we have for the victims' difficult decisions to come

9    forward in this matter.

10        In a case called <u>United States v. Heaton</u>,

11   H-e-a-t-o-n-, the government filed a Rule 48 motion for leave

12   to dismiss a charge against a defendant who allegedly committed

13   a sexual offense against a young victim.  Although I should

14   point out, very importantly, that that defendant was still

15   alive, which distinguishes it from our case.

16        Nevertheless, I think it is irrelevant because in

17   evaluating the Rule 48 motion, then district Judge Paul G.

18   Cassell -- who is now a law professor at the University of Utah

19   and is regarded to be a noted expert in victims' rights --

20   concluded that under the Crime Victims' Rights Act, victims

21   have broad rights that extend to a court's decision whether to

22   grant a government motion to dismiss under Rule 48.

23        I completely share that viewpoint in these

24   circumstances, even though the facts of our case, as I said,

25   are somewhat different from those in <u>Heaton</u>.  I believe it is

1    the court's responsibility, and manifestly within its purview,

2    to ensure that the victims in this case are treated fairly and

3    with dignity.

4         The fundamental substantive principle which applies in

5    considering the government's motion is termed the rule of

6    abatement.  This principle originated in the English common

7    law.  It was adopted by most U.S. federal courts, but more

8    recently, it has faced some appropriate criticism.  The rule of

9    abatement is best explained in the Second Circuit case of

10   U.S. v. Wright.

11        In that Wright case, two defendants had pled guilty to

12   embezzlement and tax evasion.  Both defendants appealed, but

13   one of the defendants died while his appeal was pending in the

14   Second Circuit.  The Court of Appeals rule that under the rule

15   of abatement, the judgment of conviction against the deceased

16   defendant was required to be vacated and the indictment was to

17   be dismissed.  The Wright court held that when a convicted

18   defendant dies while his direct appeal as of right is pending,

19   his death abates not only the appeal, but also proceedings had

20   during the course of the prosecution.

21        The Second Circuit incidentally has also held that

22   when a criminal conviction abates upon the death of a

23   defendant, any restitution ordered as a result of that

24   conviction must also abate, and it is also ruled the same with

25   respect to associated forfeiture orders.

1          This latter application of the rule of abatement

2     regarding forfeiture has not been universally accepted among

3     federal courts, but it certainly is the law in this circuit.

4     Some of you may be interested to know that some United States

5     courts, state courts, have criticized the rule of abatement,

6     particularly in the face of growing recognition of victims'

7     rights in the criminal justice system, including the Crime

8     Victims' Rights Act.

9          It has been written and contended in the Brooklyn Law

10    Review -- I can give you the cite later -- that when courts

11    abate criminal convictions, they reimpose a burden on victims

12    that legislatures intended to alleviate through these victim

13    rights statutes.  The state Supreme Court has even concluded

14    that the expansion and codification of victims' rights provides

15    the changed conditions needed for overruling the rule of

16    abatement.  It has also been stated that Alaska's statute and

17    its constitution now require the criminal justice system to

18    accommodate the rights of crime victims.  Further, that the

19    abatement of criminal convictions has important implications

20    for these rights.

21         But coming back to our case, which is what you are

22    concerned about and I am as well, it is appropriate to conclude

23    that if the rule of abatement applies to a convicted defendant

24    as in the Wright case, it should also apply *a fortiori* in the

25    Epstein case, which was still in the pretrial phase when

1  Mr. Epstein died, when there had been no conviction.

2           So that's just some background I wanted to share with

3  you.  At this point in time, I would like to turn to the

4  government prosecutors to hear from them in support of their

5  Rule 48 application to dismiss the Epstein indictment.

6           MS. COMEY:  Thank you, your Honor.

7           Would you like me to address the court from the

8  podium?

9           THE COURT:  If you wouldn't mind.

10          MS. COMEY:  Thank you, your Honor.

11          I believe your Honor has accurately summarized the

12 state of the law, as set forth in our papers, in light of the

13 clear Second Circuit law, that upon the death of a defendant

14 before a final entry of a judgment of conviction, all

15 proceedings must be abated.

16          In light of that clear law, the government is legally

17 obligated to seek dismissal of the pending indictment against

18 Jeffrey Epstein, and we respectfully submit, likewise, that the

19 entry of the proposed order is similarly required by law.

20          A few notes to make about that, though, your Honor.

21 To be very clear, dismissal of this indictment as to Jeffrey

22 Epstein in no way prohibits or inhibits the government's

23 ongoing investigation into other potential coconspirators, nor

24 does it prevent the bringing of a new case in the future or the

25 prosecution of new defendants.

1    It also does nothing to prevent the government from

2 continuing to explore the possibility of seeking civil

3 forfeiture of any assets that were used to facilitate the

4 crimes charged in this indictment.  Indeed, as has been stated

5 publicly, investigations into those matters have been ongoing,

6 remain ongoing, and will continue following dismissal of the

7 indictment here.

8    I would also like to note that, as the government has

9 previously mentioned, this dismissal in no way lessens the

10 government's resolve to stand up for the victims in this case,

11 both those who have come forward and those who have yet to do

12 so.  We agree with your Honor's sentiment that those victims

13 should be respected, and we appreciate your Honor's recognition

14 of that.

15    One housekeeping matter that I did want to reference

16 for your Honor.  The protective order in this case requires

17 destruction or return of any and all discovery material upon

18 conclusion of the case.  We have been in communication with

19 defense counsel, who have confirmed that they have returned all

20 physical copies that they have of discovery that the government

21 has produced to date, and they are in the process of deleting

22 any copies that they may have made.  So the parties are in

23 compliance with the protective order.

24    Finally, I just wanted to say a word about the victims

25 in this case, and particularly those who are here in court

1  today.  I'll note that in light of the court's order indicating

2  that the victims and their counsel would be permitted to be

3  heard in court here today, the government has endeavored to

4  provide notice to all known victims of today's proceeding.  We

5  did so either directly where a victim was not represented by

6  counsel or through counsel where a victim is represented by an

7  attorney.

8       The government does not know exactly how many victims

9  or their attorneys are here today and we do not know how many

10  of them or their counsel would like to speak.  To the extent

11  any individuals do wish to speak, we do not know the substance

12  of what they would like to say.  We have left that entirely up

13  to the individual decisions of the victims and their attorneys.

14       I will note, though, that throughout this case, the

15  government has endeavored and done our utmost to fulfill our

16  obligations under the Crimes Victims' Rights Act.  We have done

17  so by trying to keep as many victims as we are aware of up to

18  date about the ongoing case and about any developments in the

19  case.

20       We will continue to provide services and offer

21  services to any of the victims in this case, even after the

22  indictment is dismissed.  Both the U.S. Attorney's office and

23  the FBI have been in touch with all known victims or have

24  attempted to be in touch with all known victims, either again

25  directly where victims are not represented by counsel or

J8RsEPS1

1    through counsel where they have attorneys.  We have expressed

2    to them that services are available for those who wish to take

3    advantage of them.

4              Unless the court has any questions for me, the

5    government will otherwise rest on its papers.

6              THE COURT:  I just have one question.

7              The protective order, is that self-executing or do I

8    need to do something?

9              MS. COMEY:  It is self-executing, your Honor.

10             THE COURT:  Thanks very much, Ms. Comey.

11             MS. COMEY:  Thank you, your Honor.

12             THE COURT:  Yes.

13             I'll turn to counsel for the defense at this time.

14    Mr. Weingarten, I'm happy to hear from you.

15             MR. WEINGARTEN:  Thank you.

16             Your Honor, I think it is an understatement of the

17    year to say the world looks and feels differently today than it

18    did the last time I was before you.  For us, the elephant in

19    the room is what happened to our client.  I would like to tell

20    you how we see the world and where we are on that subject.

21             We start with the Attorney General's statements,

22    public statements, that there were very serious improprieties

23    in the jail.  We obviously read the press.  We see that the

24    warden has been taken out.  We see that the guards on duty at

25    the time have been put on leave.  We understand guards are

1    refusing to cooperate with the investigation.  We have heard

2    allegations that people at the time who had responsibility for

3    protecting our client falsified information.  We understand

4    that there were orders out there that Jeffrey Epstein was never

5    to be left alone and that the orders were ignored by many of

6    the employees of the prison.

7            In a word, yikes.  In addition, obviously we followed

8    the medical examiner's report, or we haven't followed the

9    report, we haven't seen it, but heard conclusions, initially

10   not enough evidence to come to a conclusion, wanted to see

11   more.  We assumed she was talking about the videotapes, but

12   then came to the conclusion that it was suicide.

13           We report to the court that --

14           THE COURT:  Suicide by hanging --

15           MR. WEINGARTEN:  Yes.

16           THE COURT:  -- was her conclusion?

17           MR. WEINGARTEN:  Yes.

18           And we report to the court that we had a doctor there

19   at the time, and we also have been in receipt of a tremendous

20   amount of medical and scientific evidence volunteered to us

21   opining that the injuries suffered, as reported, were far more

22   consistent with assault than with suicide, and we are happy to

23   supply the court with all the information that we have.

24           Now, in addition, as the court noted, we were underway

25   with our pretrial motions, and as the court obviously

1  understands, the NPA and the role of the NPA was going to be

2  critically important.  And I would simply like to report that

3  we went pretty far along.

4         We interviewed all of the relevant lawyers on the

5  defense side who participated in the NPA, and we were satisfied

6  that we had a very strong argument that every one of those

7  lawyers believed with an objective basis that the deal was

8  global.  That is, at the time --

9         THE COURT:  I'm sorry, that?

10         MR. WEINGARTEN:  The deal of the NPA was global.  That

11  is, more specifically, at the time, the Florida prosecutors and

12  agents knew of conduct in New York, and that no competent

13  defense counsel negotiating in good faith with the prosecutors

14  would have ever agreed to a deal back then that allowed New

15  York prosecutors to indict for precisely the same conduct in

16  the future, which, of course, is what happened.

17         In addition, we have come up with very powerful

18  evidence, we believe, that Florida prosecutors, who

19  participated in the deal, steered the victims and the alleged

20  victims to New York on more than one occasion because they did

21  not want to suffer the sleights of attacks against them.  So we

22  have advanced the ball on this very subject and we are prepared

23  to completely report to the court as to where we are and what

24  we've done.

25         Another point.  We obviously had contact with our

1  client at or around the time of his death, and obviously the

2  attorney-client privilege survives death and we are not going

3  to forfeit the privilege, but we will report to the court, with

4  as much specificity as the court may want, that at or around

5  the time of his death, we did not see a despairing, despondent

6  suicidal person.  Details to follow, if the court wishes.

7        The 800-pound gorilla, for us, of course, are the

8  video surveillance tapes.  Obviously we assume there is a tape

9  that leads directly to the door where Jeffrey Epstein was

10  housed.  If that tape reports for 12 hours before his death

11  that no one went in and out of that room, then the suggestion

12  that there was something other than a suicide seems

13  preposterous.

14        But there is no such evidence that has surfaced to

15  date.  Just the opposite.  We have heard, and we actually read

16  in the press, that the tapes were either corrupted or not

17  functioning.  Talk about a yikes.  If, in fact, the system was

18  broken for six months before Jeffrey Epstein was housed, I

19  mean, that would be stunning incompetence.  If it was allowed

20  to continue to be inoperative when Jeffrey Epstein was housed,

21  it would be incompetence times ten.  But what if the tapes only

22  broke down or were inoperative or were corrupted on the day he

23  was killed or the day he died?  Then we're in a completely

24  different situation.

25        So where does this lead?  I think where it leads,

1   Judge, is there are incredibly important questions that remain

2   open.  The public interest in this matter is obvious from this

3   courtroom.  There are conspiracy theories galore.  We are all

4   for finding the truth.  We believe this court has an

5   indispensable role to play.

