UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>    -v-<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK AG NEW YORK BRANCH, DEUTSCHE BANK TRUST COMPANY AMERICAS,<br><br>      Defendants. | 22-cv-10018 (JSR) |
| JANE DOE 1, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>    -v-<br><br>JP MORGAN CHASE BANK, N.A.,<br><br>      Defendant. | 22-cv-10019 (JSR) |
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS,<br><br>      Plaintiff,<br><br>    -v-<br><br>JP MORGAN CHASE BANK, N.A.,<br><br>      Defendant. | 22-cv-10904 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

The plaintiffs in these three related cases are two anonymous women, referred to here as "JPM Jane Doe" and "DB Jane Doe," and the Government of the United States Virgin Islands (the "USVI"). Plaintiffs claim that defendants JP Morgan Chase Bank, N.A. ("JP Morgan") and the related entities Deutsche Bank Aktiengesellschaft, Deutsche Bank AG New York Branch, and Deutsche Bank Trust Company Americas (collectively, "Deutsche Bank") are legally liable for their alleged facilitation of Jeffrey Epstein's sex crimes.

On February 1, 2023, and February 7, 2023, defendants filed motions to dismiss the operative complaints in each case. After full consideration of the parties' written submissions and oral arguments, the Court granted those motions in part and denied those motions in part by a "bottom-line order" dated March 20, 2023. This Opinion reconfirms the Court's rulings and explains the reasoning behind them.

I.   Plaintiffs' Allegations[1]

---

[1] In this Opinion, the First Amended Complaint in Jane Doe v. Deutsche Bank Aktiengesellschaft et al., 22-cv-10018, is abbreviated as "DB Jane Doe FAC"; that in Jane Doe v. JP Morgan Chase Bank, N.A., 22-cv-10019, is abbreviated as "JPM Jane Doe FAC"; and that in Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A., 22-cv-10904, is abbreviated as "USVI FAC." The JPM Jane Doe FAC incorporates by reference all allegations in the USVI FAC. See JPM Dane Doe FAC, at 48 n. 1.

A. <u>Jeffrey Epstein's Sex-Trafficking Operation</u>

Plaintiffs allege that between 2006 and 2018, DB Jane Doe and JPM Jane Doe were Jeffrey Epstein's sex slaves. He raped them repeatedly, and he sexually abused them in other ways as well. JPM Jane Doe FAC, ¶ 99; DB Jane Doe FAC, ¶ 128. He kept them in his thrall through a combination of promises, payments, and threats: promises to advance their careers and educations, payments in cash and in kind, and threats to destroy them if they did not obey his demands. JPM Jane Doe FAC, ¶¶ 70, 96, 111; DB Jane Doe FAC, ¶ 139, 143.

These Jane Does were not alone. Plaintiffs allege that beginning in 1998 and continuing until 2019, over two decades later, Epstein ran an organization that recruited hundreds of young women and girls and coerced them into performing sex acts. JPM Jane Doe FAC, ¶¶ 62, 67, 76; DB Jane Doe FAC, ¶¶ 39, 40, 88. Typically, Epstein would lure a victim to one of his residences by promising to grant a wish, would then pressure her into performing massages that became increasingly sexual, and then would force her to participate in sex acts on a continuing basis. JPM Jane Doe FAC, ¶ 66; DB Jane Doe FAC, ¶ 107.

Cash was the lifeblood of Epstein's operation. Victims were paid hundreds of dollars, in cash, each time Epstein abused them; and they were also paid hundreds of dollars, in cash, for each

additional victim that they recruited. JPM Jane Doe FAC, ¶¶ 66, 68; DB Jane Doe FAC, ¶¶ 52-53, 115. At times, plaintiffs allege, Epstein dispensed thousands of dollars in cash every day to his victims, amounting to, on average $200,000 per year. DB Jane Doe FAC, ¶¶ 54, 280-81; USVI FAC, ¶ 80. Epstein could not have run his operation, plaintiffs claim, without ready access to cash through the banking system.

B. JP Morgan's Alleged Involvement

JP Morgan began to serve as Jeffrey Epstein's principal bank as early as 1998. JPM Jane Doe FAC, ¶ 41; USVI FAC, ¶ 41. Eventually, both Epstein and at least a dozen entities affiliated with Epstein and his operation maintained bank accounts with JP Morgan. USVI FAC, ¶ 27. These accounts, plaintiffs allege, were highly lucrative for JP Morgan and essential to Jeffrey Epstein's sex-trafficking operation.

Specifically, plaintiffs allege that JP Morgan supported Epstein's sex-trafficking operation in four different ways. First, they allege that JP Morgan enabled Epstein to access the large quantities of cash that fueled his operation. JPM Jane Doe FAC, ¶ 45; USVI FAC, ¶ 103. Second, they allege that JP Morgan assisted Epstein with "structuring" his cash withdrawals so as to elude suspicion. JPM Jane Doe FAC, ¶ 179; USVI FAC, ¶ 67. Third, plaintiffs allege that JP Morgan did not timely file suspicious

activity reports ("SARs") that would have alerted authorities to Jeffrey Epstein's sex-trafficking operation. JPM Jane Doe FAC, ¶¶ 180-81; USVI FAC, ¶¶ 74-75. In particular, plaintiffs allege that JP Morgan delayed filing SARs for "thousands of transactions . . . totaling more than $1 billion, including payments to dozens of women, often with Eastern European surnames." USVI FAC, ¶ 75. Finally, plaintiffs allege that a JP Morgan subsidiary, Highbridge Capital Management, transported young women and girls from Florida to Epstein in New York, on the company's private jet. JPM Jane Doe FAC, ¶ 170.

According to the plaintiffs, by no later than 2006, JP Morgan either actually knew or should have known that it was supporting a sexual predator. JPM Jane Doe FAC, ¶¶ 190, 196. In 2006, police reports and news articles revealed that Epstein had sexually abused dozens of young women and girls. Id at 190. In 2008, Epstein pled guilty to sex offenses, including soliciting a minor for prostitution, and he registered as a sex offender. USVI FAC, ¶ 38. Following Epstein's guilty plea, dozens of public lawsuits were filed against him, which included detailed accusations of his sexual abuse of young women and girls. JPM Jane Doe FAC, ¶¶ 207-209. While JP Morgan allegedly was aware of several of these accusations, JP Morgan nonetheless continued to bank Epstein. USVI FAC, ¶ 44.

After Epstein was released from prison, accusations that he trafficked young women and girls continued to surface. Plaintiffs allege that employees within JP Morgan would occasionally report these accusations to their superiors and would ask whether JP Morgan should maintain its relationship with Epstein. In 2010, for example, JP Morgan's risk management division discussed new allegations against Epstein: "See below new allegations of an investigation related to child trafficking – are you still comfortable with this client who is now a registered sex offender?" USVI FAC, ¶ 45. In January 2011, JP Morgan's director of anti-money laundering compliance requested re-approval for the bank's relationship with Epstein from JP Morgan's then-General Counsel "in light of the new allegations of human trafficking . . ." Id. at ¶ 46.

And there were other alleged red flags. Epstein and/or his associates are alleged to have made significant cash withdrawals from JP Morgan accounts with no known payee. USVI FAC, ¶ 67. For example, Hyperion Air, Inc. -- the Epstein-controlled company that owned Epstein's private jet -- issued over $547,000 in checks payable to cash purportedly for "fuel expenses when traveling to foreign countries." Id. Additionally, JP Morgan accounts in the name of Epstein's affiliated charitable organizations made payments without a clear connection to those organizations' charitable purposes. For example, Epstein and/or his

representative used the C.O.U.Q. Foundation account to pay $29,464.66 to three young women, including two people known to be Epstein's victims. USVI FAC, ¶ 68.

One final source of JP Morgan's alleged knowledge is James ("Jes") Staley.[2] Circa 2000, Mr. Staley headed JP Morgan's private banking division, and he began to service Epstein's account. JPM Jane Doe FAC, ¶ 131. Mr. Staley is alleged to have developed a close personal friendship with Epstein. Indeed, Mr. Staley once wrote to Epstein, "I deeply appreciate our friendship. I have few so profound." USVI FAC, ¶ 56. Later, while Epstein was still a JP Morgan client, Mr. Staley was promoted to be CEO of JP Morgan Asset Management.

