**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | Case No. 1:22-CV-10019 (JSR) |
| Plaintiff, | |
| v. | |
| JPMorgan Chase Bank, N.A., | |
| Defendant. | |

## BRADLEY J. EDWARDS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISQUALIFY WILMERHALE

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

I.     WilmerHale Supports Ms. Wild's Efforts to Obtain Prosecution of the Epstein Sex-Trafficking Organization for TVPA Violations................................................... 4

II.    WilmerHale Now Opposes JPM Jane Doe 1's Efforts to Obtain Prosecution of the Epstein Sex-Trafficking Organization for TVPA Violations. ........................................... 11

ARGUMENT ................................................................................................................... 13

I.     WilmerHale Has a Conflict of Interest in Acting Directly Against Courtney Wild......... 15

       A.    The CVRA Case Is Substantially Related to the JP Morgan Case. ..................... 15

       B.    JP Morgan's Interests in Litigating Against Epstein Victim Courtney Wild   Are Materially Adverse to ECPAT's Interests in Supporting Ms. Wild. ................... 17

II.    WilmerHale is Also Conflicted Because It Has Protected Information Under the Common Interest Doctrine, Which It is Precluded from Using Against Courtney Wild. ............... 18

       A.    A Common Interest Agreement Existed When ECPAT and Ms. Wild Worked Together on the CVRA Case. ............................................................................. 19

       B.    WilmerHale Learned Ms. Wild's Confidential Legal Strategies  While   Working Closely with Ms. Wild on the CVRA Case. ....................................................... 20

III.    Because WilmerHale is Conflicted, Disqualification is the Appropriate Response......... 22

CONCLUSION.................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alpek Polyester, S.A. de C.V. v. Polymetrix AG*,
   2021 WL 5974163 (Fed. Cir. 2021) ........................................................................ 24

*Am. Int'l Grp., Inc. v. Bank of Am. Corp.*,
   827 F. Supp. 2d 341 (S.D.N.Y. 2011) .................................................................. 29

*Anderson v. City of New York*,
   No. 16CIV2583ALCJCF, 2017 WL 4382163 (S.D.N.Y. Sept. 29, 2017) ............................. 17

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
   160 F.R.D. 437 (S.D.N.Y. 1995) .......................................................................... 21

*Cresswell v. Sullivan & Cromwell*,
   922 F.2d 60 (2d Cir. 1990) .................................................................................. 15

*Decker v. Nagel Rice LLC*,
   716 F. Supp. 2d 228 (S.D.N.Y. 2010) ................................................................. 16

*Denney v. Jenkens & Gilchrist*,
   362 F. Supp. 2d 407  (S.D.N.Y. 2004) ............................................................... 22

*Doe 1 et al. v. United States*,
   359 F.Supp.3d 1201 (S.D. Fla. 2019) ......................................................... 5, 19

*Evans v. Artek Systems Corp.*,
   715 F.2d 788 (2d Cir. 1983) ................................................................................ 16

*First NBC Bank v. Murex, LLC*,
   259 F. Supp. 3d 38 (S.D.N.Y. 2017) ............................................................ 16, 26

*GateGuard, Inc. v. Goldmont Realty Corp.*,
   No. 20CIV01609VECGWG, ---F.Supp.3d---, 2022 WL 17088731 (S.D.N.Y. Nov. 21, 2022)
   .......................................................................................................................... 15

*Grupo Petrotemex, S.A. de C.V. v. Polymetrix, AG*,
   2020 WL 1227715 (D. Minn. Mar. 13, 2020) ..................................................... 24

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*,
   409 F.3d 127 (2d Cir. 2005) ................................................................................ 15

*Hull v. Celanese Corp.*,
   513 F.2d 568 (2d Cir. 1975) ................................................................................ 16

*In re Gabapentin Patent Litigation,*
    407 F. Supp. 3d 607 (D.N.J. 2005) ........................................................... 27

*In re Leslie Controls, Inc.,*
    437 B.R. 493 (Bankr. D. Del. 2010) ........................................................ 25

*In re: Courtney Wild*,
    No. 19-13843 (11th Cir. 2019) .................................................................. 6

*In re: Wild*,
    955 F.3d 1196 (2020) ................................................................................. 6

Jane Doe #1 and Jane Doe #2,
    No. 9:08-cv-80736 (S.D. Fla.) ......................................................... passim

*Roosevelt Irrigation District v. Salt River Project Agricultural and Power District*,
    810 F. Supp. 2d 929 (D. Ariz. 2011) ....................................................... 26

*Schaeffler v. United States*,
    806 F.3d 34 (2d Cir. 2015) ....................................................................... 21

*U.S. v. Prevezon Holdings Ltd.*,
    839 F.3d 227, 241 (2d Cir. 2016) ............................................................. 15

*United States v. BDO Seidman, LLP*,
    492 F.3d 806 (7th Cir. 2007) .................................................................... 25

*United States v. Patel*,
    509 F. Supp. 3d 1334 (S.D. Fla. 2020) .................................................... 21

*United States v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989) .................................................................... 22

*United States v. Stepney*,
    246 F. Supp. 2d 1069 (N.D. Cal. 2003) ................................................... 26

*Victorinox AG v. B&F Sys., Inc.*,
    709 F. Appx 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017).................... 28

*Victorinox AG v. The B & F Sys., Inc.*,
    200 F. Supp. 3d 423 (S.D.N.Y. 2016) ..................................................... 28

*Wild v. U.S. District Court for the Southern District of Florida*,
    No. 21-351 (U.S. Feb. 22, 2022).......................................................... 7, 12

**Statutes**

18 U.S.C. §§ 1591–95 ........................................................................................... 18

Crime Victims' Rights Act (CVRA),
   18 U.S.C. § 3771 ........................................................................................... 1, 4

**Other Authorities**

*Separating the Joint-Defense Doctrine from the Attorney-Client Privilege*,
   68 TEX. L. REV. 1273, 1301-02 (1990) ..................................................................... 26

Timothy Marsh, *Compulsory Corporate Social Responsibility: New York Hoteliers as Mandated
   Reporters of Child Sex Trafficking*, 45 HOFSTRA L. REV. 979, 980 (2017) ................................. 7

**Rules**

███████████████████████████ ................................................................ 10

Bradley J. Edwards, respectfully submits this memorandum of law, together with the declaration of Paul G. Cassell, in support of his Motion for Disqualification of the law firm of Wilmer, Cutler, Pickering, Hale, and Dorr, LLP (hereinafter "WilmerHale") from representing defendant JPMorgan Chase Bank, N.A. ("JP Morgan" or "JPM") in this case.

