**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | Case No. 1:22-CV-10019 (JSR) (consolidated for discovery purposes with 1:22-cv-10018-JSR and 1:22-cv-10904) |
|     Plaintiff, | |
|         v. | |
| Deutsche Bank Akteingesellschaft, et. al., | |
|     Defendants. | |
| Jane Doe 1, individually and on behalf of all others similarly situated, | |
|     Plaintiff, | |
|         v. | |
| JPMorgan Chase Bank, N.A., | |
|     Defendant. | |

<u>**DECLARATION OF PAUL CASSELL IN SUPPORT OF BRADLEY J. EDWARDS'**</u>
<u>**MOTION FOR DISQUALIFICATION OF WILMERHALE.**</u>

I, Paul Cassell, declare as follows:

    1.  I am a member in good standing of the bar of the State of Utah, licensed to practice before the courts of the state of Utah and numerous federal courts. I am currently the Ronald N. Boyce Presidential Professor of Criminal Law and Distinguished University Professor of Law at the S.J. Quinney College of Law at the University of Utah, although I am working on this litigation in my own individual capacity.

2.   I make this declaration in support of Bradley J. Edwards' motion to disqualify WilmerHale, filed contemporaneously. I have knowledge of the facts stated herein from my personal knowledge and, if called as a witness, I could and would competently testify thereto.

3.   The exhibits attached and referred to are true and correct copies.

**A. Relevant Background and Legal Experience**

4.   I have significant experience in complex litigation—and particularly in litigation involving crime victims' rights—which I have gained over more than thirty years of law practice.

5.   After graduating from Stanford Law School, I served as a law clerk to then-Judge Antonin Scalia of the D.C. Circuit (1984-85), Chief Justice Warren Burger of the U.S. Supreme Court (1985-86), Associate Deputy Attorney General for the U.S. Department of Justice (1986-88), and Assistant U.S. Attorney for the Eastern District of Virginia (1988-91).

6.   Since 1992, I have been a law professor at the S.J. Quinney College of Law at the University of Utah, teaching criminal procedure, evidence, crime victims' rights and related subjects. I have written many law review articles in these areas.

7.   Related to my teaching, I maintain an active pro bono law practice and have argued complex cases for crime victims in federal and state courts across the county. I have argued two cases before the United States Supreme Court. In 2000, I was appointed by Chief Justice Rehnquist to argue in defense of a federal statute that modified the *Miranda* warnings—*United States v. Dickerson*. In 2014, I argued for a child sex abuse victim in a case involving allocation of restitution—*Paroline v. United States and Amy.*  This was the first time that a crime victim had appeared before the U.S. Supreme Court to protect her own rights in a criminal case filed by a prosecutor.

8.   I have filed or participated in filing numerous amicus briefs before the U.S. Supreme Court, including many amicus briefs raising crime victims' rights issues.  *See, e.g.,* Br. of Coles Whalen as *Amicus Curiae in Support of Respondent*, No. 22-138 (U.S. 2023) (case argued Apr. 19, 2023) (amicus brief cited during arguments).

9.   Other crime victims' rights cases where I have filed amicus briefs in the U.S. Supreme Court include: Brief of Amici Curiae Child USA et al., *State of Montana v. Tipton*, No. 18-444 (U.S. Nov. 8, 2018); Brief for Lynn Denton et al., *Kahler v. Kansas*, No. 18-6135 (U.S. Aug 9, 2019); Brief of Arizona Voice for Crime Victims et al., *Bucklew v. Precythe*, No. 17-8151 (U.S. Aug. 22, 2018); Brief of Members of Congress in Support of Petitioner, *United States v. Briggs*, No. 19-108 (U.S. Jan. 13, 2020); Brief for Kansas Coalition against Sexual and Domestic Violent et al., *Kansas v. Boettger*, No. 18-6135 (U.S. Mar. 25, 2020).

10. I served as a United States District Court Judge for the District of Utah from 2002 to 2007. During my tenure as I judge, I handled many cases involving confidentiality issues. I was also appointed by the Chief Justice to serve as the Chair of the Criminal Law Committee. I resigned my judgeship in December 2007 to (among other reasons) return to law teaching at the S.J. Quinney College of Law at the University of Utah and to work on issues concerning crime victims' rights.

11. I have been a member of the American Law Institute since 2016 and a Fellow of the American Bar Foundation since 2016. In October 2020, I received the Ronald Wilson Reagan Public Policy Award – National Crime Victims' Service Award, from the U.S. Dept. of Justice, Office for Victims of Crime.

12.  I believe it is fair to say that I am widely regarded as one of the nation's leading experts on crime victims' rights. For example, during the victim impact hearing concerning the dismissal

3

of criminal charges against Jeffrey Epstein after his death, Judge Berman commented on my writings and described me as "a noted expert in victims' rights." U.S. v. Jeffrey Epstein, No. 19-cr-490 (RMB), Tr. at 7 (S.D.N.Y. Aug. 27, 2019). As another example, in its opinion the CVRA challenge to the Jeffrey Epstein non-prosecution agreement, the 11th Circuit described me as "one of the nation's foremost authorities on victims' rights issues." *In re Wild*, 955 F.3d 1196, 1207 n.9 (11th Cir. 2020).

