# EXHIBIT 2

No. 21-_____

IN THE

# Supreme Court of the United States

———————

IN RE: COURTNEY WILD,

*Petitioner,*

———————

**On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Eleventh Circuit**

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

BRADLEY J. EDWARDS
EDWARDS POTTINGER LP
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
(800) 400-1098

JAY HOWELL
JAY HOWELL & ASSOCIATES
644 Cesery Blvd., Suite 250
Jacksonville, FL 32211
(904) 680-1234

PAUL G. CASSELL
  *Counsel of Record*
S.J. QUINNEY COLLEGE OF LAW
AT THE UNIVERSITY OF UTAH*
383 S. University St.
Salt Lake City, UT 84112
(801) 585-5202
cassellp@law.utah.edu

(*institutional address for identification
purposes, not to imply institutional endorse-
ment)

*Counsel for Petitioner Courtney Wild*

August 31, 2021

## QUESTION PRESENTED

In 2004, Congress enacted the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, a comprehensive bill of rights for federal crime victims with specific enforcement provisions. Among the rights that the CVRA confers on crime victims is the "reasonable right to confer with the attorney for the Government in the case." 18 U.S.C. § 3771(a)(5). In the case below, a child sex trafficker—Jeffrey Epstein—was able to negotiate a secret, pre-indictment non-prosecution agreement (NPA) with federal prosecutors. Even after the agreement was consummated, Government lawyers did not confer with Epstein's child sex abuse victims about it and misled them about the agreement's existence. App. 2. Over vigorous dissents, the Eleventh Circuit en banc held below that it could not examine the Government's "shameful" failure to confer with Epstein's victims because the CVRA "does not authorize a victim to seek judicial enforcement of her CVRA rights in a freestanding civil action." App. 3, 68. The en banc decision leaves the Government free to negotiate secret, pre-indictment non-prosecution agreements without informing crime victims. The question presented in this case is:

Whether the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771 (2004), a comprehensive bill of rights for federal crime victims with specific enforcement provisions, contains rights-creating language that allows crime victims to bring a suit to enforce their right to confer with prosecutors and other CVRA rights before the Government files a federal indictment.

## PARTIES TO THE PROCEEDINGS BELOW

This petition arises from a CVRA enforcement action filed by petitioner Court-ney Wild (previously identified as Jane Doe 1) and Jane Doe 2 in the U.S. District Court for the Southern District of Florida in 2008. The Government (specifically, the U.S. Attorney's Office for the Southern District of Florida) recognized Ms. Wild as a victim of federal child sexual assault crimes committed by Jeffrey Epstein. Ms. Wild argued that, in reaching a secret non-prosecution agreement with Epstein, the Gov-ernment violated her rights under the CVRA.  The District Court agreed that the Government had violated her CVRA rights but ultimately dismissed Ms. Wild's action as moot after Epstein's death by apparent suicide. Ms. Wild sought review of that dismissal in the U.S. Court of Appeals for the Eleventh Circuit by petitioning for a writ of mandamus, as specifically authorized by the CVRA. 18 U.S.C. § 3771(d)(3). The United States responded to her petition. An Eleventh Circuit panel, and later the full Court acting en banc, denied Ms. Wild's petition.

Ms. Wild now petitions this Court for a writ of certiorari. The real party in interest and respondent to her petition to this Court is the United States.

## RELATED PROCEEDINGS

The proceedings directly related to this petition are:

United States District Court for the Southern District of Florida:

*Jane Does Nos. 1 and 2 v. United States,* Case No. 9:08-cv-80736.

United States Court of Appeals for the Eleventh Circuit:

*Jane Does Nos. 1 and 2 v. United States, Roy Black et al. Intervenors-Appellants*, Case No. 13-12923, 749 F.3d 999 (11th Cir. 2014).

*In re: Courtney Wild*, Case No. 19-13843, 955 F.3d 1196 (11th Cir. 2020) (denying mandamus), 967 F.3d 1285 (11th Cir. 2020) (vacating opinion and granting rehearing en banc), 994 F.3d 1244 (11th Cir. en banc 2021) (denying mandamus).

## TABLE OF CONTENTS

QUESTION PRESENTED ............................................................................ i

PARTIES TO THE PROCEEDINGS BELOW ............................................ ii

RELATED PROCEEDINGS......................................................................iii

TABLE OF AUTHORITIES ...................................................................... vi

PETITION FOR A WRIT OF CERTIORARI ............................................ 1

INTRODUCTION ...................................................................................... 1

OPINIONS AND ORDERS ...................................................................... 4

JURISDICTION......................................................................................... 4

RELEVANT STATUTORY PROVISIONS .............................................. 4

STATEMENT OF THE CASE.................................................................... 4

      A.    The Crime Victims' Rights Act ............................................ 4

      B.    Proceedings Below.............................................................. 6

            1.    The Epstein Investigation and the "Infamous" Non-Prosecution Agreement ......................................... 6

            2.    The Government's Concealment of the Agreement from Epstein's Victims ................................................. 7

            3.    The District Court Proceedings...................................... 8

            4.    The Eleventh Circuit Panel Proceedings.................................. 11

            5.    The Eleventh Circuit En Banc Proceedings ............................... 12

REASONS FOR GRANTING THE PETITION......................................... 15

I.    THE ELEVENTH CIRCUIT'S EN BANC DECISION DECIDED AN IMPORTANT ISSUE REGARDING ENFORCEMENT OF THE CRIME VICTIMS' RIGHTS ACT THAT THIS COURT SHOULD SETTLE NOW......................................... 17

A.  This Court Should Settle the Issue of Whether the Crime Victims' Rights Act Permits the Government to Conceal Non-Prosecution Agreements from Victims ........................................................ 17

B.  This Court Likely Faces a Now-or-Never Opportunity to Review this Critical Issue for the CVRA's Enforcement .................................. 19

II.   THE ELEVENTH CIRCUIT'S EN BANC DECISION DEPARTS FROM THIS COURT'S DECISION IN *ALEXANDER V. SANDOVAL* BY FAILING TO GIVE EFFECT TO THE CVRA'S RIGHTS-CREATING AND REMEDIAL LANGUAGE ........... 23

A.  Congress Granted Crime Victims Specific Enforcement Remedies in the Crime Victims' Rights Act ............................................ 24

B.  The Policy Concerns Raised by the Majority Provide no Basis for Ignoring the CVRA's Plain Remedial Language .................................. 28

III.  REVIEW OF THE EN BANC DECISION BELOW IS ALSO WARRANTED TO HELP RETORE CONFIDENCE IN THE FAIRNESS OF THE FEDERAL CRIMINAL JUSTICE SYSTEM ................................................. 31

CONCLUSION ..................................................... 34

APPENDIX

En Banc Opinion in the United States Court of Appeals for the Eleventh Circuit (April 15, 2021) ............................................... App. 1

Opinion in the United States Court of Appeals for the Eleventh Circuit (April 14, 2020) ............................................. App. 186

Opinion and Order in the United States District Court for the Southern District of Florida (September 16, 2019) ................................ App. 307

Opinion and Order in the United States District Court for the Southern District of Florida (February 21, 2019) .................................. App. 322

Order in the United States District Court for the Southern District of Florida (September 26, 2011) .............................................. App. 355

U.S. Department of Justice Crime Victims' and Witnesses' Rights (June 7, 2007) ................................................... App. 369

18 U.S.C. § 3771 ................................................... App. 371

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ..........................................................................*passim*

*Barnes v. Gorman,*
    536 U.S. 181 (2002) ......................................................................... 28

*Eldred v. Ashcroft,*
    537 U.S. 186 (2003) ......................................................................... 28

*In re Dean,*
    527 F.3d 391 (5th Cir. 2008) ........................................... 3, 14, 20, 21, 26

