# EXHIBIT 12

No. 21-351

IN THE

# Supreme Court of the United States

COURTNEY WILD,

*Petitioner,*

*v.*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA,

*Respondent.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**BRIEF FOR ECPAT-USA AS *AMICUS CURIAE*
IN SUPPORT OF PETITIONER**

RUSSELL SPIVAK
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007

FELICIA H. ELLSWORTH
  *Counsel of Record*
CYNTHIA D. VREELAND
DENISE TSAI
JAMES BOR-ZALE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
felicia.ellsworth@wilmerhale.com

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...........................................iii

INTEREST OF AMICUS CURIAE..............................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................................................3

ARGUMENT.....................................................................4

I.   THE ISSUE PRESENTED BY THE PETITION IS OF CRITICAL IMPORTANCE FOR CHILD VICTIMS OF SEX TRAFFICKING ..................................4

II.  THE COURT OF APPEALS' DECISION WILL FURTHER ERODE THE PROSECUTION OF SEX TRAFFICKING CRIMES ........................................7

     A.   The Court Of Appeals' Decision Will Discourage Child Victims From Reporting Sex Trafficking...................................8

     B.   The Court Of Appeals' Decision Undermines The Effective Prosecution Of Child Sex Trafficking Crimes .....................10

III. THE COURT OF APPEALS' DECISION THREATENS THE SAFETY AND DIGNITY OF CHILD VICTIMS OF SEX TRAFFICKING....................14

     A.   The Eleventh Circuit Decision Threatens The Safety Of Child Victims ..........14

     B.   The Court Of Appeals Decision Undermines The Dignity Of Child Victims.................................................................17

ii

## TABLE OF CONTENTS—Continued

Page

IV. THIS COURT'S GUIDANCE IS REQUIRED TO RESOLVE THE CIRCUIT SPLIT AND TO CONFIRM THAT THE CVRA APPLIES PRE-INDICTMENT ................................................................ 20

CONCLUSION ................................................................ 25

iii

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Apex Hosiery Co.* v. *Leader*, 310 U.S. 469 (1940) ........................................................... 22

*In re Acker*, 596 F.3d 370 (6th Cir. 2010) ...................... 22

*In re Dean*, 527 F.3d 391 (5th Cir. 2008) ................. 20, 22

*Russello* v. *United States*, 464 U.S. 16 (1983) .............. 22

*Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014) ........................................................... 20

### DOCKETED CASES

*United States* v. *Epstein*, No. 19-CR-490 (S.D.N.Y.) ................................... 15, 17, 18, 19

*In re Jane Does*, No. 08-CV-80736 (S.D. Fla.) ........ 11, 17

### STATUTORY PROVISIONS

18 U.S.C. § 3771 ....................................... 16, 18, 21

Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227 ............................ 22

### OTHER AUTHORITIES

150 Cong. Rec. S4262 (daily ed. Apr. 22, 2004) ..................................... 4, 10, 18, 19

Alvarez, Priscilla, *When Sex Trafficking Goes Unnoticed in America*, The Atlantic (Feb. 23, 2016), https://www.theatlantic.com/ politics/archive/2016/02/how-sex-trafficking -goes-unnoticed-in-america/470166/ .......................... 8

iv

**TABLE OF AUTHORITIES—Continued**

Page(s)

Busch-Armendariz, Noël, et al., Institute on
Domestic Violence & Sexual Assault,
*Human Trafficking by the Numbers: The
Initial Benchmark of Prevalence and
Economic Impact for Texas* (2016), https://
ic2.utexas.edu/pubs/human-trafficking-by-
the-numbers-the-initial-benchmark-of-preva
lence-and-economic-impact-for-texas/........................ 6

Camacho, Hon. Fernando, *Sexually Exploited
Youth: A View from the Bench*, 31 Touro L.
Rev. 369 (2015)............................................................ 12

*Child Sex Trafficking*, Children's Rights,
https://www.childrensrights.org/newsroom/
fact-sheets/child-sex-trafficking/    (visited
Oct. 4, 2021) ................................................................. 5

Dank, Meredith, et al., Urban Institute,
*Estimating the Size and Structure of the
Underground Commercial Sex Economy
in Eight Major US Cities* 22 (Mar. 12,
2014), https://www.urban.org/sites/default/
files/publication/22376/413047-estimating-
the-size-and-structure-of-the-underground-
commercialsex-economy-in-eight-major-us-
cities_0.pdf.................................................................... 25

DOJ, *Child Sex Trafficking*, https://www.
justice.gov/criminal-ceos/child-sex-traffick
ing (last modified May 28, 2020) ............................... 14

v

**TABLE OF AUTHORITIES—Continued**

Page(s)

DOJ, *National Strategy to Combat Human Trafficking* 4 (Jan. 2017), https://www.justice.gov/humantrafficking/page/file/922791/download ................................................................17

ECPAT-USA, *Statistics on Trafficking and Exploitation*, https://www.ecpatusa.org/statistics (visited Oct. 4, 2021) ..........................................5

Goldstein, Matthew, *Fund for Jeffrey Epstein's Victims Has Paid Out More Than $121 Million*, N.Y. Times (Aug. 9, 2021)..........................8

Joyner, Chris, *AJC Watchdog: Atlanta sex-trafficking tour reveals 'the hell of it'*, The Atlanta Journal-Constitution (Jan. 19, 2017) ........................................................................24

National Human Trafficking Hotline, *Florida*, https://humantraffickinghotline.org/state/florida (visited Oct. 4, 2021) ............................6

