# EXHIBIT 25



PAUL G. CASSELL
Ronald N. Boyce Presidential Professor of Criminal Law
and University Distinguished Professor of Law
S.J. Quinney College of Law University of Utah
383 South University Street
Salt Lake City, UT 84112
Telephone: 801-585-5202
cassellp@law.utah.edu
(institutional address for identification purposes only
and not to imply institutional endorsement)

January 28, 2022

Suzanne Drouet
Deputy Counsel
Office of Professional Responsibility
U.S. Department of Justice
Washington, DC 20530
Via email: Suzanne.Drouet@usdoj.gov

      Re:    Ending the Cover Up of Relevant Materials in Supreme Court No. 21-351,
              *Wild v. U.S. Dist. Court for the Southern District of Florida*

Dear Ms. Drouet:

      We write as a follow up to your email of January 21, 2022, regarding whether "further action" is warranted in connection with the improper withholding of information from Courtney Wild (a victim of the Jeffrey Epstein sex trafficking organization). We believe further action is warranted—and is warranted urgently. Specifically, since the issue has been referred to you, we believe that you are obligated to promptly inform the U.S. Supreme Court that the record in the above-captioned case is incomplete because Justice Department prosecutors improperly concealed information in district court litigation in this case. We hope that you will quickly confirm that our allegations are true and report that fact to us, the Supreme Court, and the U.S. District Court for the Southern District of Florida. This cover up must end.

*         The Department's Lawyers Have Concealed the Existence of a Data Gap in Acosta's Email In-Box*

      As you know, we have been concerned about a "data gap" in the email in-box of then-U.S. Attorney Alexander Acosta from May 26, 2007, through April 2, 2008. Your January 19, 2022, email to me indicates that OPR's investigation connected with the November 2020 report discovered the gap and thoroughly investigated "the issue." You then state that OPR "did not discover evidence anyone in the U.S. Attorney's Office for the Southern District of Florida was aware of the gap in U.S. Attorney Acosta's emails until OPR discovered it, nor did OPR find evidence indicating that anyone intentionally concealed from the plaintiffs the fact that some emails had not been properly preserved." You also noted that the gap occurred when U.S. Attorney data was migrated between March and June 2008.

Based on these representations, our concern is that Justice Department lawyers could not have possibly fulfilled their ethical obligations in 2011-13 to search for emails that the district court had ordered the Department to produce to us. The email gap described above is more than ten months long and covers a time when negotiations regarding the Epstein non-prosecution agreement (NPA) were very intense.  Any responsible email search in 2011 or later would have produced evidence of an extended gap—which, in turn, would have required Department lawyers to report to the U.S. District Court for the Southern District of Florida and to us as attorneys for Courtney Wild—that many emails were missing and could not be searched.

The relevant facts are recounted in detail in an affidavit by one of us (Edwards), which is attached to a court filing made in the Eleventh Circuit on November 16, 2020. *See* Affidavit of Bradley J. Edwards in Support of Time-Sensitive Motion to Supplement the Record with Previously Concealed Information, *In re: Courtney* Wild, No. 19-13843 (11th Cir. en banc Nov. 16, 2020) ("Edwards Affidavit"). For your convenience, the Eleventh Circuit filing and the Edwards Affidavit are included as an exhibit to this letter.

As the Edwards Affidavit recounts, immediately after Ms. Wild filed her action in 2008 in the district court (*Jane Doe 1 and 2 v. U.S.*, No. 9:08-cv-80736), she began negotiating with the Government to cooperatively produce a stipulated set of facts. Edwards Aff. 1-4. Ultimately, however, the Government declined to stipulate to any facts, forcing Ms. Wild to pursue discovery from the Government. After a hearing in which the district court noted that it lacked a "factual record" to make findings about possible CVRA violations—and after the Government had agreed that the district court could order discovery on those issues—the district court allowed Ms. Wild to make document requests to the USAO-SDFL. *Id.* at 4.

Following up on the Court's order, on October 3, 2011, Ms. Wild served on Government counsel her first Request for Production ("RFP"). *See* Edwards Aff. 4-5 & Exhibit 1 (listing requests for production). Ms. Wild sought various documents relevant to the case, including (among other things) emails between U.S. Attorney Alex Acosta and Epstein's defense team. *See id.* Ultimately, after responses and replies of various types (including a motion to intervene by Epstein), rather than produce even a single document, the Government filed a new delaying motion—a motion to dismiss Ms. Wild's action. *Id.* This delayed the case more than a year and a half—delay for which the district court apologized. Edwards Aff. 5-6. Ultimately, on June 19, 2013, the district court denied the Government's motion to dismiss. DE 189.[1] In an associated "omnibus order," the district court granted the victims' motion to compel. *See* DE 190 (Ms. Wild's "motion to compel discovery from the government [DE 130] is granted."). The district court directed the Government to produce unprivileged responsive documents to Ms. Wild and any privileged responsive documents to the court *in camera*. DE 190.

---

[1] All references to docket entries ("DE") are to entries in *Jane Doe 1 and 2 v. U.S.* (S.D. Fla.).

On July 19 and 26, 2013, the Government produced 1,357 pages of "external" documents to Ms. Wild (e.g., correspondence between prosecutors and defense attorneys) and 14,825 pages of "internal" documents to the district court (e.g., internal emails within the USAO-SDFL). The Government produced the internal documents only to the court for *in camera* review, asserting attorney-client privilege and work-product protections. Edward Aff. 6-7.

At around this time, as if in a tag-team wrestling match, Epstein's expansive legal team jumped into the fray. After intervening below, on August 1, 2013, Epstein took an interlocutory appeal to Eleventh Circuit and succeeded in staying the proceedings below. Following briefing and oral argument, on April 14, 2014, the Eleventh Circuit rejected Epstein's claim that a hitherto-unrecognized "plea bargaining privilege" prevented Ms. Wild from discovering correspondence between Epstein's legal team and the Government's prosecutors. *Jane Doe 1 et al. v. United States*, 749 F.3d 999 (2014).

So, back to the district court—and back to the efforts by Ms. Wild to develop a record regarding the NPA. Extensive motion practice followed over the next nine months. Edwards Aff. 7-8. In the course of responding to various motions, based on the representations from the Government in pleading and in discussions, Ms. Wild's counsel stated that Ms. Wild had "now obtained the full text of correspondence between the defense attorneys and prosecutors." DE 298 at 6. The Government did not file anything suggesting that Ms. Wild had misunderstood the Government's representations. Edwards Aff. 8.

On July 6, 2015, the district court reviewed the discovery issues and largely sustained the Government's privilege objections over its "internal" communications (i.e., those within the USAO-SDFL). DE 330. Noting the understanding that the Government had already provided all "external" communications to Ms. Wild, the district court stated that it "requests that the Government certify within 14 days that [the victims] have been provided with all external communications." DE 330 at 24. The Government made various filings that constituted the Government's certification of complete production of external emails. Edwards Aff. 8-9.

On February 10, 2016, Ms. Wild filed a motion for summary judgment that the Government had violated the CVRA, relying heavily on the emails and documents that the Government had produced. DE 361 7-47. Ultimately, three years later, on February 21, 2019, the district court granted Ms. Wild's summary judgment motion, finding the Government had violated Ms. Wild's CVRA right to confer with prosecutors. DE 435. Thereafter, Ms. Wild filed a motion on appropriate remedies for the Government's violation of her rights, seeking invalidation of the NPA's immunity provisions and release of relevant Government documents. But following Epstein's apparent suicide, the district court dismissed the case as moot. Ms. Wild's petition to the Eleventh Court followed. Edwards Aff. 9-10. A panel of the Eleventh Circuit—and the Eleventh Circuit en banc—denied the petition.  Ms. Wild filed a petition for certiorari in the Supreme Court, which is pending.

Against this backdrop, the Government's certifications of completeness in the district court could not have been accurate. In docket entry 330 on July 6, 2015, the U.S. District Court for the Southern District of Florida directed the Government to "certify within 14 days that [the victims] have been provided with *all external communications*." DE 330 at 24.  Given the gap in Acosta's email in-box, any such completeness certification would have been impossible. As OPR had discovered, Acosta's in-box emails from May 26, 2007, through April 2, 2008, had not "migrated" properly back in around June 2008. This means that any external communications to Acosta—such as emails from Epstein's multiple defense attorneys—were missing when Department attorneys were making production. As a result, in 2015, the Department's attorneys handling the certification should have promptly reported that gap to the district court—and to Ms. Wild's counsel. Indeed, the gap should have been reported years earlier.

Against this backdrop, it is hard to understand your statement that "OPR [did not] find evidence indicating that anyone intentionally concealed from [Ms. Wild] the fact that some emails had not been properly preserved." We had assumed that Justice Department attorneys in the U.S. Attorney's Office for the Southern District of Florida had done a professional and competent job in searching for relevant emails. Any professional and competent search for "external" emails should have quickly revealed the existence of a data gap in a key email in-box spanning ten-months. If OPR found no evidence of "intentional" concealment, then it must have necessarily found that the Department's attorneys were not doing the professional and competent job that the district court and opposing counsel was entitled to rely upon. And, of course, regardless of whether the completeness certification was "intentionally" or negligently false, OPR learned that the certification was, in fact, false.

Because OPR has necessarily now been made aware that the Department's earlier certifications of completeness were false, the Department now has candor-to-the-court obligation to disclose the existence of this false representation to the U.S. District Court for the Southern District of Florida. The Department also has a candor-to-opposing-counsel obligation to confirm to us that the Department's earlier representations were false. And, most urgently, OPR (or other Department component, such as the SG's Office) has an obligation to promptly disclose these facts to the U.S. Supreme Court, as they support Ms. Wild's pending cert petition.

*The Department's Lawyers Have Concealed Emails from Us and the Courts Handling this Case*

Further "action" is also warranted by OPR to reveal to the district court and the Supreme Court that the Department has failed to produce many emails that it was directed to produce.  From what we can tell, potentially hundreds of emails and other communications were improperly withheld from us during the district court litigation.  The Department needs to quickly take steps to disclose to the Supreme Court (and other courts) that record in this case is incomplete.

OPR can quickly determine that emails were not properly produced to us.  We were able to reach this conclusion with a just a few minutes of work. After reaching page 287 of the OPR

Report—and learning for the first time of the "data gap" discussed above—Ms. Wild's counsel began to wonder if other emails were also missing. As the old saying goes, the thirteenth stroke of a clock is not only itself discredited but calls into doubt what came before. The fact that the Government had, for more than nine years, concealed a ten-month "data gap" in emails of central importance to this case led Ms. Wild's counsel to wonder what else might be missing.

And, sure enough, in a few minutes' time, after comparing the 850,000 pages of documents that OPR had access to and the far fewer documents produced in discovery in the district court, Ms. Wild's counsel quickly located other examples of missing documents. Edwards Aff. 14-16. It appears that the missing documents include both "external" emails to and from Epstein's defense counsel to prosecutors and "internal" emails between the prosecutors. *See* Edwards Aff. 15.

In your January 21, 2022, email to me, you indicate that you would appreciate receiving "more information concerning the basis for your belief that documents were improperly withheld from" Ms. Wild.  Mr. Edwards' affidavit filed with the Eleventh Circuit on November 16, 2020, recounts some of the information that provides the basis for that belief.  As he explains there, shortly after obtaining what appeared to be a full copy of the OPR Report, we were able to identify emails that OPR had access to that we did not.

In concluding that emails appear to be missing from the production made by the Government, Mr. Edwards and I reviewed a chronological file of the materials that Mr. Edwards' Office assembled of production made by the Government during the case. In just a few minutes' time, several "external" emails were identified that appear to have been available to OPR but inexplicably were never produced to Ms. Wild.

For example, according to the OPR Report (p. 82), on Saturday September 22, 2007—shortly before the NPA was signed—Epstein defense attorney Lilly Ann Sanchez sent a series of emails to Asst. U.S. Attorney (AUSA) Andrew Lourie. Sanchez noted that she "spoke to [M]att [Menchel]" and asked Lourie to call her. Two hours later she sent Lourie a second, lengthy email, strongly objecting to a sex offender registration requirement, and outlining "all arguments against registration [as a sexual offender] in this case." So far as we can determine in our records, none of the "series" of emails were ever produced to us. This email chain is significant because it mentions a continued connection between Matt Menchel and Lilly Ann Sanchez (Epstein's attorney whom Menchel dated at some previous point) regarding the negotiations—even though Menchel had left the USAO-SDFL to enter private practice.

As another example of missing information, according to the OPR Report (p. 33), at Menchel's instruction, on June 18, 2007, the line prosecutor sent a letter to the defense counsel identifying what she described as the "statutes under consideration." So far as we can determine in our records, this transmitting email and letter has not been produced to us. This transmitting email and letter are significant because they describe the USAO-SDFL's understanding of the scope of the investigation. They are also significant because the line

prosecutor apparently objected to her supervisors sending this specific information to Epstein's lawyers, but she was instructed to do so anyway.

As another example of missing information, on June 29, 2007, Lilly Ann Sanchez sent an email to the line prosecutor requesting a two-week delay in producing one of Epstein's computers, which likely had child sexual exploitation images on it. This email discussed a delay to try and reach a "state-based resolution" of the case. OPR Rep. 45. At around the same time, whether the line prosecutor had complied with applicable Department policies before seeking the computer. *Id.* So far as we can determine in our records, this correspondence has not been produced to us. This correspondence is significant because, had the efforts to obtain the computer continued, it is likely that the USAO-SDFL would have obtained ironclad forensic evidence to charge Epstein with child pornography crimes. Any reason to delay or forego obtaining this critical evidence would have been important for Ms. Wild to know during this litigation.

As another example of missing information, on December 7, 2007, Acosta sent a letter to Lilly Ann Sanchez regarding the infamous "breakfast meeting" while the Epstein plea discussions were on-going. This is one of two contemporaneous records regarding the breakfast meeting. OPR Rep. 90. So far as we can determine in our records, this correspondence has not been produced to us. This correspondence is significant because what happened at the unusual breakfast meeting is highly disputed.

For similar reasons, it also appears to Mr. Edwards and me that "internal" emails may not have been properly provided to the district court for its *in camera* review. This conclusion must necessarily be more tentative, because the privilege log provided by the USAO-SDFL to Ms. Wild does not provide document-by-document specificity (as is normal in privilege logs). But, for example, in reviewing the Government's privilege log dated July 19, 2013 (DE 212-1), we did not immediately see a reference to a July 2007 email/letter from Matt Menchel to the line prosecutor "rebuking" her for pressing to federally charge Epstein. *See* OPR Rep. 42.

Based on the totality of the unusual circumstances, it is our opinion that it is likely other internal emails relevant to the case were not provided to the district court for *in camera* review. In reaching this conclusion, we have examined the Government privilege logs, notably the privilege logs found at DE 212-1 and 216. We have then searched for the word "Sanchez," which is the last name of Lilly Ann Sanchez, one of Epstein's defense attorneys who was involved in the negotiation of the NPA. This search produced only nine references to documents mentioning "Sanchez," only three of which were before the NPA was signed. It is our understanding, based on information and belief as well as the discussion of Sanchez in the OPR Report, that there should be more internal emails discussing Ms. Sanchez's communications.

With the limited resources available to Ms. Wild's legal team, we have not attempted to comprehensively compare the production of materials that we received and the materials

mentioned in the OPR Report. We believe that the examples of missing materials offered above are illustrative (not exclusive) and those other missing materials could be identified with more time.

*OPR Had Information that We Were Never Provided*

Our conclusion the Department's attorneys failed to properly produce emails and other documents rests not just on comparing the emails we have to those that OPR discussed. Perhaps even more significant, when Mr. Edwards and I read the OPR Report about the Epstein case, we learned about significant new evidence—including important details never previously revealed—supporting Ms. Wild's position in the case that the Government violated her CVRA rights. This new evidence was significant because (among other things), it would strongly support her argument that she and other victims were treated unfairly throughout negotiations regarding the Epstein NPA. This evidence could be used to support Ms. Wild's pending petition before the Supreme Court.

Mr. Edwards' affidavit recounted new, detailed information that had not been fully disclosed to Ms. Wild. If the Government had made this detailed information available sooner, we would have included much of it in our motions and arguments on Ms. Wild's behalf in the district court and in Eleventh Circuit petition. We now seek this information to support Ms. Wild's cert petition to the Supreme Court—and to advise the Supreme Court about the incompleteness of the factual record currently before it.

As an example of new information that we learned in the OPR report, in around May 2007, FBI agents wanted to arrest Epstein in the Virgin Islands, where he was judging a beauty pageant, but were not permitted to do so. The FBI's case agents were disappointed with the decision and the Supervisory Special Agent was extremely upset about it. The USAO-SDFL overruled the FBI's request, asking that the line prosecutor "not commit us to anything [i.e., to prosecuting Epstein] at this time." OPR Rep. 27.

As another example, the line prosecutor in the Epstein case calculated that Epstein's exposure under the U.S. Sentencing Guidelines would be a prison term of 168 to 210 months, with a possible upward departure. OPR Rep. 29. In light of this calculation and other information supporting a strong sex trafficking case against Epstein, the line prosecutor pushed aggressively for federal prosecution. She was repeatedly overruled by her supervisors. *See, e.g.*, OPR Rep. 183-85. The line prosecutor was rebuked, in a written email, by Matt Menchel for aggressively trying to pursue federal charges against Epstein. OPR Rep. 42. The line prosecutor told OPR that she was angry when she received Menchel's July 2007 email explaining that he had proposed to Sanchez resolving the federal investigation through a state plea. In the line prosecutor's view, the proposed state resolution "didn't make any sense" and "did not correspond" to Department policy requiring that a plea offer reflect "the most serious readily provable offense." OPR Rep. 40.

As another example, key decisions during the NPA's negotiations were made by Matt Menchel, who had previously apparently dated Epstein defense attorney Lilly Ann Sanchez. This relationship was not disclosed to the other supervisory attorneys in USAO-SDFL—i.e., Lourie, Sloman, and U.S. Attorney Alex Acosta. If Menchel had disclosed the romantic relationship to the Professional Responsibility Officer in the USAO-SDFL, Menchel could have been advised to step aside from the case. No independent assessment of the nature or depth of the relationship was made by anyone in the USAO-SDFL. OPR Rep. 154 n.226. According to the line prosecutor, she believed that the two-year term of imprisonment included in the initial "term sheet" provided to the defense was developed by Menchel as a favor to (his previous romantic partner) Sanchez, who was one of Epstein's attorneys. The line prosecutor recalled hearing from a supervisory prosecutor that Matt Menchel was asked by Sanchez to "do her a solid" and convince Mr. Acosta to offer a two-year term of imprisonment. OPR Rep. at 153.[2]

As another example at a July 26, 2007, meeting of agents and prosecutors, Menchel announced to the group that Acosta had decided on a resolution of the case under which Epstein would serve only two years. He then left the meeting with almost no discussion. The line prosecutor was "shocked and stunned" by this announcement. OPR Rep. 48-49.

As another example, an FBI squad supervisor yelled at AUSA Sloman about the decision not to charge Epstein federally. OPR Rep. 59.

As another example, according to the line prosecutor, Alex Acosta tried to create the appearance of having been an arm's length from the deal by sending an email creating a paper trail and stating "I don't think I should be part of negotiations. I'd rather leave it to you if that's ok." OPR Rep. at 74.

