**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | Case No. 1:22-CV-10019 (JSR) |
|     Plaintiff, | |
|       v. | |
| JPMorgan Chase Bank, N.A., | |
|     Defendant. | |

## PLAINTIFF JANE DOE 1'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 3

I.      Jeffrey Epstein's Sex-Trafficking Venture ........................................................... 3

II.     JPMC's Facilitation of the Sex-Trafficking Venture ............................................ 4

III.    Jane Doe 1's Trafficking by Epstein ...................................................................... 7

ARGUMENT ........................................................................................................................ 7

I.      The Requirements of Rule 23(a) Are Satisfied...................................................... 8

        A.      Rule 23(a)(1)—Numerosity Is Satisfied With the Trafficking Venture Injuring
                Hundreds of Potential Victims During the Class Period. ....................... 8

        B.      Rule 23(a)(2)—Common Questions of Law and Fact Clearly Exist. .................. 10

        C.      Rule 23(a)(3)—Plaintiff's Claims Are Typical. ................................... 12

        D.      Rule 23(a)(4)—Plaintiff Will Adequately Represent the Class.......................... 13

II.     The Rule 23(b) Requirements Are Satisfied. ..................................................... 14

        A.      Rule 23(b)(3)'s Requirements Are Satisfied...................................... 14

                1.      Common Questions of Law and Fact Predominate. ............................... 14

                2.      A Class Action Is Superior to Other Methods of Adjudication. ............... 19

        B.      The Rule 23(b)(1) Requirements Are Satisfied .................................... 20

III.    Ascertainability—The Class Is Sufficiently Ascertainable. ............................. 21

IV.     In the Alternative, a Rule 23(c)(4) Issues Class Is Appropriate. ..................... 22

V.      The Court Should Appoint Boies Schiller Flexner LLP and Edwards Pottinger LLC as
        Class Counsel.................................................................................................... 23

CONCLUSION.................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc v. Windsor,*
   521 U.S. 591 (1997) .................................................................................................. 19, 21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
   568 U.S. 455 (2013) ...................................................................................................... 7, 15

*Beltran v. InterExchange, Inc.,*
   No. 14-CV-03074-CMA-CBS, 2018 WL 1948687 (D. Colo. Feb. 2, 2018) ............................ 8

*Biediger v. Quinnipiac University,*
   2010 WL 2017773 (D. Conn. May 20, 2010) ........................................................................ 22

*Casilao v. Hotelmacher LLC,*
   No. CIV-17-800-SLP, 2021 WL 4487984 (W.D. Okla. Sept. 30, 2021) ................................ 13

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
   504 F.3d 229 (2d Cir. 2007) ................................................................................................. 10

*Chalmers v. City of New York,*
   No. 20 CIV. 3389 (AT), 2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022) ................................ 15

*Consol. Rail Corp. v. Town of Hyde Park,*
   47 F.3d 473 (2d Cir. 1995) ...................................................................................................... 8

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) .................................................................................................. 14

*Ebin v. Kangadis Food Inc.,*
   297 F.R.D. 561 (S.D.N.Y. 2014) ..................................................................................... 21, 22

*Espinoza v. 953 Associates LLC,*
   280 F.R.D. 113 (S.D.N.Y. 2011) .......................................................................................... 22

*In re Drexel Burnham Lambert Grp., Inc.,*
   960 F.2d 285 (2d Cir. 1992) .................................................................................................. 14

*In re LIBOR-Based Financial Instruments Antitrust Litig.,*
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................................................. 23

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,*
   241 F.R.D. 185 (S.D.N.Y. 2007) .......................................................................................... 21

*In re MF Global Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 230 (S.D.N.Y. 2015) ...................................................................... 13, 20

*In re Petrobras Securities*,
    862 F.3d 250 (2d Cir. 2017) ...................................................................... 15

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ...................................................................... 13

*In re USC Student Health Ctr. Litig.*,
    No. 2:18-cv-04258-SVW, 2019 WL 3315281 (C.D. Cal. June 12, 2019) ............... 8

*In re White*,
    64 F.4th 302 (D.C. Cir. 2023) ...................................................................... 21

*Jane Doe 30's Mother v. Bradley*,
    64 A.3d 379 (Del. Super. Ct. 2012) ...................................................................... 20

*K.A. v. City of New York*,
    413 F. Supp. 3d 282 (S.D.N.Y. 2019) ...................................................................... 8

*Katz v. United Synagogue of Conservative Judaism*,
    135 A.D.3d 458 (N.Y. App. Div. 2016) ...................................................................... 11

*Lopez v. Setauket Car Wash & Detail Ctr.*,
    314 F.R.D. 26 (E.D.N.Y. 2016) ...................................................................... 10

*M.K.B. v. Eggleston*,
    445 F. Supp. 2d 400 (S.D.N.Y. 2006) ...................................................................... 7, 16

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ...................................................................... 8, 13

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) ...................................................................... 8, 10, 19, 20

*Mullen v. GLV, Inc.*,
    330 F.R.D. 155 (N.D. Ill. 2019) ...................................................................... 8

*New Castle v. Yonkers Contracting Co.*,
    131 F.R.D. 38 (S.D.N.Y. 1990) ...................................................................... 9

*Novoa v. GEO Grp., Inc.*,
    No. EDCV172514JGBSHKX, 2019 WL 7195331 (C.D. Cal. Nov. 26, 2019) ....... 12

*Owino v. CoreCivic, Inc.,*
  60 F.4th 437 (9th Cir. 2022) ........................................................................................ 8

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
  No. 17-CV-1302 (NG) (JO), 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018) ................ 8, 17, 22

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.,*
  277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................................. passim

*Roach v. T.L. Cannon Corp.,*
  778 F.3d 401 (2d Cir. 2015) ...................................................................................... 19

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993) ............................................................................. 9, 12, 13

*S.J. v. Choice Hotels Int'l, Inc.,*
  473 F. Supp. 3d 147 (E.D.N.Y. 2020) ............................................................ 10, 15, 16

*Scott v. Aetna Servs., Inc.,*
  210 F.R.D. 261 (D. Conn. 2002) ............................................................................... 20

*Sykes v. Mel Harris & Assocs. LLC,*
  780 F.3d 70 (2d Cir. 2015) ........................................................................................ 10

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016) ................................................................................................... 15

*Villella v. Chem. & Mining Co. of Chile Inc.,*
  333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................. 12

**Statutes**

18 U.S.C. § 1591(a) ............................................................................................................ 10

