# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>Deutsche Bank Akteingesellschaft, et. al.,<br><br>    Defendants.<br><br>Jane Doe 1, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>JPMorgan Chase Bank, N.A.,<br><br>    Defendant. | Case No. 1:22-CV-10019 (JSR) |

**DECLARATION OF MARGARET GARVIN**

I, Margaret Garvin, provide the following declaration, which is true to the best of my knowledge, information, and belief:

1. I am a member in good standing of the bar of Oregon and the U.S. Supreme Court Bar.

2. I am the Executive Director of the National Crime Victim Law Institute (NCVLI) and a Clinical Professor of Law at Lewis & Clark Law School. I am recognized as a leading expert on victims' rights and am a co-author of *Victims in Criminal Procedure*. I have testified before Congress, state legislatures, and the Judicial Proceedings Panel on Sexual Assault in the Military. In 2017, I was appointed by the Secretary of Defense to serve on the Defense Advisory Committee on Investigation, Prosecution, and Defense of Sexual Assault in the Armed Forces. I also serve on the Victims Advisory Group of the United States Sentencing Commission, and Oregon Chief Justice's Criminal Justice Advisory Committee. Previously, I served as co-chair of the American Bar Association's Criminal Justice Section Victims Committee, co-chair of the Oregon Attorney General's Crime Victims' Rights Task Force, on the Legislative & Public Policy Committee of the Oregon Attorney General's Sexual Assault Task Force, and on the Victim Services Subcommittee of the Response Systems to Adult Sexual Assault Crime Panel of the United States Department of Defense.

3. In 2020, I received the Frank Carrington Crime Victim Attorney Award from the ABA Criminal Justice Section and in 2015 I was honored with the John W. Gillis Leadership Award from National Parents of Murdered Children. Before joining NCVLI, I practiced law in Minneapolis, Minnesota, and clerked for the Eighth Circuit Court of Appeals. I received my M.A. from the University of Iowa and my

J.D. from the University of Minnesota, and my Mst. in International Human Rights Law from the University of Oxford.

4. I am a member of the U.S. Supreme Court Bar and have filed various amicus briefs with the Court in crime victims' rights cases. One case in which I filed an amicus brief in the U.S. Supreme Court is *Courtney Wild v. U.S. District Court for the Southern District of Florida*, No. 21-351.

5. In August 2021, Professor Paul Cassell of the College of Law at the University of Utah sent me an email. Professor Cassell and I have worked together on many crime victims' rights matters, including efforts to expand the reach of the federal Crime Victims' Rights Act (CVRA). Professor Cassell and I have also co-written a law review article on crime victim's rights in the states. *See* Paul G. Cassell & Margaret Garvin, *Protecting Crime Victims in State Constitutions: The Example of the New Marsy's Law for Florida*, 110 J. Crim. L. & Criminology 99 (2020).

6. In his email, Professor Cassell was seeking amicus support from NCVLI for Ms. Wild's efforts to obtain Supreme Court review of a divided and controversial decision of the Eleventh Circuit, which held that the CVRA did not create any cause of action for crime victims seeking enforcement of CVRA rights before federal criminal charges were filed. I was aware of the decision and believed that it was contrary to the text, structure, and purposes of the CVRA. I understood that Ms. Wild's legal effort was designed to ultimately invalidate the Epstein non-

3

prosecution agreement (NPA), so that Ms. Wild could confer with prosecutors in Florida to try and obtain federal criminal prosecution of Epstein's co-conspirators. I agreed that NCVLI would support Professor Cassell in his efforts on behalf of Ms. Wild.

7. As I recall, Professor Cassell and I had discussions, through email and telephone, as to how NCVLI could help to support Ms. Wild. When we had those discussions, I understood we were exchanging confidential information in support of a common purpose—to help Ms. Wild obtain a grant of certiorari in the U.S. Supreme Court and, ultimately, to help her in her goal of obtaining prosecution of Epstein's co-conspirators.

