# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JANE DOE 1; JANE DOE 2; JANE DOE 3;
JANE DOE 4; JANE DOE 5; JANE DOE 6; and JANE
DOE 7,

*Plaintiffs*,

v.

DARREN K. INDYKE AND RICHARD D. KAHN,
in their capacities as co-executors of THE ESTATE
OF JEFFREY E. EPSTEIN; ESTATE OF JEFFREY
E. EPSTEIN, and ROES 2-10

*Defendants*.

Case No. 1:19-cv-07675-GBD-DCF

## JOINT STIPULATION AND ~~[PROPOSED]~~ ORDER ON PLAINTIFFS' FIFTH AMENDED COMPLAINT AND MAINTAINING STAY OF ACTION

*DF*

WHEREAS independent claims administration experts have designed and are implementing the Epstein Victims' Compensation Program (the "Program") to resolve sexual abuse claims against decedent Jeffrey E. Epstein ("Decedent") in a non-adversarial alternative to litigation; and

WHEREAS Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 7 (together, "Plaintiffs") seek to participate in the Program; and

WHEREAS Plaintiffs and Defendants Darren K. Indyke and Richard D. Kahn, Co-Executors of the Estate of Jeffrey E. Epstein (the "Co-Executors", and together with Plaintiffs, the "Parties") seek to preserve their resources and judicial economy by staying this action unless and until Plaintiffs cease their participation in the Program; and

WHEREAS, should Plaintiffs resolve their claims against Decedent via the Program, the Parties will thereafter promptly discontinue this action with prejudice; and

WHEREAS, on December 3, 2020, the Court So Ordered the voluntary dismissal with prejudice of Jane Doe 6's claims; and

WHEREAS, after several amended Complaints, on December 22, 2020, the Court entered an Order (ECF Doc. 57) granting the Co-Executors 30 days from after the lifting of the stay, if any, to answer, move or otherwise respond to Plaintiffs' Fourth Amended Complaint; and

WHEREAS, on January 3, 2020, the Court entered a Joint Stipulation and Order (ECF Doc. 36) staying this action pending Plaintiffs' participation in the Program; and

WHEREAS, on January 6, 2020, the Court So Ordered the voluntary dismissal with prejudice of Jane Doe 1's claims; and

WHEREAS, Plaintiffs now seek to amend their Fourth Amended Complaint by filing the proposed Fifth Amended Complaint attached hereto as Exhibit A, solely to add an additional plaintiff, Jane Doe 8, and allegations in support of Jane Doe 8's claims; and

WHEREAS, Jane Doe 8 also seeks to participate in the Program and preserve her resources and judicial economy by staying this action unless and until she ceases such participation;

WHEREAS, the Co-Executors consent to Plaintiffs having leave to file their Fifth Amended Complaint attached hereto, provided, however, that: (i) this is without prejudice to the Co-Executors' rights and legal positions, including without limitation their response to the Fifth Amended Complaint; and (ii) that Jane Doe 8's claims do not relate back to any of the prior Complaints in this action; and

WHEREAS, all Parties acknowledge that Plaintiff Jane Doe 8 does not waive and preserves all arguments with respect to the applicability of equitable tolling and other principles; and the Co-Executors preserve all arguments in response thereto; and

WHEREAS, the Co-Executors and Jane Doe 8 agree she shall be subject to the Court's prior Order on Plaintiff's Anonymity (ECF Doc. 31).

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for the Parties and prospective Plaintiff Jane Doe 8, that:

1. Plaintiffs are granted leave to file their proposed Fifth Amended Complaint attached hereto, without prejudice to the Co-Executors' rights and legal positions, including without limitation their response to the Fifth Amended Complaint.

2. Jane Doe 8's causes of action do not relate back to any prior Complaints in this action, whether for purposes of Fed. R. Civ. P. 15 or otherwise;

3. The filing of the Fifth Amended Complaint does not give Jane Doe 8 the right or ability to invoke or otherwise avail herself of CPLR 215(8)(a).

4. This action remains stayed pending further Order of the Court.

///

///

///

///

///

///

///

///

///

///

///

5. The Co-Executors have 30 days from after the lifting of the stay, if any, to answer, move or otherwise respond to Plaintiffs' Fifth Amended Complaint.

Dated: February 2, 2021
   New York, New York

Respectfully submitted,

THE BLOOM FIRM

By: _/s/ Arick Fudali_____

  Lisa Bloom
  Arick Fudali
  85 Delancey St.
  New York, NY 10002
  (818) 914-7397

*Attorneys for Plaintiffs and Jane Doe 8*

TROUTMAN PEPPER HAMILTON
SANDERS LLP

By:_/s/ Bennet J. Moskowitz_____

  Bennet J. Moskowitz
  875 Third Avenue
  New York, NY 10022
  (212) 704-6000
  bennet.moskowitz@troutman.com

*Attorneys for Defendants Darren K. Indyke and*
*Richard D. Kahn, Co-Executors of the Estate*
*of Jeffrey E. Epstein*

Date: _2/3/2021_____
  New York, New York

_____

HON. DEBRA FREEMAN
United States Magistrate Judge

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 2; JANE DOE 3; JANE DOE 4; JANE DOE 5; JANE DOE 7; and JANE DOE 8, | Case No.: 1:19-cv-07675-GBD |
| Plaintiffs, | FIFTH AMENDED COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| DARREN K. INDYKE AND RICHARD D. KAHN, in their capacities as co-executors of THE ESTATE OF JEFFREY E. EPSTEIN; ESTATE OF JEFFREY E. EPSTEIN and ROES 2-10, | |
| Defendants. | |

Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 7, and Jane Doe 8 ("Plaintiffs"), by and through their attorneys, The Bloom Firm, bring this action against Defendants Darren K. Indyke and Richard D. Kahn, in their capacities as co-executors of the Estate of Jeffrey E. Epstein, and Roes 2-10 ("Defendants"). On December 3, 2020, Plaintiff Jane Doe 6 voluntarily dismissed her claims against Defendants. On January 6, 2020, Plaintiff Jane Doe 1 voluntarily dismissed her claims against Defendants. Plaintiffs Jane Does 2-5 and 7 allege upon knowledge concerning their own experience and upon information and belief as to all other matters.

## I. OVERVIEW

1. Jeffrey E. Epstein ("Epstein") was a serial sexual predator who exploited his wealth and power to fraudulently and forcefully entice young women into engaging in abusive commercial sex acts. Epstein sought to take advantage of

Plaintiffs, who were each vulnerable, young women at the time of their assaults, through fraudulent, manipulative, and sometimes violent means to procure sexual favors. Epstein permanently damaged Plaintiffs' lives and careers. Though Epstein is recently deceased, the trauma and pain he caused Plaintiffs remain.

2. Through his third-party agents and his own actions, Epstein intimidated his victims by flaunting his wealth and power. Epstein invited his victims to his lavish homes, which displayed photographs of wealthy and powerful political figures, indicating that he had powerful government connections. Epstein also – both directly and indirectly – represented to his victims that he always had control over others, evidenced by his recruiters' and associates' compliance in the sexual abuse. Indeed, Epstein even threatened women with violence if they made any attempts to come forward with their stories. Any young woman entering his home and learning of his wealth, power, and connections would fear reporting him to the police or taking legal action against him before his death. Plaintiffs are no exception.

## II. THE PARTIES

3. Plaintiffs, victims of sex trafficking and molestation, have been identified by pseudonym because this matter is of a highly sensitive and personal nature, and public disclosure of their identities may subject them to further embarrassment, shame, and emotional harm.

