# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-cv-07771

KATLYN DOE,

        Plaintiff,

vs.

DARREN K. INDYKE AND
RICHARD D. KAHN AS JOINT
PERSONAL REPRESENTATIVES OF
THE ESTATE OF JEFFREY E. EPSTEIN,
FINANCIAL TRUST COMPANY, INC.,
NES, LLC, FLORIDA SCIENCE
FOUNDATION, INC., HBRK ASSOCIATES, INC.,
JEGE, INC.,

        Defendants.

_____/

## FIRST AMENDED COMPLAINT

    Plaintiff, KATLYN DOE, by and through her undersigned counsel, for her

claims against Defendants, alleges as follows:

    1.     This action is brought pursuant to 18 U.S.C. §1591 - §1595.  Therefore,

jurisdiction is proper under 28 U.S.C. §1331.

    2.     Plaintiff files this Complaint under a pseudonym in order to protect her

identity because this Complaint makes allegations of a sensitive sexual nature the

disclosure of which, in association with her name, would cause further harm to her.

3.     Plaintiff is currently a resident of and domiciled in the State of New York.

4.     At all times material, Jeffrey Epstein was a citizen of the United States and a resident of the U.S. Virgin Islands.  Jeffrey Epstein was a man of extraordinary wealth who travelled between and stayed regularly in multiple residences, including in New York, New York (within the Southern District of New York) at 9 East 71st Street, New York, NY 10021; in Palm Beach, Florida at 358 El Brillo Way, Palm Beach, Florida 33480; in New Mexico at 49 Zorro Ranch Road, Stanley, New Mexico 87056, and in the United States Virgin Islands at Island Little St. James Island No. 6B USVI 00802.

5.     At all times material to this cause of action Jeffrey Epstein was an adult male born in 1953, who died on August 10, 2019.

6.     Defendant, Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein ("Estate of Jeffrey E. Epstein") the Estate of Jeffrey E. Epstein was opened and domiciled in the United States Virgin Islands, St. Thomas Division, and is the legal entity responsible for intentional, criminal, or tortious conduct committed by Jeffrey Epstein as described in this Complaint.

7.     At all times material hereto, Defendant Financial Trust Company, Inc. ("Financial Trust"), was and is a U.S. Virgin Islands corporation conducting business in multiple locations including New York.

8.     At all times material hereto, Defendant NES, LLC, ("NES") was and is a domestic limited liability company registered in and conducting business in multiple locations including New York.

9.     At all times material hereto, Defendant, The Florida Science Foundation, Inc., ("Florida Science") was a Florida corporation conducting business in Florida, with a principal place of business located at 250 Australian Avenue, Suite 1400, West Palm Beach, Florida 33401.

10.     At all times material hereto, Defendant HBRK Associates, Inc., ("HBRK") is and was a domestic business corporation registered in and conducting business in multiple locations including New York with a Registered Agent located at 1365 York Avenue, Apartment 28, New York, New York 10021.

11.     At all times material hereto, Defendant JEGE, Inc., ("JEGE") was a Delaware corporation conducting business throughout the United States of America, including but not limited to, Florida, New York, and the United States Virgin Islands, with a registered agent located at 1209 Orange Street, Wilmington, Delaware 19801.

12.     Corporate Defendants NES, LLC; The Florida Science Foundation, Inc.; HBRK Associates, Inc.; and JEGE, Inc., referred to as "Corporate Defendants," each performed business, in whole or part, in New York.

13.     A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in the Southern District of New York; venue is proper in this District.  28 U.S.C. section 1391(b)(2).

14.     At all times material to this cause of action, Jeffrey Epstein (legally represented now through Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein (and referred to herein as "Estate of Jeffrey E. Epstein") and Corporate Defendants owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit, or conspire to commit, or cause to be committed intentional, criminal, fraudulent, or tortious acts against Plaintiff, including any acts that would cause Plaintiff to be harmed through conduct committed against her in violation of New York Penal Law section 214-G, New York Penal Law section 130.20; or  New York Penal Law section 130.35; or New York Penal Law section 130.50; or New York Penal Law section 130.52; or New York Penal Law section 130.65; or New York Penal Law 130.66; or New York Penal Law 130.67; or New York Penal Law 130.91 or any violation of 18 U.S.C. §1591 - §1595.

## FACTUAL ALLEGATIONS

15.     At all times material to this cause of action, Jeffrey Epstein was an adult male over 45 years old.  Epstein was a tremendously wealthy individual, widely recognized as a billionaire, who used his wealth, power, resources, and connections to commit illegal sexual crimes in violation of federal and state laws and who employed or conspired with other individuals and corporate entities to assist him in committing those crimes or torts or who facilitated or enabled those acts to occur.

16.     Epstein displayed his enormous wealth, power, and influence to his employees; to the employees of the corporate Defendants who worked at his direction; to the victims procured for sexual purposes; and to the public, in order to advance, carry out and conceal his crimes and torts.

17.     At all relevant times, Epstein had access to numerous mansions, as well as a fleet of airplanes, motor vehicles, boats and one or more helicopters.  For example, he regularly traveled by private jet aboard a Boeing aircraft (of make and model B-727-31H with tail number N908JE) or a Gulfstream aircraft (of make and model G-1159B with tail number N909JE).

18.     Jeffrey Epstein also frequently inhabited and travelled between numerous properties and homes, each of which he admitted to being owned or controlled by him, including a Manhattan townhome located at 9 East 71st Street, New York, NY 10021 valued conservatively by Jeffrey Epstein's own admission at

$55,931,000.00; a ranch located at 49 Zorro Ranch Road, Stanley, New Mexico 87056 valued conservatively by Jeffrey Epstein's own admission at $17,246,208.00; a home located at 358 El Brillo Way, Palm Beach, Florida 33480 valued conservatively by Jeffrey Epstein's own admission at $12,380,209.00; an apartment located at 22 Avenue Foch, Paris, France 75116 valued conservatively by Jeffrey Epstein's own admission at $8,672,820.00; an Island located at Great St. James Island No. 6A USVI 00802 (parcels A, B, C); and an Island Little St. James Island No. 6B USVI 00802 (A, B, C). *See* Jeffrey Epstein "Asset Summary – June 30, 2019" filed in Case 1:19-cr-00490-RMB on July 15, 2019 attached hereto as **Exhibit A.**

19.     The allegations herein concern Jeffrey Epstein's tortious conduct committed against Plaintiff in New York, the United States Virgin Islands, and Florida.

20.     Epstein had a compulsive sexual preference for young females as young as 14 years old and acted on that sexual preference for decades.

21.     Epstein enjoyed sexual contact with young females, including minor children, and also took pleasure corrupting vulnerable and innocent young females, including minor children, into engaging in sexual acts with him.

22.     It was widely known among individuals regularly in Epstein's presence that he obtained pleasure from corrupting, coercing and inducing vulnerable young

females into engaging in uncomfortable and unwanted sexual acts for his own gratification.

23.     Epstein's conduct of engaging in regular sexual activity with young females, including minors, was known to Corporate Defendants, who were employed by Epstein or worked at his direction for the exclusive purpose of assisting Epstein in engaging in these known sexual activities, enabling the activities through payment to victims, enabled the activities through scheduling victims to be in Epstein's presence, or arranging for transportation of the victims.

24.     Epstein's illegal sexual activities were investigated by law enforcement on at least two occasions, once in 2005-2008 by the United States Attorney for the Southern District of Florida, and more recently by the United States Attorney for the Southern District of New York in 2019.

25.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a Sealed Two Count Indictment including One Count of Sex Trafficking Conspiracy and One Count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities against children in the New York Mansion located at 9 East 71st Street.

