**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| Jane Doe 1, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>      v.<br><br>JPMorgan Chase Bank, N.A.,<br><br>    Defendant. |

Case No. 1:22-CV-10019 (JSR)

### PLAINTIFF JANE DOE 1'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JPMORGAN CHASE BANK, N.A.'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .......................................................................................................................... 3

I.      Ms. Khodarkovsky Is Qualified to Opine on Sex Trafficking for Purposes of Class
        Certification. ............................................................................................................... 4

II.     Ms. Khodarkovsky's Analysis Is Reliable. ............................................................... 11

        A.      Ms. Khodarkovsky's Opinion Is Well Within Her Role as Expert ...................... 12

        B.      Ms. Khodarkovsky Relies on Sufficient Facts and Data. .................................... 19

CONCLUSION ....................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adrea, LLC v. Barnes & Noble, Inc.*,
  2014 WL 8850434 (S.D.N.Y. Oct. 14, 2014) ........................................................ 19

*Allen v. City of New York*,
  466 F. Supp. 2d 545 (S.D.N.Y. 2006) ............................................................. 12, 17

*Am. Railcar Indus., Inc. v. GyanSys, Inc.*,
  2017 WL 11501888 (S.D.N.Y. Nov. 14, 2017) ...................................................... 11

*Arista Recs. LLC v. Lime Grp. LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ........................................................ 5, 8

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  2023 WL 2711417 (S.D.N.Y. Mar. 30, 2023) ....................................................... 13

*Case v. Unified Sch. Dist. No. 233*,
  157 F.3d 1243
  (10th Cir. 1998) ......................................................................................... 10

*Chen-Oster v. Goldman, Sachs & Co.*,
  114 F. Supp. 3d 110 (S.D.N.Y. 2015) ................................................................. 3

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................... passim

*Emig v. Electrolux Home Prods. Inc.*,
  2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) ........................................................ 9

*Feliciano v. CoreLogic Saferent, LLC*,
  2020 WL 6205689 (S.D.N.Y. June 11, 2020) ......................................................... 3

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ...................................................................... 1

*Hayes v. MTD Prod., Inc.*,
  518 F. Supp. 2d 898 (W.D. Ky. 2007) ................................................................ 10

*Hoactzin Partners, L.P. v. Fieldwood Energy, LLC*,
  2019 WL 13210657 (S.D. Tex. Oct. 18, 2019) ........................................................ 9

*HVT, Inc. v. Port Auth. of New York & New Jersey*,
  2018 WL 6079932 (E.D.N.Y. Nov. 21, 2018) ......................................................... 10

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020) ........................... 10

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  2019 WL 1569294 (D. Kan. Apr. 11, 2019) ...................................................... 19

*In re NYSE Specialists Sec. Litig.*,
  260 F.R.D. 55 (S.D.N.Y. 2009) ........................................................................ 4

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................ 10, 18

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) .............................................................................. 4

*In re Visa Check/Mastermoney Antitrust Litig.*,
  192 F.R.D. 68 (S.D.N.Y. 2000) ......................................................................... 4

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
  97 F. Supp. 3d 485 (S.D.N.Y. 2015) ............................................................... 16

*New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1266, 1305–06 (D.N.M. 2004) ........................ 13

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ......................................................................... 3, 10

*Olin Corp. v. Lamorak Ins. Co.*,
  332 F. Supp. 3d 818
  (S.D.N.Y. 2018) ........................................................................................ 4, 25

*Passman v. Peloton Interactive, Inc.*,
  2023 WL 3195941
  (S.D.N.Y. May 2, 2023) .................................................................................... 4

*Pearlstein v. Blackberry Ltd.*,
  2021 WL 4131646 (S.D.N.Y. Sept. 10, 2021) ....................................................... 10

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) .................................................................... 11, 16

*Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*,
  215 F. Supp. 3d 267 (S.D.N.Y. 2016) ................................................................ 11

*United States v. Backpage et al.*,
  No. 18-CR-422 (D. Ariz. 2018) .......................................................................... 6

*United States v. Fennell*,
  381 F. Supp. 2d 1312 (D.N.M. 2005) ................................................................. 13

*United States v. Jiau*,
  734 F.3d 147 (2d Cir. 2013) .............................................................................. 17

*Veleron Holding, B.V. v. Morgan Stanley*,
  117 F. Supp. 3d 404 (S.D.N.Y. 2015) ....................................................... 8, 10, 25

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................................... 4

**Statutes**

12 C.F.R. 21.11 ................................................................................................... 19

18 U.S.C. §§ 1591–95 .......................................................................................... 19

31 C.F.R. § 1010.310 ............................................................................................ 19

31 U.S.C. §§ 310 .................................................................................................. 19

31 U.S.C. §§ 5311-5330 ........................................................................................ 19

CFR Chapter X ...................................................................................................... 19

Wright & Miller, Fed. Prac. & Proc. Evid. § 6264.1 (2d ed.) ...................................... 6

**Other Authorities**

The Currency and Foreign Transactions Reporting Act of 1970 ................................ 19

Title III of the USA PATRIOT Act of 2001 .............................................................. 19

Treasury Order 180-01 ......................................................................................... 19

**Rules**

Fed. R. Evid. 704(a) ............................................................................................. 13

Federal Rule of Civil Procedure 23 ......................................................................... 4

Rule 702 ....................................................................................................... passim

Plaintiff Jane Doe 1 ("Doe") respectfully submits this memorandum of law in opposition to JPMorgan Chase Bank, N.A.'s ("JPMC") motion to exclude Doe's expert witness, Jane Khodarkovsky, and states as follows. Ms. Khodarkovsky is well qualified and her expert opinions about common issues will assist the Court to resolve the pending class certification motion.

## PRELIMINARY STATEMENT

The Court should deny JPMC's motion because Ms. Khodarkovsky's expert opinions readily meet the Second Circuit's "liberal standard of admissibility" under Rule 702. *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 127 (S.D.N.Y. 2014) (under "liberal" standard, denying the JPMC defendants' motion to exclude class certification expert and granting plaintiffs' motion for class certification).

For decades, notorious sex trafficker Jeffrey Epstein—with the assistance of JPMC—ran a criminal organization which recruited hundreds of young women and girls and coerced them into performing commercial sex acts. *See* ECF No. 102 at 3. Epstein's *modus operandi* involved luring victims to one of his residences through false promises, then coercing them into performing massages that became increasingly sexual—ultimately then forcing them to participate in commercial sex acts on a continuing basis. *See id.* Epstein's bank—JPMC—not only knew about of Epstein's sex-trafficking venture, *see id.* at 28–29, but also provided the operation its very lifeblood in the form of cash which Epstein paid to each of the venture's victims. *See id.* at 3–4. Literally hundreds of young females' lives were grievously harmed as a result of Epstein and his cash-fueled venture. Doe now seeks to certify a class to allow the Epstein survivors to have their day in court collectively. ECF No. 122.