6           Whether or not this indictment is dismissed, I think

7   this court has the inherent authority to find out what happened

8   on its watch.  Obviously, when the court detained Jeffrey

9   Epstein, the court did not anticipate that weeks later he would

10  be dead in his cell.  I think given the inherent authority of

11  the court, the court should make inquiry.

12          This could come in many forms.  Obviously the court

13  made inquiry as to what happened in the first incident.  When

14  there was an allegation of an attempted suicide, the court made

15  inquiry.  The court obviously was interested.

16          I recall your language.  You talked about that being

17  one of the several open questions indicating an interest on the

18  court for the others as well.  Obviously, the ultimate question

19  is what happened to the client.

20          THE COURT:  You're talking about the July 23, 2019

21  incident?

22          MR. WEINGARTEN:  Yes.

23          The court obviously could hold hearings.  The court

24  could assign a lawyer to help the court.  I think this is an

25  area where there is intense public interest.  We have complete

J8RsEPS1

1    confidence in the prosecutors in the Southern District and the

2    FBI to do a competent investigation.  But these are allegations

3    against serious components of the United States Department of

4    Justice.  Sometimes the appearance of justice is just as

5    important as justice itself.

6            I think the court supervising, or at least keeping an

7    interest in this proceeding, is incredibly important for the

8    public to have confidence in the ultimate findings, and

9    certainly for us to have confidence in the ultimate findings.

10           One more issue, Judge.  The conditions of the jail, in

11   a word, they were dreadful.  Not just for Jeffrey Epstein, but

12   for many of the prisoners over there.  This is a prison within

13   the shadows of this courthouse.  The situation is rife with

14   vermin.  The abuse and the conditions in that prison, in a

15   word, are a disgrace and everybody knows it.

16           A person with authority told us, someone with

17   knowledge, that the prisoners in Guantanamo -- and he spoke

18   with personal knowledge -- are treated better than the

19   prisoners right across the way.  The feds certainly know how to

20   run a disciplined, clean prison.  I've been in 20 of them.

21   They know how to do it just fine.  And the question is, why in

22   the world does it not happen down the road?  I think that is a

23   perfectly legitimate subject for the court to make inquiry.

24           In a word, we want the court to help us find out what

25   happened.  The court has a role to play.  It is the institution

1    that most people have confidence in in these very troubled

2    times.

3            So whether or not you dismiss the indictment, to us,

4    is beside the point.  We want you to stay on the case, we want

5    you to conduct an investigation, and we want to know what

6    happened here.

7            Thank you, your Honor.

8            THE COURT:  Just so it is clear, so your view on the

9    motion directly on its merits of the *nolle prosequi* order and

10   application by the U.S. Attorney, do you have a view on that?

11           MR. WEINGARTEN:  I think if the court felt that the

12   case had to stay alive for the court to continue, we would

13   oppose it.  I think --

14           THE COURT:  I'm sorry, if what?

15           MR. WEINGARTEN:  If the issue, if you took the

16   position for you to conduct the investigation or lead the

17   investigation or participate in the investigation, then we

18   want, the role we want you to play, if the indictment has to be

19   alive, we would oppose the motion.

20           I don't think you need to do that.  I think you can

21   dismiss the indictment.

22           THE COURT:  So you're suggesting that you support the

23   government's motion, just viewed in the context of --

24           MR. WEINGARTEN:  Yes, of course.

25           THE COURT:  Great.

1          MR. WEINBERG:  Judge, if I can just supplement?

2          THE COURT:  Absolutely.

3          MR. WEINBERG:  Thank you, sir.

4          Thank you, as an out-of-town lawyer for the privilege

5     to appear in front of you, your Honor.

6          THE COURT:  It's my pleasure.

7          MR. WEINBERG:  First, as to the conditions, we think

8     your Honor trusted the government, the Bureau of Prisons, to

9     keep our client safe and keep him in civilized conditions.  The

10    government will again ask, as to other defendants, that they be

11    detained at the MCC, some subset of them will end up in the SHU

12    unit.

13         It is a horrific.  I've called it medieval.  There's

14    vermin on the floor.  There is wet from the plumbing.  There is

15    no sunlight.  There is limited exercise.  It is simply

16    conditions that no pretrial detainee -- and I would go farther

17    as a criminal defense lawyer -- no United States defendant

18    should be subjected to.

19         Certain judges have taken views of the conditions.  We

20    would urge your Honor, the government talks about and we talk

21    about transparency, to see what kind of conditions there exist

22    within 50 or 100 yards of one of the great United States

23    district courts.

24         Second, in terms, we have a profound problem with the

25    conclusions of the medical examiner.  There are for three

1    reasons, your Honor.

2           One is the timing of Mr. Epstein's demise.  It was on

3    August 10.  On August 12, a bail pending appeal motion was

4    being filed in the Second Circuit.  On August 12 or 13, the

5    United States Attorneys were going to respond to our request

6    for the preservation and production of documents that would

7    have facilitated and furthered our efforts to demonstrate

8    communications between the Southern District of Florida, the

9    Northern District of Georgia, which was standing in the shoes

10   of the Southern District of Florida main justice and the

11   Southern District.

12          In other words, we were beginning the process

13   discharging our responsibilities.  There had been no new

14   evidence that Mr. Epstein had committed any offense against a

15   minor after 2005.  The subject matter of the New York

16   prosecution was squarely within the heartland of the Florida

17   NPA.  We had a significant motion to dismiss.  This was not a

18   futile, you know, defeatist attitude.

19          Third, we had all the discovery motions that your

20   Honor had scheduled.  So the timing for a pretrial detainee to

21   commit suicide on August 10, when his bail pending appeal

22   motion is being filed on August 12, strikes us as implausible.

23          Second, we had an independent doctor who was present

24   at the autopsy which occurred on August 11.  On August 11, the

25   city medical examiner's findings were inconclusive.  We are

1   told by a very experienced forensic pathologist that the broken

2   bones in Mr. Epstein's neck, in his larynx, are more consistent

3   with external pressure, with strangulation, with homicide, if

4   you will, than with suicide.  It doesn't exclude suicide, but

5   the pure medical forensic evidence creates profound issues

6   about what happened to him.

7           Also the time of death.  Our medical examiner's

8   opinion is it occurred at least 45 minutes and probably hours

9   before 6:30 a.m. on August 10, when he was first found, if you

10  will, according to the reports.  Yet he was moved, something

11  that is not ordinary in these circumstances.

12          I would also --

13          THE COURT:  Excuse me.  He was moved?

14          MR. WEINBERG:  Instead of having the cell in the

15  condition it was found, if he had been dead for 45 minutes or

16  two hours or four hours, there were efforts to move him and,

17  therefore, make it more difficult to reconstruct whether or not

18  he died of suicide or some other cause.

19          I spoke to Stacey Richmond, who is a responsible

20  member of this court who represents the family of Mr. Epstein.

21  She spoke to the medical examiner on the Friday after

22  Mr. Epstein's death and asked why, if the conclusion was made

23  late in the afternoon on Friday that week.  She specifically

24  asked about what extrinsic nonmedical evidence caused the

25  medical examiner to go from uncertain to suicide, and she was

told that the medical examiner had seen nine minutes of one

video which was on a stairwell between floors at the MCC. She

was told that the principal video that would have showed the

whole hall was corrupted. It was in DC with the FBI to see if

they can reconstruct it.

And I asked the same questions that my co-counsel did,

you know, was the dysfunction of the critical pivotal video, in

the most secure prison east of Florence, out in Colorado known

to the MCC before August 10, or was this corruption occurring

on August 10, which would again cause us to be skeptical of the

servitude of the medical examiner's conclusions that this was

suicide rather than some other cause.

So with my co-counsel, we ask your Honor, it is not a

question of trust or not trust. They ask you to detain people

and you trust the Bureau of Prisons. And it is within your

inherit authority, your Honor, to find out what happened to our

client.

We are angry about the conditions he was held in. And

we're also angry, quite frankly, your Honor, that the only

source of information that we get as to what happened to him is

through the media rather than through the United States

Attorney's office. We've made requests informal. We have

made Touhy requests. We've been told there is a pending

investigation.

But we trust your Honor and the judiciary, and with

1    all due respect, we believe there is an inherent and central

2    role, a pivotal role in your Honor to find out what happened to

3    a defendant in a case before the court, whether or not the

4    court grants the *nolle pros* today or whether it holds it

5    pending an investigation into Mr. Epstein's death.

6             We're not here without significant doubts regarding

7    the conclusion of suicide. We are not here to say what

8    happened. We don't know what happened. But we deeply want to

9    know what happened to our client.

10            Thank you, sir.

11            THE COURT: And you, as Mr. Weingarten, have the same

12   view of the *nolle prosequi* motion?

13            MR. WEINBERG: Yes, your Honor.

14            THE COURT: OK.

15            MS. COMEY: Your Honor, may I respond to some of those

16   points?

17            THE COURT: Sure.

18            MS. COMEY: Thank you, your Honor.

19            Just briefly. With the exception of the noting that

20   the defense does not have an objection to the government's

21   motion, virtually everything else that defense counsel just

22   argued, respectfully is completely irrelevant to the purposes

23   of today's proceeding and to the motion that is pending before

24   your Honor.

25            As an initial matter, the question --

1          THE COURT:  Well, it may be.  Well, I don't know.  You

2     say irrelevant.

3          It is a public hearing, and I think it is fair game

4     for defense counsel to raise its concerns.

5          MS. COMEY:  Certainly, your Honor.  But it is

6     irrelevant to whether or not the motion should be granted.

7          THE COURT:  Right.  I get that.

8          MS. COMEY:  I would also note that the question of

9     Mr. Epstein's death is the subject of an ongoing and active

10    investigation, as has been publicly noted, by a separate team

11    of Assistant United States Attorneys from the Southern District

12    of New York, separate from the team who is handling this

13    prosecution, as well as a separate team of FBI agents.

14         There is an ongoing and active grand jury

15    investigation into the circumstances surrounding Mr. Epstein's

16    death.  It is the function of a grand jury and of the Federal

17    Bureau of Investigation to investigate crimes in the federal

18    court system.  It is not the purview, respectfully, of the

19    court to conduct an investigation into uncharged matters.

20         So respectfully, we disagree with defense counsel's

21    suggestion that the court has some authority to conduct an

22    independent investigation.  To the extent any other defendants

23    who are detained in the MCC have concerns about the conditions

24    or believe that the conditions are relevant to a future or

25    current bail determination, it is for those defendants and

J8RsEPS1

1  their counsel to raise those arguments and for the judges

2  hearing those arguments to evaluate those claims.  It is not

3  relevant to today's proceedings.

4       Thank you, your Honor.

5       THE COURT:  In those other cases, Ms. Comey, judges do

6  have authority to investigate, but don't here?

7       MS. COMEY:  Not to investigate, your Honor, but to

8  hear arguments about the conditions of confinement in the MCC

9  as they may relate to any bail determination.  I believe that

10  was the argument that was made.

11       The bigger picture here, your Honor, is that the focus

12  of today's proceeding, as we understand it, is to allow the

13  victims who have gathered here today to be heard and to comment

14  upon the case and to comment upon the motion that is pending,

15  and to bring this case to a close.

16       THE COURT:  Got it.

17       MR. WEINGARTEN:  May I?

18       THE COURT:  Sure.

19       MR. WEINGARTEN:  We obviously saw this as, perhaps,

20  the last opportunity to be before you, and we wanted to take

21  advantage of the opportunity to say our peace and thank you for

22  allowing us.

23       There is precedent here.  Ted Stevens, the Senator

24  from Alaska case in Washington, DC, Judge Emmet Sullivan

25  ordered an independent investigation by a private lawyer when

1   he was deeply troubled by the alleged Brady violations.  I

2   represented the prosecutors in that case, so I'm very, very

3   familiar with it.

4           It is analogous.  It is a situation where there was

5   tremendous controversy over what happened in the case and

6   whether or not the prosecutors went off the reservation.  Judge

7   Sullivan -- and there were three or four independent -- not

8   independent, DOJ inquiries into the very same matter.  But

9   Judge Sullivan wanted his own opportunity to make a judgment

10  with his own independent investigation.