Plaintiffs allege that Mr. Staley had first-hand knowledge of Jeffrey Epstein's sex-trafficking operation. Mr. Staley is alleged to have visited Epstein's residences several times while that operation was ongoing, and, during these visits, observed JPM Jane Doe "as a sexual trafficking and abuse victim." JPM Jane Doe FAC, ¶ 115. On December 5, 2009, one day after Mr. Staley visited Epstein in New York, Epstein emailed Mr. Staley to say, "you were with Larry, and I had to put up with . . ." and attached a picture of a young woman in a sexually suggestive pose. USVI FAC, ¶ 58. On

---

[2] On March 8, 2023, JP Morgan impled Mr. Staley as a third-party defendant in both cases against it. Mr. Staley did not participate in briefing and argument on JP Morgan's motion to dismiss. Mr. Staley's own motion to dismiss JP Morgan's claims against him is currently sub judice.

December 20, 2009, Epstein sent to Mr. Staley an email that consisted entirely of a picture of a young woman. Id. at ¶ 59.

Plaintiffs further allege that Mr. Staley himself abused some of Epstein's victims, including JPM Jane Doe herself. JPM Jane Doe claims that "one of Epstein's friends" -- whom she later identified as Mr. Staley -- "used aggressive force in his sexual assault of her and informed [JPM Jane Doe] that he had Epstein's permission to do what he wanted to her." JPM Jane Doe FAC, ¶ 107.[3] And the USVI asserts that it possesses email correspondence between Epstein and Mr. Staley which suggests, albeit cryptically, that Mr. Staley had sexual encounters while visiting Epstein. In July 2010, Mr. Staley emailed Epstein, "That was fun. Say hi to Snow White." To which Epstein responded: "[W]hat character would you like next?" Mr. Staley answered: "Beauty and the Beast." USVI FAC, ¶ 61.

## C. Deutsche Bank's Alleged Involvement

In 2013, a JP Morgan compliance officer terminated JP Morgan's relationship with Epstein. USVI FAC, ¶ 63. Epstein then went on the market for a new bank.

Shortly before then, Paul Morris, a banker with JP Morgan who had serviced Epstein's accounts, left JP Morgan and joined

---

[3] Counsel for Jane Doe identified this executive as Jes Staley at oral argument on JP Morgan's motion to dismiss.

Deutsche Bank. DB Jane Doe FAC, at ¶ 202. Mr. Morris suggested to Deutsche Bank's senior management that a relationship with Epstein could be very lucrative: banking Epstein could generate millions of dollars in fees, and it could also lead to further relationships with Epstein's wealthy friends. Id.

Deutsche Bank took on Epstein as a client on August 19, 2013. DB Jane Doe FAC, ¶ 210. Eventually, Epstein, his related entities, and his associates opened and funded more than 40 accounts at Deutsche Bank, which held more than $110 million in assets. Id. at ¶ 210.

DB Jane Doe alleges that Epstein used his Deutsche Bank accounts much as he did his accounts with JP Morgan. He used them to withdraw cash to pay off his victims and associates. Id. at ¶¶ 52-53, 115. He solicited Deutsche Bank's advice about how to structure his withdrawals so as to evade notice. Id. at ¶¶ 229-239. And he was shielded by Deutsche Bank's failure to file suspicious activity reports. Id. at ¶ 324.

DB Jane Doe likewise alleges that Deutsche Bank either knew or should have known that Epstein used his Deutsche Bank accounts to power his sex-trafficking operation. In April 2013, after Mr. Morris proposed taking on Epstein as a client, a junior relationship coordinator assigned to the Epstein account prepared a memorandum which noted various risks posed by a relationship with Jeffrey Epstein. This memorandum noted that "Epstein was

charged with soliciting an underage prostitution [sic] in 2007,"
that "[h]e served 13 months out of his 18-month sentence," and
that "[h]e was accused of paying young woman [sic] for massages
in his Florida home." Id. at ¶ 52. Around the same time, a Deutsche
Bank compliance officer performed background checks on the
beneficiaries of one of Epstein's entities, the Butterfly Trust.
Id. at ¶ 216. This check revealed that one of the beneficiaries,
Sarah Kellen, was named as one of Epstein's co-conspirators in a
related criminal case. Id.

Once Deutsche Bank began to serve as Epstein's bank, it
allegedly continued to receive red flags. Between 2014 and 2015,
DB's Anti-Financial Crime department alerted DB's senior
management to issues concerning Jeffrey Epstein's sex trafficking.
DB Jane Doe FAC, ¶ 206. In May 2018, one of Deutsche Bank's
compliance officers asked a relationship manager assigned to
Epstein's account about payments to "accounts of women with
Eastern European surnames at a Russian Bank." An accountant at
Deutsche Bank, who was looped into the conversation, replied that
the money was "SENT TO A FRIEND FOR TUITION FOR SCHOOL." Id. at ¶
226. The compliance officer did not ask any follow-up questions,
and the transaction was cleared. Id. at ¶ 227. And Epstein's
personal attorney withdrew over $800,000 in cash on Epstein's
behalf over a four-year period, on multiple occasions asking about
the maximum amount that could be withdrawn without triggering a

reporting requirement. Id. at ¶¶ 231-32. The attorney's only explanation for these withdrawals was that Epstein needed cash for travel, tipping, and expenses. Id.

   D. Plaintiffs' Claims

     In total, plaintiffs assert 28 claims against the defendants. Several of these claims are brought under the federal Trafficking Victims Protection ACT ("TVPA"). Others assert violations of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO") and the USVI's territorial-law analogue to RICO, the Virgin Islands Criminally Influenced and Corrupt Organizations Act ("CICO"). A final statutory claim alleges a violation of the Virgin Islands Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"). Plaintiffs assert a variety of state tort claims as well.

II.  Discussion

     "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, the Court "accept[s] the complaint's factual allegations as true and draw[s] all reasonable inferences in the plaintiff's favor." Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 156-57 (2d Cir. 2017).

The Court begins by discussing three threshold issues that could, potentially, bar multiple claims asserted by two of the plaintiffs. It then discusses each surviving claim that defendants seek to dismiss.

A. <u>Threshold Issues</u>

1. <u>Release by Settlement Agreement</u>

On April 28, 2022, DB Jane Doe resolved her claims against Jeffrey Epstein's estate by signing a settlement agreement (the "Settlement Agreement"). Deutsche Bank was not a party to this agreement. Nonetheless, Deutsche Bank argues that it is a third-party beneficiary of that agreement, and that, as such, it is entitled under the terms of that agreement to dismissal of the instant claims.

The first issue raised by Deutsche Bank's argument is whether the Court may even entertain it at this juncture. Asserting that a plaintiff's claim is barred by agreement is an affirmative defense, and affirmative defenses usually cannot be considered on a motion to dismiss. <u>See, e.g.</u>, <u>Deckard v. Gen. Motors Corp.</u>, 307 F.3d 556, 560 (7th Cir. 2002) ("A motion to dismiss was improper since release is an affirmative defense, and the existence of a defense does not undercut the adequacy of the claim."). Nonetheless, this bar is not absolute. For example, the Court may consider any affirmative defense that "appears on the face of the

complaint." <u>Pani v. Empire Blue Cross Blue Shield</u>, 152 F.3d 67, 74 (2d Cir. 1998). More generally, the Court retains discretion to consider even at this early stage an affirmative defense that presents a straightforward issue of law, such as a statute of limitations defense where the relevant facts are not in dispute. <u>See, e.g.,</u> <u>Harris v. City of New York</u>, 186 F.3d 243, 250 (2d Cir. 1999).

While the Settlement Agreement is not mentioned in DB Jane Doe's complaint, the Court finds nonetheless that Deutsche Bank's argument is appropriately considered at this stage. The authenticity of the Settlement Agreement is not disputed, and neither party has suggested that extrinsic evidence would inform the Court's interpretation of it. Thus, Deutsche Bank's argument presents an unfettered question of law that can be resolved on a motion to dismiss and should not be deferred. <u>See</u> <u>Giuffre v. Andrew</u>, 579 F. Supp. 3d 429, 438 (S.D.N.Y. 2022) (considering a similar settlement agreement on a motion to dismiss).