## PRELIMINARY STATEMENT

As the Court is aware, this case involves allegations by an anonymous sex-trafficking victim of Jeffrey Epstein ("JPM Jane Doe 1"). She contends that defendant JP Morgan provided the financial lifeblood for the Epstein sex-trafficking operation. *See generally* Dkt. 75 (recounting allegations and denying motions to dismiss). JPM Jane Doe 1 seeks certification of a class of Epstein sex abuse victims, who would proceed with their legal claims against JP Morgan under the federal Trafficking Victim Protection Act (TVPA) and New York state tort law. In her recently filed class certification motion, JPM Jane Doe 1 explains that Epstein, "with the assistance of a money-hungry bank, [JP Morgan] ran a decades-long sex-trafficking operation and destroyed the lives of literally hundreds of young females." Dkt. 98 at 1. She seeks certification of a class to ensure that JP Morgan will be "held to account." *Id.*

One of the putative class members is Epstein sex abuse victim Courtney Wild. She has also sought to hold Epstein and his sex-trafficking organization accountable for what they have done. Beginning in 2008, she brought an action in the Southern District of Florida under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, seeking to set aside the Non-Prosecution Agreement (NPA) that Epstein secretly orchestrated. That NPA immunized not only Epstein but also other wrongdoers from federal prosecution under the TVPA. After lengthy litigation, the district court agreed with Ms. Wild that her CVRA rights had been denied. But following Epstein's death by apparent suicide, the district court dismissed her case as moot.

1

After filing an unsuccessful petition in the Eleventh Circuit, Ms. Wild sought certiorari in the U.S. Supreme Court. She argued that the lower court decisions should be overturned, so that the NPA could be rescinded, permitting her to confer with federal prosecutors about prosecuting other culpable parties under the TVPA. She then contacted leading crime victim advocacy organizations, seeking support for her efforts before the Supreme Court.

One organization who agreed to support Ms. Wild was ECPAT-USA ("ECPAT"[1]), the leading anti-trafficking policy organization in the country. ECPAT filed a powerful amicus brief supporting Ms. Wild, explaining that Ms. Wild and others Epstein victims deserved the chance to pursue prosecution of those involved in the Epstein sex-trafficking organization, because they had "courageously" reported the abuse they suffered from being sexually trafficked by the Epstein organization. Thereafter, counsel for Ms. Wild faced several challenging strategic and tactical questions about how to proceed, so her attorney conferred with ECPAT's attorneys about the best means of moving forward—discussing confidential information and the strengths and weaknesses of her arguments. Ms. Wild's attorneys also conferred with ECPAT's lawyers about how to best craft her briefing before the Supreme Court.

Unfortunately, the common legal effort of Ms. Wild and ECPAT was unsuccessful: The Supreme Court denied certiorari in February 2022.

Then, in November 2022, JPM Jane Doe 1—acting on her behalf and on behalf of other Epstein victims (such as Ms. Wild)—filed this action under the TVPA. As the Court is aware, the action seeks to hold JP Morgan civilly liable for its TVPA violations. And a few weeks later, JP Morgan appeared with legal counsel ready to take on the Epstein victims. JP Morgan's lawyers

---

[1] The acronym ECPAT stands for "End Child Prostitution and Trafficking."

were members of the well-regarded law firm of WilmerHale—including one of the very same lawyers who had worked in common enterprise with Ms. Wild earlier in the year.

Having previously represented ECPAT in in a common legal effort with Ms. Wild to attempt to hold accountable those involved in the Epstein sex-trafficking organization, WilmerHale now has a conflict of interest in advancing directly opposing arguments here. And WilmerHale and counsel for Ms. Wild were operating under a common interest agreement—an agreement which gave WilmerHale access to Ms. Wild's confidential information.

This Court should preserve the appearance of fairness by preventing JP Morgan from employing a law firm with access to confidential information from an Epstein sex-trafficking victim—a victim whom the firm had previously supported and whom is a putative class member here. Accordingly, WilmerHale should be disqualified from representing JP Morgan. The other large law firm that has currently appeared on behalf of JP Morgan—Massey & Gail, LLP—can immediately step in to handle the case without a conflict.[2]

## FACTUAL BACKGROUND

This disqualification motion requires evaluation of WilmerHale's two separate representations: first, its legal advocacy on behalf of Courtney Wild (an Epstein sex trafficking victim) in a substantially similar matter during September 2021 through January 2022; and second, its later legal advocacy against Courtney Wild and other Epstein sex trafficking victims in this case from December 2022 to present. To create the appropriate factual record, undersigned counsel has

---

[2] This motion is filed on behalf of Bradley J. Edwards, counsel for JPM Jane Doe 1—and co-counsel for Ms. Wild in the CVRA case. If the Court believes that the motion should be filed on behalf of Ms. Wild, counsel for Mr. Edwards would request an opportunity to make such a filing. Undersigned counsel represents that Ms. Wild joins in this motion, which seeks to prevent her confidential information from being used against her and other Epstein victims. JPM Jane Doe 1 also joins in the motion, based on the public (redacted) memorandum of law. The undersigned notes that not all counsel for JPM Jane Doe 1 represent Ms. Wild. Those other lawyers are not privy to the specific underlying facts that create the imputed conflict described here.

provided a sworn affidavit annexed to this memorandum. *See* Cassell Declaration ("Cassell Dec."). To the extent that any relevant facts are disputed, counsel requests an opportunity to establish them in an evidentiary hearing.

## I.    WilmerHale Supports Ms. Wild's Efforts to Obtain Prosecution of the Epstein Sex-Trafficking Organization for TVPA Violations.