13. I have also worked on complex civil litigation in federal and state courts, often representing victims of sexual assault.

14. In the course of my legal training—including representation of crime victims before the Supreme Court and other courts—I have become familiar with the principles of confidentiality associated with litigation, including in particular crime victim's rights amicus litigation before the U.S. Supreme Court.

**B. Lower Court Proceedings in the Crime Victims' Rights Act (CVRA) Case.**

15. Among other complex cases, from 2008 through 2022, and following, along with co-counsel Bradley J. Edwards, I represented Courtney Wild in a pro bono effort to obtain criminal prosecution of those responsible for the sexual abuse. The case was filed under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. *See Jane Doe #1 and Jane Doe #2*, No. 9:08-cv-80736 (S.D. Fla.). During the more than thirteen years that I was involved in the case, I argued multiple times in support of Epstein's victims, including several arguments before the district court, as well as the Eleventh Circuit and Eleventh Circuit en banc.

16. In this litigation involving JP Morgan, Ms. Wild's case has been commonly referred to as "the CVRA case."

4

17. The CVRA case challenged the non-prosecution agreement (NPA) entered into by the U.S. Department of Justice (through the U.S. Attorney's Office for the Southern District of Florida or USAO-SDFL) and Jeffrey Epstein. Ms. Wild argued that the NPA was concluded in violation of the CVRA, because the Justice Department had failed to confer with Epstein's victims, as required by the CVRA. *See* 18 U.S.C. § 3771(a)(5).  Among other provisions, the NPA provided immunity from criminal prosecution to any "potential coconspirators" of Epstein's. *Doe 1 et al. v. United States*, 359 F.Supp.3d 1201, 1208 (S.D. Fla. 2019). Expansively extending immunity to unnamed parties is, in my experience, unprecedented. Normal practice is for federal prosecutors to extend immunity only to named individuals and entities for identified crimes.

18.  A copy of the Epstein NPA is attached to this Declaration as Exhibit 1.

19.  The Epstein non-prosecution agreement clearly involved the Trafficking Victim Protection Act (TVPA), because it provided immunity from prosecution under the TVPA—e.g., from prosecution under 18 U.S.C. § 1591(a)(1) & (2). *See* Ex. 1 at 1-2

20. Because Ms. Wild's CVRA challenge sought to invalidate immunity provisions in the NPA Jeffrey Epstein moved to intervene in the case on all issues concerning the remedy for any violation of the CVRA. On February 13, 2014, Epstein's motion was granted and he was allowed to intervene with regard to any remedy issue concerning the non-prosecution agreement in the case. CVRA Dkt. 246.

21. Ultimately, after more than a decade of litigation, on February 21, 2019, the U.S. District Court for the Southern District of Florida (Marra, J.) handed down an opinion granting summary judgment in favor of Ms. Wild and another Epstein victim, concluding that their CVRA rights had been violated. The Court held that the Justice Department had violated the rights of Epstein's victims by concealing the NPA from them: "Particularly problematic was the Government's

5

decision to conceal the existence of the NPA and mislead the victims to believe that federal prosecution was still a possibility." *Id.* at 1219. The district court then directed briefing on the remedy for the Justice Department's violations of Ms. Wild's (and other Epstein victims') CVRA rights. *Id.*

22. Thereafter, Ms. Wild filed remedies briefing, requesting that the NPA be declared invalid. CVRA Dkt. 478. The Justice Department and Epstein responded. Ms. Wild replied. CVRA Dkt. 466.

23. Before the District Court could enter a ruling on the requested remedies, the case took an unexpected turn. On July 6, 2019, Jeffrey Epstein was arrested in New York City on multiple federal charges, including sex trafficking. After he was transferred to the Metropolitan Correctional Center in New York City, he was denied bail. On August 10, 2019, Epstein apparently committed suicide.

24. Against the backdrop of Epstein's death, on September 16, 2019, the District Court entered an order finding the case to be moot. The district court concluded that, in light of Epstein's death, no remedies were available to Ms. Wild and Epstein's other victims. CVRA Dkt. 478 at 4-15. The Court also noted that the victims could "take solace" in the fact "that this litigation had brought national attention to the Crime Victims' Rights Act and the importance of victims in the criminal justice system.… And rulings which were rendered during the course of this litigation likely played some role, however small it may have been, in the initiation of criminal charges against Mr. Epstein in the Southern District of New York and that office's continuing investigation of others who may have been complicit with him." Dkt. 478 at 14-15.

25. Thereafter, Ms. Wild sought review in the Eleventh Circuit of the District Court's mootness decision. *In re: Courtney Wild*, No. 19-13843 (11th Cir. 2019). Ms. Wild argued that her case was

not moot, because she was challenging the NPA's immunity provisions, which "were part of a secret and illegal agreement [that] continue, to this day, to block the victims' from conferring with prosecutors in Florida about federal prosecution" of those who enabled Epstein to sexually abuse dozens of minor girls. Mandamus Petn. at 20, *In re: Courtney Wild* (11th Cir. Sept. 30, 2019).

26. Ultimately, a panel of the Eleventh Circuit rejected Ms. Wild's argument. 955 F.3d 1196 (11th Cir. 2020). Ms. Wild then successfully sought rehearing en banc, supported by an amicus brief from the CVRA's Senate co-sponsors, Senators Dianne Feinstein and Jon Kyl.