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ......................................................................... 28

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980) ......................................................................... 18

*Skilling v. United States,*
    561 U.S. 358 (2010) ......................................................................... 33

*United States v. BP Prod. N. Am. Inc.,*
    2008 WL 501321 (S.D. Tex. 2008) .............................................. 20, 21

*United States v. McVeigh,*
    106 F.3d 325 (10th Cir. 1997) ............................................................ 5

## STATUTES

18 U.S.C. § 3771..................................................................................*passim*

18 U.S.C. § 3771(a) ......................................................................... 4, 24

18 U.S.C. § 3771(a)(4) .......................................................................... 26

18 U.S.C. § 3771(a)(5) ............................................................ 5, 21, 24, 29

18 U.S.C. § 3771(a)(8) ...................................................................... 5, 24

18 U.S.C. § 3771(c)(1) ................................................................... 3, 9, 26

18 U.S.C. § 3771(d) ........................................................................... 24, 25

18 U.S.C. § 3771(d)(1) ............................................................................ 2

18 U.S.C. § 3771(d)(3) ..................................................................*passim*

28 U.S.C. § 1254(1) .................................................................................. 4

28 U.S.C. § 1651(a) ................................................................................. 4

34 U.S.C. § 20141(b) ............................................................................. 30

34 U.S.C. § 20141(c)(3) ......................................................................... 30

## RULES

Sup. Ct. R. 10(c) ................................................................................... 15

## OTHER AUTHORITIES

3 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1769) ...................... 18

Paul G. Cassell et al., *Circumventing the Crime Victims' Rights Act: A Critical Analysis of the Eleventh Circuit's Decision Upholding Jeffrey Epstein's Secret Non-Prosecution Agreement*, 2021 MICH. ST. L. REV. 211 (2021)............... 27

Paul G. Cassell et al., *Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act Before Criminal Charges are Filed*, 104 J. CRIM. L. & CRIMINOLOGY 59 (2014) ....................................................... 27, 30

Paul G. Cassell & Margaret Garvin, *Protecting Crime Victims in State Constitutions: The Example of the New Marsy's Law for Florida*, 110 J. CRIM. L. & CRIMINOLOGY 99 (2020) ................................................................. 22

Paul G. Cassell, *Recognizing Victims in the Federal Rules of Criminal Procedure: Proposed Amendments in Light of the Crime Victims' Rights Act*, 2005 BYU L. REV. 835 .................................................................................. 5

JOHN C. COFFEE, JR., CORPORATE CRIME AND PUNISHMENT: THE CRISIS OF UNDERENFORCEMENT (2020).................................................................. 18

150 CONG. REC. S4261 (Apr. 22, 2004) (statement of Senator Feinstein) .............. 5, 6

150 CONG. REC. S4269 (Apr. 22, 2004) (statement of Sen. Kyl)............................ 6, 24

BRADLEY J. EDWARDS ET AL., RELENTLESS PURSUIT: MY FIGHT FOR THE VICTIMS OF JEFFREY EPSTEIN (2020).................................................................. 22

M. HALE, THE HISTORY OF THE COMMON LAW OF ENGLAND (6th ed. 1820) ............... 18

*Jeffrey Epstein's Wealth Allowed Him Many Perks While Serving Jail Time in Florida*, WASH. POST (July 19, 2019), https://www.washingtonpost.com/investigations/jeffrey-epsteins-wealth-allowed-him-many-perks-while-serving-jail-time-in-florida/2019/07/17/fab2c128-a8c5-11e9-a3a6-ab670962db05_story.html ....................................................................... 31

Marc Fisher et al., *The Pressure on a Prosecutor: How Epstein's Wealth and Power Steered Acosta Toward Lenient Deal*, WASH. POST (July 12, 2019)............ 34

Hon. Jon Kyl et al., *On the Wings of Their Angels: The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act*, 9 LEWIS & CLARK L. REV. 581 (2005) ..................................... 26

Letter from Asst. A.G. Ronald Weich to Sen. Jon Kyl (Nov. 3, 2011)........................ 30

Letter from Sen. Sasse to Attorney General Barr (Aug. 13, 2019), https://www.sasse.senate.gov/public/index.cfm/2019/8/sasse-to-doj-rip-up-epstein-deal-go-after-co-conspirators....................................................... 32

Letter from Senators Sasse, Blumenthal, Cruz, and Blackburn to Inspector General Horowitz (Dec. 2, 2019), https://www.sasse.senate.gov/public/_cache/files/cb719d31-2a1f-45ad-a701-3fc3c7b73417/12-02-19-dojigepstein.pdf...................................................................................... 32

Sun Sentinel Editorial Board, *Feds Still Stonewalling on Jeffrey Epstein Deal*, SOUTH FLA. SUN SENTINEL, Dec. 1, 2020 ......................................................... 32, 33

Statement on DOJ Office of Professional Responsibility Report on Jeffrey Epstein 2006-2008 Investigation (Nov. 12, 2020), https://www.justice.gov/opa/pr/statement-doj-office-professional-responsibility-report-jeffrey-ep-stein-2006-2008..................................................................... 32

Tung Yin, *Learning from the Jeffrey Epstein Mess: It's Time to Add a Cause of Action for Damages to the Crime Victims' Rights Act*, 69 KANS. L. REV. 447 (2021) ...................................................................................................... 31

## PETITION FOR A WRIT OF CERTIORARI

Courtney Wild respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Eleventh Circuit.

## INTRODUCTION

This petition presents an important question with sweeping implications for the proper enforcement of the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771 (2004). The CVRA promises crime victims in federal cases a right to confer with prosecutors. Yet in this case, one of the most infamous child sex traffickers in this country's history—Jeffrey Epstein, a man with wealth, power, and political influence—was able to negotiate a secret non-prosecution agreement (NPA) with federal prosecutors. The resulting tragedy was that the child victims who bravely came forward to report their sexual abuse were, as the en banc decision below acknowledged, "left in the dark—and, so it seems, affirmatively misled—by government lawyers" as to why Epstein was not being federally prosecuted for his horrific crimes. App. 2.

Beginning in July 2008, one of Epstein's victims—petitioner Courtney Wild—argued in the district court below that the Government had violated her CVRA right to confer by concealing the existence of the clandestine deal with Epstein. In February 2019, after more than a decade of litigation, the district court ruled that in orchestrating the secret deal, the Government had "misled" Ms. Wild and other Epstein victims and thus violated their CVRA right to confer. App. 348-49. But following extensive briefing—and the apparent suicide of Epstein—the district court concluded that it lacked jurisdiction to award any remedy to the victims. Ultimately, following review by a panel of the Eleventh Circuit and then by the Circuit en banc, Ms. Wild

was unable to overturn the district court's decision. The en banc majority noted its "sympathy for Ms. Wild—and the courage she has shown in pursuing this litigation." But, claiming to apply this Court's decision in *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), the majority concluded that the CVRA "does not authorize a victim to seek judicial enforcement of her CVRA rights in a freestanding civil action." App. 3.

The important legal issue of whether the CVRA allows the Government to conceal secret, pre-charging non-prosecution agreements from victims demands immediate review by this Court. Because such arrangements are, by definition, secret, other circuits may never be able to speak to the legality of such resolutions. Leaving the issue to percolate means that the Government will be free to dispense with victims' rights and orchestrate clandestine deals without affording victims any rights under the CVRA. This Court may well face a now-or-never opportunity to review the important question of whether the CVRA permits such secrecy.