National Human Trafficking Hotline, *Hotline Statistics*, https://humantraffickinghotline.org/states (visited Oct. 4, 2021) .............................. 24

National Institute of Justice, *For Human Trafficking Survivors, Justice Is More About Healing And Preventing Future Trafficking* (Apr. 7, 2021), https://nij.ojp.gov/topics/articles/human-trafficking-survivors-justice-more-about-healing-and-preventing-future................................................................12

vi

**TABLE OF AUTHORITIES—Continued**

Page(s)

National Institute of Justice, *Gaps in Reporting Human Trafficking Incidents Result in Significant Undercounting* (Aug. 4, 2020), https://nij.ojp.gov/topics/articles/ gaps-reporting-human-trafficking-incidents- result-significant-undercounting ...............................8

National Institute of Justice, *Sex Trafficking: Identifying Cases and Victims*, https:// nij.ojp.gov/topics/articles/sex-trafficking- identifying-cases-and-victims (Mar. 8, 2009)..........12

Raphael, Jody, et al., *What We Know About Sex Trafficking, Prostitution, and Sexual Exploitation in the U.S.*, World Without Exploitation (Feb. 2017), https://awaken reno.org/wp-content/uploads/2018/09/What- We-Know-About-Sex-Trafficking-Prostitu tion-and-Sexual-Exploitation-in-the-U.S.- WWE-2017.pdf.............................................................14

Serita, Hon. Toko, *In Our Own Backyards: The Need For A Coordinated Judicial Response to Human Trafficking*, 36 N.Y.U. Rev. L. & Social Change 635 (2012)...........12

The Polaris Project, *2019 U.S. National human Trafficking Hotline Statistics*, https:// polarisproject.org/2019-us-national-human- trafficking-hotline-statistics/ (visited Oct. 4, 2021) ..........................................................................24

vii

**TABLE OF AUTHORITIES—Continued**

Page(s)

The Polaris Project, *Florida Spotlight: 2019 U.S. National human Trafficking Hotline Statistics*, https://polarisproject.org/wp-content/uploads/2020/11/2019-Florida-State-Report.pdf (visited Oct. 4, 2021)....................................24

The Polaris Project, *Myths, Facts, and Statistics*, https://polarisproject.org/myths-facts-and-statistics/ (visited Oct. 4, 2021) .................5

*The Prosecution of State-Level Human Trafficking Cases in the United States*, Anti-Trafficking Review, https://www.antitraffickingreview.org/index.php/atrjournal/article/view/169/172 (visited Oct. 4, 2021)...............12

The Schapiro Group, *Men Who Buy Sex with Adolescent Girls: A Scientific Research Study* (2010), https://multco-web7-psh-files-usw2.s3-us-west-2.amazonaws.com/s3fs-public/documents/the_schapiro_group_georgia_demand_study.pdf .......................................6

U.S. Department of State, *2020 Trafficking in Persons Report* (2020), https://www.state.gov/wp-content/uploads/2020/06/2020-TIP-Report-Complete-062420-FINAL.pdf ....................13

U.S. Department of State, *3Ps: Prosecution, Protection, and Prevention*, https://www.state.gov/3ps-prosecution-protection-and-prevention/ (visited Oct. 4, 2021) ..............................7

## INTEREST OF AMICUS CURIAE[1]

Amicus Curiae ECPAT-USA is a nonprofit organization that has spent the last three decades devoted to the mission of preventing the commercial sexual exploitation of children in the United States. ECPAT-USA is a member of ECPAT International, a network of organizations in over 104 countries, working together to eliminate the sexual exploitation of children.

ECPAT-USA focuses on four paths to prevention: advocating for legislation that prevents exploitation and protects children, private sector engagement, youth education, and community education. ECPAT-USA has extensive expertise in crafting legislation to protect child victims of sexually abusive and exploitative practices and to ensure that law enforcement and judicial processes adopt procedures that protect the human rights and dignity of child survivors. ECPAT-USA worked closely with federal legislators and policymakers to help secure the passage of legislation ensuring that Americans who travel abroad to buy sex with minors can be prosecuted domestically for sexually exploiting children in other countries. It also was at the forefront of legislation that defined children induced into perform commercial sexual acts as victims of sex trafficking, not perpetrators of prostitution. ECPAT-USA continues to work with policymakers, the

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, other than amicus curiae, its members, and its counsel, made a monetary contribution intended to fund the preparation or submission of this brief. Counsel of record for the parties received notice of amicus's intent to file this brief at least 10 days prior to its due date. All parties have consented to the filing of this brief.

2

private sector, and educators to stop the commercial sexual exploitation of children in all forms.

ECPAT-USA also works closely with members of its Survivors' Council, men and women whose lived experiences as abuse victims inform best practices for legislation and policies to prevent child sexual exploitation and trafficking. To provide a full and effective remedy for child victims of sexual exploitation and trafficking, the justice system must include procedures that reflect the lived experiences of survivors and that protect reporting of their experiences.

3

## INTRODUCTION AND SUMMARY OF ARGUMENT

ECPAT-USA submits this brief to highlight the critical importance of Ms. Wild's petition to child victims of sex trafficking. The crimes committed against Ms. Wild were not only horrific but all too common. Many thousands of children across the United States are victimized by sex traffickers every day.

The Eleventh Circuit's decision—leaving Jeffrey Epstein's victims with no mechanism to address his secret plea deal—will almost certainly have a significant chilling effect on the reporting of child sex trafficking. In the words of one survivor,[2] the opinion sends a clear message to victims that "they don't matter." The decision also undermines the effective prosecution of sex trafficking by endorsing a regime where prosecutors fail to even consider the voices of victims in assessing appropriate charges.