As another example, OPR's review of Acosta's handling of the Epstein NPA allowing a state-based resolution of the case concluded that Acosta's view of the case was "flawed and unduly constricted." OPR Rep. 172.

As another example, shortly before the NPA was signed, additional information came to light that suggested that the Florida State Attorney's Office's was predisposed to manipulating the state process in Epstein's favor. OPR Rep. 174. This evidence suggested that "the state authorities should not have been considered to be a reliable partner in enforcing the NPA." *Id.*

As another example, OPR concluded that Acosta ended the Epstein investigation without the USAO-SDFL having obtained an important category of potentially significant evidence: the computers removed from Epstein's home prior to the Palm Beach Police Department's execution of a search warrant. OPR Rep. 175. Acosta did this even though there was good reason to believe the computers contained relevant—and potentially critical—

---

[2] For various reasons, OPR ultimately concluded that it could not confirm this account from the line prosecutor. OPR Rep. at 153.

information; and it was clear that Epstein did not want the contents of his computers disclosed. The USAO-SDFL ultimately agreed to end this investigation and permanently end the Government's ability to obtain possible evidence of significant crimes with apparently little serious consideration of the potential cost. OPR Rep. 173.

As another example, in her 2017 Declaration in the CVRA litigation, the line prosecutor stated that, given the challenges of obtaining victims' cooperation with a federal prosecution, "I believed and still believe that a negotiated resolution of the matter was in the best interests of the [USAO] and the victims as a whole. The [USAO] had also reached that same conclusion." In her OPR interview, however, the line prosecutor drew a distinction between resolving the investigation through negotiations that led to what in her view was a reasonable outcome, which she would have supported, and "this negotiated resolution"—that is, the NPA—which she did not support. OPR Rep. 184 n.256.

As another example, with regard to the NPA's immunity provision, this broad prosecution declination would likely have been unwise in most cases; but in this case in particular, USAO-SDFL did not have a sufficient investigative basis from which it could conclude that there were no other individuals who should be held accountable along with Epstein. OPR Rep. 185. Menchel's successor in the USAO-SDFL indicated that he had never heard of such a thing in his 33 years of experience as a prosecutor. *Id.* at 185 n.258. A senior AUSA with substantial experience prosecuting sex crimes called it "horrendous" to provide immunity for participants in sex trafficking. *Id.*

As another example, OPR concluded that the USAO-SDFL agreed to a confidentiality provision with little apparent consideration of the implications of the provision for the victims. OPR Rep. 186.

As another example, OPR concluded that Acosta exercised poor judgment in that he chose a course of action that was in marked contrast to the action that the Department would reasonably expect an attorney exercising good judgment to take. OPR Rep. 187.

As another example, on September 6, 2007, the line prosecutor raised the issue of prior consultation with Epstein's victims, noting that she was holding off in light of instructions from higher ups. The line prosecutor also noted that the Chief of the Justice Department's Child Exploitation and Obscenity Section, Andrew Oosterban, had concluded that reaching out to victims to get their prior approval was "required under the law." OPR Rep. 204. The Chief of the Palm Beach Police Department also wanted to know if the victims had been consulted about the deal. The line prosecutor was instructed that "you can't do that now." OPR 205.

As another example, on December 7, 2007, the line prosecutor prepared victim notification letters for all the victims, which gave the victims information about how to make a statement about the case during the Florida state plea hearing. Following drafting the letter, First Asst. U.S. Attorney Sloman told the line prosecutor to "[h]old the letter." He gave no

explanation. The line prosecutor put the letters in a drawer and felt disgusted. ORP Rep. 215 n. 317.

As another example, following the Fifth Circuit's decision in *In re Dean,* holding that victims have a right to confer with prosecutors on resolutions even before charging, the Appellate Division Chief of the USAO-SDFL noted that the "court's opinion makes sense." OPR Rep. 229.

As another example, as Epstein was preparing to plead guilty, the line prosecutor was told by higher ups that she could inform Ms. Wild's attorney (Mr. Edwards) "of [the plea date], but [she] still couldn't inform him of the NPA." OPR Rep. 232.

As another example, according to the Assistant State Attorney handling Epstein's plea in Florida state court, any "federal victims" who were not a party to the state case (i.e., almost every single one of them) "would not have been able to simply appear at the state plea hearing and participate in the proceedings." OPR Rep. 233 n.357.

As another example, in late June 2008, the line prosecutor drafted a victim notification letter concerning the June 30, 2008 plea. Because Mr. Acosta had agreed in December 2007 that USAO-SDFL would not provide written notice of the state change of plea, the written victim notifications were prepared to be sent only after Epstein's guilty plea. OPR Rep. 234.

As another example, OPR reached the conclusion that U.S. Attorney Alex Acosta could have authorized disclosure of the plea hearing to victims, even if he did not believe the CVRA required it, to ensure that the victims identified in the federal investigation were aware of the state court proceeding. Because the state pleas ended the federal investigation into Epstein's conduct, ensuring that the victims were notified of the state plea hearing would have been consistent with the Department's overarching commitment to treat victims with fairness, dignity, and sensitivity. Acosta's failure to prioritize notification and coordinate communication about the resolution of the case to ensure Epstein's victims were given an opportunity to attend the plea hearing, and to possibly speak about the impact of Epstein's crimes, presented a glaring contrast with Acosta's responsiveness to the demands of Epstein's attorneys, which included the unusual courtesy of allowing them to preview and respond to the USAO's draft victim notifications. OPR Rep. 272-73.

As another example, OPR reached the conclusion that Acosta failed to ensure that victims were afforded an opportunity to attend a hearing that was related to their own cases and thus failed to ensure that victims were treated with forthrightness and dignity. OPR Rep. 273.

This information would have been significant in our litigation in the district court. And, more urgently, this information could help us convince the U.S. Supreme Court that Ms. Wild's pending cert petition is "certworthy." But we have not been provided the supporting emails.

*Other Unusual Circumstances Surrounding the Missing Emails*

One of the unusual circumstances that continues to perplex Mr. Edwards and me is how Justice Department attorneys appear to quickly pass the buck when the issue of missing emails comes up. For example, almost immediately after obtaining a copy of the OPR Report, one of us (Cassell) sent a letter to attorneys who were then handling the Epstein case—prosecutors in the U.S. Attorney's Office for the Northern District of Georgia. In the November 12, 2020, letter (attached Exhibit 3 to the Edwards affidavit), we requested that USAO-NDGA assist in identifying whether or not emails like those described above were missing from the production of materials made in the case. The Office declined to provide that assistance, instead sending an email indicating its view that such "discovery" issues were not properly before the Court at this time.

As you know, we also raised the issue missing emails and other evidence with the Solicitor General's Office in October of last year.  And a similar, pass-the-buck response occurred. We raised the issue of missing emails in detailed letter on October 7, 2021.  We had telephone conference call with the SG's Office three weeks later, on October 29, 2021.  What followed were several more weeks of delay, during which we assumed that the SG's Office was confirming or dispelling the concern that the Department attorneys had concealed evidence from us.  After all this, however, on December 6, 2021, the SG simply forwarded our earlier communications to OPR.  Why didn't the SG instead quickly confirm or deny concealment of evidence from us?

It is my (Cassell's) experience as former Justice Department attorney[3] that when issues of missing evidence are raised by opposing counsel, the Justice Department usually attempts to rapidly confirm that no such evidence is missing.  That does not appear to the approach that the Department is taking in this case.  And, of course, this is not just *any* case; this case involves what the Eleventh Circuit has identified as "shameful" behavior by the Department in concluding and concealing an "infamous" non-prosecution agreement involving one of the most serious sex trafficking cases in the nation's history.

*Time is of the Essence*

As you know, Ms. Wild's cert petition to the U.S. Supreme Court is pending. The Court is expected to review it in the middle of February.  The record before the Supreme Court is currently incomplete—the Department is preventing the Court from learning that the Department's attorneys withheld from the U.S. District Court and from us important information connected with Epstein NPA. We continue to believe that the Department is

---

[3] From 1986 to 1988, Cassell served as an Associate Deputy Attorney in "Main Justice" in Washington, D.C. From 1988 to 1992, Cassell served as an Assistant U.S. Attorney in Eastern District of Virginia.

ethically and legally obligated to immediately produce to us—and our client, Ms. Wild—all of the improperly concealed materials (or, with regard to the "internal" emails, produce them immediately to the U.S. District Court for the Southern District of Florida for in camera review). We further believe that your duty of candor to the Supreme Court and opposing counsel obligates you to immediate disclose all of the circumstances surrounding the apparent cover up to the Supreme Court, so that it is aware that the "record" in the case is deceptively incomplete due to an apparent cover up by the Department's attorneys below. The Court requires that information so that it can properly and fairly evaluate Ms. Wild's pending petition for a writ of certiorari. We also require the information quickly so that we can evaluate how to present the information to the Supreme Court.

Finally, as you know, the Department has recognized Ms. Wild as a "victim" of Jeffrey Epstein's sex trafficking offenses. Accordingly, we continue to invoke her right to "confer" about all these matters.

*Conclusion*

Further action is required in this case. The Department should disclose the materials and information discussed above to us, the Supreme Court, and the U.S. District Court for the Southern District of Florida. To do anything else is to perpetuate a cover up.

Sincerely,

Paul G. Cassell
Bradley J. Edwards
*Counsel for Courtney Wild*

cc: via email:
    Brian Fletcher
    Christopher Michel

# EXHIBIT 1

# Motion to Supplement the Eleventh Circuit Record and Edwards Affidavit

No. 19-13843

*In the*

# United States Court of Appeals

*for the*

# Eleventh Circuit (En Banc)

In Re: Courtney Wild,

*Crime Victim-Petitioner.*

**TIME-SENSITIVE MOTION TO SUPPLEMENT THE RECORD WITH PREVIOUSLY CONCEALED INFORMATION**

**Mandamus from the
United States District Court for the
Southern District of Florida**

Bradley J. Edwards
EDWARDS POTTINGER LP
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
(800) 400-1098

Jay Howell
JAY HOWELL & ASSOCIATES
644 Cesery Blvd., Suite 250
Jacksonville, FL 32211
(904) 680-1234

Paul G. Cassell (Counsel of Record)
S.J. QUINNEY COLLEGE OF LAW
  at the University of Utah
383 S. University St.
Salt Lake City, UT 84112-0300
(801) 585-5202
(institutional address for
identification purposes, not to imply
institutional endorsement)

*Attorneys for Crime Victim-Petitioner Ms. Courtney Wild*

## **CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT**

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made to allow the judges of this Court to evaluate possible disqualification or recusal.

The underlying Crime Victims' Rights Act petition was filed in the district court by two sexual assault victims, who were minors when Jeffrey Epstein sexually assaulted them. To protect their privacy, they were identified throughout the district court proceedings by the pseudonyms "Jane Doe 1" and "Jane Doe 2." Now, for purposes of this petition, petitioner Jane Doe 1 has determined that the best way to encourage other sexual assault victims to step forward is for her to proceed without a pseudonym. Petitioner's name is Courtney Wild.

While Ms. Wild files this petition alone, many of the issues she raises and remedies she seeks would apply to dozens of other women who were victimized by Epstein when they were underage girls. Accordingly, at various points, we refer to Ms. Wild's arguments as "the victims'" arguments.

Ms. Wild is represented by undersigned counsel:

Cassell, Paul G. (Salt Lake City, Utah);

Edwards, Bradley J. (Fort Lauderdale, Florida); and

Howell, Jay (Jacksonville, Florida).

The respondent is the United States. The underlying non-prosecution agreement at issue was negotiated by attorneys for the United States Attorney's Office for the Southern District of Florida, which (after its recusal) is currently represented by the United States Attorney's Office for the Northern District of Georgia. The Government has been represented by the following attorneys:

Acosta, R. Alexander – former U.S. Attorney for the Southern District of Florida;

Ferrer, Wifredo A. – former U.S. Attorney for the Southern District of Florida;

Greenberg, Benjamin G. – Assistant U.S. Attorney for the Southern District of Florida;

Kitchens, Nathan P. – Assistant U.S. Attorney for the Northern District of Georgia;

Lee, Dexter – Assistant U.S. Attorney for the Southern District of Florida;

McBath, J. Elizabeth – Assistant U.S. Attorney for the Northern District of Georgia;

Orshan, Ariana Fajardo – U.S. Attorney for the Southern District of Florida;

Pak, Byung J. – U.S. Attorney for the Northern District of Georgia;

Sánchez, Eduardo I. – Assistant U.S. Attorney for the Southern District of Florida;

Steinberg, Jill – Assistant U.S. Attorney for the Northern District of Georgia; and

Villafaña, Maria – Assistant U.S. Attorney for the Southern District of Florida.

An intervenor in the proceedings below was Jeffrey Epstein. He is now deceased and therefore is no longer a party to these proceedings. It is also arguable that "potential co-conspirators of Epstein, including but not limited to Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova" (DE 361-62 at 5) are interested in this case.

Epstein's attorneys Roy Black and Martin Weinberg also intervened in the proceedings below on issues related to privileged documents.

Because this is a mandamus petition filed under the Crime Victims' Rights Act, the United States District Court for the Southern District of Florida (Marra, J.) is technically a nominal respondent.

No corporate entities are parties to this proceeding.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

FACTUAL BACKGROUND ..............................................................3

    I.    Ms. Wild Unsuccessfully Attempts to Reach a Stipulation on the Facts and Instead Obtains Court-Ordered Production of Documents from the Government. ........................................3

    II.   An OPR Investigation Reveals New Information About the Case. ................................................................................7

        A. The "Gap" in Data from Mr. Acosta's Email Inbox. ......................7

        B. Other Missing Emails. ...................................................9

        C. Evidence that the Government Did not Treat the Victims "Forthrightly." ..............................................10

RELIEF REQUESTED.......................................................................13

ARGUMENT .....................................................................................15

    I.    THIS COURT SHOULD ALLOW MS. WILD TO SUPPLEMENT THE RECORD WITH THE RECENT OPR REVELATIONS SUPPORTING HER POSITION ..........................15

        A.    This Court Has Authority to Supplement the Record When Doing So Is in the "Interests of Justice." ......................15

        B.    Supplementing the Record Here Is in the Interests of Justice.......................................................................16

1.      The New Information Proves Conclusively that the
        Issue of Production of "Privileged" Documents Is
        Not Moot Because the Government Has Now
        Waived All Privileges. ....................................................17

2.      The New Information Proves Conclusively that
        Information Was Missing in the District Court
        Record. ...........................................................................18

3.      The New Information Helps Demonstrate that the
        Government Violated Ms. Wild's Right to Fair
        Treatment. ......................................................................19

4.      The New Information Helps Demonstrate the
        NPA's Immunity Provisions Were Illegal and
        Voidable. ........................................................................20

5.      The New Information Supports Ms. Wild's Claim
        for Attorneys' Fees. .......................................................20

CONCLUSION ..................................................................................21

CERTIFICATE OF SERVICE AND COMPLIANCE.............................................23

**TIME-SENSITIVE MOTION TO SUPPLEMENT THE RECORD WITH
PREVIOUSLY CONCEALED INFORMATION**

Petitioner and crime victim, Courtney Wild, by and through undersigned counsel, hereby moves pursuant to Fed. R. App. P. 27 and under this Court's equitable powers to supplement the record with previously concealed evidence about the circumstances surrounding Jeffrey Epstein's non-prosecution agreement (NPA) and the Government's information relating to the NPA's negotiation.

**INTRODUCTION**

On November 12, 2020, the U.S. Department of Justice's Office of Professional Responsibility ("OPR") released a 290-page report regarding the U.S. Attorney's Office for the Southern District of Florida's (USAO-SDFL's) resolution of its 2006-08 federal criminal investigation of Jeffrey Epstein and its interactions with victims during the investigation.[1] The OPR Report disclosed important new information. First, the OPR Report revealed that significant emails from U.S. Attorney Alex Acosta's inbox were missing from the Government's record retention system—meaning that the Government's previous certifications in 2013 that it had provided complete production of relevant materials to Ms. Wild were inaccurate. Second, the Report revealed that other emails existed between prosecutors and defense counsel that should have previously been disclosed to Ms. Wild but were

---

[1] Counsel have been advised the OPR will place a full copy of its report on the Justice Department's website sometime today.

1

not. Third, and more broadly, the OPR Report discusses at great length the internal deliberations about the NPA within the U.S. Attorney's Office, based on email traffic and other documents—internal deliberations that the Government had been resisting disclosing to Ms. Wild and other victims on grounds that any disclosure would damage Government interests. Those new disclosures unequivocally demonstrate that the Government did not treat Ms. Wild and other victims fairly during the investigation. Obviously, the Government's twelve-year effort to shield those discussions from Ms. Wild (and other victims) has now collapsed, and the Government has waived privilege over those discussions.

Ms. Wild asks that the record in this case be supplemented with the previously concealed information in each of these three areas listed above, as spelled out in more detail in the Relief Requested section below. This Court has "the inherent equitable power to allow supplementation of the appellate record if it is in the interests of justice." *CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000). For the reasons explained at length in this motion (and in a supporting affidavit), it is clearly in the interests of justice that this Court have a complete record before it when deciding how to rule on Ms. Wild's petition.

Because this case will be argued before this Court (en banc) on December 3, 2020, this motion is time sensitive. A concurrently filed motion to expedite proposes an accelerated briefing schedule for resolving this motion.

2

## FACTUAL BACKGROUND

As this Court is aware from previous briefing and a now-vacated panel opinion ("Op."), this case involves serious questions that have arisen about an "infamous" non-prosecution agreement (Op. 4) that federal prosecutors reached with sex trafficker Jeffrey Epstein. For years, Epstein's victims have attempted to learn the facts surrounding this "shameful story" (Op. 6), and yet many "[m]ysteries still exist about how Epstein and his co-conspirators escaped federal prosecution for multiple sex-trafficking crimes." Dissent 118-19. The Justice Department's recent OPR Report helps to answer a few of those questions—but, sadly, also reveals that through twelve years of litigation in the district court and this Court the Government has concealed important information from Ms. Wild. What follows is a brief summary of the saga.

I.    **Ms. Wild Unsuccessfully Attempts to Reach a Stipulation on the Facts and Instead Obtains Court-Ordered Production of Documents from the Government.**

As recounted in detail in the accompanying affidavit of Ms. Wild's counsel, Bradley J. Edwards ("Edwards Aff."), immediately after Ms. Wild filed her action in the district court, she began negotiating with the Government to cooperatively produce a stipulated set of facts. Edwards Aff. 1-4. Ultimately, however, the Government declined to stipulate to any facts, forcing Ms. Wild to pursue discovery from the Government. After a hearing in which the district court noted that it lacked

3

a "factual record" to make findings about possible CVRA violations—and after the Government had agreed that the district court could order discovery on those issues—the district court allowed Ms. Wild to make document requests to the USAO-SDFL. *Id.* at 4.[2]

Following up on the Court's order, on October 3, 2011, Ms. Wild served on Government counsel her first Request for Production ("RFP"). *See* Edwards Aff. 4-5 & Exhibit 1 (listing requests for production). Ms. Wild sought various documents relevant to the case, including (among other things) emails between U.S. Attorney Alex Acosta and Epstein's defense team. *See id.* Ultimately, after responses and replies of various types (including a motion to intervene by Epstein), rather than produce even a single document, the Government filed a new delaying motion—a motion to dismiss Ms. Wild's action. *Id.* This delayed the case more than a year and a half—delay for which the district court apologized. Edwards Aff. 5-6. Ultimately, on June 19, 2013, the district court denied the Government's motion to dismiss. DE 189. In an associated "omnibus order," the district court granted the victims' motion to compel. *See* DE 190 (Ms. Wild's "motion to compel discovery from the government [DE 130] is granted."). The district court directed the Government to

---

[2] Undersigned counsel is unaware of any other CVRA case in which the Government forced a victim to pursue discovery in order to develop a factual record.

produce unprivileged responsive documents to Ms. Wild and any privileged responsive documents to the court *in camera*. DE 190.