18 U.S.C. § 1591(d) ..................................................................................................... 11, 16

NY Penal Law § 130 ..................................................................................................... 17, 18

Trafficking Victims' Protection Act of 2000 ..................................................................... 10

**Other Authorities**

NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 4:54 .................................................... 19

**Rules**

Fed. R. Civ. P. 23(a)(1) ...................................................................................................... 8

Fed. R. Civ. P. 23(a)(2)........................................................................................... 10

Fed. R. Civ. P. 23(a)(3)........................................................................................... 12

Fed. R. Civ. P. 23(a)(4)........................................................................................... 13

Fed. R. Civ. P. 23(b)(1)........................................................................................... 21

Fed. R. Civ. P. 23(b)(3)...................................................................................... 14, 19

Fed. R. Civ. P. 23(c)(4)........................................................................................... 23

Fed. R. Civ. P. 23(g)(1)........................................................................................... 23

Plaintiff Jane Doe 1 ("Doe" or "Plaintiff") respectfully submits this memorandum of law, together with the declarations of David Boies and Bradley J. Edwards, in support of her Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.  Doe seeks certification of the following Class:

> All women who were sexually abused or trafficked by Jeffrey Epstein ("Epstein") during the time when JPMorgan Chase Bank, N.A. ("JPMC") maintained for Epstein and/or Epstein-related entities, which included January 1, 1998, through on or about August 19, 2013, both dates inclusive, and continuing to the time of Epstein's death on August 10, 2019, (the "Class Period").

## PRELIMINARY STATEMENT

Jeffrey Epstein will go down in history as the world's most brazen and serial sex offender who, with the assistance of a money-hungry bank, JPMC, ran a decades-long sex-trafficking operation and destroyed the lives of literally hundreds of young females.  The crucial element that allowed Jeffrey Epstein to perpetrate these crimes for years was his access to loads of cash from a bank that knew exactly what he was doing and helped him avoid regulators' scrutiny so that the bank could have its take.  JPMC was Epstein's secret weapon that made decades of sexual abuse and trafficking possible.  It supported Epstein's abuse of women, and even after he was arrested, JPMC stood by him to ensure that his abuse could continue while on work release and for years thereafter.  When Epstein was arrested in Florida for paying hush money to dozens of children he was sexually abusing, JPMC did not cooperate or meet with authorities, but instead communicated with its newly crowned sex offender to make sure he knew his jail stint would not get in the way of their partnership.  While Jeffrey Epstein has seen his last day of this scheme, JPMC has not been held to account.  Doe respectfully requests that this Court grant class certification to allow the Epstein survivors to have their day in Court as a class.

Doe is confident that each of Rule 23's requirements is readily satisfied in this case. First, there is no doubt that the number of victims who were abused or trafficked during Epstein's long-standing relationship with JPMC satisfies the numerosity requirement, as the Palm Beach Police Department alone identified 36 victims prior to Epstein's conviction for soliciting a minor for prostitution, more than 100 women were compensated by the Epstein Victims' Compensation Program, and JPMC's own records show countless wires to women for no legitimate business purpose. Further, common issues of law and fact exist, and Doe's claims are typical of the class. Each class member's claims, including Doe's, arise from one course of conduct—JPMC's facilitation of sex trafficking while knowing that Epstein was using the bank to harm young women and girls, and its negligence in allowing that sex trafficking to continue for decades. For these same reasons, common questions predominate over any individualized inquiries. Proceeding as a class also meets the superiority requirement, as requiring the hundreds of Epstein's victims to individually litigate against one of the largest banks in the world would be inefficient, unjust, and an inferior way to resolve the common issues that would arise in any claim that any victim brings against JPMC.

Finally, Doe and her counsel will adequately represent the class. Doe, like all victims, seeks to hold accountable those, like JPMC, who assisted Epstein in facilitating one of the most robust criminal enterprises in history. Doe's counsel includes attorneys experienced in class actions and complex litigation and attorneys highly dedicated to this matter who were integral to the arrest and prosecution of Epstein, Ghislaine Maxwell, and Jean-Luc Brunel. Accordingly, the Court should certify the proposed class and appoint the undersigned attorneys as class counsel.

# FACTUAL BACKGROUND

## I.  Jeffrey Epstein's Sex-Trafficking Venture

Jeffrey Epstein operated a worldwide sex-trafficking venture for decades, from the early 1990s through his death in 2019, during which time he trafficked hundreds of young women.  First Amended Complaint ("FAC") ¶¶ 32, 35.  He targeted girls with vulnerabilities that he could exploit, and dangled money, opportunities, and celebrities in front of them to groom them and coerce them into submission. Epstein preferred young attractive females and he would threaten and intimidate his victims to press them to introduce him to new victims.

At one of Epstein's mansions, a victim would be forced to provide a massage—often after being instructed to undress—during which Epstein sexually assaulted her in some manner, such as by touching her breasts or genitals, using sex toys on her, or even penetrating her.  FAC ¶ 33; Ex. 2 (Expert Report of Jane Khodarkovsky ("Khodarkovsky Rep.")) ¶¶ 60, 61, 65;[1] Ex. 3 at 54–56; Ex. 4 ¶¶ 20–22; Ex. 5 at ¶¶ 11–15.  The victim would then be provided several hundred dollars in cash, typically immediately.  Ex. 6 at, *e.g.*, 14, 15, 30, 40, 47, 49, 55, 61, 74.

Epstein would also then take actions to ensure his victims were beholden to him, including sending them to doctors and psychiatrists, to dentists to get their teeth whitened, and to celebrity hairstylists to get their hair done. *See, e.g.*, Ex. 7.  In addition to dangling opportunities in front of them, Epstein provided housing to many young girls and aspiring models in a building on East 66th Street, along with car services and cell phones so he could track their every move.  Ex. 9 at 7; Ex. 10 at 22; Ex. 11 ¶ 52.

Epstein abused and trafficked his victims by means of not only coercion, grooming, and control, but also by fraud, force, intimidation, and threats.  Epstein and his co-conspirators often

---

[1]  Citations to "Ex." are exhibits to the Declaration of David Boies, filed concurrently hereto.

directly threatened their victims.  Ex. 13 at 56–57; Ex. 14 at 169, 170–174; Ex. 6 at 73; Ex. 11 ¶ 49; Ex. 15 ¶¶ 75–76; Ex. 4 ¶ 23.  Epstein and his lawyers would gather information about the girls to use against them if they ever disobeyed him.  Ex. 16; Ex. 17 ¶ 43.  Epstein made certain that his victims were aware that he socialized and conducted business with the most powerful people in the world and he would wield that power against his victims if they dared disobey him. Ex. 18; Ex. 11 ¶ 50; Ex. 19 ¶¶ 14, 25.