8. I understood that the strategic information Professor Cassell and I were exchanging was confidential and was not to be communicated publicly or otherwise used against one of us. An agreement not to exchange the information with others (outside of those working together on this effort) was necessary for us to have candid conversations about strategy, since otherwise neither I nor Professor Cassell could have talked directly about the possible arguments and counterarguments that we were considering.

9. NCVLI and Ms. Wild had a common interest in a legal matter, including an interest in having Ms. Wild's certiorari petition granted.

10. On about September 27, 2021, I shared with Professor Cassell a draft of the brief for NCVLI (and other allied crime victims' rights organizations) to see if he had any suggestions for the brief. In sharing the draft NCVLI brief and asking for suggestions, I understood that I was sharing confidential information with Professor Cassell under an implied agreement that the information would be maintained as confidential because we were pursuing common legal interests.

11. Ultimately, in early October 2021, I filed an amicus brief in support of Ms. Wild in the Supreme Court. The brief was filed on behalf of NCVLI, Arizona Voice for Crime Victims, Loyola Law School's Right in System Enforced (RISE) Clinic, the Michigan Coalition to End Domestic and Sexual Violence, the Network for Victim Recovery DC, the Ohio Crime Victim Justice Center, and the South Carolina Victim Assistance Network. In filing the brief on behalf of these crime victims' rights organizations, I did not have in place written common interest agreements with them. One reason that I did not have such written agreements in place is that NCVLI and other crime victims' rights organizations have very limited funding to handle a vast array of cases. It was commonly understood by these organizations that we were working together in a common enterprise and, accordingly, no written agreement was needed or expected. Drafting and exchanging written "joint defense agreements" or "common interest privilege agreements" would have been time consuming and an unnecessary diversion of scarce resources.

12. In other Supreme Court cases I have worked on involving crime victims' rights amicus briefs, it is my experience that written confidentiality agreements are not put in place. Because of the collaborative and supportive nature of such projects, it is widely accepted that no written confidentiality agreement is needed.

13. A summary of the argument that NCVLI and its allied organizations presented demonstrates the importance of the CVRA's conferral right:

> Conferral prior to an NPA is the *only* opportunity for a victim to be heard regarding their significant safety, financial and psychological rights and interests. *See, e.g., id.* § 3771(a)(1) (providing victims with "[t]he right to be reasonably protected from the accused"); *id.* § 3771(a)(6) (providing victims with "[t]he right to full and timely restitution as provided in law"); *cf.* Eric M. Werner, *Avoiding the Second Assault: A Guidebook for Trauma-Informed Prosecutors*, 25 Lewis & Clark L. Rev. 573, 590 (2021) (discussing how prosecutors can help victims reduce trauma by providing a victim with opportunities to engage with the case as a powerful tool against alienation and lack of control caused by the crime); Theodore R. Sangalis, *Elusive Empowerment: Compensating the SexTrafficked Person under the Trafficking Victims Protection Act, 80 Fordham L. Rev. 403, 438 (2011)* ("[C]ompensation that seeks to make victims whole can be an important first step in their recovery.").
>
> The Eleventh Circuit's holding that crime victims lack standing to remedy pre-charge rights violations created an end run around the rights and protections that Congress intended. The Eleventh Circuit did this despite the CVRA mandate that courts "shall ensure" that victims are afforded all of their rights under the law. 18 U.S.C. § 3771(b)(1). The Eleventh Circuit reached its conclusion based on a flawed reading and application of *Alexander v. Sandoval*, 532 U.S. 275 (2001). *See In re Wild*, 994 F.3d 1244 (11th Cir. 2021). Allowed to stand, the current state of the law would leave every victim of a federal crime in the Eleventh Circuit and nationally vulnerable to secret deals that strip them of their rights with no way to challenge the Government's conduct. This undermines the clear language and intent of the CVRA.

This case presents important questions of federal law that need to be settled by this Court Pursuant to U.S. Sup. Ct. R. 10(c).

14. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of May, 2023.

By: *Margaret A. Garvin*  
Margaret A. Garvin