4. Plaintiff Jane Doe 2 is a United States citizen, domiciled in Maryland. She resides in Baltimore, Maryland.

5. Plaintiff Jane Doe 3 is a United States citizen, domiciled in Virginia. She resides in Richmond, Virginia.

6. Plaintiff Jane Doe 4 is a United States citizen, domiciled in Washington. She resides in Vancouver, Washington.

7. Plaintiff Jane Doe 5 is a United States citizen, domiciled in New York. She resides in New York, New York.

8. Plaintiff Jane Doe 7 is a United States citizen, domiciled in California. She resides in Long Beach, California.

9. Plaintiff Jane Doe 8 is a United States citizen, domiciled in Florida. She resides in Lake Worth, Florida.

10. Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

11. Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

12. The identities and capacities of Defendants ROES 2 through 10 are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these Defendants by fictitious names. Plaintiffs will amend the Complaint to substitute the true names and capacities of the ROE Defendants when ascertained. Plaintiffs are informed, believe, and thereon allege that ROES 2 through 10 are, and were at all times relevant herein, employees and/or agents of Epstein.

## III. JURISDICTION AND VENUE

13. Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death and maintained a residence in the Southern District of New York. Thus, Darren K. Indyke and Richard D. Kahn, as legal representatives of the Estate of Jeffrey E. Epstein, are deemed citizens of the U.S. Virgin Islands.

14. This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action involves claims brought under 18 U.S.C. §§ 1591 and 1595.

15. The amount in controversy in this action exceeds the sum or value of $75,000.00, excluding interests and costs, and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332. The Court also has jurisdiction over this suit pursuant to 28 U.S.C. § 1367.

16. On information and belief, this Court has personal jurisdiction over Defendants Darren K. Indyke and Richard D. Kahn, in their capacities as legal representatives of the Estate of Jeffrey E. Epstein, pursuant to New York Civil Practice Law and Rules ("C.P.L.R.") Sections 30l and 302 because Defendants operate in New York, transact business in New York, and own, use, or possess real property within New York.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiffs' claim occurred in this District.

## IV.     FACTUAL ALLEGATIONS

18.     At all material times, Epstein was (or appeared to be) a man of extraordinary wealth who traveled frequently around the world, including New York, New York at 9 East 71st Street, New York, NY 10021; Palm Beach, Florida; and in the United States Virgin Islands.

19.     At all material times, Epstein was an adult male who was born in 1953 and died on August 10, 2019.

## JANE DOE 2

20.     At all material times, Jane Doe 2 was an aspiring female model and also a hostess at The Coffee Shop, located at 29 Union Square West, New York, New York 10003.

21.     In or around June 2004, at The Coffee Shop, an anonymous woman ("Roe") approached Jane Doe 2 at The Coffee Shop. Roe began the conversation by complimenting Jane Doe 2's physical appearance. Roe told Jane Doe 2 that her nice, wealthy client liked young, pretty girls to massage him. Roe then offered Jane Doe 2 hundreds of dollars to massage Epstein at his mansion. Roe also intimated that there may even be future opportunities to make more money.

22.     Shortly thereafter, Roe took Jane Doe 2 to a club. At this club, Roe told Jane Doe 2 that she had worked for Epstein for a long time and that the job for which she was recruited simply entailed a brief massage. Based on these representations, Jane Doe 2 accepted the offer.

23.     Jane Doe 2 was reasonably excited and hopeful about the opportunity to make money now and in the future. She struggled financially, so she reasonably believed that the opportunity to make money by giving massages would and could provide much-needed financial support.

24.     After being reassured by Roe that the massage would not involve any unwanted touching, Jane Doe 2 met Roe near a small deli and/or cafe around the corner from Epstein's mansion, per Roe's instructions. Roe reiterated that Epstein

4

would not touch her and that she would not have to undress for the massage. Roe again described Epstein as wealthy and kind. Jane Doe 2 agreed to meet Epstein with the understanding that he would not touch her and would provide her money after she provided him with a massage.

25.    Immediately following this conversation with Roe, Jane Doe 2 arrived at Epstein's Upper East Side mansion for the massage. At the mansion, Epstein utilized increasingly aggressive tactics once he was alone with Jane Doe 2. During the massage, Epstein told Jane Doe 2 to undress, and Jane Doe 2 reluctantly acquiesced. Epstein then asked Jane Doe 2 to strip naked. Fearing what would happen to her if she were to refuse his demands, Jane Doe 2 again acquiesced. Epstein then sexually molested her by forcefully touching Jane Doe 2's breasts and masturbating in front of her. Epstein then forcefully penetrated Jane Doe 2 with his hand and an object. Epstein then ejaculated. Before she left Epstein's home, Jane Doe 2 received hundreds of dollars.

26.    Per his *modus operandi,* Epstein's method of recruiting and enticing Plaintiffs, and his fraudulent conversion of the massage to molestation, intentionally made Jane Doe 2 feel as if the incidents that took place in his mansion were not crimes. Through his recruiter, Epstein expressed that Jane Doe 2 would simply give him massages for pay. Epstein normalized the sexual abuse by staging the room where the abuse took place with a massage table. As a result, Jane Doe 2, barely over the age of 18, had reason to believe the massages were legitimate and reasonably relied upon Epstein's misrepresentation to their detriment. This was a deliberate and deceptive plan and scheme by Epstein, and carried out by Roe, to ensure that his victims were unaware that they were victims to avoid criminal and civil liability.

27.    Until Epstein's publicized July 2019 criminal indictment which notified Jane Doe 2 of the uncanny similarity between her experiences and those of Epstein's other victims described in the indictment, Jane Doe 2 had been unaware that she had become victims of the sordid sex-trafficking scheme, then-exposed by the media and federal government. As well, Jane Doe 2 was aware that a private

right of action is stayed during the pendency of a criminal action under 18 U.S.C Section 1595(b)(1).

**JANE DOE 3**

28.   At all relevant times, Jane Doe 3 was a minor under the age of 18. At all relevant times, Jane Doe 3 was an aspiring model in New York.

29.   In or around 1990, Jane Doe 3 met Epstein in New York, New York, when she was approximately 15 years old. On information and belief, Elite Model Management held casting calls in New York City wherein models were sent to meet with various Elite Model Management affiliates and clients, including photographers and casting directors. On information and belief, Epstein represented himself as a modeling photographer connected to Elite Model Management.

30.   On Jane Doe 3's first day of casting calls with her dream agency, Elite Model Management, she was excited and hopeful for the opportunity to work with renowned photographers and casting directors. This was the first casting call she ever attended.

31.   For her first casting call appointment, the agency's owner, John Casablanca, directed Jane Doe 3 to a residential address in Upper East Side Manhattan. Jane Doe 3 believed the appointment to be a legitimate casting call and was unaware of the identities of the homeowner, photographer, or any casting director at the time.

32.   When Jane Doe 3 arrived at the home, she was required to complete what she believed to be standard casting call paperwork, which required her size, age, height, and pager number. Epstein then introduced himself to Jane Doe 3 as a casting photographer.

33.   Almost immediately after this brief introduction, Epstein told Jane Doe 3 to remove her clothing. Jane Doe 3 complied because she believed removing her clothes was mandatory to complete the casting calls and to be competitive in the modeling industry. She wanted to advance her career, so she complied. Once Jane Doe 3 stripped to her underwear, Epstein took photographs of Jane Doe 3's near-

naked body from different angles. He did so by fraudulently representing to Jane Doe 3 that he was a photographer and worked in the fashion industry.

34.  While she remained partially exposed, Epstein pushed Jane Doe 3 against a wall, pressing his body against hers, until she could not move. Jane Doe 3 froze in discomfort. She did not say anything because she reasonably relied on Epstein's and Elite Model Management's representations that Epstein was a legitimate photographer and believed the offensive touching may have been customary for casting calls.