26.     On July 8, 2019, Jeffrey Epstein was arrested pursuant to the aforementioned Indictment, which is attached hereto as **Exhibit B**.

27. The Indictment stated in part, and Plaintiff herein adopts as true and relevant to her Complaint, that "Jeffrey Epstein, the defendant, enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence") to engage in sex acts with him, after which the victims were given hundreds of dollars in cash." Criminal Indictment at 1.

28. "Moreover, and in order to maintain and increase his supply of victims, Epstein also paid certain of his victims to recruit additional girls to be similarly abused by EPSTEIN. In this way, EPSTEIN created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach." Criminal Indictment at 1-2.

29. "The victims described herein were as young as 14 years old at the time they were abused by Jeffrey Epstein, and were, for various reasons, often particularly vulnerable to exploitation. Epstein intentionally sought out minors and knew that many of his victims were in fact under the age of 18, including because, in some instances, minor victims expressly told him their age." Criminal Indictment at 2.

30. "In creating and maintaining this network of minor victims in multiple states to sexually abuse and exploit, JEFFREY EPSTEIN … worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, contacting victims and scheduling their sexual encounters with

8

EPSTEIN at the New York Residence and at the Palm Beach Residence." Criminal Indictment at 2.

31.     The indictment further explained, and Plaintiff adopts and alleges, that, "[v]ictims were initially recruited to provide 'massages' to Epstein, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts." Criminal Indictment at 3.

32.     "Epstein abused numerous minor victims at the New York Residence by causing these victims to be recruited to engage in paid sex acts with him." Criminal Indictment at 3.

33.     Plaintiff was interviewed as part of that 2019 criminal sex trafficking case against Jeffrey Epstein, and has been considered a victim of Jeffrey Epstein and treated as such by the Government.

34.     In addition to the allegations in the criminal indictment referenced above, Epstein also utilized a similar, if not the same, scheme many years before the time period that was charged and many years after, as well as in additional geographical locations nationally and internationally.

35.     The named Corporate Defendants enabled Jeffrey Epstein to receive daily massages from young females, often minors, who were not experienced in massage. Rather than receive regular body massages, Epstein was sexually abusing the young females, including Plaintiff, in violation of New York Penal Law Section

130, a fact known to the various Corporate Defendant employees who were in regular contact with Epstein.

36.      Jeffrey Epstein could not have committed the many illegal and improper sexual offenses against Plaintiff without assistance from Defendants NES, HBRK, JEGE and FLORIDA SCIENCE.

37.      Employees of the each of the various named Corporate Defendants performed actions or failed to perform actions that further placed victims, including Plaintiff, in danger of being sexually abused by Epstein, and assisted in the concealment of his sexually abusive acts.

38.      Corporate Defendant HBRK employed recruiters of young females, or directed employees of his related companies, to recruit young females.  In order to grow the enterprise and satisfy his insatiable sexual desire, Epstein and those working at his direction enabled victims themselves to elevate their status within the enterprise to that of a paid recruiter of other victims, an elevation only made possible through the assistance of Defendants. HBRK paid these victims with elevated status to recruit other victims to be abused by Epstein.

**Defendant HBRK**

39.      Defendant HBRK employees were compensated specifically to assist Jeffrey Epstein in obtaining young females, including minors, for sexual purposes, or for engaging in sex with young females, or scheduling appointments between

these young females and Epstein for sexual purposes, or for engaging in acts to conceal the sexual activities between Epstein and these young females which included paying the young females for the sexual encounter or making promises to the young females to keep them quiet.

40.     Defendant HBRK employees were hired by Epstein strictly to perform functions to allow his sexual activity with young females, including minors, to continue.

41.     HBRK employees were expected to maintain large amounts of cash at each of Epstein's properties including his mansion in New York, in order for Epstein to have money to pay the young females, including Plaintiff for sexual activities. HBRK employees did perform this function.

42.     Defendant HBRK employees were expected to maintain a list of names and phone numbers of young females, including Plaintiff, who had been to Jeffrey Epstein's homes, and those employees did perform that job function.

43.     Defendant HBRK employees were expected to make telephone calls to young females, and take telephone calls from young females, including Plaintiff for the purpose of causing the young female to go to one of Jeffrey Epstein's properties, including his NY Mansion, for the purposes of engaging in sexual contact with Jeffrey Epstein. HBRK employees did perform this job function.

44.     Defendant HBRK employees were expected to maintain a schedule for appointment times for young females, including Plaintiff to be at Jeffrey Epstein's property, including his NY Mansion, for the purpose of making sure the sexual encounter occurred at the exact time Jeffrey Epstein wanted it to occur.  HBRK employees did perform that job function.

45.     HBRK employees were expected to communicate with young females, including Plaintiff to arrange travel and lodging, in order to ensure that the young female including Plaintiff was in Jeffrey Epstein's presence for sexual encounters to occur with Jeffrey Epstein at the exact time he wanted.  HBRK employees did perform that job function.

46.     HBRK employees were also involved in concealing the sexual encounters between Jeffrey Epstein and young females, including Plaintiff, in many ways, including hiring lawyers for young females; making payments to young females; labeling these young females as masseuses to attempt to describe the sexual encounter with a false and innocuous label; reminding, by email or other communication, how powerful and wealthy Jeffrey Epstein was in order to prevent the young female including Plaintiff from revealing the illegal nature of the sexual abuse in which Jeffrey Epstein was engaging with them; maintained damaging files on many of the young female victims that could be used against the female if she ever were to turn on Epstein or cooperate with law enforcement or in civil lawsuits

12

against him or the organization; and causing young females to engage in acts she otherwise did not want to engage in such as marriages to other females.

### Defendant JEGE

47.     Defendant JEGE employees were compensated specifically to assist Jeffrey Epstein in obtaining young females, including minors, for sexual purposes, or for engaging in sex with young females, or scheduling appointments between these young females and Epstein for sexual purposes, or for engaging in acts to conceal the sexual activities between Epstein and these young females which included paying the young females for the sexual encounter or making promises to the young females to keep them quiet.

48.     Defendant JEGE employees were hired by Epstein strictly to perform functions to allow his sexual activity with young females, including minors, to continue.

49.     JEGE employees were expected to maintain large amounts of cash at each of Epstein's properties including his mansion in New York, in order for Epstein to have money to pay the young females, including Plaintiff for sexual activities. JEGE employees did perform this function.

50.     Defendant JEGE employees were expected to maintain a list of names and phone numbers of young females, including Plaintiff, who had been to Jeffrey Epstein's homes, and those employees did perform that job function.

51.     Defendant JEGE employees were expected to make telephone calls to young females, and take telephone calls from young females, including Plaintiff for the purpose of causing the young female to go to one of Jeffrey Epstein's properties, including his NY Mansion, for the purposes of engaging in sexual contact with Jeffrey Epstein. JEGE employees did perform this job function.

52.     Defendant JEGE employees were expected to maintain a schedule for appointment times for young females, including Plaintiff to be at Jeffrey Epstein's property, including his NY Mansion, for the purpose of making sure the sexual encounter occurred at the exact time Jeffrey Epstein wanted it to occur.  JEGE employees did perform that job function.

53.     JEGE employees were expected to communicate with young females, including Plaintiff to arrange travel and lodging, in order to ensure that the young female including Plaintiff was in Jeffrey Epstein's presence for sexual encounters to occur with Jeffrey Epstein at the exact time he wanted.  JEGE employees did perform that job function.

54.     JEGE employees were also involved in concealing the sexual encounters between Jeffrey Epstein and young females, including Plaintiff, in many ways, including hiring lawyers for young females; making payments to young females; labeling these young females as masseuses to attempt to describe the sexual encounter with a false and innocuous label; reminding, by email or other

14

communication, how powerful and wealthy Jeffrey Epstein was in order to prevent the young female including Plaintiff from revealing the illegal nature of the sexual abuse in which Jeffrey Epstein was engaging with them; maintained damaging files on many of the young female victims that could be used against the female if she ever were to turn on Epstein or cooperate with law enforcement or in civil lawsuits against him or the organization; and causing young females to engage in acts she otherwise did not want to engage in such as marriages to other females.