At this class certification stage, Doe offers testimony from Jane Khodarkovsky as an expert witness qualified to opine on class-wide issues revolving around:

- "sex trafficking and how the financial infrastructure can facilitate, support and promote sex trafficking networks, including the methods and means used by traffickers to engage in money laundering and other financial and tax crimes";
- "human trafficking, including sex trafficking, and the ways that sex traffickers, sex trafficking networks, and their co-conspirators exploit victims for financial gain"; and
- "the manner, method, and means by which sex trafficking enterprises use the financial sector to facilitate and support their trafficking networks."

*See* ECF No. 132-2, Expert Report of Jane Khodarkovsky (Mar. 1, 2023) ("Rep.") at 1; *see also* ECF No. 132-3, Reply Expert Report of Jane Khodarkovsky (Apr. 24, 2023) ("Reply Rep."). Ms. Khodarkovsky served as a U.S. Department of Justice ("DOJ") Human Trafficking Finance Specialist and Trial Attorney in its Criminal Division's Money Laundering and Asset Recovery Section. Rep. at 2. In addition to serving as a federal prosecutor for years, Ms. Khodarkovsky has diverse experience as a state prosecutor, civil litigator, and judicial law clerk, and she currently works on anti-money laundering and trafficking-related issues as both general counsel of a non-profit corporation and founder of a consulting firm. *Id.* at 36–37. Based on her experience investigating and prosecuting sex-trafficking, money laundering, financial crimes cases, Ms. Khodarkovsky opines that evidence will show multiple common issues, such as: (1) Epstein ran a multi-victim sex trafficking venture where the victims allege they have been subjected to similar abuse, manipulation, and coercive scheme by Epstein and his co-conspirators; (2) JPMC's financial infrastructure commonly provided Epstein's venture with capital, real and tangible property, and societal influence that allowed the venture to operate for more than a decade; and (3) Epstein subjected his victims to a common scheme and plan with JPMC's knowing support. *Id.* at 33–34.

As part of its efforts to avoid facing a class of Epstein survivors, JPMC has moved to exclude Ms. Khodarkovsky as an expert witness. JPMC appears not to challenge the relevance of Ms. Khodarkovsky's expert testimony, but insists she is "not a sex trafficking expert" and

"unreliable." ECF No. 131 ("Mot.") at 2, 8. JPMC's motion should be swiftly denied. Ms. Khodarkovsky is well qualified to provide expert opinions regarding both sex trafficking and its financial infrastructure, as well as the intersection of the two. While JPMC attempts to cast aspersions on her background, it sidesteps the undisputable fact that Ms. Khodarkovsky is a former DOJ prosecutor with real-world experience in working with trafficking victims, prosecuting traffickers, and uncovering the financial underpinnings of trafficking organizations. Ms. Khodarkovsky's expert testimony is also reliable and therefore admissible. She has carefully explained in detail in both of her reports and at her deposition how Epstein had a common scheme as a part of his JPMC-supported sex-trafficking venture. JPMC's motion, on the other hand, ducks the majority of Ms. Khodarkovsky's analysis, which shows how the evidence—even in the earliest stages of discovery—demonstrates that class-wide issues exist concerning JPMC knowingly benefitting from Epstein's sex-trafficking venture.

## **ARGUMENT**

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (internal citation omitted), *objections overruled*, 325 F.R.D. 55 (S.D.N.Y. 2018). Exclusion remains "the exception rather than the rule." *Feliciano v. CoreLogic Saferent, LLC*, 2020 WL 6205689, at *2 (S.D.N.Y. June 11, 2020). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" is not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, (1993)

When a motion to exclude expert testimony is made at the class certification stage,[1] the inquiry is "limited to whether or not the [expert report is] admissible to establish the requirements of [Federal] Rule [of Civil Procedure] 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009). In other words, "[t]he question is not, therefore, whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to liability, but rather whether [the Court] may utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (S.D.N.Y. 2000). Thus, a court's decision to consider an expert report at the class-certification stage is not dispositive of the question whether the report will be received at the merits stage. *Passman v. Peloton Interactive, Inc.*, 2023 WL 3195941, at *4 (S.D.N.Y. May 2, 2023).

## I.   Ms. Khodarkovsky Is Qualified to Opine on Sex Trafficking for Purposes of Class Certification.

In this Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *See Daubert*, 509 U.S. at 588–89; *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 831 (S.D.N.Y. 2018) (Rakoff, J.) (internal citation omitted) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has the equivalent relevant practical experience."); *see also* Wright & Miller,

---

[1] Neither the Supreme Court nor the Second Circuit has definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) ("The Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage."); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (noting in dicta that the Court "doubt[s] that" "*Daubert* did not apply to expert testimony at the certification stage of class-action proceedings" but not settling the question). But the Court need not weigh in on this debate today: Ms. Khodarkovsky's testimony easily clears the hurdles of both Rule 702 and *Daubert* at this class certification stage.

Fed. Prac. & Proc. Evid. § 6264.1 (2d ed.) ("'Experience' may also qualify a witness as an expert so long as it is obtained in a practical context."). If an expert's training and experience are in a field closely related to the area to the proposed testimony, that may, in appropriate circumstances, be sufficient to meet Rule 702's qualification standards. *See Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011). Ms. Khodarkovsky easily clears this hurdle and is qualified to opine on sex trafficking and financial infrastructure at the class certification stage.

Ms. Khodarkovsky has worked on between 50 to 100 sex trafficking cases over the course of her professional career. She graduated from the University of Michigan Law School, where she worked in the law school's Human Trafficking Clinic representing survivors of both sex trafficking and forced labor. Rep. at 37. Upon graduating, she completed a judicial clerkship with the Honorable Ronald D. Wigler in New Jersey. *Id.* She is currently a licensed attorney with the New York Bar, and has worked in a civil litigation law firm where she handled all aspects of civil cases, including class action matters. *Id.* From there, Ms. Khodarkovsky spent nearly a decade as a prosecutor at the Office of the New Jersey Attorney General, the New York County District Attorney's Office, and the U.S. Department of Justice. *Id.* at 36–37. She is currently the General Counsel and Head of Risk and Compliance for the Celo Foundation, a sustainability/financial-inclusion nonprofit; the founder and president of Chazak Consulting, a sole-member LLC firm focused on consulting services related to anti-money laundering, human trafficking, and child exploitation; a Board Member, Secretary, and Treasurer to the Association for Women in Cryptocurrency; and the strategic advisor to Veri Labs, a technology company, where she provides subject matter expertise related to anti-money laundering. *Id.* at 36.