11          THE COURT:  OK.

12          MR. WEINBERG:  If I could just add one precedent, your

13  Honor.

14          The Chief judge in the District of Massachusetts or

15  the Chief Judge at the time, Judge Wolf, in a case called

16  U.S. v. Fleming, when the conditions at Walpole, which is a

17  state prison where federal prisoners were being held -- we

18  don't have a federal MCC in Boston -- went to the prison,

19  stayed in the prison to determine whether or not the complaints

20  about the conditions were authentic.

21          I think your Honor has the inherent authority to go to

22  the ninth floor and see how the MCC houses pretrial detainees.

23          Thank you.

24          THE COURT:  Are you saying that whether or not the

25  motion is granted that is pending before us?

1          MR. WEINBERG:  Yes, your Honor.

2          I think, like when appeals are taken, bail issues

3    remain before the district court.  Jurisdiction is not

4    completely divested.  Your Honor issued a pretrial detention

5    order and your Honor has the power, the inherent authority,

6    they are not going to refuse to allow you to go look at the

7    ninth floor.  They are going to count on you to make decisions

8    in the future.

9          I just trust that the executive branch is not going to

10   prevent the judicial branch from looking into the death of

11   Jeffrey Epstein or the conditions in the SHU unit at the MCC,

12   sir.

13         THE COURT:  Great.  Thank you.

14         MS. COMEY:  May I, your Honor?

15         Just very briefly, your Honor.  I would note that upon

16   the dismissal of the indictment, which I believe the parties

17   agree is appropriate in this case, there would be no case.

18   There would be no jurisdiction for the court to conduct any

19   sort of inquiry, even if the court had such authority.

20         THE COURT:  Right.

21         OK.  I think we've heard enough.

22         It is at this point in the hearing that I would like

23   to call upon victims' counsel, plural, for any remarks they may

24   have and they may wish to make.  Also, to introduce their

25   clients, those of them who wish to be heard.

1    It would be helpful if, in doing that, if counsel --

2  Mr. Edwards and I see and I see Mr. Boise as well -- I know

3  they are counsel to several, at least several of the victims.

4  It would be helpful if whoever is speaking, both Mr. Edwards

5  and Mr. Boise, would indicate to the court whether or not they

6  have discussed the pending motion with their clients, that is

7  to say and the rule of abatement, etc., etc. with them prior to

8  today's hearing.

9    Are we going to hear from Mr. Edwards first, is that

10  right?

11    MR. EDWARDS:  Thank you, your Honor.

12    THE COURT:  You bet.

13    It would be helpful, Mr. Edwards, if you would state

14  and spell your name for the court reporter.

15    If you are going to introduce someone else, which I

16  trust that you are, if you could state and spell their name as

17  well.

18    MR. EDWARDS:  Yes, your Honor.

19    May it please the court.  Brad Edwards, B-r-a-d

20  E-d-w-a-r-d-s, with the law firm of Edwards Pottinger.

21    I have in the courtroom today 15 victims that I

22  represent and have represented over the years.  There are at

23  least 20 more who didn't make this hearing today for a

24  multitude of reasons, some out of fear of public exposure,

25  others because the way in which this case ended will never

1  bring full justice, and they decided it was best for them not

2  to talk today.

3           Some of my clients are going to address the court that

4  are here today.  Others are not.  Some are going to use their

5  names, and have in the past, and others wish to remain

6  anonymous.  And I have instructed each of them to inform the

7  court reporter that they will be proceeding as Jane Doe so that

8  the court reporter can take them down.

9           THE COURT:  For those who wish to remain anonymous?

10           MR. EDWARDS:  Exactly, your Honor.

11           THE COURT:  And that is satisfactory, as far as I am

12  concerned.

13           MR. EDWARDS:  Before we do that, I would like to

14  address a couple of the things that have occurred this morning.

15           First of all, whether relevant or not, I personally,

16  and on behalf of my clients, do appreciate the presentation

17  that Mr. Weingarten made and Mr. Marty Weinberg made.

18           I have tremendous respect for Mr. Weinberg.  I've

19  worked with him through this and related cases for years, and I

20  understand the reason why they made the presentation that they

21  made.

22           There is two things of interest to our clients in that

23  respect.  One is, because of the tragic ending, that none of my

24  clients wanted, nor did I, nor did anyone else, if there is

25  some civil rights violation and there is some civil remedy for

1   Mr. Epstein that goes to the estate, certainly the victims are

2   interested in that as they might help to repair the damage

3   done.

4           Second, Mr. Epstein's untimely death, the timing is

5   curious to us.  But more so, it makes it absolutely impossible

6   for the victims to ever get the day in court that they wanted

7   in court and to get full justice.  That now can never happen.

8   I know that Mr. Epstein's attorneys say he wanted it, and they

9   know, we did too.  And there are a lot of people here today

10  that are very sad by the way that this ended for both

11  Mr. Epstein and the fact that full justice was robbed from

12  them, once again.

13          The second issue I wanted to address was the Law

14  Review or the Law Journal article that your Honor referenced,

15  which is troubling because the opinion seems to say that

16  transparency is not appropriate in the criminal system and is

17  not appropriate at this point in time.

18          That's tough to swallow, especially in this case,

19  given the long history of this case.  Personally, it is tough

20  to swallow, and on behalf of my clients, I can say that is very

21  concerning.  Transparency is the only way that the justice

22  system works.  We know this because there was a similar

23  investigation of Mr. Epstein many years ago, from 2005 to 2008.

24          My personal involvement in this case was because a

25  young female came into my office named Courtney Wild, and she

1   came to me not asking to file a lawsuit against Jeffrey

2   Epstein, but simply asking for the government to talk to her.

3   She was cooperating in an FBI investigation and wanted the

4   government to speak with her, and I thought that was going to

5   be an easy task.

6          It was only a few months later that we learned that

7   this investigation that was represented to my client in written

8   form, that it would be a long investigation, and to be patient.

9   Basically, to hang tight.  It was resolved by way of a secret

10  deal that never allowed any of the more than 30 victims who had

11  been identified of Mr. Epstein's abuse in Florida to ever

12  participate in a single hearing.  There was a hearing.  They

13  were never notified.

14         I then went on to represent many of them in civil

15  cases and also in extensive pro bono work.  And I can tell your

16  Honor that while Jeffrey Epstein's abuse of them hurt them and

17  harmed them for many years, the feelings they had was

18  aggravated exponentially by the facts that they had no rights

19  in the criminal justice system, by the fact that they were

20  treated as if they didn't matter.  They were not allowed their

21  rights under the Crime Victims' Rights Act to meaningfully

22  confer with prosecutors, to be treated with fairness, to be

23  treated with dignity.  That is what this is supposed to be

24  about, and to have notice of hearings.

25         So I do want to thank your Honor, and especially the

prosecutors who have worked this investigation and this case,

which is very different in experience for all of my clients and

the other Epstein victims in this case, because they were

allowed to be a part of the process.  While some of them

elected not to be here today, that opportunity should always be

allowed for them.

In 2008, we filed that case under the Crime Victims'

Rights Act because our clients' rights were violated, and as

your Honor knows, a federal judge has ruled in our clients'

favor that their rights were violated.  So this hearing today

means a lot to them.  The fact that they may never get their

chance to speak in court, they may never get complete closure,

and all of us have to wonder, if their rights had been afforded

them the first time, would any of us be here right now.  Or

wouldn't it more likely be the case that everyone, including

Jeffrey Epstein, would have turned out better for it?

Today, I have not only represented, but met and become

very close with many of these victims.  Many of these

survivors.  They are very strong people.  They are people who

have persevered through a lot of adversity.  It's been a roller

coaster of emotions that has led us to where we are today.  And

while they have all been cast over the years because of the

secrecy of the first investigation, in the shadow as victims,

you can't put them all in one bucket and say one size fits all.

They are each individual people who were harmed differently and

1    distinctly through not only the abuse, but the system.

2          And on behalf of all of them, I would like to thank

3    your Honor for the fairness with which they've been treated,

4    and the United States Attorney's office for the way in which

5    you have handled this investigation, and especially how you

6    have treated the victims in this case.

7          Like I said, I have many who want to speak.  Some that

8    can't.  This is a very difficult day for them.  But we

9    appreciate the opportunity and the invitation.

10          The first client that I have that is going to address

11    your Honor is the one who walked into my office in 2008 asking

12    just to be heard, Courtney Wild.

13          THE COURT:  Hold on one second.  Did you all want to

14    be seated?

15          You don't need to be standing.  Whatever is more

16    comfortable until you're ready to give some comments.  It's up

17    to you.

18          Ms. Wild, if you could spell your name for the court

19    reporters, please.

20          MS. WILD:  Courtney, C-o-u-r-t-n-e-y, last name Wild,

21    W-i-l-d.

22          (Continued on next page)

23

24

25

1          MS. WILD:  My name is Courtney Wild, and I'm a victim

2     of Jeffrey Epstein.  Jeffrey Epstein sexually abused me for

3     years, robbing me of my innocence and mental health.  Jeffrey

4     Epstein has done nothing but manipulate our justice system,

5     where he has never been held accountable for his actions, even

6     to this day.

7          Jeffrey Epstein robbed myself and all the other

8     victims of our day in court to confront him one by one, and for

9     that he is a coward.

10          I want to thank the U.S. Attorney's for seeking

11    justice that has been long over due, and most importantly,

12    given us, the victims, our day in court to speak our peace and

13    find some sort of closure.  I feel very angry and sad that

14    justice has never been served in this case.  Thank you.

15          THE COURT:  Thanks very much.

16          MR. EDWARDS:  I believe my next client who is going to

17    speak is probably going to speak as Jane Doe.

18          JANE DOE NO. 1:  Yes, Jane Doe.

19          THE COURT:  We'll say Jane Doe No. 1, just for the

20    record.

21          JANE DOE NO. 1:  Okay.  Thank you for allowing us to

22    speak today.  I've shifted what I want to say in hearing

23    what's already been said, and just about the question of

24    Jeffrey's death.  I don't know what the relevance is to this

25    hearing, but I do know that it is profoundly relevant to my

1   life, as a victim.  I don't like that word, but I still feel

2   like I am learning the ways that he's impacted me as a complex

3   situation, but he was also a major part of my life.  As

4   destructive as that relationship was and as much of a villain

5   as we have created him to be -- based on facts we've created

6   him to be a villain -- he's a complex villain and actually all

7   of that is irrelevant.  Anybody deserves -- an investigation is

8   the right thing to do.  Like, we do need to know how he died.

9           It felt like a whole new trauma all over again, and I

10  don't know why, you know, because I -- I'm trying to defend

11  myself against him at this point in my life, but it still does

12  not feel good.  It didn't feel good to wake up that morning and

13  find out that he had allegedly committed suicide.  Okay.  But I

14  also wanted to say to the press, I'm reading -- I read my story

15  in the paper.  I read so many other girls' stories that are so

16  similar to my own, and everything that's been focused on is not

17  the most important part of it.

18          There was -- the problem with focusing on these, the

19  facts of the situation, that were out of the ordinary and like

20  because he was such a grand person, and it was just a unique

21  situation.  I know that that's the more interesting side of the

22  story, but I don't want to be used as entertainment.  And the

23  problem, the fundamental problem of the whole situation is the

24  element of exploitation and coercion, and these are things that

25  so many girls can relate to.

1    And even though this Jeffrey Epstein brought it to a

2    grand scale, on some level, a lot of girls could relate to the

3    trauma that we are talking about, and even though this whole

4    situation sucks, I would like to think that it may be possibly

5    a catalyst for change because, obviously, as we're seeing with

6    the "Me Too" movement, change needs to happen and it's -- what

7    I'm seeing in the papers is not a common story, but it's so

8    much more common than you realize.  That's all.  Thank you.

9        THE COURT:  Thank you very much.

10        MR. EDWARDS:  I believe that the next client is going

11    to also be a Jane Doe; so I think for the purposes of the

12    record it will be Jane Doe 2.