Turning now to the merits of Deutsche Bank's argument, the Court first notes that this argument succeeds only if the parties to the Settlement Agreement <u>intended</u> for Deutsche Bank to benefit from it. <u>See</u> <u>Port Chester Elec. Const. Co. v. Atlas</u>, 357 N.E.2d 983, 985–86 (N.Y. 1976) ("It is old law that a third party may sue as a beneficiary on a contract made for his benefit. However, an intent to benefit the third party must be shown . . . ."); <u>Suffolk</u>

Cnty. v. Long Island Lighting Co., 728 F.2d 52, 63 (2d Cir. 1984)
("It is ancient law in New York that to succeed on a third party
beneficiary theory, a non-party must be the intended beneficiary
of the contract, not an incidental beneficiary to whom no duty is
owed."); see also Restatement (Second) of Contracts § 302. In
general, such an intent can be found only when "the language of
the contract . . . clearly evidences an intent to permit
enforcement by the third party." Fourth Ocean Putnam Corp. v.
Interstate Wrecking Co., 485 N.E.2d 208, 212 (N.Y. 1985).

Deutsche Bank claims that the Settlement Agreement evidences
such an intent because it is styled a "broad release" of claims
against "any entities or individuals who are or have ever been
engaged by (whether as independent contractors or otherwise),
employed by, or worked in any capacity for" Jeffrey Epstein. See
Declaration of David B. Hennes in Supp. of Mot. to Dismiss, Ex. A
("Settlement Agreement"), at p. 2. Since, Deutsche Bank argues, DB
Jane Doe's own theory of her case is that Deutsche Bank was both
"engaged by" and in some sense "worked . . . for" Epstein, Deutsche
Bank is covered by the Settlement Agreement.[4]

---

[4] Deutsche Bank also argues that since the Epstein estate paid a large
amount of money -- $7.4 million -- to DB Jane Doe pursuant to the Settlement
Agreement, the Settlement Agreement was intended to resolve a broad class of
claims potentially asserted by DB Jane Doe, including claims against Deutsche
Bank. But this argument is sheer speculation at best and hardly sufficient to
meet the high standard for evidencing third-party beneficiary status.

But the terms "engaged by" and "worked . . . for" must be read in the context of the agreement as a whole. And another provision of the Settlement Agreement plainly indicates that it was not intended to preclude claims against financial institutions that provided services to Epstein. Specifically, the Settlement Agreement states, "[T]he parties <u>do not believe there is any reasonable interpretation</u> that this General Release could be construed to release James ("Jes") Staley, Leon Black, <u>or their respective entity affiliations</u>." Settlement Agreement, at p. 4 (emphasis supplied). Jes Staley was employed by JP Morgan, which provided financial services to Jeffrey Epstein. In effect, this demonstrates the parties' agreement that the Settlement Agreement was never intended to release claims against financial institutions that provided services for Epstein and, indeed, could not even be reasonably interpreted as such.[5]

Read as a whole, therefore, the Settlement Agreement does not "clearly evidence" an intent to benefit Deutsche Bank. Thus, the

---

[5] At oral argument, counsel for Deutsche Bank argued that the carve-out for Jes Staley and JP Morgan should not be read to limit the Settlement Agreement's release as to other financial institutions, because Jes Staley had a distinctive relationship with Jeffrey Epstein, as Epstein's personal friend. <u>See</u> Conference of Mar. 13, 2023, Tr. 10:2-7. But Mr. Staley's alleged friendship with Epstein does not undercut the significance of the parties' statement about the interpretation of the General Release. If Deutsche Bank's interpretation of the General Release were correct, it would presumptively bar claims against all financial institutions that provided services to Epstein, whether linked to him by personal friendship or not. The parties to the Settlement Agreement expressly indicated that this interpretation would be unreasonable.

Court finds that Deutsche Bank is not a third-party beneficiary of that agreement, and DB Jane Doe's claims are not barred by it.

2. Parens Patriae Standing

The next two threshold issues concern whether the USVI can assert claims under the TVPA. The first such issue is whether the USVI has standing to assert such claims.

The USVI asserts that it has standing as parens patriae. There can be no doubt that Congress intended to grant it such standing. One section of the Trafficking Victims Protection Act, codified at 18 U.S.C. § 1595(d), reads:

> In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the State, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief. 18 U.S.C. § 1595(d).[6]

Congress, however, does not have final word. Article III of the Constitution has been interpreted to impose distinct requirements for standing to sue in federal court, and those requirements are not "automatically" satisfied "whenever a statute

---

[6] Emphasis supplied. In this section, "State" includes the USVI. 22 U.S.C. § 7102(13).

grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Spokeo, Inc. v. Robins, 578 U.S. 330, 341 (2016), as revised (May 24, 2016). To establish Article III standing, any plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021). States and territories that seek to sue parens patriae must also (1) allege an injury to a quasi-sovereign interest that affects a sufficiently substantial segment of its population and (2) seek relief to the territory's injury that would be unavailable to individual plaintiffs. See Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez, 458 U.S. 592, 607 (1982). Nonetheless, even though Congress's creation of a statutory right of action does not settle whether these requirements are satisfied, it is "instructive." Spokeo, 578 U.S. at 341. "Congress may elevate harms that exist in the real world before Congress recognized them to actionable legal status." Id. (cleaned up).

JP Morgan challenges the USVI's parens patriae standing. It argues, first, that to the extent that the USVI sues on behalf of Epstein's victims who resided in the USVI, that interest is not "distinct from the interests of particular private parties" and therefore cannot be a basis for parens patriae standing. Def's

Mem. of Law in Supp. of Mot. to Dismiss, at 6. But, second, to the extent that the USVI seeks to vindicate a more generalized interest -- such as an interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home," Mem. of Law. in Opp. to Def's Mot. to Dismiss, at pp. 9-10 -- this interest, JP Morgan says, is insufficiently concrete and particularized.

However, JP Morgan overstates the second objection. The USVI's asserted interest in "assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking enterprises flourishing in the Islands that are their home" is indeed general (as all interests that ground parens patriae standing must be); but it directly parallels the interest that Puerto Rico successfully asserted in Snapp, which was an interest in "assuring its residents that it will act to protect them from . . . the harmful effects of discrimination." Snapp, 458 U.S. at 609.

Indeed, the similarities between the interest asserted by the USVI here and that asserted by Puerto Rico in Snapp are considerable. Like the discrimination that was at stake in Snapp, sex-trafficking is a problem that might well re-occur, especially in a remote an isolated territory such as the USVI. Additionally, sex-trafficking is a problem that the USVI would, if it could,

"likely attempt to address through its sovereign lawmaking powers." Snapp, 458 U.S. at 607.

Snapp remains a leading case -- perhaps the leading case -- on parens patriae standing. Since the interest asserted by the USVI here is directly analogous to the interest that provided parens patriae standing in Snapp, the USVI has Article III standing.

### 3. Retroactivity of 18 U.S.C. § 1595(d)

The last threshold issue, which similarly affects whether the USVI can assert a TVPA claim, is whether the applicable statutory provision, 18 U.S.C. § 1595(d) applies retroactively. While the statute providing a federal civil remedy for victims of sex trafficking, 18 U.S.C. § 1595, was mostly enacted in 2003, the "parens patriae" subdivision, section 1595(d), was not added until 2018, approximately five years after JP Morgan terminated its relationship with Jeffrey Epstein. JP Morgan argues that Section 1595(d) does not apply retroactively and, therefore, does not provide the USVI with a right to assert the parens patriae TVPA claim alleged in the USVI's complaint.

As a general matter, federal courts apply a two-prong test to determine whether statutes apply retroactively. Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994); Velez v. Sanchez, 693 F.3d 308, 324-25 (2d Cir. 2012). The first step is to ask "whether Congress has expressly prescribed the statute's proper reach."

_Landgraf_, 511 U.S. at 280; _Velez_, 693 F.3d at 325. If Congress is silent, a court must ask "whether [the statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." _Landgraf_, 511 U.S. at 280; _Velez_, 693 F.3d at 325.

Since Congress did not expressly indicate whether section 1595(d) applies retroactively, the precise issue before the Court is whether section 1595(d) increased parties' liabilities for past conduct to such an extent that it does not apply retroactively. To address that question, the Court must consider whether section 1595(d) so greatly increased the likelihood that defendants would face suit that it is equivalent to a new cause of action. Section 1595(d) does not, in itself, impose any legal liability; it merely allows a new group of people -- state attorneys general -- to vindicate liabilities that already existed. Cf. _Hughes Aircraft Co. v. U.S. ex rel. Schumer_, 520 U.S. 939, 950 (1997), (distinguishing a statute that "essentially creates a new cause of action" from one that creates "an increased likelihood that an existing cause of action will be pursued"). Nonetheless, by conferring a right of action on "an expanded universe of plaintiffs with different incentives," _id_. at 950, a statute can so greatly increase the likelihood of suit that it is functionally equivalent to a new _cause_ of action. Determining whether a statute does this

demands "a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." I.N.S. v. St. Cyr, 533 U.S. 289, 321 (2001) (cleaned up). The Court's judgment should be guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations." Martin v. Hadix, 527 U.S. 343, 345 (1999).