Courtney Wild is one of the heroes who brought the Epstein sex-trafficking organization to light. In 2007, Ms. Wild cooperated with the FBI investigation into Epstein. But the next year, the prosecutors refused to tell her what had happened in the case. And so, in July 2008, Mr. Edwards (quickly joined by undersigned counsel) filed a suit for Ms. Wild under the Crime Victims' Rights Act. *See* Jane Doe #1 and Jane Doe #2, No. 9:08-cv-80736 (S.D. Fla.) (the "CVRA case"). Ms. Wild's case soon exposed a secret NPA reached between the U.S. Attorney's Office for the Southern District of Florida (USAO-SDFL) and Jeffrey Epstein. Cassell Dec. ¶¶ 15-18.

Ms. Wild argued that this clandestine NPA violated the CVRA, because the Justice Department had failed to confer with Epstein's victims as the law required. *See* 18 U.S.C. § 3771(a)(5). Lengthy litigation ensured. Because Ms. Wild's action sought to invalidate immunity provisions in his agreement, Jeffrey Epstein was allowed to intervene regarding "any remedy issue concerning the non-prosecution agreement in the case." CVRA Case, Dkt. 246. *See generally* Cassell Dec. ¶¶ 19-20.

Ultimately, following more than a decade of litigation, in February 2019, the district court granted summary judgment in favor of Ms. Wild and another Epstein victim. The Court held that the Justice Department had violated the CVRA rights of Epstein's victims by "conceal[ing]" the Epstein NPA from the victims and "mislead[ing] the victims to believe that federal prosecution was still a possibility." *Doe 1 et al. v. United States*, 359 F.Supp.3d 1201, 1219 (S.D. Fla. 2019).

The district court then directed briefing on the remedy for Department's violations of Ms. Wild's (and other Epstein victims') CVRA rights. *Id.*

Thereafter, during the summer of 2019, Ms. Wild filed remedies briefing, requesting that the NPA be declared invalid as to Epstein and other culpable parties. CVRA Dkt. 458 at 4. The Justice Department and Epstein responded in opposition; Ms. Wild replied. *See* CVRA Dkt. 463, 466; *see also* Cassell Dec. ¶ 21-22.

But before the District Court could enter a ruling on Ms. Wild's requested remedies, the case took an unexpected turn. On July 6, 2019, Jeffrey Epstein was arrested in New York City on multiple federal charges, including sex trafficking. And on August 10, 2019, Epstein apparently committed suicide. Cassell Dec. ¶ 23.

In light of Epstein's death, on September 16, 2019, the District Court found Ms. Wild's CVRA case to be moot. CVRA Dkt. 478. The district court concluded that no remedies remained available to Ms. Wild and other victims. *Id.* at 4-15. The Court also concluded that the victims could "take solace" in the fact "that this litigation had brought national attention to the Crime Victims' Rights Act and the importance of victims in the criminal justice system.…" *Id.* at 14-15.

Unwilling to simply take solace in having brought Epstein's crimes to light, Ms. Wild sought review of the mootness finding in the Eleventh Circuit. *In re: Courtney Wild*, No. 19-13843 (11th Cir. 2019). Ms. Wild argued that the case was not moot, because she was challenging the NPA's immunity provisions, which blocked prosecution of key players in the Epstein sex-trafficking organization. Mandamus Petn. at 20, *In re: Courtney Wild* (11th Cir. Sept. 30, 2019).

Ultimately, following oral argument, a divided panel of the Eleventh Circuit rejected Ms. Wild's petition. *In re: Wild*, 955 F.3d 1196 (2020). Ms. Wild then successfully sought rehearing en banc. But on April 15, 2021, the Eleventh Circuit en banc, in a split decision (7-4), again denied

Ms. Wild's petition. *In re: Wild*, 994 F.3d 1244 (11th Cir. en banc 2021). The majority decision concluded that, as a matter of first impression, because federal criminal charges had never been filed against Epstein, Ms. Wild had no "stand-alone" civil remedy under the CVRA. *Id.* at 1256-64. The four dissenters argued that the majority was misreading the CVRA in a way that would harm "all crime victims in this Circuit." *Id.* at 1288 (Branch, J., dissenting); *see also id.* at 1327 (Hull, J. dissenting) ("The Majority's ruling eviscerates the CVRA and makes the Epstein case a poster child for an entirely different justice system for crime victims of wealthy defendants."). *See generally* Cassell Dec. ¶¶ 24-27.

Several months later, on August 31, 2021, Ms. Wild (represented by undersigned counsel, Brad Edwards, and Florida attorney Jay Howell) filed a certiorari petition in the Supreme Court. Br. for Petitioner, *Wild v. U.S. Dist. Ct. for S. Dist. of Fla.*, 142 S. Ct. 1188 (No. 21-351). Ms. Wild argued that the Eleventh Circuit's en banc decision left the Justice Department "free to negotiate secret, pre-indictment non-prosecution agreements without informing crime victims." *Id.* at i. Her petition sought further proceedings allowing "rescission of the NPA's immunity provision protecting" Epstein and others from TVPA prosecution. *Id.* at 10; Cassell Dec. ¶¶ 28-29.

Shortly after filing Ms. Wild's certiorari petition, undersigned counsel reached out to various organizations which might have an interest in supporting Ms. Wild. One such organization was ECPAT—generally regarded as "the leading anti-trafficking policy organization in the country." Timothy Marsh, *Compulsory Corporate Social Responsibility: New York Hoteliers as Mandated Reporters of Child Sex Trafficking*, 45 HOFSTRA L. REV. 979, 980 (2017). After various back-and-forth emails, ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

██████████ ECPAT sent a three-way email, introducing undersigned counsel to Ms. Vreeland at WilmerHale. And thereafter, Ms. Wild's counsel and WilmerHale exchanged emails about the areas of weakness where Ms. Wild could especially use help from ECPAT. WilmerHale responded that ████████████████████████████████████████████████████

Ms. Wild's counsel and the WilmerHale lawyers also set up a conference call. On September 22, 2021, they held a Zoom call about how WilmerHale could best support Ms. Wild.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████

On October 1, 2021, WilmerHale sent to undersigned counsel a full draft of ECPAT's amicus brief. WilmerHale asked ██████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

After some additional discussion, on October 4, WilmerHale filed an amicus brief for ECPAT supporting Ms. Wild. The brief was signed by Felicia H. Ellsworth at WilmerHale's Boston office. Cassell Dec. ¶ 52. The WilmerHale brief contains many statements supporting Ms. Wild and other Epstein sex trafficking victims:

- ECPAT-USA submits this brief to highlight the critical importance of Ms. Wild's petition to child victims of sex trafficking. The crimes committed against Ms. Wild were not only horrific but all too common.