27. On April 15, 2021, a split decision (7-4) by the Eleventh Circuit en banc denied Ms. Wild's mandamus petition seeking to overturn the district court's mootness ruling. The majority decision concluded that, as a matter of first impression, because federal criminal charges had never been filed against Epstein, Ms. Wild had no "stand-alone" civil remedy under the CVRA. 994 F.3d 1244 (11th Cir. en banc 2021). The four dissenters argued that the majority was misreading the CVRA in a way that would harm "all crime victims in this Circuit." *Id.* at 1288 (Branch, J., dissenting); *see also id.* at 1327 (Hull, J. dissenting) ("The Majority's ruling eviscerates the CVRA and makes the Epstein case a poster child for an entirely different justice system for crime victims of wealthy defendants.").

**C.  Supreme Court Proceedings in the Crime Victims' Rights Act Case.**

28. Thereafter, on August 31, 2021, Ms. Wild (represented by Brad Edwards, Jay Howell, and me) filed a petition for a writ of certiorari in the U.S. Supreme Court. No. 21-351. Her petition argued that the Eleventh Circuit's en banc decision left the Justice Department "free to negotiate secret, pre-indictment non-prosecution agreements without informing crime victims." *Id.* at i. Her petition sought review of the decision below, with the ultimate goal of obtaining "rescission of the

NPA's immunity provision" protecting Epstein and other culpable traffickers. *Id.* at 10. A copy of the petition is attached as Exhibit 2.

29.  I was counsel of record for Ms. Wild in the Supreme Court.

30.  I have experience in litigating cases in the U.S. Supreme Court. A litigant seeking certiorari is well advised to attempt to secure amicus support of the certiorari petition. Accordingly, shortly after I filed Ms. Wild's certiorari petition, I reached out to various organizations who might have an interest in supporting Ms. Wild.

31. I handled virtually all issues associated with the amicus briefing by myself, and other members of Ms. Wild's team (including Mr. Edwards) were not significantly involved.

32.  I was familiar with an organization known as ECPAT-USA ("ECPAT"). ECPAT is an acronym for "End Child Prostitution and Trafficking." It is generally regarded as "the leading anti-trafficking policy organization in the country." Timothy Marsh, *Compulsory Corporate Social Responsibility: New York Hoteliers as Mandated Reporters of Child Sex Trafficking*, 45 HOFSTRA L. REV. 979, 980 (2017).

33. Ms. Wild's case, of course, revolved around her efforts to hold traffickers accountable. I believed that ECPAT would want to join forces with Ms. Wild in trying to hold accountable those who had trafficked her.

34. ██████████████████████████████████████████████
██████████████████████████████

35. ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████

36. ███████████████████████████████████████████████
███████████████████████████████████████████

37. ███████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████

38. ███████████████████████████████████████████████
████████████████████████████

39. ███████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████

40. ███████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████

41. ██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████

42. 

43.

44.

45.

46.

47. From my perspective, at that time (and continuing thereafter) the WilmerHale lawyers and I were engaged in a joint and common effort to find the best path forward for Ms. Wild to have her certiorari petition granted and, ultimately, to hold the key players in Epstein's organization

accountable for their crimes. I would not have exchanged confidential assessments about the weaknesses in Ms. Wild's petition with the WilmerHale lawyers unless we were operating under confidentiality protection. Based on my experience in working on Supreme Court litigation, I do not believe any lawyer in my position would have exchanged confidential assessments about weaknesses in a client's argument without confidentiality protection.

48. In my experience in Supreme Court litigation, it is uncommon for attorneys working cooperatively to find supporting arguments from amici to enter into a formal, written common interest agreement. Indeed, I cannot immediately recall the existence of a formal written common interest agreement in the last decade when I have worked on crime victims' rights cases in the Supreme Court. Instead, the existence of a common interest arrangement protecting confidentiality in such situations is generally and obviously understood to be part of the enterprise of working together. Otherwise, it would be impossible for attorneys working on such cases to candidly talk about the strengths and weaknesses of their legal arguments.



52. ██████████████████████████████████████████████████

████████████████████████████████ The brief was signed by Felicia H. Ellsworth at

WilmerHale's Boston office. ████████████████████████████████████████

████████████ That was the first time, as I recall, that Ms. Ellsworth had been involved. My

substantive interactions were with Ms. Vreeland.

53. A copy of WilmerHale's brief for ECPAT, supporting Ms. Wild, is found at Exhibit 12.

54. Multiple amicus briefs were filed in support of Ms. Wild, including amicus briefs from

Child USA, Senators Feinstein and Kyl (the CVRA co-sponsors), Legal Momentum, and the

National Crime Victim Law Institute. Because there were multiple briefs—filed by multiple

lawyers—it was hard for me to keep track of precisely which lawyers were representing which

amici groups. I did not pay a great deal of attention to which law firms were associated with the

filings—including ECPAT's filing—because the identity of the law firms was not salient to the

legal work.

55. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

56. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

57. On October 7, 2021, I sent a detailed letter to the Solicitor General's Office about the improperly concealed emails. Exhibit 13. Thereafter, I had a conference call with the Solicitor General's Office and received a reply from the Office. In a December 6, 2021, email, the Office refused further discussions about the issue. Instead, the Office had referred the matter to the Justice Department's Office of Professional Responsibility (OPR).  In a response letter dated December 27, 2021, I asked the Office to immediately provide the improperly concealed information. Exhibit 14.  But based on the course of the discussions, it did not appear that my request would be agreed to.

58. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

59. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

60. ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

██████████████████

61. I understood at that time, as I had earlier, that the WilmerHale lawyers and I were engaged in a joint effort to find the best path forward for Ms. Wild to try and hold the key players in Epstein's trafficking organization accountable for their crimes.

62. On January 4, 2022, I send an email to the WilmerHale team, attaching the Justice Department's reply brief. I indicated that I wanted to discuss how to respond regarding ████████

█████████████████████████████████

63. On January 5, 2022, Ms. Vreeland and I confirmed a time for a conference call on January 6. *Id.* I also sent ███████████████████████████████████

████████████████████████████████████

███

64. On January 6, 2022, I held a conference call with the WilmerHale team. I have a recollection that Ms. Vreeland was on the call. Based on the follow up email from the call (discussed below), I believe that the participants in the call were Cynthia Vreeland, Felicia H. Ellsworth, and Denise Tsai. *See* Ex. 16 (email from Ms. Tsai to me, cc'ing only two WilmerHale lawyers, Ms. Vreeland and Ms. Ellsworth).

65. I do not have notes from the call. The only documents that I have connected directly to the call are the follow-up emails discussed below. The following paragraphs are my best recollection of what occurred.

66. ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

67. We discussed the best strategy for handling ████████████████████████ We
discussed strategic options █████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

68.  A legal strategy that I had been considering pursuing for Ms. Wild ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ I recall that the general sense was that, ████████████████████

████████████████████████████████████████████████ At the conclusion
of the call, we agreed to stay in touch.  WilmerHale also agreed to search its files ████████████████

████████████████████████████████████

69. It is my firm recollection that I would not have shared details about Ms. Wild's strategy
unless were operating under a common interest agreement. I shared confidential assessments of
the strengths and weaknesses of Ms. Wild's arguments. ██████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

70. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

71. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

72. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

73. Following the conference call, I turned my attention to drafting Ms. Wild's reply. A key

issue was presenting ████████████████████████████████████████████████

████████████████████████████████████████████

74. ████████████████████████████████████████████████

████████████████████████████



80. Four days later, on January 18, 2022, I filed my reply brief in support of Ms. Wild's certiorari petition. The reply brief cited the ECPAT amicus brief. Exhibit 20 at 12. ████████

████████████████████████████████████████████████████████████████████████████

████████████

> Moreover, the tranquil picture the Government paints is jarringly at odds with a lengthy footnote it drops on the brief's last page. The footnote reveals that, several days before filing its brief, the Solicitor General's Office referred to OPR allegations that the prosecutors handling this case concealed documents in earlier proceedings. The Government acknowledges that for months Ms. Wild's counsel has been asking for review of these allegations—well-founded allegations that during discovery in this case prosecutors hid hundreds of critical emails from both Ms. Wild's counsel and the district court. Given that the Government's overarching theme is its request that the Court—and crime victims—should trust it to do the right thing, this disturbing development confirms that such faith would be misplaced. This disturbing case needs further review by this Court.

Ex. 20 at 13.

81. Sadly (from Ms. Wild's and my perspective), on February 22, 2022, the Supreme Court denied certiorari—more than thirteen years after Ms. Wild had filed her original brief challenging the Epstein non-prosecution agreement. *Wild v. U.S. District Court for the Southern District of Florida*, No. 21-351 (U.S. Feb. 22, 2022).

**D. The Office of Professional Responsibility Decides Not Investigate.**

82. Through the remainder of 2022, OPR did not appear to make much progress on the issue of the concealed emails. Based on my review of emails, on January 14, 2022, I requested that Mr. Fletcher pass along the contact person at OPR conducting the review. Exhibit 21. On January 18, 2022, Mr. Fletcher indicated that the review was being conducted by Ms. Suzanne Drouet.

83. That same day, I sent email to Ms. Drouet indicating that time was of the essence in reviewing the issue, given that Ms. Wild's certiorari petition was then pending before the U.S.

Supreme Court. I asked that she confirm that the Justice Department had improperly withheld emails from Ms. Wild, so that I could present that information to the Supreme Court. Exhibit 22.

84. On January 19, 2022, Ms. Drouet responded, acknowledging my request that OPR promptly confirm that information was improperly withheld from Ms. Wild. Ms Drouet stated OPR was not, at that time, conducting an investigation into the allegation.  Instead, it was "reviewing your correspondence and allegations and determining whether further action is warranted." *Id.*

85. On January 21, 2022, I responded, asking what additional information OPR would find helpful in determining whether to conduct an investigation. *Id.*

86. On January 21, 2022, Ms. Drouet responded that I should feel free to pass along information at my convenience, and that OPR had noticed a gap in data between March and June 2008.  Exhibit 23.