In addition, the illegitimacy of the Justice Department's practice of secretly and deceptively arranging non-prosecution deals is far too serious for this Court to wait to see what other circuits might say. The decision below "gut[s] victims' rights under the CVRA." App. 98. Such a dubious interpretation runs counter to the statute's plain language, which Congress designed to create a comprehensive bill of rights for crime victims—with enforceable rights. The CVRA specifically provides that victims can assert their rights under the Act "in the district court in which a defendant is being prosecuted for the crime or, *if no prosecution is underway*, in the district court in the district in which the crime occurred." 18 U.S.C. § 3771(d)(1) (emphasis added).

2

And the CVRA covers "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, *investigation*, or prosecution of crime …." 18 U.S.C. § 3771(c)(1) (emphasis added). Under the statute's plain language, "[t]here are clearly rights under the CVRA that apply before any prosecution is underway. Logically, this includes the CVRA's establishment of victims' reasonable right to confer with the attorney for the Government." *In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008) (per curiam) (internal citation and quotation omitted). Unsurprisingly, then, Congress has enacted a statute that forbids the Government from concluding clandestine non-prosecution agreements and concealing them from crime victims.

Not only does the legal issue in this case demand immediate review, but the outcome does as well. As the author of the en banc opinion below sadly conceded, the Government's deceptive conduct was "[s]hameful all the way around" and "[t]he whole thing makes me sick." App. 68 (Newsom, J., concurring). Yet, while conceding the injustice of the result, the en banc Court below felt constrained to conclude that Ms. Wild could not pursue any legal remedy. This Court should review the en banc decision below, reverse for the reasons given by the dissenting judges, and interpret the Crime Victims' *Rights* Act as providing enforceable rights for victims.

## OPINIONS AND ORDERS BELOW

The Eleventh Circuit's en banc decision for which review is sought (App. 1-185) is reported at 994 F.3d 1244. The panel decision (App. 186-306) is reported at 955 F.3d 1196. The district court's order dismissing Ms. Wild's case (App. 307-21) is reported at 411 F.Supp.3d 1321. The district court's decision on the underlying issue of the CVRA's coverage (App. 355-68) is reported at 817 F.Supp.2d 1337.

## JURISDICTION

The decision of the Eleventh Circuit en banc was entered on April 15, 2021. On July 19, 2021, this Court reiterated its earlier orders that the time for filing a petition for certiorari for a case decided in April 2021 is 150 days from the date of the judgment. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1) and § 1651(a).

## RELEVANT STATUTORY PROVISIONS

This case centers on the Crime Victims' Rights Act, the relevant text of which is reproduced in the appendix to this petition. App. 371-74.

## STATEMENT OF THE CASE

### A.    The Crime Victims' Rights Act.

In 2004, Congress enacted the Crime Victims' *Rights* Act to provide a comprehensive bill of rights for crime victims in the federal criminal justice process. In its first sentence, the CVRA promises that "[a] crime victim *has* the following *rights* …." 18 U.S.C. § 3771(a) (emphases added). From there, the CVRA proceeds to list eight rights that victims possess under the law, including (as particularly relevant here)

4

the "reasonable right to confer with the attorney for the Government in the case" and the "right to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(5) & (8).

In enacting the CVRA, Congress was acutely aware that its previous victims' rights laws had failed to protect victims throughout the federal criminal justice process because the statutes had proven to be unenforceable. As the CVRA's congressional sponsors explained, Congress decided to enact new legislation because "victims were not being given the rights afforded to them by prior legislation." 150 CONG. REC. S4261 (Apr. 22, 2004) (statement of Senator Feinstein). In passing the CVRA, Congress specifically sought to overrule an earlier Tenth Circuit decision, which held that crime victims in the Oklahoma City bombing case had no "standing" to enforce their rights in court. *Id.* (discussing *United States v. McVeigh*, 106 F.3d 325, 334-36 (10th Cir. 1997)). *See generally* Paul G. Cassell, *Recognizing Victims in the Federal Rules of Criminal Procedure: Proposed Amendments in Light of the Crime Victims' Rights Act*, 2005 BYU L. REV. 835, 845-47, 852.

To ensure that victims could enforce their rights under the new law, the CVRA provides that a crime victim can bring a CVRA enforcement action "in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred." 18 U.S.C. § 3771(d)(3). In explaining the CVRA's enforcement provisions, the CVRA's sponsors stated that these provisions are "what makes this legislation so important, and different from earlier legislation: It provides mechanisms to enforce the set of rights

provided to victims of crime." 150 Cong. Rec. S4261 (Apr. 22, 2004) (statement of Sen. Feinstein). Thus, under the CVRA, "for the first time victims will have clear standing to ask our courts to enforce their rights." *Id.* Expanding from previous congressional legislation, the CVRA also went "one very important step further—linking rights to remedies …." *Id.* Congress was concerned that, if victims lacked the ability to enforce their rights "in the criminal trial and appellate courts of this country, any rights afforded are, at best, rhetoric. We are far past the point where lip service to victims' rights is acceptable. The enforcement provisions of this bill ensure that never again are victims' rights provided in word but not in reality." 150 Cong. Rec. S4269 (Apr. 22, 2004) (statement of Sen. Kyl).

### B.   Proceedings Below

#### 1.   The Epstein Investigation and the "Infamous" Non-Prosecution Agreement.

As the en banc decision below recognized, this case arises against the backdrop of underlying facts that "are beyond scandalous—they tell a tale of national disgrace." App. 3. The national disgrace began from 1999 through 2007, when well-heeled and well-connected financier Jeffrey Epstein ran a vast child sex trafficking ring, sexually abusing girls (including Ms. Wild) at his mansion in Palm Beach, Florida and elsewhere in the United States and overseas. App. 3. Following a lengthy criminal investigation, the FBI referred the case for prosecution to the U.S. Attorney's Office for the Southern District of Florida. App. 4. The Government's prosecutors then secretly discussed the case for months with Epstein's enormous legal defense team, which sought

6

to deflect the prosecutors from filing the well-supported, 53-page indictment they had already drafted. App. 4.

Because these discussions had clearly matured to the point where a precise disposition of specific federal criminal charges was involved, the prosecutors understood that the CVRA extended rights to Epstein's child sex abuse victims. As a result, the Government prosecutors mailed Ms. Wild and more than thirty other Epstein victims "standard CVRA victim notification letter[s]" advising them of their CVRA rights, including their right to petition the district court for relief if the victims believed that the Government was violating their rights. App. 324, 369-70.

Ultimately, the Government and Epstein covertly agreed to what would become "an infamous non-prosecution agreement." App. 4. Under this extraordinary NPA, Epstein would plead guilty in Florida court to two low-level state offenses. App. 4-5. In exchange, the NPA labeled Epstein's child victims "prostitutes" and granted all of Epstein's vast ring of "potential coconspirators" immunity from federal criminal prosecution in Florida. App. 5. The agreement also contained financial provisions that were "likely calculated to quickly and quietly resolve as many victim [civil] suits as possible." App. 5 n.1.

### 2.    The Government's Concealment of the Agreement from Epstein's Victims.

Once the NPA was signed in September 2007, Epstein's lawyers raised objections to the victims being informed about the agreement. But the career prosecutors in the U.S. Attorney's Office fully recognized that the CVRA required that the victims be told what was happening. App. 104 n.7. For reasons that have yet to be explained,

however, the Government never notified the victims about the agreement—or even that such an agreement was under consideration. App. 189. Indeed, the Government's efforts "graduated from passive nondisclosure to (or at least close to) active misrepresentation." App. 6. Rather than disclosing the NPA it had signed, the Government sent letters to Ms. Wild and other victims telling them the case was "currently under investigation" and requesting their "continued patience." App. 6.