Equally troubling, the decision threatens the safety and dignity of young victims. Traffickers maintain control over their victims through violence and abuse. Allowing prosecutors to negotiate a non-prosecution agreement, and even to provide names of known victims to the trafficker, all with no notice to young victims, places those victims at great risk. It also undermines the fundamental protections that the Crime Victims' Rights Act (CVRA) was intended to restore, including the right to fairness and dignity. Further, in the words of another victim, "it makes you feel like the

---

[2] In preparation for submission of this amicus brief, ECPAT-USA interviewed members of its Survivors' Council on their reactions to Ms. Wild's case. ECPAT-USA has included comments from these interviews throughout this petition. To protect their safety and privacy, individuals are identified only by first or last name or by pseudonyms (indicated in quotes), if requested.

4

trafficker wins and will always win.  How can a victim become a survivor if there is no true/real justice system."

Finally, the Eleventh Circuit opinion not only creates a circuit split, but also significantly undermines the reach and protections of the CVRA within that Circuit, which houses two of the four states—Florida and Georgia—where child sex trafficking is most rampant in this country.

Amicus urges the Court to grant certiorari so that the CVRA's critical protections—including the rights to be protected, heard, and treated with fairness and dignity by the justice system—will extend to all child victims.

## ARGUMENT

### I.  THE ISSUE PRESENTED BY THE PETITION IS OF CRITICAL IMPORTANCE FOR CHILD VICTIMS OF SEX TRAFFICKING

Congress enacted the CVRA to ensure that crime victims would never again be "ignored, cast aside, and treated as non-participants in a critical event in their lives … kept in the dark by prosecutors to[o] busy to care enough, by judges focused on defendant[s'] rights, and by a court system that simply did not have a place for them."  150 Cong. Rec. S4262 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein).

Petitioner Courtney Wild's experience is a shocking and very public example of what happens when prosecutors ignore the CVRA's protections.  As the en banc decision below recognized, the crimes underlying this case "are beyond scandalous—they tell a tale of national disgrace."  Pet. App. 3.  Prosecutors nevertheless

5

negotiated a secret, "shameful" plea deal with Ms. Wild's "well-heeled and well-connected" trafficker Jeffrey Epstein, leaving Ms. Wild and Epstein's other young victims completely "in the dark." Pet. App. 2.

Ms. Wild's harrowing experience was not only horrific but far too common. ECPAT-USA and other anti-trafficking organizations estimate that, on any given day, more than 40 million people worldwide are victims of human trafficking, including 4.8 million in "forced sexual exploitation." *Statistics on Trafficking and Exploitation*, ECPAT-USA, https://www.ecpatusa.org/statistics (visited Oct. 4, 2021). More than one million of those in "forced sexual exploitation" are children. *Id.* The average age of these child victims is just *fifteen*— the same age as Ms. Wild when Epstein first sexually abused her. Pet. App. 100; *Child Sex Trafficking*, Children's Rights, https://www.childrensrights.org/newsroom/fact-sheets/child-sex-trafficking/ (visited Oct. 4, 2021).

The sex trafficking of children is a rampant problem not only across the globe but also in the United States. The clandestine nature of these crimes and the vast amount of under-reporting make it difficult to assess the full extent of the abuse.[3] Available state-specific studies, however, underscore the immensity of these crimes:

- In Florida, where Epstein sexually abused Ms. Wild and at least 36 other young victims, the state received reports of 896 human trafficking cases (in-

---

[3] As more fully discussed in Section II.A, sex trafficking is grossly underreported. *See* The Polaris Project, *Myths, Facts, and Statistics*, https://polarisproject.org/myths-facts-and-statistics/ (visited Oct. 4, 2021).

6

cluding 640 sex trafficking cases) in 2019 alone. 172 of these cases involved child victims. *Florida*, Nat'l Human Trafficking Hotline, https://humantraf fickinghotline.org/state/florida (visited Oct. 4, 2021). Florida consistently ranks third in the nation for reports of human trafficking, and there have been 4,636 cases reported since 2007 involving as many as 6,568 victims. *Id.* Moreover, these reported cases represent only a small fraction of the story; the vast majority of sex trafficking crimes are not reported.

- In Georgia, one study estimated that more than 12,400 men in Georgia pay for sex with an adolescent girl *each month*. The Schapiro Group, *Men Who Buy Sex with Adolescent Girls: A Scientific Research Study* 1, 9 (2010), https://multco-web7-psh-files-usw2.s3-us-west-2.amazonaws.com/s3fs-public/documents/the_schapiro_group_georgia_demand_study.pdf.

- In Texas, another study estimated that there were approximately 79,000 minor and youth victims of sex trafficking living in Texas, many of whom were repeatedly victimized. Busch-Armendariz et al., Inst. on Domestic Violence & Sexual Assault, *Human Trafficking by the Numbers: The Initial Benchmark of Prevalence and Economic Impact for Texas* 13, 58 (2016), https://repositories.lib.utexas.edu/handle/2152/44597.

The potential for further secret plea deals is an issue of critical importance not only to Epstein's young victims, but also to the many other thousands of child victims of sex trafficking across the country. ECPAT-USA's work with its Survivors' Council lays bare the

7

betrayal felt by these victims.  Survivors' Council member Shanifa stated that allowing non-prosecution deals—like the one arranged with Epstein—will "keep the stigma that the law does not care about us … if [prosecutors] are secretly cutting deals … how do you want us as survivors to stand up for ourselves?"  Another Survivors' Council member, Carmen, described the case as "a betrayal … instead of the [CVRA] or justice being used in service of the victim, it was used for the trafficker.  Victims should be the ones being supported by the law, and even so they weren't."