On July 19 and 26, 2013, the Government produced 1,357 pages of "external" documents to Ms. Wild (e.g., correspondence between prosecutors and defense attorneys) and 14,825 pages of "internal" documents to the district court (e.g., internal emails within the USAO-SDFL). The Government produced the internal documents only to the court for *in camera* review, asserting attorney-client privilege and work-product protections. Edward Aff. 6-7.

At around this time, as if in a tag-team wrestling match, Epstein's expansive legal team jumped into the fray. After intervening below, on August 1, 2013, Epstein took an interlocutory appeal to this Court and succeeded in staying the proceedings below. Following briefing and oral argument, on April 14, 2014, this Court rejected Epstein's claim that a hitherto-unrecognized "plea bargaining privilege" prevented Ms. Wild from discovering correspondence between Epstein's legal team and the Government's prosecutors. *Jane Doe 1 et al. v. United States*, 749 F.3d 999 (2014).

So, back to the district court—and back to the efforts by Ms. Wild to develop a record regarding the NPA. Extensive motion practice followed over the next nine months. Edwards Aff. 7-8. In the course of responding to various motions, based on the representations from the Government in pleading and in discussions, Ms. Wild's counsel stated that Ms. Wild had "now obtained the full text of correspondence

between the defense attorneys and prosecutors." DE 298 at 6. The Government did not file anything suggesting that Ms. Wild had misunderstood the Government's representations. Edwards Aff. 8.

On July 6, 2015, the district court reviewed the discovery issues and largely sustained the Government's privilege objections over its "internal" communications (i.e., those within the USAO-SDFL). DE 330. Noting the understanding that the Government had already provided all "external" communications to Ms. Wild, the district court stated that it "requests that the Government certify within 14 days that [the victims] have been provided with all external communications." DE 330 at 24. The Government made various filings that constituted the Government's certification of complete production of external emails. Edwards Aff. 8-9.

On February 10, 2016, Ms. Wild filed a motion for summary judgment that the Government had violated the CVRA, relying heavily on the emails and documents that the Government had produced. DE 361 7-47. Ultimately, three years later, on February 21, 2019, the district court granted Ms. Wild's summary judgment motion, finding the Government had violated Ms. Wild's CVRA right to confer with prosecutors. DE 435. Thereafter, Ms. Wild filed a motion on appropriate remedies for the Government's violation of her rights, seeking invalidation of the NPA's immunity provisions and release of relevant Government documents. But following

6

Epstein's apparent suicide, the district court dismissed the case as moot. Ms. Wild's petition to this Court followed. Edwards Aff. 9-10.

## II.   An OPR Investigation Reveals New Information About the Case.

Meanwhile, in Washington, D.C., interest in the Government's "infamous" non-prosecution agreement led to an OPR investigation beginning in February 2019. *Id.* 10-11. The investigation lasted eighteen months. Last week, on November 12, 2020, a Justice Department representative met with some of Epstein's victims and released to them an "executive summary" of OPR's findings. At the same time, OPR released its full report to Congress. *See id.* at 11-12.  Three revelations from the OPR Report relate to this motion.

### A. The "Gap" in Data from Mr. Acosta's Email Inbox.

In reaching its conclusions, OPR relied primarily on communications (especially emails) among prosecutors and between prosecutors and defense counsel. OPR Report 11. The 286-page report quotes extensively from these various emails. However, it is not until after the end of the report—at page 287, buried in a "methodology" addendum—that the OPR Report reveals a "data gap" in Mr. Acosta's email inbox. Specifically, OPR admits that it was unable to recover emails to Mr. Acosta that were sent during a period spanning more than ten months—from May 26, 2007, through April 2, 2008. OPR Report 288. As even passing familiarity with the Epstein case would make clear, this "data gap" precisely covers the months

7

of greatest interest to anyone trying to determine what happened during the Epstein NPA negotiations. The gap begins just a few weeks before the first substantive meeting between prosecutors and Epstein's defense team; the gap ends just as Epstein's appeals regarding the NPA were concluding. Edwards Aff. 12-13. And the "data gap" is for the records of *the* U.S. Attorney—*the* person who finally approved the NPA. *Id.* at 13.

The remarkable precision with which the "data gap" covers the documents of greatest interest could be just a coincidence. But what clearly cannot be ascribed to bad luck is that, after twelve years of hard-fought efforts by Ms. Wild to determine what happened in the case, the Justice Department is just now just admitting the gap's existence. As recounted in detail above (and in even greater detail in the accompanying Edwards Affidavit), Ms. Wild had fought to obtain these very emails for more than nine years! Edwards Aff. 1-9. And yet, during these nine years, the Government never disclosed what it claims is a "technical glitch." Edwards Aff. 12-13. To the contrary, as recounted above, the Government certified that it had produced all relevant "external" emails to Ms. Wild and all relevant "internal" emails to the district court for *in camera* review. Given the data gap, that certification could not possibly have been true—a fact that the Government must have known for many months, and likely for many years.

8

And other documents may also be missing. The OPR Report states that OPR was unable to locate copies of "a few [emails] to or from Acosta." OPR Rep. 165 (emphasis added). This statement about being unable to locate some emails "from" Acosta is inconsistent with OPR's statement that it was able to locate all emails regarding the case except for the ten-month period involving Acosta's inbox. *Compare* OPR Rep. 287.

### B. Other Missing Emails.

After reaching page 287 of the OPR Report—and learning for the first time of the "data gap"—Ms. Wild's counsel began to wonder if other emails were also missing. As the old saying goes, the thirteenth stroke of a clock is not only itself discredited but calls into doubt what came before. The fact that the Government had, for more than nine years, concealed a ten-month "data gap" in emails of central importance to this case led Ms. Wild's counsel to wonder what else might be missing.

And, sure enough, in a few minutes' time, after comparing the 850,000 pages of documents that OPR had access to and the far fewer documents produced in discovery below, Ms. Wild's counsel quickly located other examples of missing documents. Edwards Aff. 14-16. It appears that the missing documents include both "external" emails to and from Epstein's defense counsel to prosecutors and "internal" emails between the prosecutors. *See* Edwards Aff. 15.

Here again, it is hard to understand why the fact that emails are missing is just surfacing now. The OPR Report makes no mention of it. And, despite Ms. Wild's specific request made in September 2020 for any missing emails or other documents uncovered by OPR, no effort was made by the Government to supplement its production to cure any earlier deficiencies. Edwards Aff. 15.

## C. Evidence that the Government Did not Treat the Victims "Forthrightly."

Last but not least, the OPR Report contains significant new evidence supporting Ms. Wild's position that the Government treated the victims unfairly throughout its negotiations with Epstein's defense team. As is apparent from the facts recounted above, the Government has resisted reaching an agreement on any of the relevant facts of this case, instead asserting privileges and work-product protection at every turn. But the OPR Report contains abundant information—not previously disclosed to the victims—supporting Ms. Wild's position. *See* Edwards Aff. 16-19. Here are a few examples:

- In around May 2007, the FBI had wanted to arrest Epstein in the Virgin Islands, where he was judging a beauty pageant. The USAO-SDFL overruled the decision, asking that the line prosecutor "not commit us to anything at this time." The FBI's case agents were disappointed with the decision not to arrest Epstein and the Supervisory Special Agent was extremely upset about it. OPR Rep. 27.

- The line prosecutor in the Epstein case calculated that Epstein's exposure under the U.S. Sentencing Guidelines would be a prison term of 168 to 210 months, with a possible upward departure. OPR Rep. 29. In light of this calculation and other information supporting a strong sex trafficking case

10

against Epstein, the line prosecutor pushed aggressively for federal prosecution. She was repeatedly overruled by her supervisors. *See, e.g.,* OPR Rep. 183-85.

- The line prosecutor told OPR that she was angry when she received her supervisor's (Matt Menchel's) July 2007 email explaining that he had proposed to defense attorney Lilly Ann Sanchez to resolve the federal investigation through a state plea. In the line prosecutor's view, the proposed state resolution "didn't make any sense" and "did not correspond" to Department policy requiring that a plea offer reflect "the most serious readily provable offense." OPR Rep. 40.

- The line prosecutor was sternly rebuked by her supervisor (Matt Menchel) for trying to pursue federal charges against Epstein. OPR Rep. 42.

- Key decisions during the NPA's negotiations were made by Matt Menchel, who was head of the Criminal Division for the USAO-SDFL. Menchel had previously dated Epstein defense attorney Lilly Ann Sanchez. This romantic relationship was not disclosed to the other supervisory attorneys in USAO-SDFL—i.e., Andrew Lourie, Jeffrey Sloman, and U.S. Attorney Alex Acosta. If Menchel had disclosed this close relationship to the Professional Responsibility Officer in the USAO-SDFL, Menchel would have probably been advised to step aside from the case. No independent assessment of the nature or depth of Menchel's romantic relationship with Sanchez was made by anyone in the USAO-SDFL. OPR Rep. 154 n.226.

- According to the line prosecutor, she believed that the two-year term of imprisonment included in the initial "term sheet" provided to the defense was developed by Menchel as a favor to (his previous romantic partner) Sanchez, who was one of Epstein's defense attorneys. The line prosecutor recalled hearing from a supervisory prosecutor that Matt Menchel was asked by Sanchez to "do her a solid" and convince Mr. Acosta to offer to Epstein a deal with just a two-year term of imprisonment. OPR Rep. 153.[3]

- At a July 26, 2007, meeting of agents and prosecutors, Menchel announced to the group that U.S. Attorney Acosta had decided on a resolution of the case

---

[3] For various reason, OPR ultimately concluded that it could not confirm this account from the from the line prosecutor. OPR Rep. at 153.

under which Epstein would serve only two years. He then left the meeting with almost no discussion. The line prosecutor was "shocked and stunned" by this announcement. OPR Rep. 48-49.

- Shortly before the NPA was signed, additional information came to light suggesting that the Florida State Attorney's Office's was predisposed to manipulating the state process in Epstein's favor. OPR Rep. 174. This evidence suggested that "the state authorities should not have been considered to be a reliable partner in enforcing the NPA." *Id.*

- Acosta ended the Epstein investigation without the USAO-SDFL having obtained potentially significance evidence: a computer removed from Epstein's home before the Palm Beach Police Department's execution of a search warrant. This computer likely contained highly incriminating evidence. OPR Rep. 175.

- With regard to the NPA's broad immunity provision, this blanket declination would likely have been unwise in most cases, but was particularly unwise in the Epstein case because the USAO-SDFL did not have a sufficient basis from which it could conclude that there were no other individuals who should be held accountable along with Epstein. OPR Rep. 185. Menchel's successor in the USAO-SDFL indicated that he had never heard of such a thing in his 33 years of experience as a prosecutor. *Id.* at 185 n.258.

- On September 6, 2007, the line prosecutor raised the issue of prior consultation with Epstein's victims, noting that she was holding off in light of instructions from higher ups. The line prosecutor also noted that the Chief of the Justice Department's Child Exploitation and Obscenity Section, Andrew Oosterbaan, had concluded that reaching out to victims to get their prior approval was "required under the law." OPR Rep. 204. The Chief of the Palm Beach Police Department also wanted to know if the victims had been consulted about the deal. The line prosecutor was instructed by her supervisors that "you can't do that now." OPR Rep. 205.

- On December 7, 2007, the line prosecutor prepared victim notification letters for all the victims, which gave the victims information about how to make a statement about the case during the Florida state plea hearing. Following the drafting of the letter, First Assistant U.S. Attorney Jeffrey Sloman told the line

prosecutor to "[h]old the letter." He gave no explanation. The line prosecutor put the letters in a drawer and felt disgusted. ORP Rep. 215 & n. 317.

- Following the Fifth Circuit's decision in *In re* Dean—holding that victims have a right to confer with prosecutors on resolutions even before charges are filed—the Appellate Division Chief of the USAO-SDFL noted that the "court's opinion makes sense." OPR Rep. 229.

- As Epstein was preparing to plead guilty, the line prosecutor was told by higher ups that she could only inform Ms. Wild's attorney (Mr. Edwards) "of [the plea date], but [she] still couldn't inform him of the NPA." OPR Rep. 232.

- OPR concluded that Alex Acosta failed to ensure that victims were afforded an opportunity to attend a hearing that was related to their own cases and thus failed to ensure that victims were treated with forthrightness and dignity. OPR Rep. 273.

## **RELIEF REQUESTED**

A few hours after the OPR Report was released, Ms. Wild's legal counsel sent a letter to the Government's lawyers in this case (e.g., the U.S. Attorney's Office for the Northern District of Georgia (USAO-NDGA)), seeking their agreement to supplement the appellate record before this Court with the three categories of information just discussed. Edwards Aff. 15-16 (Exhibit 3). Unable to secure agreement from the Government, Ms. Wild now files this motion asking this Court to allow her to supplement the record in three ways:

(1) The appellate record in this case should be supplemented with the fact that, when the Government made it production of correspondence and other documents to Ms. Wild in 2013, it did not disclose that it was missing emails from Alex Acosta's

13

email inbox from May 26, 2007, through April 2, 2008—the exact time period when Mr. Acosta was most deeply involved in negotiating and approving the Epstein NPA;

(2) The appellate record should also be supplemented with the fact that the Government failed to properly disclose all external emails to Ms. Wild during discovery in this case—and the Government must now immediately provide those missing communications to Ms. Wild; and

(3) Now that the Government has waived privilege over all of its internal deliberations regarding the NPA, the Government should be directed to immediately provide to Ms. Wild's counsel all of the internal emails and other documents that OPR considered in reaching its conclusions. Ms. Wild would then have five business days to decide which of these materials and other conclusions from the OPR Report that she wants to add to the record in this case.

After supplementation of the record in these three ways, Ms. Wild requests that she would then be allowed five additional business days in which to file a supplemental brief describing for this Court the importance of the newly added information.

## **ARGUMENT**

**I.   THIS COURT SHOULD ALLOW MS. WILD TO SUPPLEMENT THE RECORD WITH THE RECENT OPR REVELATIONS SUPPORTING HER POSITION**

In order to properly resolve Ms. Wild's petition, the Court should allow Ms. Wild to supplement the record with the recent OPR revelations in the three areas described above. This Court is clearly empowered to supplement an appellate record if doing so is in the "interest of justice." *In re Piazza,* 719 F.3d 1253, 1274 n.10 (11th Cir. 2013). The interests of justice support allowing Ms. Wild to provide to this Court all available information that bears on efforts to enforce her CVRA rights— information that the Justice Department itself has collected.

### **A. This Court Has Authority to Supplement the Record When Doing So Is in the "Interests of Justice."**

While ordinarily this appellate court decides cases based on the record developed in the trial court, in unusual circumstances this Court clearly has authority to supplement the record. *See, e.g., Corbett v. Transportation Security Administration*, 930 F.3d 1225, 1231 n.1 (2019) (granting motion to supplement record).[4] This Court has granted motions to supplement under its inherent equitable powers where the materials were "relevant to the questions before [the Court] and [would] allow [the Court] to make a more informed decision." *Id.* This Court has

---

[4] While the cases we cite in this section all involve appeals rather than petitions, under the CVRA Ms. Wild is entitled to "ordinary standards of appellate review." 18 U.S.C. § 3771(d)(3).

allowed supplementation even where new materials would "not conclusively resolve" the issues before it so long as the materials were "helpful … in the aid of making an informed decision." *Walker v. City of Calhoun, Georgia,* 901 F.3d 1245, 1256 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1446 (2019); *accord Schwartz v. Millon Air, Inc.,* 341 F.3d 1220, 1225 (11th Cir. 2003). Thus, this Court has "stress[ed]" that it has "equitable authority to supplement the record when 'in the interests of justice.'" *In re Piazza,* 719 F.3d 1253, 1274 n.10 (11th Cir. 2013).

To be sure, this Court could remand to the district court to allow it to fully develop the factual record on the information that the Government improperly withheld. But a remand would not be in the interests of justice because it would further delay a case that has already consumed twelve years. Moreover, the materials with which Ms. Wild proposes to supplement the record all regard matters that the Government cannot reasonably dispute. They are all based on information that was uncovered by the Justice Department's own Office of Professional Responsibility.[5]

### B. Supplementing the Record Here Is in the Interests of Justice.

Supplementing the record in this case is in the interests of justice, as it would allow this Court to make a ruling based on a complete factual record—including a record based on what information the Justice Department itself admits is missing.

---

[5] Nothing in this motion waives any right of Ms. Wild to also pursue these issues in the district court on her own initiative. *Cf.* Fed. R. Civ. P. 60(d)(3) (authorizing a motion to set aside a judgment for "fraud on the court").

**1. The New Information Proves Conclusively that the Issue of Production of "Privileged" Documents Is Not Moot Because the Government Has Now Waived All Privileges.**

The most obvious—indeed, incontrovertible—way in which the new information in the OPR Report is relevant to issues before this Court is that it demonstrates that the Government has waived privileges over its internal deliberations. In dismissing this case, the district court denied Ms. Wild's informational request to see all "internal" documents because the Government had asserted privilege and work-product protection over the documents. DE 478 at 9-10. In her petition, Ms. Wild argued that the district court erred, because the Government had waived its privileges in 2017 through disclosures it made in opposing summary judgment. Pet. 46-47. In its response in this Court, the Government's first argument for affirming the district court on this issue was that all internal information relating to the Government's decisions concerning the NPA was "privileged and/or protected from disclosure under the work product doctrine." Gov't Resp. 50.

Whatever merit the Government's argument might have had earlier has now vanished. The Government has undoubtedly waived all privileges by releasing its OPR Report, which contains more than 150 single-spaced pages revealing its intra-office emails and other internal communications regarding the NPA. *See* OPR Rep. 11-119, 192-246. Indeed, the only remaining question is why the Government has not already informed this Court of this important new fact. *See Bd. of License*

17

*Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (explaining that appellate counsel have a "continuing duty to inform the Court of any development which may conceivably affect the outcome" of an appellate proceeding.) Last Thursday, the Government should have immediately disclosed to this Court the fact that it has now waived its earlier privilege assertions.

Indeed, the fact that the OPR Report has so broadly and clearly discussed internal deliberations—without any apparent resulting problems—calls into question the accuracy of the Government's earlier representations about the supposed need for confidentiality. The Government's second argument to this Court against production of documents was that any such disclosure "could adversely affect and interfere with the ongoing investigation by the Department of Justice related to [Epstein's co-conspirators]." Gov't Resp. 50. This claim has been exposed as a falsehood. OPR has now voluntarily disclosed hundreds of internal emails and other documents from 2006-08 without any apparent interference with the Government's on-going criminal investigations in 2020.