Epstein was charged for the conduct underlying his sex-trafficking venture twice.  After receiving a complaint, the Palm Beach Police Department ("PBPD") identified more than 30 girls who Epstein sexually abused at his Palm Beach mansion.  Ex. 6.  In 2006, the PBPD investigation was turned over to the United States Attorney's Office, which after identifying nearly 40 underage victims entered into a non-prosecution agreement ("NPA") pursuant to which Epstein pleaded guilty to prostitution charges.  Ex. 20.  A decade later, on July 2, 2019, the U.S. Attorney's Office for the Southern District of New York charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591.  Ex. 21.  Epstein died in jail on August 10, 2019.

## II.    JPMC's Facilitation of the Sex-Trafficking Venture

One primary reason why Epstein's sex-trafficking venture and conspiracy accumulated new victims exponentially was Epstein's access to unlimited amounts of cash and his knowledge that he had a complicit bank—JPMC—through which he could operate his illegal abuse organization without fear of being reported to law enforcement.  FAC ¶ 39.  Without exorbitantly large amounts of cash, Epstein's operation could not effectively operate, as newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.  *Id.* ¶ 40.  Put plainly, Epstein needed a bank that knew he was engaging in illegal activity and did not care, which Epstein had in JPMC.  *Id.* ¶ 46.

From about 1998 through 2013 (and following), JPMC knowingly and intentionally participated in the Epstein sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture. *Id.* ¶ 124. Around 2000, Epstein developed a key relationship when he began working with the then-head of JPMC's private banking division, Jes Staley. *Id.* ¶ 125. Acting on behalf of JPMC, Staley assured Epstein that he would help Epstein and his operation in any way he could. *Id.* ¶ 157. For over a decade, JPMC went far beyond what a non-complicit bank would have done and instead assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture. *Id.* ¶ 154. JPMC not only worked diligently to run cover for Epstein, but it was the hub for Epstein's entire legal enterprise. Specifically, money was paid from Epstein-affiliated JPMC accounts to victims of trafficking and to known Epstein co-conspirators, such as convicted sex trafficker Ghislaine Maxwell. *Id.* ¶ 155. Money was also withdrawn from Epstein-affiliated JPMC accounts in cash to pay victims in furtherance of the sex-trafficking venture. *Id.* JPMC approved loans for ███████████

████████████████████████████████████████████████████████████

██████████████████████████

JPMC knew about Epstein's sex-trafficking venture even before his 2008 conviction. JPMC was aware of accusations about Epstein and his co-conspirators trafficking network from the late 1990s and early 2000s. Khodarkovsky Rep. ¶ 109. JPMC employees had regular and ongoing communications about the public allegations about Epstein, yet JPMC provided Epstein the ability to maintain and withdraw cash to pay his victims. *See, e.g.*, Exs. 22, 23, 24, 25.

JPMC representatives communicated internally about Epstein's guilty plea on September 20, 2007, and scheduled calls to discuss it. Exs. 22 & 26. Reporters contacted Jes Staley on December 3, 2007, to discuss a story about Epstein. Ex. 27. Bank employees directly

communicated in ███████████████████████████████████████████

███████████████   Khodarkovsky Rep. ¶ 109.  And after Epstein pleaded guilty, in 2010, JPMC

bankers were made aware of new allegations of Epstein engaging in sex trafficking.  Exs. 28, 29.

After JPMC's compliance department escalated the new allegations, JPMC decided it was

comfortable keeping Epstein as a client. Exs. 30, 31, 32, 33.

JPMC ignored all the allegations about Epstein's sex trafficking and instead continued to

facilitate the venture.  JPMC paid funds to victims of trafficking, co-conspirators, and women

coerced to bring other women from Epstein-related accounts (Ex. 34); permitted Epstein and his

co-conspirators to withdraw large sums of cash to pay victims, including Doe (Ex. 35); housed

accounts for known co-conspirators to which Epstein transferred tens of millions of dollars (FAC

¶¶ 174, 240, 255); deliberately failed to file reports in the face of red flags because the reports

might result in government intervention in the sex-trafficking venture (*id*. ¶¶ 156, 180–82, 187);

permitted Epstein to withdraw thousands of dollars in hush money after Doe was brutally raped

(*id*. ¶ 159); trafficked girls on a private jet owned by subsidiary Highbridge (*id*. ¶¶ 170, 176);

refused to cut ties with Epstein despite the pleas of certain JPMC executives, enabling his

trafficking for many more years (*id*. ¶¶ 161, 172, 184); and funded a modeling agency that funneled

girls to Epstein for abuse (*id*. ¶ 241).

After Epstein's benefits to JPMC began to wane, JPMC decided to get out of the sex

trafficking business.  In 2013, due to the overwhelming publicity about Epstein's illegal sexual

activities, and the departure of Staley from JPMC, JPMC reluctantly stopped being Epstein's

banker.  *Id.* ¶ 185.  But while JPMC stopped being Epstein's banker, it continued to take

subsequent actions to promote the venture and conspiracy.  *Id.* ¶ 187.  For example, it deliberately

and willfully continued to fail to timely file SARs about the suspicious activities it had seen.  *Id.*
And it continued to recommend Epstein as a good client to others who inquired.  *Id.*

III.    **Jane Doe 1's Trafficking by Epstein**

Plaintiff Jane Doe 1 was one of Epstein's many victims while he banked with JPMC.  She
was living with her mother when she met Jeffrey Epstein in 2006.  FAC ¶¶ 94, 95; Ex. 36 at 88:8–
10, 94:10–12.  By this time, Epstein had a long history of grooming, indoctrinating, controlling,
and ultimately committing sexual offenses against young, vulnerable women like Doe.  FAC ¶ 96.

Over the ensuing years, from 2006 through 2013, Epstein sexually abused Doe on
numerous occasions, as well as trafficked Doe to Epstein's friends for commercial sex acts.  FAC
¶¶ 99, 100, 101.  Epstein and his co-conspirators constantly reminded Doe how powerful and
important Epstein was.  *Id.* ¶ 96.  As with Epstein's other victims, Doe was chastised if she refused
Epstein's sexual demands and was told she should be grateful that Epstein was willing to help her
with her career and education.  *Id.*  And, as with Epstein's other victims, Doe was usually paid in
cash that was withdrawn from one of Epstein's accounts at JPMC.  *Id.* ¶ 109; Ex. 36 at 110:5–9;
111:15–112:10.