35.  While Epstein had Jane Doe 3 pinned against the wall, he pulled down his pants and thrusted against her until he ejaculated. Jane Doe 3 felt harmed and violated.

36.  Traumatized, Jane Doe 3 immediately left New York following the casting call to return to her home in Connecticut, despite intending to remain in New York to further her modeling career. Out of fear, Jane Doe 3 did not attend another casting call for several weeks and thereafter chose to only work with secondary market agencies for years. Due in part to the psychological and emotional scarring from her encounter with Epstein, Jane Doe 3 disenrolled from her high school while only in the tenth grade.

37.  Epstein's method of recruiting and enticing Jane Doe 3, and his fraudulent conversion of a casting call into molestation/rape, was intended to make Jane Doe 3 feel as if the molestation/rape that took place at the casting call was not a crime. Epstein knew a vulnerable minor like Jane Doe 3 would rely on his representations that the molestation/rape was legitimate. To her detriment, Jane Doe 3 did, in fact, rely on his representations. This was a deliberate plan and scheme by Epstein, and carried out by Epstein, to ensure that his victims were unaware that they were victims to avoid criminal and civil liability. Until Epstein's July 2019 criminal indictment, Jane Doe 3 had been unaware that, due to this incident, she had become victim of a sordid sex-trafficking scheme. As well, Jane Doe 3 was aware that a private right of action is stayed during the pendency of a criminal action under 18 U.S.C Section 1595(b)(1).

**JANE DOE 4**

38.     At all relevant times, Jane Doe 4 was a minor under the age of 18.

39.     Jane Doe 4 first met Epstein in or around 1984 in Hilton Head Island, South Carolina. On information and belief, Epstein had rented and/or leased a vacation home from Jane Doe 4's mother, a local real estate agent in Hilton Head Island.

40.     As was common in the area, Jane Doe 4 offered babysitting services to the tourists renting property from her mother. Jane Doe 4 was approximately 13 years old at the time when Epstein first hired Jane Doe 4 to work as a babysitter.

41.     When Jane Doe 4 arrived at Epstein's vacation rental in South Carolina, there were no young children to babysit. Instead, Epstein immediately offered 13-year-old Jane Doe 4 alcohol and drugs. Impressionable and shocked, Jane Doe 4 accepted Epstein's offering. Epstein raped Jane Doe 4 for the first time later that night.

42.     Epstein continued the same pattern of abuse and assault of Jane Doe 4 over the next several years. During summers, Epstein visited Hilton Head and hired Jane Doe 4 for her "babysitting services." In reality, Epstein was supplying a teenage girl alcohol and illicit drugs and subsequently assaulting and violent raping her.

43.     On information and belief, Epstein took nude photographs of Jane Doe 4. Jane Doe 4 was not made aware when the photos were taken. However, when Jane Doe 4 saw photographs of her own nude body and asked Epstein to return them, Epstein became violent and refused to provide these photographs to Jane Doe 4.

44.     Epstein's sexual abuse of Jane Doe 4 continued across state lines. On information and belief, Epstein flew Jane Doe 4 to New York, New York on approximately three of four occasions. During these trips, Epstein brought Jane Doe 4 to intimate gatherings with other prominent, wealthy men. It was later made clear to Jane Doe 4 that Epstein brought her to these parties to essentially offer her up as "fresh meat" to these other men.

45.     Jane Doe 4 was brutally and forcibly battered, assaulted, and raped by these other men she met through Epstein. On one occasion, one of these prominent men forcibly slapped Jane Doe 4 in the face after she was forced to perform oral sex on him. This same man forcibly raped her, penetrating her both vaginally and anally. On information and belief, Epstein was aware of and, indeed encouraged, the assault of Jane Doe 4 by these other men.

**JANE DOE 5**

46.     At all relevant times, Jane Doe 5 resided and worked in New York, New York.

47.     In or around September 2003, Jane Doe 5 first met Epstein. At the time, Jane Doe 5 was interviewing for a position as an executive and/or personal assistant for Epstein's close friend. To protect Jane Doe 5's anonymity, Jane Doe 5's employer will herein be referred to as "Epstein Associate 1."

48.     Although Jane Doe 5 was interviewing for a position to work for Epstein Associate 1, it was made clear from this initial interview that Epstein would control a substantial portion of Jane Doe 5's employment and, further, that maintaining her physical appearance would be a priority. Indeed, Epstein Associate 1 conducted the initial interview in Epstein's office and spent a substantial amount of time during the interview discussing Epstein, emphasizing to Jane Doe 5 that Epstein was a very powerful man. Jane Doe 5 was hired shortly after her initial interview.

49.     Epstein began his systematic, near constant abuse of Jane Doe 5 from their very first interaction. Jane Doe 5 first met Epstein at the office, wherein Epstein commented to her that she had a "good body" and that he liked her small breasts. To emphasize this point, Epstein then groped Jane Doe 5's breasts in the middle of the office. Shocked and appalled, Jane Doe 5 did not know how to respond.

50.     Epstein's inappropriate conduct and statements became a normal part of Jane Doe 5's job. As part of her job duties, Jane Doe 5 regularly completed various tasks for Epstein. Jane Doe 5 managed and organized a household

renovation project for Epstein in his New York residence. She once was ordered to send a package of cookies to Epstein at his Virgin Islands residence. She also prepared weekly status reports for Epstein, providing updates to Epstein on various projects he had assigned her during the week affecting his day to day life. Jane Doe 5 spoke to Epstein over the phone nearly every day. Jane Doe 5 understood that she had to prioritize any tasks Epstein had assigned her. Indeed, if Epstein's assignment conflicted with a task that Epstein Associate 1 had assigned her, Epstein replied: "But I pay you." Jane Doe 5's salary was paid through Nes, LLC – a corporation believed to be owned, managed, controlled, and/or maintained by Epstein. Thus, from the very beginning, Jane Doe 5 understood that Epstein controlled a substantial part of her employment.

51.     Epstein created a hyper-sexualized work environment for Jane Doe 5. In each of their phone conversations, Epstein made inappropriate comments to Jane Doe 5, such as interrupting her to ask what she was wearing. Epstein once told Jane Doe 5 to take off her shirt, so he could compare her breasts with Epstein Associate 1's breasts. On multiple occasions, Epstein groped Jane Doe 5's breasts and commented that he enjoyed her "small breasts" or words to that effect. Epstein also repeatedly attempted to insert his fingers in Jane Doe 5's mouth, requiring her to forcibly push his hand away. On one occasion, Epstein approached Jane Doe 5 while she was speaking with another employee and forcibly grabbed Jane Doe 5's vagina. Jane Doe 5 immediately jumped away. In response, Epstein simply carried on the conversation with the other employee as if nothing had happened. The abuse was constant.

52.     Jane Doe 5 tried to tell Epstein to stop. When he made unwelcome comments to her, Jane Doe 5 responded with words to the effect of: "Inappropriate, Jeffrey" or "Not the time and place, Jeffrey." When Epstein physically touched, groped, or assaulted her, Jane Doe 5 either forcibly removed his hands or immediately stepped back. Epstein never apologized for his actions or acknowledged the boundaries Jane Doe 5 attempted to create. Jane Doe 5's lack of consent to his conduct was entirely irrelevant to Epstein.