## **Defendant NES**

55.     Defendant NES employees were compensated specifically to assist Jeffrey Epstein in obtaining young females, including minors, for sexual purposes, or for engaging in sex with young females, or scheduling appointments between these young females and Epstein for sexual purposes, or for engaging in acts to conceal the sexual activities between Epstein and these young females which included paying the young females for the sexual encounter or making promises to the young females to keep them quiet.

56.     Defendant NES employees were hired by Epstein strictly to perform functions to allow his sexual activity with young females, including minors, to continue.

57.     NES employees were expected to maintain large amounts of cash at each of Epstein's properties including his mansion in New York, in order for Epstein

to have money to pay the young females, including Plaintiff for sexual activities. JEGE employees did perform this function.

58.     Defendant NES employees were expected to maintain a list of names and phone numbers of young females, including Plaintiff, who had been to Jeffrey Epstein's homes, and those employees did perform that job function.

59.     Defendant NES employees were expected to make telephone calls to young females, and take telephone calls from young females, including Plaintiff for the purpose of causing the young female to go to one of Jeffrey Epstein's properties, including his NY Mansion, for the purposes of engaging in sexual contact with Jeffrey Epstein. JEGE employees did perform this job function.

60.     Defendant NES employees were expected to maintain a schedule for appointment times for young females, including Plaintiff to be at Jeffrey Epstein's property, including his NY Mansion, for the purpose of making sure the sexual encounter occurred at the exact time Jeffrey Epstein wanted it to occur.  NES employees did perform that job function.

61.     NES employees were expected to communicate with young females, including Plaintiff to arrange travel and lodging, in order to ensure that the young female including Plaintiff was in Jeffrey Epstein's presence for sexual encounters to occur with Jeffrey Epstein at the exact time he wanted.  JEGE employees did perform that job function.

62.     NES employees were also involved in concealing the sexual encounters between Jeffrey Epstein and young females, including Plaintiff, in many ways, including hiring lawyers for young females; making payments to young females; labeling these young females as masseuses to attempt to describe the sexual encounter with a false and innocuous label; reminding, by email or other communication, how powerful and wealthy Jeffrey Epstein was in order to prevent the young female including Plaintiff from revealing the illegal nature of the sexual abuse in which Jeffrey Epstein was engaging with them; maintained damaging files on many of the young female victims that could be used against the female if she ever were to turn on Epstein or cooperate with law enforcement or in civil lawsuits against him or the organization; and causing young females to engage in acts she otherwise did not want to engage in such as marriages to other females.

63.     Defendant NES employees also worked as private pilots responsible for trafficking young females, including Plaintiff, to be with Jeffrey Epstein for sexual purposes. Plaintiff was taken by NES employees to Florida and to the Virgin Islands for the purpose of Jeffrey Epstein engaging in abusive and illegal sexual acts with her.

### Defendant FLORIDA SCIENCE

64.     Defendant FLORIDA SCIENCE FOUNDATION operated in Florida from at least 2008 through 2010 for the primary, if not exclusive, purpose of

17

allowing Jeffrey Epstein to continue to engage in improper, illegal, and abusive sexual acts with young females while he was on work release during his Florida jail sentence or while on house arrest/community control from that jail sentence.

65. Defendant FLORIDA SCIENCE maintained a physical office located at 250 Australian Avenue, Suite 1400, West Palm Beach, FL 33401.

66. Defendant FLORIDA SCIENCE employees were young females who reported to the office location to perform job functions that included engaging in sexual activities with Jeffrey Epstein while he was on work release or house arrest.

67. Plaintiff was flown to Florida to report to her "job" at the FLORIDA SCIENCE FOUNDATION under the guise of having a legitimate employment, only to find that FLORIDA SCIENCE was a cover whose function it was to facilitate Jeffrey Epstein's sexual abuse of her inside the office.

## CORPORATE DEFENDANTS

68. Corporate Defendants HBRK and JEGE informed targeted young female victims, including Plaintiff, that Epstein possessed extraordinary wealth, power, resources, and influence; that he was a philanthropist who would help female victims advance their education, careers, and lives; and that she only need to provide Epstein with body massages in order to avail herself of his assistance and influence.

69. Corporate Defendants HBRK, NES, and JEGE through their employees fulfilled Epstein's compulsive need for sex with young females by preying on their

personal, psychological, financial, and related vulnerabilities. Epstein and Defendant HBRK, NES, and JEGE tactics included promising the victims money, shelter, transportation, gifts, employment, admission into educational institutions, educational tuition, profession, licensure, protection, healthcare, and other things of value.

70.     Jeffrey Epstein's sexual attraction to young, often underage, females dated back to at least the mid-nineties, a fact well known to each of the Corporate Defendants, and perpetuating Epstein's need to engage in sex with a variety of young females, including Plaintiff was the primary, if not exclusive function of Defendants HBRK, NES, FLORIDA SCIENCE and JEGE work for Jeffrey Epstein..

71.     Defendants, HBRK, JEGE, and NES, through its employees and independent contractors, recruited or procured dozens if not hundreds of young females, including Plaintiff, for the purpose of Epstein's sexual gratification.

72.     Jeffrey Epstein, and Corporate Defendants, specifically targeted underprivileged, emotionally vulnerable and/or economically disadvantaged young females to sexually molest and abuse.

73.     Each of the Corporate Defendants committed acts of negligence that allowed for Epstein to commit acts in violation of New York Penal Law section 130.

74.     Each of the Defendants committed acts against Plaintiff in violation of 18 U.S.C. §1591 - §1595.

## **KATLYN DOE**

75.     Plaintiff was seventeen years old when she met Jeffrey Epstein in 2007, at a time when Jeffrey Epstein was under federal criminal investigation by the United States Attorney for the Southern District of Florida in relation to his commission of various federal crimes, including violations of 18 U.S.C. §1591, against more than 30 identified minor females.

76.     By 2007, Jeffrey Epstein had engaged been engaging in illegal sexual conduct with minor females, including minors, for many years, a fact well known to employees of Defendant, HBRK, JEGE, and NES.

77.     In 2007, Plaintiff was suffering from an eating disorder, which made her vulnerable, and her young age made her particularly attractive to Jeffrey Epstein and Jeffrey Epstein had a message delivered to Plaintiff that he could help her.

78.     Believing that Jeffrey Epstein would help Plaintiff cure her eating disorder, she reported as instructed to Jeffrey Epstein's office located at 457 Madison Avenue in New York, New York in order to meet and discuss treatment options for Plaintiff.

79.     In addition to the eating disorder, Plaintiff had another serious medical condition for which she would require a complicated surgery or series of surgeries to cure.

80.     Jeffrey Epstein, seizing on another vulnerability of Plaintiff, at the first meeting at his office promised Plaintiff that he would pay for her to receive the expensive, necessary surgeries, and utilize his expansive resources to obtain the most skilled medical doctors to perform those surgeries.

81.     These promises were reasonably relied upon by Plaintiff and caused Plaintiff to feel indebted to Jeffrey Epstein.

82.     Jeffrey Epstein informed Corporate Defendants HBRK, NES, and JEGE of Plaintiff, her medical problems, and the role each would play in recruiting, scheduling, paying, transporting, and making false promises to Plaintiff in order to cause her to engage in commercial sexual acts with Jeffrey Epstein.