At DOJ, Ms. Khodarkovsky served as a Trial Attorney and the sole Human Trafficking Financial Specialist in the Money Laundering and Asset Recovery Section, where she led

investigations and prosecutions of complex money laundering and financial crimes, including cases involving sex trafficking, forced labor, child exploitation and other victim crimes. *Id.* at 2. She was designated as lead prosecutor of her section to support DOJ's Joint Task Force Alpha to combat trafficking and worked closely with prosecutors from DOJ's Human Trafficking Prosecution Unit. *Id.* at 6. Ms. Khodarkovsky served regularly as a subject matter expert supporting cases around the country's U.S. Attorney's Offices. *Id.* She helped to provide best practices on how to investigate financial crimes, obtain necessary financial records, interview victims of trauma and assault, and present evidence to grand juries and trial juries. *Id.* at 3. As an example, she provided the subject matter expertise to the trial team on money laundering and forfeiture in *United States v. Backpage et al.*, No. 18-CR-422 (D. Ariz. 2018), where Backpage.com and its executives were charged with running a racketeering enterprise related to women and girls being forced to engage in commercial sex acts. Rep. at 4. She has conducted dozens of witness and victim interviews in cases involving sex trafficking and sexual abuse at both DOJ and the University of Michigan's Human Trafficking Clinic. *Id.* at 5.

Ms. Khodarkovsky has also provided dozens of trainings and presentations related to trafficking, financial crimes, and the intersection of the two. *Id.* at 7, 38–39. Just a few of those many engagements include:

- "Human Trafficking, Child Exploitation, Human Rights, and Violations & Sanctions" - Effective Strategies Series" – Thomson Reuters Special Services, Panelist, July 27, 2022, New York, NY;
- U.S. Department of Justice and Federal Bureau of Investigations – "How to Conduct a Financial Crimes and Money Laundering Investigation" – May 12, 2021, Virtual;
- U.S. Attorney's Office for District of Columbia – "Financial Investigations and Asset Forfeiture for Human Trafficking and Child Exploitation Cases" – Nov. 17, 2020, Virtual;
- Internet Crimes Against Children Task Force Conference – "Following the Money to Enhance Human Trafficking and Child Exploitation Cases" – Sept. 17, 2020, Virtual;

- U.S. Department of Justice, Project Safe Childhood Seminar – "Forfeiture and Restitution in Child Exploitation and Child Sex Trafficking Cases" – Mar. 4-6, 2020, Columbia, SC;
- U.S. Department of Justice and White House - Legal Aid Interagency Roundtable – "Importance of financial investigations, forfeiture, and restitution in human trafficking" – Feb. 21, 2020, Washington D.C.;
- U.S. Department of Justice's Human Trafficking Coordinators Training - Anti-Money Laundering and Financial Crimes; Asset Forfeiture & Restitution – Oct. 23-25, 2019, Columbia, SC.

*Id.* at 38–39. Ms. Khodarkovsky also co-authored the article "Prosecuting Sex Trafficking Cases in the Wake of the Backpage Takedown and the World of Cryptocurrency," which was published in the Department of Justice's Journal of Federal Law and Practice (May 2021). *Id.* at 9. She was the money laundering and forfeiture expert who helped to draft the White House National Action Plan to Combat Human Trafficking in 2020–21 and then the DOJ's National Strategy to Combat Human Trafficking (2011-2022). *Id.* at 10. Ms. Khodarkovsky worked with her DOJ money laundering section to draft and contribute to the National Defense Authorization Act of FY2021, and regularly provided training to DOJ components and U.S Attorney colleagues on the specific changes mandated by the Anti-Money Laundering Act (AML Act). *Id.* at 9–10. She has also helped DOJ draft and critique legislation for the assistance of members of Congress. *Id.* at 10.

All of this is but a sample of Ms. Khodarkovsky's vast professional experience working in the intersection of trafficking and financial crimes, which makes her well-qualified under the "liberal" admission standard to opine at the class certification stage on sex trafficking and how the necessary financial infrastructure can facilitate and support a sex trafficking enterprise. As explained in detail in her Report, based on her experiences and a preliminary review of the evidence in discovery, it is her expert opinion that common issues exist regarding whether Epstein ran a multi-victim, JPMC-funded sex-trafficking venture and subjected his victims to a common scheme and plan with JPMC's knowing support. There is a direct nexus between Ms.

Khodarkovsky's experience and training in sex trafficking and financial crimes and her testimony relating to Epstein's sex-trafficking venture and JPMC's role in it. That is all that is needed to meet Rule 702's qualification standards. *See Arista Records*, 2011 WL 1674796, at *3.

JPMC's arguments that Ms. Khodarkovsky is not qualified to opine on common features of sex trafficking are unpersuasive. For example, JPMC attacks Ms. Khodarkovsky because this is the first occasion for her being hired as an expert witness and having her deposition taken. Of course, if that were reason for disqualifying, then literally every expert witness be penalized for their first time being proffered in a lawsuit.[2] If anything, Ms. Khodarkovsky's recent experience in the field is a strength, not a weakness. JPMC also attempts to penalize Ms. Khodarkovsky for "[not] hold[ing] any credential other than her law degree" and for "major[ing] in Political Science and History." Mot. at 3, 3 n.2. JPMC's criticisms of Ms. Khodarkovsky's educational background are inapposite given her many years of actual work experience at DOJ, state prosecutor offices, a judicial clerkship, and elseqhere. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 445 (S.D.N.Y. 2015) ("[A]s to [the expert's] lack of academic experience . . . The word of an experienced trader about what traders are and are not allowed to do with information obtained during negotiations . . . is potentially worth far more than the opinion of any ivory tower academic."); *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008) ("[I]t is well-settled that, to be an expert, a person need not hold a particular degree or license."). For good measure, JPMC even faults Ms. Khodarkovsky for being an attorney. *See* Mot.

---

[2] JPMC also attacks Ms. Khodarkovsky on the ground that "this case is the second time she has ever worked on a class action in any capacity." Mot. at 3. Not only is this false in both citation (nowhere in lines 285:23-286:21 of her transcript does she testify to this) and in reality (Ms. Khodarkovsky has worked on at least three class actions lawsuits as a civil litigation associate), but it is irrelevant—Ms. Khodarkovsky is not offered as a "class action litigation expert" but rather on the commonalities existing in the sex trafficking and finance evidence in this case.

at 3. But "[m]erely being a lawyer does not disqualify one as an expert witness." *Hoactzin Partners, L.P. v. Fieldwood Energy, LLC*, 2019 WL 13210657, at *5 (S.D. Tex. Oct. 18, 2019) (finding attorney expert witness to be qualified to testify about commercial and business development aspect of the oil and gas business).