13        THE COURT:  Yes.

14        JANE DOE NO. 2:  Good morning, your Honor.

15        THE COURT:  Good morning.  How are you?

16        JANE DOE NO. 2:  Doing okay.  I hadn't prepared any

17    words to speak today, but there is something that was on my

18    mind this morning when I got here.  It's been on my mind in

19    reading through the press and through the people that I've

20    spoken to about it, friends, family.  It's something that's

21    bothered me because I think it has a lot of blame in it, as

22    well, a little bit of what my friend, who was up here, was

23    speaking about.

24        I think that a lot of people asked why we spent so

25    much time, why we stayed.  It's an experience that's really

1    hard to explain to people who haven't gone through it.  I think

2    there's a writer, Thomas Nagel, who wrote an essay called "What

3    is it like to be a bat?"  And I think that he touches on it

4    pretty strongly and if you haven't experienced something, it's

5    very hard to fully understand why someone makes the decisions

6    they do and what the circumstances were.

7         I don't want to speak for all of the victims.  I think

8    each of us has a different story and different circumstances

9    for why we stayed in it, but for me, I think he was really

10   strategic in how he approached each of us.  Things happened

11   slowly over time.  We didn't -- it almost was like, putting it

12   like that analogy of a frog being in a pan of water and slowly

13   turning the flame up.  You didn't realize it was happening, and

14   it just -- I don't think anyone can fully understand the

15   experience, but I just -- the blame feels very strong.

16        There's a lot of support as well, but I just want

17   people to try and understand that we aren't bad people.  We

18   weren't trying to -- it wasn't a situation where we were trying

19   to extort money from someone.  A lot of us were in very

20   vulnerable situations and in extreme poverty, circumstances

21   where we didn't have anyone on our side, to speak on our

22   behalf, and that's really scary.

23        You start to blame yourself because, at first, you

24   don't tell anyone what's happening, and it becomes your deep,

25   dark secret that you tried to keep from everyone.  And I didn't

1   even know I was a victim until I spoke with my lawyers.  I had

2   no idea.  I had so much self-hatred and doubt and just guilt

3   for everything.  I still do.  I still don't feel like I deserve

4   to say I'm a victim, and I think that's a big problem with our

5   society right now, that people are still blaming victims, and I

6   think that does need to change.

7          I hope that today people understand that each of us

8   has a story, has a past, has a family and just give us a chance

9   to -- you know, that's basically all I just wanted to say.

10          THE COURT:  Thank you so much.

11          JANE DOE NO. 2:  Thank you so much.

12          THE COURT:  Okay.

13          MR. EDWARDS:  Okay.  I think that the next person who

14  is going to speak is also going to be speaking as Jane Doe; so

15  for the purpose of the record, Jane Doe No. 3.

16          JANE DOE NO. 3:  Thank you for allowing us to speak

17  today.  I came to New York City 15 years ago to pursue modeling

18  from a small town.  I signed on with an agency and was excited

19  to pursue my passion and my dream.  Several months later, I met

20  a female who told me about Mr. Epstein.  She portrayed him as

21  an amazing man who genuinely cared for people and that he was

22  going to be able to help me in a modeling career.

23          I was excited to meet him, after hearing her talk

24  about him.  He sounded like an amazing person.  An introduction

25  was made at his New York home, and it is there that I was

J8RPEPS2

1    sexually assaulted.  I left his home, after he threw me,

2    basically put money on the table, and I was ashamed.  I was

3    embarrassed.  This was not the way I was brought up, and I

4    couldn't believe this had happened to me.

5            I left and my world kind of spiraled after that.  I

6    stopped going on modeling castings.  I gained weight.  I became

7    depressed.  I stopped going out with my friends, and only five

8    months after I had been in New York City to pursue my dream, I

9    left.  I left the modeling industry, and I left New York City,

10   and I totally switched my career paths.

11           I buried this deep within me, and all of the new

12   occurrences that have come up in the media is what brought it

13   back up for me.  And I feel sickened and saddened that it took

14   so many years, and God knows how many victims, for this to

15   finally come out, but I'm thankful it did.  And I'm just angry

16   that he's not alive anymore to have to pay the price for his

17   actions.  So I thank you for your time.

18           THE COURT:  You're very welcome.

19           MR. EDWARDS:  Your Honor, Jane Doe No. 4, I believe,

20   is going to speak now.

21           JANE DOE NO. 4:  Good morning, your Honor.

22           THE COURT:  Good morning.

23           JANE DOE NO. 4:  I just have something very short to

24   say.  I met Jeffrey Epstein at a very vulnerable place in my

25   life, and whatever the outcome is with everything, I just

1    wanted to express that we, the victims, we will always carry

2    irreparable damage and pain throughout our lives after this.

3    It's something that's never going to go away.

4            You know, whoever we marry in our life, whatever

5    future we have in our life, it's always going to be something

6    that's always there for us.  And I'm very nervous right now.

7    And Jeffrey Epstein, he took away the chance I had at having

8    the future I had envisioned for myself as a young girl, and I

9    think many of us here today will never fully heal from that

10   pain and the heartache that we'll continue carrying with us.

11           So I just wanted to say that.  It's something that

12   it's irreparable.  I can't even really use a better word to

13   describe that.  So thank you for hearing us today.

14           THE COURT:  You're very welcome.

15           MR. EDWARDS:  Your Honor, Jane Doe No. 5 would like to

16   speak.

17           JANE DOE NO. 5:  This is a letter that I wrote; so

18   it's going to be:  Dear Jeffrey, I think you are a mentally

19   disturbed human being.  You used your power to make me believe

20   at a young age that I could have my dreams of being a model.

21   You paid for your freedom.  You violated my rights.  You should

22   have to pay for them, just as anyone else.  You got a plea deal

23   that no one else would have been able to get.  You used your

24   money to get out of paying the price for your actions.

25           Also, as a victim, I never got to see what the

1 agreement was or why the special treatment got approved.  I

2 think you should have been in jail for several years in

3 population and live like everyone else that is mentally

4 disturbed like you.  You paid for yourself to get special

5 treatment while you were in jail.  I don't even think you spent

6 a day in a jail as a normal human being.

7   You had investigators come to my house and also went

8 to my friend's house to question them.  I will never be able to

9 over -- I will never be able to get over the overwhelming

10 emotions and embarrassment I experienced from that trauma.  I

11 needed therapy several times a week and had high stress and

12 anxiety levels.

13   You paid your way to make the public think that the

14 girls had nothing in life going on for them.  You wanted to try

15 and blame that we were lower class and that was the problem

16 with the girls.  I was from a middle class family and did well

17 in school.  I lived the American girl dream -- or the American

18 girl life.  I went on family vacations around the world, grew

19 up in a good city, and my parents are still married to this

20 day.  Basically, everything you said that we didn't have in our

21 life, I did.

22   It all came down to I was told I was making $200 in an

23 hour.  Being young, that was a lot of money, and I didn't know

24 any better.  Sadly, you were the one with an illness that you

25 should have to go and see a doctor and also have a mentor group

1    for the sickness you have.  I will continue with writing my

2    book about that secret life, with all the newspaper articles of

3    the case, my high school agenda book of official dates.  I'm

4    basing that proof that I deposited cash after leaving

5    Jeffrey's.  I still have all of the information, articles that

6    I collected over the years.

7            You mentally and physically traumatized me.  I went to

8    therapy, and it was the best thing I did for myself.  If anyone

9    only learns one thing from this case, I hope is that money

10   should not let you buy your way free.  A crime is a crime and a

11   victim is a victim.  Thank you.

12           THE COURT:  Thank you.  Thank you very much.

13           MR. EDWARDS:  Your Honor, my next client is Chauntae

14   Davies, C-h-a-u-n-t-a-e, Davies, D-a-v-i-e-s.

15           MS. DAVIES:  I met Jeffrey Epstein through my first

16   massage teacher, a man who took me in as his apprentice to

17   teach me a practice I wanted to learn while in desperate search

18   to find a cure for a debilitating neurological disorder that I

19   have, which manifests into violent vomiting attacks, largely

20   triggered by stress.  It's called Cyclic Vomiting Syndrome.

21           I was recruited by Ghislaine Maxwell.  Upon my first

22   meeting of her, I wouldn't know I had been recruited until many

23   years later, when I would read it in a headline.  Ghislaine and

24   Jeffrey took me in.  They sent me to school.  They gave me a

25   job.  They flew me around the world, introduced me to a world I

1  had only dreamt of and made me feel as though I had become a

2  part of their family, another thing I was desperately searching

3  for.

4         But on my third or fourth time meeting them, they

5  brought me to Jeffrey's island for the first time, and on the

6  first night there, Sarah Kellen came tapping on my door late at

7  night to inform me Jeffrey was ready for another massage.  My

8  instincts told me this didn't feel right, but I got up and

9  followed her to a villa I hadn't yet seen.  Jeffrey and

10 Ghislaine's villa.

11        I began my massage, trying not to let him smell my

12 fear and obvious discomfort, but before I knew what was

13 happening, he grabbed onto my wrist and tugged me towards the

14 bed.  I tried to pull away, but he was unbuttoning my shorts

15 and pulling my body onto his already naked body faster than I

16 could think.  I was searching for words but all I could say was

17 meek, "No, please stop," but that just seemed to excite him

18 more.

19        He continued to rape me, and when he was finished, he

20 hopped off and went to the shower.  I pulled my shorts up, and

21 I ran as fast as I could back to my own villa, my feet bloodied

22 from the rocks.  I cried myself to sleep that night.

23        I spent two weeks vomiting, almost to death, in a

24 Los Angeles hospital after that first encounter.  Jeffrey's

25 abuse would continue for the next three years, and I allowed it

J8RPEPS2

1  to continue because I had been taken advantage of my entire

2  life and had been conditioned to just accept it.

3       It took me a long time to come forward, too long

4  maybe, and all it took to bring -- and all that it took to

5  bring this man to justice has been robbed by his death.  Every

6  day, every week I've spent in the hospital since, I've suffered

7  and he has won.  Every job offer that's been offered to me and

8  then retracted because of my connection to this case, I have

9  suffered and he has won.  Every public humiliation I have

10  endured, I have suffered and he has won.  Every relationship

11  that I've had to end because of the abuse that I have endured

12  by the hands of this man, I have suffered and he has won.

13       Every woman sitting in this room today, and all of the

14  women who have yet come forward and who have not yet to come

15  forward and whose lives have been affected by Jeffrey Epstein's

16  sick abuse of young girls, we have all suffered, and he is

17  still winning in death.

18       I refuse to let this man win in death.  I couldn't

19  fight back when Jeffrey Epstein sexually abused me because I

20  hadn't yet found my voice.  Well, I have found my voice now,

21  and while Jeffrey may no longer be here to hear it, I will not

22  stop fighting, and I will not be silenced anymore.  I needed

23  him to hear the pain he's caused, what I've gone through

24  because of him.  I wrote a 350-page book of all the pain that I

25  have endured at the hands of this man that I really needed him

1    to hear.  His death has robbed me of that justice.

2            Please don't rob us of justice again.  Thank you.

3            THE COURT:  Thank you.

4            MR. EDWARDS:  Your Honor, I think I have one more

5    client that is going to speak today, Anouska De Georgiou.

6            THE COURT:  Would you spell that?

7            MS. DE GEORGIOU:  Good morning, your Honor.

8            THE COURT:  Good morning.

9            MS. DE GEORGIOU:  My name is spelled A-n-o-u-s-k-a,

10   D-e, space, G-e-o-r-g-i-o-u.

11           Thank you, your Honor, for giving us the opportunity

12   to be heard this morning.

13           THE COURT:  Sure.

14           MS. DE GEORGIOU:  When I was introduced to Jeffrey

15   Epstein, I was young and full of hope and the foolishness of a

16   teenager.  I was idealistic, and I saw the good in people.