Applying this standard, the Court finds that section 1595(d) applies retroactively. State attorneys general do indeed have somewhat different incentives to bring suit than private citizens; presumably, that is one reason why Congress added section 1595(d). So there likely will be some cases in which a state attorney general files a civil action under the TVPA even though individual victims of human trafficking would not.

But section 1595(d) only authorizes state attorneys general to vindicate the interests of their individual residents, acting as parens patriae. This limits the incremental exposure of defendants in two ways. First, section 1595(d) confers a right of action on only a small number of new plaintiffs in each case: the attorneys general of each state whose residents have been harmed by a particular sex trafficking venture. Second, and more important, the quasi-sovereign interests that give states standing to sue under section 1595(d) are tied to injuries that would give individual plaintiffs a right to sue under section 1595(a). For

both of these reasons, section 1595(d) increases the likelihood of suit to a relatively small degree.

A comparison to the facts of Hughes is instructive. Hughes considered the inverse of the facts presented here. Prior to a 1986 amendment, the False Claims Act did not permit private relators to sue on behalf of the Government when their suits were based on information already in the Government's possession. Id. at 941. (The Government, by contrast, could sue on its own behalf.) A 1986 amendment eliminated that precondition for private parties to sue. Thus, the 1986 amendment to the False Claims Act enabled countless private parties to sue under circumstances in which, previously, only the Government could sue. The statutory amendment considered in Hughes, therefore, expanded the likelihood of suit dramatically.

The Second Circuit's decision in Velez is not to the contrary. In Velez, the Second Circuit rejected a plaintiff's claim that the TVPA's private right of action -- 18 U.S.C. § 1595(a) -- applies retroactively. Applying this right of action retroactively, the Second Circuit held, would "represent[] a significant expansion of civil liability." Velez, 693 F.3d at 325; see also Hughes, 520 U.S. at 939 ("The extension of an FCA cause of action to private parties in circumstances where the action was previously foreclosed . . . essentially creates a new cause of action . . . ."); Doe v. Siddig, 810 F.Supp.2d 127, 135 (D.D.C.2011) (rejecting

the retroactive applicability of 18 U.S.C. § 1595(a) because it "represented a significant expansion of civil liability").

But there is a crucial difference between Velez and the USVI's claim against JP Morgan. Before Congress established a private right of action under the TVPA, the TVPA was a purely criminal statute. Thus, when Congress added a private right of action to the TVPA in 2003, it added civil liability to a statute that previously only imposed criminal sanctions. That act did indeed "represent a significant expansion of civil liability." Velez, 693 F.3d at 325. By contrast, in 2018, when Congress empowered state attorneys general to assert TVPA claims, it merely gave a new set of plaintiffs the right to vindicate potential liabilities which already existed. Put another way, 18 U.S.C § 1595(d) did not expand any party's liability; it merely made it more likely that such liability would actually be assessed. Cf. Hughes, 520 U.S. at 950 (distinguishing a statute that "essentially creates a new cause of action" from one that creates "an increased likelihood that an existing cause of action will be pursued"). Velez, therefore, does not control.

B. TVPA Participation Liability

Having disposed of these threshold issues, the Court now turns to the plaintiffs' individual claims. Each plaintiff claims that JP Morgan or Deutsche Bank participated in Jeffrey Epstein's sex-

trafficking venture, in violation of 18 U.S.C. § 1591(a)(2). This claim involves three elements. First, the defendant must have participated in a commercial sex trafficking venture. Second, the defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture. Finally, the defendant must have benefited from its participation in the venture.

## 1. Participation

JP Morgan and Deutsche Bank argue that they did not participate in Jeffrey Epstein's sex-trafficking venture because they merely provided their usual banking services to him and his affiliated entities. That, they contend, is not enough to "participate" in the venture under the TVPA. Participation requires "specific conduct that furthered the sex trafficking venture," Noble v. Weinstein, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) -- "more than just passive facilitation, but some level of active engagement." G.G. v. Salesforce.com, 603 F. Supp. 3d 626, 644 (N.D. Ill. 2022). Simply providing their usual services, defendants say, does not rise to the level of such active engagement. See Geiss v. Weinstein Co. Holdings LLC, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019); Salesforce.com, 603 F. Supp. 3d at 648.

But even if participation requires such engagement, plaintiffs adequately allege that defendants so participated in

Jeffrey Epstein's sex-trafficking venture. JPM Jane Doe and the USVI allege, inter alia, that JP Morgan assisted with "structuring" cash withdrawals so that those withdrawals would not appear suspicious. JPM Jane Doe FAC, ¶¶ 179, 189. They allege that JP Morgan delayed filing suspicious activity reports concerning Epstein's activities. Id. at ¶¶ 180-81; USVI FAC, ¶¶ 74-75. And they allege that JP Morgan actually trafficked women and girls for Jeffrey Epstein through its subsidiary, Highbridge. JPM Jane Doe FAC, ¶¶ 170, 176.

Similarly, DB Jane Doe alleges that Deutsche Bank "concealed its delivery of hundreds of thousands of dollars in cash to Epstein and his associates" by willfully failing to file suspicious activity reports, DB Jane Doe FAC, ¶ 324; that DB "structured" 97 cash withdrawals by Epstein's co-conspirators in the amount of $7,500 per withdrawal to avoid alerting authorities, id. at ¶ 337; that Deutsche Bank failed to implement oversight imposed by its Americas Reputational Risk Committee, id. at ¶ 325; and that Deutsche Bank allowed Epstein to use its accounts "to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more to then known co-conspirators." Id. at ¶¶ 212-13. Moreover, even the cash that DB provided to Epstein, DB Jane Doe alleges, was unusual. Id. at ¶ 320 ("It was far from routine for Deutsche Bank to provide $200,000 per year in cash to someone like Epstein, who did not have an apparent need for such

extravagant sums. Moreover, the circumstances in which Epstein was requesting such large amounts were far from routine and raised numerous 'red flags'—taking it well outside routine circumstances.").

In short, plaintiffs allege that both JP Morgan and Deutsche Bank went well beyond merely providing their usual services to Jeffrey Epstein and his affiliated entities. Thus, even if it is true that "active participation" in a sex-trafficking venture requires some special tailoring of one's services to that venture, plaintiffs plausibly plead that this element of participation liability is satisfied.

2. <u>Knowledge</u>

The second element of participation liability under the TVPA is knowledge. The defendant must either have known, or recklessly disregarded the fact that, "force, fraud, or coercion" was used to "cause [a] person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2).[7] To satisfy this element, it not enough for the defendant to have "only an abstract awareness of sex trafficking in general." <u>S.J. v. Choice Hotels Int'l, Inc.</u>, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020). Instead, the defendant must have known, or recklessly disregarded, that force, fraud, or coercion was used

---

[7] This particular knowledge is only necessary in the case of an adult victim. <u>See</u> 18 U.S.C. § 1591(a)(2).

in the <u>particular</u> sex-trafficking venture that it is alleged to have participated in. <u>Id</u>.

Defendants argue that even more specific knowledge is necessary. They say that they can be held liable only if they knew that force, fraud, or coercion was used with respect to <u>the plaintiff herself</u>. It is true that some courts appear to have taken this position in the past. <u>See, e.g.</u>, <u>Salesforce.com</u>, 603 F. Supp. 3d at 646 ("[A] claim under [Section] 1595 requires that 'the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated [Section 1591] as to the plaintiff.'"); <u>Lundstrom v. Choice Hotels Int'l Inc.</u>, 2021 WL 5579117, at *8 (D. Colo. Nov. 30, 2021) (failure to allege defendant "should have known about plaintiff's sex trafficking at its hotels"); <u>A.B. v. Hilton Worldwide Holdings, Inc.</u>, 484 F. Supp. 3d 921, 938-39 (D. Or. 2020) (failure to "allege[] facts which sufficiently link notice of Plaintiff['s] sex trafficking to any of these Defendants"). But those decisions do not control this Court, and defendants do not cite to any element of either the text or the legislative history of 18 U.S.C. § 1591(a)(2) that supports this interpretation.