- In Florida, where Epstein sexually abused Ms. Wild and at least 36 other young victims, the state received reports of 896 human trafficking cases (including 640 sex trafficking cases) in 2019 alone.

- Ms. Wild and nearly two dozen other victims came forward, at great risk to themselves, to report an egregious string of abuses, for nothing.

- As anti-trafficking advocates have long cautioned—and leading jurists are now recognizing—a significant percentage of sex trafficking crimes are misunderstood, particularly at the pre-indictment stage, when prosecutors ignore victims or, worse, treat them as criminals. Victims of these crimes may be cast aside as law breakers, when in fact they are victims of traffickers who control them with violence and abuse, and their traffickers all-too-frequently are not punished for the heinous crimes they commit. This is exactly what happened in the Epstein case, contributing to the many further tragedies that followed.

- The power imbalance fueled by exploitation and abuse that is present in all trafficking situations was also readily apparent in Epstein's trafficking crimes. As various victim-survivors testified, Epstein manipulated them and caused them to fear his influence and power:

- Ms. Wild and others courageously reported the abuse they suffered at Epstein's hands when they were children; in return, the government not only kept them blind to the secret deal it struck with Epstein, but in the process, labeled them "prostitutes."

*See* Cassell Dec., Ex. 12 (ECPAT brief).

The next day, October 5, undersigned counsel sent a ████████████ to Ms. Vreeland "and others" at WilmerHale. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Undersigned counsel also said: ████████████████████████████████

████████████████████████████████████████████████████

████

Thereafter, with ECPAT's (and other supporting amici's) role in the briefing concluded, undersigned counsel began working in anticipation of filing Ms. Wild's reply brief. Counsel was concerned about how to handle the fact that ████████████████████████████████████████

████████████████████████████████████████████ Undersigned counsel was perplexed about how to best proceed. Knowing the WilmerHale lawyers were skilled litigators, undersigned counsel requested an opportunity to discuss the issue with them. On December 29,

2021, undersigned counsel sent an email ████████████████████████████████

to the WilmerHale team that had filed the amicus brief supporting Courtney Wild. The email noted

that, with the Wilmer team's expertise, it "might be able to give me some strategic guidance on

███████████████████████████████████████████████ The next

day, Ms. Vreeland responded, indicating that WilmerHale would be happy to talk ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

On January 4, 2022, the Justice Department filed its reply in opposition to Ms. Wild's

certiorari petition. Undersigned counsel then set up a conference call with the WilmerHale team,

which was held on January 6. It appears that the WilmerHale participants on the call were Cynthia

Vreeland, Felicia H. Ellsworth, and Denise Tsai. Cassell Dec. ¶¶ 61-64.

The January 6 call involved a discussion of the best strategy and tactics for Ms. Wild to

pursue her goals of invalidating the NPA and holding the culpable parties in the Epstein trafficking

organization accountable. Undersigned counsel and WilmerHale discussed strategic options that

included focusing ████████████████████████████████████████

███████████████████████████████████████████ Also discussed

was highlighting ████████████████████████████████████████

████████████████████████████████████████████████

████████████ But the conversation ultimately began to center on ████████████ Cassell Dec. ¶¶

65-67.

A legal strategy that undersigned counsel had been considering pursuing for Ms. Wild was

████████████████████████████████████████████████

████████████████████████████████████ The WilmerHale attorneys discussed that theory at length, including the tactical advantages and disadvantages of various types of filings. Also discussed were ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ At the conclusion of the call, counsel agreed to stay in touch. WilmerHale also agreed to search its files for ██████████████████

████████████. Later that day, WilmerHale sent a sample and successful ████████████ Cassell Dec. ¶¶ 68-71.

Informed by the discussions with the Wilmer lawyers, undersigned counsel determined that the best way for Ms. Wild to proceed was to ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Cassell Dec. ¶ 72.

Following the conference call, undersigned counsel turned attention to drafting Ms. Wild's reply. A key issue was presenting the ████████████ issue. On January 13, 2022, undersigned counsel transmitted to the WilmerHale team (e.g., Cynthia Vreeland, Denise Tsia, and Felise H. Ellsworth) a full draft of the certiorari petition and asked for "strategic thoughts" on how to best proceed. The email highlighted the ████████████ issue and the pros and cons of various options for addressing it. Later that day, Ms. Vreeland responded that she had ████████████████████

████████████ She proposed a call at the end of the day to discuss, cc'ing Felicia H. Ellsworth. Later undersigned counsel and Ms. Vreeland discussed how to improve Ms. Wild's reply brief. Cassell Dec. ¶¶ 73-79.

Four days later, on January 18, 2022, undersigned counsel filed Ms. Wild's reply brief in support of certiorari. The reply brief cited the ECPAT amicus brief. Cassell Dec., Ex. 20 at 12. The reply brief also pressed the point that ███████████████████████████████████████████████ warranted further review. *Id.* at 13.

Sadly (from Ms. Wild and ECPAT's perspective), the next month, the Supreme Court denied certiorari—more than thirteen years after Ms. Wild had filed her original challenge to the Epstein non-prosecution agreement. *Wild*, 142 S. Ct. 1188 (2022).

And, in addition, after months and months of foot-dragging, on January 10, 2023, OPR informed undersigned counsel that it would not investigate the concealed-emails issue. Cassell Dec. ¶¶ 82-94.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

## II.   WilmerHale Now Opposes JPM Jane Doe 1's Efforts to Obtain Prosecution of the Epstein Sex-Trafficking Organization for TVPA Violations.

Meanwhile, on November 24, 2022, another Epstein sex abuse victim—JPM Jane Doe 1—filed this proposed class action lawsuit against JP Morgan. Dkt. 1. JPM Jane Doe 1 proposed that a class should be certified consisting of:

> All women who were sexually trafficked by Jeffrey Epstein during the time when JP Morgan maintained bank accounts for Epstein and/or Epstein related-entities, which was in or about 2000 through … August 2013 … (the "Class Period").

Dkt. 1 at 53. Ms. Wild is indisputably a member of the class identified above. Indeed, in the CVRA proceedings discussed above, the Justice Department apologized for failing to confer with her. Cassell Dec. ¶¶ 99-100.