87. On January 28, 2022, I sent a detailed letter to Ms. Drouet about the circumstances suggesting that urgent action was required for the Justice Department to promptly inform the U.S. Supreme Court that the record in the case was incomplete because "Justice Department prosecutors improperly concealed information in the in the District Court litigation." Exhibit 24, Exhibit 25.

88. Despite the request for urgent action, OPR did not respond. A few weeks later, on February 22, 2022, the Supreme Court denied certiorari.

89. On March 10, 2022, having heard nothing from OPR for approximately six weeks, I asked OPR whether it was making any progress in determining whether further action was needed in connection with the improper withholding of the emails. Exhibit 26. On March 11, 2022, Ms. Drouet responded that my complaint remained under review but that no updates were available. *Id.*

90. On June 30, 2022, I sent another inquiry to OPR, noting that an additional three months had elapsed with no update and wondering about current status. *Id.* On July 9, 2022, OPR responded that no updates were available. *Id.*

91. Three months later, I still had not received any response from OPR. So, on October 7, 2022, I sent further follow up, requesting an update. *Id.*

92. Ten weeks later, I still had not received any response from OPR. So on December 23, 2022, I sent further follow up, requesting an update. Exhibit 27.

93. On January 4, 2023, Ms. Drouet responded. This was first response from OPR in approximately six months. Ms. Drouet indicated that she expected to be able to communicate further information in the very near future. Ex. 27.

94. On January 10, 2023, OPR sent me a letter, stating that (in its view) "no further action is warranted in this matter." Exhibit 28 at 2. The letter stated that, even assuming emails were withheld, OPR could not conclude that a Department attorney acted intentionally or recklessly. The letter also stated that, even assuming emails were missing in the Department's production to Ms. Wild, OPR could not necessarily conclude that the emails were improperly withheld. Accordingly, OPR was taking no further action on the issue. *Id.*



95. ████████████████████████████████████████████████████████████████████

96. WilmerHale's knowledge of ████████████████████████ is something that can be used against Ms. Wild in this litigation. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ WilmerHale is also aware of Ms. Wild's attorney's candid

assessment of the strengths and weaknesses of that theory.

97. WilmerHale's knowledge of ████████████████ is also something that could bear

on the obstruction of justice issues in the JP Morgan case. The JPM Jane Doe case involves

obstruction of the TVPA's enforcement. *See* JPM Dkt. 75 at 34 (allowing JPM Jane Doe's claim

to move forward that "JP Morgan … knew of investigations into Jeffrey Epstein's sex-trafficking

operation and they intentionally failed to file suspicious activities report in order to frustrate such

investigation" (emphasis added)). The "investigation" that JP Morgan obstructed included the

FBI's investigation into Epstein's TVPA sex trafficking crimes against (among other victims) Ms.

Wild. As the Complaint alleges, "In taking the steps described above, JP Morgan obstructed,

attempted to obstruct, and interfered with the federal government's enforcement of the TVPA,

including the U.S. Attorney's Office for the Southern District of Florida's criminal investigation

of Epstein in and around 2006 to 2008 …." FAC ¶ 183. *See also* FAC ¶¶ 79, 80, 230, 231, 472

(referencing Florida investigation). And has been recognized in the CVRA case, "The FBI

ultimately determined that [Ms. Wild and another woman] … were victims of sexual abuse by

Epstein while they were minors. [Ms. Wild] provided information about her abuse … to the FBI

on August 7, 2007." Doe 1 v. United States, 359 F.Supp.3d at 1205.

98. An important issue concerning the obstruction claim in the JP Morgan case is ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Because WilmerHale understands Ms. Wild's ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ that knowledge could place Ms. Wild (and JPM

Jane Doe) at a disadvantage from the position they would otherwise be in.

**E.  The Jane Doe 1 Litigation Against JP Morgan.**

99. Meanwhile, on November 24, 2022, another Epstein sex abuse victim—Jane Doe 1—filed

a proposed class action lawsuit against JP Morgan Bank (hereinafter "JP Morgan"). Case No. 22-

cv-10019. (The case was quickly consolidated for discovery purposes with a similar lawsuit by

another Epstein sex abuse victim, Case No. 22-cv-10018.) The lawsuit argued that a class should

be certified consisting of:

> All women who were sexually trafficked by Jeffrey Epstein during the time when
> JP Morgan maintained bank accounts for Epstein and/or Epstein related-entities,
> which was in or about 2000 through in or about August 2013, both dates inclusive
> (the "Class Period").  Dkt. 1 at 53.[1]

100.       Ms. Wild is indisputably a member of the class identified above. The U.S.

Department of Justice has repeatedly identified Ms. Wild as a victim of Epstein sex abuse. Indeed,

in the CVRA proceedings discussed above, the Justice Department apologized for failing to confer

with her. As another example, during the bail hearing before Judge Berman after Epstein was

arrested, Ms. Wild testified in opposition to Epstein's release. Judge Berman later cited Ms. Wild's

testimony in denying bail for Epstein. Tr. at 11, *United States v.* Epstein, No. 19-CR-490 (RMB)

July 18, 2019). As another example, during the hearing before Judge Berman closing the Epstein

criminal case, Ms. Wild testified about being victimized by Epstein. Tr. at 34-35, *United States v.*

*Epstein*, No. 19-CR-490 (RMB) (Aug. 27, 2019).