On Friday, June 27, 2008, as Epstein was about to enter his state guilty pleas triggering the federal NPA, the Government understood that the CVRA required it to notify Epstein's victims about the upcoming court date. Accordingly, it provided the victims notice that Epstein would be pleading guilty to state charges on Monday, June 30. App. 339. But the Government did not disclose that Epstein's plea was linked to the federal investigation and thus would prevent the filing of any federal criminal charges against Epstein and his co-conspirators. App. 339-40. Accordingly, Ms. Wild (and other victims) did not attend the June 30 hearing. App. 340. On that day, Epstein pled guilty to the Florida state charges, formally triggering the previously signed NPA. App. 340.

### 3.   The District Court Proceedings.

Sensing that something nefarious was afoot, a week later, on July 7, 2008, Ms. Wild filed a petition with the district court, alleging violations of her rights under the CVRA. App. 106. Following various hearings, in August 2008, the district court ordered the Government to disclose the NPA to the victims. App. 107. Thereafter, the

Government provided the NPA to the victims for the first time, while refusing to stipulate to the relevant facts concerning how the NPA came into existence. App. 107.

After two years of litigation in related civil suits against Epstein, in June 2010, the victims obtained correspondence between the Government attorney's and Epstein's defense lawyers that revealed how they had worked together to deliberately conceal the NPA from the victims. At this point, "[c]ontradicting what it had stated expressly in multiple earlier letters to the victims," the Government reversed course about the CVRA's coverage and now claimed that the Act did not apply at all because federal prosecutors had never filed federal charges against Epstein. App. 106.

In September 2011, the district court rejected the Government's new and novel position. App. 359-64. The district court observed that the CVRA's plain language required victims' rights to be extended by the Justice Department and other "agencies of the United States engaged in the detection, *investigation,* or prosecution of crime," 18 U.S.C. § 3771(c)(1) (emphasis in opinion), language which "surely contemplates pre-charge application of the CVRA." App. 362. And the district court further noted that a victim can bring a CVRA enforcement action "in the district court in which a defendant is being prosecuted for the crime or, *if no prosecution is underway,* in the district court in the district in which the crime occurred." App. 362 (*citing* 18 U.S.C. § 3771(d)(3) (emphasis in opinion)). The district court reasoned that "[i]f the CVRA's rights may be enforced before a prosecution is underway, then, to avoid a strained reading of the statute, those rights must attach before a complaint or indictment formally charges the defendant with the crime." App. 362.

Proceeding under this district court ruling, over the next eight years, Ms. Wild attempted to prove that the Government had disregarded Epstein's victims' CVRA rights. After extensive litigation—and court-ordered production by the Government of all external communications regarding the NPA—on February 21, 2019, the district court agreed with the victims that the Government had violated their CVRA right to confer. App. 222-54. The district court explained that it was undisputed that the Government had entered into an NPA with Epstein without conferring with his victims or even informing them of the agreement. App. 347. The district court held that, at a bare minimum, the CVRA required "the Government to inform [the victims] that it intended to enter into an agreement not to prosecute Epstein." App. 348. The district court further found that the Government had "conceal[ed]" the NPA from the victims and "misled" the victims about the possibility of a federal prosecution. App. 348-49. The court concluded that "[w]hen the Government gives information to victims, it cannot be misleading." App. 349.

After ruling that the Government had violated the CVRA, the district court directed briefing on what remedies were appropriate. App. 9. Ms. Wild then submitted a brief listing nineteen proposed remedies, including rescission of the NPA's immunity provision protecting Epstein and his co-conspirators from federal prosecution in the Southern District of Florida. App. 9.

Meanwhile, on July 6, 2019, the FBI arrested Jeffrey Epstein on federal sex trafficking crimes committed in the Southern District of New York. App. 7.

On August 10, 2019, while in Government custody, Jeffrey Epstein apparently committed suicide. App. 7.

Shortly after Epstein's reported suicide in New York, on September 16, 2019, the Florida district court abruptly concluded that Ms. Wild's request for remedies in her case had become moot—even though she was seeking to invalidate the NPA's immunity provision protecting Epstein's co-conspirators from federal prosecution. App. 307-21. The district court acknowledged that the unfortunate consequence of its order was that "despite [the victims] having demonstrated the Government violated their rights under the CVRA, in the end they are not receiving much, if any, of the relief they sought. They may take solace, however, in the fact that this litigation has brought national attention to the Crime Victims' Rights Act and the importance of victims in the criminal justice system." App. 320-21.

### 4.    The Eleventh Circuit Panel Proceedings.

Two weeks later, on September 30, 2019, Ms. Wild sought to have the district court's mootness dismissal reviewed by the Eleventh Circuit—appellate review that the CVRA specifically authorizes. 18 U.S.C. § 3771(d)(3). Following oral argument, a divided panel of the Eleventh Circuit reluctantly held that crime victims have no CVRA rights at all until prosecutors formally file federal criminal charges. App. 186-306. The panel sadly acknowledged that "[i]t isn't lost on us that our decision leaves petitioner and others like her largely emptyhanded, and we sincerely regret that." App. 237. Indeed, the panel admitted that "[u]nder our reading, the CVRA will not prevent federal prosecutors from negotiating 'secret' plea and non-prosecution

agreements, without ever notifying or conferring with victims, provided that they do so before instituting criminal proceedings." App. 237. The panel conceded that its holding meant "[w]e can only hope that in light of the protections provided by other statutes—and even more so in the wake of the public outcry over federal prosecutors' handling of the Epstein case—*[prosecutors] will not do so*." App. 237-38 (emphasis in original).

The panel dissent strongly challenged the majority's reading of the CVRA, arguing that "our Court should enforce the plain and unambiguous text of the CVRA and hold that the victims had two CVRA rights—the right to confer with the government's attorney and the right to be treated fairly—that were repeatedly violated by the [Government]." App. 245. The dissent concluded that the "Majority's contorted statutory interpretation materially revises the statute's plain text and guts victims' rights under the CVRA." App. 247.

## 5. The Eleventh Circuit En Banc Proceedings.

Ms. Wild filed a timely petition for rehearing en banc. On August 7, 2020, the Eleventh Circuit granted rehearing en banc and vacated the panel's decision.

Following oral argument, on April 15, 2021, the Eleventh Circuit en banc denied Ms. Wild's petition by a vote of 7-4. App. 1-185. The en banc majority, however, changed the rationale for the denial. Writing for the en banc majority (as he had for the panel majority), Judge Newsom now concluded that "we needn't decide whether, in the abstract, the [CVRA] rights to confer and to be treated with fairness might attach prior to the formal commencement of criminal proceedings ...." App. 13.

Instead, relying on this Court's decision in *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), the majority explained that the key issue was whether a statute enacted by Congress "displays an intent to create not just a private right but also a private remedy." App. 20.

Turning to that issue of remedy, the majority first noted that Ms. Wild relied on provisions in the CVRA that created private remedies for victims to enforce their rights. The majority conceded that, for example, the CVRA specifically provides that victims can "assert[]" their CVRA rights "in the district court in which a defendant is being prosecuted for the crime or, *if no prosecution is underway*, in the district court in the district in which the crime occurred." App. 45 (quoting 18 U.S.C. § 3771(d)(3) (emphasis in original)). But while the district court (and other courts) had read this phrase straightforwardly as meaning that a victim could assert rights if "no prosecution is [yet] underway," the majority concluded that the language, "on its face, … would well mean that 'no prosecution is [*still*] underway." App. 46 (emphasis in original).

Second, the majority turned to the "coverage" provision in the CVRA, which extends the Act's obligations to "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, *investigation*, or prosecution of crime …." App. 47. The majority believed that this language was "a 'to whom' provision, not a 'when' provision." App. 48. In the majority's view, if the provision were a "when" provision, then the clause would have "been situated differently in the provision." App. 49.