## II.  THE COURT OF APPEALS' DECISION WILL FURTHER ERODE THE PROSECUTION OF SEX TRAFFICKING CRIMES

As government officials around the world have uniformly recognized, strong prosecution is critical to eliminating human trafficking.  *See, e.g.*, U.S. Dep't of State, Office to Monitor and Combat Trafficking in Persons ("effective law enforcement action is an indispensable element of government efforts to fight human trafficking").  The Eleventh Circuit en banc decision threatens to further erode the successful prosecution of sex trafficking in at least two significant ways.  First, the decision will have a chilling effect on the reporting of trafficking crimes.  By refusing to recognize the scope of the promises imbued in the CVRA, sex trafficking victims will be even more reticent to come forward.  Second, even where there is reporting, the decision undermines the effective prosecution of these cases.  Ms. Wild's case provides a quintessential example of what happens when prosecutors erase trafficking victims from the investigation and prosecution process—

8

perhaps the most infamous sex trafficker in this country's history received a light plea and early release, resulting in a long string of further sexual crimes against many more young victims.[4]  The fact that this occurred in Ms. Wild's very public case will only exacerbate underreporting and anemic prosecutions.

## A.  The Court Of Appeals' Decision Will Discourage Child Victims From Reporting Sex Trafficking

The vast majority of human trafficking offenses are not reported.  For example, a National Institute of Justice study found that trafficking reports to law enforcement represented as little as 6% of potential victims and, at most, 18% of potential victims.  Nat'l Inst. of Just., *Gaps in Reporting Human Trafficking Incidents Result in Significant Undercounting* (Aug. 4, 2020),  https://nij.ojp.gov/topics/articles/gaps-reporting-human-trafficking-incidents-result-significant-undercou nting; Alvarez, *When Sex Trafficking Goes Unnoticed in America*, The Atlantic (Feb. 23, 2016), https://www.theatlantic.com/politics/archive/2016/02/ho w-sex-trafficking-goes-unnoticed-in-america/470166/ ("The problem with human trafficking is that of course the victims are silenced ... We don't have good data about it.").

If allowed to stand, the decision below will almost certainly discourage reporting.  Ms. Wild and nearly two dozen other victims came forward, at great risk to

---

[4] The Epstein Victims' Compensation Program ultimately paid approximately $121 million to more than 135 victims.  Goldstein, *Fund for Jeffrey Epstein's Victims Has Paid Out More Than $121 Million*, N.Y. Times (Aug. 9, 2021), https://www.nytimes.com/2021/08/09/business/jeffrey-epstein-victims-fund.html.

9

themselves, to report an egregious string of abuses, for nothing. The lesson of this case for other victims is clear. As expressed by Survivors' Council member Citlali:

> I watched the documentary about a week after it premiered on Netflix and when I got to the part where they were talking about the plea deal, I was disgusted and I was devastated for the survivors. It takes so much courage to tell someone what has happened to you, let alone decide to testify against your trafficker. I know for a fact that really did a number on them. You're basically telling those survivors that they don't matter.

Survivors' Council member Shanifa similarly commented that it gives credence to threats that traffickers use—"I know a lot of people in law enforcement, [so] don't come forward." She found it "heartbreaking[,] [y]ou come so far, and here comes the system pushing you back … . The whole point is for kids to come forward, but if [secret non-prosecution agreements are] how it's going to play out, a lot of people won't come forward, a lot of people won't feel comfortable." Survivors' Council member "Stacy" recounted the torture and murder of victims who tried to report their traffickers, including one who was shot and "is a vegetable now" because she spoke with police. For victims who endanger themselves by reporting, the Eleventh Circuit's distinction between pre- and post-indictment rights is meaningless: they need protection regardless of the stage of the process, and without it, they will be even more reluctant to come forward.

The Eleventh Circuit's decision is impossible to square with the CVRA's import and intention. Worse,

10

it would reinforce a lived reality that the CVRA was intended to abolish—a "world in which victim's rights [are] provided in word but not in reality."  150 Cong. Rec. S4269 (daily ed. Apr. 22, 2004) (statement of Sen. Kyl).  As Judge Hall's dissent recognized, the Eleventh Circuit's holding "tells Ms. Wild and Epstein's other victims" that their efforts were "for naught" and that they have "no remedy" for the government's "appalling" misconduct.  Pet. App. 184.  Given this message, the courageous reporting by child sex trafficking victims will be even more rare to come by.  Survivors' Council member Carmen, whose reporting led to the successful prosecution of an international trafficking ring, commented, "If we don't support survivors who are reporting, what will victims who haven't reported feel?  They'll think:  What support will I get?  If this survivor wasn't supported, they would support me even less."

### B.  The Court Of Appeals' Decision Undermines The Effective Prosecution Of Child Sex Trafficking Crimes

The decision below threatens not only to chill the number of child sex trafficking cases reported, but also to seriously undermine the effective prosecution of those cases that are reported, because it endorses a regime where prosecutors fail to even consider the voices of young victims in assessing appropriate charges.

As anti-trafficking advocates have long cautioned—and leading jurists are now recognizing—a significant percentage of sex trafficking crimes are misunderstood, particularly at the pre-indictment stage, when prosecutors ignore victims or, worse, treat them as criminals. Victims of these crimes may be cast aside as law breakers, when in fact they are victims of traffickers who

11

control them with violence and abuse, and their traffickers all-too-frequently are not punished for the heinous crimes they commit.