## 2.  The New Information Proves Conclusively that Information Was Missing in the District Court Record.

Another incontrovertible way in which the new information is relevant is that it shows that the Government has concealed important information about the email record in this case. As explained above, the Government was aware—but has failed to previously disclose to Ms. Wild or this Court—that a "data gap" existed in

18

Acosta's email inbox covering exactly the critical time period when he was leading the prosecution team negotiating the NPA. Indeed, the Government failed to produce other important communications between prosecutors and defense counsel regarding the NPA. These facts also should lead to an adverse inference against the Government under basic federal evidentiary principles. *See Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 945 (11th Cir. 2005) (holding that federal law allows the sanction of an adverse inference for spoliation of evidence). This Court should supplement the record with the fact that the Government improperly withheld important information and then permit Ms. Wild to file a supplemental brief on the implications of that disturbing fact.

### 3. The New Information Helps Demonstrate that the Government Violated Ms. Wild's Right to Fair Treatment.

In her petition, Ms. Wild argued that the district court erred in failing to reach (among other things) her argument that the Government had violated her CVRA right to be "treated with fairness" and "dignity." Pet. 52-55. The new information that Ms. Wild proposes to add to the record includes the Government's own admission that "[t]he Government failed to treat [Epstein's] victims *forthrightly* and with *sensitivity*." OPR Report at 280 (emphases added). This semantic obfuscation relies on thesaurusification to avoid directly conceding that the Government violated Ms. Wild's CVRA rights to be treated with "fairness" and "dignity." Through twelve years of arduous litigation, the Government has strenuously denied this basic

19

conclusion. The Government's own admission, along with the documentary and other evidence fully supporting it, is plainly relevant to a central issue in the case.

### 4. The New Information Helps Demonstrate the NPA's Immunity Provisions Were Illegal and Voidable.

In her petition, Ms. Wild also argued that the NPA's immunity provisions were illegal and voidable. Pet. 36-39. The new information relates to the NPA's voidability by helping to support Ms. Wild's argument that the Government failed to afford her CVRA rights.

### 5. The New Information Supports Ms. Wild's Claim for Attorneys' Fees.

Finally, in her petition, Ms. Wild argued that the district court erred in denying her attorneys' fees. Pet. 50-51. In response, the Government argued that it had not acted in "bad faith" and thus the factual basis for awarding attorneys' fees under the Hyde Amendment did not exist. Gov't Resp. 55-56. The information that Ms. Wild seeks to add to the record will directly show bad faith. For example, it would show that the Government concealed a ten-month "data gap" in important emails for nine years. It would also show that the Government failed to properly provide Ms. Wild with all information that she needed to make her case. Finally, it would show that the Government failed to treat Ms. Wild (as the Government puts it) "forthrightly." All of this information is relevant to whether Ms. Wild is entitled to attorney's fees.

## POSITION OF THE GOVERNMENT

Before pursuing these issues with this Court, Ms. Wild's counsel contacted Government counsel in an attempt to avoid further litigation, asking if they would agree to supplementing the appellate record in the three areas described above. *See* Exhibit 3, Edwards Aff. (letter to government counsel). Government counsel has only indicated its opposition to the motion.

While it is perhaps unsurprising that the Government does not want to have this Court consider whether prosecutors improperly concealed information from Ms. Wild, these issues are highly relevant to at least five issues currently before the Court—as just explained. More disturbingly, the Government has not yet explained why it has failed to reveal such facts as the Acosta "data gap" and the missing emails sooner. Accordingly, counsel for Ms. Wild reserves the right to seek sanctions if the Government's conduct remains unexplained.

## CONCLUSION

This Court should order supplementation of the record with newly available information regarding three issues discussed in the Justice Department's OPR Report, as described above by Ms. Wild in the Relief Requested section of this motion.

Respectfully submitted,

/s/Paul G. Cassell

Bradley J. Edwards
EDWARDS POTTINGER LP
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
(800) 400-1098

Jay Howell
JAY HOWELL & ASSOCIATES
644 Cesery Blvd., Suite 250
Jacksonville, FL 32211
(904) 680-1234

Paul G. Cassell (Counsel of Record)
S.J. QUINNEY COLLEGE OF LAW
  at the University of Utah
383 S. University St.
Salt Lake City, UT 84112-0300
(801) 585-5202
(institutional address for
identification purposes, not to imply
institutional endorsement)

*Attorneys for Crime Victim-Petitioner Ms. Courtney Wild*

22

## U.S. Court of Appeals for the Eleventh Circuit
## Case No. 19-13843

In Re: Courtney Wild,

### Crime Victim-Petitioner

_____/

### AFFIDAVIT OF BRADLEY J. EDWARDS, ESQ.

1. I, Bradley J. Edwards, Esq., do hereby declare that I am a member in good standing of the Bar of the State of Florida. Along with co-counsel, I represent Courtney Wild in the above-listed action to enforce her rights under the Crime Victims Rights Act (CVRA). I also represented her (and many other victims) in civil suits against Jeffrey Epstein for sexually abusing them. I am also familiar with the criminal justice system, having served as state prosecutor in the Broward County State Attorney's Office. I am the managing partner of the law firm Edwards Pottinger LLC, where I specialize in providing civil representation for children, victims of sexual abuse, and victims of violent crimes. Because of my involvement in this case and others involving Epstein, I possess detailed familiarity with the Jeffrey Epstein sex trafficking organization and with the efforts to hold him and co-conspirators accountable

2. This affidavit covers factual issues regarding the Government's production of materials in the district court and in this Court in the above-captioned action. Among other things, this affidavit provides factual information demonstrating that the Government has not properly produced all documents that it was directed to produce in the district court and that, as a result, this Court lacks the complete factual record justice requires on which to make a determination about Ms. Wild's petition. This affidavit also demonstrates that the Government has recently waived attorney-client and other privileges that it asserted in the district court.

3. Rule 27 of the Federal Rules of Appellate Procedure authorize the filing of this affidavit as support for the accompanying motion. *See* FRAP 27(a)(2)(B) (requiring "any affidavit" in support of a motion to be "served and filed with the motion").

### Background Facts Regarding Unsuccessful Efforts to Reach Stipulated Facts with the Government

4. The general course of the proceedings below is well-known to this Court. For purposes of this affidavit regarding missing evidence and waiver of privileges, it is enough to recount the unsuccessful efforts of the victims to reach a stipulated set of facts with the Government as well as various district court orders directing the Government to produce documents to Ms. Wild.

5. By way of general background, the underlying crimes involved in this case were committed more than fifteen years ago, by a sex trafficking organization run by Jeffrey Epstein

and numerous coconspirators. As this Court observed in its panel opinion (since vacated), Epstein and his coconspirators sexually trafficked and abused more than thirty identified minor girls, including petitioner, Ms. Wild. But despite the scope of Epstein's sex trafficking organization, the Government (i.e., the U.S. Attorney's Office for the Southern District of Florida (USAO-SDFL)) ultimately decided not to file any federal charges against Epstein. Even though career prosecutors had drafted a 53-page indictment against Epstein (Op. 3), the Government elected to enter into "what would become an infamous non-prosecution agreement" (Op. 4). Under this agreement, Epstein would plead guilty in Florida court to two state "prostitution" offenses. In exchange, he and his coconspirators would receive immunity from federal prosecution. Op. 4. The agreement also contained "[a]n odd set-up" for Jeffrey Epstein to pay for victim representation that was "likely calculated to quickly and quietly resolve as many victim [civil] suits as possible." Op. 4 n.1. Epstein entered his guilty plea in Florida state court on June 30, 2008, thereby triggering the non-prosecution agreement. Op. 4.

6. One week later, on July 7, 2008, I filed a petition to enforce the CVRA rights of Ms. Wild (then referred to as "Jane Doe No. 1") and another victim, Jane Doe No. 2, with regard to sex offenses committed against them by Jeffrey Epstein while they were minors. *See* Docket Entry ("DE") 1. The district court first held a hearing on the victims' petition on July 11, 2008. The district court discussed a need to "hav[e] a complete record, and this is going to be an issue that's … going to go to the Eleventh Circuit, [so it] may be better to have a complete record as to what your position is and the government's is as to what actions were taken." Tr. Hearing (July 11, 2008) at 25-26. The Court directed Ms. Wild and the Government to confer about what additional evidence was needed to resolve Ms. Wild's motion. *Id.* at 32.

7. Following the directions of the district court, Ms. Wild then attempted to reach a stipulated set of facts with the USAO-SDFL. The USAO-SDFL offered a very abbreviated set of proposed facts, and Ms. Wild responded with a detailed set of proposed facts. *See* DE 225-1 at 2.

8. Rather than respond to the victims' specific suggested undisputed facts, however, the U.S. Attorney's Office reversed course. Following an unsuccessful effort to get the Government to agree to facts surrounding the concealment of the NPA, on July 29, 2008, the Government filed what it called a "Notice to Court Regarding Absence of Need for Evidentiary Hearing." DE 17. The Government claimed that because it had never filed federal charges against Epstein—and that was a dispositive fact for the victims' claims—there was no need for any further evidence in the case.

9. On August 1, 2008, the victims (Ms. Wild and Jane Doe 2) responded to the Government's notice. The response argued that, because the Government had concealed the NPA, it had violated Ms. Wild's right to confer and violated her right to be treated with fairness. DE 19 at 2. Ms. Wild also argued that the Government should be required to produce the NPA. *Id.* at 2-3. Ms. Wild also proffered a set of proposed facts on which to resolve the case. *Id.* at 3-9. The victims also asked the Court to direct the Government to confer with the victims about the facts. *Id.* at 14.

10. On August 14, 2008, the district court held a hearing on the issues. Ms. Wild asked the Court to unseal the NPA, so that she could make a decision as to how best to proceed. Tr. Hrng.

(August 14, 2008) at 4-5. Following arguments from the Government against disclosure, the district court ordered "the Government to produce the [NPA] and any addenda" to the victims. *Id.* at 23. The production was to be made under seal. The district court followed up with a written order, directing that the Government "shall produce a copy of the Non-Prosecution Agreement, including any modifications and addenda thereto (collectively referred to as the 'Agreement'), to the attorneys for [the victims]." DE 26 at 1.

11. Thereafter, unable to secure the Government's agreement to any facts surrounding how the NPA had been negotiated, Ms. Wild pursued that same question in her civil suit against Epstein. Ultimately, after more than a year of lengthy and complex legal battles with Epstein's numerous civil defense attorneys, Ms. Wild (and two other victims in common interest agreement) succeeded in obtaining, through a court order in a civil case, disclosure of some of Epstein's correspondence with the USAO-SDFLA within three business days. *Doe v. Epstein*, No 9:09-cv-80893, DE 572 (June 25, 2010). Thereafter, despite having had more than four months' notice to be ready to produce the documents rapidly (in light of an impending trial date), Epstein began producing a mishmash of information from the correspondence. On July 1, 2010, one of Epstein's victims (in common interest agreement with Ms. Wild) filed a motion seeking to have Epstein held in contempt for not producing these materials. Five days later, Epstein settled his civil case with Ms. Wild and two other Epstein victims, all represented by undersigned counsel.

12. At this point, with at least some correspondence in hand, counsel for Ms. Wild returned to her CVRA case. In September 2010, Ms. Wild prepared a motion in the nature of a summary judgment motion, with a proposed set of undisputed facts. DE 41 at 2. She submitted them to Government in an effort to narrow any range of disputes. On October 22, 2010, the USAO-SDFL agreed to review the facts and decide which ones were disputed. DE 41 at 2. But after various delays and unsuccessful efforts to resolve the factual issues, the Government ultimately informed the victims that it did not believe it had time to review the victims' proposed statement of facts and advise which were accurate. DE 41 at 2-3.

13. As an accommodation to the U.S. Attorney's Office, on October 27, 2010, the victims filed a report with the Court in which they agreed to delay filing their motion and accompanying facts for up to two weeks to see if negotiations could resolve (or narrow) the disputes with the U.S. Attorney's Office (DE 41 at 4). Discussions with the U.S. Attorney's Office continued, including a personal meeting between Ms. Wild and the U.S. Attorney in December 2010. DE 225-1 at 3. Ms. Wild asked for an investigation into how the NPA had been negotiated—a negotiation that led to her never having a chance to see Epstein in court.

14. Also, on December 10, 2010, my co-counsel (Professor Paul Cassell) sent a letter to Wilfredo A. Ferrer, the U.S. Attorney for the Southern District of Florida, requesting an investigation into the handling of the Epstein case and possible improper influences on its disposition. *See* DE 265-1 at 32-33. Thereafter, on December 17, 2010, the USAO-SDFL indicated that it needed to seek advice on whether it was recused from handling the case. Six months later, on May 6, 2011, after the Cassell letter had been forwarded to the Justice Department's Office of Professional Responsibility in Washington, D.C., OPR wrote back indicating that the issue of improper influences was already being litigated in the CVRA case and therefore that it would not

investigate the matter. *See* Ex. 2 accompanying this motion (2019 letter to OPR containing 2010 letter as an attachment).

15. Meanwhile, after further discussion failed to produce any agreement on the facts or other visible progress, Ms. Wild informed the U.S. Attorney's Office that she would file her "summary judgment" motion with the district court on March 18, 2011, and requested further cooperation from the Government about the facts. DE 225-1 at 4. However, the Government declined to cooperate, citing its position that the CVRA did not apply pre-charging: "[W]hile this Office remains willing to cooperate, cooperation does not mean agreeing to facts that are not relevant to the resolution of the legal dispute at issue." DE 225-1 at 4 (citing letter from U.S. Attorney Ferrer to victims' counsel).

### Ms. Wild's Efforts to Obtain Information from the Government

16. Accordingly, on March 21, 2011, still having been unsuccessful in reaching an agreement with the Government about any of the facts of the case, Ms. Wild filed four motions: (1) a motion for summary judgment on the violation of Ms. Wild's CVRA rights (DE 48); (2) a motion to have her facts accepted because of the Government's failure to contest the facts (DE 49); (3) a motion for an order directing the U.S. Attorney's Office not to withhold relevant evidence (DE 50); and (4) a motion to use the earlier obtained U.S. Attorney's Office correspondence with Epstein's counsel to prove violations of her rights (DE 51). Among other arguments, Ms. Wild contended that she had been denied her CVRA right to confer with the Government attorney on her case and her CVRA right to be treated with fairness. DE 48 at 24-26. Various responses from the Government and replies from Ms. Wild followed.

17. Following a hearing, on September 26, 2011, the district court concluded that Ms. Wild had properly sought to enforce her CVRA rights in the district court. DE 99 at 6-10. However, the district court concluded that it "lack[ed] a factual record" to make the necessary findings regarding the possible violations. The district court noted that the Government had conceded that the district court possessed power to order relevant discovery. *Id.* at 11. The district court accordingly allowed Ms. Wild to "conduct limited discovery in the form of document requests and requests for admission from the U.S. Attorney's Office." *Id.*

18. Following up on the Court's order, on October 3, 2011, Ms. Wild served on Government counsel her first Request for Production (RFP). A copy of this Request for Production is attached as Exhibit 1 to this Affidavit. Ms. Wild's request broadly sought various documents connected with Epstein and the federal investigation and prosecution. The request sought production of documents that fell into 22 different categories connected with the case. These categories included all materials related to the Epstein investigation (RFP 1), to victim notifications (RFPs 2 & 3), to Epstein's efforts to obtain a favorable deal (RFP 8), to communications between the Government and Epstein regarding victim notifications concerning the NPA (RFP 15), to any possibly improper relationship between prosecutors and Epstein (RFP 16), and to any investigation done by OPR relating to any "conflict" regarding the case by USAO-SDFL (RFP 17 & 18).

19. Perhaps most important in connection with the later production of emails, Ms. Wild also made a request for all documents (which was defined as including emails) relating to the negotiations to resolve Epstein's federal criminal liability, as well as other information on the subject:

> Please provide all documents, correspondence, and other information between Government attorneys/officials (including both federal and state prosecutors) and attorneys for Jeffrey Epstein (or non-attorney[s] acting on Epstein's behalf) relating to (1) negotiations involving the possible prosecution (and ultimately the non-prosecution) by federal or state agencies for sex offenses, including sex offenses committed against Jane Doe #1 and Jane Doe #2, (2) Epstein's entry of state guilty pleas for related sex offenses; (3) a non-prosecution agreement entered into between Epstein and the Government that barred his prosecution for offenses committed against Jane Doe #1 and Jane Doe #2; (4) the fulfillment of Epstein's and/or the Government's obligations under the non-prosecution agreement and/or the state guilty pleas Epstein entered; (5) any work release or other conditional release of Epstein from confinement; (6) any designation of Epstein as a sex offender or restrictions on him contacting victims of his offenses (including Jane Doe #1 and Jane Doe #2); and (7) any termination of supervision or parole of Epstein. This information should include unredacted e-mails, letters, and correspondence of any type between government prosecutors working on the case (including, but not limited to, federal prosecutors Alexander Acosta, Jeffrey H. Sloman, Matt Menchel, Andy Lourie, Ann Marie Villafana, Dexter Lee, and Bruce Reinhart and state prosecutors Dahlia Weiss, Lana Belolovek, and others involved in the Epstein investigation) and defense attorneys representing Epstein (including, but not limited to, Roy Black, Jay Lefkowitz, Jack Goldberger, Martin Weinberg, Gerald Lefcourt, Michael Tien, Guy Lewis, Lilly Ann Sanchez, Ken Starr, Alan Dershowitz) and agents acting in support of Epstein (including, but not limited to, former President Bill Clinton and Andrew Albert Christian Edward (a/k/a Prince Andrew, Duke of York). This should also include letters of recommendation or similar communications submitted to any Government official vouching for or providing support for Jeffrey Epstein.

Exhibit 1, RFP 21 at 9-10.

20. Ultimately, after responses and replies of various types (including a motion to intervene by Epstein), rather than produce even a single document (*see* DE 129 at 2), the Government filed a new motion—a motion to dismiss Ms. Wild's action. DE 119. The Government also sought a stay of further discovery. *Id.*

21. On December 5, 2011, Ms. Wild responded in opposition to the motion to dismiss. DE 127. She also filed associated protective motions, including a "Protective Motion to Compel." DE 130. This motion specifically asked the Court to compel production of all (unprivileged) materials that Ms. Wild had sought in her previous requests for production. DE 130 at 1-2.

22. Following various responses and replies, not much happened in the case for nearly two years, until on March 14, 2013, Ms. Wild filed a new motion to compel production and for a prompt ruling on her pending motions. DE 183. Ms. Wild noted that she had filed for summary judgment nearly two years earlier and that "[t]hrough more than four-and-a-half years of litigation, … the Government has refused to reach a stipulated set of facts." DE 183 at 1.

23. Two weeks later, the district court entered an order in which the court "apologize[d] to the parties for not having resolved these matters sooner" and recognized "that this delay has prevented the case from proceeding on the merits." DE 184 at 1. The district court promised to rule "in the relatively near future." *Id.*

### **The District Court Orders the Government to Produce Relevant Documents**

24. On June 19, 2013, the district court denied the Government's motion to dismiss. DE 189. The district court concluded that the CVRA applied to Ms. Wild's claims, and that the resolution of those claims would require "development of a full evidentiary record." DE 189 at 12 n.6.