## ARGUMENT

Class certification is warranted when four prerequisites are met: (1) numerosity; (2)
commonality; (3) typicality; and (4) adequacy—and the action qualifies under one of Rule 23(b)'s
subdivisions.  *See M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 440 (S.D.N.Y. 2006) (Rakoff, J.).
"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification
stage. Merits questions may be considered to the extent—but only to the extent—that they are
relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."
*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  Courts must interpret
Rule 23 liberally and must "adopt a standard of flexibility" when determining whether a proposed

class satisfies its requirements. *Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir. 1997) (internal quotations omitted).

Here, the proposed class easily meets Rule 23(a) requirements, and this action qualifies for certification under Rule 23(b)(3) or 23(b)(1).  In fact, courts often grant certification in similar cases involving trafficking or sex abuse claims.[2]  In the alternative, the Court can certify several issue classes pursuant to Rule 23(c)(4).

## I.     The Requirements of Rule 23(a) Are Satisfied.

### A.   Rule 23(a)(1)—Numerosity Is Satisfied With the Trafficking Venture Injuring Hundreds of Potential Victims During the Class Period.

Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is presumed when the proposed class contains 40 or more members.  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Here, there can be no doubt that Jeffrey Epstein trafficked or abused more than 40 girls and women during the class period.  Epstein perpetuated—and JPMC facilitated—a large-scale sex-trafficking venture in which he abused three to four individuals per day.  FAC ¶ 81.

During the investigation that resulted in Epstein's 2008 conviction—squarely in the middle of Epstein's relationship with JPMC and the class period—officials identified 36 victims who

---

[2]     *See, e.g.*, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905 (10th Cir. 2018) (affirming class certification in a TVPA forced labor case); *Owino v. CoreCivic, Inc.*, 60 F.4th 437 (9th Cir. 2022) (same); *K.A. v. City of New York*, 413 F. Supp. 3d 282, 302 (S.D.N.Y. 2019) (denying motion to dismiss class action for female prisoners raising § 1983 claims regarding numerous improper intimate examinations); *In re USC Student Health Ctr. Litig.,* No. 2:18-cv-04258-SVW, 2019 WL 3315281 (C.D. Cal. June 12, 2019) (preliminarily approving settlement class in case involving USC doctor involved in repeated sexual misconduct); *Mullen v. GLV, Inc.,* 330 F.R.D. 155, 168 (N.D. Ill. 2019) (granting class certification in case involving coach sexually abusing multiple underage players); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-CV-1302 (NG) (JO), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018) (certifying TVPA forced labor class); *see also Beltran v. InterExchange, Inc.,* No. 14-CV-03074-CMA-CBS, 2018 WL 1948687, at *5 (D. Colo. Feb. 2, 2018) (certifying class where national RICO Class's claim arose out of "the same course of events" and the "same purported overall fraud").

Epstein paid for sex acts and massages in his Florida mansion.  Ex. 6; *see also* Ex. 37 at 29:24–30:16 (Detective Recarey testimony that he interviewed approximately 30 girls who gave Epstein massages).  Epstein's house manager, Juan Alessi, provided a sworn statement to investigators stating that Epstein had up to three massages a day and that Alessi observed hundreds of young "massage therapists" visiting Epstein's Florida home during his 11-year tenure.  Ex. 39 at 9–10.  Epstein's phone book contains an extensive list of phone numbers for female "masseuses."  Ex. 40 at 70, 88, 96, 97.   It has been publicly reported that Epstein settled "at least two dozen lawsuits with young women" for similar allegations.  Ex. 41.

If that were not enough, Epstein's 2019 indictment stated that he "abused *dozens* of minor girls" from 2002 to 2005.  Ex. 21 (emphasis added).  Shortly after Epstein's indictment, he died in his jail cell and Judge Berman provided 23 victims with the opportunity to speak in open court about the trafficking and the harm they suffered as a result.  Ex. 42 (Berman Hearing).  Plaintiff's attorneys have themselves collectively represented more than 70 victims since 2008.  Ex. 1 at ¶ 9 (Declaration of Bradley J. Edwards ("Edwards Decl.")); Boies Decl. ¶¶ 8, 10.  The Epstein Victims' Compensation Program ("EVCP") reported that it deemed about 150 individuals eligible for   compensation   from   Epstein's   estate.     ECF   No.   55-1;   *see   also* https://www.epsteinvcp.com/documents/67.  And, finally, Plaintiff's expert witness estimates that there will be more than 100 class members based on JPMC's own financial records.  Khodarkovsky Rep. ¶ 69.   Accordingly, the number of class members well exceeds forty and joinder is impracticable.[3]

---

[3]      If the Court had any doubt that the class contains fewer than 40 members, it can still find numerosity satisfied.  *See, e.g.*, *New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) (certifying a class of thirty-six members).  The "[d]etermination of practicability depends on all the circumstances surrounding the case, not on mere numbers."  *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (internal citations omitted).  The dispersion of victims across the

B.  Rule 23(a)(2)—Common Questions of Law and Fact Clearly Exist.

Rule 23's commonality requirement is met if all class members' claims share a common question of law or of fact.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007).  "Even a single common question of law or fact may suffice to satisfy the commonality requirement."  *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) (Rakoff, J.).  A question is common to the class if it is "capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Lopez v. Setauket Car Wash & Detail Ctr.*, 314 F.R.D. 26, 28 (E.D.N.Y. 2016) (internal citation omitted).  The "one stroke" rule is often satisfied where, as here, there is a uniform policy or practice that affected all class members.  *See Sykes v. Mel Harris & Assocs. LLC,* 780 F.3d 70, 80 (2d Cir. 2015); *Menocal*, 882 F.3d at 920 (finding commonality where plaintiffs based their TVPA claims on a common policy).

Doe brings two claims under the Trafficking Victims' Protection Act of 2000 ("TVPA") on behalf of the class: (1) a beneficiary liability claim under 18 U.S.C. § 1591(a), the elements of which are that "(1) the person or entity must knowingly benefit, financially or by receiving anything of value, (2) from participating in a venture, (3) that the person knew or should have known has engaged in an act in violation of this chapter."  *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 152–53 (E.D.N.Y. 2020) (internal quotations omitted); and (2) an obstruction of TVPA enforcement claim, which requires proof that JPMC acted to obstruct, attempt to obstruct,

---

United States and abroad would make joinder impracticable here.  *See id.*; *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 105 (considering "evidence that the investors are geographically dispersed institutions and individuals" in finding numerosity).  Even within the U.S., Epstein's sex-trafficking venture operated in at least six states.  *See* FAC ¶¶ 87, 103, 106, 141, 212.

interfere with, or prevent an investigation or prosecution into Epstein for trafficking.  18 U.S.C.
§ 1591(d).