53.     Epstein also asserted control over Jane Doe 5's physical appearance. Epstein regularly commented on Jane Doe 5's diet. When meals were ordered for the office, Epstein would cancel Jane Doe 5's order if he did not approve of what she had ordered. Epstein forced Jane Doe 5 to exercise at his private gym, indicating to her that she had to maintain a certain physical appearance to keep her employment. Epstein also insisted on taking Jane Doe 5 out to buy clothes and even, on occasion, to hair salons, where Epstein instructed the hair stylist how he wanted Jane Doe 5's hair to be cut. The clothes Epstein purchased for Jane Doe 5 were inevitably tight-fitting and low cut. Epstein Associate 1 made it clear to Jane Doe 5 that she was expected to wear these clothes anytime Epstein would be around the office. Epstein presented these purchases under the guise of nice gestures which were part of Jane Doe 5's professional development; in reality, Epstein was fraudulently recruiting, enticing, and grooming Jane Doe 5 to become one of his many victims.

54.     As part of her job as assistant to Epstein Associate 1, Epstein Associate 1 directed Jane Doe 5 to travel with Epstein on his various trips, including trips to Epstein's residence located in the Virgin Islands. On her second trip to the island, Jane Doe 5 was directed to go to Epstein's bedroom. Epstein was wearing a bathrobe when Jane Doe 5 walked into the room. After a few minutes, Epstein directed Jane Doe 5 to lay next to him on the bed. Epstein then initiated a personal conversation with Jane Doe 5 – asking pointed questions about her body, her measurements, and her sex life. Jane Doe 5 felt uncomfortable, yet trapped. Jane Doe 5 knew Epstein controlled the only means of travel to and from the island and all communications, so she stayed in bed with him and answered his questions until he let her go.

55.     Following, Jane Doe 5 had three nonconsensual sexual encounters with Epstein, all of which occurred in New York, New York.

56.     On information and belief, Epstein directed Epstein Associate 1 to summon Jane Doe 5 to his home. Upon arriving at Epstein's residence in New York, Jane Doe 5 was led up the stairs to a small, dark room with a massage table. Epstein

then entered the room and immediately directed Jane Doe 5 to get undressed. Jane Doe 5 complied, but kept her underwear on. Epstein then directed Jane Doe 5 to get on the massage table and massaged her. Epstein then aggressively and forcefully massaged Jane Doe 5's breasts. Jane Doe 5 was terrified and frozen.

57.    Shortly after Epstein's massage began, Jane Doe 5 saw another unknown woman enter the room. The woman was completely naked. Epstein directed the woman to perform oral sex on Jane Doe 5, while he watched and continued to forcefully massage Jane Doe 5's breasts. Soon after Epstein ejaculated, he left the room. While dressing, Jane Doe 5 saw that Epstein had left cash by the small sink in the room.

58.    On the second occasion, Epstein Associate 1 again summoned Jane Doe 5 to Epstein's New York residence. Again, Jane Doe 5 was escorted to the small, dark room upstairs with the massage table. Epstein then ordered Jane Doe 5 to take off her clothes and to lay down on the massage table. Terrified, Jane Doe 5 complied. Another woman came into the room. Epstein directed the woman to perform oral sex on Jane Doe 5 while forcibly holding Jane Doe 5 down on the table as Jane Doe 5 began to squirm. When Epstein had finished the assault, Epstein immediately left the room and, again, left money on the small sink for Jane Doe 5.

59.    On the third and last occasion, Epstein himself directly summoned Jane Doe 5 to his residence. As Epstein controlled her employment and was clearly a wealthy, powerful man, Jane Doe 5 believed she had no other option but to comply. When she arrived at the residence, Jane Doe 5 was immediately taken to a small room. Epstein entered the room wearing a bathrobe. Epstein then directed Jane Doe 5 to massage him. He opened his bathrobe and was naked. He masturbated in front of her on the table while he continued to instruct Jane Doe 5 to massage his legs and his chest. Epstein then began to grope Jane Doe 5's breasts while she massaged him. Epstein placed his hand behind Jane Doe 5 and tried to bring her closer to him. Jane Doe 5 resisted and was able to push back. Epstein became more forceful, pulling Jane Doe 5 up onto the table, so that she now straddled his thighs. Epstein forcibly pulled Jane Doe 5's body onto his pelvis. Jane Doe 5 tried pushing

herself way, but Epstein placed his hands on her shoulders and neck area, pushing Jane Doe 5 down onto his penis. Epstein held Jane Doe 5's wrists while he raped her. Jane Doe 5 was left naked, abused and alone in the small, dark room on the second floor.

60.    Further, Epstein regularly threatened Jane Doe 5, her close friends, and her family during her employment with him and Epstein Associate 1. In a clear effort to silence and normalize his behavior, Epstein regularly commented with words to the effect: "We're all family here. What happens in the family stays in the family." The threats became more aggressive. In an obvious effort to intimidate and coerce Jane Doe 5 into silence and prevent her from pursuing any claims against him, Epstein once told Jane Doe 5 (with words to the effect): "You will never work in New York again and you'll have to crawl back to [Jane Doe 5's home state]." Other times, to maintain Jane Doe 5's silence, Epstein stated: "You are nothing without this job. I'll see to it that you will never work in New York again."

61.    Epstein would also reference his powerful friends and business partners in these threats, once commenting to Jane Doe 5 that his attorney would "burn you" – or words to that effect. Epstein also made it known that he had a friendly relationship with law enforcement. Indeed, Jane Doe 5 often saw a police placard displayed in Epstein's vehicles that, on information and belief, permitted him to avoid parking tickets.

62.    Epstein did not limit his threats to Jane Doe 5; he would also often threaten Jane Doe 5's boyfriend at the time as well. Epstein once commented – with words to the effect – that he would "ruin" her boyfriend.

63.    In his most direct threat, Epstein commented to Jane Doe 5 that: "I will burn you. I will [expletive] burn you. I will hunt you down." Fearing for her life and the lives of her friends and family, Jane Doe 5 left her job soon after this latest threat.

64.    This campaign of continued harassment and intimidation continued well after Jane Doe 5's employment ended. In January 2011, Jane Doe 5 attended a wedding wherein one of Epstein's close, known associates was in attendance. This

13

associate approached Jane Doe 5 and offered Jane Doe 5 another opportunity to work for Epstein Associate 1 and Epstein. The associate represented to Jane Doe 5 that she had Epstein's authority to make this offer.

65.    In approximately 2013, Epstein Associate 1 recruited Jane Doe 5 with a similar offer of employment. Because Jane Doe 5 had worked for Epstein Associate 1, Jane Doe 5 depended on Epstein Associate 1 to provide recommendations for other prospective employers. Epstein Associate 1 knew this and sought to take advantage of Jane Doe 5's dependence. When Jane Doe 5 asked Epstein Associate 1 for a recommendation, Epstein Associate 1 told Jane Doe 5 (with words to the effect) that: "Our door is always open. You are welcome to come work for us at any time." Jane Doe 5 immediately understood that the "us" referred to Epstein.

66.    Though under the guise of another employment opportunity, Jane Doe 5 understood that the "offers" to work for Epstein were attempts to entice Jane Doe 5 into providing sexual favors in exchange for financial advancement. Jane Doe 5 refused both offers.

67.    Each threat and employment offer was part of an intentional, malicious campaign of intimidation and coercion by Epstein to prevent Jane Doe 5 from taking any legal action against him and coming forward with her story. Given the very explicit nature of Epstein's threats to herself, her career, and to her family and friends, Jane Doe 5 could not come forward out of fear of retaliation from Epstein until after his death. Given Epstein's vast wealth and political connections, Jane Doe 5 reasonably feared for the safety of her family, her friends, and herself.

## JANE DOE 7

68.    In or around April 1998, Jane Doe 7 was working as a receptionist in an office located in New York City, New York. At the time, Jane Doe 7 wanted to be a fashion designer and attended the Fashion Institute of Technology after work.