83.     Corporate Defendants HBRK, NES, and JEGE, through their employees, met Plaintiff on multiple occasions and did provide her money, make appointments for her to see Jeffrey Epstein for the purpose of sex, made doctor's appointments or told her they made those appointments, transported Plaintiff, and participated in causing Plaintiff to enter into a marriage to a female she did not want to marry, all to further cause Jeffrey Epstein to abuse Plaintiff sexually.

84.     Jeffrey Epstein, Corporate Defendants HBRK, NES, and JEGE and employees thereof, began to groom Plaintiff for sexual exploitation as soon as they met her.  She was provided with gifts such as free haircuts, beauty treatments, and medical care for the purpose of causing her to feel indebted to Jeffrey Epstein.

21

85.      Jeffrey Epstein, and others who acted under his direction including employees for Defendants, seized upon Plaintiff's needed medical help in order to control and manipulate Plaintiff into full cooperation with the enterprise and compliance with Jeffrey Epstein's perverted sexual motives.

86.      Plaintiff was seventeen years old when she was first induced to go to Epstein's New York mansion located at (9 East 71st Street, New York, New York).

87.      While in the mansion, Plaintiff was taken by employees or associates working at the direction of Jeffrey Epstein, to an office where another young female, believed to be employed through Defendant NES and later through Defendant HBRK, and Jeffrey Epstein were. Jeffrey Epstein ordered Plaintiff to show him her breasts. Plaintiff then complied. Jeffrey Epstein told her that he could tell by her breasts that she had an eating disorder that he could help cure and that he needed to continue to see her.

88.      Plaintiff was taken to the massage room located inside the mansion. While there, Jeffrey Epstein instructed Plaintiff to massage him, despite her having no massage experience. During the encounter, Jeffrey Epstein commanded Plaintiff to pinch his nipples, and later during this "massage" Jeffrey Epstein grabbed Plaintiff's breasts, digitally penetrated Plaintiff, used a sex toy to enter Plaintiff and otherwise forcibly touched Plaintiff's body in a sexual manner, for no legitimate

purpose, but only to degrade or abuse Plaintiff or for the purpose of sexually gratifying himself.

89.      The fact that Jeffrey Epstein was forcibly touching Plaintiff in a sexual manner, for no legitimate purpose, but only to degrade or abuse Plaintiff or for the purpose of sexually gratifying himself, was known or should have been known by everyone who regularly worked in the New York Mansion, including based on Jeffrey Epstein's long-standing known and open prevalence for committing such acts, the fact that it was well-known at this point that Jeffrey Epstein had been arrested for similar conduct, and the open and known frequency with which Epstein continued to engage in the conduct.

90.      Despite having been sexually assaulted by Jeffrey Epstein, Plaintiff, feeling as though she had no choice, especially in light of the promises she was made, returned to Jeffrey Epstein's New York mansion on many occasions where she was continually sexually abused, and after each occasion she was paid hundreds of dollars in cash that employees of HBRK, NES, or JEGE kept on location at the mansion for the purposes of making sure Epstein always had cash to pay young female victims for sex. Plaintiff continued to reasonably rely upon Jeffrey Epstein's promises and representations to secure her the medical care she needed, which caused her to return many times and be subjected to sexual abuse.  Plaintiff was also coerced into cooperating with Epstein by her reasonable fear that if she did not

cooperate then Epstein and the many others who acted as his direction, including Corporate Defendants, would cause her serious harm.

91. Defendants NES, HBRK, and JEGE knew that false promises were made to Plaintiff about Epstein's desire and ability to obtain medical care and treatment for her in order to cause her to engage in commercial sex. They also knew that the threat of serious injury, implied or otherwise, would be used and was used in order to cause Plaintiff to engage in sex with Epstein.

92. Plaintiff was told and made to understand by Jeffrey Epstein and employees for Defendants HBRK, NES, and JEGE that if she remained loyal and obedient to him he would provide her with the medical treatment she needed, and, conversely, if she did not remain loyal and obedient to him he would ensure that she never received the medical care she needed.  In addition, in that event, the scheme or plan orchestrated by Jeffrey Epstein and Defendant HBRK, NES, and JEGE was designed to cause Plaintiff to believe that if she failed to perform commercial sex acts with Jeffrey Epstein that she would suffer financially, reputationally, and in other ways.

93. Later in 2007, after Plaintiff turned eighteen years old, Jeffrey Epstein invited her to visit his residence on a private island in the United States Virgin Islands.

94.     Prior to her trip to the Island, Plaintiff informed Jeffrey Epstein on multiple occasions that she was a virgin and that it was very important to her for religious purposes that she not engage in sexual intercourse until she was married.

95.     While on the private Island of Little St. James, despite having knowledge of Plaintiff's prohibition of intercourse, Jeffrey Epstein pressured, manipulated, intimidated and forced Plaintiff to engage in intercourse and lose her virginity to him, resulting in him retaining even greater control over Plaintiff.

96.     After losing her virginity, Plaintiff returned again to Jeffrey Epstein at his New York mansion, lured again by his continuing promises to provide her with essential medical treatment; to further her career; and her reasonable fear that she would suffer serious harm if she failed to commit the commercial sex acts he required of her.

97.     Between 2007 and the time when Jeffrey Epstein was convicted of felony sex offenses in Florida in June 2008, Jeffrey Epstein continued to caused Plaintiff to engage in commercial sexual acts with him, including sexual intercourse, in exchange for cash payments and various other financial enticements such as medical treatment, dance classes, and educational courses.

98.     On June 30, 2008, Jeffrey Epstein pled guilty to state court charges in Palm Beach, Florida where he was sentenced to eighteen months in jail, followed by twelve months community control, and forced to register as a Sex Offender.

99. In or about August 2008, Defendant HBRK Associates, Inc. ("HBRK") was incorporated in New York, New York.

100. Upon information and belief, Defendant HBRK employed numerous individuals whose primary, if not exclusive, objective was to commit violations of 18 USC Section 1591. Specifically, HBRK employees were designated to fulfill different roles in recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting by any means, young females, including Plaintiff, knowing that fraud or coercion would be used to cause that female, including Plaintiff, to engage in a commercial sex act.

101. Defendant HBRK employees paid Plaintiff for engaging sex with Epstein; made travel arrangements in order for Plaintiff to engage in commercial sex; told Plaintiff she would get medical treatment if she did as Epstein instructed such as engage in sex with him and enter into a marriage with a female whom she did not want to marry.

102. At all times material hereto, employees of Defendant, HBRK, worked for and at the direction of Jeffrey Epstein.

103. Certain employees of Defendant, HBRK, were: 1) recruiters who spent their time and energy developing ways in which to recruit young females for Jeffrey Epstein who were enticed to commit commercial sex acts with him as a result of coercion or fraud; 2) schedulers responsible for maintaining the schedule of the dates

26

and times when young girls would be maintained "on call" for the purpose of committing commercial sex acts; 3) other employees of Defendant, HBRK, responsible for paying the victims of 18 U.S.C. §1591 crimes to conceal the criminal enterprise; and 4) certain employees responsible for providing valuable services or items of value to victims of sex trafficking offenses such as money, gifts, living quarters, housing, dental treatment, food, medical treatment, hair and beauty treatments, as well as living arrangements, travel arrangements, educational arrangements furthering the commercial sex act, and 5) other employees who concealed the criminal sex trafficking enterprise.

104.     During Jeffrey Epstein's hearing in which he pled guilty to felony sexual offenses in Florida, which required him to register as a sex offender on June 30, 2008, he informed the court that if released on work release, he would work for Defendant Florida Science Foundation, located at 250 Australian Avenue, Suite 1400, West Palm Beach, Florida 33401.