JPMC also paints a distorted picture of Ms. Khodarkovsky's experience at DOJ by cherry-picking citations from her deposition to suggest a lack of experience with trafficking issues. But Ms. Khodarkovsky testified that she was "***the*** subject matter expert from the Department of Justice related to investigating human trafficking, including sex trafficking cases, along with money laundering and financial crimes as part of those sex trafficking cases for other U.S. government partners." ECF No. 132-1 ("Khodarkovsky Dep.") at 21:10–16 (emphasis added). Ms. Khodarkovsky explained that at DOJ she "developed a lot of [her] knowledge of sex trafficking, of how to investigate and prosecute those cases, as well as how to train or teach others to use financial investigations or money laundering investigations to be able to bring . . . sex trafficking cases to bear." *Id.* at 22:4–10. She also explained that she was specifically hired by DOJ for the human trafficking finance specialist role and to "build out a program for [DOJ] focused on how to bring financial crimes and money laundering cases in sex trafficking and forced labor cases." *Id.* at 24:8–11. In sum, JPMC's attempts to downplay Ms. Khodarkovsky experience at DOJ by

pointing to notices of appearance[3] and charging decisions[4] are nothing more than "pure pettifoggery." *See Veleron*, 117 F. Supp. 3d at 445.

JPMC relies on either inapt cases where the proffered expert had no experience in the relevant area of expertise, *see, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559–560 (S.D.N.Y. 2004) (expert in diabetes case "admitted that he is not an expert on diabetes in the U.S."); *Hayes v. MTD Prod., Inc.*, 518 F. Supp. 2d 898, 901 (W.D. Ky. 2007) (no "objective proof" that witness was expert in "the field of riding mower safety" in mower defect case), or cases where the court did in fact find that the expert was qualified in at least some subject matter. *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 35 (S.D.N.Y. 2020) (finding proffered expert was "extensively qualified economist"); *Pearlstein v. Blackberry Ltd.*, 2021 WL 4131646 (S.D.N.Y. Sept. 10, 2021) (all four witness qualified to provide expert testimony); *Nimely*, 414 at 396 (overturning on grounds unrelated to qualification, but noting that "no substantial dispute

---

[3] JPMC's criticism about the lack of a formal "notice of appearance" in various cases is an odd one. Of the many qualified and seasoned lawyers representing JPMC in this matter, there are many who have not entered a notice of appearance, yet that is no reason to diminish their undoubtedly important contributions to their defense of JPMC. *See HVT, Inc. v. Port Auth. of New York & New Jersey*, 2018 WL 6079932, at *4 (E.D.N.Y. Nov. 21, 2018) ("The fact that Mr. Meola did not file a notice of appearance in this case does not prevent him from performing legal services on behalf of a client."); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1252 (10th Cir. 1998) (notice of appearance is not "the relevant question").

[4] Of the 50 to 100 sex trafficking cases Ms. Khodarkovsky worked on at DOJ, she of course did have the authority to make charging decisions and was involved in many cases where she determined whether or not to bring sex trafficking charges. JPMC appears to assume that the sample of cases Ms. Khodarkovsky listed in her report were the only cases she worked on, which could not be further from the truth. Ultimately, though, it matters little, as the instant case is, of course, a civil case with a preponderance-of-the-evidence standard, whereas Ms. Khodarkovsky's criminal cases involved the beyond-a-reasonable-doubt standard. Whether she would charge someone as a prosecutor in a criminal sex trafficking case and whether she can identify the existence of sex trafficking in a civil case like this one are two completely different inquiries. *Allred v. Chynoweth*, 990 F.2d 527, 533 n.4 (10th Cir. 1993) (noting the "vast differences" between preponderance and reasonable-doubt standards of proof) (citing *In re Winship*, 397 U.S. 358, 367–68 (1970)).

concerning [the] expert ['s] qualifications as a forensic pathologist"). Here, Ms. Khodarkovsky has extensive experience and knowledge in the area of expertise for which she was retained—sex trafficking, along with its financial implications.

At bottom, JPMC's complaints "as to the strength of [the expert's] credentials . . . go to the weight, not the admissibility, of [the] testimony." *Daubert*, 509 U.S. at 596; *Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 274 (S.D.N.Y. 2016) ("quibbles" with an expert's qualifications "are properly explored on cross-examination" and "go to the weight, not admissibility" of an expert's testimony). Ms. Khodarkovsky's experience in sex trafficking meet the "liberal" standard for admission.

## II.   Ms. Khodarkovsky's Analysis Is Reliable.

Ms. Khodarkovsky also meets the reliability prong under Rule 702 and *Daubert*.  The test for reliability is "flexible," and the court may, "but need not," consider the specified factors identified in *Daubert* which are testing, peer review and publication, assessment of error-rate, and general acceptance in the relevant scientific community. *Am. Railcar Indus., Inc. v. GyanSys, Inc.*, 2017 WL 11501888, at *19–23 (S.D.N.Y. Nov. 14, 2017) (Rakoff, J.) (cleaned up), *aff'd*, 764 F. App'x 57 (2d Cir. 2019). In cases where experts "draw a conclusion from a set of observations based on extensive and specialized experience," "the method is the application of experience to facts."  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 50 (S.D.N.Y. 2016).

Here, Ms. Khodarkovsky's analysis in applying her experience to the facts before her is reliable, particularly given the narrow scope of the testimony: whether common and recurring issues exist across the class.

A.   Ms. Khodarkovsky's Opinion Is Well Within Her Role as Expert.

JPMC accuses Ms. Khodarkovsky of improperly "usurping" the role of both judge and jury. Far from it, Ms. Khodarkovsky's opinions are well within her role as an expert witness and provide useful assistance at the class certification stage of this complex litigation.

JPMC asserts that Ms. Khodarkovsky "begins her analysis by telling the reader 'how ... crimes alleged like sex trafficking are defined.'" Mot. at 9 (citing Rep. at 12). Not true. Ms. Khodorkovsky begins the section of her report describing her opinions by explaining how "the necessary financial infrastructure can facilitate and support the sex trafficking enterprise." Rep. at 12. From there, the report provides some brief, prefatory background on the TVPA. *Id.* at 12–13. But "an expert opinion is not automatically inadmissible because it refers to the law." 1 Kenneth S. Broun et al., McCormick on Evidence § 16 (8th ed. 2020). "This is not a case . . . where 'the witness repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms.'" *Allen v. City of New York*, 466 F. Supp. 2d 545, 549 (S.D.N.Y. 2006).

Ms. Khodorkovsky is not opining on whether JPMC has violated the TVPA—or the BSA, FinCEN regulations, or any other statutes or rules. Rather, Ms. Khodarkovsky's references to the TVPA (to provide one example) concern the background facts that Doe and the putative class are asserting as a predicate for the opinions that follow. *See, e.g.*, Rep. at 13–14. Thereafter, against that backdrop, Ms. Khodarkovsky offers well-founded expert opinions to assist the Court in determining whether class certification is warranted in this case.