17   Jeffrey Epstein manipulated me, coerced me and sexually abused

18   me.

19           Something I think is very important to communicate is

20   that loss of innocence, trust and joy is not recoverable.  The

21   abuse, spanning several years, was devaluing beyond measure and

22   affected my ability to form and maintain healthy relationships,

23   both in my work and my personal life.  He could not begin to

24   fathom what he took from us, and I say "us" because I am every

25   girl he did this to, and they're all me.  And today we stand

1   together, those that are present and those that aren't.

2            I was a victim, and it has taken me many, many years

3   to stand here and say, yes, it was me.  I was a victim, but I

4   will not remain a victim and be silent for one more day.

5   Although I think it's tragic when anybody dies before their

6   time, I'm extremely relieved that Jeffrey Epstein will not be

7   in a position to hurt anymore children or anymore women, and

8   I'm glad to be part of a group of women who are now bonded

9   forever in the trauma that we endured at the hands of this man.

10  Thank you.

11           THE COURT:  Thank you.

12           MR. EDWARDS:  Your Honor, we had one client who was

13  not able to be here but sent a message through a letter.  Her

14  name is Michelle Licata, M-i-c-h-e-l-l-e; last name,

15  L-i-c-a-t-a.  And Brittany Henderson, of my office, is going to

16  read her letter as instructed.

17           THE COURT:  Sure.

18           MS. HENDERSON:  Thank you, your Honor.

19           THE COURT:  Yup.

20           MS. HENDERSON:  What happened to me occurred many

21  years ago when I was in high school, but it still effects my

22  life.  I was told then that Jeffrey Epstein was going to be

23  held accountable, but he was not.  In fact, the government

24  worked out a secret deal and didn't tell me about it.  The case

25  ended without me knowing what was going on, without him being

1  held responsible, without any explanation and without a chance

2  for my voice to be heard.  I was treated like I did not matter.

3          Many years later, he was arrested again.  These

4  investigators and attorneys representing the United States have

5  been completely different.  I am still mad, concerned and

6  confused about how he committed suicide and escaped

7  responsibility again, but I know it is not the fault of the

8  judge or the government attorneys.

9          I was allowed to be a part of the process this time.

10  My attorney was able to tell me what was going on at every

11  stage because they kept him informed.  Thank you for inviting

12  me.  It means more to me than you can ever know.  I was not

13  able to be here this time, but I know that I was allowed to be

14  and I had the chance to attend this hearing, which is helping

15  me in my healing process.  The fact that I mattered this time

16  and the other victims mattered is what counts.  For that, I am

17  grateful.

18          THE COURT:  Thank you.

19          MR. EDWARDS:  Your Honor, finally, in 2008 when I

20  filed the case under the Crime Victims Rights Act, it wasn't me

21  alone.  I did it with Paul Cassell and Jay Howell.

22          Paul Cassell is here today, and I think your Honor

23  even cited to a piece of -- an opinion of his from when he was

24  on the bench, and he has some remarks to make.

25          Once again, your Honor, I really do believe that this

J8RPEPS2

1    is a model for how victims should be treated in a criminal

2    process, and we really do appreciate it.  Thank you.

3              THE COURT:  Thank you.

4              MR. CASSELL:  I'll be very brief because I know there

5    are others that want to speak here.  I'm Paul Cassell,

6    C-a-s-s-e-l-l, previously served as a federal judge at the

7    District of Utah, currently a law professor, where I teach

8    crime victims rights at the University of Utah, College of Law.

9              I just wanted to take one minute to address some

10   suggestion that there would be no need for a hearing this

11   morning.  I think, having heard already from these powerful

12   victims and recognizing how important giving those statements

13   will be in the trajectory of their lives, makes clear that your

14   Honor has followed exactly the right path.  Legally, there is

15   one precedent, which is *U.S. v. Heaton*, a case that you cited

16   that I wrote about a decade ago, and as explained in that

17   opinion, victims have important interests in the criminal

18   justice system that can only be recognized if they're given

19   their day in court.

20             With all due respect to other law professors that have

21   recently written an article, I think transparency is one of the

22   overriding objectives in our criminal justice system, and the

23   one substantive action that I would urge your Honor to take

24   today is to publish your remarks as a published opinion.  The

25   Heaton case is, to my knowledge, the only reported decision on

1  this particular issue, even though it's more than a decade old

2  and, yet, we can see today that these problems recur in many

3  other cases.  Your remarks today, I think, should be published

4  so that they can serve as a guide for other judges around the

5  country.

6          I would encourage you to add into your remarks a

7  reference to the Crime Victims Rights Act.  The Crime Victims

8  Right Act promises victims the right to be treated with

9  fairness, dignity and respect, and the process that we see

10  unfolding this morning is a clear example of how victims can be

11  treated with fairness, dignity and respect.

12          So I know that your Honor is wondering what is the

13  appropriate action here.  Unfortunately, it seems like there

14  are no other legal options, but there was a legal option for

15  you to decide to exercise, which was to allow these victims to

16  come forward.  And if there's been one positive thing that has

17  come out of the tragedies, the abuse, the other events of this

18  case, it's been your decision to allow these victims to be

19  heard this morning, and I encourage you to publish your

20  decision and to encourage other judges to follow what is

21  clearly a model for crime victims rights and is clearly an

22  example that should be followed in other cases down the road.

23          THE COURT:  Thank you very much.  I appreciate your

24  being here.  I had no idea that you would be here when I wrote

25  the remarks, but it was clear from the literature that you are

1  the leading expert formerly of the District Court of Utah, I

2  believe, and it's a pleasure to have you here today.

3          MR. CASSELL:  Thank you, your Honor.

4          THE COURT:  Thanks.

5          Mr. Boies?

6          MR. BOIES:  Thank you, your Honor.  David Boies of

7  Boies Schiller Flexner.  We have with us today five of the

8  victims that we represent.  There are a number of additional

9  victims who either were unable to attend or are still unwilling

10 to come forward publicly.  This has been an enormously

11 traumatic aspect of their lives, something that, as you've

12 already heard and will hear more today, is something that they

13 can never entirely escape from.

14         I want to, as prior counsel have, commend both the

15 Court and counsel for the Department of Justice for the

16 consideration and respect and attention that they have paid to

17 the victims.  We believe that that is not only right, as a

18 matter of human dignity, but we think that is exactly what the

19 law requires and intends.

20         I will be more blunt than the Court has been, or

21 Professor Cassell has been about Professor Green's article.

22 That is an article that cites no authority, and I believe there

23 is no authority for his proposition.  I entirely respect his

24 right to advocate on behalf of his client Alan Dershowitz, who

25 has retained him in connection with litigation that we've

1    brought against Mr. Dershowitz, but I would have expected that

2    the Law Journal or Professor Green himself would have disclosed

3    that connection, which I think is a conflict.

4         But regardless of the appropriateness of his

5    disclosure, or lack of disclosure, I think that his article

6    opposing allowing the victims to have a voice in this

7    proceeding is inconsistent not only with the policy that

8    underlies the Crime Victim Rights Act and the very statute that

9    Mr. Epstein is being prosecuted under, but it ignores the

10   actual language of those statutes, and many other statutes, in

11   which Congress has made clear that the purpose of the criminal

12   law is no longer simply to punish the individual defendant, but

13   it is to find some way of trying to mitigate the damage that

14   has been done to the victims through restitution and economic

15   mitigation, but also through the ability to confront and to

16   have the court system and the justice system and the

17   prosecutors treat these victims as they are victims, as they

18   are human beings, and they are entitled to the respect that our

19   society needs to give every human being.  So I think that this

20   is not only commendable, but I think it is what the law

21   requires.

22        In response to the question the Court asked, I have

23   discussed this hearing with my clients.  I have told them that,

24   under the applicable law, the government has no alternative but

25   to move to dismiss this case, and I believe under the

1   applicable law in this circuit, the Court has no alternative

2   but to grant that motion.

3           I think the current law is outdated, as the Court

4   suggested in some of its remarks.  I think there will come a

5   time when either an Appellate court or the Congress will make

6   clear that, just as it's possible to continue civil cases

7   against someone after they have deceased, it is possible, at

8   least for purposes of things like restitution, to continue

9   criminal cases, but we are not there now.  And, fortunately, in

10  this case, there are other ways and perhaps even more efficient

11  ways to vindicate the interests of the victims here.

12          We greatly appreciate the remarks of the

13  representative of the Department of Justice today, and we, too,

14  on behalf of the victims, are not going to stop when we walk

15  out of this courtroom.  We are going to continue to seek

16  vindication against Mr. Epstein's estate and, in some senses,

17  perhaps even more important, against the people who worked with

18  him and enabled him.

19          As you have already heard, and will hear more,

20  Mr. Epstein did not act alone.  He could not have done what he

21  did, on the scope and the scale of what he did, for as many

22  years as he did it without the activities and support and the

23  co-conspirator activity of a number of other key individuals,

24  and those individuals also need to bear their share of

25  responsibility, and those people need to have a reckoning as

1    well.

2           My partner Sig McCawley, who's been working with me

3    for more than five years on this case, is going to, with the

4    Court's permission, introduce five of our clients who will

5    speak briefly to your Court.  Thank you very much.

6           THE COURT:  Thank you very much, Mr. Boies.  Pleasure

7    to have you here.

8

9           MS. McCAWLEY:  Thank you, your Honor, the first victim

10   that would like to speak today is Theresa J. Helm.

11          THE COURT:  Can we have the spelling of your name?

12          MS. McCAWLEY:  Sure.  Sigrid, S-i-g-r-i-d, and the

13   last name is M-c-C-a-w-l-e-y, and I'm a partner at Boies

14   Schiller Flexner.

15          THE COURT:  Thank you.

16          MS. HELM:  Good morning.

17          THE COURT:  Good morning.

18          MS. HELM:  Thank you, prosecutors and Judge, and the

19   Court.  My name is Theresa Helm.  I note today I do feel

20   respected and listened to; so I appreciate that, and I have to

21   say that I commend the boldness of the New York prosecutors for

22   pursuing a man that has, you know -- and others, that have

23   clearly taken a lot from a lot of people.

24          17 years ago I knew him only as "Jeffrey."  I was

25   recruited and brought from California to New York, and that

1  experience for the last 17 years has been a dark corner in my

2  story, in my life, in my life story and that has been

3  definitely made worse by my own self-shame and that -- and

4  anger for normalizing all of the red flags.  I feel like we are

5  conditioned to do that, and that's something that needs to

6  change.

7          So I'm here today, you know, I'm coming forward

8  because it is time to bring light to that darkness, and it's

9  time to replace that darkness with light.  And I am a survivor

10  of this, and I do aim to progress further from being a

11  survivor, you know.  I feel I've worked hard, quite hard, to

12  get to where I'm at now, and I'm definitely at a place in my

13  life where I will no longer cover up.  I'll no longer cover up

14  what needs to be brought to light.

15          Jeffrey is no longer here, and the women that helped

16  him are, Ghislaine Maxwell.  My experience is with Ghislaine

17  Maxwell and Sarah Kellen, and they definitely need to be held

18  accountable for helping him, helping themselves, helping one

19  another carry on this huge, almost like a system.  So they need

20  to be held accountable, all of them, and I would like to see

21  that, certainly on behalf of myself and for everyone here.

22  Thank you.

23          THE COURT:  Thanks so much.

24          MS. McCAWLEY:  Our next client, who is going to speak

25  this morning, is Virginia Roberts Giuffre.

1            MS. GIUFFRE:  Good morning, your Honor.

2            THE COURT:  Good morning.  How are you?

3            MS. GIUFFRE:  Okay.  Thank you.  My name is Virginia

4    Roberts Giuffre, that's V-i-r-g-i-n-i-a, Roberts,

5    R-o-b-e-r-t-s, Giuffre, G-i-u, double F, for Fred, -r-e.

6            I am a victim of Jeffrey Epstein and Ghislaine Maxwell

7    in the dark and cruel and criminal acts they committed against

8    me and hundreds of other girls and young women for years and

9    years and years, unstopped.