Instead, the text of section 1591(a)(2) directly supports the plaintiffs' interpretation of the knowledge element of their TVPA claims. Section 1591(a)(2) imposes liability for knowingly

benefiting from "participating in" a sex-trafficking venture. A sex-trafficking venture, in turn, is defined as a venture that has "recruit[ed], entic[ed], harbor[ed], transport[ed], provid[ed], obtain[ed], advertise[d], maintain[ed], patronize[ed], or solicit[ed] by any means a person" that uses "force, threats of force, fraud, coercion . . . or any combination of such means" to "cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). By the express terms of the statute, then, liability is imposed for knowingly benefiting from participation in a sex-trafficking <u>venture</u>, not for knowingly benefiting from the sex-trafficking of a particular <u>person</u>. Knowledge, therefore, is required with respect to the venture, not with respect to any particular person.

Plaintiffs have pled sufficient facts to support their allegations that JP Morgan had such knowledge of Jeffrey Epstein's sex-trafficking venture, either directly or by recklessly disregarding what was plainly to be seen. As detailed above, plaintiffs allege that JP Morgan was aware of Epstein's convictions for sex crimes and ignored numerous red flags associated with Epstein's accounts, which all suggested that Jeffrey Epstein operated a sex-trafficking venture. Even these allegations alone are sufficient to support plaintiffs' allegations that JP Morgan knew or recklessly disregarded that Epstein operated such a venture.

But there is more, such as Jes Staley's alleged personal knowledge of Epstein's sex-trafficking venture. "[W]hen an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal." Apollo Fuel Oil v. United States, 195 F.3d 74, 76 (2d Cir. 1999).[8] When Epstein was JP Morgan's client, Mr. Staley was one of JP Morgan's high-level executives, and his duties included overseeing Epstein's account. USVI FAC, ¶ 84. And if the allegations in plaintiffs' complaints are taken as true, Mr. Staley had actual first-hand knowledge that Epstein conducted a sex-trafficking venture. In fact, JPM Jane Doe alleges that Mr. Staley observed her specifically "as a sexual trafficking and abuse victim." FAC, ¶ 115. Through attribution of Mr. Staley's alleged knowledge to JP Morgan, the complaints might well support an allegation that JP Morgan actually knew that Jeffrey Epstein ran a sex-trafficking venture. At the very least, they sufficiently support plaintiffs' allegation that JP Morgan recklessly disregarded the existence of such a venture.

DB Jane Doe also pleads sufficient facts to support her allegation that Deutsche Bank knew or recklessly disregarded that Jeffrey Epstein ran a sex-trafficking venture. Before Epstein was

---

[8] JP Morgan argues that Mr. Staley's knowledge cannot be attributed to JP Morgan because he acquired it outside the scope of his employment. Def's Mem. of Law in Supp. of Mot. to Dismiss, 4-5. For attribution of knowledge, however, what matters is whether Mr. Staley's knowledge was material to his duties as an employee, not how he came to that knowledge.

onboarded at Deutsche Bank, DB Jane Doe alleges, Epstein was convicted of soliciting a minor for prostitution. DB Jane Doe FAC, ¶¶ 42-43, 279. Then, in November 2012, Paul Morris joined Deutsche Bank from JP Morgan, where he had been a member of the team that serviced Epstein's account, he and brought to DB his knowledge of Epstein's affairs. Id. at ¶ 201. Thereafter, beginning around November 2013, Epstein began using Deutsche Bank accounts to send wire transfers to collaborators in his sex-trafficking operation, whose names and alleged collaborative activity had by then been made public. Id. at ¶¶ 212-16. Not much after that, in 2014 and 2015, an internal department within Deutsche Bank alerted management about Epstein's sex trafficking. Id. at ¶ 231. And a Deutsche Bank executive is alleged to have met with Epstein and to have observed victims in Epstein's home. Id. at ¶¶ 235-36. If taken as true, and viewed in a light most favorably to DB Jane Doe, these allegations make it plausible that Deutsche Bank knew of, or recklessly disregarded, Jeffrey Epstein's sex-trafficking venture.

Thus, the Court finds that the plaintiffs have pled sufficient facts to support their allegations that JP Morgan and Deutsche Bank knew or recklessly disregarded that Jeffrey Epstein conducted a sex-trafficking venture.

3. Benefit

The last element of liability for participating in a sex-trafficking venture is that the defendant benefited from its

participation. JP Morgan and Deutsche Bank do not contest that they received fees and other revenue from providing services to Jeffrey Epstein and his affiliated entities. But they both assert that the mere receipt of revenue does not satisfy the benefit requirement. Instead, they say, plaintiffs must allege that they received revenue from Jeffrey Epstein and his affiliated entities in exchange for their furtherance of Epstein's sex-trafficking venture. See Geiss v. Weinstein Co. Holdings LLC, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) ("[T]here must be a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit.").

Although the Court is not convinced that the benefit element should be read in this way, even assuming arguendo that defendants are correct, the plaintiffs have here offered sufficient allegations to satisfy this element. Indeed, JPM Jane Doe expressly alleges that JP Morgan chose to ignore warnings that Epstein was involved in sex-trafficking because JP Morgan understood that it would lose a lot of money if it fired Epstein as client. JPM Jane Doe FAC ¶¶ 152, 173, 214. JPM Jane Doe also alleges that JP Morgan executives specifically lobbied to keep Epstein as a client despite reports of sex-trafficking JP Morgan's relationship with Epstein was lucrative. Id. at ¶¶ 132–33, 161, 172, 184, 213–14.

DB Jane Doe makes similar allegations against Deutsche Bank. DB Jane Doe alleges that Deutsche Bank overlooked warnings that

Epstein was involved in sex-trafficking because of the "number of sizable deals" that DB obtained through its relationship with Jeffrey Epstein. DB Jane Doe FAC, ¶ 243. DB Jane Doe also alleges that Paul Morris proposed that DB establish accounts for entities affiliated with Jeffrey Epstein, not personal accounts in Epstein's name, to help conceal both DB's participation in Epstein's sex-trafficking venture and the existence of that venture. Id. at ¶¶ 205, 243. Like plaintiffs' allegations against JP Morgan, these allegations make it plausible that Deutsche Bank knowingly benefited from furthering Jeffrey Epstein's sex-trafficking venture.

4. Conclusion

In short, the allegations in the complaints, if taken as true and viewed in a light most favorable to the plaintiffs, plausibly support each element of plaintiffs' claims under 18 U.S.C. § 1591(a)(2). Accordingly, defendants' motions to dismiss these claims are denied.

C. Liability for Obstructing TVPA Enforcement

JPM Jane Doe and DB Jane Doe also allege that JP Morgan and Deutsche Bank obstructed the enforcement of the TVPA. 18 U.S.C. § 1591(d) makes it unlawful to "obstruct[], attempt[] to obstruct, or in any way interfere[] with or prevent[] the enforcement of" 18 U.S.C. § 1591(d). For a defendant to be liable for obstructing the

enforcement of the TVPA, it must (1) know of an effort to enforce the TVPA and (2) intentionally obstruct or attempt to obstruct that enforcement effort. See United States v. Farah, 766 F.3d 599, 612 (6th Cir. 2014). Plaintiffs allege that JP Morgan and Deutsche Bank obstructed the enforcement of the TVPA by, among other things, failing to file suspicious activity reports that would have alerted authorities to Epstein's sex-trafficking venture. JPM Jane Doe FAC, ¶¶ 476-79; DB Jane Doe FAC, ¶¶ 449-52.

As an initial matter, defendants argue that JPM Jane Doe and DB Jane Doe have no right to assert obstruction claims. The TVPA's "civil remedy," 18 U.S.C. § 1595(a), only provides a right of action to a "victim" of a violation of the TVPA.  18 U.S.C. § 1595(a). And defendants argue that JPM Jane Doe and DB Jane Doe are not the victims of any obstruction of an enforcement effort. The only victim of such an action, defendants say, is the government that makes such an effort. See Doe v. Fitzgerald, 2022 WL 425016, at *4 (C.D. Cal. Jan. 6, 2022) ("The 'victim' of the obstruction of enforcement set out in section 1591(d) is the state or federal government[.]"). Thus, defendants say, the Jane Does do not have a right to assert their obstruction claims.