Beginning in December 2022, WilmerHale lawyers (including Felicia H. Ellsworth) appeared on behalf of JP Morgan in this case. Thereafter, WilmerHale began the diligent representation of its clients that the firm is well known for. Among other defense efforts, on March 5, 2023, Ms. Ellsworth sent a subpoena to Brad Edwards, asking him to appear for a deposition and to produce numerous documents. For example, among the documents requested were "[a]ll documents or communications with ███████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████ Indeed, the broad subpoena also appears to cover information from Mr. Edwards about his communications during the CVRA litigation described above. *See* Cassell Dec. Ex. 29 at 9, Attachment A, ¶ 14 (requesting production of "[a]ll documents or communications with any non-Clients … related to any litigation Epstein, an Epstein-Related Individual or Epstein-Related Entities.").

Undersigned counsel agreed to represent Mr. Edwards regarding the subpoena. On March 20, 2023, undersigned counsel sent to Ms. Ellsworth responses and objections by Mr. Edwards to the subpoena, raising overbreadth and other concerns. Ten days later, on March 30, 2023, undersigned counsel (along with counsel for JPM Jane Doe 1) held a meet-and-confer conference call with Ms. Ellsworth and Andy O'Laughlin of WilmerHale. Cassell Dec., ¶¶ 105-109.

Because this call was the first time undersigned counsel had interacted with opposing counsel on this case, counsel began the call by introducing himself. Undersigned counsel mentioned working together with Mr. Edwards for many years on the "CVRA case." Mr. O'Laughlin responded that this was one of the reasons that WilmerHale wanted information from Mr. Edwards—i.e., that WilmerHale was "trying to get up to speed" on the CVRA case. During the call, undersigned counsel and WilmerHale discussed whether Mr. Edwards had been deposed

in the "CVRA case." Undersigned counsel did not immediately recall any such deposition but agreed to investigate. Discussions also followed about whether there were other sources of information that would help WilmerHale get "up to speed" on the issues surrounding Jeffrey Epstein's sex trafficking. For various reasons, undersigned counsel did not recall at that time that WilmerHale had been in the CVRA case. Cassell Dec. ¶¶ 110-12.

Following the call, undersigned counsel began to think about how to provide WilmerHale with information that would help it "get up to speed" on the CVRA case. And on the next morning, Friday, March 31, 2023, counsel looked at Ms. Wild's certiorari petition in the CVRA case—one of the last filings in the case, which contained a good overview of the proceedings. Undersigned counsel then began reviewing the amicus briefs filed in the case, noticing that the law firm that had filed ECPAT's brief supporting Ms. Wild was WilmerHale. That was the first time undersigned counsel recalled WilmerHale's involvement in the CVRA case. Two business days later, on Tuesday, April 4, 2023, undersigned counsel contacted WilmerHale, alerting them to the conflict. Subsequent discussions to resolve the issue were unsuccessful, leading to this motion. Cassell Dec. ¶¶ 113-29.[3]

## **ARGUMENT**

The authority of federal courts to disqualify attorneys "derives from their inherent power to 'preserve the integrity of the adversary process.'" *U.S. v. Prevezon Holdings Ltd.*, 839 F.3d 227,

___

[3] In communications with WilmerHale, undersigned counsel has made clear that he is not accusing the firm of bad faith. Cassell Dec., ¶ 126, Ex. 32 (noting "[a]t the outset, I want to be clear that I am in no way suggesting any bad faith on your part or [by] others at Wilmer"). However, WilmerHale has vaguely suggested that undersigned counsel might be seeking "litigation advantage" in raising this serious conflict of interest issue at this time. As the foregoing account makes clear, any such suggestion would be without merit. Undersigned counsel raised the conflict issue immediately when it became apparent. Indeed, not raising the issue at this time would create the risk of having it surface in later proceedings—and perhaps presented by other persons—when the Court might have more difficulty in unwinding the issue.

241 (2d Cir. 2016) (quoting *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127 (2d Cir. 2005)). A court is thus permitted to "disqualif[y] ... an attorney in order to forestall violation of ethical principles." *GateGuard, Inc. v. Goldmont Realty Corp.,* No. 20-CIV-01609-VEC-GWG, ---F.Supp.3d---, 2022 WL 17088731, at *2 (S.D.N.Y. Nov. 21, 2022) (citing *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990)). In deciding whether to exercise this power, courts must weigh "a client's right freely to choose his counsel against the need to maintain the highest standards of the profession." *Hempstead Video*, 409 F.3d at 132 (internal quotation marks omitted). Although "[m]otions to disqualify are disfavored and subject to a high standard of proof," the Second Circuit has held that "any doubt should be resolved in favor of disqualification." *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 56 (S.D.N.Y. 2017) (citing *Evans v. Artek Systems Corp.,* 715 F.2d 788, 791–92 (2d Cir. 1983) and *Hull v. Celanese Corp*., 513 F.2d 568, 571 (2d Cir. 1975)).

Here, the relevant ethical rules could be New York rules, as this motion is filed in a case pending in the Southern District of New York. But, as discussed in Part II, below, a preliminary question arises concerning whether ECPAT and Ms. Wild formed a common interest agreement to jointly proceed against the culpable parties in the Epstein sex-trafficking organization. That question concerns Ms. Wild's expectations in connection with litigation arising out of the U.S. District Court for the Southern District of Florida—which was then-pending in the U.S. Supreme Court. Between September 2021 and February 2022 (and until November), there was no connection between the lawyers and New York. Accordingly, this Court should determine that initial question—involving a common interest agreement at a time when litigation was located elsewhere—using the rules applicable to those courts, and particularly to the Supreme Court where

the case was then-pending. In any event, the issues here are so clear that WilmerHale's disqualification is required regardless of which lawyer code the Court determines is relevant.

## I.      WilmerHale Has a Conflict of Interest in Acting Directly Against Courtney Wild.

This Court has recognized that "disqualification motions often benefit from guidance offered by the American Bar Association (ABA) [Code] ...." *Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 233 (S.D.N.Y. 2010). Under the ABA's Model Rules of Professional Responsibility, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." ABA Model Rules of Professional Conduct, Rule 1.9.[4] Here, the current matter and the CVRA case are substantially related and material adversity exists.