---

[1] Unless otherwise indicated, all references to "Dkt." from this point forward in the declaration
   refer to the JP Morgan case.

101.     On December 5, 2022, an initial pre-trial conference was held in the *JP Morgan* case.  During the conference, Felicia H. Ellsworth of the law firm of Wilmer Hale, made an oral motion to appear pro hac vice on behalf of JP Morgan. That motion was granted. Other members of the Wilmer Hale firm have also entered appearances for JP Morgan.

102.     I attended the December 5, 2022, initial pre-trial conference, as an attorney representing Jane Doe 1 in the related *Deutsche Bank* case. While I observed Ms. Ellsworth in the courtroom, I did not recognize her as one of the attorneys whom I had worked with on the CVRA case. In my email and telephone interactions in that case, I had worked primarily with Ms. Vreeland, who was in Boston. In addition, I associated the WilmerHale law firm as being a District of Columbia law firm, since I had previously worked with Wilmer lawyers in the District of Columbia. At that time, I did not recall the fact that WilmerHale had been involved in the CVRA case. As a result, I also did not recall that I had discussed strategy with them.

**F.  The Subpoena from WilmerHale to Mr. Edwards**

103.     On March 5, 2023, Ms. Ellsworth sent a subpoena to Brad Edwards, asking him to appear for a deposition and to produce numerous documents. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

104.      The broad subpoena also appeared to seek information from Mr. Edwards about his communications with Wilmer Hale during the CVRA litigation described above. ██████████

████████████████████████████████████████

███████████████████████████████████

███████

105.     Mr. Edwards accepted service of the subpoena and asked me to represent him in connection with the subpoena. I agreed.

106.     On March 13, 2023, I attended the oral argument on the motions to dismiss in the *Jane Doe 1 v. Deutsche Bank* and *Jane Doe 1 v. JP Morgan* cases, in my capacity as legal counsel for Jane Doe 1 in the *Deutsche Bank* case. I again saw Ms. Ellsworth but did not make the connection to her role earlier in the CVRA case.

107.     On March 20, 2023, I sent to Ms. Ellsworth responses and objections by Mr. Edwards to the subpoena. The same day, Ms. Ellsworth thanked me for the responses and indicated that she would review and revert.

108.     One week later, on March 27, 2023, Ms. Brittany Warren at WilmerHale asked for my availability for a meet and confer to discuss the responses.

109.     The next day, March 28, 2023, I responded to Ms. Warren indicating that I would be available on Thursday, March 30, for a meet and confer. We agreed on a time.

110.     On March 30, 2023, along with Alex Law (representing JPM Jane Doe 1), I held a meet-and-confer with Ms. Ellsworth and Andy O'Laughlin of the WilmerHale team representing JP Morgan. Because this was the first time we had interacted in person on the *JP Morgan* case, I began the call by introducing myself and indicating that we had "probably seen each other across the courtroom"—referencing our two in-court appearances recently in front of Judge Rakoff.  I also mentioned that I had worked with Mr. Edwards for many years on the "CVRA case"—that is, Ms. Wild's challenge to Epstein non-prosecution agreement under the CVRA. In response to my introduction, Mr. O'Laughlin stated that Mr. Edwards' involvement in the CVRA case was one of

the reasons that WilmerHale wanted to get information from Mr. Edwards—i.e., that WilmerHale was "trying to get up to speed" on the CVRA case.

111.     During the call, we worked (amicably) through some of the issues connected with the broad subpoena to Mr. Edwards. For example, during the call, we discussed (in connection with request #2 in the subpoena[2]) whether Mr. Edwards had been deposed in "the CVRA case." I indicated that I did not immediately recall any such deposition, but that I would investigate and get back to WilmerHale. We also had discussions about whether there were other sources of information that would help WilmerHale get "up to speed" on issues surrounding Epstein's sex trafficking.

112.     During the call, I had no recollection that WilmerHale had worked on the CVRA case. Mr. O'Laughlin's statement that WilmerHale was "trying to get up to speed" on the CVRA gave me the impression that they were just then beginning to become aware of the facts of that case.

**G.  First Recognition of the Likely Conflict of Interest – March 31, 2023.**

113.     Following the call, on March 30, I began to think about how I could provide WilmerHale with information that would help it understand the CVRA case.  And on the next morning, Friday, March 31, 2023, I began to look at information that might be useful to WilmerHale. One of the documents that came to mind was the certiorari petition that I filed in the CVRA case. That petition was one of the last court filings connected with the CVRA case and contained (in the "statement of facts" section) a good overview of the CVRA litigation.

---

[2] Request #2 seeks: "A copy of all deposition, trial, hearing, or any other transcripts reflecting Your [Mr. Edwards'] testimony in any litigation in which You were a witness that related to Epstein, Epstein-Related Individuals, or Epstein-Related Entities."  In an email to WilmerHale on April 19, 2023, discussed below, I erroneously referred to Request #2 as Request #4.

114.     But then it occurred to me that not only had Ms. Wild filed her petition in the Supreme Court, but a number of other amici organizations had also filed supporting her. I looked at, first, a supporting amicus brief filed by Child USA, to see if it had a good summary of the case as well. Then I looked at, second, a supporting amicus brief filed by ECPAT (which I recalled was a leading anti-sex trafficking organization).  Ex. 12.