Judge Newsom, the author of the en banc majority opinion, also wrote a separate concurring opinion to his own opinion. App. 68-69. He admitted that he was "filled" with a "sense of sorrow" in rejecting Ms. Wild's petition. App. 68. He agreed that the Government's concealment of the Epstein agreement was "[s]hameful all the way around. The whole thing makes me sick." App. 68 (cleaned up). But Judge Newsom felt compelled by this Court's precedents to read the CVRA to produce a result that made "my heart break for one of the parties before me." App. 69.

Chief Judge William Pryor and three other judges (Newsom, Lagoa, and Tjoflat, JJ.) wrote a separate concurrence, arguing that the dissents had failed to properly consider the context of the CVRA. App. 54-67.

Judge Tjoflat, joined by four other judges (William Pryor, Wilson, Newsom, and Lagoa, JJ.), also wrote a separate concurrence, expressing concern about the "untoward effects" that would follow from allowing victims to assert CVRA rights pre-charge. App. 70-96.

Judge Branch dissented, joined by three other judges (Martin, Jill Pryor, and Hull, JJ.). App. 97-155. Judge Branch explained that Ms. Wild's petition "presents important issues of first impression regarding the … CVRA … that affect all crime victims in this Circuit." App. 97. In Judge Branch's view, the majority improperly applied *Alexander v. Sandoval*, which held that the presence or absence of "rights-creating" language in a statute is "critical to the Court's analysis of whether Congress intended to provide a private right of action to a particular benefitted class." App. 99. Judge Branch concluded that the majority should have followed the Fifth Circuit,

which had held that the CVRA creates rights that can apply pre-charging. App. 118 (*citing In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008)).

Judge Hull also dissented, explaining that the majority's decision would have "far-reaching consequences in our Circuit." App. 182. The decision will "leave[] federal prosecutors free to engage in the secret plea deals and deception pre-charge that resulted in the travesty here." App. 182. The majority's ruling would thus create a "sort of two-tiered justice system—one in which wealthy defendants hire experienced counsel to negotiate plea deals in secret and with no victim input …." App. 182. Judge Hull concluded that the majority's ruling "eviscerates the CVRA and makes the Epstein case a poster child for an entirely different justice system for crime victims of wealthy defendants." App. 184-85.

## REASONS FOR GRANTING THE PETITION

The Court should grant this petition because the Eleventh Circuit en banc "decided an important question of federal law that has not been, but should be, settled by this Court …." S. Ct. R. 10(c). The importance of this case to crime victims—and to the public—cannot be overstated. If the Eleventh Circuit's interpretation of the CVRA is allowed to stand, the Government will have received the first appellate court permission to move forward with secret non-prosecution agreements. Twelve years of extensive litigation in this case leave no doubt that the Government intends to take full advantage of that permission.

Given that the underlying legal issue involves a practice that the Government intends to keep secret, this Court may well face a now-or-never opportunity consider the question presented. It was only due to unusual circumstances that Jeffrey Epstein's NPA was revealed to the victims—and the public. In future cases, there is no guarantee that the Government will disclose its clandestine NPAs, much less disclose them in a way that would permit the kind of district and appellate court challenges that occurred here. Accordingly, unlike many other areas of federal law, this petition presents an issue that this Court cannot simply leave to percolate in the circuits, confident that it will have future opportunities for review. To ensure that it can review the important issue of whether the CVRA permits secret NPAs, the Court must immediately grant this petition.

Congress clearly drafted the Crime Victims' *Rights* Act to block such covert Government maneuvers. By ignoring the "rights creating" language found in the CVRA, the Eleventh Circuit en banc misapplied *Alexander v. Sandoval*, 532 U.S. 275 (2001). The consequence was to "gut" the Crime Victims' Rights Act and create a two-tier system of justice, in which wealthy defendants can conspire with prosecutors to reach agreements that entirely exclude victim input and thwart transparency with the public. App. 181-83.

The en banc decision also warrants review because it validates a "national disgrace," bringing the federal criminal justice system into disrepute. The Government deceptively concealed a secret plea deal with "one of this era's most infamous child predators"—concealment that the en banc Court regretfully believed that it was

16

powerless to review. App. 68. Conceivably, the comprehensive victims' rights statute that Congress crafted might somehow allow such deceitful behavior by the Government. But such an important issue should be decided by this Court on plenary review.

I. **THE ELEVENTH CIRCUIT'S EN BANC DECISION DECIDED AN IMPORTANT ISSUE REGARDING ENFORCEMENT OF THE CRIME VICTIMS' RIGHTS ACT THAT THIS COURT SHOULD SETTLE NOW.**

The important legal issue of whether the nation's preeminent crime victims' rights statute permits the Government to secretly conclude pre-indictment non-prosecution agreements warrants immediate review by this Court. Simply put, the illegitimacy of the Justice Department's practice of covertly and deceptively arranging non-prosecution deals is far too serious for this Court to wait to see what other circuits might say. And, in any event, this Court now faces what may well be its only opportunity to review this critical issue because future secret non-prosecution agreements are unlikely to result in litigation that could reach this Court.

A. **This Court Should Settle the Issue of Whether the Crime Victims' Rights Act Permits the Government to Conceal Non-Prosecution Agreements from Victims.**

It appears to be undisputed that, if the Eleventh Circuit's en banc interpretation of the CVRA is allowed to stand, federal prosecutors will be free to secretly negotiate pre-charge non-prosecution agreements disposing of federal charges, all the while keeping victims in the dark. As Judge Hull explained in her dissent below, "The Majority's holding has far-reaching consequences …. The Majority's ruling—limiting judicial enforcement of CVRA violations to a formal post-charge period—leaves federal prosecutors free to engage in the secret plea deals and deception pre-charge that resulted in the travesty here." App. 182.

17

Whether such clandestine and even deceptive practices are consistent with the CVRA is an exceedingly important question of federal law that warrants this Court's immediate review. The mere existence of secret non-prosecution deals—such as the one orchestrated by Epstein's high-powered legal team—calls into doubt the fairness of the federal criminal justice system. The availability of secret NPAs "eviscerates the CVRA and makes the Epstein case a poster child for an entirely different justice system for crime victims of wealthy defendants." App. 185.

By definition, such secret arrangements cannot be scrutinized by the public— contrary to the presumption of openness that is a critical safeguard in our nation's criminal justice system. For example, this Court has recognized the historic importance of open criminal trials, explaining that they provide "assurance that the proceedings were conducted fairly to all concerned" and discourage "decisions based on secret bias or partiality." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 556 (1980) (Burger, C.J., plurality opinion) (*citing* M. HALE, THE HISTORY OF THE COMMON LAW OF ENGLAND 343-345 (6th ed. 1820); 3 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 372-73 (1769)). In modern times, most federal criminal prosecutions are not resolved by trial but rather by negotiation. And from what can be gleaned from the existing public information, "[o]ver the last fifteen years, there has been a dramatic increase in the use of pre-indictment 'alternative settlement vehicles' such as … non-prosecution agreements to resolve federal crimes." App. 183. *Cf.* JOHN C. COFFEE, JR., CORPORATE CRIME AND PUNISHMENT: THE CRISIS OF UNDERENFORCEMENT 138 (2020) (concluding that "in the [Justice Department's increasing] transition

from deferred prosecution agreements to nonprosecution agreements, we are seeing a loss of transparency"). This Court should review whether the Government can lawfully conclude such pre-indictment arrangements in secret without conferring with victims.

### B. This Court Likely Faces a Now-or-Never Opportunity to Review this Critical Issue for the CVRA's Enforcement.

If this Court asks the Government to respond to this petition, the Government can be expected to attempt to avoid further review of its "shameful" behavior (App. 7, 68) by making the shopworn argument that this Court should wait for the issue to more fully percolate in the circuits below. In other cases, such an argument might carry the day. But here, any such argument carries little weight. Because the question presented involves—quite literally—secret non-prosecution arrangements, other circuits will likely never have a chance to review the issue. This Court may well face a now-or-never opportunity to enforce the CVRA's rights for crime victims.