This is exactly what happened in the Epstein case, contributing to the many further tragedies that followed. Rather than listening to Epstein's young victims in assessing appropriate charges—affording them the right to be reasonably protected, to be reasonably heard, to confer with the attorneys for the Government, and to be treated with fairness and dignity—prosecutors instead forged ahead with a secret plea deal, dismissing these young victims as "prostitutes" in that agreement. Pet. App. 4; *see* Epstein Non-Prosecution Agreement 1, 3, *In re Jane Does*, No. 9:08-CV-80736 (S.D. Fla. Feb. 10, 2016), Dkts. 361, 361-62.

Judge Fernando Camacho of the Supreme Court of New York (and ECPAT-USA Board member) and Judge Toko Serita of the Criminal Court of the City of New York have been instrumental in the founding and expansion of the Queens Human Trafficking Court. Both have emphasized the critical importance of listening to the voices of young victims in assessing charges. As Judge Camacho explained:

> We are now beginning to recognize two fundamental truths: (1) many of the kids charged with prostitution in New York City are victims and not criminals; and (2) the justice system's treatment of these kids needs to change. Let's not punish them, let's get them help. ... I no longer avoid the gaze of sexually exploited youth. I now look them in the eye and what I see is not despair—I see kids, full of hopes and dreams, ready to soar if only given the chance.

12

Camacho, *Sexually Exploited Youth: A View from the Bench*, 31 Touro L. Rev. 369, 383 (2015).

As Judges Camacho and Serita have further emphasized, applying the correct lens to trafficking victims—listening to the facts underlying the crimes against them—not only increases the number of successful trafficking prosecutions but also guides victims to organizations that can provide the necessary services to escape the cycle of abuse and to thrive. *Id.*; *see also* Serita, *In Our Own Backyards: The Need For A Coordinated Judicial Response to Human Trafficking*, 36 N.Y.U. Rev. L. & Social Change 635, 652-659 (2012) (describing the positive impact of New York State's reform efforts); Ferrell et al., The Prosecution of State-Level Human Trafficking Cases in the United States, Anti-Trafficking Review, https://www.antitrafficking review.org/index.php/atrjournal/article/view/169/172 (referring to victim testimony as "critical to a prosecution."); Nat'l Inst. of Just., *For Human Trafficking Survivors, Justice Is More About Healing And Preventing Future Trafficking* (Apr. 7, 2021), https://nij.ojp.gov/topics/articles/human-trafficking-survivors-justice-more-about-healing-and-preventing-future ("Survivors' testimony is commonly essential to bringing traffickers to justice."). As expressed by Robert Moossy, former Director of the DOJ Civil Rights Division's Human Trafficking Prosecution Unit: "Sex trafficking victims provide the most complete and compelling evidence for a successful prosecution." Nat'l Inst. of Just., *Sex Trafficking: Identifying Cases and Victims*, https://nij.ojp.gov/topics/articles/sex-trafficking-identifying-cases-and-victims (Mar. 8, 2009).

Consistent with these insights, the State Department's 2020 Trafficking in Persons Report highlights

13

engagement with victims as critical to successful traf-
ficking prosecutions.  The report cites a study finding
that, with increased victim assistance and involvement,
the number of defendants charged increased by 76%
and the number convicted by 106%.  U.S. Dep't of
State, *2020 Trafficking in Persons Report* 515 (2020).

Amicus's own work confirms that the involvement
of victims in the investigation and prosecution of child
sex trafficking—sorely lacking in the Epstein case—
results in more successful prosecutions.  For Survivors'
Council member Faith Robles, the trust that law en-
forcement and prosecutors fostered was critical:
"[T]hey never pushed me, they never threatened, they
treated me with respect.  That made a big difference …
[T]hey wanted to take care of me and make me safe."
Prosecutors kept Faith apprised of her trafficker's
whereabouts and the status of the case, including pre-
indictment.  After her trafficker escaped to Mexico, and
then returned to the U.S. without prosecutors'
knowledge, Faith "decided to help them even when it
seemed like the case would be closed" by reporting his
return to prosecutors—all "[b]ecause I trusted the
prosecutors and the agents."  Faith ultimately testified
in court against her trafficker, and he—along with four
others in his crime ring—were convicted.

In short, removing from the CVRA's protections
the victims' right to reasonably confer with prosecutors
pre-indictment will almost certainly undermine effec-
tive prosecution of child sex trafficking crimes.  Had
prosecutors provided Ms. Wild the protections the
CVRA was designed to ensure—the protections the
U.S. Attorney's Office itself proclaimed she had in its
CVRA notification letter, Pet. App. 369—this would
have significantly increased the likelihood of a success-

14

ful prosecution on more serious charges and saved countless further victims.

### III. THE COURT OF APPEALS' DECISION THREATENS THE SAFETY AND DIGNITY OF CHILD VICTIMS OF SEX TRAFFICKING

The decision below, if allowed to stand, also will cause immeasurable further harm to child victims of sex trafficking, not only by endangering their safety but also by undermining their fundamental dignity.

### A. The Eleventh Circuit Decision Threatens The Safety Of Child Victims

A steep power imbalance exists in every child sex trafficking situation. This imbalance will only be exacerbated, at great risk to child victims, if the government remains free to keep victims in the dark about pre-indictment plea deals, as it did with Epstein's many victims.