25. The same day, in an associated "omnibus order," the district court granted Ms. Wild's motion to compel (DE 130). *See* DE 190 (Ms. Wild's "motion to compel discovery from the government [DE 130] is GRANTED." The district court directed the Government to produce "responsive documents in response to all outstanding requests for producing of documents encompassing any documentary material exchanged by or between the federal government and persons or entities outside the federal government (including without limitation all correspondence generated by or between the federal government and Epstein's attorneys)." DE 190 at 2. The district court further ordered the Government to produce "all *other* responsive documents in response to all outstanding requests for production of documents," DE 190 at 2 (emphasis added), although to the extent that the Government believed that these documents were privileged, they could provide those to the Court *in camera*. *Id.*

26. On July 19 and 26, 2013, the Government turned over 1,357 pages of documents to Ms. Wild. DE 257 at 2 (cited in DE 330 at 3). These documents were essentially correspondence between prosecutors and Epstein's counsel that had previously been provided by Epstein in civil litigation, although these documents from the Government were not redacted (as Epstein's production had been).

27. At the same time, the Government also submitted 14,825 pages to the district court for *in camera* review. *See* DE 257 at 2 (cited in DE 330 at 3). The Government raised various privilege and other objections to producing the materials it submitted *in camera*, such as attorney-client privilege and work-product protection.

28. On August 2, 2013, the Government also filed for leave to file relevance objections to some of Ms. Wild's requests for production. DE 219.

29. On August 16, 2013, Ms. Wild made several filings in response to the government's production, attempting to obtain access to the documents: Notice of Filing Objections to Privilege

Log (DE 224); Motion to Compel Production of Documents that are not Privileged (DE 225) and a supporting affidavit (DE 225-1); Renewed Motion for an Order Directing the U.S. Attorney's Office not to Withhold Relevant Evidence (DE 226); and Protective Petition for Disclosure of Grand Jury Materials Relevant to Their Petition for Enforcement of their CVRA Rights (DE 227).

30. At around this time, Jeffrey Epstein intervened in the case. And on August 1, 2013, Epstein's lawyers took an appeal to this Court and succeeded in staying proceedings in the district court. Epstein's claim was that the documents between Epstein's lawyers and the Government were covered by a previously unrecognized "plea bargaining privilege." Following briefing and oral argument, on April 14, 2014, this Court rejected the claim. *Jane Doe 1 et al. v. United States*, 749 F.3d 999 (2014). Following the filing of various additional motions by Epstein's legal team, this Court issued its mandate and lifted its stay on June 11, 2014. DE 254.

31. The case then returned to the district court—and my efforts on behalf of Ms. Wild to develop the record of what happened continued. Now that the case was back in front of it, on September 22, 2014, the district court ruled on Ms. Wild's motion to compel production of documents that are not privileged (DE 225) and related motions. The district court noted that it had previously ordered the Government to produce documents responsive to Ms. Wild's discovery requests. DE 257 (citing DE 190). The district court also noted that it had directed the Government to file *in camera* all documents alleged to be privileged. Against this backdrop, Ms. Wild's motion for production of unprivileged documents was denied as moot, in light of the Government's previous production of documents. DE 257 at 3. The district court also set up a briefing schedule regarding privilege assertions. The Government was allowed to file relevance objections to Ms. Wild's first request for production. *See* DE 257 at 4 (granting DE 219, which sought leave to file relevance objections).

32. On October 6, 2014, the Government filed objections to some of Ms. Wild's requests for production—but, notably, not to RFP 21, which sought all correspondence and other documents between the Government and Epstein's lawyers regarding the NPA's negotiation. *See* DE 260.

33. On October 20, 2014, Ms. Wild reasserted her objections to the Government's assertions of privileges. DE 265. Ms. Wild provided a detailed set of arguments, including a lengthy supporting affidavit from me—Ms. Wild's counsel. DE 265-1. Among many other arguments, Ms. Wild pointed to the crime-fraud exception to attorney-client privilege and work product protections, which blocks assertion of privilege or work-product protection if various forms of misconduct are involved. DE 265 at 5-6.

34. On the same day, October 20, 2014, Ms. Wild also filed a response to the Government's Motion for Leave to File Relevance Objections. DE 266. Ms. Wild also objected that the Government had not clearly specified which documents it was objecting to producing. *Id.* at 3-6. Ms. Wild also argued that the materials were relevant to the case. *Id.* at 6-14.

35. On November 14, 2014, the Government replied to the victims' responses and objections. DE 277. The Government argued that it had not committed any misconduct (other than,

potentially, failing to properly notify the victims) and thus the crime-fraud exception was inapplicable. DE 277 at 5-7 (Gov't Resp. to Victims Reassertion of Objections to Privileges).

36. The Government also responded to Ms. Wild's argument that the existence of possible crime-fraud was shown by a 2011 inquiry by the Department's Office of Professional Responsibility, noting that OPR had "declined" to investigate. DE 277 at 7.

37. On November 24, 2014, the victims replied in support of their reassertion of objections to Government's assertion of privileges. DE 278.

38. In the course of responding to various motions, based on the representations from the Government in pleadings and in discussions, Ms. Wild's counsel stated that Ms. Wild had "now obtained the full text of correspondence between the defense attorneys and prosecutors." DE 298 at 6. The Government did not file anything suggesting that Ms. Wild had misunderstood the Government's representations.

## The District Court Orders the Government to Certify It Has Produced All External Documents.

39. On July 6, 2015, the district court reviewed the discovery issues and largely sustained the Government's privilege objections. DE 330. The district court began by recounting its earlier order to the Government, directing production of all materials exchanged between the prosecutors and persons or entities outside the federal government. DE 330 at 2. The district court noted that, in addition, the Government was allowed to file assertedly privileged material with the district court and had produced nearly 15,000 pages to the court for *in camera* review. DE 330 at 3. The district court then reviewed the Government's various objections to producing the materials that had been filed *in camera*, sustaining most of the Government's arguments. *See* DE 330 at 20-24.

40. Notably, in the course of making its ruling on privilege materials, the district court explained its understanding (which was the same as mine and co-counsel's) that all external communications between the Government and others (e.g., defense attorneys) had already been provided to Ms. Wild. In line with that understanding, the district court stated: "*The Court requests that the Government certify within 14 days that Petitioners [i.e., Ms. Wild and Jane Doe 2] have been provided with all external communications*." DE 330 at 24 (emphasis added).

41. Fourteen days later, on July 20, 2015, the Government filed a notice of "partial compliance" with the district court's direction, along with an unopposed motion for extension of time to comply with the remainder of the court's order. DE 332. With regard to partial compliance, the Government noted that it had withheld a few pieces of correspondence only because of handwritten notes by government attorneys on the documents. DE 332 at 1. "Clean" copies of those few documents were produced. *Id.* The Government also noted that "the Court has asked the United States to certify that certain documents were already produced." DE 332 at 4. The Government noted a hard drive crash in 2008 had impacted recovering some emails—although those emails had "been recovered" and needed to be reviewed. The Government requested fourteen more days to make its certification. *Id.*

42. On the same day, July 20, 2015, the district court granted the Government's motion for extra time to make the certification, to which the victims had stipulated. DE 334.

### The Government's Certification That it Has Produced All Relevant External Documents

43. Fourteen days later, on August 3, 2015, the Government filed a document styled as a "Notice of Filing Third Supplemental Privilege Log." DE 338. The notice briefly stated that various documents were being delivered to the district court for *in camera* review. DE 338 at 1. Accompanying the notice was a document, containing a chart regarding various documents, primarily correspondence between the prosecutors and FBI agents. DE 338-1. (None of the documents involved correspondence with defense counsel.) So at this point, the Government's certification of complete production of external emails appeared to have been completed. That was my understanding, co-counsel's understanding, and the only reasonable understanding.

44. On October 1, 2015, the district court ruled on the government's privilege log. The district court noted that it had conducted an *in camera* review of the documents in question, finding it necessary to review a new issue. DE 339 at 1. The court noted that the Government was asserting attorney-client privilege regarding correspondence between prosecutors and FBI agents. The district court rejected that that argument and directed production of specified documents. DE 339 at 1-3.

45. At this point, in light of the Court's direction to the Government to certify that it had provided all "external communications" and the Government's actions recited above, it was my understanding that I had received all external communications between the Government and Epstein's attorneys.

46. At no point during this process was I ever told about any "data gap" in Alex Acosta's email inbox. At no point during this process was I ever told about the Government withholding any emails that were covered by RFP 21.

### Summary Judgment is Granted for Ms. Wild

47. On February 10, 2016, co-counsel and I filed our lengthy motion for summary judgment on the issue of whether the Government had violated Ms. Wild's CVRA rights, including her rights to confer with prosecutors, to be treated with fairness, and to receive accurate notice of court hearings. DE 361. The factual predicate for that motion was largely based on the emails and correspondence which had been provided by the Government. DE 361 at 7-47.

48. In spring and summer 2016, the parties engaged in settlement discussions. Those discussions were unsuccessful.

46. On August 25, 2016, I served on the Government a second set of Requests for Production and Requests for Admission. On March 31, 2017, the Government responded to these requests.

46. On June 2, 2017, the Government filed its opposition to Ms. Wild's Motion for Summary Judgment and its own, Cross-Motion for Summary Judgment. DE 401-2. In support of this motion, the Government filed an affidavit from Maria Villafaña ("the line prosecutor"), explaining reasons why the Government had taken the actions that it did in negotiating the NPA. DE 403-19. On June 6, 2017, the Government filed a response to Ms. Wild's statement of facts. DE 407.

49. On August 11, 2017, I filed for Ms. Wild a Motion for Finding Waiver of Work Product and Similar Protections by the Government and for Production of Documents. DE 414. The motion argued that the line prosecutor's affidavit revealed internal deliberations of the Government. On August 25, 2017, the Government responded in opposition to the motion. DE 421. On September 1, 2017, the victims replied in support of their motion for waiver. DE 422.

50. On August 11, 2017, the victims replied in support of their motion for summary judgment. DE 417.

51. A year and a half later, on February 21, 2019, the district court granted Ms. Wild's motion for summary judgment, finding that the Government had violated her right to confer with prosecutors. DE 435. The district court did not reach Ms. Wild's argument that her right to be treated with fairness had been violated. The district court denied, without prejudice, Ms. Wild's motion for finding of a waiver of work product protections. DE 435 at 33.

52. After the district court found the Government had violated Ms. Wild's CVRA rights, briefing followed on what remedies should be granted for that violation. *See* Ms. Wild's Pet. at 13-14. As part of her remedies briefing, Ms. Wild renewed her waiver motion, asking the district court for the second time for a finding that the Government had waived privilege and work product protection by asserting that its internal deliberations concerning the NPA were all benign. Ms. Wild also explained why it was important for the victims to have the opportunity to learn as much as possible about the decision-making in this case. DE 458 at 28-29. The Government filed no specific response to this request for a finding of waiver. *See* DE 464 at 55-56. But the district court ultimately denied this particular request and, indeed, dismissed the entire case as moot in light of Epstein's apparent suicide. DE 478. Ms. Wild's petition to this Court followed.

### The OPR Investigation into the Handling of the Epstein Case

53. Meanwhile, in Washington, D.C., interest in the Government's handling of the Epstein case led to an investigation by the Justice Department's Office of Professional Responsibility (OPR).

54. As established in congressional records, on January 15 and 16, 2019, William Barr appeared before the Senate Judiciary Committee for a confirmation hearing to be Attorney General of the United States. During the hearing, Senator Sasse inquired about how Jeffrey Epstein received such a lenient resolution of his federal criminal exposure.

55. During the hearing, Senator Sasse recounted news reports that "in 2007, despite ample physical evidence and multiple witnesses corroborating the girls' stories, federal prosecutors and

Epstein's lawyers quietly put together a remarkable deal for Epstein, then age 54. He agreed to plead guilty to two felony prostitution charges in State Court, and, in exchange, he and his accomplices received immunity from Federal sex trafficking charges that could have sent him to prison for the rest of his life. He served 13 months in a private wing of the Palm Beach County stockade. His alleged co-conspirators, who helped schedule his sex sessions, were never prosecuted. And the deal … was sealed so that no one, not even his victims, could know the full scope of Epstein's crimes and who else was involved. The fact that Federal prosecutors appear to have crafted this secret sweetheart deal for a child rapist obviously enrages moms and dads everywhere." U.S. Senate Jud. Comm.: Confirmation Hrng. on the Nomination of Hon. William Barr to be Attorney General of the United States, 116 Cong., 1st Sess. (Jan.15 and 16, 2019).

56. Senator Sasse asked Mr. Barr to investigate the Epstein case: "On this particular case, will you commit to making sure that there is a full and thorough investigation into the way DOJ handled the Epstein case?" *Id.*

57. Mr. Barr committed to investigate: "[I]f I am confirmed, I will make sure your questions are answered." *Id.*

58. Mr. Barr was later confirmed to be the U.S. Attorney General.

59. On February 6, 2019, Department of Justice's Office of Legislative Affairs informed Senator Sasse that OPR had opened an investigation in the Epstein matter. OPR Rep. v-vi.

60. The next day, February 7, 2019, my co-counsel (Professor Paul Cassell) sent a letter to OPR, wondering why OPR had not undertaken a similar inquiry back in 2010, when he had requested such an investigation on behalf of Ms. Wild and other Epstein victims. *See* Letter from Prof. Paul Cassell to OPR (Feb. 7, 2019) (Exhibit 2 to this Affidavit).

61. From February 6, 2019, through November 12, 2020, OPR investigated the Epstein case, ultimately releasing to Senator Sasse and other members of Congress its report on the subject on November 12, 2020. *See* OPR Rep. (transmission cover letter).

### The Justice Department's Meeting with Victims on the OPR Report

62. On around September 16, 2020, I was contacted by Stacie B. Harris, Associate Deputy Attorney General and National Coordinator for Child Exploitation and Human Trafficking at the U.S. Department of Justice. In subsequent phone calls between Ms. Harris, myself, and my co-counsel, Ms. Harris indicated that OPR would be releasing its report on the Epstein case shortly. Ms. Harris indicated that there would be a meeting where Epstein's victims would be invited and informed of the OPR Report findings before the report was released. I agreed to provide assistance and did provide assistance in arranging that meeting.

63. Initially a meeting was set in Miami for October 22, 2020. Ultimately, the meeting was postponed until November 12. 2020.

64. On November 12, 2020, I attended a meeting in the Miami area with Ms. Harris, numerous Epstein victims as well as several victims representatives and attorneys, including my co-counsel. During the meeting, Ms. Harris described the "Executive Summary" to the OPR Report. Ms. Harris also fielded questions from victims and representatives, made several phone calls to OPR representatives in Washington, D.C., to acquire answers to several questions, and then returned with the answers to those questions.

65. Cell phones and other recording devices were not permitted in the meeting. Accordingly, my recollection of the meeting is based on my memory and notes taken by myself and co-counsel.

66. One new and important fact that Ms. Harris reported during the meeting was that all of emails in Alex Acosta's inbox from May 26, 2007 through April 2, 2008 were missing. The missing emails were ascribed to a "technical glitch." This was first time I had heard about any Acosta emails being missing.

67. A follow up question to Ms. Harris attempted to identify exactly when OPR had learned of the gap. After a call to OPR, Ms. Harris returned and reported that OPR learned of the gap at some point during its investigation.

68. During the meeting, Ms. Harris was also asked whether OPR intended to release the entire OPR Report (not just the Executive Summary) to the victims. Ms. Harris stated that it was being released to members of Congress who had requested it, and that Congress had the ability to release it. Ms. Harris assured that if members of Congress elected to release the Report, the Justice Department would post the report on its website to make it available to Epstein's victims.

69. During the meeting, Ms. Harris was asked if OPR was aware of allegations that prosecutors in USAO-SDFL had received employment opportunities after leaving the Office that appeared to have been connected to Epstein. Ms. Harris called OPR and then returned to report that OPR was aware of these allegations but that they did not change OPR's conclusions.

70. Shortly after the meeting concluded, Ms. Harris indicated to my co-counsel that Ms. Wild's request for prompt production of any missing emails or other information had been communicated to the U.S. Attorney's Office for the Northern District of Georgia (USAO-NDGA), which was handling the CVRA litigation. Ms. Harris indicated that all questions related to the CVRA litigation had to be directed to USAO-NDGA.

71. Without revealing any specifics about what victims stated during the meeting, the general tenor of the meeting was that the victims were dissatisfied that OPR had failed to carefully investigate all concerns about the handling of the Epstein case.

**The OPR Report Reveals Missing Acosta Emails**

72. Within a day of the meeting, the OPR Report was publicly available, apparently having been released by Congress and posted on the *Washington Post's* website. *See*

https://www.washingtonpost.com/context/read-the-report-investigation-into-the-u-s-attorney-s-office-for-the-southern-district-of-florida-s-resolution-of-its-2006-2008-federal-criminal-investigation-of-jeffrey-epstein-and-its-interactions-with-victims-during-the-investigation/db9373e8-22f8-4712-b4a7-be844d162de0/?itid=lk_inline_manual_4   (visited November 14, 2020). I have been informed by Ms. Harris that the Justice Department will place the full report on its website on November 16, 2020.

73. I have reviewed the OPR Report, and in reaching its conclusions, OPR relied primarily on internal emails among prosecutors and communications between the Government and defense counsel. *See* OPR Rep. 11.

74. The 286-page OPR report quotes extensively from various emails. However, it is not until after the end of the report—at page 287, in a "methodology" addendum—that readers of the Report learn about a "data gap" in Mr. Acosta's email inbox. OPR was unable to recover emails to Mr. Acosta that were sent during a period spanning more than ten months, which just so happen to be the exact time period most relevant to the Epstein investigation—from May 26, 2007, through April 2, 2008. OPR Rep. 288.

75. This "data gap" in the Acosta emails covers the months of greatest interest to anyone trying to determine what happened during the Epstein NPA negotiations. The gap begins on May 26, 2007. May is the month the line prosecutor has explained that her 60-count and 53-page draft indictment against Epstein and three of his co-conspirators was completed. The first substantive meeting between prosecutors and Epstein defense attorneys took place a month later, on June 26, 2007. OPR Rep. at 34. Thereafter, a review of the correspondence that I have been provided shows significant negotiations between the USAO-SDFL and Epstein's lawyers in July through the end of September 2007, when the NPA was ultimately signed. *See also* OPR Report at 36-37 (noting intense activity during this time). The private "breakfast meeting" between Acosta and Lefkowitz was on October 12, 2007. Negotiations between Epstein lawyers and the USAO-SDFL regarding victim notifications were on-going between November and December 2007. The Epstein defense team took an "appeal" to Main Justice in the early months of 2008, with many of the materials being sent during March 2008. The email gap ends on April 2, 2008.

76. Because Acosta was the person with ultimate authority to approve (or disapprove) any resolution of the Epstein NPA, his emails are among the most important documents in understanding what the USAO-SDFL's final decision was going to be regarding the NPA.

77. As recounted above, emails coming into Acosta's inbox were specifically requested by me in RFP 21 in late 2011—a request that I pursued through multiple years of litigation. As recounted above, in 2013 and 2014, the district court ordered the Government to produce all emails covered in RFP 21.

78. The OPR Report also mentions that it was unable to locate in USAO-SDFL records "a few [mails] to or from Acosta" and Epstein's defense attorneys. OPR Rep. 165. OPR does not explain further what Acosta emails "to or from" defense attorneys were missing.

13

79. I had understood from the Government's filings in 2015, that it had "certified" that Ms. Wild had received all "external" emails and documents involving communications concerning the NPA between USAO-SDFL and Epstein's lawyers.

80. As an experienced attorney who has been involved in document production in many significant legal cases, I can attest it would have been highly unlikely that someone doing a thorough email document search of Mr. Acosta's emails would not have noticed a ten-month gap in the inbox email file.