As explained further below with regards to predominance, each element of the beneficiary
liability claim is common to the class—if each class member brought an individual action, each
would have to prove that JPMC knew about Epstein's sex-trafficking venture through testimony
and evidence from JPMC's employees themselves; that JPMC benefitted from the trafficking
venture through evidence of revenues JPMC earned from Epstein's accounts; and that JPMC
participated in the venture by, for example, facilitating cash withdrawals used to directly pay class
members for commercial sex, paying funds to co-conspirators, deliberately failing to file reports
that might result in government intervention, "structuring" cash withdrawals, and failing to file
SARs.  *See* Khodarkovsky Rep. ¶¶ 78–88, 92–95.  As to the obstruction claim, each class member
would have to prove that JPMC obstructed a prosecution or investigation.

Doe also brings two negligence claims alleging that: (1) JPMC negligently failed to
exercise reasonable care to prevent the physical harm of Epstein's victims; and (2) JPMC
negligently failed to exercise reasonable care as a banking institution providing non-routine
banking.  To state a claim for negligence under New York law, "a plaintiff must show that the
defendant owed the plaintiff a duty and breached that duty, and that the breach proximately caused
the plaintiff harm."  *Katz v. United Synagogue of Conservative Judaism*, 135 A.D.3d 458, 459
(N.Y. App. Div. 2016).  As highlighted in the parties' motion to dismiss briefing, these negligence
claims involve both legal and factual issues common to the class.  For example, JPMC has argued
that it owes no duty of care to non-customers, while Doe argues the opposite—that legal issue will
be one common to the class.  *See* ECF Nos. 46 at 10–13, 49 at 12–14.  Further, factual issues
relevant to the element of breach are common to the class, as each class member would argue that

JPMC's breached its duty of care by, for example, directly participating in the sex-trafficking venture that harmed them and helping Epstein conceal the venture from authorities, allowing it to persist for decades. *See, e.g.*, FAC ¶¶ 189, 224, 170. Accordingly, common questions of law and fact exist.

    C. <u>Rule 23(a)(3)—Plaintiff's Claims Are Typical.</u>

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. "Plaintiffs are not required, in proving typicality, to show that the situations of the named representatives and the class members are identical." *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 109; *see also Robidoux*, 987 F.2d at 936–37 (the typicality requirement is usually met "irrespective of minor variations in the fact patterns underlying individual claims"). And typicality does not "require that damages be identical among class members." *Villella v. Chem. & Mining Co. of Chile Inc*., 333 F.R.D. 39, 55 (S.D.N.Y. 2019); *see also Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 108; *Novoa v. GEO Grp., Inc.*, No. EDCV172514JGBSHKX, 2019 WL 7195331, at *14 (C.D. Cal. Nov. 26, 2019) (explaining in TVPA case that "[t]he typicality requirement can be met notwithstanding varying fact patterns supporting class member claims, and this extends to disparity in damages by the representative plaintiffs"). "Courts in this Circuit have held that the typicality requirement is not demanding." *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 107.

As explained above, Doe's claims are representative of those of the class. Like the other class members, Doe was victimized by the sex-trafficking venture pursuant to Epstein's well-oiled *modus operandi* during Epstein's relationship with JPMC. *See supra* at 2–7; Khodarkovsky Rep. ¶ 73. The fact that the circumstances of Epstein's trafficking of Doe may slightly differ from the circumstances by which each class member was victimized is irrelevant to the class certification

inquiry. *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45–46 (S.D.N.Y. 2013) (where "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims").

The claims in this action are not against the trafficker (Epstein) and instead are directed at JPMC's course of conduct, and how that conduct affected the class. Khodarkovsky Rep. ¶¶ 74–75. More specifically, Doe's claims and the class members' claims are based on the same "course of events"—JPMC's relationship with Epstein—and similar "legal arguments to prove the defendant's liability"—JPMC's participation in Epstein's sex-trafficking venture and negligence in failing to prevent harm to Epstein's victims. *See Robidoux*, 987 F.2d at 936; *see also Marisol A.*, 126 F.3d at 377 (finding no abuse of discretion in typicality finding where class members' injuries resulted from a "unitary course of conduct by a single system"); *Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 WL 4487984, at *7 (W.D. Okla. Sept. 30, 2021) (rejecting argument that "personal experiences unique to certain class members and not experienced by others demonstrate a lack of typicality" in TVPA case where "the class members' claims are based on the same legal theories and the same operative conduct of Defendants as the claims brought by the Named Plaintiffs"). Thus, Doe's claims are typical of the claims of the other class members.

D.  Rule 23(a)(4)—Plaintiff Will Adequately Represent the Class.

Under Rule 23(a)(4), adequacy requires that the representative of the parties will "fairly and adequately protect the interests of the class." *In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 237 (S.D.N.Y. 2015). "A finding that a proposed class representative satisfies the typicality inquiry constitutes strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 109. Even if a conflict exists, it does not

"necessarily defeat class certification—the conflict must be fundamental." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

Here, Plaintiff will "fairly and adequately" represent the class; she has actively participated in and monitored the litigation, has been deposed once, and has agreed to be deposed again. Doe seeks to hold JPMC accountable for facilitating the sex-trafficking venture that harmed her and countless others. Ex. 36 at 31:16–20 ███████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████ Her interests align with the class members' interests, and she will continue to prosecute this matter vigorously. Further, Doe's counsel is "qualified, experienced and generally able to conduct the litigation." *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). Accordingly, the adequacy requirement is met.

## II.   The Rule 23(b) Requirements Are Satisfied.

In addition to meeting the four prerequisites under Rule 23(a), Doe can also demonstrate that two different types of class action are appropriate under Rule 23(b). First, a class under Rule 23(b)(3) is appropriate because common questions of law or fact predominate over any questions affecting individual class members and the class action is the superior way to adjudicate these issues. Second, a class under Rule 23(b)(1) is appropriate because individual adjudications would establish incompatible standards of conduct under Rule 23(b)(1).