69.    While working in New York, Jane Doe 7 befriended a young woman and aspiring model, Roe 2. On information and belief, Roe 2 worked as a receptionist at a different office in the same building as Jane Doe 7. Jane Doe 7 and

Roe 2 frequently shared lunches together during the workweek. Jane Doe 7 was eager to make a friend in the fashion industry.

70.     Thereafter, Roe 2 engaged in a persistent campaign to recruit Jane Doe 7 on behalf of Epstein.

71.     During one of their shared lunches, Roe 2 asked Jane Doe 7 whether she wanted to earn "extra money" by providing massages to older men. Jane Doe 7 declined Roe 2's offer. On information and belief, this was Roe 2's first attempt to recruit Jane Doe 7 on behalf of Epstein.

72.     One month later in or May 1998, Roe 2 began to invite other men to the lunches with Jane Doe 7. Roe 2 said she was dating these other men. Roe 2 explained to Jane Doe 7 that she could "tag along" for a free lunch.

73.     Roe 2 brought Jane Doe 7 to a café close to their office building for one such lunch. When the two women arrived at the café, they met Epstein Associate 1. On information and belief, Roe 2 and Epstein Associate 1 had a prior relationship and had planned to meet for this lunch with Jane Doe 7. Roe 2 and Epstein Associate 1 greeted each other warmly. Roe 2 introduced Jane Doe 7 to Epstein Associate 1. The three women then grabbed a table.

74.     Shortly thereafter, a man joined the three women and sat at the empty chair left for him. He was introduced as Jeffrey Epstein.

75.     The lunch lasted approximately 45 minutes. As the lunch was ending, Epstein Associate 1 asked Jane Doe 7 to stand up and turn around in front of the group. Epstein Associate 1 started complimenting Jane Doe 7's body, telling Jane Doe 7 that she was "perfect." Epstein Associate 1 asked Jane Doe 7 how old she was. Jane Doe 7 responded that she was nineteen years old. Epstein told Jane Doe 7 that she "looked so much younger." This comment concerned Jane Doe 7 as she thought it was a rebuke. However, Epstein then clarified that Jane Doe 7's young appearance "was a good thing." Jane Doe 7 and Roe 2 returned to their respective offices after the lunch.

76.     On information and belief, Roe 2 arranged this lunch with Epstein Associate 1 as a second attempt to recruit Jane Doe 7 on behalf of Epstein.

77.     The following day, Jane Doe 7 and Roe 2 again ate lunch together. Roe 2 told Jane Doe 7 that she had spoken with Epstein after the lunch and that Epstein was interested in dating Jane Doe 7. Roe 2 then called Epstein on her cell phone and handed the phone to Jane Doe 7. Epstein, flaunting his wealth, told Jane Doe 7 that he could "show her the world." Jane Doe 7 declined Epstein's advances.

78.     On information and belief, Roe 2 arranged this call with Epstein as a third attempt to recruit Jane Doe 7 on behalf of Epstein.

79.     In or around June 1998, Roe 2 invited Jane Doe 7 to spend one week in the Caribbean with her. Jane Doe 7 declined. On information and belief, this invitation to the Caribbean was Roe 2's fourth attempt to recruit Jane Doe 7 on Epstein's behalf.

80.     In or around June or July 1998, Roe 2 showed Jane Doe 7 a pamphlet for a charity in Haiti. Roe 2 explained that the charity provided food, funding, supplies, and uniforms to schools in Haiti. Roe 2 then said that she knew of an "older rich man" who would provide a generous donation to the charity in exchange for a simple massage. Roe 2 did not identify Epstein as this older man at this time. She did not provide any details as to what this massage would entail. Jane Doe 7 agreed to provide a massage to facilitate this donation to a deserving charity.

81.     Roe 2 arranged for the massage the very next day during their lunch. Jane Doe 7 was nervous; she tried to offer an excuse to avoid the encounter. Roe 2 became upset and accused Jane Doe 7 of breaking her promise. Feeling guilty and obligated, Jane Doe 7 reluctantly followed Roe 2 to the supposed massage appointment.

82.     Roe 2 led Jane Doe 7 to Epstein's townhouse on 71st Street. Roe 2 and Jane Doe 7 were greeted by a well-dressed butler at the front door. Roe 2 and Jane Doe 7 were then led to an office with an older man sitting at this desk. Roe 2 appeared to have had an appointment scheduled with this man. This man asked Roe 2 to walk back and forth for him as if on a runway. This man did not introduce himself to Jane Doe 7, but asked Roe 2 whether she had brought Jane Doe 7 along with her to the townhouse. Roe 2 confirmed that she had. This man then asked Jane

Doe 7 if she was interested in modeling. Jane Doe 7 confirmed she that she had no interest in modeling. The man then turned his attention back to Roe 2 and began discussing whether Roe 2 could walk in a fashion show.

83.     On information and belief, Roe 2 recruited Jane Doe 7 to Epstein in exchange for furthering her modeling career.

84.     The meeting in the office was brief. After the meeting had ended, the women were led up the stairs and along a long hallway to a small room. To Jane Doe 7's surprise, Epstein Associate 1 was waiting in the hallway. Roe 2 had not previously mentioned that she had planned to meet Epstein Associate 1. Epstein Associate 1 and Roe 2 greeted each other in a friendly manner. The three women then entered the small, dimly lit room. A dark curtain hung from the ceiling, blocking the view of the room's interior.

85.     Upon entering, Epstein Associate 1 eventually undressed Jane Doe 7 and led Jane Doe 7 and Roe 2 further into the room. Jane Doe 7 noticed a massage table in the middle of the room. Shortly thereafter, Epstein entered the room with a towel around his waist. He laid face down on the massage table. He complimented Jane Doe 7's partially-nude body as he did so.

86.     Epstein Associate 1 began to instruct Jane Doe 7 how to massage Epstein's back. Epstein Associate 1 continued to provide instructions to Jane Doe 7, explaining what Epstein "liked" and "didn't like."

87.     Jane Doe 7 noticed that Roe 2 had left the room at some point. Jane Doe 7 was then left alone in the room with Epstein Associate 1 and Epstein. Jane Doe 7 asked where Roe 2 had gone, and Epstein Associate 1 assured her Roe 2 would return shortly.

88.     Epstein then provided Jane Doe 7 various demands about how to massage and touch him. Jane Doe 7 complied with Epstein's orders. She was uncomfortable and scared, but felt she had no way to escape.

89.     Epstein and Epstein Associate 1 then proceeded to violently sexually assault Jane Doe 7. Epstein Associate 1 held Jane Doe 7 while Epstein raped her.

90.     Epstein ejaculated. He instructed Epstein Associate 1 to move Jane Doe 7's body off him, as Jane Doe 7's body was completely limp. He then left the room.

91.     Jane Doe 7 was left bleeding profusely on the table. She was in tremendous pain. She could not move. Epstein Associate 1 had to help Jane Doe 7 to the bathroom.

92.     Jane Doe 7 eventually dressed and returned to the office. Jane Doe 7 called Roe 2 and told her what Epstein had done. In response, Roe 2 insisted that Jane Doe 7 had not been raped.

93.     Jane Doe 7 was overcome with embarrassment, shame, and guilt. She bore her pain in silence.

94.     Approximately one week later, Roe 2 asked Jane Doe 7 if she wanted to have a "girls' weekend" in Palm Beach. Jane Doe 7 hesitated, but Roe 2 said that the plane fare and housing would be handled. Jane Doe 7 hesitantly acquiesced.