105.     In October 2008, Jeffrey Epstein, while employed by Defendant Florida Science Foundation, and while simultaneously serving his so-called "work release" jail sentence, corresponded with Plaintiff via email to obtain sexually explicit photographs of Plaintiff and her female relative.  Jeffrey Epstein informed Plaintiff to get a camera from Defendant HBRK employee, Associate 1, to take the pictures.

106.     In March 2009, Jeffrey Epstein wrote to Plaintiff, again during his so-called "jail" sentence, that she could fly to Florida where she would be legitimately employed at Defendant Florida Science Foundation where Jeffrey Epstein was working on "work release" during his "jail" sentence in Palm Beach County, Florida.

107.     In June 2009, Jeffrey Epstein continued to communicate with Plaintiff in an effort to coerce her to travel to see him and work for Defendant Florida Science. He instructed Plaintiff to coordinate with another Defendant HBRK, Associate 2, so that he could arrange for Plaintiff to be flown from New York to Florida to work with him.

108.     In June or early July of 2009, Plaintiff was flown down to Florida where she spent time with him in his so-called office at the Florida Science Foundation where he was on "work release."   Plaintiff believed she was flown to be legitimately employed by Defendant Florida Science, but learned once there that Jeffrey Epstein and employees of Defendant HBRK, NES and FLORIDS SCIENCE knew that this fraudulent representation was made to cause Plaintiff to cause her to engage in commercial sex acts with Jeffrey Epstein at his "work release" office.  Specifically, while in Jeffrey Epstein's "office" at the Florida Science Center, Plaintiff was made to engage in sexual encounters with Jeffrey Epstein — both alone with Epstein during which she engaged in sexual intercourse, and also on one occasion with another young female and Epstein.

28

109.     While on work release, Jeffrey Epstein reported regularly to "work" at the Florida Science Foundation.  While there, he and other FLORIDA SCIENCE or HBRK employees corresponded with employees and associates in New York in an effort to recruit, transport, solicit, and harbor young females, including Plaintiff, for the purpose of causing Plaintiff to travel from New York to Florida in order to cause her to engage in a commercial sex act.

110.     In conjunction with Defendants HBRK and JEGE, who conspired to commit offenses in violation of 18 USC §1591, transportation was arranged for Plaintiff to fly from New York to Florida specifically for the purpose of meeting with Jeffrey Epstein where it was known fraud or coercion would be used to cause the Plaintiff to commit a commercial sex act.  These events occurred while Jeffrey Epstein was in the course and scope of his employment and while he was at the physical office location of the Defendant, Florida Science Foundation.

111.     Specifically employees for HBRK and JEGE told Plaintiff she would be traveling to Florida to work for Defendant FLORIDA SCIENCE in a legitimate work position, while knowing that this was a false representation to Plaintiff intended for Plaintiff to reasonably rely upon it to her detriment, causing her to engage in commercial sex with Epstein.

112.     Jeffrey Epstein knew that Plaintiff would travel for the purposes of engaging in this commercial sex act as a result of his false representations that he would help her, upon which Plaintiff reasonably relied.

113.     Defendant Florida Science Foundation, and the acts Jeffrey Epstein was conducting there, along with the involvement and assistance of employees of Defendant HBRK and Defendant JEGE, caused Plaintiff to credibly believe that if she did not comply with demands to engage in commercial sex acts she would suffer serious financial, psychological, and reputational harm.

114.     Defendant FLORIDA SCIENCE was an entity the primary purpose of which was to provide a business through which Jeffrey Epstein, a registered sex offender, could work while on "work release" during his "jail" sentence.

115.     At the time, Defendant Florida Science Foundation and Jeffrey Epstein, were supposed to be under close watch by the Palm Beach Sheriff's Office as it was Jeffrey Epstein's "work release" employment during his "jail" sentence for committing sexual offenses.

116.     It is difficult to imagine a demonstration of wealth, power, and influence greater than that of Defendants JEGE, NES, HBRK, Florida Science, and Jeffrey Epstein, who in coordination caused Plaintiff to engage in a commercial sex act with Jeffrey Epstein at his "work release" office, while Jeffrey Epstein was serving his jail sentence.  Jeffrey Epstein, through his brazen and powerful

30

organization was quite literally able to commit federal sex trafficking offenses at his work release office, during his jail sentence.

117.     Jeffrey Epstein was able to commit violations of 18 U.S.C. §1591 while on work release for committing sex crimes against minors that had recently caused him to be registered as a permanent Sex Offender, a clear demonstration that Jeffrey Epstein and the corporate Defendants with whom he associated wielded power well beyond the bounds of the United States legal system, further confirming for Plaintiff that if she failed to commit commercial sex acts, Jeffrey Epstein or Corporate Defendants could and would cause her serious harm.

118.     In 2010, after having completed his "jail" sentence, and while Jeffrey Epstein was on house arrest in Florida, he was permitted to travel to New York while wearing his ankle monitoring device.  During one such trip, Plaintiff was made to engage in sexual intercourse with Jeffrey Epstein in exchange for financial compensation.  Employees of Defendant HBRK, recruited, scheduled and paid Plaintiff and the sexual intercourse occurred at his New York mansion, owned at the time by Nine East.

119.     Between 2009 and 2014, Jeffrey Epstein, in concert with and through the assistance of numerous other individuals and related corporate entities, including Corporate Defendants and employees thereof, recruited, enticed, harbored, transported, obtained, maintained, or solicited Plaintiff knowing that means of fraud

and coercion were being used to cause Plaintiff to engage frequently in commercial sexual acts that were continual and frequent during each of those years.

120.     In addition to those acts described in this Complaint, Jeffrey Epstein also used fraud, the threat of force, or coercion to cause Plaintiff to engage in commercial sexual acts the details of which are too graphic and perverted to include in this public pleading.

121.     In exchange for each such commercial sex act, Plaintiff was provided financial compensation.

122.     In order to cause Plaintiff to engage in each commercial sex act, Epstein and his co-conspirators, associates, employees and related corporate entities, including Corporate Defendants, knew that fraud was being used to cause Plaintiff to engage in such acts.

123.     For instance, Jeffrey Epstein and employees of Defendant HBRK represented to Plaintiff that he could and would use his vast wealth and connections to well-respected doctors in order to obtain the complicated medical treatment and surgeries Plaintiff needed for her severe medical condition, knowing those representations were false and that Plaintiff would and did reasonably rely upon those representations.

124.     Between 2008 and 2014, Jeffrey Epstein, and employees of Defendant HBRK, continually repeated his representations and promises to obtain this medical

treatment for Plaintiff's condition in order to cause Plaintiff to continue to engage in commercial sex acts.

125.    Jeffrey Epstein's representations to Plaintiff that he would obtain the complicated medical treatment Plaintiff needed were false and were made knowing that Plaintiff would reasonably rely upon those misrepresentations to her detriment.

126.    To ensure Plaintiff's continued cooperation with the Epstein enterprise, and to cause Plaintiff to continue to engage in commercial sex acts through reliance on his false promises, Epstein and employees of Defendant HBRK would provide things of value to Plaintiff such as hair and beauty treatment, minor medical treatment, assistance with schooling, and other services, as well as give the realistic impression that Epstein could fulfill his promise of securing the major medical treatment Plaintiff needed.

127.    Multiple associates and employees, of Defendants HBRK and JEGE assisted in causing Plaintiff to engage in commercial sex acts knowing fraud would be used to cause Plaintiff to continue to engage in such acts.  This assistance included making promises, scheduling medical appointments or promising to schedule medical appointments, and otherwise making representations about Epstein's ability to secure medical treatment for Plaintiff all while knowing these were false and fraudulent representations designed to entice or induce Plaintiff to commit commercial sex acts for Jeffrey Epstein.