Any other approach would be incomprehensible. For example, Ms. Khodarkovsky could hardly describe the kinds of "coercion" that sex traffickers commonly deploy (*id.* at 14–15) without at least a brief discussion of the types of "coercion" made actionable under the TVPA (*id.* at 13). She is not purporting to "express[] a legal conclusion" (Mot. at 10) about whether Epstein actually

employed coercion—facilitated by JPMC's participation—but rather to describe the common issues of coercion that will be presented as the case moves forward. Report at 14–16 (describing common TVPA "coercion" issues).

While an opinion about whether Epstein's actions satisfied the TVPA's coercion requirements might be a "legal conclusion," an opinion about whether certain actions were common across the class "is merely an 'ultimate issue' and therefore the permissible subject of expert testimony" at the class certification stage. *Better Holdco, Inc. v. Beeline Loans, Inc.*, 2023 WL 2711417, at *25 (S.D.N.Y. Mar. 30, 2023). Ms. Khodarkovsky's opinions are admissible even if they embrace ultimate facts and issues. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). And, to be sure, the fact that Ms. Khodorkovsky is an experienced attorney in the sex-trafficking field does not disqualify her. *United States v. Fennell*, 381 F. Supp. 2d 1312, 1316 (D.N.M. 2005) (allowing testimony by attorney expert); *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1266, 1305–06 (D.N.M. 2004) (law professor).

In addition to common issues pertaining to "coercion," Ms. Khodarkovsky's report also contains many other examples of useful opinions on common issues in this case. Here again, she does not purport to define the law or resolve factual disputes. Instead, she uses her expertise to crystalize and spotlight widespread issues that will develop in the case regarding trafficking sex trafficking victims, financial aspects of sex trafficking, and the effect of banking laws and regulations on sex trafficking.  Here are some highlights of the common issues:

*Common Issues Regarding Sex Trafficking Victims*

- "Victims of sex trafficking may also feel coerced or threatened by what they perceive the stature of the person, who is recruiting or exploiting them may have." *Id.* at 14.

- "[I]n my experience working on cases and supporting the U.S.-Mexico Bilateral Human Trafficking Enforcement Initiative, I reviewed hundreds of telephone records, utility bills, airline tickets, and saw the use of cash by the traffickers and various accounts to control and threaten the victims, born abroad and in the U.S." *Id.* at 15.
- "Based upon the complaint, the preliminary review of publicly available information, and preliminary review of the discovery, my expert opinion is that Epstein had a specific modus operandi in how he trafficked and abused girls, which he repeated over and over again." *Id.* at 19.
- "It is also my expert opinion that the Epstein sex-trafficking venture operated as a venture to target vulnerable victims in common ways." *Id.* at 25.
- "It is common for traffickers and their facilitators to create a climate of fear in victims of trafficking by demonstrating their access to capital and professionals such as bankers, accountants, or lawyers." *Id.* at 25.
- "In my review of the complaint, publicly available reports, and preliminary review of the discovery, my expert opinion is that the volume of public reporting about the allegations of sexual abuse (and certain allegations of money laundering/Ponzi schemes), sexual assault, child sex trafficking and sex trafficking over the relevant time period related to Epstein and his co-conspirators, including reporting of Epstein's connections to prominent business leaders, attorneys, and politicians, could also serve to intimidate and make victims apprehensive and fearful to come forward for fear of not being believed." *Id.* at 33.

*Common Issues Regarding Financial Aspects of Sex Trafficking*

- "My expert opinion based on my experience investigating sex trafficking and money laundering cases, is that the fungibility of cash makes it much harder to trace once it has left the bank account, and especially if the bank has not filed timely suspicious activity or currency transaction reports to alert FinCEN or law enforcement of financial transactions or series of transactions that demonstrate indicia of criminal activity." *Id.* at 20.
- "The BSA and its implementing regulations require domestic banks and other financial institutions to establish and maintain programs to detect and report suspicious activity . . . Financial institutions must make certain disclosures, including filing Currency Transaction Reports (CTRs), Suspicious Activity Reports (SARs), and other reports pursuant to their BSA obligations." *Id.* at 24.
- "Based on my experience investigating sex trafficking and money laundering cases, my expert opinion is that Doe and the potential class members would all be impacted in a common manner by Epstein's continuous access to large amounts of capital." *Id.* at 27.
- "[A] majority of the issues that will likely be at issue in this case . . . appear to be common issues flowing from the defendant bank's financial support and funding of the Epstein sex-trafficking venture. . . . The plaintiffs' claims regarding whether such financial support is actionable under the TVPA could be established through common evidence." *Id.* at 29.

*Common Issues the Effect of Banking Laws and Regulations on Sex Trafficking*

- " . . . [T]he questions as to whether the bank followed proper procedures related to KYC, AML and reporting suspicious activity, does not appear that these violations differed significantly from victim to victim as discussed throughout my report as the bank's KYC, AML and reporting suspicious activity would be questioned by Doe and all class members not related to one isolated transaction, but regular transactions and series of transactions that occurred year after year." *Id.* at 28.

- "Many of the issues present in this case concern banking practices and regulations. Some of those issues may require expert testimony. Plaintiffs' claims could be established through common evidence, including (for example) common expert testimony." *Id.* at 29.

- "My review of the complaint and preliminary review of the discovery shows that the types of facts and issues I would explore in my financial investigations such as source of funds, opening and closing bank documents, cash deposits and withdrawals, wires and wiring instructions, payments to third parties, opening and closing numerous limited liability companies, high amounts of funding for air travel, transportation, gas, food, and lack of payroll records connected to business accounts, among others, would all be common facts . . ." *Id.* at 29–30.

These expert opinions about common issues do not "usurp" the Court's role in making the legal determination of whether class certification is appropriate under Rule 23. Instead, these opinions provide helpful information about sex trafficking and its financial components that would otherwise be impossible to understand. For example, as the Court is aware from resolving multiple discovery disputes, JPMC's obligations as a bank involve a veritable alphabet soup of acronyms and specialized terms. At issue here (among many other complex disputes) is whether JPMC faces liability under the TVPA for failing to discharge its obligations as a potential MSB under FinCEN's BSA regulations requiring the filing of CTRs and SARs to ensure KYC and AML compliance with rules against "structuring" cash withdrawals that lack an "apparent lawful

purpose."[5] It is unclear how JPMC proposes to wade into that regulatory thicket without an expert guide.[6]

JPMC also accuses Ms. Khodarkovsky of "impermissibly taking on the role of jury in interpreting the evidence." Mot. at 11 (internal quotation omitted). Here again, not so. Ms. Khodarkovsky is not *interpreting* the evidence, but rather *surveying* the voluminous and complex evidence. And then, having surveyed the available evidence, she uses her expertise in sex-trafficking issues to pinpoint common issues of fact that might not otherwise be apparent. This is the everyday fare of an expert opinion. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015) (economist's expert report properly "combed through [voluminous] sales reports, compiled and aggregated the data . . . and presented it in a more readily understandable format"); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016)