10           Thank you for allowing me to address the Court and

11   speak the truth.  I commend the prosecutors from the Southern

12   District of New York for the ongoing investigation and its

13   pursuit of justice for us victims.  It has given me hope, and I

14   will not let go of that hope.

15           When I was recruited by Ghislaine Maxwell at

16   Mar-a-Lago, just before I was 17, I thought I was given a big

17   break, and I'd be able to reset my life and become an actual

18   real massage therapist.  My hopes were quickly dashed, and my

19   dreams were stolen.  Jeffrey Epstein is no longer alive, but

20   this is not about how he died.  This is about how he lived.

21           He will not have his day in court, but the reckoning

22   of accountability has begun, supported by the voices of these

23   brave and beautiful women in this courtroom today.  The

24   reckoning must not end.  It must continue.  He did not act

25   alone and we, the victims, know that.  We trust the government

1    is listening and that the others will be brought to justice.

2    Thank you, your Honor.

3              THE COURT:  Thank you very much.

4              MS. McCAWLEY:  The next client of ours that will be

5    speaking this morning is Sarah Ransome.

6              MS. RANSOME:  Thank you, your Honor.  My name is Sarah

7    Ransome, R-a-n-s-o-m-e.  I'm a victim of Jeffrey Epstein and

8    Ghislaine Maxwell's international sex trafficking ring.

9              I would like to thank the Court for the dignity and

10   the respect you are showing me here today, as well as the other

11   victims.  I would also like to acknowledge and extend my

12   gratitude to the prosecutors from the Southern District of

13   New York for pursuing justice on behalf of the victims.

14   Please, please finish what you have started.  I struggled to

15   find the words to adequately say how important your work is to

16   us.

17             For a very long time Jeffrey Epstein gamed the system

18   at every level, and when he realized he couldn't do that any

19   longer, he showed the world what a depraved and cowardly human

20   being he is by taking his own life.  But we, the victims, are

21   still here, prepared to tell the truth, and we all know he did

22   not act alone.  We are survivors, and the pursuit of justice

23   should not abate.  Thank you, your Honor.

24             THE COURT:  You're very welcome.

25             MS. McCAWLEY:  Our next client who is going to be

1  speaking this morning is Annie Farmer.

2         MS. FARMER:  Good morning, your Honor.

3         THE COURT:  Good morning.

4         MS. FARMER:  Annie, A-n-n-i-e, Farmer, F-a-r-m-e-r.

5         I had the opportunity to speak at Jeffrey Epstein's

6  bail hearing, and I really appreciate that you heard me and

7  listened to me that day.  I am so sorry that others will not

8  have the opportunity to stand before him the way that I did.

9  But I'm here today to speak on behalf of my sister, Maria

10  Farmer, who could not be here.

11         Jeffrey Epstein, Ghislaine Maxwell not only assaulted

12  her, but as we're hearing from so many of these brave women

13  here today, they stole her dreams and her livelihood.  She

14  risked her safety in 1996, so many years ago, to report them,

15  to no avail, and it is heartbreaking to her and to me that all

16  this destruction has been wrought since that time.

17         We were deeply disappointed and disturbed by Epstein's

18  death and the fact that that was allowed to happen while he was

19  in the government's custody, and I'm encouraged to hear that

20  there will be a full investigation as to how that was allowed

21  to happen.

22         But it is extremely important, as others are saying,

23  that he did not act alone and that the other people that were a

24  part of what he did are held accountable and that that

25  investigation continues.

1      I believe that we have a real problem in this country

2 with perpetrators of sexual abuse and sexual assault being held

3 accountable.  There are so many roadblocks to victims being

4 heard, to cases being investigated thoroughly, and then to

5 those cases being prosecuted.  And so I think this is a really

6 important signal to send a message to victims out there that

7 people will take you seriously, people will follow through, and

8 that even those in power, as we have unfortunately seen, that

9 has not been often are able to escape that, that even those in

10 power will be held accountable.  Thank you.

11      THE COURT:  Thanks so much.

12      MS. McCAWLEY:  Our next client, who's going to address

13 the Court is Marijke Chartouni.  She says it much more

14 beautifully than I do; so I'll let her say it.

15      MS. CHARTOUNI:  My first name is spelled,

16 M-a-r-i-j-k-e; last name is C-h-a-r-t-o-u-n-i.

17      My name is Marijke Chartouni, and I am a victim of

18 Jeffrey Epstein and the sophisticated sex trafficking operation

19 he ran, where he allegedly was to be a financier.

20      I was 20 and previously modeled and was living in the

21 West Village.  I met a young woman named Rena through a mutual

22 friend.  We were friends for a few months.  She was an amazing

23 artist and liked to party.  One day she called me and asked if

24 I was interested in meeting a friend of hers.  She told me he

25 wanted to meet me and really liked blonds, and I thought he was

1  our age and liked to do the same things we did at that age; so

2  I agreed.

3        On a sunny, crisp day, we took the train together to

4  the Upper East Side.  She then began to talk a little bit about

5  him on our way to his house.  I was at his house.  I was

6  sexually assaulted by both Rena and Jeffrey Epstein in his

7  mansion.  It left me feeling both disgusted and betrayed.

8        As we walked home to the subway afterwards, she

9  continued to tell me about the man who had just abused me with

10 her participation.  She seemed exhilarated from the horrific

11 experience.  I was shocked and in a daze.  This is a few things

12 that she had told me.  She told me he went to Cooper Union.  He

13 was a mathematical genius.  That he had favorite girls that he

14 would take to Chanel for 15-minute, all-you-can-buy shopping

15 trips.  She told me his right-hand person had connection to the

16 arts and the fashion world, and she could help me.

17       This is not my complete story.  I'll stop here.  I'm

18 in a good, stable place in my life, and I had decided to come

19 forward to be a voice to the victims who may not be able to

20 tell their story, or at least not yet.  I feel like I am a

21 survivor.

22       Thank you, Judge Berman, for inviting victims to speak

23 today before you.  We hope the government is listening very

24 closely to the words we are saying.

25       THE COURT:  Thank you very much.

1      MR. BOIES:  Your Honor, just very briefly.

2      THE COURT:  Sure.

3      MR. BOIES:  I would like to express to the Court how

4  proud I am of all of these women who have come forward.  It's

5  taken an enormous amount of strength and courage for them to do

6  so.  Thank you.

7      THE COURT:  Thanks, Mr. Boies.  Hold on one second.

8      (Pause)

9      MS. LERNER:  Thank you, your Honor.  My name is

10  Kimberly Lerner, of Lerner and Lerner, and your Honor, with

11  your permission, I would like my client, Jennifer Aroz, to

12  stand next to me.

13      THE COURT:  Sure.

14      MS. LERNER:  Would that be okay?

15      THE COURT:  Absolutely.

16      MS. LERNER:  Your Honor, I would like to begin by

17  saying that I am in awe of all of these beautiful women.  I

18  just want to let you know, on behalf of Jennifer and myself, we

19  admire you, we respect you, and we applaud you, and you are

20  brave survivors.  And Jennifer's heart is with all of you, and

21  we thank you so much for coming forward.

22      Jennifer, when she went public, she thought she was

23  one of the only ones, and to see all of these faces is, I know,

24  amazing for her.

25      Jeffrey Epstein was a predator, a pedophile and a sick

J8RPEPS2

1  individual.  However, he was also a thief.  He stole Jennifer's

2  childhood dreams, her innocence and her self-confidence.  She

3  was 14 years old.  What he could not buy, he forcibly took.

4  Why?  Because he surrounded himself with a network of powerful

5  people who not only looked the other way, but also actively

6  facilitated and participated in his sexual abuse of children.

7  Jeffrey Epstein thought he was above the law, and

8  essentially he was until now.  The system let Jennifer and the

9  other victims down, but it does not have to end here.  We ask

10  the U.S. Attorney's Office and the FBI to bring all of

11  Epstein's enablers and co-conspirators to justice.

12  It has taken Jennifer 18 years to find her voice, and

13  again, Jeffrey Epstein has tried to silence her.  While she

14  will never have her chance to face him in court, he no longer

15  has any power over her.  Today, this brave survivor will be

16  heard.

17  MS. AROZ:  Thank you for allowing me to be able to

18  have my chance in court today, to be able to tell you what this

19  horrific man did to my life.  You can't even imagine how much

20  it affected my childhood, all the way through my adult life.

21  He robbed me of my dreams.  He robbed me of my chance to pursue

22  a career I always adored.  He stole my chance at really feeling

23  love because I was so scared to trust anyone for so many years

24  that I had such severe anxiety.  I didn't want to leave my

25  house let alone my bed.

1          The fact that he felt entitled to take away my

2    innocence, the fact that he felt that he could do whatever he

3    wanted, regardless of the laws, hurts me so very much.  It took

4    me years to tell anyone what Epstein did to me because I was so

5    ashamed and embarrassed at what people would say or think of me

6    until I found out there were other victims, girls just like me.

7    I knew I could no longer keep my silence no matter how ruthless

8    and powerful Epstein was, and still is even after his death.

9          The fact I will never have a chance to face my

10   predator in court eats away at my soul.  Even in death, Epstein

11   is trying to hurt me.  I had hoped to at last get an apology,

12   but this evil man had no remorse or caring for what he did to

13   anyone.  I felt let down by the people who were supposed to

14   watch him in prison.  They let this man kill himself and kill

15   the chance of justice for so many others in the process, taking

16   away our ability to speak.

17         Out of all the damages and side effects that Epstein

18   caused by his heartless and selfish acts, it's very hard to put

19   my feelings and emotions into words, trying to let his

20   horrendous actions go and attempting to forgive him, has been

21   so difficult for me.  Yet, as hard as it's been to come so

22   publicly forward, I refuse to let Epstein take me as a victim

23   anymore.

24         I am a survivor.  The many that stand before me here

25   today that have shared the horrific experiences with this

deplorable human being, because even though this weak, evil

coward tried to steal all of our childhoods, tried to steal all

of our innocence and tried to steal all of our means of

justice, he will never steal our inner strength, and he will

never, ever, ever steal our voice.  Thank you so much.

THE COURT:  You're welcome.

MS. GIBBS:  Good morning, your Honor.  Teri Gibbs,

T-e-r-i, G-i-b-b-s.  For the record, I am a California

attorney.  I'm not admitted to the New York State bar.  I am

here to make a statement on behalf of New York attorney, Lisa

Bloom.  I work for her firm, The Bloom Firm.

Lisa Bloom represents four of Jeffrey Epstein's

victims, Jane Doe 6, for the record, Jane Doe 7 and Jane Doe 8.

I am so proud of all of you victims who are here today and are

able to voice yourselves today.  I will not and cannot comment

on the criminal case, or Ms. Bloom's communications with her

clients.

Ms. Bloom would like to share three of her client's

statements for the record.  Here are the statements.  Statement

of Jane Doe 6.

To the Honorable Richard M. Berman.  Jeffrey Epstein

stole my innocence.  He gave me a life sentence of guilt and

shame.  I do not consider myself a victim.  I see myself a

survivor.  The abuse that I endured cannot continue.  Let's

stop this before it happens to other young women.  Jane Doe.

J8RPEPS2

1          Statement of Jane Doe 7.  To the Honorable Richard M.

2   Berman.  I used to be relatively carefree, inquisitive, hopeful

3   and excited about life, but my life changed because of Jeffrey

4   Epstein.  My perspective on life became very dark when I was

5   unknowingly recruited by one of his agents.  Jeffrey Epstein

6   ruined me.  His recruiter ruined me.  The far-reaching

7   consequences of that day ruined my family's lives.

8          I've chosen to remain anonymous in order to protect my

9   family from unwanted media attention.

10          I was just trying to figure out my path in life when I

11   encountered Jeffrey Epstein in his New York City mansion.  I

12   cannot even begin to summarize the many detriments this

13   experience of sexual assault has had on my life.  Immediately

14   following the incident, I was unable to function and be around

15   other people.  My parents had to rescue me and bring me home,

16   where I became a recluse for years.