The statute cannot be read in this cramped fashion. While 18 U.S.C. § 1595(a) does not define "victim," a different section of the federal criminal code -- which establishes criminal procedure that is generally applicable across federal crimes -- defines a

"crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A); see also 18 U.S.C. § 10608(e)(2) (defining a victim as "a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime"). This definition accords with ordinary usage, which recognizes as a victim "one that is injured, destroyed, or sacrificed under any of various conditions." Victim, Merriam-Webster's Collegiate Dictionary (10th ed.). Thus, the "victims" of one who obstructs the enforcement of the TVPA include not just the government, but also include those who suffered harm because the government's enforcement efforts were hindered.

Turning now to the merits of plaintiffs' claims, the Court finds that the plaintiffs plead sufficient facts to support their obstruction claims. JPM Jane Doe and DB Jane Doe allege that JP Morgan and Deutsche Bank, respectively, knew of investigations into Jeffrey Epstein's sex-trafficking operation and that they intentionally failed to file suspicious activity reports in order to frustrate such investigations. JPM Jane Doe FAC, ¶¶ 187, 224, 296, 356, 368, 397, 432, 438-40; DB Jane Doe FAC, ¶¶ 42-46, 60-63, 188-99, 212-13, 445-48. Thus, the Court denies defendants' motions to dismiss plaintiffs' obstruction claims.

D. <u>TVPA Perpetrator Liability</u>

Plaintiffs' allegations that defendants themselves perpetrated sex-trafficking are another matter. A direct perpetrator of sex trafficking is someone who knowingly "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits" an underage person to engage in a commercial sex act or does the same to an adult by means of force, fraud, or coercion. 18 U.S.C. § 1591(a)(1). Plaintiffs' allegations do not adequately allege that either JP Morgan or Deutsche Bank did so.

DB Jane Doe claims that Deutsche Bank's cash "was part of the 'recruitment' of Jane Doe and other victims." Pl.'s Mem. in Oppo. to Def.'s Mot. to Dismiss, at 21. The alleged facts that Epstein used cash obtained from Deutsche Bank to recruit his victims, and that Deutsche Bank recklessly disregarded that he was so doing, might jointly render Deutsche Bank liable for participating in Epstein's venture (see above). But they do not make Deutsche Bank the recruiter.

JPM Jane Doe's allegations are a little more on point, but still not sufficient. JPM Jane Doe alleges that JP Morgan directly perpetrated sex-trafficking in two ways. First, she alleges that "a powerful financial executive" at JP Morgan (later identified as Jes Staley) sexually assaulted JPM Jane Doe. Second, JPM Jane Doe

alleges that JP Morgan's subsidiary, Highbridge, transported some of the victims of Jeffrey Epstein's sex-trafficking venture. But even if Mr. Staley's actions are attributable to JP Morgan, those actions do not support a perpetrator claim, because the TVPA does not impose liability for sexual assault per se (a classic state crime), but also requires the additional elements described above. See 18 U.S.C. § 1591(a)(1).  And JPM Jane Doe's complaint does not allege that JP Morgan knew that the women and girls allegedly transported by Highbridge would be caused to engage in a commercial sex act, which is likewise an essential element of a TVPA perpetrator claim. See 18 U.S.C. § 1591(a).

Since plaintiffs' allegations do not state all the elements of claims for perpetrating a violation of the TVPA, defendants' motions to dismiss these claims are granted.

E. Aiding and Abetting a Violation of the TVPA

JPM Jane Doe and DB Jane Doe also allege that JP Morgan and Deutsche Bank, even if they were not themselves perpetrators, aided and abetted Jeffrey Epstein's violations of 18 U.S.C. § 1591(a). They support this claim with the following train of logic. First, Jeffrey Epstein violated 18 U.S.C. § 1591(a) through his direct acts of sex-trafficking. Second, 18 U.S.C. § 2 makes anyone criminally "punishable as a principal" if they aid or abet the commission of an offense against the United States. Finally, 18

U.S.C. § 1595(a) provides a "civil remedy" to victims of the TVPA. It states: "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States" (emphasis supplied). In other words, plaintiffs contend that 18 U.S.C. § 2 (a criminal statute) is incorporated within the civil remedy provision of the TVPA. Since principals are subject to civil liability when they violate 18 U.S.C. § 1591(a), and 18 U.S.C. § 2 puts aiders and abettors in an equivalent criminal position to principals, plaintiffs contend that aiders and abettors are subject to civil liability under 18 U.S.C. § 1595(a).

Plaintiffs' claims thus hinge on a question of law: whether the "civil remedy" provided by 18 U.S.C. § 1595(a) enables sex-trafficking victims to pursue claims for aiding and abetting. The parties take opposing positions. Defendants argue that section 1595(a)'s civil remedy does not apply, because aiding and abetting liability is provided by 18 U.S.C. § 2, which is not within "this chapter" (i.e., the TVPA: 18 U.S.C. § 1581 et seq.). See Noble, 335 F. Supp. 3d at 525-526 (rejecting aiding and abetting liability under the TVPA). Plaintiffs, meanwhile, contend that 18 U.S.C. § 2 is incorporated within the TVPA.

37

The defendants are correct: The TVPA does not provide civil liability for aiding and abetting. In general, aiding and abetting liability should not be inferred when a statute does not expressly provide for it. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 185 (1994) ("it is not plausible to interpret the statutory silence as tantamount to an implicit congressional intent to impose § 10(b) aiding and abetting liability."). Moreover, neither the text nor the legislative history of the TVPA indicates that Congress intended to provide civil liability for aiding and abetting a violation of it. In fact, some aspects of the TVPA's legislative history suggests that Congress had the opposite intention: Congress specifically rejected defining "participation in a venture" -- which would entail civil liability -- so as to include aiding and abetting. Compare Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, § 5, 132 Stat. 1253, 1255 (2018) (rejecting definition of "participation in a venture" that included "aids or abets") with H.R. 1865, 115th Cong. (as introduced in House, April 3, 2017) (bill draft proposing "aids or abets" in definition of participation in a venture).

A comparison to Rothstein v. UBS AG is instructive. See Rothstein v. UBS AG, 708 F.3d 82 (2d Cir. 2013). In Rothstein, the Second Circuit considered this issue as presented by a similar statute, the Anti-Terrorism Act. The Anti-Terrorism Act, like the

Trafficking Victims Protection Act, is a largely criminal statute that also provides a civil remedy for violations of it. See 18 U.S.C. § 2333(a) (providing a private right of action). Also like the Trafficking Victims Protection Act, the civil remedy provision of the Anti-Terrorism Act does not expressly provide liability for aiding or abetting, but the Act is codified in Title 18 of the United States Code, section 2 of which makes any aider or abettor "punishable as a principal." In Rothstein, the Second Circuit held that 18 U.S.C. § 2333 does not provide a right of action to assert claims for aiding and abetting. Rothstein, 708 F.3d at 97-98.

Rothstein's holding was supported by two premises. The court noted Central Bank's general presumption that aiding and abetting liability should not be inferred from statutory silence. Id. at 97. And the court also noted that other provisions of the ATA -- sections that surround its civil remedy provision -- do provide for aiding and abetting liability. Id. at 98. That context, the court found, suggested that Congress affirmatively rejected aiding civil liability for aiding and abetting a violation of the ATA.

So too for the TVPA. There is a presumption that aiding and abetting liability should not be read into section 1595's silence, a presumption that is confirmed by its legislative history. Since, therefore, the TVPA does not provide civil liability for aiding and abetting under section 2, plaintiffs' aiding and abetting claims are dismissed.

F. Attempting to Benefit from a TVPA Violation

Plaintiffs also allege that JP Morgan and Deutsche Bank attempted to benefit from a TVPA violation. A defendant is liable for attempting to violate the law only if they have the specific intent to commit the underlying violation of the law. United States v. Farhane, 634 F.3d 127, 145 (2d Cir. 2011). But the complaints here do not plead facts that support the inference that either JP Morgan or Deutsche Bank had this specific intention. If taken as true, plaintiffs' allegations do support the inference that Deutsche Bank and JP Morgan intended to profit from their relationships with Jeffrey Epstein, and that accomplishing that object required JP Morgan and Deutsche Bank to provide banking services that allegedly, they knew, or recklessly disregarded, supported Jeffrey Epstein's sex-trafficking venture. But the complaints do not support the allegation that either JP Morgan or Deutsche Bank acted with the specific intent of benefiting from a sex-trafficking venture. Thus, plaintiffs' claims for attempting to violate the TPVA are dismissed.