### A. The CVRA Case Is Substantially Related to the JP Morgan Case.

This lawsuit (i.e., the *JPM Jane Doe* case) is "substantially related" to the CVRA case. According to the comments to the ABA Model Rules, "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." ABA Rule 1.9, Comment 3. This Court has explained that, under New York ethics rules, the substantial relationship inquiry "turns on the nexus between the factual issues, not the legal issues, in the successive representations." *Anderson v. City of New York*, No. 16CIV2583ALCJCF, 2017 WL 4382163, at *4 (S.D.N.Y. Sept. 29, 2017) (finding substantial relationship based on "common material factual issues").

---

[4] The N.Y. Rules of Professional Conduct are almost word-for-word equivalent. *See* N.Y. Rules Prof. Conduct 1.9(a). Florida Rules are similar. *See* Fla. Rules of Prof. Conduct 4-1.9.

Here, many "common material factual issues" exist. Among other things, the *JPM Jane Doe* case involves the same core "transaction" as the CVRA case—i.e., Jeffrey Epstein's sex trafficking organization and TVPA crimes committed against Epstein victims, including Ms. Wild. *See* First Amended Complaint ("FAC") ¶ 62 ("Beginning in and around 1998 and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture and conspiracy in violation of 18 U.S.C. §§ 1591–95"). The CVRA case involved efforts to overturn the Epstein NPA, which immunized crimes by Epstein and others investigated by the U.S. Attorney's Office for the Southern District of Florida and the FBI "from in or around 2001 through in or around September 2007, including … [crimes] in violation of Title 18, United States Code, Section 1591(a)(1) and [(2)]." Cassell Dec., Ex. 1 at 2.

In addition, this case involves efforts by JPM Jane Doe 1 to certify a class of "[a]ll women who were sexually trafficked by Jeffrey Epstein during the time when JP Morgan maintained bank accounts for Epstein and/or Epstein related-entities, which was in or about 2000 through in or about August 2013 …." Dkt. 1 at 53. Ms. Wild is a putative class member.[5]

In addition, this case involves obstruction of the TVPA's enforcement. *See* Dkt. 75 at 34 (allowing JPM Jane Doe to move forward with the claim that "JP Morgan … knew of investigations into Jeffrey Epstein's sex-trafficking operation and [it] intentionally failed to file suspicious activities report in order to frustrate *such investigation*" (emphasis added)). One critical "investigation" that JP Morgan obstructed was the FBI's investigation into Epstein's TVPA sex

---

[5] A comment to ABA Model Rule 1.7, dealing with conflicts involving current clients, indicates that "a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an *unrelated* matter." Cmt. 25. (emphasis added). This case involves the *opposite* situation, where a lawyer (e.g., WilmerHale) seeks to take positions adverse to an unnamed (but identified) member of the class in a clearly *related* matter.

trafficking crimes against (among other victims) Courtney Wild. As the Complaint alleges, "In taking the steps described above, JP Morgan obstructed, attempted to obstruct, and interfered with the federal government's enforcement of the TVPA, including the U.S. Attorney's Office for the Southern District of Florida's criminal investigation of Epstein in and around 2006 to 2008 …." FAC ¶ 183; *see also* FAC ¶¶ 79, 80, 230, 231, 472 (allegations regarding the Florida investigation). And has been recognized in the CVRA case, "The FBI ultimately determined that [Courtney Wild and another woman] … were victims of sexual abuse by Epstein while they were minors. [Ms. Wild] provided information about her abuse … to the FBI on August 7, 2007." *Doe 1*, 359 F.Supp.3d at 1205. Of course, that investigation—and the resulting non-prosecution agreement— were at the center of the CVRA case.

### B.   JP Morgan's Interests in Litigating Against Epstein Victim Courtney Wild Are Materially Adverse to ECPAT's Interests in Supporting Ms. Wild.

WilmerHale is now representing JP Morgan in this matter. In connection with that representation, WilmerHale is obviously undertaking a representation in which JP Morgan's interests are materially adverse to ECPAT's (as well as Ms. Wild's). The examples are legion.

To provide one illustration, on April 10, WilmerHale filed (through Ms. Ellsworth as lead counsel) JP Morgan's answer to the complaint. The complaint raises various defenses (against both JPM Jane Doe 1 and, potentially, members of the class). One of JP Morgan's defenses is that Jane Doe 1 (and, potentially, class members) acted "*in pari delicto*" with Epstein and associates. Dkt. 83 at 62. Of course, that defense directly conflicts with the positions taken by ECPAT *defending* Ms. Wild and other child trafficking victims. *See* Cassell Dec., Ex. 12 at 17 (ECPAT briefing arguing that "Ms. Wild and others courageously reported the abuse they suffered at Epstein's hands when they were children ….").

Indeed, not only is WilmerHale defending positions contrary to those it previously advanced for ECPAT—it is now directly attacking ECPAT. In a deposition last week, a JP Morgan witness opposing class certification directly accused ECPAT of



Cassell Dec., Ex. 34 (Depo. Tr. of JP Morgan Class Certification Expert Ms. Mehlman-Orozco at 174-75). Further questions made clear that JP Morgan—acting through WilmerHale—was staking out the exact opposite position about Ms. Wild previously advanced in ECPAT's CVRA brief:



*Id.* at 179-80 (cleaned up).

In sum, the current matter and the CVRA case are substantially related and material adversity exists. Accordingly, under generally recognized rules of professional responsibility, WilmerHale has a conflict of interest.

## II.  WilmerHale is Also Conflicted Because It Has Protected Information Under the Common Interest Doctrine, Which It is Precluded from Using Against Courtney Wild.

Not only is WilmerHale conflicted because it is acting against the interests of ECPAT and Ms. Wild, but it is also acting contrary to a common interest agreement between ECPAT and Ms. Wild during the CVRA case. This conflict also requires disqualification.

18

### A.    A Common Interest Agreement Existed When ECPAT and Ms. Wild Worked Together on the CVRA Case.

A common interest privilege is generally recognized in litigation. For example, previous decisions of this court have explained that "[a]lthough originally developed in the context of cooperation between codefendants in criminal cases, this extension of the [common interest] doctrine is fully applicable to parties in civil cases as well." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D.N.Y. 1995). And the Southern District of Florida has likewise recognized common interest protection where the parties "identify a common legal interest or strategy in obtaining a particular legal goal whether or not litigation is ongoing." *United States v. Patel*, 509 F. Supp. 3d 1334, 1347 (S.D. Fla. 2020) (*citing Schaeffler v. United States*, 806 F.3d 34, 42 (2d Cir. 2015)).