115.     It was at that time that I noticed that the law firm that had filed the ECPAT brief supporting Ms. Wild was WilmerHale's Boston office. And I also noticed that the "counsel of record" for the case was lead counsel for JP Morgan in this *JP Morgan* case—i.e., Felicia H. Ellsworth. In connection with the current litigation, I had not recalled WilmerHale's—and Ms. Ellsworth's—involvement until that moment. I remembered generally that Ms. Wild had been supported by ECPAT and several other amici organizations. But with regard to ECPAT, my contacts had been almost exclusively through Ms. Vreeland.  And because Ms. Vreeland was based (as I understood it) in Boston, I didn't have a clear association in my mind between her and Wilmer Cutler, which I have always regarded as a law firm based primarily in the District of Columbia.

116.     It quickly occurred to me that there might well be some direct factual overlap between the issues that WilmerHale, representing ECPAT, had presented to the U.S. Supreme Court and the issues in this case—i.e., the JP Morgan case. I had forgotten the details of WilmerHale's brief. But as I re-read the brief, I noticed various factual assertions that appeared to overlap directly with the factual assertions that JPM Jane Doe 1 is making on behalf of the class members in this case.  For example, the Wilmer brief contains the following statements (internal citations omitted):

- ECPAT-USA submits this brief to highlight the critical importance of Ms. Wild's petition to child victims of sex trafficking. The crimes committed against Ms. Wild were not only horrific but all too common. Many thousands of children across the United States are victimized by sex traffickers every day.

- In Florida, where Epstein sexually abused Ms. Wild and at least 36 other young victims, the state received reports of 896 human trafficking cases (including 640 sex trafficking cases) in 2019 alone.

- Ms. Wild and nearly two dozen other victims came forward, at great risk to themselves, to report an egregious string of abuses, for nothing.

- As anti-trafficking advocates have long cautioned—and leading jurists are now recognizing—a significant percentage of sex trafficking crimes are misunderstood, particularly at the pre-indictment stage, when prosecutors ignore victims or, worse, treat them as criminals. Victims of these crimes may be cast aside as law breakers, when in fact they are victims of traffickers who control them with violence and abuse, and their traffickers all-too-frequently are not punished for the heinous crimes they commit.  This is exactly what happened in the Epstein case, contributing to the many further tragedies that followed.

- A steep power imbalance exists in every child sex trafficking situation. This imbalance will only be exacerbated, at great risk to child victims, if the government remains free to keep victims in the dark about pre-indictment plea deals, as it did with Epstein's many victims.

- The power imbalance fueled by exploitation and abuse that is present in all trafficking situations was also readily apparent in Epstein's trafficking crimes. As various victim-survivors testified, Epstein manipulated them and caused them to fear his influence and power:

- Moreover, sex traffickers are often, like Epstein, repeat offenders.

- Michelle Licata, one of [Epstein's] victims, testified, "The case ended without me knowing what was going on, without him being held responsible, without any explanation and without a chance for my voice to be heard. I was treated like I did not matter."

- And for Chauntae Davies, "I couldn't fight back when Jeffrey Epstein sexually abused me because I hadn't yet found my voice. Well, I have found my voice now …. I needed him to hear the pain he's caused, what I've gone through because of him. … His death has robbed me of that justice. Please don't rob us of justice again."

- As Teala Davis, an Epstein victim, testified, "I'm still a victim because I am fearful for my daughters and everyone's daughters. I'm fearful for their future in this world, where there are predators in power, a world where people can avoid justice if their pockets run deep enough."

- Ms. Wild and others courageously reported the abuse they suffered at Epstein's hands when they were children; in return, the government not only kept them blind to the secret deal it struck with Epstein, but in the process, labeled them "prostitutes."

27

Ex. 12.

### H. Alerting WilmerHale to the Likely Conflict of Interest – April 4, 2023

117.        I moved rapidly to distill and present the conflict issue to WilmerHale. On Tuesday,

April 4, 2023, two workdays after I realized the potential for conflict of interest, I sent Ms.

Ellsworth (and Mr. O'Laughlin) a detailed email about the conflict. I noted that the statements

(like those above) from the ECPAT brief were in apparent conflict with JP Morgan's position in

this case. I also noted that I had discussed legal strategies about Ms. Wild's briefing in the Supreme

Court and further efforts after the petition. I also noted that Ms. Wild (and likely other Epstein

victims that WilmerHale had quoted in the ECPAC brief) were class members in the pending case

against JP Morgan. I noted that I had "set the matter out in some detail in an effort to start to try to

get agreement on the facts on this issue." I suggested further discussion on the issue, suggesting a

date of April 10. Exhibit 30. Six days later, on April 10, 2023, Ms. Ellsworth responded, indicating

that she did not believe there was any conflict. First, with regard to whether there were conflicting

"factual assertions" between the JP Morgan defense and the ECPAT brief, Ms. Ellsworth asserted

JP Morgan agreed that child sex trafficking was a horrendous crime. With regard to discussions

with Ms. Wild's legal counsel in preparing briefing to the Supreme Court, Ms. Ellsworth argued

that the legal issues were not "substantially related" to the JP Morgan case. Ms. Ellsworth also

noted that WilmerHale had represented ECPAT in the case rather than Ms. Wild. Exhibit 31.