It was only through a unique combination of circumstances that the Government's covert plans came to light here through court-ordered disclosure of the Epstein NPA. That disclosure occurred only because Epstein's victims brought their lawsuit to enforce their CVRA rights—a lawsuit that the Eleventh Circuit en banc later held they should never have been allowed to even file. In future cases, it will be exceedingly difficult (if not impossible) for crime victims to challenge the legal issues surrounding "secret plea deals" in the lower courts—much less all the way to this Court. App. 182. And one can read the voluminous pleadings of the Government through twelve years

of contested litigation without seeing any promise (much less an enforceable one) that the Government will avoid such shameful behavior in the future.

In 2009, the Fifth Circuit had seemingly put an end to such covert practices by the Government. In *In re Dean*, 527 F.3d 391 (5th Cir. 2008) (per curiam), prosecutors and defense attorneys schemed together to keep a plea deal secret. *Id.* at 392-93. As in this case, career prosecutors recognized their CVRA obligation to confer with victims before a plea. *Id.* But rather than entirely ignore the CVRA, the *Dean* prosecutors filed an *ex parte* motion in the district court. The prosecutors contended that the number of victims of the crime meant "it would not be practicable" to confer with all of them and disclosing the plea agreement to the victims would "impair the plea negotiation process …." *Id.* at 392. The Government accordingly asked to be relieved of its acknowledged CVRA obligation to confer with victims pre-charging. *Id.* at 393. The district court granted the motion, allowed the government to file secret charges, and then accepted a secret plea agreement to those charges. *Id.* It was only at that point that the Government notified the victims of what it had done.

The victims challenged the secret deal before the district court. In a lengthy opinion citing dozens of authorities, the district court squarely held that CVRA rights apply before charges are filed. *United States v. BP Prod. N. Am. Inc.,* 2008 WL 501321 at *11 (S.D. Tex. 2008). However, the district court also concluded that, because there were specific findings justifying keeping this particular plea agreement secret, no basis existed for overturning the plea. *Id.* at *19-22.

The victims quickly sought review of the district court's ruling in the Fifth Circuit, which held in a published opinion that the secret deal violated the CVRA because the CVRA extends rights to victims before charging:

> The district court acknowledged that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway." *BP Prods.*, 2008 WL 501321 at *11. Logically, this includes the CVRA's establishment of the victims' "reasonable right to confer with the attorney for the Government." 18 U.S.C. § 3771(a)(5). At least in the posture of this case (and we do not speculate on the applicability to other situations), the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain.

*Id.* at 394. The Fifth Circuit then overturned the district court's ultimate decision to allow the filing of secret charges, explaining that *"[i]n passing the [CVRA], Congress made the policy decision—which we are bound to enforce—that the victims have a right to inform the plea negotiation process by conferring with prosecutors before a plea agreement is reached." Id.* at 395 (emphasis added).

It is clear that the facts of the Fifth Circuit's *Dean* case are "similar to the facts in this case." App. 118. However, the Eleventh Circuit en banc majority defensively asserted that its ruling did not create a circuit split because, in *Dean*, the victims could seek to "vindicate" their right to confer "during the course of an ongoing criminal prosecution." App. 13. But as Judge Branch explained in her dissent below, this is truly "a distinction without a difference" because the Fifth Circuit "addressed the issue of the victims' CVRA rights prior to the filing of the criminal information." App. 119 n.14. More important, the path to "vindication" that the Eleventh Circuit en banc relied upon will invariably be foreclosed in the setting of a *non-prosecution* agreement—where no subsequent proceedings will occur.

The divergence between the Eleventh Circuit's and Fifth Circuit's approaches warrants this Court's immediate review. Regardless of how clear the split is with the Fifth Circuit, the fact remains that the Eleventh Circuit's en banc decision has validated deceptive plea deals, giving the Government a blueprint for executing such secret arrangements in future cases in all other circuits. And because the non-prosecution agreements can be secret—and (obviously) will not lead to any subsequent prosecution—it is unlikely that this Court will ever be able to review whether the Government's practice complies with the CVRA.

On top of these seemingly insurmountable problems, it is also well known that most crime victims are unable to secure legal representation to assert their rights in criminal cases. *See* Paul G. Cassell & Margaret Garvin, *Protecting Crime Victims in State Constitutions: The Example of the New Marsy's Law for Florida*, 110 J. CRIM. L. & CRIMINOLOGY 99, 136 (2020). Here, it was only because undersigned counsel stepped in to represent Ms. Wild on a pro bono basis that this case has proceeded as far as it has. *See generally* BRADLEY J. EDWARDS ET AL., RELENTLESS PURSUIT: MY FIGHT FOR THE VICTIMS OF JEFFREY EPSTEIN (2020).

In sum, with respect to enforcing CVRA rights regarding pre-indictment non-prosecution agreements, this case appears to effectively present a now-or-never opportunity for this Court to determine whether the Government's covert practices comply with the statute.

II.   THE ELEVENTH CIRCUIT'S EN BANC DECISION DEPARTS FROM THIS COURT'S
      DECISION IN *ALEXANDER V. SANDOVAL* BY FAILING TO GIVE EFFECT TO THE
      CVRA'S RIGHTS-CREATING AND REMEDIAL LANGUAGE.

Even if other circuits could somehow be expected to reach and decide the va-
lidity of the Government's practice of secretly and deceptively reaching non-prosecu-
tion deals, the illegitimacy of the practice is far too serious for this Court to wait to
see what other circuits might say. At issue in this case is whether the Justice Depart-
ment will be left free to conceal from crime victims NPAs it reaches with the criminals
who have harmed those victims. Congress has clearly decided how this question is to
be answered. When Congress enacted the Crime Victims' *Rights* Act, it placed specific
rights-creating language into the Act, including language allowing a victim to enforce
her CVRA rights "*if no prosecution is underway*, in the district court in the district in
which the crime occurred." 18 U.S.C. § 3771(d)(3) (emphasis added). This is exactly
the sort of "rights-creating" language—and authorization to appear in court—that
this Court in *Alexander* said that Congress should use if it was creating enforceable
rights. 532 U.S. at 291.

This reading of the CVRA is so straightforward that it is hard to understand
how the en banc majority below reached a different conclusion. But the majority and
concurring judges tipped their hand by spending multiple pages explaining their
views that, as a matter of policy, crime victims should not be permitted to confer with
prosecutors about pre-charging dispositions of criminal cases. This policy issue is not
for the judiciary to determine; instead, it belongs to Congress. And, in any event, by
creating a "reasonable" right for victims to confer with prosecutors, Congress sensibly

23

established a modulated right that applies specifically in cases such as this one without unduly burdening law enforcement.

### A.   Congress Granted Crime Victims Specific Enforcement Remedies in the Crime Victims' Rights Act.

The issue of whether the CVRA permits victims to enforce their rights before charges are filed is ultimately a question of what Congress enacted. As this Court explained in *Alexander*, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." 532 U.S. at 286.

Here, the Crime Victims' *Rights* Act's plain language makes clear that Congress has used "rights-creating" language. *Id.* at 288. Indeed, the Act's first sentence begins by stating that "[a] crime victim *has* the following *rights* ...." 18 U.S.C. § 3771(a) (emphases added). Then, as relevant to this case, Congress promises crime victims "[t]he reasonable *right* to confer with the attorney for the Government in the case" and "[t]he *right* to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(5) & (8) (emphases added).