As the Department of Justice has recognized, traffickers target vulnerable children, manipulate them into gaining their trust, and maintain control through physical, psychological, and emotional abuse. DOJ, *Child Sex Trafficking*, https://www.justice.gov/criminal-ceos/child-sex-trafficking (updated May 28, 2020). One survey of trafficking survivors across eleven major U.S. cities found that 92.2% reported being the victim of at least one of twelve forms of physical violence (including being threatened with a weapon, shot, strangled, burned, kicked, punched, beaten, stabbed, or raped), and many reported experiencing an average of over *six* forms of violence. Raphael et al., *What We Know About Sex Trafficking, Prostitution, and Sexual Exploitation in the U.S.*, World Without Exploitation

15

37 (Feb. 2017), https://awakenreno.org/wp-content/
uploads/2018/09/What-We-Know-About-Sex-Trafficking-
Prostitution-and-Sexual-Exploitation-in-the-U.S.-WWE-
2017.pdf. An Ohio survey of child sex trafficking vic-
tims found that 42% percent had been victims of vio-
lence so severe that they had been to the emergency
room at least once as a result; 49% percent had been
diagnosed with a mental health issue. *Id.* at 39.

The power imbalance fueled by exploitation and
abuse that is present in all trafficking situations was
also readily apparent in Epstein's trafficking crimes.
As various victim-survivors testified, Epstein manipu-
lated them and caused them to fear his influence and
power:

- "[H]e was really strategic in how he approached
  each of us…. A lot of us were in very vulnerable
  situations and in extreme poverty, circumstances
  where we didn't have anyone on our side, to speak
  on our behalf, and that's really scary. You start to
  blame yourself …." H'rg. Tr. at 38:7-22, *U.S.* v. *Ep-
  stein*, No. 19-CR-490 (S.D.N.Y. Aug. 27, 2019), Dkt.
  53 (statement of Jane Doe No. 2).

- "[H]e threatened me and let me know who was in
  charge. 'Do you know how important my time is?
  I'll bury you. I ow[n] this … f'ing town.'…. He was
  the master of the universe and the world bent to
  his will." H'rg Tr. at 81:6-18 (statement of victim-
  survivor raped by Epstein when she was 16 years
  old).

- "I remember feeling so small and powerless, espe-
  cially after he positioned me by laying me on his
  floor so that I was confronted by all the framed
  photographs on his dresser of him smiling with

16

wealthy celebrities and politicians….” H’rg Tr. at 75:15-18 (statement of victim-survivor sexually molested by Epstein when she was 15 years old).

Given these cycles of abuse and the risk of retaliation, victims who are able to come forward to report their traffickers to authorities do so courageously, and at great risk to their own safety. The CVRA explicitly recognizes the peril that victims face, and expressly includes “[t]he right to be reasonably protected from the accused.” 18 U.S.C. § 3771(a)(1).

The decision below, far from protecting children who have been victimized by sex traffickers as the CVRA requires, further endangers them. As the en banc court recognized, Ms. Wild and others like her were “left in the dark” by the government’s secret deal with Epstein. Pet. App. 2. The decision “leaves federal prosecutors free to engage in the secret plea deals and deception pre-charge that resulted in the travesty here.” Pet. App. 182 (Hull, J. dissenting).

That “travesty” is perpetuated when victims—who face significant risks of retaliation from their traffickers—are not kept apprised of pre-indictment proceedings, including the potential of a plea or non-prosecution agreement. It is critical to victim safety that they be informed of the status of all pre-trial proceedings, including potential plea or non-prosecution agreements for their trafficker. Indeed, in Ms. Wild’s case, the prosecutors not only failed to inform the victims of the plea deal, but also failed to inform them that, as part of the non-prosecution agreement, the government “provide[d] a list of known victims to Epstein,” Pet. App. 5 n.1. That the government would agree to provide the *names* of victims—without the victims’ knowledge or consent—is especially appalling.

17

Moreover, sex traffickers are often, like Epstein, repeat offenders. *See* DOJ, *National Strategy to Combat Human Trafficking* 4 (Jan. 2017), https://www.justice.gov/humantrafficking/page/file/922791/download ("Most defendants in the FBI's human trafficking cases have prior criminal records, and they are prone to recidivism"). The Eleventh Circuit's endorsement of the government's right to strike secret plea agreements that allow traffickers to return to the streets thus not only creates grave dangers for current victims, but also jeopardizes the safety of those who may become potential future victims.

### B. The Court Of Appeals Decision Undermines The Dignity Of Child Victims

The decision below also seriously undermines victims' fundamental dignity and silences their voices. The case's high profile and the enormity of the injustice suffered by Epstein's victims means the decision, if left unreviewed, will send a clear signal to all child victims of sex trafficking: that this "tale of national disgrace," Pet. App. 3, and their own experiences, are simply not worth further attention.

Ms. Wild and others courageously reported the abuse they suffered at Epstein's hands when they were children; in return, the government not only kept them blind to the secret deal it struck with Epstein, but in the process, labeled them "prostitutes." *See* Pet. 7; Pet. App. 5; Epstein Non-Prosecution Agreement 1, 3, *In re Jane Does*, No. 9:08-CV-80736 (S.D. Fla. Feb. 10, 2016), Dkts. 361, 361-62. Michelle Licata, one of his victims, testified, "The case ended without me knowing what was going on, without him being held responsible, without any explanation and without a chance for my voice to be heard. I was treated like I did not matter." Hr'g Tr.