### The OPR Report Reveals that Other Emails Are Missing from the Production Made to Ms. Wild

81. In the short time since the Report has been made available, I have already been able to identify some emails that were not properly produced to Ms. Wild during the discovery proceedings recounted above. The following paragraphs provide several examples of missing emails.

82. In concluding that these emails appear to be missing from the production made by the Government, I have reviewed a chronological file of the materials that my Office assembled of production made by the Government during the case. In just a few minutes' time, I identified several "external" emails that appears to have been available to OPR but inexplicably never made available to Ms. Wild.

83. According to the OPR Report (p. 82), on Saturday September 22, 2007—shortly before the NPA was signed—Epstein defense attorney Lilly Ann Sanchez sent a series of emails to Lourie. She noted that she "spoke to [M]att [Menchel]" and asked Andrew Lourie to call her. Two hours later she sent Lourie a second, lengthy email, strongly objecting to the registration requirement, and outlining "all arguments against registration [as a sexual offender] in this case." So far as we can determine in our records, none of the "series" of emails has been produced to us. This email chain is significant because it mentions a continued connection between Matt Menchel and Lilly Ann Sanchez (Epstein's attorney whom Menchel dated at some previous point) regarding the negotiations—even though Menchel had left the USAO-SDFL to enter private practice.

84. As another example of missing information, according to the OPR Report (p. 33), at Menchel's instruction, on June 18, 2007, the line prosecutor sent a letter to the defense counsel identifying what she described as the "statutes under consideration." So far as we can determine in our records, this transmitting email and letter has not been produced to us. This letter and transmitting email is significant because it describes the USAO-SDFL's understanding of the scope of the investigation. It is also significant because the line prosecutor apparently objected to her supervisors sending this specific information to Epstein's lawyers, but she was instructed to do so anyway.

85. As another example of missing information, on June 29, 2007, Lilly Ann Sanchez sent an email to the line prosecutor requesting a two-week delay in producing one of Epstein's computers, which likely had child sexual exploitation images on it. This email discussed a delay to try and reach a "state-based resolution" of the case. OPR Rep. 45. At around the same time,

14

Epstein defense attorney Roy Black wrote separately to the line prosecutor, demanding to know whether the line prosecutor had complied with applicable Department policies before seeking the computer. *Id.* So far as we can determine in our records, this correspondence has not been produced to us. This correspondence is significant because, had the efforts to obtain the computer continued, it is likely that the USAO-SDFL would have obtained ironclad forensic evidence to charge Epstein with child pornography crimes. Any reason to delay or forego obtaining this critical evidence would have been important for the victims to know during this litigation.

86. As another example of missing information, on December 7, 2007, Acosta sent a letter to Lilly Ann Sanchez regarding the "breakfast meeting." This is one of two contemporaneous records regarding the breakfast meeting. OPR Rep. 90. So far as we can determine in our records, this correspondence has not been produced to us. This correspondence is significant because what happened at the unusual breakfast meeting is highly disputed.

87. It also appears that "internal" emails may not have been properly provided to Judge Marra for his *in camera* review. This conclusion must necessarily be more tentative, because the privilege log provided by the USAO-SDFL to Ms. Wild does not provide document-by-document specificity (as is normal in privilege logs). But, for example, in reviewing the Government's privilege log dated July 19, 2013 (DE 212-1), I do not immediately see a reference to a July 2007 email/letter from Matt Menchel to the line prosecutor "rebuking" her for pressing to federally charge Epstein. *See* OPR Rep. 42.

88. It is my opinion that it is likely other internal emails relevant to the case were not provided to the district court for *in camera* review. In reaching this conclusion, I have examined the Government privilege logs, notably the privilege logs found at DE 212-1 and 216. I have then searched for the word "Sanchez," which is the last name of Lilly Ann Sanchez, one of Epstein's defense attorneys who was involved in the negotiation of the NPA. This search produced only nine references to documents mentioning "Sanchez," only three of which were before the NPA was signed. It is my understanding, based on information and belief as well as the discussion of Sanchez in the OPR Report, that there should be more internal emails discussing Ms. Sanchez's communications.

89. In the short time since the OPR Report was released, and with the limited resources available to Ms. Wild's legal team, I have not had the opportunity to comprehensively compare the production of materials that we received and the materials mentioned in the OPR Report. I believe that the examples of missing materials offered above are illustrative (not exclusive) and those other missing materials could be identified with more time. I plan to try and work with the Government to confirm that the emails described above are missing from the Government's earlier production and, more broadly, to understand what emails mentioned in the OPR Report were and were not produced. I will update the Court if important new information is learned.

90. I am personally aware of a letter my co-counsel, Professor Paul Cassell, sent to the U.S. Attorney's Office for the Northern District of Georgia on November 12, 2020, regarding the missing emails. *See* Exhibit 3 (attached to this affidavit). In his letter, Professor Cassell requested that USAO-NDGA assist in identifying whether or not emails like those described above were missing from the production of materials made in the case. I am personally aware that the Office

declined to provide that assistance, instead sending an email indicating its view that such "discovery" issues were not properly before this Court at this time.

## New Information Learned from the OPR Report

91. Last but not least, the OPR Report contains significant evidence—including important details never previously revealed—supporting Ms. Wild's position that the Government violated her CVRA rights because (among other things) she and other victims were treated unfairly throughout negotiations regarding the Epstein NPA.

92. The following paragraphs in this section contain new, detailed information that had not been fully disclosed to Ms. Wild. If the Government had made this detailed information available sooner, I would have included much of it in my motions and arguments on Ms. Wild's behalf in the district court and in this Court.

93. In around May 2007, the FBI had wanted to arrest Epstein in the Virgin Islands, where he was judging a beauty pageant, but were not permitted to do so. The FBI's case agents were disappointed with the decision and the Supervisory Special Agent was extremely upset about it. The USAO-SDFL overruled the FBI's request, asking that the line prosecutor "not commit us to anything [i.e., to prosecuting Epstein] at this time." OPR Rep. 27.

94. The line prosecutor in the Epstein case calculated that Epstein's exposure under the U.S. Sentencing Guidelines would be a prison term of 168 to 210 months, with a possible upward departure. OPR Rep. 29. In light of this calculation and other information supporting a strong sex trafficking case against Epstein, the line prosecutor pushed aggressively for federal prosecution. She was repeatedly overruled by her supervisors. *See, e.g.,* OPR Rep. 183-85.

95. The line prosecutor was rebuked, in a written email, by Matt Menchel for aggressively trying to pursue federal charges against Epstein. OPR Rep. 42.

96. The line prosecutor told OPR that she was angry when she received Menchel's July 2007 email explaining that he had proposed to Sanchez resolving the federal investigation through a state plea. In the line prosecutor's view, the proposed state resolution "didn't make any sense" and "did not correspond" to Department policy requiring that a plea offer reflect "the most serious readily provable offense." OPR Rep. 40.

97. Key decisions during the NPA's negotiations were made by Matt Menchel, who had previously apparently dated Epstein defense attorney Lilly Ann Sanchez. This relationship was not disclosed to the other supervisory attorneys in USAO-SDFL—i.e., Lourie, Sloman, and U.S. Attorney Alex Acosta. If Menchel had disclosed the romantic relationship to the Professional Responsibility Officer in the USAO-SDFL, Menchel could have been advised to step aside from the case. No independent assessment of the nature or depth of the relationship was made by anyone in the USAO-SDFL. OPR Rep. 154 n.226.

98. According to the line prosecutor, she believed that the two-year term of imprisonment included in the initial "term sheet" provided to the defense was developed by Menchel as a favor

to (his previous romantic partner) Sanchez, who was one of Epstein's attorneys. The line prosecutor recalled hearing from a supervisory prosecutor that Matt Menchel was asked by Sanchez to "do her a solid" and convince Mr. Acosta to offer a two-year term of imprisonment. OPR Rep. 153.[1]

99. At a July 26, 2007, meeting of agents and prosecutors, Menchel announced to the group that Acosta had decided on a resolution of the case under which Epstein would serve only two years. He then left the meeting with almost no discussion. The line prosecutor was "shocked and stunned" by this announcement. OPR Rep. 48-49.

100. An FBI squad supervisor yelled at AUSA Sloman about the decision not to charge Epstein federally. OPR Rep. 59.

101. According to the line prosecutor, Alex Acosta tried to create the appearance of having been an arm's length from the deal by sending an email creating a paper trail and stating "I don't think I should be part of negotiations. I'd rather leave it to you if that's ok." OPR Rep. 74.

102. OPR's review of Acosta's handling of the Epstein NPA allowing a state-based resolution of the case concluded that Acosta's view of the case was "flawed and unduly constricted." OPR Rep. 172.

103. Shortly before the NPA was signed, additional information came to light that suggested that the Florida State Attorney's Office's was predisposed to manipulating the state process in Epstein's favor. OPR Rep. 174. This evidence suggested that "the state authorities should not have been considered to be a reliable partner in enforcing the NPA." *Id.*

104. OPR concluded that Acosta ended the Epstein investigation without the USAO-SDFL having obtained an important category of potentially significant evidence: the computers removed from Epstein's home prior to the Palm Beach Police Department's execution of a search warrant. OPR Rep. 175. Acosta did this even though there was good reason to believe the computers contained relevant—and potentially critical—information; and it was clear that Epstein did not want the contents of his computers disclosed. The USAO-SDFL ultimately agreed to end this investigation and permanently end the Government's ability to obtain possible evidence of significant crimes with apparently little serious consideration of the potential cost. OPR Rep. 173.

105. In her 2017 Declaration in the CVRA litigation, the line prosecutor stated that, given the challenges of obtaining victims' cooperation with a federal prosecution, "I believed and still believe that a negotiated resolution of the matter was in the best interests of the [USAO] and the victims as a whole. The [USAO] had also reached that same conclusion." In her OPR interview, however, the line prosecutor drew a distinction between resolving the investigation through negotiations that led to what in her view was a reasonable outcome, which she would have supported, and "this negotiated resolution"—that is, the NPA—which she did not support. OPR Rep. 184 n.256.

---

[1] For various reason, OPR ultimately concluded that it could not confirm this account from the line prosecutor. OPR Rep. at 153.

106. With regard to the NPA's immunity provision, this broad prosecution declination would likely have been unwise in most cases; but in this case in particular, USAO-SDFL did not have a sufficient investigative basis from which it could conclude that there were no other individuals who should be held accountable along with Epstein. OPR Rep. 185. Menchel's successor in the USAO-SDFL indicated that he had never heard of such a thing in his 33 years of experience as a prosecutor. *Id.* at 185 n.258. A senior AUSA with substantial experience prosecuting sex crimes called it "horrendous" to provide immunity for participants in sex trafficking. *Id.*

107. OPR concluded that the USAO-SDFL agreed to a confidentiality provision with little apparent consideration of the implications of the provision for the victims. OPR Rep. 186.

108. OPR concluded that Acosta exercised poor judgment in that he chose a course of action that was in marked contrast to the action that the Department would reasonably expect an attorney exercising good judgment to take. OPR Rep. 187.

109. On September 6, 2007, the line prosecutor raised the issue of prior consultation with Epstein's victims, noting that she was holding off in light of instructions from higher ups. The line prosecutor also noted that the Chief of the Justice Department's Child Exploitation and Obscenity Section, Andrew Oosterban, had concluded that reaching out to victims to get their prior approval was "required under the law." OPR Rep. 204. The Chief of the Palm Beach Police Department also wanted to know if the victims had been consulted about the deal. The line prosecutor was instructed that "you can't do that now." OPR 205.

110. On December 7, 2007, the line prosecutor prepared victim notification letters for all the victims, which gave the victims information about how to make a statement about the case during the Florida state plea hearing. Following drafting the letter, First Asst. U.S. Attorney Sloman told the line prosecutor to "[h]old the letter." He gave no explanation. The line prosecutor put the letters in a drawer and felt disgusted. ORP Rep. 215 n. 317.

111. Following the Fifth Circuit's decision in *In re Dean,* holding that victims have a right to confer with prosecutors on resolutions even before charging, the Appellate Division Chief of the USAO-SDFL noted that the "court's opinion makes sense." OPR Rep. 229.

112. As Epstein was preparing to plead guilty, the line prosecutor was told by higher ups that she could inform Ms. Wild's attorney (Mr. Edwards) "of [the plea date], but [she] still couldn't inform him of the NPA." OPR Rep. 232.

113. According to the Assistant State Attorney handling Epstein's plea in Florida state court, any "federal victims" who were not a party to the state case (i.e., almost every single one of them) "would not have been able to simply appear at the state plea hearing and participate in the proceedings." OPR Rep. 233 n.357.

114. In late June 2008, the line prosecutor drafted a victim notification letter concerning the June 30, 2008 plea. Because Mr. Acosta had agreed in December 2007 that USAO-SDFL

would not provide written notice of the state change of plea, the written victim notifications were prepared to be sent only after Epstein's guilty plea. OPR Rep. 234.

115. OPR reached the conclusion that U.S. Attorney Alex Acosta could have authorized disclosure of the plea hearing to victims, even if he did not believe the CVRA required it, to ensure that the victims identified in the federal investigation were aware of the state court proceeding. Because the state pleas ended the federal investigation into Epstein's conduct, ensuring that the victims were notified of the state plea hearing would have been consistent with the Department's overarching commitment to treat victims with fairness, dignity, and sensitivity. Acosta's failure to prioritize notification and coordinate communication about the resolution of the case to ensure Epstein's victims were given an opportunity to attend the plea hearing, and to possibly speak about the impact of Epstein's crimes, presented a glaring contrast with Acosta's responsiveness to the demands of Epstein's attorneys, which included the unusual courtesy of allowing them to preview and respond to the USAO's draft victim notifications. OPR Rep. 272-73.

116. OPR reached the conclusion that Acosta failed to ensure that victims were afforded an opportunity to attend a hearing that was related to their own cases and thus failed to ensure that victims were treated with forthrightness and dignity. OPR Rep. 273.

117.  As is apparent from the facts recounted above, the Government has resisted reaching an agreement on the relevant facts of this case, asserting privileges and work product protection throughout. On November 12, 2020, the OPR Report clearly abandoned the Government efforts to maintain those privileges and work-product protections by making extensive disclosures of previously undisclosed information held within the Government. *See* OPR Rep. *passim.*

\* \* \* \* \*

I declare that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 16th day of November, 2020.

        /s/ Bradley J. Edwards
        BRADLEY J. EDWARDS, ESQ.

Exhibits:
1. October 3, 2011 Request for Production
2. February 7, 2019 Letter from Professor Paul Cassell to OPR
3. November 12, 2020 Letter from Professor Paul Cassell to the U.S. Attorney's Office – N.D. Ga.

# EXHIBIT 1

October 3, 2011 Request for Production

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 08-80736-Civ-Marra/Johnson**

JANE DOE #1 and JANE DOE #2,

      **Plaintiffs**

      **v.**

UNITED STATES,

      **Defendants**

_____/

**JANE DOE #1 AND JANE DOE #2'S FIRST REQUEST FOR PRODUCTION**
**TO THE GOVERNMENT REGARDING INFORMATION RELEVANT TO THEIR**
**PENDING ACTION CONCERN THE CRIME VICTIMS RIGHTS ACT**

COME NOW Jane Doe #1 and Jane Doe #2 ("the victims"), by and through undersigned

counsel, and request the defendant United States (hereinafter "the Government") to produce the

original or best copy of the items listed herein below for inspection and/or copying, pursuant to

the Court's Order (DE #99) directing discovery in this case.

**BACKGROUND**

As the Government will recall, the victims have asked the Government to stipulate to

undisputed facts in this case.  The Government has declined.  Accordingly, the victims filed their

Motion for Finding of Violations of the Crime Victims' Rights Act and Request for a Hearing on

Appropriate Remedies (DE 48) (the victims' "summary judgment motion") along with a Motion

to Have Their Facts Accepted Because of the Government's Failure to Contest Any of the Facts

(DE 49).

On September 26, 2011, the Court denied the victims' motion to have their facts accepted

(DE 99 at 11).  At the same time, however, the Court has ordered discovery to develop the

factual record concerning the summary judgment motion (DE 99 at 11).   The Court reserved ruling on the victims' motion for an order directing the Government not to suppress relevant evidence (DE 99 at 11).

On September 28, 2011, the victims requested that the Government voluntarily provide documents concerning this case.  The Government declined to provide even a single document. Accordingly, the victims now seek the following information relevant to their pending summary judgment motion.

## DISCOVERY REQUESTED

The numbered discovery requests below should all be construed in light of the definitions of terms provided at the end of the requests.

1.   In the victims' currently-pending summary judgment motion, the victims contend that the Government conducted an extensive criminal investigation into Jeffrey Epstein's sexual exploitation of young girls, including Jane Doe #1 and Jane Doe #2 between 2001 and 2008. The victims also contend that the FBI and other federal agencies established that Epstein operated a large criminal enterprise that used paid employees and underlings to repeatedly find and bring minor girls to him.  In deferring ruling on the victims' summary judgment motion, the Court noted that the victims had alleged that the FBI and the U.S. Attorney's Office's "investigation developed a strong case for a federal prosecution against Epstein based on 'overwhelming' evidence."  DE 99 at 2.  The Court, however, also noted that this was an allegation that needed "further factual development."   DE 99 at 2 n.2.  Please provide all documents, correspondence, and other information that supports these victims' allegations, including:

    (a) the FBI case file on the Epstein case;

    (b) all documents, correspondence, witness statements, FBI 302s, and other similar information, that the Government collected as part of its case against and/or investigation of Epstein, including any information provided to Epstein or receive from Epstein as part of "discovery" or exchange of information concerning the case;

    (c) all documents, correspondence, witness statements, and other similar information that the Government received from any federal, state, local, or other law enforcement agency regarding sex offenses committed against children by Jeffrey Epstein;

    (d) the 82-page prosecution memorandum (a/k/a "pros memo") outlining numerous federal sexual offenses committed by Epstein (and any attachments to that memorandum) and the 53-page draft indictment for numerous federal

offenses that the Government developed in this case and any similar successor or predecessor document; and

(e) Any other prosecution memorandum regarding Jeffrey Epstein (and any documents attached to that memorandum) and all draft federal indictments that were prepared regarding Epstein.  Please also provide all documents, correspondence, and other information regarding these prosecution memoranda and the draft federal indictments.

2.   Throughout their pending summary judgment motion, the victims contend that they received only limited notifications from the Government (and, in particular, the U.S. Attorney's Office acting through FBI agents) about the plea negotiations that occurred with Jeffrey Epstein and the non-prosecution agreement that was ultimately reached.  Please provide all documents, correspondence and other information regarding victim notifications in this case, including (but not limited to):

a)   All crime victims notifications (and draft notifications) sent to Jane Doe #1 and Jane Doe #2 and the other identified victims of Epstein's offenses;

b)   All correspondence, documents, and other information regarding negotiations between the Government and Epstein's defense attorneys concerning the extent and nature of notifications to be made to Epstein's victims;

c)   All correspondence, documents, and other information regarding discussions between the Government, the FBI, the Palm Beach Police Department, the Palm Beach County State Attorney's Office, and Epstein's defense attorneys concerning the extent and nature of notifications to be made to Epstein's victims;

d)   All correspondence, documents, and other information regarding "marching orders" that were given to FBI agents regarding the information that they could provide to the victims about the negotiations and the non-prosecution agreement;

e)   All correspondence, documents, and other information regarding information that could be given to attorneys for the victims about the non-prosecution agreement, including information about what could be told to Brad Edwards (counsel for Jane Doe #1 and Jane Doe #2) about the non-prosecution agreement;

f)   All correspondence, documents, and other information regarding Epstein's awareness that his victims (including Jane Doe #1 and Jane Doe #2) would not be notified of the non-prosecution agreement (and its ultimate presentation in court) or given a chance to confer regarding the plea negotiations he was conducting with the Government.