### A.  Rule 23(b)(3)'s Requirements Are Satisfied.

#### 1.  *Common Questions of Law and Fact Predominate.*

Rule 23(b)(3) certification turns on whether common issues predominate over individualized issues. "[A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide

proof." *In re Petrobras Securities*, 862 F.3d 250, 270 (2d Cir. 2017) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Doe need not "prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen*, 568 U.S. at 469. Similarly, "predominance does not require a plaintiff to show that there are no individual issues." *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 111. The requirement calls "only for predominance, not exclusivity, of common questions." *See Chalmers v. City of New York*, No. 20 CIV. 3389 (AT), 2022 WL 4330119, at *17 (S.D.N.Y. Sept. 19, 2022).

In this case, Doe brings claims for negligence and violation of the TVPA. *See* ECF No. 66. Those claims will be proven with common evidence, and proof pertaining to specific class members does not predominate over the core common questions regarding JPMC's liability to the class members.

        i.      Common Questions Predominate for Plaintiff's TVPA Claims.

Doe's TVPA claims for beneficiary liability and obstruction of TVPA enforcement will require the adjudication of primarily issues common the class and subject to common, class-wide proof. These claims involve the following common issues that can be proven with common evidence, among others:

- **<u>Existence of a Sex-Trafficking Venture.</u>** Each class member asserting a beneficiary liability claim would have to prove that Epstein ran a sex-trafficking venture in violation of the TVPA. *See S.J.*, 473 F. Supp. 3d at 152–53. Proof of this venture would, of course, be common to the class, as it would consist of testimony from victims and witnesses about the operation of Epstein's trafficking venture and documents from law enforcement regarding the venture, among other things.

- **<u>JPMC's Knowledge.</u>** Each class member asserting a beneficiary liability claim would have to prove JPMC "knew or should have known" about Epstein's sex-trafficking venture. *See id*. This factual issue can and will be proven with common evidence, such as the testimony of JPMC's employees, written communications discussing the venture and media reports regarding the venture, and publicly available information about the venture demonstrating that JPMC should have known about the venture if it claims it lacked actual knowledge. *See* Khodarkovsky Rep. ¶¶ 105–110.

15

- **<u>JPMC's Participation.</u>**  Each class member asserting a beneficiary liability claim would have to prove JPMC participated in the sex-trafficking venture.  *See S.J.*, 473 F. Supp. 3d at 152–53.  This element can be proven with common evidence, such as JPMC's account records, JPMC employees' communications, and JPMC's employees' testimony evidencing JPMC paying funds to victims of trafficking and co-conspirators from Epstein-related accounts; permitting Epstein and his co-conspirators to withdraw large sums of cash to pay victims and to structure those withdrawals to avoid detection; housing accounts for known co-conspirators to which Epstein transferred tens of millions of dollars; deliberately failing to file reports in the face of red flags; and refusing to cut ties with Epstein despite the pleas of certain JPMC executives, enabling his trafficking for many more years.  *See* Khodarkovsky Rep. ¶¶ 111–113.

- **<u>JPMC's Benefit.</u>**  Each class member asserting a beneficiary liability claim would have to prove JPMC benefitted from its participation in the venture.  *See S.J.*, 473 F. Supp. 3d at 152–53.  This element can be proven with common evidence, including JPMC documents and testimony showing that JPMC earned millions of dollars from accounts it knew Epstein used for trafficking, from the additional wealthy clients that Epstein brought JPMC, and from lucrative business opportunities that Epstein offered.

- **<u>JPMC's Obstruction</u>**.  Each class member asserting an obstruction claim would have to prove that JPMC obstructed the government's enforcement of the TVPA.  18 U.S.C. § 1591(d).  This element can be proven with common evidence such as documentary and testimonial evidence from JPMC itself showing that JPMC failed to file SARs with FinCEN in hinderance of the DOJ's criminal investigation of Epstein.

One of JPMC's proposed experts has opined that class certification is inappropriate, for example, because ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████.  Ex. 43 at 57.[4]  But factual questions affecting individual members cannot defeat class certification given the common issues regarding JPMC's liability.  *See, e.g.*, *Eggleston*, 445 F. Supp. at 400 (certifying class of immigrants denied public benefits even though "each member of the class was denied benefits for slightly different reasons and under slightly different circumstances").  Indeed, because the "TVPA's explicit statutory language makes

---

[4]       Dr. Mehlman-Orozco also suggests that Jeffrey Epstein's victims were ████████████ ████████████, despite making numerous television appearances in which she decried the heinousness of Epstein's trafficking and called Epstein's victims what they are, "true victims of sex trafficking and exploitation."  Ex. 43 at 21; *see, e.g.*, https://abcnews.go.com/ThisWeek/video/epstein-eyes-times-pierre-thomas-64911537.

clear that a 'reasonable person' standard applies in determining whether a particular harm (or threat of harm) is sufficiently serious" to force compliance, any claim that litigating "coercion" under the TVPA "would require an individualized consideration of each putative class member is mistaken." *Paguirigan*, 2018 WL 4347799, at *8. Accordingly, common issues subject to common proof predominate over individualized issues relating to Doe's TVPA claims.

        ii.    Common Questions Predominate for Plaintiff's Negligence Claims.

Doe has also brought two negligence claims against JPMC—one for JPMC's negligent failure to exercise reasonable care to prevent physical harm, and one for JPMC's negligent failure to exercise reasonable care as a banking institution providing non-routine banking. As to her claim for negligent failure to exercise reasonable care to prevent physical harm, the legal and factual issues common to all class members include, among others:

- JPMC's duty to exercise reasonable care to avoid conduct that would combine with Epstein's crimes, and permit Epstein's crimes, in violation of New York Penal Law Chapter 130 (FAC ¶ 312);

- JPMC breaching its duty by providing financial and other support for Epstein's sex trafficking venture which set the forces in motion that directly and proximately injured and caused physical harm to Doe and the Class Members (*id.* ¶ 313);

- JPMC reasonably foreseeing that its negligent failure to prevent physical harm would result in physical harm to Doe and the Class Members (*id.* ¶ 314);

- JPMC failing to act reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex crimes in violation of Chapter 130 (*id.* ¶ 315);

- JPMC realizing the likelihood that it was creating an opportunity for Epstein to commit intentional tortious conduct against Doe and the Class Members (*id.* ¶ 316);

- JPMC knowing that its own conduct was necessary to give Epstein opportunities to engage in that conduct and commit those crimes (*id.*); and

- JPMC's negligent acts and omissions foreseeably creating substantial risk of Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact (*id.* ¶ 318).