95.     Epstein Associate 1 and another young woman picked Jane Doe 7 up at work. Jane Doe 7 had no prior knowledge that Epstein Associate 1 or Epstein would be involved. Surprised, Jane Doe 7 asked Epstein Associate 1 whether Epstein would be joining them that weekend. Epstein Associate 1 confirmed that he would not be in attendance that weekend. Buttressed by the fact that another young woman was also in the car, Jane Doe 7 hesitantly got in the car and was taken directly to a private jet. The jet took off that morning.

96.     Upon arrival to Palm Beach, a town car picked Jane Doe 7 up from the airport and drove her to a large estate located on El Brillo Way in Palm Beach, Florida. Jane Doe 7 saw Epstein when she first stepped out of the car. She immediately panicked. She knew that she had, once again, been lied to. Jane Doe 7 immediately began to run down the street. Epstein and his security guards caught her. She was then locked in the laundry room of Epstein's mansion, unable to escape.

97.     At the time, Jane Doe 7 was too injured to have sexual intercourse. Instead, Jane Doe 7 was forced to provide oral sex to both a man and another

18

woman. She had no other choice: she was locked in a room and had no means to travel back home. Jane Doe 7 had never met these individuals prior to meeting them at Epstein's residence.

98.    That same weekend, Epstein flew Jane Doe 7 to his Estate on the Virgin Islands. Jane Doe 7 spent the weekend on the Virgin Island. Epstein controlled everything: she could not make any phone calls, she had no money or clothes, and she could not escape. Jane Doe 7 was eventually flown back to her home. As she was leaving the island, one of Epstein's escorts threatened Jane Doe 7. This man told Jane Doe 7 that she would wish she was dead if she revealed anything about what had happened to her. Jane Doe 7 was terrified. After what she had gone through, she had no intention of provoking Epstein's rath.

99.    Following this weekend, Jane Doe 7 experienced tremendous emotional distress and physical pain. Her personal relationships suffered; she experienced tremendous anxiety around other men; and she eventually dropped out of college as she was unable to continue her studies.

100.    After dropping out of college, Jane Doe 7 joined her family on a sailing trip circumnavigating the globe, traveling from Africa to Connecticut.

101.    In or around 2001, Jane Doe 7 was traveling with her family as part of this trip near or around Red Hook, St. Thomas in the Virgin Islands. During this trip, Jane Doe 7 went out with some family friends at a local bar. She met a group of young travelers, who wanted to explore nearby islands. Jane Doe 7 agreed. The group boarded a small boat and traveled to a nearby island. The group docked their boat and walked up to the island.

102.    The group was immediately approached by guards, who escorted Jane Doe 7 further into the Island where she met Epstein. Jane Doe 7 was shocked. She had no idea she had traveled to Epstein's island and was even further shocked that Epstein was present on the island.  On information and belief, Epstein ordered the remaining group off his island.

103.    Jane Doe 7 was stranded and alone on the Island with Epstein. She was terrified. Epstein led her to bedroom where she was to stay the night.

104.    Jane Doe 7 attempted to call for help. Jane Doe 7 tried to hide until help arrived.

105.    There were several other young women on the Island. Jane Doe 7 tried to blend in with these other women and avoid Epstein's attention. She was staying in a small bedroom with another American woman. Epstein entered the bedroom when the other woman was taking a shower. Epstein instructed Jane Doe 7 to undress. She did not resist; she knew he could hurt her. He then raped Jane Doe 7.

106.    Later that evening, Epstein became aware that Jane Doe 7 attempted to call for help. He was extremely angry and threatened Jane Doe 7. Epstein told Jane Doe 7 that he would hunt her down if she ever told anyone else about his action. He threatened her family. He told her that he would destroy her life. And Jane Doe 7 believed him. He had already taken so much from her; she had no doubt that Epstein could cause her further pain and harm.

107.    Given the very explicit nature of Epstein's threats to herself and family, Jane Doe 7 could not come forward out of fear of retaliation from Epstein until after his death. Given Epstein's vast wealth and political connections, Jane Doe 7 reasonably feared for the safety of her family, her friends, and herself.

108.    Jane Doe 7, desperate to escape, eventually found passage off the island when a stranger agreed to sail her back to her family in Red Hook. Though Jane Doe 7 was able to escape Epstein's island, she has not been able to escape the trauma, pain, and psychological damages that Epstein has caused.

## JANE DOE 8

109.    In or around May or June 2002, Jane Doe 8 first met Epstein. Jane Doe 8 was around fifteen years old and a sophomore in high school in Palm, Beach, Florida.

110.    At the time of Jane Doe 8's first encounter with Epstein, Jane Doe 8's friend, Roe 3, brought Jane Doe 8 to Epstein's mansion in Palm Beach, Florida. Roe 3 told Jane Doe 8 that Epstein was a wealthy friend with a "nice, large" mansion on the Florida coast and that they could "hang out" by his pool. Roe 3 also told Jane Doe 8 that she frequented Epstein's mansion and that she occasionally gave him

20

massages for approximately $200, but that Jane Doe 8 did not have to give him a massage during their visit. On information and belief, Roe 3 was acting as Epstein's recruiter and under his express instruction to target Jane Doe 8.

111.   Roe 3 introduced Jane Doe 8 to Epstein at his mansion. Epstein then told Jane Doe 8 that it was nice to meet her and asked her general questions about her herself. At this point, Jane Doe 8 did not believe Epstein would hurt her.

112.   Roe 3 then told Jane Doe 8 to wait in Epstein's kitchen while she gave Epstein a professional massage on a massage table in a different room. Roe 3 did not reveal to Jane Doe 8 whether Epstein sexually assaulted her during the massage. Jane Doe 8 believed Epstein legitimately employed Roe 3 as his masseuse.

113.   Soon after, Roe 3 told Jane Doe 8 that Epstein wanted to also employ Jane Doe 8 as a masseuse. Roe 3 stated that Jane Doe 8 only had to perform the massages for approximately twenty to thirty minutes and that Epstein would compensate her for her labor. Roe 3 told Jane Doe 8 that she could wear her bathing suit or remain fully clothed during the massages. Roe 3 expressly assured Jane Doe 8 that the massages would not involve any unwanted touching.

114.   Jane Doe 8 was reasonably excited and hopeful about the opportunity to make money. She was a broke teenager with little financial assistance from her family, which struggled financially, and Jane Doe 8 reasonably believed Epstein's offer could provide much-needed financial support to help her save for her college tuition. Jane Doe 8 allowed Roe 3 to provider her phone number to Epstein's assistant, Sarah Kellen ("Kellen").

115.   Shortly after, Kellen called Jane Doe 8 and scheduled her to massage Epstein at his Palm Beach, Florida mansion. On information and belief, Kellen was aware that Jane Doe 3 was a minor.

116.   In or around May or June 2002, Jane Doe 8 arrived at Epstein's mansion for her first day on the job to give him a massage. Kellen led Jane Doe 8 to an upstairs room in the mansion with a massage table. When Kellen left the room, Epstein entered wearing a towel around his waist. He told Jane Doe 8 to take off her clothes. Jane Doe 8 stripped down until she only wore her bathing suit. Soon

after Epstein lay supine on the massage table, he told Jane Doe 8 to massage his chest and pinch his nipples. She complied because she thought following his instructions was required for the massage.

117.  Next, Epstein exposed his bare penis and masturbated. While he masturbated, he repeatedly pushed Jane Doe 8's long hair behind her back to better view her breasts. Each time she moved her hair to cover her breasts, he pushed her hair away. This scared Jane Doe 8. She was terrified that he would hurt her.

118.  At some point, Epstein pulled Jane Doe 8's bikini bottoms to the side and stroked her vagina. He then pinched her nipples. Jane Doe 8 stood frozen. Finally, Epstein ejaculated. He then handed her hundreds of dollars. Throughout the encounter that lasted approximately fifteen to twenty minutes, Jane Doe 8 felt like she would not be able to leave the room.