128.    In order to cause Plaintiff to engage in each commercial sex act, Epstein and his co-conspirators, associates, employees and related corporate entities, including Corporate Defendants, used coercion, and knew that coercion would be used, in order to cause Plaintiff to engage in such acts.

129.    Epstein and various associates, employees, and related corporations and employees, including Corporate Defendants, worked in concert together as an enterprise with extraordinary power, wealth, and resources capable of impacting Plaintiff's life in positive or negative ways depending on her level of cooperation, a fact known to Plaintiff.

130.    Epstein and others associated with Epstein, including employees of Defendant HBRK, bragged about Epstein's unusual political and powerful connections and his ability to obtain education, housing, or medical needs for young females who cooperated with Epstein's sexual demands.

131.    In addition to being explicitly reminded, by Epstein or one of his associates, of Jeffrey Epstein's extraordinary power to reward and punish, his power to do so was apparent to Plaintiff, inasmuch as she: 1) visited Epstein many times at the New York townhouse, located at 9 East 71 Street, New York, New York, which has been reported as the largest single residence in Manhattan; she knew that this was where Jeffrey Epstein resided when in New York 2) flew on the Boeing 747 jet owned by Defendant, JEGE, Inc., and controlled by Jeffrey Epstein and related

34

companies; 3) visited his Florida Mansion located at 358 Brillo Way, Palm Beach, Florida owned or controlled by Jeffrey E. Epstein from 1990 through December 23, 2011; and 4) visited his private Island in the United States Virgin Islands; and was caused to engaged in commercial sex with Jeffrey Epstein at each of those locations.

132.     Under Epstein's control were numerous employees, believed to also be employees of one or more of the named Corporate Defendants including chefs, butlers, receptionists, schedulers, secretaries, flight attendants, pilots, housekeepers, maids, sex recruiters, drivers and other staff members, each who worked for the purpose of causing young females including Plaintiff to engage in commercial sex with Jeffrey Epstein or caused Jeffrey Epstein to sexually abuse Plaintiff without detection.

133.     The main function of each of the associates who acted at the instruction or direction of Epstein was to recruit, entice, harbor, transport, provide, obtain, maintain, or solicit young females, knowing that fraud or coercion would be used to cause that female, including Plaintiff, to engage in a commercial sex act.

134.     Each such associate described above was also employed to perform functions in order to avoid detection of the illegality of Epstein's commercial sex trafficking and to forever conceal the enterprise.

135.     One significant element used to compel commercial sex acts of young females, including Plaintiff, and to avoid detection of the sex trafficking ring, was

the design of the scheme or pattern intended to cause a person to believe that failure to perform an act would result in serious psychological, financial or reputational harm.

136. The scheme included frequent statements from Jeffrey Epstein and his associates, including employees of Defendant HBRK, that: (1) Jeffery Epstein was of extraordinary wealth, power and influence; (2) Jeffrey Epstein's business and political friends, including world leaders, were told to Plaintiff to be some of the most powerful people in the world; (3) the scheme or plan was designed to constantly grow the number of victims through the recruitment of other victims; (4) Jeffrey Epstein had the ability to advance or destroy nearly anyone financially, reputationally, or otherwise; (5) medical and normal life necessities would be denied victims if they, like Plaintiff, failed to perform commercial sex acts for Epstein; and (6) Epstein could take away Plaintiff's life needs such as shelter or housing if she failed to perform those acts.

137. The fact that Defendant Epstein orchestrated to commit commercial sex acts inside his office while serving his jail sentence for violation of Florida State Law sex crimes further coerced Plaintiff into committing commercial acts with Jeffrey Epstein.

138. By 2013, Epstein continued to promise Plaintiff that if she engaged in commercial sexual acts he would use his influence to secure her medical surgery and

treatment for her serious medical condition, although up to that time he had still not followed through on his promises. When pressed by Plaintiff to make good on his promises, Jeffrey Epstein proposed another condition of his promise and said that if Plaintiff fulfilled it he would pay her $20,000 so that she could afford the surgery herself.

139. In or about 2013, Jeffrey Epstein told Plaintiff that she needed to marry another woman of Epstein's choosing. In furtherance of that objective, and upon the promise that he would pay $20,000 to Plaintiff in order for her to obtain her needed surgery, Jeffrey Epstein forced Plaintiff to marry the woman.

140. Epstein, through his long-time New York attorney, Associate 4, arranged for Plaintiff to get married. The ceremony included not only signing the necessary legal paperwork prepared by Associate 4 but also posing for photographs to give the appearance that the marriage was legitimate.

141. Jeffrey Epstein also promised to provide Plaintiff a permanent place to live if she would marry and live with the woman at one of his apartments located at 301 East 66th Street, New York, NY.

142. During this period of time, Jeffrey Epstein continued to require Plaintiff to commit commercial sex acts.

143. Plaintiff knew that if she did not agree to marry the woman and continue to commit commercial sex acts, Jeffrey Epstein would cause her serious psychological, financial, reputational, and medical harm.

144. Jeffrey Epstein made clear to Plaintiff that if she did marry the woman she would be paid $20,000 for her surgery and would have a stable place to live. He also made it clear to Plaintiff that if she did not marry the woman, he would renege on his long-standing promise to provide Plaintiff with the surgery she needed, thereby coercing Plaintiff to go along.

145. In 2013, after Plaintiff completed the marriage, Jeffrey Epstein paid her $10,000 and said that the second half of the promised money would not be paid until the marriage ended.

146. Jeffrey Epstein continued to use the still-owed $10,000 as a cudgel to cause Plaintiff to continue to engage in commercial sex acts, knowing that if she did not do so he would never pay the shortfall.

147. In 2014, Plaintiff was twenty-five-years old. Because of her age, which he considered "too old," Jeffrey Epstein stopped causing her to engage in commercial sex.

148. Because she was no longer of use to him as a sex victim, Jeffrey Epstein and his associates forced Plaintiff to move out of the apartment at 301 East 71st Street, leaving Plaintiff without a place to live.

149.     In 2017, Plaintiff and the woman divorced and Plaintiff, having fulfilled the condition set by Epstein for the payment of the $10,000 balance due, asked for that sum to be paid.  Despite his earlier promise, Jeffrey Epstein refused to pay.

150.     Epstein, his associates and related companies, including Corporate Defendants, through acts of fraud and coercion, caused Plaintiff to engage in commercial sex acts for many years as outlined above.

151.     While Jeffrey Epstein initially and briefly followed through on his promise to provide Plaintiff with a place to live in his apartments at 301 East 66th Street, New York, New York, he reneged on his promise and left Plaintiff stranded, and legally married, with nowhere to live.

152.     Because Jeffrey Epstein still owed Plaintiff $10,000, because he had continued to make promises that he would again find her housing, and because he had always promised to locate and pay for the best surgeons in the country to fix her serious medical condition, Plaintiff continued to periodically engage in commercial sex acts with Jeffrey Epstein through 2014.

153.     In November 2017, Plaintiff emailed Jeffery Epstein and reminded him that he had already paid her $10,000 for entering into the fraudulent marriage with another victim of Jeffrey Epstein at his request and asking when she would receive the additional ten thousand dollars that was promised to her.

154.     Rather than agreeing to honor his promise to Plaintiff—the promise that had not only induced her into the marriage, but that had also caused her, in part, to continue to engage in commercial sexual acts with Defendant—Jeffrey Epstein refused to pay her the balance due and never followed through on his other promise to secure Plaintiff's medical care, a promise which caused Plaintiff to engage in commercial sex trafficking for years.

155.     In November 2017, Plaintiff realized for the first time, with certainty, that Jeffrey Epstein did not intend, and had never intended, to honor his promises to her, and that he would refuse at all times to pay her the second half of the money that he had promised to pay her.