---

[5] The Trafficking Victim Protection Act (TVPA) is found at 18 U.S.C. §§ 1591–95. A definition of Money Service Business (MSB) is found in 31 CFR 1010.100(ff) (formerly 31 CFR 103.11(uu)). The Financial Crime Enforcement Network's (FinCEN's) authority is described in 31 U.S.C. §§ 310 et seq. and Treasury Order 180-01 (superseded by Treasury Order 180-01 in 2014). The Currency and Foreign Transactions Reporting Act of 1970 (which legislative framework is commonly referred to as the "Bank Secrecy Act" or "BSA") requires U.S. financial institutions to assist U.S. government agencies to detect and prevent money laundering. The BSA is sometimes referred to as an "anti-money laundering" law ("AML") or jointly as "BSA/AML." Several AML acts, including provisions in Title III of the USA PATRIOT Act of 2001, have been enacted since 1970. *See, e.g.,* 31 U.S.C. §§ 5311-5330; *see also* 31 CFR Chapter X (formerly 31 C.F.R. Part 103). These laws and regulations include various "Know Your Customer" (KYC) obligations. Among these are the requirements for currency transaction reports (CTRs), found in 31 C.F.R. § 1010.310 *et seq.* Other obligations can include the filing of Suspicious Activity Reports (SARs), as directed by 12 C.F.R. 21.11 *et seq.*

[6] JPMC complains that Ms. Khodarkovsky is "not offered as a banking or financial services expert." Mot. at 11 n.7. But she is offered as an expert in such closely aligned areas as "how the necessary financial infrastructure can facilitate and support the sex trafficking enterprise" and factual issues "concerning the financial institution's federal, state, and regulatory obligations that facilitated and supported the Epstein sex trafficking network, including the bank's due diligence, know-your-customer (KYC), and other risk protocols." Rep. at 12.

(experts may "synthesize[ ] or summarize[ ] data in a manner that streamlines the presentation of that data").

To provide one illustration, Ms. Khodarkovsky notes that a common factual issue will be whether "Epstein had a specific modus operandi in how he trafficked and abused girls, which he repeated over and over again." Rep. at 19. Here again, expert opinion on this factual issue of *modus operandi* will be helpful. To be sure, an opinion addressing "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help is not relevant and is therefore inadmissible." *United States v. Jiau*, 734 F.3d 147, 154 (2d Cir. 2013) (internal quotation omitted). But the *modus operandi* of sex-trafficking organizations is hardly a "lay matter." Ms. Khodarkovsky's opinion concerns the need for Doe and class members to present evidence regarding common issues of fact—issues related to being "manipulated about the nature of their visit to Epstein's home, groomed to believe that Epstein may help with their financial, medical, or educational needs, while being forced to engage in sex acts on him at his home in New York and elsewhere." Rep. at 19. Expert guidance on how such techniques as "grooming" are used by sex-traffickers will be helpful in making the class certification determination. And even if Ms. Khodarkovsky offers her expert opinion that Epstein—facilitated by JPMC—was engaged in grooming, it is clear that "[a]n expert may properly give evidence stating a factual conclusion even if it embraces an ultimate issue to be decided by the jury." *Allen*, 466 F. Supp. 2d 545, 549 (S.D.N.Y. 2006).

Remarkably, JPMC stakes out the position that "nothing" in the "documents or testimony" in this case "requires specialized knowledge, expertise, or skill to interpret." Mot. at 11. Here again, not so. To provide but one clear-cut illustration, a finder of fact might wonder why Epstein's co-conspirators made repetitive cash withdrawals from JPMC branches in amounts that almost

invariably fell below the $10,000 threshold for filing a Currency Transaction Report ("CTR" is the common acronym in the banking field). To the lay person, perhaps such a structure for the withdrawals was a matter of convenience. But through the eyes of an expert in sex trafficking, such withdrawals would immediately be a red flag of suspicious activity. These withdrawals would raise the possibility of "structuring"—that is, making withdrawals in a way designed to avoid triggering the bank's requirement of filing not only CTRs but also Suspicious Activity Reports ("SAR" is the common acronym in the baking field), which may then also evade law enforcement scrutiny. Ms. Khodarkovsky offers expert opinions in this area (*see* Rep. at 24), which will present common factual issues across the class. This is hardly something that a factfinder can be expected to assess without the use of expert testimony.[7]

Finally, Ms. Khodarkovsky's report also makes clear that she "offer[s] such expert testimony to assist the Court in its determination of class action status based on my knowledge, skill, experience, training, and education." *Id.* at 12. To the extent these opinions have led her to conclude that the common evidence available in this case may prove the elements of class certification, she is not opining on whether the ultimate legal standard for class certification has been met.[8] The Court will independently apply the law to specific factual issues a reach a

---

[7] JPMC's reliance on *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), a non-class action case, is misplaced. There, the plaintiffs' proffered expert witness, a medical doctor, gave testimony for which the sole apparent purpose was to "provide historical commentary of what happened" and "background" as to the medicine at issue in the case. *Id.* at 551. The court determined that testimony as to the "history of Rezulin" was unnecessary in the context of relatively "uncomplicated facts," so it excluded this "historian" witness. *Id.* Such is not the case here: Ms. Khodarkovsky's offers far more than the "history" or "narrative of the case," and the facts in this cases are anything but "uncomplicated."

[8] If the Court wants to reinforce the boundary against offering legal opinions, it can enter an order precluding that testimony—an approach it adopted in another case. *See Adrea, LLC v. Barnes & Noble, Inc.*, 2014 WL 8850434, at *1 (S.D.N.Y. Oct. 14, 2014) (Rakoff, J.) (rejecting *Daubert* challenges to witnesses on both sides but instructing that "[n]o expert will be permitted to opine on questions of law").

determination of whether to certify a class. There is no risk that the Court will fail to independently

fulfill its duty because of Ms. Khodarkovsky's expert opinions or substitute Ms. Khodarkovsky's

conclusions for its own. Rather, Ms. Khodarkovsky is offering her expertise in the sex trafficking

arena to the facts of this case to assist the Court in its own, independent application of Rule 23 and

determination of class certification.

     B.  <u>Ms. Khodarkovsky Relies on Sufficient Facts and Data.</u>

JPMC also claims that Ms. Khodarkovsky's opinions are too speculative and rely on

insufficient facts and data. Of course, Ms. Khodorkovsky submitted her initial report on March 1,

2023—three months before the close of fact discovery.[9] It is well-settled that "as the parties remain

engaged in merits discovery at the class certification stage, the information available to experts is

limited. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2019

WL 1569294, at *4 (D. Kan. Apr. 11, 2019); *cf. Adrea, LLC* (degree of speculation in expert's

testimony was "a function of the limited nature of the underlying evidence available in this case").