17          I was changed forever and buried my assault deep down,

18   where the darkness couldn't hurt me anymore, but of course, it

19   has always been here, lingering and affecting me unconsciously.

20   At the time, I was mired in shame, guilt and humiliation.  I

21   had somehow tricked myself into thinking that I had allowed the

22   assault to happen, that I did it to myself, that I don't

23   deserve to be alive or to be loved.  I believed that I was a

24   disgusting, shameful person who does not deserve to ever be

25   happy.  These are the thoughts I've lived with on a daily

1   basis.

2           Furthermore, because I couldn't tell anyone, out of

3   fear of judgment, blame or retaliation, keeping this secret

4   completely hindered my ability to uncover why these issues

5   existed for me, which could have led to a path of healing over

6   the years.

7           It is time for those of power to do the right thing.

8   It is time for compassion toward our fellow human beings to

9   reign over money, power and greed.  We need to protect our most

10  vulnerable to allow them a chance at a normal life, and nothing

11  should come in the way of that.  I believe that for future

12  generations, including my own children, this case will set a

13  precedent that victims must no longer suffer in silence on our

14  own or be shamed for coming forward to seek protection.

15          This case should demonstrate to those who want to harm

16  others that there will be a reckoning, and they will pay dearly

17  for the harm they inflict on innocent people.  Judge Berman, I

18  thank you for from the bottom of my heart for this forum and

19  opportunity.

20          To all of those survivors who came before me, I

21  commend your bravery.  There is no way I could have done this

22  without you.

23          Thank you to the public following this story, for your

24  outrage and desire for answers, which will hopefully move this

25  case forward so that victims can stop having to relive their

1    experiences every day and move on to begin to heal.

2            God bless the victims, their families, the

3    investigators and public servants working so diligently to find

4    those answers and to right all these wrongs.  Jane Doe 7.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J8RsEPS3

1          THE COURT:  Thanks very much.

2          MS. GIBBS:  One more.  Statement of Jane Doe 8.

3          In the past few weeks, I have had to reflect on my

4   interaction with Jeffrey Epstein and realized that, though I

5   have yet to put it all behind me, I am still a victim.  I say

6   this because I have to come to terms with it in an effort to

7   truly get past the abuse I suffered at the hands of Epstein.

8          Pursuing criminal penalties against him and having an

9   opportunity to address the egregious crimes he committed

10  against me and other young woman would have helped my recovery

11  process.  This all came to an abrupt halt when he took his own

12  life.  This point of disclosure is lost.

13         I cannot say that I am pleased he committed suicide,

14  but I am at peace knowing he will not be able to hurt anyone

15  else.  However, a sad truth remains.  I, along with other

16  people, will never have an answer as to why.  I will never have

17  an apology for the wrongdoing.  And most importantly, Epstein

18  will not be justly sentenced for his crimes.  Now I sit in my

19  home questioning the well-being of those girls like myself.  In

20  choosing death, Epstein denied everyone justice.

21         Any efforts made to protect Epstein's name and legacy

22  send a message to the victims that he wins and that he is

23  untouchable.  I understand his case may be dismissed or closed,

24  but this makes me feel as though I, and anyone else who fell

25  pry to his hands, simply do not matter.

1    I ask that you very seriously consider the final

2  decision, because it will undoubtedly affect all other facets

3  of this case, including any future charges brought against the

4  recruiters or third parties to his crimes.  I do not want the

5  narrative to be, Those poor girls.  I want to send a message to

6  anyone who would consider engaging in similar acts to think

7  twice beforehand.  I want some sort of closure for those of us

8  who relive those horrible moments where we were assaulted,

9  abused, and taken advantage of by Epstein.

10    You have the opportunity to help us seek that closure.

11  I appreciate your time and consideration and ask for your

12  continued support in dealing with this case to illustrate that

13  we, Epstein's victims, do matter.

14    Sincerely, Jane Doe 8.

15    On behalf of Lisa Bloom and The Bloom Firm, thank you,

16  your Honor.

17    THE COURT:  Thank you, Ms. Gibbs.

18    Did we have any other victim's counsel or victims?

19    Ms. Allred.

20    MS. ALLRED:  Good morning, your Honor.

21    THE COURT:  Good morning.  How are you?

22    MS. ALLRED:  Fine.  Thank you.

23    Allred, Maroko & Goldberg by Gloria Allred,

24  G-l-o-r-i-a A-l-l-r-e-d.

25    Your Honor, thank you so much for this opportunity to

afford the victims their voice, because many of them have never

spoken before.  They never spoke in Florida.  They never spoke

anywhere.  They never told their mother.  They never told their

father.  They never told their family members.  This is an

opportunity for them to be heard.  We thank you for that.

Your Honor, for 43 years my firm has been the leading

women's rights private law firm in the United States.  We have

helped thousands of victims.  And I, as an officer of the

court, and as a believer in the system, have tried to encourage

the victims to have confidence in the system that should

provide them access to justice that should help them to assert

and vindicate their rights in a court of law.  It has been

increasingly difficult in this case for me to say to my clients

that they should have confidence in the system of justice given

what has occurred in this case, People v. Jeffrey Epstein.

Having said that, I am encouraged by the fact that

this court, essentially, in an unprecedented situation where

the defendant is deceased, is still affording these victims an

opportunity to be heard.  So we thank you for that.  It is some

encouragement.

Your Honor, you also asked do our clients wish to be

heard in reference to some of the issues that have been raised

this morning, including what should happen into this case.

Your Honor, there has been a suggestion that the court should

investigate the circumstances of the death of Mr. Epstein.  I'm

1    not going to repeat the arguments made by counsel, but I would

2    say that if there is jurisdiction, and I know that is a legal

3    issue which has been previously argued, that certainly it would

4    increase the confidence of my clients.  Not just my clients,

5    but victims all over, and some are, by the way, located in

6    other parts of the world, to have the court oversee the

7    investigation.

8         We are encouraged by the sensitivity of the attorneys

9    for the United States Attorney's office for the Southern

10   District of New York and the investigation that is going on

11   with the separate team.  However, and, of course, the defense

12   is also conducting its own investigation.  But I do think the

13   greatest confidence would be if the court in some way would be

14   able to oversee an investigation because the court is a neutral

15   party.  And although the court certainly has a stake in finding

16   out what happened to defendants who are in the custody of the

17   federal system and who should be there to face the prosecutors

18   and the charges against them, but now are not because clearly

19   the system has failed.

20        And the United States Attorney has admitted that, and

21   even before he admitted that, everybody knows the system

22   failed.  Failed the victims, failed the court, failed everyone.

23        In any event, your Honor, having seen so many

24   thousands of victims of gender violence, sex harassment, sexual

25   assault, I've dealt with child sex trafficking, child

molesters, I mean, this is a unique case because there are so

many victims and so many failures of the system.  At this

point, what we would really ask for is not just words, but

words have been helpful, but deeds, and that is very important.

In addition, I would like to say, throughout this case

is the running theme of the betrayal of trust.  Betrayal of

trust by Jeffrey Epstein.  Betrayal of trust by the system.

And betrayal of trust to the victims who had a right to

justice.  And the Crime Victims' Act should not just be words,

it should have meaning and it should be enforced.

In essence, we are asking, although you may need to,

of course, grant this motion to dismiss, I think because the

court has shown sensitivity to victims and victims' needs, if

there is a way to at least keep the record open so that victims

who have not been able to be physically present in the

courtroom today and who have not been able to submit to the

court any letters, victim impact, and who have not been able to

secure attorneys or speak to attorneys yet -- so, for example,

I'll still hearing from victims who I have not been able to

meet with yet because they just recently are now contacting

me -- so if they could submit, at least for the record, their

victim impact statements, that, I think, would be a very

important assistance to them.  So that would be, at least they

would know that what they are sharing is on the record.

So, in summary, I would say that they are looking

1    forward to the very serious investigation by the United States

2    Attorney of who may have conspired in this case, and that is

3    very hopeful, and we're hoping that everyone who may have a

4    role to this criminal prosecution will submit that evidence.

5         This is about power.  This is about many victims

6    having lived in fear -- fear of the rich, the powerful, the

7    famous, fear that the system will not afford them justice.  So

8    fear of not coming forward.  And fear, of course, is a weapon

9    that the rich, powerful, famous, and sexual predators used to

10   silence the victims.  But that is gone for a lot of victims

11   because they refuse to suffer in silence.

12        Finally, it does take courage to speak truth to power.

13   We thank this honorable court for giving these victims a voice.

14   We thank them, even after the death of the defendant, for

15   showing respect for the victims, allowing them dignity,

16   allowing them a voice.  We do want truth, we do want justice,

17   we do want accountability, and we do want those conspirators to

18   face the justice system.

19        Your Honor, right now we have two of our clients who

20   would like to address the court.

21        THE COURT:  Sure.

22        MS. ALLRED:  Then I have a couple of statements on

23   victims who do not wish to address the court.

24        As they come up, we'll give them the opportunity to

25   say either their name or Jane Doe.

1          By the way, thank you, your Honor, for allowing some

2     of these victims to be called Jane Doe.  What number the court

3     affords to them, we'll accept whatever that is.

4          Thank you.

5          THE COURT:  We're up to nine.

6          MS. ALLRED:  Thank you.

7          MS. DAVIES:  Hello.  My name is Teala Davies.  That is

8     T-e-a-l-a D-a-v-i-e-s.

9          I was going to start this statement by saying that I

10    was a victim of Jeffrey Epstein.  But that's not the case.  I'm

11    still a victim of Jeffrey Epstein.  I'm still a victim because

12    the fear of not being heard stopped me from telling my story

13    for so many years.  This lingering fear almost stopped me from

14    attending this monumental movement of strength and power.

15         I'm still a victim because I am fearful for my

16    daughters and everyone's daughters.  I'm fearful for their

17    future in this world, where there are predators in power, a

18    world where people can avoid justice if their pockets run deep

19    enough.

20         I'm still a victim because the 17-year-old Teala was

21    manipulated into thinking she had found someone who cared,

22    someone who wanted to help.  Jeffrey knew I had nowhere to go.

23    He knew I was vulnerable, and he took advantage of that poor

24    girl, who will never be the same.

25         I cannot eat at the thought that Jeffrey Epstein -- I

1    cannot eat at the thought of Jeffrey Epstein not serving the

2    time he needed to realize the pain and suffering he caused so

3    many vulnerable young girls.  He thought he was untouchable,

4    and honestly, so did I.  I thought he was the most powerful

5    person I would ever meet.

6            But the end is here and here I stand becoming more

7    powerful than he will ever be.  Thank you.

8            THE COURT:  Thank you.

9            JANE DOE:  Jane Doe.

10           Um, in 2004, when I was 15 years old, I flew on

11   Jeffrey Epstein's plane to Zorro Ranch, where I was sexual

12   molested by him for many hours.  What I remember most vividly

13   was him explaining to me how beneficial the experience was for

14   me and how much he was helping me to grow.  Yikes.

15           I remember feeling so small and powerless, especially

16   after he positioned me by laying me on his floor so that I was

17   confronted by all the framed photographs on his dresser of him

18   smiling with wealthy celebrities and politicians.

19           After he finished with me, he told me to describe in

20   detail how good my first sexual experience felt.  That was the

21   first of many lies I was forced to carry for him, the weight of

22   which proliferated my trauma.  I felt powerless not merely

23   because one man wanted to strip me of my innocence, but because

24   I was the victim of a system that just enfranchises human

25   beings, making them vulnerable to pedophilic exploitation.

1    As unjust as what happened to me was, I believe that

2  experience to be a symptom of insidious and pathological

3  violence that extreme wealth yields, a violence which

4  ultimately stays hidden through channels of extreme power that

5  serve it.