G. Conspiracy to Violate the TVPA

Finally, plaintiffs allege that JP Morgan and Deutsche Bank conspired with Epstein and others to violate the TVPA. "The gist of conspiracy is, of course, agreement." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989). To be

liable, each defendant must have "entered into a joint enterprise with consciousness of its general nature and extent." United States v. Alessi, 638 F.2d 466, 473 (2d Cir. 1980). Plaintiffs' factual allegations do not support the inference that either defendant made such an agreement. If the allegations in the complaints are taken as true, the defendants did indeed agree to provide banking services for Epstein and his affiliated entities and that they knew, or recklessly disregarded, would assist his sex-trafficking venture. But that agreement is different from an actual agreement to participate in a sex-trafficking venture. Plaintiffs also allege that the defendants covered up Epstein's sex-trafficking by willfully failing to file suspicious activity reports. But plaintiffs do not plead any facts which support the inference that the defendants did so pursuant to an agreement with Epstein and/or others to further his sex-trafficking operation. Thus, plaintiffs' conspiracy claims are dismissed.

H. RICO

Having discussed plaintiffs' TVPA claims, the Court now turns to DB Jane Doe's claim that Deutsche Bank violated section 1962(c) of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and conspired to violate RICO in violation of section 1962(d).

There can no liability under section 1962(c) if the defendant did not participate in the conduct of an enterprise. See DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (to state a civil claim under 18 U.S.C. 1962(c), a plaintiff must allege that a defendant participated in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity") (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). To participate in a racketeering enterprise under the relevant provisions of RICO, a defendant must "direct the enterprise's affairs." Reves v. Ernst & Young, 507 U.S. 170, 177, 180 (1993). While a defendant need not play the "predominant" part in the operation of the enterprise, it must "exert" some "control" over it. Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003).

While DB Jane Doe does not precisely define the enterprise that Deutsche Bank and Jeffrey Epstein allegedly formed (and this itself would warrant dismissal of her RICO claims) her allegation appears to be that Deutsche Bank participated in Jeffrey Epstein's sex trafficking venture. If that is Jane Doe's allegation, her substantive civil RICO claim fails, for she has not alleged that Deutsche Bank controlled or directed that venture in any way.

DB Jane Doe's RICO conspiracy claim likewise fails, for she has not alleged any factual basis for a finding of a "conscious agreement among the defendants." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n. 4 (2d Cir. 1990). DB Jane Doe has not

pled sufficient facts to support her allegation that Deutsche Bank consciously agreed to undertake racketeering activity in violation of section 1962 with Jeffrey Epstein. Instead, at most, she alleges that Deutsche Bank acted unlawfully as part of an implicit quid pro quo: Deutsche Bank would conceal Epstein's sex-trafficking venture in exchange for Epstein's lucrative fees.

Because DB Jane Doe fails to plausibly allege that Deutsche Bank participated in a violation of section 1962(c), or that Deutsche Bank consciously agreed to participate in one, Deutsche Bank's motion to dismiss DB Jane Doe's civil RICO claims is granted.

## I. CICO

The USVI makes a similar allegation against JP Morgan, which fails for similar reasons. The USVI claims that JP Morgan violated the Virgin Islands Criminally Influenced and Corrupt Organizations Act ("CICO"), the Virgin Islands' territorial-law analogue to RICO. But the USVI fails to plausibly allege two of the initial elements of such a claim: that a criminal enterprise existed, and that JP Morgan participated in it.

The USVI alleges that JP Morgan's association with Jeffrey Epstein was a de facto enterprise. Any enterprise formed in this way -- an "association-in-fact enterprise" -- must have three features: a common purpose, relationships among those associated

with the enterprise, and longevity to pursue the enterprise's purpose. <u>People v. McKenzie</u>, 66 V.I. 3, 12 (Super. Ct. 2017).

The USVI, however, has failed to support its allegation that JP Morgan shared a common purpose with Jeffrey Epstein. The USVI does not allege that JP Morgan shared the purpose of trafficking or abusing Epstein's victims. Rather, the USVI alleges that the purpose of JP Morgan's association with Epstein was simply to make money. If the USVI's allegations are taken as true, achieving that purpose did require JP Morgan to support Epstein's sex-trafficking venture. But neither human trafficking nor its consequences were part of JP Morgan's purpose; JP Morgan would have been just as happy for Epstein's victims to escape, so long as Epstein's fees continued to roll in.

And even if JP Morgan did form an enterprise with Jeffrey Epstein, the facts in the complaint do not support the USVI's allegation that JP Morgan participated in it. Like DB Jane Doe, the USVI does not allege that JP Morgan conducted Epstein's sex-trafficking venture in any way. For that reason, and because the USVI fails to plausibly allege an enterprise as well, JP Morgan's motion to dismiss the USVI's CICO claim is granted.

J. <u>CFDBPA</u>

The last statutory claim brought against the defendants is the USVI's claim that JP Morgan violated the Virgin Islands

Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"). The USVI alleges that JP Morgan gained an unfair advantage over other, law-abiding banks by supporting Epstein's sex-trafficking venture. USVI FAC, ¶¶ 130-36. In exchange for JP Morgan's support, the USVI alleges, Epstein provided JP Morgan with "referrals of high-value business opportunities." Id. at ¶ 135.

The USVI's pleadings are threadbare. The USVI does not say which banks, in particular, were denied the "high-value business opportunities" that JP Morgan allegedly obtained. It does not describe any connection between those banks and the Virgin Islands. And it does not say that these banks actually did comply with their legal obligations with respect to similarly-situated customers, which is an essential aspect of the USVI's unfairness claim. Thus, the USVI's allegations fall well short of making its CFBDPA claim plausible, and JP Morgan's motion to dismiss this claim is granted.

K. Negligence

JPM Jane Doe and DB Jane Doe and also assert several New York state-law tort claims against JP Morgan and Deutsche Bank. Their first set of such claims allege that JP Morgan and Deutsche Bank were negligent. They allege that the banks failed to exercise reasonable care to prevent physical harm and that the banks failed to exercise reasonable care as banking institutions providing non-routine banking services.

Under New York law (as under the law of virtually every state), there are three elements of negligence: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." Solomon ex rel. Solomon v. City of New York, 489 N.E.2d 1294 (N.Y. 1985). The parties contest the first and the third elements, duty and proximate causation.

JP Morgan and Deutsche Bank say that they owed no duty to Jane Doe. According the banks, they had no duty to prevent Jeffrey Epstein from harming either Jane Doe, nor did they acquire any duty of care from their banking relationship with Epstein. See In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 118, 126 (2d Cir. 2013) ("[B]anks and other financial institutions do not owe non-customers a duty to protect them from the intentional torts of their customers.").

But JP Morgan and Deutsche Bank, like everyone else, owed both Jane Does the ordinary duty of reasonable care. This duty can extend to actions undertaken by third parties. Restatement (Third) of Torts: Phys. & Emot. Harm § 19 ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."); Ford v. Grand Union Co., 197 N.E. 266, 268-69 (N.Y. 1935) (defendant owes a duty to avoid injury to others "by forces set in motion" by the defendant). Banks are not exempt from this duty.

See Elmaliach v. Bank of China Ltd., 110 A.D.3d 192, 206 (N.Y. App. Div. 2013) ("We do not find case law to support the argument that . . . a bank can never be held liable to non-customers"); id. at 206 ("[A] tortfeasor's compliance with relevant laws and regulations will not insulate it from liability if it fails to act objectively reasonably"). And this duty applies when banks provide nonroutine services. See id. at 207 ("Although New York does not generally recognize a duty on the part of banks to non-customers, that does not mean that New York policy would prohibit recovery under the alleged facts, if proven."). Since JPM Jane Doe and DB Jane Doe do indeed allege that JP Morgan and Deutsche Bank helped "set in motion" Jeffrey Epstein's sex-trafficking venture -- by providing the cash that fueled it -- they plausibly assert that JP Morgan and Deutsche Bank owed a duty to them.

JP Morgan and Deutsche Bank also contend that their conduct is not a proximate cause of Jane Doe's injury. When an alleged injury is caused by an intervening criminal act, such as sexual abuse, the defendant's conduct is a proximate cause only when that intervening act is "a natural and foreseeable consequence of a circumstance created by [the] defendant." Hain v. Jamison, 68 N.E. 3d 1233, 1236-37 (N.Y. 2016). "[P]roximate cause will be found lacking where the original negligent act merely 'furnished the occasion for' . . . 'an unrelated act to cause injuries not ordinarily anticipated.'" Id. at 1238. And the banks assert

(rehearsing arguments considered above) that they neither knew nor should have known that their services contributed to the abuse of the Jane Does.