Under this doctrine, "communications made in the course of an ongoing common [legal] enterprise and intended to further the enterprise are protected." *Schaeffler*, 806 F.3d at 40 (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)). And a common understanding is enough; no formal, written document is required. *See, e.g., Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004) (common interest doctrine applies where was "an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy").

Here, it is obvious that ECPAT and Ms. Wild were engaged in a common and cooperative legal enterprise—to give Ms. Wild the opportunity to confer with federal prosecutors about prosecuting the sex traffickers in the Epstein organization for TVPA and other crimes. As recounted in the facts above, after Ms. Wild filed her certiorari petition, her undersigned counsel contacted ECPAT seeking support. And thereafter, ECPAT put Ms. Wild's counsel in direct contact with WilmerHale. Ms. Wild's counsel and WilmerHale then discussed, in writing and

through a Zoom conference call, some of the weaknesses in Ms. Wild's existing briefing and how ECPAT could help fill some of those weaknesses. Thereafter, ECPAT shared a copy of its briefs with counsel for Ms. Wild, offering a conference call if needed to help shape the brief. Cassell Dec. ¶¶ 32-51

Ultimately WilmerHale filed the *amicus* brief for ECPAT, explaining (among other things) how Ms. Wild and other Epstein victims had "courageously reported the abuse they suffered at Epstein's hands …." Cassell Dec., Ex. 12 at 13.

Two months later, in connection with a complicated legal argument that needed to be covered in her reply in support of her petition, undersigned counsel conferred with the WilmerHale lawyers (including, it appears, Ms. Ellsworth) to obtain "strategic guidance" about how best to proceed. That conferral included discussion of the strengths and weaknesses of various legal strategies, including a specific strategy under ███████████████████████████████ Cassell Dec., ¶¶ 56-79.

### B. WilmerHale Learned Ms. Wild's Confidential Legal Strategies While Working Closely with Ms. Wild on the CVRA Case.

Based on previous discussions with WilmerHale, the firm may take the position that it did not learn any confidential information during discussions with Ms. Wild's counsel from September 2021 through January 2022. As the facts recounted above make clear, any such claim would be untrue. Through extended discussions, WilmerHale learned about the strengths—and weaknesses—of Ms. Wild's positions in the CVRA case. Cassell Dec. ¶¶ 34-79. And, as demonstrated above, the CVRA case is inextricably intertwined with this case. Indeed, as undersigned counsel is typing this motion, no doubt WilmerHale lawyers are typing an opposition to certifying a class (due on May 12)—a class that would include Ms. Wild. And part of WilmerHale's opposition will, no doubt, explain why WilmerHale lawyers believe that the Court

should not certify a class regarding JP Morgan's obstruction of the very criminal investigation that was at the heart of the CVRA case.

Also based on previous discussions with WilmerHale, it appears that the firm may argue that undersigned counsel somehow "waived" confidentiality in revealing that information to WilmerHale attorneys. But such a conclusion would make no sense. Undersigned counsel reached out to ECPAT for support for Ms. Wild. After identifying WilmerHale as counsel, ECPAT placed Ms. Wild's counsel in direct contact with them—as part of a common legal strategy to assist Ms. Wild. And thereafter, Ms. Wild's counsel candidly discussed strengths—and weaknesses—of her position. Cassell Dec. ¶¶ 34-45.

As the annexed declaration makes clear, undersigned counsel would never have shared confidential strategic and tactical information about Ms. Wild's legal approach to the case without a confidentiality understanding. Cassell Dec. ¶¶ 47, 69.[6]  Indeed, based on undersigned counsel's experience in working on Supreme Court litigation, no lawyer would have exchanged confidential assessments about weaknesses in a client's argument without confidentiality protection. The existence of a common interest arrangement protecting confidentiality in such situations is generally understood to be part of the enterprise of working together. Otherwise, it would be impossible for attorneys working on such cases to candidly talk about their legal arguments. Cassell Dec. ¶¶ 47-48. And "it is a well-established component of the common interest doctrine that one party to a common enterprise cannot waive the privilege for another party." *Grupo*

---

[6] Undersigned counsel has also taken all necessary steps to preserve the confidentiality of the information. For example, the Court may recall that during the May 1, 2023, conference call, WilmerHale's counsel repeatedly pressed for disclosure of the confidential information. Because counsel for other parties (e.g., the U.S. Virginia Island and Mr. Staley) were on the call, counsel declined to disclose that confidential information in that forum.

*Petrotemex, S.A. de C.V. v. Polymetrix, AG*, 2020 WL 1227715, at *3 (D. Minn. Mar. 13, 2020), *aff'd sub nom. Alpek Polyester, S.A. de C.V. v. Polymetrix AG*, 2021 WL 5974163 (Fed. Cir. 2021).

In short, what the course of events makes clear is that the parties' communications were "related to the parties' common legal interest against their 'common enemy' …." *In re Leslie Controls, Inc.,* 437 B.R. 493, 502 (Bankr. D. Del. 2010). Ms. Wild and ECPAT (represented by WilmerHale) had a common enemy—Epstein and other traffickers in his organization—and a common goal—obtaining criminal prosecution under the TVPA.

In addition, the strategic information that WilmerHale learned is not of mere academic interest. As discussed at greater length in the annexed declaration, whether Ms. Wild will deploy one of the legal strategies developed with the assistance of WilmerHale remains under active consideration today. Cassell Dec. ¶ 95. WilmerHale's knowledge of that fact could be used against Ms. Wild in these proceedings. *Id.* at ¶¶ 96-98.

### III.   Because WilmerHale is Conflicted, Disqualification is the Appropriate Response.

For both reasons explained above, WilmerHale is in a conflicted position. First, having argued directly in favor of Epstein sex-trafficking victims including Courtney Wild, it is now arguing against them. Second, it possesses confidential information of Ms. Wild, an Epstein sex abuse victim. WilmerHale is not permitted to waive the confidentiality that previously existed. *See United States v. BDO Seidman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007) ("the privileged status of communications falling within the common interest doctrine cannot be waived without the consent of all of the parties"), cert. denied, 552 U.S. 1242 (2008). *See generally* Note, *Separating the Joint-Defense Doctrine from the Attorney-Client Privilege*, 68 TEX. L. REV. 1273, 1301-02 (1990) (the common interest privilege remains intact even when the parties "later become adversaries").