### I.  Positions Being Asserted by WilmerHale for JP Morgan.

118.        Coincidentally, on the same day that Ms. Ellsworth asserted that there were no

conflicting factual assertions between the earlier CVRA case and JP Morgan's defense in this case,

JP Morgan filed its answer in this case. JP Morgan generally denied the allegations in Jane Doe

1's (first amended) complaint. JP Morgan Answer to Complaint, Dkt. 83

119.     Specifically with regard to the class allegations in Jane Doe 1's complaint, JP

Morgan denied "that a class can or should be certified." *Id.* at ¶ 276. With regard to the allegation

that there were dozens of women in the class of Epstein victims, JP Morgan denied the allegations.

*Id.* at ¶ 278. With regard to the allegations that Epstein and others used means of force, fraud,

coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims

and to cause victims to engage in commercial sex acts, JP Morgan denied the allegations. *Id.* at ¶

281.

120.     JP Morgan made many other similar denials about the fact of abuse of Epstein sex

assault victims (including putative class member Ms. Wild). For example, with regard to Count III

of the Complaint (negligent failure to exercise reasonable care to prevent physical harm), JP

Morgan denied that it set forces in motion that directly and proximately injured and caused

physical harm to Jane Doe 1 and the Class members. *Id.* at ¶ 313.

121.     As another example of denying harm to Epstein victims, with regard to Count IV

of the Complaint (negligent failure to exercise reasonable care as a banking institution providing

non-routine banking), JP Morgan denied that a result of its breach of legal duties "Jane Doe 1 and

the Class Members repeatedly suffered direct and foreseeable injuries" from Epstein and others,

"including injuries from federal and state sexual offenses (including sexual assaults) and resulting

emotional distress, mental pain and suffering, and other physical, psychological, and other

injuries." *Id.* at 339.

122.     As another example of denying harm to Epstein victims, with regard to Count V

(knowing beneficiary in a TVPA violation), JP Morgan denied that it facilitated Epstein's violation

of the TVPA, whereby Epstein would coerce, defraud, and force Jane Doe 1, as well as other

Members of the Class, to engage in commercial sex acts." *Id.* at 101.

123.    In addition to denying the allegations in the complaint, JP Morgan also raised various affirmative defenses, which it indicated "may be applicable to one or more of the putative class members whom [Jane Doe 1] may seek to represent." *Id.* at 62. These defenses included:

- that the damages suffered should be barred or reduced in accordance with the doctrines of comparative and contributory negligence or fault;

- that JP Morgan owed no duty to prevent physical harm by Epstein; and

- that the causes of action asserted and any damages claimed must be reduced in proportion to any wrongful conduct of persons of entities other than JP Morgan.

*Id.* at 62-67 (8th, 12th, and 24th defenses).

124.    Another defense that JP Morgan raised was the doctrine of *in pari delicto. Id.* at 62 (5th defense). This doctrine requires proof that a plaintiff "who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Black's Law Dictionary* 911 (10th ed. 2014).

125.    JP Morgan's answers to the complaint were signed by Felicia H. Ellsworth as lead counsel for JP Morgan.

**J. Unsuccessful Efforts to Resolve the Conflict of Interest Issue.**

126.    Returning now to the subject of communications between me and Ms. Ellsworth, after some scheduling emails, on April 19, 2023, I responded to Ms. Ellsworth's email of April 10. I noted my view that a conflict existed and that the prudent course would be to surface this issue with the Court to obtain clarity on the situation, one way or the other. I began by noting that I was not accusing WilmerHale of bad faith. But I continued to believe a conflict existed. Exhibit 32

127.    I further explained that, in my view, I had been operating through an informal common interest agreement or joint defense agreement in my representation of Ms. Wild. I also cited my preliminary legal research on the issue. *Id.*

128.    In concluding my email, I noted that WilmerHale might see things differently from me, but that it would be useful to figure out how to rapidly move forward. I proposed that we rapidly draft an agreed statement of facts about what had occurred, so that we could then present the issue to the Court. *Id.*

129.    On April 25, 2023, Ms. Ellsworth responded, arguing that no conflict existed because there was no joint defense or common interest agreement between Ms. Wild and ECPAT-USA. Ms. Ellsworth proposed surfacing the issue for the Court. After various scheduling emails, agreement was reached to present the issue to the Court on May 1, 2023. Exhibit 33.

130.    At a conference c all on May 1, the Court ordered briefing on the conflict issue.

131.    Exhibit 34 is a true and correct copy of relevant excerpts from the Deposition of Ms. Mehlman-Orozco in this case.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May, 2023.

By: _____

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
University of Utah
383 S. University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Fax: 801-585-6833
Email: pgcassell.law@gmail.com

## CERTIFICATE OF SERVICE

A sealed, ex parte copy of the foregoing has been provided to the Court via the Court's CM/ECF system. A copy of the same has also been provided, via email, to Felicia J. Ellsworth at the WilmerHale law firm.

Redacted copies of the foregoing have been provided to all parties in this matter, via the Court's CM/ECF system.

May 4, 2023

By: */s/ Paul G. Cassell*
Paul G. Cassell
*Pro Hac Vice*