Not only did Congress confer specific rights on crime victims, but it crafted enforcement mechanisms for victims to enforce those rights. Indeed, Congress's stated purpose for enacting the CVRA was to "ensure that never again are victim's rights provided in word but not in reality." 150 CONG. REC. S4269 (Apr. 22, 2004) (statement of Sen. Kyl). This case merely requires an application of a cause of action that Congress expressly provided in its enactment. In § 3771(d), entitled "Enforcement and limitations," Congress directed that victims could enforce their rights in court:

24

**(d) Enforcement and limitations.—**

(1) Rights.—The crime victim . . . may assert the *rights* described in sub-section (a).

. . .

(3) Motion for relief and writ of mandamus.—The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime *or, if no prosecution is underway, in the district court in the district in which the crime occurred*. The district court shall take up and decide any motion asserting a victim's right forthwith.

18 U.S.C. § 3771(d) (emphases added). Thus, "[i]n the clear and unambiguous text of § 3771(d), Congress created a legal mechanism for crime victims to enforce their CVRA rights (i.e., [a] statutory remedy) whenever a violation of such rights might occur." App. 128.

Not only is this reading of the text "clear and unambiguous" but the majority's narrower reading produces at least three absurdities. The majority held that the phrase requires a victim to bring a CVRA enforcement action in an ongoing proceeding. The first absurdity is that this interpretation "effectively reads the phrase 'if no prosecution is underway' out of the statute," because when no prosecution is "underway," no such ongoing proceeding will exist. App. 137.

The second absurdity comes from the fact that, under the majority's reading, a victim might be required to file a motion for relief "in the district where the crime occurred in which there is no pending or closed court proceeding because the defendant was prosecuted in a different district. In other words, the motion for relief would initiate a freestanding cause of action—something the Majority insists the statute does not authorize." App. 138.

25

The third absurdity stems from the fact that, in other parts of the CVRA, Congress extended to victims rights that apply pre-charging. Some of the CVRA's rights apply in the context of on-going court proceedings—e.g., the right "to be reasonably heard at any public proceeding in the district court involving release, plea, [or] sentencing …." 18 U.S.C. § 3771(a)(4). But, as the Fifth Circuit has held, "[t]here are clearly rights under the CVRA that apply before any prosecution is underway. Logically, this includes the CVRA's establishment of the victims' 'reasonable right to confer with the attorney for the Government.'" *In re Dean*, 527 F.2d at 394 (cleaned up); *see also* Hon. Jon Kyl et al., *On the Wings of Their Angels: The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act*, 9 Lewis & Clark L. Rev. 581, 594 (2005) ("While most of the rights guaranteed by the CVRA apply in the context of legal proceedings following arrest and charging, other important rights are triggered by the harm inflicted by the crime itself…. [T]he CVRA sweeps … away [any doubts on this point] with its proviso that the rights established by the Act may be asserted 'if no prosecution is underway, in the district court in the district in which the crime occurred.'").

Congress also made clear that the CVRA can apply during a criminal investigation by expressly applying the Act to federal agencies involved in the "investigation" of crime. The CVRA instructs that the Justice Department and "other departments and agencies of the United States engaged in the *detection, investigation, or prosecution* of crime" must "make their best efforts to see that crime victims are … accorded[] the rights described in [the CVRA]." 18 U.S.C. § 3771(c)(1)

26

(emphases added). As the principal dissent explained below, there would "be no reason to mandate that federal agencies involved in crime 'detection' or 'investigation' ensure that crime victims are accorded their CVRA rights if those rights did not exist pre-charge. Rather, the use of disjunctive wording ... —the 'or'—indicates agencies that fit either description must comply ...." App. 116-17. *See generally* Paul G. Cassell et al., *Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act Before Criminal Charges are Filed*, 104 J. CRIM. L. & CRIMINOLOGY 59, 87 (2014); *see also* Paul G. Cassell et al., *Circumventing the Crime Victims' Rights Act: A Critical Analysis of the Eleventh Circuit's Decision Upholding Jeffrey Epstein's Secret Non-Prosecution Agreement*, 2021 MICH. ST. L. REV. 211, 228 (2021).

The majority below engaged in a "strategic bypass." App. 164. It chose not to reach the obvious conclusion that Congress created rights that apply pre-charging "rather than to hold Ms. Wild has CVRA rights that were violated but [has] no remedy as to the government misconduct." App. 164. But the net effect of the majority's truncated ruling is the conclusion that Congress, quite absurdly, crafted an Act that, on the one hand, promised victims rights that extend pre-charging while, on the other hand, failed to contain any enforcement mechanism reaching that far.

The decision below clearly misapplied this Court's holdings about how to interpret Congress's rights-creating language. This Court has instructed that "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, *see Alexander v. Sandoval,* 532 U.S. 275, 286–287 (2001), it cannot limit a cause of action that Congress has created."

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 128 (2014). Indeed, this Court has "recognized the traditional presumption in favor of *any appropriate relief* for violation of a federal right …." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (emphasis in original).

**B.    The Policy Concerns Raised by the Majority Provide no Basis for Ignoring the CVRA's Plain Remedial Language.**

The recurring theme to the decision below was that allowing an enforcement action pre-charging, while "not implausible" as a matter of text, produced policy results that the majority disagreed with. App. 36, 203. For example, as its lead illustration of what terrible occurrences might befall the country if Ms. Wild prevailed, the majority expressed its concern that the CVRA would be interpreted to mean that courts might be asked (as Ms. Wild did here) to "order prosecutors to confer" with victims. App. 36.

As a jurisprudential matter, the majority's approach contradicts this Court's repeated holdings that "[t]he wisdom of Congress' action . . . is not within our province to second guess." *Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003). Ultimately, what kinds of rights crime victims deserve in the federal criminal justice process is a policy decision left to the nation's elected representatives.

 But looking at the majority's parade of horribles, it is difficult to discern their horribleness. Ironically, the majority noted that the question before it was not "whether, as a matter of best practices, prosecutors should have consulted with Ms. Wild (and other victims) before negotiating and executing Epstein's NPA. By all accounts—including the government's own—they should have." App. 52. Given the

28

majority's "sincere regret" about its decision approving a secret deal that was "[s]hameful all the way around," it is hard to understand how the majority simultaneously concluded that Congress did not intend to reinforce "best practices" by covering cases such as this one. App. 68. As the majority read the statute, Congress drafted the Crime Victims' *Rights* Act—essentially a broad bill of rights for crime victims— to be easily circumvented by prosecutors through the simple expedient of "negotiating 'secret' plea and non-prosecution agreements before instituting criminal proceedings." App. 52. Surely a more natural reading of the Act is one that forbids such clandestine maneuvers.

The majority's sky-will-fall speculation is also belied by the Justice Department's ability to provide pre-charging rights to victims—including in this very case! The Justice Department had no difficulty in determining that, as of 2006, when its "attorney for the Government in the case" (18 U.S.C. § 3771(a)(5)) had drafted a specific federal indictment and was actively negotiating with Epstein's numerous defense attorneys about a possible disposition, the case had matured to the point where Epstein's victims possessed CVRA rights. Indeed, the Government's lead career prosecutor mailed more than thirty Epstein victims "*standard* CVRA victim notification letters," telling Ms. Wild and other victims that, "as a victim … of a federal offense you have a number of [CVRA] rights." App. 4, 329, 369 (emphasis added).