18

47:24-48:2, *U.S.* v. *Epstein*, No. 19-CR-490 (S.D.N.Y. Aug. 27, 2019), Dkt. 53.  And for Chauntae Davies, "I couldn't fight back when Jeffrey Epstein sexually abused me because I hadn't yet found my voice.  Well, I have found my voice now ….  I needed him to hear the pain he's caused, what I've gone through because of him. … His death has robbed me of that justice. Please don't rob us of justice again." *Id.* at 45:18-46:2.

As these victims' voices underscore, the prosecutors' conduct and the Eleventh Circuit's ruling undermine one of the fundamental rights that the CVRA was meant to restore for victims:  the "right to be treated with fairness and with respect for the victim's dignity." 18 U.S.C. § 3771(a)(8).  The CVRA was enacted to address the all-too-common situation where "victims and their families [are] ignored, cast aside, and treated as non-participants in a critical event in their lives," and "kept in the dark by prosecutors to[o] busy to care enough, by judges focuses on defendant's rights, and by a court system that simply did not have a place for them."  150 Cong. Rec. S4262 (daily ed. Apr. 22, 2004 2004) (statement of Sen. Feinstein).  The victim's right to fairness and dignity was "not intended to just be aspirational," but was "intended to direct Government agencies and employees … to treat victims of crime with the respect they deserve."  *Id.* at S4269 (statement of Sen. Kyl).  As Senator Kyl further recognized, "[h]uman dignity" is "such an important part of the foundation of our country" that the concept must be recognized "especially for those who have been victimized in our society because we could not as a government provide adequate protection for them."  *Id.* at S4262.

Rather than respecting the dignity of Ms. Wild and Epstein's other child victims, the government failed

19

them.  This grave injustice has resulted in the very sit-
uation that the CVRA was meant to protect against,
where "the experience of the criminal justice system
le[aves] crime victims and their families victimized yet
again."  150 Cong. Rec. at S4262 (statement of Sen.
Feinstein).

Not only does the Eleventh Circuit's decision un-
dermine victims' dignity, but it erodes victims' faith in
the criminal justice system.  As the dissenters empha-
size, the en banc decision creates a "two-tiered justice
system—one in which wealthy defendants hire experi-
enced counsel to negotiate plea deals in secret and with
no victim input."  Pet. App. 181-183 (Hull, J. dissent-
ing).  To child sex trafficking victims, the message is
clear:  even after the trafficker is reported to authori-
ties, he maintains power that the victim can never hope
to have—particularly if he is wealthy.  As Teala Davis,
an Epstein victim, testified, "I'm still a victim because I
am fearful for my daughters and everyone's daughters.
I'm fearful for their future in this world, where there
are predators in power, a world where people can avoid
justice if their pockets run deep enough."  H'rg Tr.
74:15-19, *U.S.* v. *Epstein*, No. 19-CR-490 (S.D.N.Y.
Aug. 27, 2019), Dkt. 53.  Similarly, Survivors' Council
member La-Fon explains, "This secret plea deal that
Jeffery Epstein made does so much harm to other teen-
agers who are trafficked because it makes you feel like
the trafficker wins and will *always* win.  How can a vic-
tim become a survivor if there is no true/real justice
system to begin with. … This just confirms that, if you
have no money, you don't stand a chance in justice be-
ing served."  For Autumn Burris, Survivors' Council
member and founder of Survivors for Solutions, when
the "agencies, law enforcement and the courts that are
charged with holding male perpetrators accountable,

20

regardless of power, wealth or social status" fail to protect victims' rights, it makes those systems "complicit in sex trafficking."

In short, by removing child victims from the justice process, the Eleventh Circuit decision perpetuates their victimization and strips them of their dignity: first by their trafficker, then by the justice system.

### IV. This Court's Guidance Is Required To Resolve The Circuit Split And To Confirm That The CVRA Applies Pre-Indictment

"[D]ivision is a traditional ground for certiorari." *Wheaton Coll.* v. *Burwell*, 134 S. Ct. 2806, 2807 (2014). The Eleventh Circuit's en banc opinion created just that: an unambiguous and intractable split in the circuit courts, as the Fifth Circuit came to the exact opposite outcome in *In re Dean*, 527 F.3d 391 (5th Cir. 2008). This split alone warrants granting certiorari.

As the Petition notes, the Fifth Circuit's decision in *Dean* firmly established that crime victims have rights and the power to enforce those rights prior to the filing of charges. Pet. 21 (quoting Pet. App. 118). The *Dean* case arose from an oil refinery explosion that killed 15 people and injured another 170. *See* 527 F.3d at 392. Before the government charged the company that owned the refinery, the DOJ filed an *ex parte* motion asking the court how to comply with its notice obligations under the CVRA given the number of victims. *Id.* at 392-393. The district judge barred the government from notifying the victims of any impending plea agreement because publication would "prejudice [the company] and could impair the plea negotiation process and may prejudice the case in the event that no plea is reached." *Id.* at 393 (internal citations omitted). After

21

the government filed a sealed criminal information and
the company pleaded guilty, the victims asked the court
to reject the agreement given the government's viola-
tion of their rights under the CVRA, but the court re-
fused to do so. *Id.*

The Fifth Circuit reversed, stating: "'[t]here are
clearly rights under the CVRA that apply ***before*** any
prosecution is underway' … includ[ing] the CVRA's es-
tablishment of victims' 'reasonable right to confer with
the attorney for the Government.'" *Id.* at 394 (quoting
18 U.S.C. § 3771(d)(3)) (emphasis added). Although
*Dean* ultimately denied mandamus for prudential rea-
sons, the panel strongly endorsed a victim's pre-
indictment rights under the CVRA: "In passing the
Act, Congress made the policy decision—which we are
bound to enforce—that the victims have a right to in-
form the plea negotiation process by conferring with
prosecutors before a plea agreement is reached." *Id.* at
395. As the Fifth Circuit further emphasized, "[t]he
Act gives the right to confer." *Id.*