3.   The victims allege in their pending summary judgment motion that the Government negotiated a non-prosecution agreement with Epstein and that among the subjects covered in that non-prosecution agreement was a confidentiality provision that precluded disclosing the agreement to them and to other victims.  Please provide all draft plea agreements (both state and federal) and non-prosecution agreements prepared either by attorneys for the Government or by attorneys for Epstein, as well as any correspondence, documents or other information pertaining to these agreements and to any confidentiality provision in these agreements.  Please indicate that date on which each of these proposed agreements was drafted and by whom.

4.  The victims allege in their pending summary judgment motion that the Government was interested in finding a place to conclude any plea agreement that would effectively keep Epstein's victims (most of whom resided in or about West Palm Beach) from learning what was happening through the press.   Please provide all correspondence, documents, and other information pertaining to negotiations between the Government and Jeffrey Epstein concerning the court and/or location in which Jeffrey Epstein would enter any guilty plea (including in particular any negotiations concerning concluding the plea in Miami or other location outside of West Palm Beach).

5.  The victims allege in their pending summary judgment motion that part of the plea negotiations with Epstein involved Epstein's efforts to make sure that the victims would be represented in civil cases against Epstein by someone who was not an experienced personal injury lawyer.  Please provide all correspondence, documents, and other information pertaining to negotiations between the Government and Jeffrey Epstein regarding any legal representation of the victims in civil cases against Epstein, including any negotiations about what kinds of representation should be provided in a plea agreement or non-prosecution agreement.

6.  The victims allege in their pending summary judgment that the Government wanted the non-prosecution agreement with Epstein concealed from public view because of the intense public criticism that would have resulted had the agreement been disclosed and/or the possibility that victims would have objected in court and convicted the judge not to accept the agreement.  Please provide all correspondence, documents, and other information concerning the Government's and/or Epstein awareness or discussion of this possible public criticism and/or victim objections.

7.  The victims allege in their pending summary judgment motion that the Government was aware that it potentially had obligations under the CVRA to notify the victims about the non-prosecution agreement and any related state court plea agreement.   Please provide all correspondence, documents, and other information regarding the Government's awareness of its potential CVRA obligations in this case and regarding any discussions between the Government and Epstein concerning these CVRA obligations in this case.  This should include any objections raised by Epstein to any notification of the victims (including Jane Doe #1 and Jane Doe #2) and any Government response to these objections.  This should also include any correspondence and information about whether the CVRA applied to the victims.

8.  The victims allege in their pending summary judgment motion that, after Epstein signed the non-prosecution agreement, his performance was delayed while he used his significant social and political connections to lobby the Justice Department to obtain a more favorable plea deal (including lobbying components of the Justice Department in Washington, D.C., including the Child Exploitation Obscenity Section).  Please provide all correspondence, documents, and other information regarding Epstein's lobbying efforts to persuade the Government to give him a more favorable plea arrangement and/or non-prosecution agreement, including efforts by former President Bill Clinton, Andrew Albert Christian Edward (a/k/a Prince Andrew, Duke of York), Harvard Law Professor Alan Dershowitz, Ken Starr, Lillian Sanchez, Jay Lefkowitz, and Roy Black on his behalf.

9.  On January 10, 2008, Jane Doe #1 and Jane Doe #2 received letters from the FBI advising them that "this case is currently under investigation."  Please provide all documents, correspondence, and other information relating to those representations being made by the FBI to Jane Doe #1 and Jane Doe #2, including all information about whether the FBI was aware of the non-prosecution agreement at that time and about whether Epstein was aware of the notifications being made to the victims.

10.  In their pending summary judgment motion, the victims have alleged that the FBI was led to believe that their investigation of Epstein was going to produce a federal criminal prosecution and that the FBI was also misled by the U.S. Attorney's office about the status of the case. Please provide all documents, correspondence, and other information relating to these allegations, including:

   a)  All documents, correspondence, and other information relating to discussions between the U.S. Attorney's Office and the FBI concerning the status of the investigation and the plea discussions with Epstein, as well as what kind of charges would appropriately be filed against Epstein;

   b)  All documents, correspondence, and other information relating to the U.S. Attorney's Office's representations to the FBI and any other state or local law enforcement agency about how this case was being handled; and

   c)  All documents, correspondence, and other information relating to whether the FBI would support the position of the U.S. Attorney's Office that it has not violated the rights of Epstein's victims in this case.

11. In their pending summary judgment motion, the victims have alleged that they had various meetings with Government prosecutors and/or agents (including FBI agents).  Related to these meetings, they also allege that in mid-June 2008, their attorney (Bradley J. Edwards) discussed with an AUSA involved in the case the need for filing federal charges and that the AUSA asked the attorney to send a letter about why such charges should be filed without disclosing the existence of a previously-signed non-prosecution agreement.  The victims further allege that on about July 3, 2008, their attorney sent a letter urging the filing of federal charges against Epstein.  Please provide all documents, correspondence, and other information regarding these meetings with the victims and their legal counsel, including meetings with them on October 26, 2007, and January 31, 2008, and the contact with their legal counsel in mid-June 2008.  Please also provide all documents, correspondence, and other information related to contacts between the Government and the National Crime Victim's Law Institute (NCVLI) concerning possible legal representation or other assistance to the victims by NCVLI.

12. In their pending summary judgment motion, the victims allege that in mid-June 2008, their attorney (Bradley J. Edwards) discussed with an AUSA involved in the case the need for filing federal charges and that the AUSA asked the attorney to send a letter about why such charges should be filed without disclosing the existence of the non-prosecution agreement.  The victims further allege that on about July 3, 2008, their attorney sent a letter urging the filing of federal charges against Epstein. Please provide all documents, correspondence, and other information regarding these contacts, including e-mails and correspondence generated as a result of the attorney's inquiry and any action that was taken in response to the letter that he sent.

13. In their pending summary judgment motion, the victims allege that on or about June 27, 2008, the Government learned that Epstein would be entering his plea to state charges on about June 30, 2008.  Please provide all documents, correspondence, and information regarding:

    a) How the Government Office learned that the plea was going to be entered;

    b) How the Government notified victims about the entry of the guilty plea; and

    c) The contents of the notifications given to the victims about the entry of the guilty, including whether the victims were informed about the non-prosecution agreement and about whether the entry of this plea would preclude prosecution of crimes Epstein had committed against them.

14. In their pending summary judgment motion, the victims have alleged that the Government and Epstein worked together to keep the existence of the non-prosecution agreement secret, including declining comment about the existence of such an agreement when asked about it when his guilty plea in state court became public knowledge.  Please provide all documents, correspondence, and information about the Government's and Epstein's efforts to keep the existence of the non-prosecution agreement secret, including all e-mails and correspondence about "declining comment" or similar devices to keep the non-prosecution agreement secret.

15. In their pending summary judgment motion, the victims allege that at all materials times, it would have been practical and feasible for the Government to have kept the victims informed about the discussions concerning the non-prosecution agreement.  The victims further allege that on about July 9, 2008, the U.S. Attorney's Office provided notice to Jane Doe #1 of some of the terms of the agreement between it and Jeffrey Epstein.  The victims also received a "corrected" notification letter on about September 3, 2008.  Please provide all documents, correspondence, and other information about these notifications, including:

    a) any information about whether these notifications should or should not include some mention of the non-prosecution agreement;

    b) any information about the contents of these notifications;

    c) any communications between the Government and Epstein's counsel regarding what the notifications should contain, including any communication on or about July 9, 2008, objecting to parts of the draft;

    d) Any communications between the Government and Epstein's counsel about which parts of the non-prosecution agreement were operative (including whether Part 3 was operative);

    e) Any communications between the Government and Epstein's counsel regarding the September 3, 2008, corrected notification letter; and

    f) any documents, correspondence, and other information regarding the practicality and feasibility of providing notice to the victims of the existence of the agreement, which shall include any correspondence related to meeting with the victims or notifying them in any way of the non-prosecution agreement.

16. In their pending summary judgment motion, the victims allege that one of the senior prosecutors in the U.S. Attorney's Office joined Epstein's payroll shortly after important decisions were made limiting Epstein's criminal liability – and improperly represented people close to Epstein.  In light of this fact, the peculiar nature of the non-prosecution agreement

reached in this case, and other information in the possession of the victims, it is also possible that other improper relationships exist between Government agents and Epstein.  Please provide any documents, correspondence, and other information regarding the possibility of any improper relationship, including:

    a)  Attorney Bruce Reinhart's involvement in and/or awareness of any aspect of the Government's criminal investigation and/or possible prosecution/non-prosecution of Epstein;

    b)  Attorney Bruce Reinhart's involvement in and/or awareness of the Government's interest in any witness, subject, or target of the Epstein investigation, including Sarah Kellen, Ghislaine Maxwell, Nadia Marcinkova, Lesley Groff, Haley Robson, Louella Ruboyo, Larry Morrison, Larry Visoki, David Rogers, William Hammond, and Robert Roxburgh;

    c)  All documents, correspondence, and other information reflecting telephone calls (including telephone logs and telephone billing statements) made by or received by Reinhart from Jeffrey Epstein, the Florida Science Foundation, Jack Goldberger, Alan Dersowitz, Roy Black, Ken Starr, Lillian Sanchez, and any other person involved with the criminal defense of Jeffrey Epstein, including telephone calls to and from Jack Goldberger and the Florida Science Foundation;

    d)  All documents, correspondence, and other information (including, for example, e-mails) that were sent to, copied to, or sent by Reinhart in which the word "Epstein," "Kellen, "Ruboyo," "Morrison," "Visoki," "Rogers," "Hammond," Roxburgh," "Villafana, " "Florida Science Foundation," "Starr," "Black," "Goldberger," "Jeffrey," "Australian," "Lewis," "Sanchez," "358 El Brillo Way" appears and which are connected to or related to Jeffrey Epstein, Jack Goldberger, or the Jeffrey Epstein investigation or prosecution;

    e)  All documents, correspondence, and other information (including for example e-mails) of a similar nature that indicate that <u>any</u> other Government prosecutor has represented (or discussed representing) a person or entity related to Jeffrey Epstein or has received business or funds from a person or entity related to Jeffrey Epstein;

    f)  All documents, correspondence, and other information that indicate or suggest that <u>any</u> Government prosecutor or investigator (including state and local prosecutor or investigator) has had any form of business, social, personal, or other relationship with Jeffrey Epstein or a person or entity related to Jeffrey Epstein; and

    g)  All documents, correspondence, and other information that indicate or suggest that <u>any</u> Government prosecutor or investigator (including state and local prosecutor or investigator) would receive anything of value, directly or indirectly from Jeffrey Epstein or a person or entity related to Jeffrey Epstein (including any charitable contributions to be made by Epstein to any entity).

    17. In December 2010, the victims sent a letter to the U.S. Attorney's Office for the Southern District of Florida, requesting that the Office investigate whether "improper influences" were brought to bear during the negotiations involving the possible prosecution (and ultimately the non-prosecution) of Jeffrey Epstein.  That letter led to a reference of the matter to the Office of

Professional Responsibility (OPR) in the Justice Department in Washington, D.C., which began some kind of an inquiry/investigation.  Please provide:

   a) All documents, correspondence, and other information collected by the Office of Professional Responsibility (OPR) and any other component of the Justice Department (including the FBI) in response to the victims' letter;

   b) All documents, correspondence, witness statements, and other information collected as part of OPR's inquiry/investigation;

   c) All documents, correspondence, witness statements and other information collected as part of any criminal inquiry/investigation that was initiated as a result of that letter, including any inquiry/investigation into criminal conflict of interest violations (such as 18 U.S.C. § 205 and § 207)

   d) All documents, correspondence, witness statements, and other information collected by any federal investigative agency that was triggered by OPR's inquiry/investigation, including any FBI inquiry/investigation regarding any improper influences or criminal or ethical violations that may have been committed by government attorneys during the handling of the Epstein investigation and/or prosecution;

   e) Any documents, correspondence, and other information regarding the accuracy or inaccuracy of Bruce Reinhart's sworn statements (found in DE 79-1 at p. 31) that he "did not participate in any way in the Office's investigation of Epstein;" that he "was not involved in any of the Office's decisionmaking with regard to the Epstein matter;" and that he "never learned any confidential, non-public information about the Epstein matter;"

   f) Any documents, correspondence, or other information regarding the circumstances that lead OPR to send a letter to the victims on May 6, 2011, indicating that they would not provide any further assistance to the victims in connection with their allegations that improper influences were brought to bear on the Epstein case;

   g) Any document, correspondence, e-mail, memoranda, or other information prepared by OPR, the FBI, or other Justice Department Component as a result of or following up on the victims' December 2010 letter concerning the Epstein case; and

   h) Any documents, correspondence, or other information that OPR has collected or obtained regarding the Epstein investigation and/or prosecution.

18. At a couple points during the prosecution of this action, including in approximately December 2010 and most recently after the August 2011 hearing, the Justice Department in Washington, D.C., discussed or determined that the U.S. Attorney's Office for the Southern District of Florida (USAO SDFL) was "conflicted out", or may be conflicted out, of handling various issues related to the Epstein case because it suffered from a conflict of interest.  The Justice Department accordingly sent various issues related to the Epstein case (and, on information and belief, issues related to Jane Doe #1 and Jane Doe #2) to the Department of Justice and to a United States Attorney's Office in another District.  Please provide all documents, correspondence, and other information regarding the potential conflicts of interest that the Justice Department discussed or determined existed for the USAO SDFL, as well as any referral that was made to Main Justice or to any other District, including any documents that

were transmitted to any other District regarding the conflict and regarding what was to be investigated.

19. In March 2011, former U.S. Attorney Alexander Acosta sent a three-page letter to the news media in which he claimed that when Government attorneys began investigating Epstein, Epstein launched "a yearlong assault on the prosecution and the prosecutors." Shortly thereafter, Jeffrey Epstein's defense attorney Roy Black sent a responsive letter to Alexander Acost's letter to the news media in which he claimed that he did not pry into the personal lives of prosecutors but merely pointed out misconduct and over-reaching by certain people involved in the Epstein investigation. Please provide all documents, correspondence and other information that supports or contradicts Acosta's allegations in his letter, including any information that the Justice Department received from Epstein attacking the prosecutors and investigators working on the case. Please also provides all documents, correspondence, information about misconduct and over-reaching that was provided by Black and that the Government found that supported or contradicted such allegations.

20. In their pending summary judgment motion, the victims have alleged that Epstein's guilty plea to state charges was intended to be the consummation of a non-prosecution agreement that barred prosecution of federal offenses committed against them. They have further alleged that Epstein entered such a guilty plea on or about June 30, 2008. Please provide all documents, correspondence, and other information between the Government and state and local prosecutors and police agencies (including The Palm Beach Police Department and Palm Beach State Attorney's Office) regarding the Epstein investigation and ultimate Epstein plea.

21. In their pending summary judgment motion, the victims have alleged that correspondence in the possession of the Government will support their claims. Please provide all documents, correspondence, and other information between Government attorneys/officials (including both federal and state prosecutors) and attorneys for Jeffrey Epstein (or non-attorney acting on Epstein's behalf) relating to (1) negotiations involving the possible prosecution (and ultimately the non-prosecution) by federal or state agencies for sex offenses, including sex offenses committed against Jane Doe #1 and Jane Doe #2, (2) Epstein's entry of state guilty pleas for related sex offenses; (3) a non-prosecution agreement entered into between Epstein and the Government that barred his prosecution for offenses committed against Jane Doe #1 and Jane Doe #2; (4) the fulfillment of Epstein's and/or the Government's obligations under the non-prosecution agreement and/or the state guilty pleas Epstein entered; (5) any work release or other conditional release of Epstein from confinement; (6) any designation of Epstein as a sex offender or restrictions on him contacting victims of his offenses (including Jane Doe #1 and Jane Doe #2); and (7) any termination of supervision or parole of Epstein. This information should include unredacted e-mails, letters, and correspondence of any type between government prosecutors working on the case (including, but not limited to, federal prosecutors Alexander Acosta, Jeffrey H. Sloman, Matt Menchel, Andy Lourie, Ann Marie Villafana, Dexter Lee, and Bruce Reinhart and state prosecutors Dahlia Weiss, Lana Belolovek, and others involved in the Epstein investigation) and defense attorneys representing Epstein (including, but not limited to, Roy Black, Jay Lefkowitz, Jack Goldberger, Martin Weinberg, Gerald Lefcourt, Michael Tien, Guy Lewis, Lilly Ann Sanchez, Ken Starr, Alan Dershowitz) and agents acting in support of Epstein (including, but not limited to former President Bill Clinton and Andrew Albert Christian Edward

(a/k/a Prince Andrew, Duke of York).  This should also include letters of recommendation or similar communications submitted to any Government official vouching for or providing support for Jeffrey Epstein.

22. As you know, throughout their pending summary judgment motion, the victims have alleged that they were not properly notified of plea negotiations with Jeffrey Epstein and were denied their right to confer by the Government and that instead the Government gave Epstein generous concessions through the plea negotiations.   Please provide any documents, correspondence and other information that reflects or discusses any consideration of any type that Epstein had previously provided or offered to provide to the Government (or any individual within the Government, in either his official or private capacity) or any person previously employed by the Government and involved in the Epstein investigation or prosecution.  The documents, correspondence, and other information should include any information discussing:

> (a) Any donation or offer to donate, directly or indirectly, either funds, services, or any other valuable consideration to any person or entity;
> (b) Any offer to assist, directly or indirectly, any person to obtain employment, business opportunities, business clients, real estate, office properties;
> (c) Any offer to assist the Government or law enforcement agencies in the investigation or prosecution of any federal or state criminal offense;
> (d) Any consideration that Epstein had provided to Government or law enforcement agencies in the past; and
> (e) Any other consideration of any type that Epstein offered to provide or had provided in the past that could provide a basis for the Government extending Epstein a more generous or lenient plea bargain or non-prosecution agreement than would be received by any other similarly situated child abuse suspect.

23. The Crime Victims' Rights Act, 18 U.S.C. § 3771(c)(1), requires the Government to use its "best efforts" to protect the rights of crime victims.   Please provide all documents, correspondence, and other information that will assist Jane Doe #1 and Jane Doe #2 in protecting their rights under the CVRA, including all documents, correspondence, and other information that the Government previously identified as being helpful to the victims but refused to provide based on its legal interpretation (now rejected by the Court) that the CVRA did not apply to this case because no indictment was filed.

24. In the course of its investigation of Epstein and negotiations with Epstein, the Government (i.e., federal investigators and prosecutors) shared documents, correspondence, and information with other persons outside the federal government, including state and local prosecuting and law enforcement agencies, prosecuting and law enforcement agencies in other countries, Epstein's legal counsel, legal counsel for crime victims, and other entities.  Please provide all documents, correspondence, and other information that the Government shared with any entity or person outside the federal government, including all correspondence (including e-mails) with those entities or persons.