Common issues also predominate as to Doe's second negligence claim for failure to exercise reasonable care as a banking institution providing non-routine banking, including:

- JPMC owing a duty not to knowingly provide non-routine banking support and assistance for Epstein that it knew, and had reason to know, would lead to and support intentional tortious conduct and Chapter 130 crimes by Epstein (*id.* ¶ 324);

- JPMC breaching said duty by providing non-routine banking support to Epstein, including: providing hundreds of thousands of dollars in cash to Epstein and his co-conspirators when it knew that the cash would be used to facilitate coercive sex acts (*id.* ¶ 326); failing to follow numerous banking requirements in connection with financial dealings with Epstein (*id.* ¶ 327); and deliberately failing to file SARs (*id.* ¶ 335); and

- JPMC reasonably foreseeing that its actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to intentional torts and sex offenses against Doe and the Class Members (*id.* at ¶ 342).

These common factual issues can likewise be proven with common evidence, such as documentary and testimonial evidence from JPMC showing that JPMC provided accounts and other financial services which were almost exclusively used for Epstein to pay expenses related to Epstein's criminal activity, attorney's fees for criminal and civil lawsuits and sex-abuse settlements, private investigators to investigate sex abuse victims, and extravagant lifestyle for Epstein; provided cash to help Epstein pay victims; permitted Epstein to structure cash withdrawals to avoid being flagged by the authorities; actively trafficked young women through its subsidiary Highbridge; and helped Epstein conceal the trafficking from authorities which allowed him to abuse girls for a long stretch of time.  *See, e.g.*, FAC ¶¶ 155, 159, 170, 178, 179, 187, 230. Accordingly, Doe has met the predominance factor for class certification under Rule 23(b)(3).

iii.    Individualized Damages Determinations Cannot Defeat Class Certification.

There is no real dispute that each member of the class was harmed by the trafficking that JPMC facilitated.  While JPMC may argue that each class member suffered a different amount of harm, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."  *Pub. Employees' Ret. Sys. of Mississippi*, 277

F.R.D. at 119 (granting class certification where damages were not measurable on a class-wide basis because the "Court may determine at a later point that subclasses are appropriate to manage the allocation of damages, but this decision need not be made at this early stage"); *see also Menocal*, 882 F.3d at 922 (holding that the "presence of individualized damages issues does not defeat the predominance of questions common to the TVPA class" and that the district court could limit the class action to liability issues); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3)."). The mere fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat the predominance requirement. *See* Newberg & Rubsenstein on Class Actions § 4:54 & n.2 (collecting cases demonstrating that "courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations").

### 2. A Class Action Is Superior to Other Methods of Adjudication.

Doe can also demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The relevant factors include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* A Rule 23(b)(3) class is superior when it allows for the vindication of "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc v. Windsor*, 521 U.S. 591, 617 (1997).

19

Here, the TVPA was designed to protect victims of trafficking who are particularly vulnerable, Khodarkovsky Rep. ¶¶ 43, 115–117, and class treatment is therefore superior in such situations.  *See Jane Doe 30's Mother v. Bradley*, 64 A.3d 379, 385 (Del. Super. Ct. 2012); *see also Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 268 (D. Conn. 2002) (finding class action superior in a case alleging violations of state labor law in part because "class members may fear reprisal"). Further, a class action here would avoid a "multiplicity and scattering of suits" that would follow from numerous victims of one single trafficking venture, enabled by JPMC, having to independently vindicate their rights in courts across the country.  *See In re MF Global Holdings*, 310 F.R.D. at 239; *see also Menocal*, 882 F.3d at 915 (Rule 23(b)(3) class superior where "the putative class members reside in countries around the world").  Litigating this case has required taking substantial discovery from JPMC, including many depositions and obtaining tens of thousands of documents, that would be relevant to each class member's claims but would be difficult for each class member to obtain on her own in an individual lawsuit.  *See* Boies Decl. ¶ 5. Further, Epstein's sex-trafficking scheme operated on an international scale, with victims spanning multiple different countries and multiple states within the U.S.  *See* FAC ¶¶ 87, 103, 106, 141, 212.  A class action would efficiently curtail the possibility of the "scattering" of suits across the country and is the superior method of adjudicating this dispute.

B.  The Rule 23(b)(1) Requirements Are Satisfied

For all the reasons explained above, the Rule 23(b)(3) requirements for a class certification are clearly satisfied.  Additionally, however, a class can be certified pursuant to Rule 23(b)(1). Rule 23(b)(1)(A) is satisfied where "prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Rule 23(b)(1)(A) applies to cases "where the party is obliged

by law to treat the members of the class alike (a utility acting towards customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity." *Amchem*, 521 U.S. at 614.  A class can proceed under Rule 23(b)(1) if "prosecuting separate actions by or against individual class members" would cause confusion or be impracticable.  *In re White*, 64 F.4th 302, 304 (D.C. Cir. 2023).

Here, inconsistent or varying adjudications with respect to individual class members would establish incompatible standards for JPMC.  This case presents important issues concerning the obligations of banks in connection with sex-trafficking (and other criminal) organizations.  These issues include what constitutes "knowingly benefiting" from a sex-trafficking organization in violation of the TVPA, as well as what constitutes non-routine banking support of sex-trafficking. The resolution of these issues will dictate standards of responsibility for financial (and other) institutions in this area that will have broad applicability.  *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 185, 200 (S.D.N.Y. 2007) (certifying class under Rule 23(b)(1)(A) because if the plaintiffs were to "pursue their negligence claims individually, there is a risk that one jury will find the Defendants acted reasonably while another jury will find that they breached a duty of reasonable care").  Inconsistent adjudications would create grave difficulties for the operation of financial institutions, as well as for the protection of victims of sex-trafficking and other crimes.

## III. Ascertainability—The Class Is Sufficiently Ascertainable.

The Second Circuit recognizes an implied requirement of ascertainability, or that "the identity of class members must be reasonably ascertainable by reference to objective criteria." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566–67 (S.D.N.Y. 2014) (Rakoff, J.).  "Class members need not be ascertained prior to certification, but must be ascertainable at some point in the case." *Espinoza v. 953 Associates LLC*, 280 F.R.D. 113, 125 (S.D.N.Y. 2011).  "The standard

21

for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'" *Ebin*, 297 F.R.D. at 567. "[T]he Second Circuit has instructed that failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Id.* (internal citation omitted).