119.  At this visit, Epstein told Jane Doe 8 that he could assist her with getting into medical school and that he would help her save money for college.

120.  In or around June or July 2002, Kellen called Jane Doe 8 to again massage Epstein at his mansion. At this juncture, Jane Doe 8 did not understand that Epstein had sexually assaulted her. She truly believed that he wanted to help her earn money.

121.  During Jane Doe 8's second encounter with Epstein, he physically forced her to straddle him while he masturbated. He pushed her waist down onto his, attempting to touch his penis against her vagina. Jane Doe 8 feared Epstein would rape her. To prevent him from penetrating her, she forced her knees against the massage table to hold herself up. Eventually, he ejaculated. He then left the room and paid her hundreds of dollars.

122.  Jane Doe 8 continued to return to Epstein's mansion because she thought that the sexual assaults were a normal part of the massages. Jane Doe 8 also continued to return because Epstein repeatedly told her that he would help her gain admission into college.  She thought he liked her and genuinely wanted to help her reach her goals.

123. Kellen thereafter continued to call Jane Doe 8 to schedule Jane Doe 8's massages-turned-sexual assaults at Epstein's mansion once per month. After each visit, Epstein paid Jane Doe 8 hundreds of dollars.

124. In or around 2003, Epstein became more aggressive and the massages worsened. Jane Doe 8 put up with the aggression because she needed the money that he paid her after each massage. She used the money to pay for food, gas, professional clothing for interviews, school textbooks, college visits, and college exam preparation. She thought that enduring the massages was the only way she would be able to prepare for and eventually attend college.

125. In or around the beginning of 2003, Epstein grabbed Jane Doe 8's body, pulled down her shirt, then took a picture of her breasts without her consent.

126. On another occasion in or around 2003, Epstein pushed Jane Doe 8 onto his massage table. While she lay supine, he forcibly rubbed a sex toy on her vagina. She was in pain.

127. In or around 2003 or 2004, Epstein digitally penetrated Jane Doe 8 with his fingers on or about ten occasions. On several of these occasions, he placed her on the massage table, held her head down, covered her eyes, then digitally fingered her with his fingers. This hurt Jane Doe 8, at times causing her to bleed. When she attempted to stop him from touching her, he moved her hands away and pinned her body to the massage table.

128. When Epstein behaved aggressively, he asked Jane Doe 8 to cuddle with him in his bed, chat with him by his pool, or offered her a massage by another woman. She accepted his offers because she believed she had to in order to maintain her employment.

129. In or around 2003, Epstein asked Jane Doe 8 to travel with him to an island, but she declined.

130. In or around 2004, Epstein again told Jane Doe 8 that he would use his connections at Harvard University to help her gain admission to an elite college.

131. On information and belief, Epstein attempted to befriend Jane Doe 8 and entice her with trips and his professional connections to manipulate her into

23

believing that his intention was not to harm her, so that she would allow his abuse to continue.

132. Per his modus operandi, Epstein's method of recruiting and enticing Plaintiffs, and his fraudulent conversion of the massage to molestation, intentionally made Jane Doe 8 feel as if the incidents that took place in his mansion were not crimes. Through his recruiter, Epstein expressed that Jane Doe 8 would simply give him massages for pay. Epstein normalized the sexual abuse by staging the room where the abuse took place with a massage table. As a result, Jane Doe 8, a minor, had reason to believe the massages were legitimate and reasonably relied upon Epstein's misrepresentation to their detriment. This was a deliberate and deceptive plan and scheme by Epstein, and carried out by Roe 3, to ensure that his victims were unaware that they were victims to avoid criminal and civil liability.

133. Epstein utilized this modus operandi to prey on Jane Doe 8 for approximately three years until in or around 2005. Jane Doe 8 was a minor for the first two and a half years of her "employment" with Epstein.

134. In or around 2005, Epstein's associates threatened Jane Doe 8 after learning through other sources that Jane Doe 8 had visited Epstein's Palm Beach mansion. They parked vehicles at her school, home, and her family's home to watch and silence her. Epstein's associates told her that Epstein's accusers fabricated their stories about him. Epstein's associates also told her they would ruin her livelihood if she took legal action against Epstein or assisted the state of Florida in their criminal investigation into his sexual assault of minors. Each threat was part of an intentional, malicious campaign of intimidation and coercion by Epstein to prevent Jane Doe 8 from coming forward with her story. Given the very explicit nature of Epstein's threats, Jane Doe 8 could not come forward out of fear of retaliation from Epstein until after his death. Given Epstein's vast wealth and political connections that he often boasted about to her, Jane Doe 8 reasonably feared for the safety of her family, her friends, and herself.

///

///

24

## V.    DAMAGES

135.   As a direct result of the sexual assault by Epstein, Plaintiffs have suffered, and continue to suffer, from psychological damages, including, but not limited to, depression, anxiety, anger, flashbacks, and nightmares.

136.   Plaintiffs also suffered psychological trauma affecting their abilities to generally function and several areas of their lives, including but not limited to their personalities, self-esteem, sexualities, relationships, and careers.

137.   Further, for the undetermined future, Plaintiffs must relive their sexual assault everyday due to the inescapable coverage of Epstein's federal criminal sex-trafficking case.

138.   Moreover, until recently, Plaintiffs' psychological damages have been debilitating, and have prevented them from understanding and asserting their legal rights. Additionally, Plaintiffs have feared and have been intimidated by Epstein, his wealth, his close connections to Donald Trump, Bill Clinton, Alan Dershowitz and other powerful political, business and legal leaders, and have feared retaliation. As a result, Plaintiffs were deprived of the opportunity to commence this lawsuit before Epstein's death. Upon Epstein's death, Plaintiffs felt less threatened and a sense of freedom.

139.   However, Plaintiffs' distressing experiences at the hands of Epstein will affect them for their entire lives.

## COUNT I
### Violation of The Trafficking Victims Protection Act 18 U.S.C. §1591
### (All Plaintiffs Against All Defendants)

140.   Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

141.   Epstein recruited and enticed Plaintiffs by initiating a professional relationship with them. At times on his own volition and at other times through his recruiters, Roes 2-10, Epstein invited and recruited (1) Plaintiffs Jane Does 1, 2, and 8 to provide him "massages" for money – the payment of money being of value to the Plaintiffs; (2) Plaintiffs Jane Doe 3, 5, and 8 to feign career advancement

opportunities, which were of value to Plaintiffs; (3) Plaintiff Jane Doe 4 to provide "babysitting" for money – the payment of money being of value to the Plaintiff; and (4) Plaintiff Jane Doe 7 to provide him with a "massage" in exchange for a charitable donation on her behalf, the payment being of value to Plaintiff. A meeting with a wealthy man like Epstein was of considerable value for impressionable minors and aspiring, financially vulnerable female models and professionals.

142. Based upon the representations by Epstein and Roes 2-10, these invitations reasonably led Plaintiffs to believe there may be future earnings or professional opportunities for Plaintiffs if they accepted Epstein's invitations.

143. Plaintiffs reasonably relied upon the monetary promises and offers made by Epstein. In fact, Plaintiffs only accepted the invitations by Epstein and Roes 2-10 because Plaintiffs understood the invitations to be an opportunity to gain money, career advancement, or objects of value.