156.     Plaintiff participated in the commercial sexual acts because she knew she would not be able to guarantee receipt of the remaining ten thousand dollars owed to her unless she continued to acquiesce to Jeffrey Epstein's sexual demands and because she was fearful that she would be seriously harmed if she failed to perform the required commercial sex acts.

157.     Plaintiff was never paid the additional ten thousand dollars Jeffrey Epstein had promised to pay her for the marriage favor, nor was she ever able to receive the surgery that she continues to need today.

## COUNT I
## BATTERY AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS JOINT PERSONAL REPRESENTATIVES OF THE ESTATE OF JEFFREY E. EPSTEIN

158.    The Plaintiff adopts and realleges paragraphs 1 through 157 above.

159.    Jeffrey Epstein committed a harmful or offensive touching against Plaintiff.

160.    As a direct and proximate result of Jeffrey Epstein's battery, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

**COUNT II**
**BATTERY/VIOLATION OF SECTION 130**
**AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS JOINT**
**PERSONAL REPRESENTATIVES OF THE ESTATE OF JEFFREY E.**
**EPSTEIN**

161.     The Plaintiff adopts and realleges paragraphs 1 through 157 above.

162.     The intentional acts of Jeffrey Epstein against Plaintiff constitute a sexual offense as defined in New York Penal Law § 130, including but not limited to the following:

   a.  Sexual misconduct as defined in §130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

   b.  Rape in the first degree as defined in §130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

   c.  Criminal sexual act in the first degree as defined in §130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Plaintiff by forcible compulsion;

   d.  Forcible touching as defined in §130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

   e.  Sexual abuse in the third degree as defined in §130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Plaintiff by forcible compulsion.

163.     As a direct and proximate result of Jeffrey Epstein's forcible touching, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation,

embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT III
### NEGLIGENCE AGAINST
### FINANCIAL TRUST COMPANY, INCORPORATED

164. The Plaintiff adopts and realleges paragraphs 1 through 157 above.

165. At all times material hereto, Financial Trust Company, Inc. (hereinafter "Financial Trust") was a U.S. Virgin Islands corporation conducting business in New York.

166. At all times material hereto, Defendant, Financial Trust, employed Jeffrey Epstein.

167. Defendant, Financial Trust, had a duty to exercise reasonable care to refrain from retaining in its employ, a person with known dangerous propensities in a position that would present a foreseeable risk of harm to others.

168.     Defendant Financial Trust operated in part to satisfy the personal needs of Jeffrey Epstein, which included daily massages which Epstein requires to be sexual in nature.

169.     This Epstein requirement that he receive regular massages from untrained young females caused Defendant and its employees to knowingly turn a blind eye to the dangerous sexual addictive propensities of Jeffrey Epstein, despite knowledge that he would cause harm to many young females including Plaintiff, in order to retain its most valuable employee—Jeffrey Epstein.

170.     Defendant Financial Trust operated in part to further Jeffrey Epstein's goal to obtain, recruit, and procure young females for the purposes of providing sexually explicit massages to Jeffrey Epstein.

171.     During the course and scope of his employment for Defendant, Jeffrey Epstein did fulfill the corporate objective of receiving sexual massages procured for him by employees of Defendant.

172.     Jeffrey Epstein was notorious for converting each massage into a sexually exploitive activity in violation of New York Penal Law Section 130, a fact which was known or should have been known in the exercise of reasonable care by Defendant.

173.     Even though Defendant, Financial Trust, knew of Jeffrey Epstein's propensity for the sort of behavior that caused Plaintiff's harm and Jeffrey Epstein's

44

constant engagement in this type of criminal behavior during the course and scope of his employment, Defendant retained Jeffrey Epstein and failed to properly supervise him.

174. Jeffrey Epstein did not have a set work schedule or office but instead conducted business on behalf of the corporation from various locations all over the world.

175. While conducting said business, Jeffrey Epstein was frequently utilizing corporate finances in furtherance of his sexually explicit behavior.

176. Upon information and belief, at times other employees of the Defendant corporation were coordinating these sexually explicit massages for Epstein to engage in during business hours, while he was within the course and scope of his employment for Defendant.

177. In fact, while Jeffrey Epstein was conducting business telephone calls or authorizing company actions on behalf of Defendant, Financial Trust, he would frequently be receiving a sexually explicit massage.

178. In certain circumstances, sexually explicit massages provided by young women, oftentimes minor children, who were untrained in the art of massage, were coordinated by another employee of Defendant who knew or should have known that the massage was being conducted by an underage girl for the exclusive purpose of committing sexual crimes against her.

179.     Jeffrey Epstein engaged in this type of sexually abusive behavior on a daily basis to the extent that engaging in sexual massages became the most regular activity that he engaged in while in the course and scope of his employment.

180.     Jeffrey Epstein's habitual routine of recruiting and engaging in sexually explicit massages began many years before the formation of Defendant and was not a lifestyle unknown to Defendant, Financial Trust.

181.     Defendant, Financial Trust, knew or in the exercise of reasonable care should have known that Jeffrey Epstein was potentially dangerous, had engaged in a pattern of criminal sexual behavior against young females, including minors, for years prior to the formation of Defendant Financial Trust, and that he was not going to cease committing criminal sexual acts.

182.     Jeffrey Epstein was retained with knowledge of the propensity of this sort of behavior.

183.     Defendant, Financial Trust, retained Jeffrey Epstein with knowledge that he would in fact injure others, such as Plaintiff, during the course and scope of his employment.

184.     Despite such knowledge, Financial Trust knowingly placed Jeffrey Epstein in a position to cause foreseeable harm, which could have been prevented had Defendant taken reasonable care in making decisions regarding the retention and supervision of Jeffrey Epstein.

46

185.    Defendant's negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130 of the NY Penal Law.

186.    As a direct and proximate result of Defendant's negligence, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Financial Trust Company, Inc. for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT IV
## NEGLIGENCE AGAINST NES, LLC

187.    The Plaintiff adopts and realleges paragraphs 1 through 157 above.

188.    It is believed that each employee of Defendant, NES, operated at the direction of Jeffrey Epstein.

189.   Upon information and belief, the primary responsibility of each employee of Defendant, NES, LLC ("NES") was to fulfill the needs or requests of Jeffrey Epstein; more particularly, his daily massage schedule.

190.   Upon information and belief, the employees of Defendant, NES, were compensated to primarily, if not exclusively, procure or maintain each young female masseuse, or to assist, knowingly or unknowingly, in the concealment of any misconduct committed against each masseuse.

191.   Upon information and belief, the employment responsibilities of the various employees of Defendant, NES, included but were not limited to: 1) recruiting young females, including minor children such as Plaintiff, to provide massages, 2) creating Jeffrey Epstein's massage schedule, 3) maintaining Jeffrey Epstein's massage schedule, 4) escorting various young females into the massage room at the New York mansion owned by Nine East, 5) maintaining contact with the various young females who were recruited to the New York mansion for the purposes of providing Jeffrey Epstein with a massage, 6) providing compensation to each young masseuse upon the completion of her engagement with Jeffrey Epstein, 7) providing meals and food and other services to the young females in order to provide an air of legitimacy to the functions of the corporation, 8) providing hospitality services to the young females in order to provide an air of legitimacy to the functions of the corporation, 9) providing educational services, 10) providing medical services, 11)

providing transportation services, 12) providing housing services, 13) providing various other enticements to ensure the continued cooperation of the various young female masseuse with Defendant NES's corporate objective, 14) encouraging individuals, including the females who were recruited to the house to provide a massage to recruit other young females to engage in the same activity for Jeffrey Epstein, and 15) coordinating together and with Jeffrey Epstein to convey a powerful and apparently legitimate enterprise system capable of gaining cooperation from young females recruited for massage, often minors such as Plaintiff.