In light of the ongoing developments, this court should apply "a focused *Daubert* analysis which

scrutinize[s] the reliability of the expert testimony in light of the criteria for class certification and

the current state of the evidence." *In re EpiPen*, 2019 WL 1569294, at *4 ("the forthcoming class

certification determination is but a preliminary determination subject to reevaluation and

amendment in light of developments in the case").

Even on a limited record, Ms. Khodorkovsky states countless times in her report and (in

deposition) how she arrived at her well-founded conclusions about common issues:

> What I had said was that I believe that I reviewed materials in this case where I felt
> comfortable finding, in my opinion, based on experience, including what I
> reiterated in both my March 1st and the paragraph you are citing here, that the
> allegations of sex trafficking that Jane Doe and other victims of Epstein have put
> forward and that I reviewed all reflect that he had a method by which he identified

---

[9] Her Reply Report, too, was submitted weeks before close of fact discovery.

vulnerable victims and used those vulnerabilities to recruit them, groom them, and then exploit them, and he was able to do that because he was also paying them in cash and had the financial ability to do so in a cycle and pattern that he was engaging in. That's what I meant by my opinions in this case.

                      \*       \*       \*

Yeah. I think it goes really to the heart of what my opinion is, which is based on what I've reviewed, Epstein identified victims who were vulnerable and used that vulnerability to bring him – bring them, excuse me, into his orbit, into his world, manipulated them to believe that he could help them because of their vulnerability, and then ultimately exploited them with – to engage in commercial sex acts. And paid them for that. So the – the method or pattern that he used would be illustrated if someone like Jane Doe was to testify at trial.

                      \*       \*       \*

In this specific case, what I reviewed was that Epstein had a method by which he exploited and targeted women. So I based my opinion based on what I had reviewed. In other cases, if there was a different trafficker, there would be an evaluation of whether or not there was the same pattern or method of recruiting and exploiting. I don't necessarily need to know every nuance of circumstances, because, to me, what I have reviewed Epstein used and identified vulnerabilities and vulnerable individuals to target, to coerce into engaging into commercial sex acts with him for money.

Khodarkovsky Dep. at 126:16–127:8; 132:12–24; 123:4–17.

      Evidence obtained over the course of the discovery period confirms many of Ms.

Khodarkovsky's initial opinions. For example:

- ***Epstein's Use of Cash at JPMC.*** The total amount of direct payments from Epstein's accounts at JPM from 2003 to 2013 included approximately ▮ women for a total of $▮▮▮. Ex. 2.[10] This is in addition to the regular and numerous cash withdrawals of $▮▮ on a monthly basis from Epstein's one account ending in ▮▮ or payments to women in round who numbers including those of $▮▮ to $▮▮ range. Ex. 3. JPMC even sent emails confirming knowledge about Epstein's cash use, remarking in one: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 4.
- ***JPMC's Awareness of Epstein Accusations Regarding Trafficking/Abuse***. JPMC knew that Epstein was a convicted sex offender, was alleged to have a *modus operandi* of engaging "▮▮▮▮▮▮▮▮▮▮▮▮" and was aware of the accusations that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮" commenting that this "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 5. This JPMC knew all while ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 6.

---

[10] Citations to "Ex." are citations to the Declaration of David Boies, filed concurrently hereto.

One of JPMC's own executives even testified in his deposition about Epstein: "█████████████████████████████████████████████████████████████████████████████████████████████" Ex. 7 at 260:16–21. He further testified that Epstein "█████████████████████████████████████████████████████████████████████████████████████" *Id.* at 360:21–361:2.

- ***JPMC's Non-Routine Banking Services.*** As one example of JPMC's non-routine banking services offered to Epstein, JPMC opened a bank account for ████ ███████████ with no date of birth, no phone number is provided, an address listed as "████████████████████████████████" (Epstein address), noting that "████ ███████████████████████████████████████████████████████████████████████████████" Ex. 8 at 2. The occupation listed for Ms. Marcinkova is "████████" *Id.* Her source of wealth is "███████" "through modeling assignments" with "████████████████████████████████████████████" *Id.* at 3. ██████████████ 's social security provided to the bank "█████████████████████████████████████████████████████████" *Id.* at 4. The search on January 28, 2004 reports that "███████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.* It goes on to say that "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.*

- ***JPMC Visits to Epstein's Homes.*** JPMC staff visited Epstein's homes, including in New York and his island. Ex. 9 at 14–15. For example, Jes Staley visited his New York townhouse on at least eight occasions, Mary Casey visited him 2–3 times, Mary Erdoes was there two times, and Paul Morris (who became Epstein's banker after JPMC stopped servicing Epstein's accounts, *see* Ex. 10) on three occasions. Ex. 9. Jes Staley also visited Epstein in U.S. Virgin Islands on two occasions. *Id.* Erdoes testified during her deposition that she was aware that ████████████████████ Ex. 11 at 38:4–16.

Ms. Khodarkovsky also made clear in her deposition why she elected not to interview Doe or any other Epstein survivor, *i.e.*, based on her professional experience she did not want to re-traumatize them by forcing them to relive their terrible experiences with Epstein:

Q. Okay. Did you interview your clients, Jane Doe, your client in the JPMorgan case, Jane Doe, about her experience with Jeffrey Epstein?
A. I did not interview her because I believe that it could retraumatize her. And I relied on her deposition and statements that had been previously provided to her -- to the psychologist and also just in the record that I reviewed.
*     *     *
Q. Did you ask to interview any of those women?
A. I did not, for the same reason I stated earlier.
*     *     *

21

> Q. Okay. So fair to say you didn't interview anyone about their experiences with Jeffrey Epstein?
> A. That's correct. I chose not to interview the victims in order to prevent them from having to be retraumatized by talking to me again about their experience.

Khodarkovsky Dep. at 88:13–22; 89:14–17; 90:4–1. In addition to emphasizing this point, she also explained that she "reviewed materials that were complete enough to form an opinion based on my experience about the type of abuse and exploitation that Jane Doe alleged and is purported by other victims of Epstein." *Id.* at 109:15–19. Unsatisfied with Ms. Khodarkovsky's answer, JPMC insists that she should have pressed on with interviews because of Ms. Khodarkovsky's past experience interviewing witnesses at DOJ. This argument makes little sense. Ms. Khodarkovsky conducted witness interviews in the context of a federal criminal case in order to make ultimate prosecutorial determinations; here, she offers no opinion as to the merits of Doe's case, but rather opines on common issues amongst putative class members for the preliminary purpose of class certification.[11]

JPMC's primary example of Ms. Khodarkovsky engaging in "speculation" is in response to JPMC asking about an underage girl claiming she was in love with Epstein and claiming this somehow points to a lack of coercion. Setting aside JPMC's repugnant blame-the-victim tactics, JPMC does not even recount the full line of questioning and instead cherry-picks a single fragment. The full transcript provides a different picture of Ms. Khodarkovsky's answer—as well as the

---

[11] JPMC's argument that Ms. Khodarkovsky's own acknowledgement of the importance of witness interviews based on her experience obligates her to conduct them in this case collapses on itself: since Ms. Khodarkovsky has such vast experience with witness interviews, she of all people would know when they are necessary and when they are not.