6    I first identified with this feeling the night after I

7  was molested by Epstein, when another girl and I took out two

8  of his ATVs and raised them across the mesa.  I crashed mine

9  and expressed my concern to the other girl of getting in

10  trouble, which she replied to me, Don't worry, no one gets in

11  trouble for anything here.

12    Even as a child, I understood, in a sad and precocious

13  way, what I hoped we have the ability of changing now.  Even

14  though Epstein is dead, there is still justice to be brought

15  for the crimes we felt powerless against concealing for him and

16  the system that supported him for all these years.

17    Thank you.

18    THE COURT:  You're very welcome.

19    MS. ALLRED:  Thank you.

20    Your Honor, may it please the court.  I would like to

21  read a statement for Jane Doe, my client, who is present in

22  court, but requested that I read it.

23    We only have one opportunity at childhood.  One

24  opportunity to develop.  One opportunity to find direction for

25  our lives.  Jeffrey Epstein robbed and denied me at each

J8RsEPS3

1    opportunity he had.

2         I came from a small Texas town, not far from the New

3    Mexico border.  My mother died when I was 11, after suffering

4    from cancer for many years.  My father was devastated, as were

5    my siblings and I.  My father was saddled with debt.  My only

6    hope for college was to get a scholarship.

7         When I was 15, I was a blossoming freshman in high

8    school and was trying to carry on my mother's dream.  She

9    wanted me to master the violin.  After school, I would often go

10   to a mall in a nearby city.  A lady approached me and saw I had

11   a violin case with me and asked if I was any good.  We talked

12   about the violin, my family, and why I had clothes that looked

13   like hand-me-downs.

14        The lady told me she works for a very rich man who had

15   a home close by and that he would pay to hear me play.  I was

16   told that if I could get away, she could arrange for

17   transportation to and from his place and have me back before

18   anyone knew I was gone.  After some hesitation, I agreed.  This

19   decision was the beginning of the end of my childhood.

20        The man who only identified himself as J or Jeff had

21   asked if I would give him a massage, and over four visits,

22   eventually progressed to forced oral copulation.  The money he

23   gave me further placed my young soul into a perverse sense of

24   hell.

25        I was so utterly disgusted with myself and what he did

to me that I stopped going to see him.  I had documented the

events with a Texas rape crisis center about the man I know now

as Jeffrey Epstein.

Epstein targeted and took advantage of me, a young

girl, whose mother had recently died a horrific death and whose

family structure had deteriorated.  His actions placed me, a

young girl, into a downward spiral to the point where I

purchased a gun and drove myself to an isolated place to end my

suffering.

A voice that could only have been from my mother told

me, quote, I am not the victim, I am the victor, and I dare not

pull the trigger." I returned the gun days later.

Epstein is a coward.  He lived his life leaching off

the souls of inspiring, young girls due to the fact that he

could never know how it feels inspired to live.  Like a leach,

once Epstein had his fill, he would unlatch and seek out

another victim.

The only sense of justice I had hoped to see was

Epstein being sentenced.  However, Epstein died as he lived,

taking the easy way out without any responsibility.

Your Honor, the next statement is also a statement of

a Jane Doe.  May it please the court.

I was a 16-year-old virgin when Jeffrey Epstein first

raped me.  I was naive and gullable.  He was a pillar of

finance and a giant in the world that I was an insignificant

1    part of.  I was so impressed that this great man would even

2    talk to me and impart any of his wisdom on me.  I gladly jumped

3    at the chance to meet him again, when he told me how impressed

4    he was with my personal story and maturity for my age.

5         When I was in his presence, he made an effort to call

6    celebrities and influential people on speakerphone, like

7    Academy Award-winning actresses and super models, who always

8    answered his calls.  Sadly, I was impressed.

9         He was friends with former and future heads of states

10   and every other fixture in the New York social scene and

11   beyond.  He knew important people in my own world that I looked

12   up to and revered, but he spoke about them like they were sweet

13   distractions far beneath his stature.  He could easily reach

14   down from his position and influence the people directly

15   involved with my daily life and future prosperity.  I was the

16   perfect victim.

17        My whole life was extremely turbulent.  But one of my

18   mother's greatest wishes was that all her children would

19   graduate from respectable universities.  He promised me that he

20   would write me a letter of recommendation for Harvard if I got

21   the grades and scores needed for admission.  His word was worth

22   a lot, he assured me, as he was in the midst of funding and

23   leading Harvard's studies on the human brain, and the president

24   was his friend.

25        The fact that all of you already know these next

1  details, which I'll share, should ignite fire instead of induce

2  the complacency they did in the past, when heard repeatedly

3  over the years, but yes, an innocent massage turned sexual

4  almost immediately.

5      "Here, come.  Come help me with a kink in my shoulder

6  while we finish our discussion."  A large vibrator and a couple

7  of hundred dollars, disgust and dirty secret, more praise and

8  imparted wisdom from a godlike figure, a deliberate diabolical

9  depression of grooming and submission for his pleasure and

10 release.  Even if I resisted, I was no match for him.  I felt

11 powerless, ashamed, and embarrassed.  I wanted to vomit

12 remembering these moments.

13     What I learned in those depraved sessions, staring up

14 at the dome ceiling in his private massage room, tore a violent

15 hole through any normal sexual awakening.  I'm haunted forever,

16 having learned everything there is to know about sex through a

17 vile criminal.  Every time a new molestation would bring a new

18 lesson, the progressive and constant unwinding.  I was nothing

19 more than a teenage prostitute.  I was his slave.

20     I had never even kissed a boy before I met him, and

21 never throughout the horrific abuse did Jeffrey Epstein kiss me

22 even once.  When he stole my virginity, he washed my entire

23 body compulsively in the shower and then told me, "If you're

24 not a virgin, I will kill you."  And then I wasn't a virgin

25 anymore.

1     He forcefully penetrated me.  I was numb.  There was

2  pain, but his use of the vibrator and his fingers in previous

3  sessions with me had left a black hole-like void between my

4  legs.  I protested, but he forced my face into the bed to

5  stifle my cries.  That was my first time.

6     I got a few hundred dollars, as usual, as he led me

7  out of his mansion with assurances that I was on the right path

8  guided by him.  I lied to myself and tried to believe him.  I

9  became a hollow shell.  If I missed an appointment, he

10  threatened me and let me know who was in charge. "Do you know

11  how important my time is?  I'll bury you.  I owe this -- I

12  won't say the word -- F'ing town."  He would hang up.

13     I would stand there frozen in the street, terrified

14  that his assistant would call to reschedule.  I made sure to

15  stay in line and not disobey him.  I was in complete denial.

16  Being paid after every scheduled meeting felt routine and

17  disgusting.  He was the master of the universe and the world

18  bent to his will.

19     He would eventually brag to his assistants about my

20  ability to please him sexually right in front of me, leaving me

21  feeling grotesque and worthless.  Everything in my outside life

22  was falling apart.  I distanced myself from friends and grew

23  further away from my family.  I felt less human after each

24  ordeal.  My psyche broke down completely and wouldn't let me

25  continue.

1    One day I walked out of his residence and passed a

2 girl similar to myself.  When I turned around, she was entering

3 Jeffrey's residence.  He no longer even tried to schedule his

4 appointments with other girls in secrecy from me.  Maybe he

5 never did.  I was too stupid to see.

6    My world shattered.  I had been so naive.  I had an

7 epiphany in a calvary of desperation.  I realized I was just

8 one of many young girls he had in rotation come to perform for

9 him for money.  I went into a deep depression and never lifted

10 completely.  I wanted to inflict pain on myself.  I was

11 humiliated, angry, and suicidal.  I locked myself away from

12 everything.  I cut myself off forever from the world I had

13 known.

14    I endured the daily agony of knowing my life would

15 never be the same.  I could never go back to New York City and

16 the wonderful life I had taken for granted before I met this

17 demon named Jeffrey Epstein.

18    This creature had manipulated and outwitted the whole

19 system, including some of the most intelligent scientists,

20 political people, prosecutors, and power players.  How easy was

21 it to manipulate a 16-year-old virgin who never had a boyfriend

22 and came from a background of hardship with no parental

23 guidance or support.

24    I went to therapy and was given antidepressants for

25 severe anxiety and depression.  My only solace, years later,

was my desire to succeed on my own terms.  I emersed myself

into my studies and was accepted to every college I applied to,

graduating from a top university.  To this day, there is still

an ache in my being that I did not apply to Harvard in fear of

his influence there.

They say you never forget your first.  I'm in a

never-ending nightmare trying to do just that.  I'm forever

suffering because everything reminds me of that horror.  This

new wave of worldwide publicity only worsens my despair.

It was only many years later that I was finally

intimate with a man again, and those moments were marred by my

actions as a child with Jeffrey Epstein.  Even now is

impossible to separate his treachery from any care of a good

man.

For one brief moment there was elation when he was

recently arrested.  I would finally get my chance to see him

again face to face and show him what I had become, that I had

succeeded on my own, that I was worth something in spite of his

abuse, and that I had surmounted the monumental obstacles he

laid before me throughout my entire life since falling prey to

him.

I had hoped humanity would prevail, but it seems to me

that he outsmarted everyone so far, and his ghost is still

laughing at us.  I appeal to all of those just and true that

his evil legacy and his death not stand in the way of

1  resolution and justice for all of his underaged victims.

2  Thank you, your Honor.

3  And then just one last one, and this is much shorter.

4  Statement of Jane Doe, also my client.

5  I was a model in another country when I came to the

6  United States.  I was told by a booker that I needed to meet

7  with a man named Jeffrey Epstein, who was the owner of

8  Victoria's Secret.  The booker told me that Mr. Epstein could

9  help me get into Victoria Secret's world.

10  It was my childhood dream to be a Victoria's Secret

11  model.  So I went one day in the afternoon and I met

12  Mr. Epstein in his office in his mansion in New York.  A woman

13  introduced herself and suggested to me that I should be

14  extremely nice to Mr. Epstein, because if he liked me, he would

15  probably have photographers shooting photos of me right away.

16  The told me to go upstairs and directed me to Jeffrey

17  Epstein's office.  Mr. Epstein had a white robe on and we

18  chatted very briefly.  I had my portfolio of photos, but he

19  didn't even look at it.  Suddenly, he took his robe off and got

20  close to me.  I got up to leave, but the door was locked.

21  I didn't know what was going on.  It was my first

22  official meeting to be cast in the United States.  I was a

23  young girl and confused.  He got very close to me, and I had a

24  skirt on.  He started to touch my genitals.  I refused him.

25  Then he went to the massage table and showed me the vibrator.

1    I took it and threw it at him.

2           At that point, I ran to the door again and figured out

3    how to get out of there.  A girl outside asked me where I was

4    going and she said to be careful.  She said that Mr. Epstein

5    knew a lot of powerful people, including Bill Clinton, and that

6    if I didn't do what Mr. Epstein wanted, I would not be able to

7    have any job in the industry.

8           I was so scared.  I couldn't wait to get out of there,

9    and I left.  I took the train home.  I had spent all of my

10   savings getting Victoria's Secret lingerie to prepare for what

11   I thought would be my audition.  But instead, it seemed like a

12   casting call for prostitution.  I felt like I was in hell.

13          Thank you, your Honor.

14          Thank you.

15          THE COURT:  Thank you, Ms. Allred.

16          Was there anybody else, any victim's counsel or any of

17   the other victims who have not been heard and wish to be heard?

18          Well, OK then.  All I have to say, really, is thank

19   you, all of you, for your participation in today's remarkable

20   hearing.  I think everybody has benefited greatly from your

21   input, and especially from the testimony of victims here today

22   and who have had the courage to come forward.

23          We have also benefited throughout these proceedings,

24   however brief altogether, from the attorneys' legal advocacy

25   and their written and oral submissions.  I'm grateful to them

1  as well, both for the government and the defense and those

2  representing the victims.

3          Finally, we're also grateful to the press for their

4  very diligent coverage of seemingly every detail of this case.

5          That concludes our work for today and we stand

6  adjourned.

7          Thanks.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25