For the reasons already discussed above, however, JPM Jane Doe and DB Jane Doe allege that JP Morgan and Deutsche Bank should have known that their banking services sustained Jeffrey Epstein's sex-trafficking venture. Indeed, they go further and adequately allege that the defendants actually knew this or at least recklessly disregarded what was plainly to be seen. Such constructive knowledge plausibly makes harm to plaintiffs and other victims of Epstein's sex-trafficking a "natural and foreseeable" consequence of the actions of JP Morgan and Deutsche Bank.

Thus, the Court finds that JPM Jane Doe and DB Jane Doe plausibly allege both that JP Morgan and Deutsche Bank owed a duty to them, and that the banks proximately caused harm to them by breaching that duty. Thus, the Court denies defendants' motions to dismiss plaintiffs' negligence claims.

L. Intentional Infliction of Emotional Distress

JPM Jane Doe and DB Jane Doe also allege that JP Morgan and Deutsche Bank intentionally inflicted emotional distress upon them. The elements of such a claim under here applicable New York law are: "(1) extreme and outrageous conduct; (2) the intent to

48

cause, or the disregard of a substantial likelihood of causing, severe emotional distress; (3) causation; and (4) severe emotional distress." Eskridge v. Diocese of Brooklyn, 210 A.D.3d 1056, 1057 (N.Y. App. Div. 2022).

At the outset, the Court notes that this cause of action is "highly disfavored" and "almost never successful." Sesto v. Slaine, 171 F. Supp. 3d 194, 201-02 (S.D.N.Y. 2016). That is especially so when, as here, the plaintiff asserts a negligence claim. Since almost all conduct that amounts to the intentional infliction of emotional distress ("IIED") also constitutes negligence, IIED claims are routinely dismissed for their redundancy with negligence claims. See, e.g., Wolkstein v. Morgenstern, 275 A.D.2d 635, 637 (N.Y. App. Div. 1st Dep't. 2000) ("Generally, a cause of action for infliction of emotional distress is not allowed if essentially duplicative of tort or contract causes of action."); Samuel et al. v. Rockefeller Univ., 2022 WL 2916784, at *2 (N.Y. Sup. Ct. July 25, 2022) (dismissing IIED claim as duplicative of negligence claim). So it is with the Jane Does' IIED claims: if the conduct of JP Morgan and Deutsche Bank was extreme and outrageous, and was intended to cause (or was made with reckless disregard for) severe emotional distress, and in fact caused severe emotional distress -- JP Morgan and Deutsche Bank were thereby also liable for negligence. This alone is likely sufficient grounds for dismissal.

Additionally, the plaintiffs fail to allege that JP Morgan and Deutsche Bank "intentionally directed" their conduct at them. <u>Martin v. Citibank, N.A.</u>, 762 F.2d 212, 220 (2d Cir. 1985) ("The conduct must also be intentionally directed at the plaintiff . . . ."). None of the plaintiffs' allegations supports the inference that either JP Morgan or Deutsche Bank directed their conduct at JPM Jane Doe or DB Jane Doe specifically. Instead, they are alleged to have financed Jeffrey Epstein, who then harmed JPM Jane Doe, DB Jane Doe, and others. While the plaintiffs' harm might have been a foreseeable consequence of defendants' actions, the allegations in the complaints do not support the inference that it was specifically directed toward them. For both of these reasons, plaintiffs' IIED claims are dismissed.

M. <u>Aiding and Abetting Battery</u>

Last, JPM Jane Doe and DB Jane Doe allege that JP Morgan and Deutsche Bank aided and abetted the battery of them. They claim that Jeffrey Epstein and his associates sexually abused them -- acts that amounted to battery -- and that the defendants supported those wrongs.

Under New York law, there are three elements of aiding and abetting battery: "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3)

the defendant's knowing and substantial assistance in the principal violation." Scollo ex rel. Scollo v. Nunez, 847 N.Y.S.2d 899 (Sup. Ct. 2007), aff'd, 60 A.D.3d 840 (N.Y. App. Div. 2009).

The defendants focus on this last element: whether they provided "knowing and substantial assistance" to those who battered the Jane Does. "Knowledge," for these purposes, is actual knowledge. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006); JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005) ("[T]he weight of the case law, cited above, defines knowledge in the context of an aiding and abetting claim as actual knowledge."); Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998) ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge."); Steinberg v. Goldstein, 279 N.Y.S. 240, 242 (App. Div. 1967). "Substantial assistance," meanwhile, requires "commit[ting] some overt act, either by words or conduct, in furtherance of" the battery of Plaintiff. McKiernan v. Vaccaro, 91 N.Y.S.3d 478, 481 (App. Div. 2019); Lindsay v. Lockwood, 625 N.Y.S.2d 393, 397 (Sup. Ct. 1994). That, in turn, requires "intentional or deliberate acts directed at causing harm which would rise to the level of actionable conduct

in relation to the subject assault." Shea v. Cornell Univ., 192 A.D.2d 857, 858, 596 N.Y.S.2d 502, 503 (1993).

As explained above, the complaints are devoid of facts which support the allegation that the acts of JP Morgan and Deutsche Bank were specifically and intentionally directed at causing harm to the Jane Does. Thus, the defendants' motions to dismiss plaintiffs' claims for aiding and abetting battery are granted.

III. Conclusion

For the foregoing reasons, the Court hereby reconfirms its rulings in its "bottom-line" order of March 20, 2023. Defendants' motions to dismiss are therefore granted in part and denied in part, as specified below:

With respect to Jane Doe v. Deutsche Bank Aktiengesellschaft et al., 22-cv-10018, the Court grants defendants' motion to dismiss with respect to Counts II, III, IV, V, VII, VIII, IX, and X of the First Amended Complaint. The Court denies defendants' motion with respect to Counts I, VI, XI, and XII of the First Amended Complaint. Thus, for clarity, the following claims asserted by plaintiff Jane Doe against defendants Deutsche Bank Aktiengesellschaft, Deutsche Bank AG New York Branch, and Deutsche Bank Trust Company Americas remain as part of the case: (1) the claim that defendants knowingly benefited from participating in a sex-trafficking venture, in violation of 18 U.S.C. § 1591(a)(2);

(2) the claim that defendants obstructed enforcement of the Trafficking Victims Protection Act, in violation of 18 U.S.C. § 1591(d); (3) the claim that defendants negligently failed to exercise reasonable care to prevent physical harm; and (4) the claim that defendants negligently failed to exercise reasonable care as a banking institution providing non-routine banking. All other claims are dismissed.

With respect to Jane Doe v. JP Morgan Chase Bank, N.A., 22-cv-10019, the Court grants defendant's motion to dismiss with respect to Counts I, II, VI, VII, VIII, and IX of the First Amended Complaint. The Court denies defendant's motion with respect to Counts III, IV, V, and X of the First Amended Complaint. Thus, for clarity, the following claims asserted by plaintiff Jane Doe against defendant J.P. Morgan Chase Bank, N.A. remain as part of the case: (1) the claim that defendant negligently failed to exercise reasonable care to prevent physical harm; (2) the claim that defendant negligently failed to exercise reasonable care as a banking institution providing non-routine banking; (3) the claim that defendant knowingly benefited from participating in a sex-trafficking venture, in violation of 18 U.S.C. § 1591(a)(2); and (4) the claim that defendant obstructed enforcement of the Trafficking Victims Protection Act, in violation of 18 U.S.C. § 1591(d). All other claims are dismissed.

With respect to <u>Government of the United States Virgin Islands</u> <u>v. JP Morgan Chase Bank, N.A.</u>, 22-cv-10904, the Court grants defendant's motion to dismiss with respect to Counts II, III, and IV of the First Amended Complaint. The Court denies defendant's motion with respect to Count I of the First Amended Complaint. Thus, for clarity, the claim of plaintiff the Government of the United States Virgin Islands that defendant JP Morgan Chase Bank, N.A. knowingly benefited from participating in a sex-trafficking venture, in violation of 18 U.S.C. § 1591(a)(2), remains as part of the case. All other claims are dismissed.

SO ORDERED.

New York, NY
May ___, 2023

JED S. RAKOFF, U.S.D.J.