Allowing WilmerHale to proceed in this unusual situation would certainly cause victims to wonder about the opposing law firm having an unfair advantage. Other courts "have ruled that

an attorney may be disqualified if her client's interests require that she cross-examine (or oppose in a subsequent action) another member of a joint defense agreement about whom she has learned confidential information." *United States v. Stepney*, 246 F. Supp. 2d 1069, 1075 (N.D. Cal. 2003). In this closely-watched case—where dozens and dozens of Epstein sex-trafficking victims are seeking to become members of a class against JP Morgan—"any doubt should be resolved in favor of disqualification." *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 56 (S.D.N.Y. 2017).

Other courts have found conflicts in similar situations—and have disqualified the law firms involved. In *Roosevelt Irrigation District v. Salt River Project Agricultural and Power District*, 810 F. Supp. 2d 929 (D. Ariz. 2011), the defendants moved to disqualify plaintiff's counsel based on the participation of lawyers from plaintiff's counsel's firm in joint defense agreements ("JDAs") involving defendants in other cases. The court assessed whether (1) there was an actual exchange of relevant confidential information between the lawyers in the joint defense group; (2) the former representation related to the joint defense groups was "the same or substantially related" to the current litigation; and (3) the current client's interest were "materially adverse" to the interests of the party claiming to be protected by the JDA. The court found an implied attorney-client relationship between some lawyers and the other JDA members to the extent there was an actual transfer of relevant confidential information. Although plaintiff's firm screened the lawyers, the court imputed the lawyers' disqualifying conflicts to plaintiff's firm. Citing the legal "profession's institutional need to avoid even the appearance of a breach of confidence," *id.* at 986, the court disqualified the firms involved in the JDA.

Similarly, in *In re Gabapentin Patent Litigation,* 407 F. Supp. 2d 607 (D.N.J. 2005), two lawyers represented a defendant in a joint defense agreement (and exchanged confidential information) but left their firm and joined a firm that subsequently represented an adverse party in

the same litigation. The lawyers were screened from the case and the new firm obtained waivers regarding the adverse representation, but only from the defendant they had represented. The court disqualified the lawyers and their new firm because they did not obtain waivers from all the members of the joint defense agreement. *Id.* at 614-15.

In considering whether to disqualify WilmerHale, the Court can also consider other unusual aspects of this litigation. One pertinent fact is that WilmerHale's client—JP Morgan—has vast resources that can be used to cover any incremental burden. Moreover, throughout the last several months of this litigation, JP Morgan has employed two large firms to represent it: WilmerHale and Massey & Gail, LLP. Four attorneys from the Massey & Gail firm are currently counsel of record for JP Morgan. And according to that firm's website, its "decades of experience in the courtroom, plus our deep bench of seasoned attorneys, give us uncommon litigation firepower." *See* https://www.masseygail.com. Indeed, according to the website, the firm is "often asked to step in to try an already pending case after a client reexamines its trial team." *Id.* It is my understanding that Massey & Gail attorneys, since appearing in early February, have been copied on correspondence, attended each of the parties' conferences, led several Court hearings on behalf of JP Morgan, and are up-to-speed with case developments. As a result, there would be no real prejudice to JP Morgan or the cases' schedule to substitute it as JP Morgan's counsel.

For all the reasons outlined above, WilmerHale is conflicted as a firm. Generally, an "attorney's conflicts are presumptively imputed to her firm." *Victorinox AG v. The B & F Sys., Inc.*, 200 F. Supp. 3d 423, 426 (S.D.N.Y. 2016), *aff'd sub nom. Victorinox AG v. B&F Sys., Inc.*, 709 F. Appx 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017). And because WilmerHale lawyers were involved in the CVRA discussions, the firm itself is conflicted under the authorities cited above.

24

To be clear, undersigned counsel is not suggesting bad faith on the part of WilmerHale. Indeed, undersigned counsel emphasized that point in earlier communications. *See* Cassell Dec., ¶ 126. But to ensure that JPM Jane Doe and other victims are not unfairly disadvantaged, WilmerHale should be disqualified.

If for any reason, the Court should conclude that disqualification of the firm is not appropriate, the Court should also consider other options to prevent WilmerHale from using Ms. Wild's confidences against her and other Epstein victims. One possibility would be to screen the attorneys at issue (e.g., Ms. Ellsworth and others in possession of Ms. Wild's confidential information) from the other WilmerHale lawyers on the JP Morgan team. *See, e.g., Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 827 F. Supp. 2d 341, 346 (S.D.N.Y. 2011) (discussing "effective ethical screen" that "fences the disqualified attorney from the other attorneys in the firm"). There may be other methods as well. While disqualification of the entire firm is the most straightforward approach, the Court could also direct WilmerHale to propose other viable options.

<u>**CONCLUSION**</u>

For the reasons stated above, Mr. Edwards respectfully requests that the Court disqualify WilmerHale from representing JP Morgan in this case.

Dated: May 4, 2023

Respectfully Submitted,

/s/  Paul G. Cassell

Paul G. Cassell
*Pro Hac Vice*

S.J. Quinney College of Law at the
    University of Utah
383 S. University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
Email: pgcassell.law@gmail.com
(institutional address for identification
purposes, not to imply institutional
endorsement)

*Counsel for Bradley J. Edwards*

**CERTIFICATE OF SERVICE**

 A sealed, ex parte copy of the foregoing memorandum of law in support of disqualification (along with annexed declaration) has been provided to the Court via the Court's CM/ECF system. An unredacted copy of the memorandum and declaration has also been provided, via email, to Felicia J. Ellsworth at the WilmerHale law firm, at felicia.ellsworth@wilmerhale.com.

 Redacted copies of the foregoing have been provided to all parties in this matter, via the Court's CM/ECF filing system.

May 4, 2023

By:  */s/ Paul G. Cassell*
Paul G. Cassell
*Pro Hac Vice*