Perhaps the Justice Department did not have any difficulty in providing "standard" pre-charging notifications to crime victims in this case because it has long been required to do so. In a separate statute that pre-dated the CVRA's enactment,

Congress required all Justice Department agencies engaged in "the detection, investigation, or prosecution of crime" to "identify the victim or victims of a crime" at "the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation…." 34 U.S.C. § 20141(b). The statute also required Justice Department agencies to provide those identified victims with "the earliest possible notice of … the status of the investigation of the crime, to the extent it is appropriate to inform the victim and to the extent that it will not interfere with the investigation." 34 U.S.C. § 20141(c)(3). In light of these provisions, the Justice Department's investigative agencies "provide [service referrals, reasonable protection, and notice concerning the status of the investigation] to thousands of victims every year, whether or not the investigation results in a federal prosecution." Letter from Asst. A.G. Ronald Weich to Sen. Jon Kyl (Nov. 3, 2011), *cited in* Cassell et al., 104 J. CRIM. L. & CRIMINOLOGY at 96. Presumably, in crafting the CVRA in 2004, Congress understood that the Justice Department was already making these "standard" pre-charging notifications.

At least in circumstances where a case has matured to the point where an investigation has been completed, federal charges have been drafted, and prosecutors and defense attorney are engaging in negotiations about disposition of those charges, the CVRA requires that prosecutors must take the modest step of conferring with the victims as well. This important and recurring issue regarding how the CVRA operates pre-charging demands immediate review by this Court.

### III.   REVIEW OF THE EN BANC DECISION BELOW IS ALSO WARRANTED TO HELP RESTORE CONFIDENCE IN THE FAIRNESS OF THE FEDERAL CRIMINAL JUSTICE SYSTEM.

Even if the only relevant consideration were the effect of the Eleventh Circuit's errors on this particular case, this Court's review would still be warranted. As the majority below recognized, "[t]he facts underlying this case … are beyond scandalous—they tell a tale of national disgrace." App. 3. The nation's highest Court should review this "national disgrace" and bring some measure of justice by overturning the decision below.

This case involves "one of this era's most infamous child predators." App. 68. Any other criminal who ran such an extensive international child sex trafficking conspiracy would, no doubt, have received a lengthy federal prison term. But somehow, Epstein arranged a secret deal that allowed him to serve most of his time on "work release." *See Jeffrey Epstein's Wealth Allowed Him Many Perks While Serving Jail Time in Florida*, WASH. POST (July 19, 2019).[1] This "preposterous" non-prosecution agreement, Tung Yin, *Learning from the Jeffrey Epstein Mess: It's Time to Add a Cause of Action for Damages to the Crime Victims' Rights Act*, 69 KANS. L. REV. 447, 489 (2021), has left Epstein's victims—and the public—to wonder why Epstein was treated so favorably. As the dissent below explained, "[m]ysteries remain about how Epstein escaped federal prosecution and why, for nearly a year, the government made affirmative misrepresentations to the Florida victims of his serious sex crimes and to the victims' counsel." App. 184.

---

[1]   https://www.washingtonpost.com/investigations/jeffrey-epsteins-wealth-allowed-him-many-perks-while-serving-jail-time-in-florida/2019/07/17/fab2c128-a8c5-11e9-a3a6-ab670962db05_story.html.

31

These "mysteries" about the deal have led to fierce criticism from all quarters. For example, Senator Ben Sasse, then-Chairman of the Senate Judiciary Oversight Subcommittee, wrote to Attorney General William Barr that "[t]he idea that wealth and connections can buy injustice—the only plausible explanation for such pathetically soft terms for a serial child rapist at the heart of a massive international criminal enterprise—is wholly and completely inconsistent with the basic notions of fairness and equality that undergird the rule of law enshrined in our Constitution." Letter from Sen. Sasse to Attorney General Barr (Aug. 13, 2019).[2] The bottom line is that the shocking Epstein deal has "ignited a crisis of public trust in the Department and exacerbated the erosion of trust that the American people have in our institutions of republican self-government more broadly." Letter from Senators Sasse, Blumenthal, Cruz, and Blackburn to Inspector General Horowitz (Dec. 2, 2019).[3]

The Justice Department itself investigated the mysterious origins of the Epstein plea deal. But the resulting report by the Office of Professional Responsibility (OPR) has never been formally released to the victims or the public. Instead, the Department has officially released only a brief "executive summary." *See* Statement on DOJ Office of Professional Responsibility Report on Jeffrey Epstein 2006-2008 Investigation (Nov. 12, 2020).[4] That summary purports to blame the deal on "poor judgment," but fails to provide a full accounting of what happened. *See* Sun Sentinel

---

[2]   https://www.sasse.senate.gov/public/index.cfm/2019/8/sasse-to-doj-rip-up-epstein-deal-go-after-co-conspirators.

[3]   https://www.sasse.senate.gov/public/_cache/files/cb719d31-2a1f-45ad-a701-3fc3c7b73417/12-02-19-dojigepstein.pdf.

[4]   https://www.justice.gov/opa/pr/statement-doj-office-professional-responsibility-report-jeffrey-epstein-2006-2008.

Editorial Board, *Feds Still Stonewalling on Jeffrey Epstein Deal*, SOUTH FLA. SUN SENTINEL (Dec. 1, 2020) ("More than a decade later, and with Epstein dead, the Department of Justice still resists a full accounting.").

According to a copy of the report that the media has somehow obtained, the OPR report appears to contain evidence that, in the earlier proceedings in the district court below, the Justice Department affirmatively misrepresented that its prosecutors had disclosed all of the relevant external emails regarding the Epstein agreement. If the Court asks the Government to respond to this petition, we believe that the Government will be forced to confirm that, far from having produced all the external emails concerning the deal, in fact, an undisclosed gap existed in U.S. Attorney Alex Acosta's email inbox from May 26, 2007, through April 2, 2008—the exact time period when Mr. Acosta was most deeply involved in negotiating the Epstein non-prosecution agreement. *See* Motion to Supplement the Record with Previously Concealed Information, *In re: Courtney Wild*, No. 19-13843 (11th Cir. Nov. 16, 2020). The Government has yet to take any steps to correct its false representations to the district court—and to Ms. Wild.

It is not uncommon for this Court to grant review in highly publicized criminal cases because of the importance that such cases have in shaping the public's perception of how the system operates. *See, e.g., Skilling v. United States*, 561 U.S. 358, 377-99 (2010) (affirming lower court decision that substantial pre-trial publicity in the Enron case did not produce an unfair trial). This case may well be the most prominent criminal case in recent memory—and has created a public view that, so long as a

33

defendant is powerful enough, he can manipulate the federal criminal justice system. *See* Marc Fisher et al., *The Pressure on a Prosecutor: How Epstein's Wealth and Power Steered Acosta Toward Lenient Deal,* WASH. POST (July 12, 2019) ("Acosta's decision [] to sign [the NPA] . . . has led to repeated waves of public outrage in the years since."). If left to stand, the decision below will "make[] the Epstein case a poster child for an entirely different justice system for crime victims of wealthy defendants" and validate a "two-tiered justice system—one in which wealthy defendants hire experienced counsel to negotiate plea deals in secret and with no victim input." App. 183. This Court should grant Ms. Wild's petition and hold that victims can argue in court that Epstein's infamous non-prosecution deal cannot stand because it was covertly orchestrated in violation of the Crime Victims' Rights Act.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

BRADLEY J. EDWARDS
EDWARDS POTTINGER LP
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
(800) 400-1098

JAY HOWELL
JAY HOWELL & ASSOCIATES
644 Cesery Blvd., Suite 250
Jacksonville, FL 32211
(904) 680-1234

PAUL G. CASSELL
 *Counsel of Record*
S.J. QUINNEY COLLEGE OF LAW
AT THE UNIVERSITY OF UTAH\*
383 S. University St.
Salt Lake City, UT 84112
(801) 585-5202
cassellp@law.utah.edu

(\*institutional address for identification purposes, not to imply institutional endorsement)

*Counsel for Petitioner Courtney Wild*

34