The Eleventh Circuit's decision, in sharp contrast,
declined to address the panel's ruling that the CVRA
does not apply pre-indictment (effectively leaving the
district court's decision standing). The court also effec-
tively gutted any pre-indictment rights by ruling that
the CVRA provides no private right of action to en-
force those rights. The en banc majority's central hold-
ing—"Congress has given crime victims a specific
means of judicial enforcement … within the context of a
preexisting case, not for initiating a freestanding civil
action," (Pet. App. 29-30)—cannot be reconciled with
the Fifth Circuit's unmistakable holding that the

22

CVRA provides rights prior to the filing of charges. *Dean*, 527 F.3d at 395.[5]

The Eleventh Circuit's divergence from the *Dean* court is all the more troubling considering Congress's acquiescence in the *Dean* decision. Six years after *Dean* in 2015, Congress amended the CVRA, imbuing victims with additional rights. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 113(a)(1), 129 Stat. 227, 240. As this Court has affirmed, "[t]he long time failure of Congress to alter [a law] after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one." *Apex Hosiery Co.* v. *Leader*, 310 U.S. 469, 488 (1940). Congress's actions revising some provisions of the law but leaving undisturbed provisions that would bear on the Fifth Circuit's conclusion in *Dean* evinces a choice to leave that outcome standing. "[I]t is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U.S. 16, 23 (1983) (citation and quotations omitted).

The circuit split is exacerbated by two further realities. ***First***, the rarity of the circumstances giving rise to the split are not often repeated, meaning absent judicial intervention, the split is likely to persist. As the Petition explains, "[b]ecause the question presented

---

[5] Adding further ambiguity, the Sixth Circuit is "uncertain" whether the CVRA protections apply "prior to [the] filing of … charges," *In re Acker*, 596 F.3d 370, 373 (6th Cir. 2010). As Judge Newsom observed in his original panel decision, "[t]he district courts that have considered the question" are also "divided." Pet. App. 202 (citing cases).

23

involves—quite literally—secret non-prosecution arrangements, other circuits will likely never have a chance to review the issue." Pet. 19. The Eleventh Circuit's decision effectively endorses this practice and risks perpetuating it; although the judges may have harshly characterized the government's actions, these statements were all bark with no bite, as the panel ruled that Ms. Wild was powerless to hold the government accountable for its shortcomings.

*Second*, and critically important to the anti-trafficking community, the Eleventh Circuit's decision undermines the reach and protections of the CVRA in two of the four states where sex trafficking is most rampant—Florida and Georgia. Polaris, a highly respected organization widely recognized for its National Trafficking Hotline, maintains a "heatmap" of the locations where it receives trafficking reports. As this heatmap confirms, and multiple studies reinforce, Florida and Georgia are both hotspots for trafficking crimes.



24

Polaris, *2019 U.S. National human Trafficking Hotline Statistics*, https://polarisproject.org/2019-us-national-human-trafficking-hotline-statistics/.

Florida is not only the third most populous state in the Union, but also home to the third highest number of reported cases of human trafficking—896 cases and 1,887 victims in the most recent year for which data has been compiled, *Hotline Statistics*, National Human Trafficking Hotline, https://humantraffickinghotline.org/states—and experiences trafficking at the third highest rate per capita with 4.08 persons trafficked per 100,000 Floridians. In 2019 alone, the year Epstein was arrested for his second string of sexual offenses, Polaris received calls identifying 427 individual human traffickers in the state collectively running 243 trafficking businesses. The Polaris Project, *Florida Spotlight: 2019 U.S. National human Trafficking Hotline Statistics*, https://polarisproject.org/wp-content/uploads/2020/11/2019-Florida-State-Report.pdf. And these reports indicate only the reported trafficking crimes, not the vast number of unreported ones.

Georgia is the eighth most populous state but experiences the sixth highest number of reported cases of trafficking, making it the state with the fourth highest rate of trafficking reports per capita. *See* https://humantraffickinghotline.org/states. One study estimated that more than 12,400 men in Georgia pay for sex with an adolescent girl each ***month***. *See* Joyner, *AJC Watchdog: Atlanta sex-trafficking tour reveals 'the hell of it'*, The Atlanta Journal-Constitution (Jan. 19, 2017), https://www.ajc.com/news/state--regional/ajc-watchdog-atlanta-sex-trafficking-tour-reveals-thehell/ckp2tU0uDGYFOpQZl6P3yM/. Another recent study concluded that more than $290 million is spent annually on commercial sex in Atlanta alone, by far the most of

25

any city studied.  Dank et al., Urban Inst., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 22 (Mar. 12, 2014), https://www.urban.org/sites/default/files/publication/22376/413047-estimating-the-size-and-structure-of-the-underground-commercialsex-economy-in-eight-major-us-cities_0.pdf.

In short, the Eleventh Circuit's decision to restrict the rights of all crime victims—including child victims of sex trafficking—removes the protection of the CVRA in two of the four states where it is most needed.  Countless numbers of young victims in Florida, Georgia, and elsewhere, will bear the brunt of this decision.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

RUSSELL SPIVAK
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007

FELICIA H. ELLSWORTH
  *Counsel of Record*
CYNTHIA D. VREELAND
DENISE TSAI
JAMES BOR-ZALE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
felicia.ellsworth@wilmerhale.com

OCTOBER 2021