25.  After the victims had made extensive efforts to try and reach a stipulated set of facts in this case, in March 2011 the Government refused to negotiate about such facts.  Accordingly, at that time the victims filed various motions to obtain evidence in this case and, at the same time,

the victims voluntarily made all initial disclosures on their part that are required by Federal Rule of Civil Procedure 26(a)(1).  Please provide all initial disclosures required by the Federal Rules of Civil Procedure, including all disclosures required by Rule 26(a)(1).

## **DEFINITIONS**

For the purpose of construing the foregoing discvery requests, the following terms are defined:

The term "documents" means and includes, without limitation, all writings of any kind, including the originals and all non-identical copies or drafts, whether different from the original by reason of any notation made on such copy or draft or otherwise including, without limitation, correspondence, memoranda, notes, diaries, statistics, letters, e-mails, electronic computer files, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice communications, offers, notations of any sort of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer print-outs, teletypes, facsimiles, invoices, work sheets and all drafts, alterations, modifications, changes, and amendments of any of the foregoing, graphic or aural writs, records or representations of any kind including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures; and electronic, mechanical or electric records or representations of any kind including, without limitation, tapes, cassettes and disc recordings, and writings and printed material of every kind.

The term "correspondence" means any tangible object that conveys information or memorializes information that was conveyed in tangible or oral form including, but not limited to, writings, letters, memoranda, reports, notes, e-mails, telephone logs, telephone billing information, telephone recordings, and interoffice communications.

The term "Epstein's victims" means any person that the Government identified as a possible victim of a sex offense committed by Jeffrey Epstein, including Jane Doe #1, Jane Doe #2, all victims identified in attachment to the non-prosecution agreement entered into by Epstein, and another person that the Government investigated as a possible victim of Epstein's sex offenses.

The term "Government" means the federal government, including all employees of and components of the United States Department of Justice (such as, the Office of the Attorney General, the Office of the Deputy Attorney General, the Criminal Divisions, the Office of Professional Responsibility, the Child Exploitation and Obscenity Section, the U.S. Attorney's Offices for the Southern District and Middle District of Florida, and the Federal Bureau of Investigation) and other federal government agencies with law enforcement responsibilities related to the Epstein case (such as the Internal Revenue Service).  This request for production seeks all documents, correspondence, and other information held by all of these entities, including all employees of and components of the Justice Department that worked on or were in any way involved the Epstein investigation and/or that possess information relevant to the victims' claims.

The term "including" means containing within the request, but not limiting the request.

The term "witness statement" means any document or other recording in any form (including oral form) reflecting, recording, or otherwise memorializing a statement made or information conveyed by a potential witness, including for example FBI 302's.  The term includes information collected by any law enforcement, prosecuting or government agency, including all federal, state, and local law enforcement agencies located in Washington, D.C., or Florida.

## NO GRAND JURY TRANSCRIPTS SOUGHT

If any of the foregoing requests cover grand jury transcripts, do not provide the grand jury transcript.  If any of the foregoing requests include documents that quote directly from a grand jury transcript, please redact that particular quotation.

## PRIVILEGE LOG

If you believe that any document, correspondence, or other information requested in this request is subject to a privilege and if you intend to assert that privilege, please provide a "privilege log" consistent with Local Rule 26.1(g), including a description a document that is consistent with Local Rule 26.1(g)(3)(B).  Your privilege log should include the type of document, general subject matter of the document, date of the document, and author and addressee of the document or correspondence.

## REDUCING UNDUE BURDEN

If you believe that complying with any of the foregoing requests would be unduly burdensome, please contact victims counsel – Bradley J. Edwards – to discuss ways to reduce any such burden.

DATED: October 3, 2011

Respectfully Submitted,

s/ Bradley J. Edwards
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
Telephone (954) 524-2820
Facsimile (954) 524-2822
Florida Bar No.: 542075
E-mail: brad@pathtojustice.com

*and*

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
  University of Utah
332 S. 1400 E.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: cassellp@law.utah.edu

Attorneys for Jane Doe #1 and Jane Doe #2

## CERTIFICATE OF SERVICE

The foregoing document was served on October 3, 2011, on the following via US Mail and E-Mail Transmission:

Dexter Lee
A. Marie Villafaña
Assistant U.S. Attorneys
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
(561) 820-8711
Fax: (561) 820-8777
E-mail: Dexter.Lee@usdoj.gov
E-mail: ann.marie.c.villafana@usdoj.gov
Attorneys for the Government

Roy Black, Esq.
Jackie Perczek, Esq.
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
RBlack@royblack.com
Attorneys for Proposed Intervenors Roy Black et al.

Respectfully Submitted,

*S/ Bradley J. Edwards*
Bradley J. Edwards
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.

# EXHIBIT 2

Letter from Professor Paul Cassell to OPR

(February 7, 2019)

**S.J. QUINNEY**
**COLLEGE OF LAW**
THE UNIVERSITY OF UTAH

PAUL G. CASSELL
Ronald N. Boyce Presidential Professor of Criminal Law
and University Distinguished Professor of Law
S.J. Quinney College of Law University of Utah
383 South University Street
Salt Lake City, UT 84112
Telephone: 801-585-5202
cassellp@law.utah.edu

February 7, 2019

Corey Amundson
Director and Chief Counsel
U.S. Department of Justice
Office of Professional Responsibility
950 Pennsylvania Ave., N.W., Suite 3266
Washington, DC 20530-0001

Re:    OPR Investigation into the Non-Prosecution of Jeffrey Epstein

Dear Director Amundson,

I write to you in connection with the recent announcement that your Office of Professional Responsibility, at the request of Senator Sasse, has opened an investigation into allegations that Department attorneys may have committed professional misconduct in connection with their decision not to federally prosecute Jeffrey Epstein for sex crimes against dozens of girls.

I am not certain whether you are aware that, on December 10, 2010, I wrote a letter to the then-U.S. Attorney for the Southern District of Florida, requesting an investigation into these very same issues.  See attachment 1.  My letter was referred to OPR, who then wrote back to me that they would not investigate the matter because it was under litigation.  See attachment 2.

In light of the fact that you are now apparently willing to investigate these issues, I respectfully request that you investigate the allegations I made in my 2010 letter.  I would also request that Mr. Bradley J. Edwards and I – who have been representing several of Epstein's sexual assault victims for more than a decade in an effort to obtain information on these issues – have an opportunity to discuss the issues with you.  Our clients – including Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4 – would also request that they be kept informed about all information the OPR uncovers.

Thanks in advance for considering these requests, which I make in my own personal capacity.

Sincerely,

Paul G. Cassell

cc: Senator Ben Sasse

**ATTACHMENT 1**

Letter from Professor Paul Cassell to U.S. Attorney Ferrer (Dec. 10, 2010)



**S.J. QUINNEY**
# COLLEGE OF LAW
THE UNIVERSITY OF UTAH

PAUL G. CASSELL
Ronald N. Boyce Presidential Professor of Criminal Law
Telephone: 801-585-5202
cassellp@law.utah.edu

December 10, 2010

Wifredo A. Ferrer
United States Attorney
Southern District of Florida
99 N.E.4th Street
Miami, FL 33132

    Re:    <u>Request for Investigation of Jeffrey Epstein Prosecution</u>

Dear Mr. Ferrer:

    I am writing as someone with extensive experience in the federal criminal justice system – as a former Associate Deputy Attorney General, Assistant United States Attorney, federal judge, and currently criminal law professor – to alert you to what seems to be the most suspicious criminal case I have ever encountered. I ask that you investigate whether there were improper influences and actions during your office's criminal investigation of Jeffrey Epstein, particularly regarding the decision to enter into a binding non-prosecution agreement blocking his prosecution for numerous federal sex offenses he committed over many years against more than thirty minor girls.

    As I am sure you are well aware, in 2006 your office opened a criminal investigation with the FBI into allegations that for years Jeffrey Epstein sexual abused dozens of minor girls in his West Palm Beach mansion. The FBI soon developed compelling evidence that Epstein had in fact committed numerous federal sex offenses with more than 30 minor girls. And yet, your office ultimately entered into a plea arrangement which allowed Epstein escape with a non-prosecution agreement that ensured he would have no federal criminal liability and would spend no more than 18 months in state jail. For sexual offenses of this magnitude – in a case with more than 30 witnesses providing interlocking testimony, all made automatically admissible by virtue of Fed. R. Evid. 414 – this is an extraordinary outcome.

    Why did your office enter into this highly unusual non-prosecution arrangement with Epstein? Suspicion begins with the point that Epstein is a politically-connected billionaire. But that wouldn't be troubling without considerable other evidence that something went terribly wrong with the prosecution for other, improper reasons. Consider the following highly unusual facts:

    First, it appears that Epstein was tipped off before the execution of a search warrant at his home. We know that lead state police officers -- Detective Recarey and Police Chief Michael Reiter -- complained that the house was "sanitized" by the time they arrived to serve a search warrant for child pornography. This sanitation was evident by the various computer wires hanging with no computers attached. Housekeeper Janusz Banasiak later testified in a civil

deposition that Epstein's assistant, Adriana Mucinska (Ross) and another man (unknown) were instructed to remove, and did in fact remove, multiple computers from Epstein's home shortly before the search warrant was served.  The fact that there could well have been a tip off is apparently suspected by federal authorities.

Second, there is evidence that one of the senior prosecutors in your office joined Epstein's payroll shortly after important decisions were made limiting Epstein's criminal liability and improperly represented people close to Epstein.  During the federal investigation of

Third, Epstein appears to have deliberately kept from victims in the case correspondence with your office and the Justice Department that might have shed light on improper influences. Along with other capable attorneys, I was involved in representing one of Epstein's victims (S.R.) who filed a federal civil case against Epstein.  Suspecting that Epstein may have improperly influenced your office, we immediately served discovery requests on Epstein for all the correspondence with your office regarding the plea negotiations.  Eleven months of hard litigation ensued, in which Epstein made every conceivable argument against production. Finally, late in June of this year, his appeals exhausted, Epstein produced the correspondence to us.  However, in violation of the court order, he redacted the correspondence so that he provided only emails and other statements *from* your office – not his emails and statements *to* your office.  More significantly, even though he was under court order to produce all correspondence between his attorneys and your office, Epstein secretly withheld correspondence by several of his most high-powered attorneys – namely Ken Starr and Lilly Ann Sanchez.  Epstein settled the case with S.R. within days after this limited production, and we did not realize the absence of what must have been critical discussions between your office and Starr and Snachez (among others).  Epstein's refusal to allow us to see that information raises the suspicion in our minds that there must have been unusual pressures being brought to bear during the plea discussions that would have been revealed had Epstein complied with his production obligations.

Fourth, there appears to have been an unprecedented level of secrecy between your office and the Federal Bureau of Investigation during this case. The FBI was responsible, along with state and local police agencies, for building the case against Epstein.  They appear to have developed an overwhelming criminal against him.  And yet, when your office signed the non-prosecution agreement with him, it is not clear to us that the FBI was consulted about this decision.  Indeed, we have suspicions that the FBI was not informed of this decision until, perhaps, months later.

Supporting this suspicion is our on-going litigation regarding the treatment of the victims in this case.  As you know from our draft pleadings that we have discussed with your office, we believe there is compelling evidence that the victims and their attorneys were deceived about the existence of a non-prosecution agreement for months in order to avoid what certainly would have been a firestorm of controversy about such lenient treatment of a repeat sex offender.  Our impression from the evidence we have been able to obtain so far is that the FBI was similarly kept in the dark – not consulted about or even told about the NPA.  While a certain amount of tension has always existed between federal prosecuting and investigating agencies, not even informing the FBI about the Epstein NPA seems highly unusual.

All of these strange facts  -- as well as the facts that we are alleging in our crime victims' litigation – lead us to think that there was something rotten with the way this case was handled.  Epstein could have faced years and years in prison for numerous federal sex offenses.  And yet he managed to contrive to walk away with no federal time at all (and only minimal state time).   We respectfully ask you to investigate through appropriate and independent channels the handling of the Epstein (non)prosecution.

Thank you in advance for considering this request.  I would be happy to provide any other additional information that would be useful to you.

Sincerely,

Paul G. Cassell

# ATTACHMENT 2

Letter from U.S. Department of Justice Office of Professional Responsibility to
Professor Paul Cassell (May 6, 2011)

Case 9:08-cv-80736-KAM Document 522 Entered on FLSD Docket 05/30/2011 Page 1 of 1
Case 1:22-cv-10019-JSR Document 107-25 Filed 05/04/23 Page 84 of 89
USCA11 Case: 19-13843 Date Filed: 11/16/2020 Page: 70 of 75

**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue N.W., Room 3266*
*Washington, D.C. 20530*

MAY – 6 2011

Professor Paul G. Cassell
S.J. Quinney College of Law
The University of Utah
332 South 1400 East, Room 101
Salt Lake City, Utah 84112-0730

Dear Professor Cassell:

Your letter dated December 10, 2010 to United States Attorney Wifredo A. Ferrer was forwarded to the Office of Professional Responsibility (OPR). OPR has completed an inquiry into your allegation of professional misconduct by the United States Attorney's Office for the Southern District of Florida (USAO) in the criminal investigation of Jeffrey Epstein. Specifically, you question whether "improper influences" resulted in the USAO's decision to enter into a non-prosecution agreement with Mr. Epstein.

Most, if not all, of the allegations set forth in your letter are currently being litigated on behalf of victims under the Crime Victim's Rights Act in *Jane Doe #1 and Jane Doe #2 v. United States*, Case No. 08-80736-Civ-Marra/Johnson (S.D. Fla.). OPR has jurisdiction to investigate allegations of misconduct involving Department of Justice (DOJ) attorneys or law enforcement personnel that relate to the exercise of an attorney's authority to investigate, litigate or provide legal advice. It is, however, the policy of this Office to refrain from investigating issues or allegations that were, are being, or could have been addressed in the course of litigation, unless a court has made a specific finding of misconduct by a DOJ attorney or law enforcement personnel or there are present other extraordinary circumstances. Based on our review of your correspondence, and the pleadings filed in the *Doe* case, we have determined that your allegations fall into this category. No court has made a finding of misconduct and there are no extraordinary circumstances.

We regret that we can be of no further assistance to you. Thank you for bringing this matter to our attention.

Sincerely,

Robin C. Ashton
Counsel

# EXHIBIT 3

Letter from Professor Paul Cassell to U.S. Attorney 's Office – N.D. Georgia

(November 12, 2020)

PAUL G. CASSELL
Ronald N. Boyce Presidential Professor of Criminal Law
S.J. Quinney College of Law at the University of Utah
383 S. University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
cassellp@law.utah.edu[*]

November 12, 2020

**Via email**

Jill Steinberg
Special Attorney
U.S. Attorney's Office for the
Northern District of Georgia
600 U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
Via Email

**Re:**   *In re Courtney Wild,* Case No.: 13843 (11ᵗʰ Cir. en banc)

Dear Ms. Steinberg,

  This morning we attended a briefing from Ms. Stacie Harris, U.S. Department of Justice, Office of Deputy Attorney General.  She provided us an "executive summary" of an Office of Professional Responsibility (OPR) report regarding the U.S. Attorney's Office for the Southern District of Florida's (USAO-SDFL's) handling of the Jeffrey Epstein non-prosecution agreement. What we heard during that briefing raises serious concerns about the completeness of current appellate record before the Circuit.  We are planning to raise these questions with the Eleventh Circuit via a motion. But we write to you to try and narrow any disagreement and see whether you will voluntarily provide to us some of the information and stipulate to our motion to include that information in the record.

  *Missing Emails*

  During the briefing, Ms. Harris provided an "executive summary" of a much longer report. That brief summary purports to exonerate attorneys in the USAO-SDFL of misconduct. However, when pressed, Ms. Harris called OPR and then reported back to us that OPR had been unable to locate "incoming" emails in the in-box to U.S. Attorney Alexander Acosta from the period May 2007 to November 2008. This gap was

[*] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah.

ascribed to a "technical glitch." This is the first we have ever heard of such a glitch – which was never reported to either Judge Marra in the district court or to the Eleventh Circuit.  As you know, we formally requested all emails by Mr. Acosta relevant to the Epstein case in October 2011. And we were told that all such emails had either been produced to us (if they involved "external" communications outside his Office) or to Judge Marra (if they were "internal" and therefore privileged). We believe that the full details of what emails are missing and why should be disclosed to both the Eleventh Circuit and Judge Marra.

Question: Will you disclose to the Eleventh Circuit and Judge Marra that some emails were missing and stipulate to this fact being included in the record in Ms. Wild's case?

*Completeness of Email Production to Ms. Wild and Judge Marra*

In the course of this morning's meeting, Ms. Harris stated that OPR was able to collect "all emails" relevant to the five targets of the investigation. We have no way of evaluating the accuracy of that statement.  But we did note that Ms. Harris also indicated that OPR reviewed 800,000 pages of documents as part of its investigation. That figure is far more than the number of pages that were have seen disclosed to Ms. Wild in the CVRA case—which number around 16,000 pages in total.  We have also been told that federal prosecutor Matthew Menchel, head of the USAO-SDFL's Criminal Division, was heavily involved in discussions about the Epstein NPA, but we received very few emails from or to him during discovery.  We also note the absence of emails to Mr. Acosta mentioned above.

This large discrepancy in the number of documents produced to Ms. Wild and Judge Marra versus what OPR later located—along with the absence of significant Menchel emails and the "technical glitch" regarding Acosta emails—leads us to conclude that OPR may have located emails and other documents connected with the case that were improperly withheld from Ms. Wild (or, at least, not produced when they should have been) or from Judge Marra. We would like you to either certify to us either (1) that, having reviewed all of the OPR materials, all materials were properly produced to Ms Wild or Judge Marra when they should have been; or (2) there were some materials that OPR  located that should have been produced to us or Judge Marra. We asked Ms. Harris about this issue and she said that she could not comment on it and that we should contact your Office on these subjects.

Question: Will you provide such a certification to us and stipulate to its inclusion in the record?

*Waiver of Privileges*

As you know, in the district court, the USAO-SDFL asserted privileges and work product protection over approximately 15,000 pages of documents.  Of course, those protections—designed to protect internal Justice Department communications—have been waived now that the substance of many of those communications have been disclosed outside the Department.  Indeed, in the Executive Summary we received this morning indicates that the OPR report provides an "extensive account" of the relevant events. In light of this fact, we believe that all privileges and other protections have now been waived and these documents should be immediately turned over to Ms. Wild.

Question: Will you immediately provide to us all documents over which the USAO-SDFL has previously asserted privilege or work-product protection (or any of those documents) and stipulate to their inclusion in the record?

<u>Conclusion</u>

We request your position, in writing, on these issues by 2:00 p.m. eastern time, November 13, 2020.  I would be happy to discuss these issues further if it would be helpful. Thank you in advance for your assistance.

Respectfully submitted,

Paul G. Cassell and Bradley J. Edwards
Counsel for Ms. Wild

cc: Stacie Harris, Office of the Deputy Attorney General

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I certify that on November 16, 2020, the foregoing document was served on the parties to this proceeding via the Court's CM/ECF system, which sends notifications to the parties and counsel of record. This motion complies with the type-volume limitation of Rule 32(g)(1) and Rule 27(d)(2)(A) because it contains fewer than 5,200 words, i.e., 5,198 words.


 /s/ Paul G. Cassell
Paul G. Cassell