Here, class membership is ascertainable by objective criteria. The class is defined to include only women abused or trafficked by Epstein between January 1998 and Epstein's death in August 2019. First, class members are ascertainable through reference to publicly available information such as law enforcement reports, legal proceedings that dozens of victims have initiated against Epstein or his Estate, and statements to the media in which victims came forward. Second, documents produced by JPMC and Epstein's Estate in this matter identify victims, such as account ledgers reflecting payments from Epstein to victims. Khodarkovsky Rep. ¶ 68–71; Boies Decl. Exs. 33, 34; *see also Paguirigan*, 2018 WL 4347799, at *4 n.4 (finding ascertainability of a TVPA class through the defendant's own produced records). Third, class members could submit additional documentation identifying themselves as victims, such as contemporaneous communications about the abuse, medical records, victim notification letters that the Department of Justice sent to many victims pursuant to the Crime Victims Protection Act, or determinations of eligibility from the EVCP. *See, e.g.*, Ex. 44; Ex. 45; Ex. 8; Ex. 12 at 13–14; Ex. 38 at 6. Accordingly, the class is sufficiently ascertainable at this stage. *See Biediger v. Quinnipiac University*, 2010 WL 2017773, at *4 (D. Conn. May 20, 2010) (finding class of students subject to sex discrimination sufficiently ascertainable).

## IV.    In the Alternative, a Rule 23(c)(4) Issues Class Is Appropriate.

Plaintiff has demonstrated that this action is appropriate for class certification in its entirety pursuant to Rule 23(a) and Rule 23(b). In the alternative, however, Plaintiff respectfully requests

certification of a Rule 23(c)(4) issues class.  Under Fed. R. Civ. P. 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues."  *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 464 (S.D.N.Y. 2018).

The Court can certify an issues class resolving the common issues of liability identified in Sections I.B and II.A.1, *supra*.  As explained above, Doe is pursuing several theories of liability against JPMC under the TVPA and New York state law.  Within each of those separate theories of liability are particular issues that go to JPMC's liability, for which class treatment is clearly superior to individualized litigation.  *See supra* at II.A.2.  For example, the Court may certify a class as to the question of whether JPMC knowingly benefitted, in violation of the TVPA, from Epstein's sex-trafficking venture; whether JPMC obstructed enforcement of the TVPA; whether JPMC owed a duty of care to the class members; and whether JPMC exercised reasonable care to prevent injury to Doe and other class members.  While Doe maintains that this action may be certified in its entirety under Rule 23(b), in the alternative, the Court should certify a class on each of these issues, in addition to the remaining common issues outlined in Sections I.B and II.A.1, under Rule 23(c)(4).

## V.     The Court Should Appoint Boies Schiller Flexner LLP and Edwards Pottinger LLC as Class Counsel.

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  "In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(a).

Under this criteria, Boies Schiller Flexner, LLP ("BSF") and Edwards Pottinger, LLC ("EPLLC") meet Rule 23(a)(4)'s adequacy requirement and should be appointed as Class Counsel under Rule 23(g).  BSF and EPLLC have already invested substantial time and resources in investigating Doe's claims, prosecuting this case, and gathering discovery from JPMC and third parties.  Since the filing of the initial complaint, BSF and EPLLC have been involved identifying and investigating Doe's claims and facilitating the discovery process, including by engaging experts, deposing key JPMC employees and other witnesses, responding to JPMC's motion to dismiss, producing documents to JPMC, collecting documents from third parties by subpoena, and reviewing the many documents produced by JPMC thus far.  Boies Decl. ¶ 5; Edwards Decl. ¶ 3.  BSF and EPLLC have committed, and continue to commit, substantial time and resources to representing the Class, and have worked vigorously and zealously to competently represent the interests of the members of the Class.  *Id.*

BSF and EPLLC are eminently qualified to represent the proposed class and its interests.  BSF and EPLLC have substantial experience handling class actions, complex litigation, banking matters, matters involving trafficking and abuse, and, more specifically, cases related to Epstein's sex-trafficking venture.  Boies Decl. ¶¶ 3–4, 8, 10; Edwards Decl. ¶¶ 4–7.  David Boies of BSF is one of the most well-known class action attorneys in the United States and has recovered billions of dollars for plaintiffs in class action litigation.  Boies Decl. ¶ 3–4, 7.  Sigrid McCawley of BSF has devoted years of her career to seeking justice for Epstein's survivors, and her work contributed to the arrest of Jeffrey Epstein, Ghislaine Maxwell, and Jean-Luc Brunel.  *Id.*  ¶ 9–10.  Brad Edwards and Brittany Henderson have likewise been leaders in prosecuting actions against Epstein and his co-conspirators and have litigated numerous other high-profile matters for survivors of

24

sexual violence.  Edwards Decl. ¶¶ 8–13.  Thus, Rule 23(g) is satisfied and the Court should appoint BSF and EPLLC as class counsel.

## **CONCLUSION**

For the reasons stated herein, Doe respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Jane Doe as the Class Representative; (3) appointing Boies Schiller Flexner, LLP and Edwards Pottinger, LLC as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: April 28, 2023                               Respectfully Submitted,

                                                    _/s/  David Boies_____
                                                    David Boies
                                                    Andrew Villacastin
                                                    Sabina Mariella
                                                    Boies Schiller Flexner LLP
                                                    55 Hudson Yards
                                                    New York, New York
                                                    Telephone: (212) 446-2300
                                                    Fax: (212) 446-2350
                                                    Email: dboies@bsfllp.com
                                                    Email: avillacastin@bsfllp.com
                                                    Email: smariella@bsfllp.com

                                                    Sigrid McCawley (*pro hac vice*)
                                                    Daniel Crispino (*pro hac vice*)
                                                    Boies Schiller Flexner LLP
                                                    401 E. Las Olas Blvd. Suite 1200
                                                    Fort Lauderdale, FL 33316
                                                    Telephone: (954) 356-0011
                                                    Fax: (954) 356-0022
                                                    Email: smccawley@bsfllp.com
                                                    Email: dcrispino@bsfllp.com

                                                    Bradley J. Edwards
                                                    Edwards Pottinger LLP
                                                    425 N. Andrews Ave., Suite 2
                                                    Fort Lauderdale, FL 33301

Telephone: (954) 524-2820
Fax: (954)-524-2822
Email: brad@epllc.com

Brittany N. Henderson
Edwards Pottinger LLP
1501 Broadway
Floor 12
New York, NY
Telephone: (954) 524-2820
Fax: (954) 524-2820
Email: brittany@epllc.com

*Counsel for Jane Doe 1*