144. At the outset of initiating his relationship with Plaintiffs, Epstein knew that he would make fraudulent and enticing offers for harmless "massages," "babysitting" opportunities, "employment" opportunities, or "casting calls." He made these offers knowing he would then sexually touch Plaintiffs for his own sexual gratification. He knew his offers of hundreds of dollars would convince Plaintiffs to engage in massages or accept his offers so that he could convert the massages into molestation. Similarly, Epstein knowingly and fraudulent posed as a fashion photographer, pretended to need babysitting services, and played the part of harmless philanthropist to isolate Plaintiffs to be able to then sexually assault them.

145. Once he knowingly recruited and enticed Plaintiffs, Epstein then engaged in commercial sex acts with Plaintiffs by forcibly fondling them, including their breasts and/or genitals, for sexual gratification under the fraudulent guise of career advancement, "babysitting" opportunities, or massages in exchange for money.

146. Epstein intended that his fraud and force cause sex acts to take place.

147.  Roes 2-10, as Epstein's recruiters, knowingly and intentionally conspired with Epstein to facilitate the fraud and sexual abuse of Plaintiffs.

148.  Plaintiffs initially complied with Epstein's orders during the fraudulent acts because they believed they were part of the "massages," and "professional opportunities." They believed that they had to engage in these practices in get paid, receive objects of value, or obtain career advancement. When Epstein then began to touch Plaintiffs in an aggressive, sexual manner, Plaintiffs were terrified and froze. Indeed, through his fraudulent representations, Epstein had isolated each of the Plaintiffs to overpower or otherwise control them. He held himself out as a wealthy, powerful man. Plaintiffs felt they had no other choice but to comply with this man's orders.

149.  Epstein's promises, as sometimes relayed by Roes 2-10, were made in relation to the payment for massage services, career advancements, and objects of value, which affects interstate commerce. Epstein's exchange of massage career opportunities for sex acts has a substantial effect on interstate commerce.

150.  Epstein's use of his position as a powerful, wealthy man to otherwise engage in touching with young women was for the purpose of his own sexual gratification.

151.  On information and belief, the fraudulent "massages" and "professional opportunities" were routinely utilized by Epstein to engage in sex acts with Plaintiffs. In fact, Epstein used this precise fraud to engage in commercial sex acts with multiple young, female victims, as evidenced by his 2008 Florida solicitation of prostitution conviction and recent 2019 criminal indictment for sex trafficking.

152.  As a result of Defendant Epstein's heinous and willful conduct, Plaintiffs are entitled to compensatory damages, punitive damages, attorney's fees, costs, and all other appropriate relief.

/ / /

/ / /

/ / /

## COUNT II

## SEXUAL BATTERY

## (Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 5, and Jane Doe 7 Against All Defendants)

153.  Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

154.  Epstein intentionally committed battery by sexually assaulting Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 5, and Jane Doe 7 when they were young women. As set forth herein, Epstein intentionally sexually assaulted and touched Plaintiffs in an offensive and sexual manner without their consent.

155.  Epstein's actions constitute sexual offenses as defined under New York Penal Law § 130 *et seq.*, including but not limited to Article 130.35, as Epstein sexually assaulted Plaintiffs by forcible compulsion within 20 years of filing this Complaint. *See* N.Y.C.P.L.R. § 213-C.

156.  As applicable only to Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 5, a criminal action against Epstein with respect to the same sex trafficking enterprise from which the claims of Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 5 arise was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

157.  As a direct and proximate result of these Epstein's actions, Plaintiffs were caused to suffer and continue to suffer personal injury, debilitating and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## COUNT III

## SEXUAL BATTERY OF A MINOR

## (Plaintiffs Jane Doe 3, Jane Doe 4, and Jane Doe 8 Against All Defendants)

158.  Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

159. At all relevant times herein, Plaintiffs Jane Doe 3, Jane Doe 4, and Jane Doe 8 were minors.

160. Epstein made violent, harmful and offensive sexual contact against Plaintiffs including, but not limited to, forcibly massaging and groping Plaintiffs' breasts, forcing his erect penis against their persons, and raping Plaintiffs. Such acts constitute sexual offenses committed against a child less than eighteen years of age as defined under New York Penal Law § 130 *et seq.*

161. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claim arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

162. Plaintiffs did not consent to Epstein's harmful and offensive contact.

163. Epstein acted intentionally and/or with deliberate indifference and callous disregard of Plaintiffs' rights and physical and emotional safety and wellbeing.

164. The conduct of Epstein was extreme, outrageous, and beyond the bounds of common decency.

165. As a direct and proximate result of these attacks, Plaintiffs were caused to suffer and continue to suffer personal injury, debilitating and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## COUNT IV
## SEXUAL ASSAULT OF A MINOR
### (Plaintiffs Jane Doe 3, Jane Doe 4, and Jane Doe 8 Against All Defendants)

166. Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

167. At all relevant times herein, Plaintiffs Jane Doe 3, Jane Doe 4, and Jane Doe 8 were minors.

168. Epstein intended to deprive and did deprive Plaintiffs of their freedom of movement by use of physical barriers, force, threats of force, menace, deceit, and

unreasonable duress. Such acts constitute sexual offenses committed against a child less than eighteen years of age as defined under New York Penal Law § 130 *et seq.*

169. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claim arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

170. Plaintiffs did not consent to Epstein's acts, which were objectively unreasonable.

171. As a direct and proximate result of Epstein's conduct, as alleged herein, Plaintiffs have suffered, and will continue to suffer, the damages herein mentioned, in an amount according to proof.

172. As a direct and proximate result of these attacks, Plaintiffs were caused to suffer and continues to suffer personal injury, debilitating, and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

**COUNT V**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(All Plaintiffs Against All Defendants)**

173. Plaintiffs repeat and re-allege each and every allegation as set forth in the preceding paragraphs as if set forth in full herein.

174. As a direct result of these allegations as stated, Epstein committed intentional infliction of emotion distress against Plaintiffs.

175. Epstein's actions, as set forth herein, constitute extreme and outrageous conduct that shocks the conscience. Epstein's plan to recruit, entice, and assault Plaintiffs goes beyond all possible bounds of decency and is intolerable in s civilized community. Such acts constitute sexual offenses committed against a child less than eighteen years of age as defined under New York Penal Law § 130 *et seq.*

176. Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

30

177.   As applicable only to Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, and Jane Doe 5, a criminal action against Epstein with respect to the same sex trafficking enterprise from which the claims of Plaintiffs Jane Doe 2, Jane Doe 3, Jane Doe 4, and Jane Doe 5 arise was terminated on August 29, 2019, less than one year prior to the filing of this Complaint.  *See* N.Y. C.P.L.R. § 215(8)(a).

178.   As a direct and proximate result of Epstein's actions, Plaintiffs were caused to suffer and continue to suffer personal injury, debilitating and extreme emotional trauma, and severe humiliation, some or all of which may be permanent in nature and which will require continued psychological counsel and care.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiffs pray that this Court:

A.   Award Plaintiffs all of their damages under The Trafficking Victims Protection Act 18 U.S.C. § 1595, the civil remedy for violation of The Trafficking Victims Protection Act 18 U.S.C. § 1591, and common law, including compensatory damages and punitive damages in an amount of $100,000,000.00 or in an amount to be determined at trial.

B.   Award Plaintiffs all attorney's fees, costs and expenses available under law;

C.   Award Plaintiffs all pre-judgment interest and post judgment interest available under law; and

D.   Award Plaintiffs such additional and further relief as this Court may deem just and proper.

///

///

///

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable of right by jury.

DATED: February 2, 2021

Respectfully submitted,

**THE BLOOM FIRM**

By:   /s/ Arick Fudali
Lisa Bloom
Arick Fudali
Colleen M. Mullen, pro hac vice
Teri Gibbs, pro hac vice
Attorneys for Plaintiffs
85 Delancey St., Ste. 29
New York, NY 10002
(818) 914-7397