192.    In fulfilling their employment responsibilities, each employee voluntarily assumed a duty with respect to each young female recruited to massage Jeffrey Epstein, including Plaintiff.

193.    To fulfill said duty, each employee was required to perform their assumed duty carefully without omitting to do what an ordinarily prudent person would do in accomplishing the task.

194.    The young females being recruited to engage in massages for Jeffrey Epstein were inexperienced in the art of massage, a fact that was known or should have been known to Defendant NES and its employees in the exercise of reasonable care.

195. Plaintiff relied on Defendant NES's voluntary assumption of a duty as well as the voluntary assumption of each individual employee to act with reasonable care towards her.

196. In the exercise of reasonable care, Defendant and its employees further knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximate harm that would be caused by his likely sexual misconduct and various violations of New York Penal Law Section 130.

197. The failure of Defendant NES and each of its respective employees to act in the same manner as an ordinarily prudent person, placed Plaintiff in a more vulnerable position than if Defendant and its employees had not assumed the obligation to treat her with reasonable care.

198. In breaching its duty, NES launched a force or instrument of harm directed toward Plaintiff. In doing so, Defendant, NES, enhanced the risk Plaintiff faced and caused her to forego any opportunity she may otherwise have had to avoid the risk inherent with being in a room alone with Jeffrey Epstein to perform a massage as an untrained minor child.

199. Defendant's negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130 of the NY Penal Law.

200. As a direct and proximate result of Defendant's negligence, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain,

emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against NES, Inc, for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT V
## NEGLIGENCE AGAINST JEGE, INC.

201.     The Plaintiff adopts and realleges paragraphs 1 through 157 above.

202.     At all times material hereto, Defendant, JEGE, Inc. owned the Boeing 757 aircraft of make and model B-727-31H with tail number N908JE ("subject aircraft."

203.     At all such times, Defendant maintained legal control over the subject aircraft.

204.     As a common carrier, Defendant had a heightened duty to safely transport Plaintiff to her destination.

51

205.    Defendant knew or should have known that Plaintiff was being transported to fulfill the improper and illegal sexual needs of Jeffrey Epstein.

206.    Defendant knew or should have known that Jeffrey Epstein would commit sexual offenses against Plaintiff in violation of Article 130 of the NY Penal Law if Defendant transported her on the subject aircraft.

207.    Defendant breached its duty to Plaintiff by operating the subject aircraft and transporting Plaintiff when she was a minor child for purposes of allowing Jeffrey Epstein to commit sex acts against her.

208.    Defendant's negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130 of the NY Penal Law.

209.    As a direct and proximate result of Defendant's breach, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against JEGE, Inc. for compensatory and general damages, attorney's fees, punitive damages and such

other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT VI
## CAUSE OF ACTION AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS JOINT PERSONAL REPRESENTATIVES OF THE ESTATE OF JEFFREY E. EPSTEIN PURSUANT TO 18 U.S.C. § 1595

210.    Plaintiff adopts and realleges paragraphs 1 through 157 above.

211.    Jeffrey Epstein, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited, threatened, forced, or coerced Plaintiff to engage in commercial sex acts.

212.    Such actions were undertaken knowing that his use of force, threats of force, fraud, coercion, and/or combinations of such means would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In doing so, Jeffrey Epstein violated 18 U.S.C. §1591.

213.    Furthermore, Jeffrey Epstein attempted to violate 18 U.S.C. § 1591. In so doing, violated 18 U.S.C. § 1594(a).

214.    Jeffrey Epstein conspired with each member of the enterprise, and with other persons known and unknown, to violate 18 U.S.C. § 1591. In so doing, Jeffrey Epstein violated 18 U.S.C. § 1594(c).

215.    By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

216.    Certain property of Epstein's was essential to the commission of the federal crimes and torts described herein, including the use of multiple private aircraft including a Boeing aircraft (of make and model B-727-31H with tail number N908JE) and a Gulfstream aircraft (of make and model G-1159B with tail number N909JE). Such aircraft, along with other of Jeffrey Epstein's property, were used as means and instruments of Jeffrey Epstein's tortious and criminal offenses and, as such, are subject to forfeiture.

217.    Additionally, Jeffrey Epstein's New York mansion, located at 9 East 71st Street, New York, New York, in the Southern District of New York, and his private island located in the United States Virgin Islands, were used as means and instruments of Jeffrey Epstein's tortious and criminal offenses and, as such, are subject to forfeiture.

218.    As a direct and proximate result of Jeffrey Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress;

psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy; and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future. In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT VII
## FLORIDA SCIENCE FOUNDATION, INC.
## PURSUANT TO 18 U.S.C. § 1595

219.   Plaintiff adopts and realleges paragraphs 1 through 157 above.

220.   Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

221.   Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and

were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In doing so, Defendant corporation violated 18 U.S.C. §1591.

222. Furthermore, Defendant Florida Science attempted to violate 18 U.S.C. § 1591. In so doing, violated 18 U.S.C. § 1594(a).

223. Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591. In so doing, Defendant violated 18 U.S.C. § 1594(c).

224. By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

225. Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

226. As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish;

humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Florida Science Foundation, Inc. for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT VIII
### CAUSE OF ACTION AGAINST
### FINANCIAL TRUST COMPANY, INC.
### PURSUANT TO 18 U.S.C. § 1595

227.     Plaintiff adopts and realleges paragraphs 1 through 157 above.

228.     Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

229.     Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and

were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In doing so, Defendant corporation violated 18 U.S.C. §1591.

230.    Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations. In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

231.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591. In so doing, violated 18 U.S.C. § 1594(a).

232.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591. In so doing, Defendant violated 18 U.S.C. § 1594(c).

233.    By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

234.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

235.   As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy; and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, Financial Trust Company, Inc., For compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT IX
## CAUSE OF ACTION AGAINST NES, LLC
## PURSUANT TO 18 U.S.C. § 1595

236.   Plaintiff adopts and realleges paragraphs 1 through 157 above.

237. Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

238. Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In doing so, Defendant corporation violated 18 U.S.C. §1591.

239. Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591. In so doing, violated 18 U.S.C. § 1594(a).

240. Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591. In so doing, Defendant violated 18 U.S.C. § 1594(c).

241. By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

242. Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting,

soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

243.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, NES, Inc., for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT X
### CAUSE OF ACTION AGAINST
### HBRK ASSOCIATES, INC.
### PURSUANT TO 18 U.S.C. § 1595

244.    Plaintiff adopts and realleges paragraphs 1 through 157 above.

245.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

246.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

247.    Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations.  In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

248.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

249.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

250.    By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

251.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

252.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, HBRK Associates, Inc., for compensatory and general damages, attorney's fees, punitive

damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT XI
## CAUSE OF ACTION AGAINST JEGE, INC.
## PURSUANT TO 18 U.S.C. § 1595

253.    Plaintiff adopts and realleges paragraphs 1 through 157 above.

254.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

255.    Plaintiff was flown on the plane owned by Defendant, JEGE, for the purposes of allowing Jeffrey Epstein to commit commercial sex acts with her in violation of 18 USC Section 1591.

256.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

257.    Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in

violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations. In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

258. Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591. In so doing, violated 18 U.S.C. § 1594(a).

259. Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591. In so doing, Defendant violated 18 U.S.C. § 1594(c).

260. By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

261. Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

262. As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish;

humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy; and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future. In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, JEGE, Inc., for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated: January 6, 2020.

Respectfully Submitted,

EDWARDS POTTINGER, LLC

*/s/ Bradley J. Edwards*
Bradley J. Edwards
Brittany N. Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954)-524-2820
Fax: (954)-524-2822
Email: ecf@epllc.com
        brad@epllc.com
        brittany@epllc.com

(*ADMISSION PRO HAC VICE*)