One need look no further as to the re-traumatization of Epstein's survivors than JPMC's own conduct throughout this litigation, which includes (but is not limited to) subjecting the named Plaintiff and her family to numerous invasive proceedings that have retraumatized them repeatedly since Doe courageously filed suit. No other victim should be forced to endure such attacks.

unabashed shameful theory that JPMC is pursuing that underage girls could properly and lawfully

be manipulated by Epstein into performing commercial sex acts:

> Q. Okay. And you see here that in the second paragraph on this page there's a description of an interview of a 17-year-old who was asked to talk about Jeffrey Epstein, and who replied that she was so in love with Jeffrey Epstein and she would do anything for him and she would not speak to us -- with us about anything either negative or positive. Do you see that?
> A. I do see that, yes.
> Q. Okay. And would you agree with me that love is one reason why somebody might have sexual contact with Jeffrey Epstein?
> MR. VILLACASTIN: Objection.
> A. I believe that based on what I've reviewed, Jeffrey Epstein used the vulnerability of some of these women to make them they believe they loved him, and that's why they continued to engage in the relationship, and this does happen in other sex trafficking cases. That's part of the coercion that occurs, yes.
> Q. Sure. Sometimes when people say they are in love they've just been coerced and don't know what they are talking about, but sometimes people actually fall in love; right?
> MR. VILLACASTIN: Objection.
> A. In sex trafficking cases that I've had, there have also been victims who have said that they love their traffickers. There have been cases where victims have testified on behalf of their traffickers at trials in my experience, but that does not mean that they are not victims of trafficking.
> Q. I understand. But to determine whether somebody is fitting into the category you are describing, where they say they are in love but really they are a victim, or into the other category where they actually fell in love, wouldn't you want to talk to the person and understand all of the circumstances that led the person to say that?
> A. For specifically this particular individual, she is 17 years old at the time of this interview, and she may well believe that she is in love with Epstein. But he has used his methods that he uses on his victims to -- to make the young woman believe that she's in love with him. And this is typical of a certain type of trafficking where the victims do believe that they love the trafficker. For example, I have had cases that I have advised on where the trafficker is the only family that victim knows, and they are still a victim of trafficking. They're still being coerced. But they experience a feeling of love because the -- one of the reasons why they were victimized by their trafficker was because they may not necessarily have had someone else in their life. So what is being described in this report is, in my experience, typical of victims of trafficking.

Khodarkovsky Dep. at 195:21–198:14; *see also id.* at 200:20–201:18. JPMC is of course free to

advance its bizarre and illegitimate defense of Epstein's coercion. But nothing in that defense

renders Ms. Khodarkovsky's opinions somehow unreliable.

Not content with merely asking Ms. Khodarkovsky whether underage children falling in love with their rapist and trafficker negates coercion, JPMC doubles down by asking Ms. Khodarkovsky other offensive and implausible questions about:

- Whether she made any efforts to study how prevalent "voluntary participation" is in the commercial sex industry (*id.* at 118:23–25);
- Whether there was "no difference on the question of fraud, between being told you're coming to provide a massage and being told you are coming to provide a naked massage with touching, if what happens is you provided a naked massage and were touched" (*id.* at 218:11–16);
- Whether one of Epstein's victims is "entitled to decide for herself" that she "tolerate some gross behavior" in exchange for "being paid well, getting a rental car, having her tuition covered" (*id.* at 159:19–23);
- Whether she needed in to interview an Epstein victim who "compared herself to Heidi Fleiss, the famous madame" to "figure out whether they were in this category of consenting, voluntary engagement in sex work" (*id.* at 239:17–19; 240:25–241:2);

These questions epitomize JPMC's litigation strategy of shifting blame to the victims in an attempt to escape its own liability. When convenient for public relations purposes, JPMC starts its briefing with a concession that "Epstein's behavior was monstrous." ECF No. 135 at 1. But when it comes time to determine what evidence will be used in this case, JPMC sings a different tune of "voluntary participation" by Epstein's victims. JPMC cannot have it both ways.

It appears that JPMC's true complaint is that it disagrees with Ms. Khodarkovsky's opinions—including that Epstein had a common *modus operandi* in abusing and trafficking his victims which was knowingly enabled by and cash and other financial backing from JPMC.[12] But just because JPMC disagrees with Ms. Khodarkovsky's opinions does not mean her opinions are unreliable. *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018)

---

[12] JPMC's own expert could not deny that certain similarities existed among the many allegations against Epstein. *See* Ex. 1 at 131–35 (testifying that ██████████████████████████████ ██████████████████████████████████████████████████████████████████████.

(Rakoff, J.) ("The testimony of a party's expert must be evaluated within the context of that party's own theory of the case. As a result, where the legal or factual sustainability of a party's theory has not yet been decided, the possibility that such theory may be legally or factually deficient is not justification for concluding that, in the context of that party's theory, the expert's testimony is unreliable or unhelpful." (cleaned up)). JPMC's disagreement "is at best an avenue for cross-examination, rather than a disqualification from testifying." *Veleron*, 117 F. Supp. 3d at 445. Here, as in most cases, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" Ms. Khodarkovsky's opinions. *Daubert*, 509 U.S. at 596.

## CONCLUSION

For the reasons stated herein, Doe respectfully requests that the Court deny JPMC's motion to exclude Ms. Khodarkovsky as an expert witness.

Dated: May 22, 2023                                Respectfully Submitted,

                                             /s/ David Boies
                                             David Boies
                                             Andrew Villacastin
                                             Sabina Mariella
                                             Alexander Law
                                             Boies Schiller Flexner LLP
                                             55 Hudson Yards
                                             New York, New York
                                             Telephone: (212) 446-2300
                                             Fax: (212) 446-2350
                                             Email: dboies@bsfllp.com
                                             Email: avillacastin@bsfllp.com
                                             Email: smariella@bsfllp.com
                                             Email: alaw@bsfllp.com

                                             Sigrid McCawley (*pro hac vice*)
                                             Daniel Crispino (*pro hac vice*)
                                             Boies Schiller Flexner LLP
                                             401 E. Las Olas Blvd. Suite 1200

Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com

Bradley J. Edwards
Edwards Pottinger LLP
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954)-524-2822
Email: brad@epllc.com

Brittany N. Henderson
Edwards Pottinger LLP
1501 Broadway
Floor 12
New York, NY
Telephone: (954) 524-2820
Fax: (954) 524-2820
Email: brittany@epllc.com

*Counsel for Jane Doe 1*