NFQDDOE1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
JANE DOE, individually and on
behalf of all others similarly
situated,

          Plaintiff,                     New York, N.Y.

          v.                             22 Civ. 10019 (JSR)

JPMORGAN CHASE BANK, N.A.,

          Defendant/Third-Party
          Plaintiff.
------------------------------x
GOVERNMENT OF THE UNITED
STATES VIRGIN ISLANDS,

          Plaintiff,

          v.                             22 Civ. 10904 (JSR)

JPMORGAN CHASE, N.A.,

          Defendant/Third-Party
          Plaintiff.
------------------------------x
JPMORGAN CHASE, N.A.,

          Third-Party Plaintiff,

          v.

JAMES EDWARD STALEY,

          Third-Party Defendant.
------------------------------x          Argument

                                         May 26, 2023
                                         2:00 p.m.


Before:

                    HON. JED S. RAKOFF,

                                         District Judge
```

NFQDDOE1

1                                        APPEARANCES

2

3    BOIES, SCHILLER & FLEXNER, LLP
              Attorneys for Plaintiff Jane Doe
4    BY:   SABINA MARIELLA
              ANDREW VILLACASTIN
5              SIGRID MCCAWLEY

6    WILMER CUTLER PICKERING HALE & DORR, LLP
              Attorneys for Defendant
7    BY:   FELICIA H. ELLSWORTH
              HILLARY CHUTTER-AMES
8              ALAN SCHOENFELD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NFQDDOE1

1              (Case called; appearances noted)

2              THE COURT:  Good afternoon.  We're here on the

3     question of class certification.

4              I just got off the phone with counsel for the same

5     parties who were calling from the deposition of Diamond, I

6     think his name was, with a question, so you're missing all the

7     fun, folks, but here we are.  I think we ought to take up,

8     first, the question of whether the expert report of a Jane

9     Doe's putative expert should be considered on this motion.

10             I asked her to be here in case we had questions for

11    her, but I'll start with questions for counsel.  I guess my

12    first question is how does she pronounce her name?

13             MS. MCCAWLEY:  That's a better question for Andrew.

14    He's going to be handling the expert, and I'll be handling the

15    class certification.

16             MR. VILLACASTIN:  I didn't ask her this, your Honor,

17    but I think it's Khodarkovsky.

18             THE COURT:  So I'm looking at her report, and in the

19    end of the report, after some 30 plus pages, she says, in

20    paragraph 118, "given the above facts, and principles, and my

21    expertise in the area, I herein state the following summary

22    opinions:  One, class certification is appropriate here in this

23    multi-victim sex trafficking case where the victims allege that

24    they've been subjected to similar abuse, manipulation, and

25    coercive scheme by Epstein and his co-conspirators."

NFQDDOE1

| 1 | That sounds to me like an opinion of what legal |

1    That sounds to me like an opinion of what legal

2    conclusion the Court should make based on legal principles.

3    The law of the United States is clear, there's only one expert

4    on the law, and that is the judiciary, not any witness.

5         So should I strike that first opinion?

6         MR. VILLACASTIN:  I don't believe so, your Honor.

7         This is Andrew Villacastin on behalf of Jane Doe.

8         You can ask Ms. Khodarkovsky herself.  She testified

9    at deposition that she is not here to offer legal conclusions.

10        THE COURT:  Then why isn't it -- under something

11   called the English language, why isn't the sole meaning of that

12   first opinion a legal conclusion?

13        MR. VILLACASTIN:  So I would say it perhaps is a

14   matter of drafting.  I ensure you that the intend --

15        THE COURT:  Well, who drafted this?

16        MR. VILLACASTIN:  Ms. Khodarkovsky did.

17        THE COURT:  Did you review it?

18        MR. VILLACASTIN:  I did, your Honor.

19        THE COURT:  This is the penultimate -- this is where

20   she stated her opinions.  Everything else is a lead up to this.

21   That's why she starts this paragraph by saying, given the above

22   facts and principles, et cetera.  So I don't think it's a

23   question of wording or not.  I strike that first opinion.

24        Let's turn to the second opinion:  Class certification

25   is also appropriate, because Epstein and his co-conspirators

NFQDDOE1

```
 1    would not be able to engage in the decades long sex trafficking

 2    enterprise without access to capital, real and tangible

 3    property, and societal influence, without the financial

 4    infrastructure of this bank.

 5          Now, putting aside the apparent grammatical error in

 6    the last few words, where does her expertise include any

 7    expertise on the financial infrastructure of the bank, on

 8    societal influence, whatever the heck that means?  The most she

 9    seems to be saying is that he needed some money, although she

10    doesn't indicate what reason she has to believe that he

11    couldn't finance this with his own money; but I don't see where

12    her expertise, such as it may be, and that's been challenged of

13    course by your adversary, bears on any of that second opinion.

14          MR. VILLACASTIN:  So, in order to put a framework for

15    the way that the report was written, I understand that this is

16    the summary opinions and conclusions that appear at the end of

17    the report.  However, her opinions are scattered throughout the

18    report.

19          THE COURT:  So you want me to go pick and choose?  Oh,

20    there's something scattered in footnote 5.  Oh, my gosh.  How

21    could I have missed that?  Oh, and there, on page 29, in a half

22    a sentence is some other thing that she didn't include in her

23    formal opinions, but I should take that into account, too.

24          Is that what you're saying?

25          MR. VILLACASTIN:  Well, I believe, for example, in our
```

NFQDDOE1

opposition brief, we cited in pages 13 to 15 a number of common

factual issues that she identified with references to where

they were included in the report themselves.

THE COURT:  So now answer my question.  Why shouldn't

I strike that second opinion?

MR. VILLACASTIN:  It would make sense, for example, to

strike the beginning part, class certification is appropriate,

because, as you said, you are the only legal expert in this

case.  However, I would refer back to the balance of her

report.  And you asked what was the expertise.  The expertise

--

THE COURT:  Yes.  What's her expertise, aside from

what a jury would have on "societal influence?"

MR. VILLACASTIN:  For example, societal influence, a

lot of the allegations concerning Epstein and how he was able

to run his sex trafficking venture is based on his access to

influential people:  For example, bankers, lawyers, academics,

people who are in the front page of the news.  And based on her

experience, that is something that is used, that status, or

that perception of status is used to control the victims within

his venture.  So if, perhaps, another place to look at what her

expertise --

THE COURT:  I'm sorry.  Maybe I'm not following what

you just said.  If her opinion is that people with contacts,

prominent contacts will often have more influence than people

NFQDDOE1

who don't, or that people with money will often have more
influence than people who don't, I guess I have two reactions.
The first is, duh; and the second is, why do we need an expert
on that?

MR. VILLACASTIN:  I do think, your Honor, that it is a
matter of expertise, and her years of work --

THE COURT:  Her years of associating with people who
have prominent friends gives her that expertise?

MR. VILLACASTIN:  Not her personal involvement with
people with prominent friends, but investigating sex
trafficking ventures and organizations.

THE COURT:  Your adversary says she didn't do much in
this area; she never tried a case in this area.

MR. VILLACASTIN:  I think that's kind of an
unfortunate way to look at her experience.  She worked for
three and a half years for -- as the sole person within -- she
worked for the Department of Justice for three and a half
years, and she worked closely with the human trafficking
prosecution unit.  As we set forth in our brief, she was
involved in 5,200 cases, interviewed a number of sex
trafficking victims.

THE COURT:  What is her expertise on the financial
infrastructure of JPMorgan Bank?

MR. VILLACASTIN:  It doesn't have to be specific to
JPMorgan Bank, your Honor.  I would note that she served --

NFQDDOE1

| | |
|---|---|
| 1 | THE COURT:  So if it doesn't -- let's say it's the |
| 2 | infrastructure of Signature Bank.  What about that would be |
| 3 | relevant here? |
| 4 | MR. VILLACASTIN:  So, for example, perhaps it's a |
| 5 | matter of phrasing.  It's not the financial structure of |
| 6 | JPMorgan Bank or Signature Bank.  It's the financial structure |
| 7 | of a sex trafficking venture through the use of a bank.  So the |
| 8 | expertise, your Honor, is this is beyond a lay person's |
| 9 | capability.  She sifted through a multitude of financial |
| 10 | statements, including bank accounts, including spreadsheets of |
| 11 | financial records.  These are things that perhaps when |
| 12 | presented to you, you found it was helpful when she culled from |
| 13 | that set the specific documents that proved points, but the |
| 14 | ability, for example, to identify a pattern of withdrawals, or |
| 15 | a pattern of creating new accounts to be able to evade red |
| 16 | flags -- |
| 17 | THE COURT:  What's her expertise of that? |
| 18 | MR. VILLACASTIN:  Through her same experience in the |
| 19 | Department of Justice for three and a half years, her |
| 20 | continuing work in that space. |
| 21 | THE COURT:  She's not an economist, is she? |
| 22 | MR. VILLACASTIN:  She does not have a Ph.D. in |
| 23 | economy, but -- |
| 24 | THE COURT:  Has she ever worked for a bank? |
| 25 | MR. VILLACASTIN:  I don't believe so, your Honor. |

NFQDDOE1

```
 1    But, you know, as you said yourself in the Olin case, there is
 2    a liberal view "of the qualification or requirements of Rule
 3    702, at least to the extent that a lack of formal training does
 4    not necessarily disqualify an expert from testifying if he or
 5    she has equivalent relevant practical experience."
 6              I would submit here that --
 7              THE COURT:  I'm not sure that's part of the question
 8    I'm asking.  What is her practical experience, as opposed to
 9    simply being a prosecutor?
10              MR. VILLACASTIN:  A lot of it comes from her time as a
11    prosecutor, but during her time as a prosecutor, she developed
12    her skills, for example, to investigate financial institutions
13    such as JPMorgan, which puts her in a unique position to be
14    able to see how the transactions -- the management of the bank
15    accounts, and all of these things were used to facilitate
16    potentially Jeffrey Epstein's sex trafficking venture.
17              THE COURT:  As you also pointed out a minute ago, the
18    first part of that opinion is, of course, a question for the
19    Court.
20              MR. VILLACASTIN:  Absolutely, your Honor, and, again,
21    to put a framework of it, I do believe it is a matter of
22    drafting.  She was appointed as an expert for the purposes of
23    class certification.  Her opinions, however, are not legal
24    conclusions, but summaries of, you know, common factual issues.
25    And because it, you know, is within the context of class
```

NFQDDOE1

1    certification, this is perhaps, again, a drafting choice to

2    acknowledge the elements, perhaps place how her conclusions fit

3    within that framework, but in no means to suggest to the judge

4    that she is offering or trying to help reach a legal

5    conclusion.

6         THE COURT:  So the third opinion, the only other

7    opinion, is "the victims were subjected to a common scheme and

8    pattern on the part of Epstein and his co-conspirators, who

9    were able to advance such scheme due to defendant's role in

10   concealing and facilitating large cash withdrawals, opening and

11   maintaining of duplicative purpose business and checking

12   accounts, and regularly providing Epstein and his

13   co-conspirators with additional funds in the form of loans and

14   credit, while knowing of the widespread and dangerous sex

15   trafficking venture."

16        That seems to embrace every issue that the jury, if

17   this case goes to a jury, would have to decide.  What is it in

18   her expertise that she brings that would be different from what

19   the Court already knows in deciding class certification, or a

20   jury would know from common experience in deciding the merits?

21        MR. VILLACASTIN:  Again, your Honor, I would break it

22   into two parts:  One aspect is her expertise in sex

23   trafficking; the other is her expertise in the financial

24   infrastructure.  And both perhaps come from her years at the

25   Department of Justice, where, again, she was the human

NFQDDOE1

1    trafficking finance specialist, but also the trial attorney in

2    its criminal division for money laundering and asset recovery

3    section.  So while it is true that perhaps facts can be

4    presented to a jury, it is certainly helpful and useful to the

5    judge, who is a relevant audience at this stage, to have the

6    benefit of her report.

7            THE COURT:  All right.  Now, let me hear from counsel

8    for JPMorgan, who has raised a variety of other objections to

9    this expert, and then we'll hear again from counsel for Jane

10   Doe.

11           MS. ELLSWORTH:  Thank you, your Honor.

12           Felicia Ellsworth on behalf of JPMorgan.

13           So, as your Honor's questions have previewed, we've

14   raised essentially three separate challenges to

15   Ms. Khodarkovsky's report or opinion being considered by the

16   Court for class certification purposes.  The first is that

17   Ms. Khodarkovsky -- I'm sorry if I'm mispronouncing it -- does

18   not have the requisite expertise.  She holds herself out both

19   in the expert report that your Honor was just reading from and

20   reaffirmed for the deposition that she sat for that she is

21   seeking to be qualified as an expert in sex trafficking, not as

22   an expert on the internal workings of a bank, not as an expert

23   on the way the money flows.  An expert on sex trafficking.

24           And as we think we've made clear and tried to lay out

25   for the Court, we don't think she has an expertise to be

NFQDDOE1

qualified as an expert in sex trafficking.  She's an attorney.
She has --

THE COURT:  So just so I understand that first point,
really two points, you're saying, number one, you don't think
she has the expertise in sex trafficking; and, number two, that
doesn't make her an expert in societal influences, in bank
infrastructure, or all that other stuff?

MS. ELLSWORTH:  Correct.

I don't think she has the expertise to be an expert in
either of those things, but as she has put herself forward -- I
should say counsel for Doe has put her forward as an expert in
sex trafficking.  That is the way they chose to define her
expertise.  That is the way she chose to define her expertise
when we asked her about it in her deposition.  And I think as
has been clear from the briefing and the back and forth, the
sole thing that counsel is relying upon as providing her with
any expertise in sex trafficking is a three year and five month
stint in the Department of Justice.  Not in the Department of
Justice's human trafficking unit, but, rather, in a money
laundering unit.

During that time, she did not enter an appearance as
counsel --

THE COURT:  Of course anyone who served three and a
half years in the Department of Justice would be qualified as
an expert in endless bureaucracy, but that's not the issue

NFQDDOE1

1   before the Court.

2           MS. ELLSWORTH:  Not today, your Honor, no.

3           Again, as an attorney, as a trial attorney, she did

4   not enter an appearance in any of the cases that, again,

5   counsel for Doe and Ms. Khodarkovsky have put forward as

6   providing a basis for some expertise in sex trafficking.  Those

7   cases, most of them, were not even charged when she was with

8   the department.  For the few that were charged when she was at

9   the department, she wasn't involved in the charging decision.

10  And, again, very few of them even involved the Trafficking

11  Victims Protection Act.

12          So it's not that the whole three years and five months

13  that she spent in DOJ could even be attributed to expertise,

14  but, more importantly, what she doesn't have the background in

15  is the question really before the Court, which is, is this

16  issue susceptible to treatment on a class-wide basis.  And this

17  issue being the question of whether there's been a violation of

18  the Trafficking Victims Protection Act.

19          The expert reports that JPMorgan has put forward --

20          THE COURT:  Well, I think the allegations, not all of

21  them, but are that Mr. Epstein lured many young girls into his

22  sex venture by enticing them to, for example, give him

23  massages, which then became ever more erotic, and then paying

24  them off with money, and sometimes paying them additional money

25  to recruit other young women; and I don't see -- this may be

NFQDDOE1

1      more a question for your adversary when he stands up in a

2      minute.  I don't see why you need to be an expert to see that

3      if those allegations are true, they may well violate the sex

4      trafficking statute, and that if the money that he used to

5      carry this venture out was provided by a bank that knew or

6      should have known what he was up to, that they may be liable as

7      well.  Those are important issues, but I don't see where

8      expertise adds anything.

9              MS. ELLSWORTH:  Well, I agree that expertise, as to

10     the questions that your Honor just posed, is not -- or that

11     expertise in the form of expert testimony is not required.

12     Those are questions of fact and law for the Judge and jury as

13     to whether the facts are borne out, and whether those, in fact,

14     meet the elements of the TVPA.  Where expertise is relevant,

15     and where Ms. Khodarkovsky lacks the expertise, is the question

16     of what does -- what, in fact, does human trafficking look

17     like, what are the indicia of sex trafficking, what are facts

18     and circumstances that are not consistent with that.

19             THE COURT:  Now, it's not like we're writing on a

20     totally clean slate here.  So there was an indictment that was

21     issued by the Southern District of New York U.S. Attorney in

22     2019 against Mr. Epstein.  The grand jury that issued that

23     indictment found, to quote from paragraph one of that

24     indictment, "as set forth herein, over the course of many

25     years, Jeffrey Epstein, the defendant, sexually exploited and

NFQDDOE1

1    abused dozens of minor girls at his various homes."

2            It then goes on to, in paragraph two, say in

3    particular, "the defendant enticed and recruited and caused to

4    be enticed and recruited minor girls to visit his mansion in

5    Manhattan, his estate in Palm Beach, and other locations, to

6    engage in sex acts with him, after which he would give the

7    victims hundreds of dollars in cash.  Moreover, and in order to

8    maintain and increase his supply of victims, Epstein also paid

9    certain of his victims to recruit additional girls to be

10   similarly abused by Epstein.  In this way, Epstein created a

11   vast network of underage victims for him to sexually exploit."

12           Then it goes on for many pages to spell out more

13   details.  Now, those, of course, are findings by a grand jury

14   made on probable cause.  I see no reason why I can't take

15   account of them in deciding class certification.  What I'm

16   having real trouble seeing is what the expert report adds to

17   what the grand jury has already concluded.

18           MS. ELLSWORTH:  Well, I don't disagree with you there,

19   your Honor.  What I do think is before the Court, and what your

20   Honor will hear when you take up the next motion, is the

21   question of whether the experience of the individuals that are

22   members of the putative class that Doe's counsel seeks to

23   certify, in fact, is susceptible to treatment on a class-wide

24   basis, given differences in -- a wide variety of differences

25   and experiences that all those individuals experienced.

NFQDDOE1

1          THE COURT:  Yes, and that's a separate issue.  But,

2     again, that might have been perhaps the subject of expertise by

3     a psychiatrist or a psychologist, which was offered, for

4     example, in the case before Judge Nathan, but that's not the

5     kind of expertise that's being offered here.

6          MS. ELLSWORTH:  No, and I would just go on, your

7     Honor, in addition to Ms. Khodarkovsky's expertise as an expert

8     in sex trafficking, we do have other reasons why we think the

9     Court should exclude the opinion, and let me go through those

10    quickly.  And I'm happy to answer any questions.

11         The second reason, in addition to the Rule 702,

12    failure to actually have the expertise is building off some of

13    the questions your Honor was asking counsel for Doe earlier,

14    which is a vast majority of the report and opinions being

15    offered are either legal conclusions, about the legislative

16    history of the TVPA, or about the elements of the offense,

17    which are not the appropriate subject of expert testimony, or

18    simply what I would call a recitation of facts and serving as

19    what is called by some Courts a mouthpiece for the lawyers in

20    providing information about why, or purporting to provide

21    information about why the discovery, the limited discovery,

22    frankly, that Ms. Khodarkovsky reviewed, she believes meets the

23    elements of the offense.  That, of course, is the province of

24    the jury in this case, or the Judge, if it's tried to the

25    bench.

NFQDDOE1

1          So, really, the vast majority of the 30 plus pages

2     that your Honor was looking through contain conclusions or

3     information that are not the subject of expert testimony at

4     all.  They usurp the Judge.  They usurp the jury.  Beyond that,

5     there is also the question of the reliability of the

6     information that Ms. Khodarkovsky relied on in arriving at

7     these conclusions both in her initial report and in a reply

8     report after both more discovery had occurred in the case and

9     after she had had the opportunity to review the expert report

10    submitted by JPMorgan in opposition to class certification.

11          There were two expert reports:  One from an expert in

12    sex trafficking who has been qualified as an expert in numerous

13    courts and used by the Department of Justice frequently in sex

14    trafficking prosecutions; and one by a medical doctor who had

15    conducted an analysis, an assessment of the named plaintiff in

16    this case.  And how different experiences may have been

17    experienced by that individual from a medical, psychiatric

18    perspective.

19          In response to that, Ms. Khodarkovsky submitted a

20    reply report that did nothing more but continue to parrot not

21    even all the discovery in the case.  She did not review the

22    Epstein victims' compensation program data that was produced in

23    response to this Court's order that it be produced in response

24    to JPMorgan's subpoena.  A huge trove of data was produced in a

25    spreadsheet and summary format that has been submitted to the

NFQDDOE1

Court in connection with class certification, and that

Ms. Khodarkovsky could have looked at to determine the

similarities, if any, between the putative class members and

the many, many differences between them.

She didn't review any of it at all.  She didn't review

any of the proposed class members, including the named

plaintiff, or the 50 or so other individuals who purport to be

represented, or who class counsel purports to represent, to

have an understanding of those individuals' experience, and to

use that to support her proposed opinion about the

appropriateness of treating all of these cases as a monolithic

class.

So there are a variety of different problems, we

think, with this report, and the reason we brought this motion

is we don't think your Honor should consider it at all in

considering class certification and using your gatekeeper

function.  And, in particular, because it is the primary, or

one of the primary sources on which the plaintiffs rely in

support of their motion for class certification.

They quote heavily from the First Amended Complaint,

and from Ms. Khodarkovsky's two reports.  That's the primary

basis for their --

THE COURT:  Well, we'll get to that point in a minute,

but that's why I brought to your attention what the grand jury

found, because those are findings of fact.  They're not binding

NFQDDOE1

on me, but they were -- you talked about something the Court can take cognizance of.

MS. ELLSWORTH:  And I think the way the Court could use those grand jury findings would be to ascertain something not contested, which is Mr. Epstein was engaged in horrendous criminal activity, including sex trafficking.  That's not something being contested at all by JPMorgan.

The question here is the experiences of those individual victims are sufficiently similar such that they can be treated on a class-wide basis.

THE COURT:  We are getting a little more into what I wanted to get to in a little while, but what the heck.  If, in fact, he engaged, as the grand jury found, as specific modus operandi, and that involved numerous, as the grand jury found, young girls, and then from the standpoint of class certification, assuming there is evidence that the money that he needed to run this venture came from JPMorgan Bank, and assuming, which of course is contested, but assuming for these purposes that JPMorgan Bank knew or should have known that that's what the money was being used for, what does it matter that any given victim may -- that there may be some nuances in their particular situation?

MS. ELLSWORTH:  Well, I'll let Mr. Schoenfeld address these in greater detail when we argue that motion, but let me say this.  The evidence that has been adduced in this case to

NFQDDOE1

date has shown not nuances in the experience but, in fact,

very, very different types of experience in terms of duration,

location, you know, payment, or lack thereof, involvement in

enticing others to be a part of the organization, or not.

THE COURT:  Yes.  Well, rather than interrupt you on

that, let's go back to what you were talking about, and I think

it's time to hear from your adversary on the expert report,

because I remain, to be frank, very skeptical that this report

adds anything material to the Court's consideration.

MS. ELLSWORTH:  Thank you, your Honor.

THE COURT:  Thank you.

MR. VILLACASTIN:  Your Honor, there were a number of

topics discussed, so I want to make sure that I hit them in the

order that they were discussed, but also to pivot to whatever

you want to focus on.  The first is the allegation that

Ms. Khodarkovsky doesn't have the relevant expertise, and I'll

quote to you from the advisory notes to Rule 702, which says

"the text of Rule 702 expressly contemplates that an expert may

be qualified on the basis of experience."

Now, we heard argument from Ms. Ellsworth that she was

not a member of the human trafficking unit of the Department of

Justice.  That's admitted.

THE COURT:  No, I think what they're talking about in

that advisory note is like if you had a case involving a frozen

pipe in your basement, and someone was offered to opine as to

NFQDDOE1

the cause, you could offer a plumber.  A plumber could say,

I've looked at 40,000 frozen pipes, and, in my experience, they

freeze because of insufficient insulation, or insufficient

construction, or insufficient design; and I've looked at this

particular frozen pipe, and I can see that it wasn't -- there

was plenty of insulation, so it wasn't a lack of insulation;

and it was properly connected up to the other pipes, so it

wasn't improperly constructed; and so it must have been, based

on my experience, bad design.

       That's what they're talking about.  That's not what

she has.

       MR. VILLACASTIN:  Your Honor, what you provided is one

example of where expertise would be relevant, but this is

another example.  For example, you mentioned the phrase "modus

operandi" before.  In the same way that --

       THE COURT:  I mean, to state -- I'm sorry.  I keep

interrupting.  Go ahead.

       MR. VILLACASTIN:  No.  No.  In the same way a plumber

who has dealt with a number of pipes throughout the course of

his career can gain an expertise that's admissible under the

flexible standard governing *Daubert*, in the same way a person

who has interviewed, for example, up to 100 sex trafficking

victims would gain relevant expertise as to whether or not

someone such as Jeffrey Epstein would have a modus operandi.

       I agree, for example, that you read from an indictment

NFQDDOE1

1    that provided findings of fact, and I don't dispute necessarily

2    that any report would be necessary, but the inquiry here is not

3    whether it's needed.  The inquiry is whether or not the report

4    is useful and the testimony is useful.  And here, certainly,

5    based on her qualifications -- and I do want to correct

6    something.

7            THE COURT:  Your adversary pointed out that it's

8    riddled with legal conclusions, and the fact that the expert

9    disclaims that she's giving any legal opinion, a much crueler

10   judge than me might describe it as hypocrisy.

11           MR. VILLACASTIN:  I agree, and that's why we're lucky

12   that we're before you, your Honor, because there was no doubt

13   in my mind that you even needed a *Daubert* hearing in the first

14   place, because you are certainly qualified and, you know,

15   perhaps willing to, you know, know immediately whether or not a

16   certain sentence or paragraph describes a legal conclusion

17   which you would not accept.  However, you can also identify,

18   within the balance of her report, the factual conclusions that

19   she has framed as common questions, which would assist you.

20           One thing I wanted to hit was whether or not she was

21   offered, for example, solely for sex trafficking.  To be clear,

22   she was offered for sex trafficking, but I'll direct the Court

23   to page 16, note 6 of our opposition, which quotes from her

24   report at page 12; and it lists a litany of things where a lay

25   person would certainly benefit from the testimony of

NFQDDOE1

```
1    Ms. Khodarkovsky's expertise.  Due diligence.  KYC, for
2    example, is not known to lay people as "know your customers."
3    The myriad of financial regulations that govern banking
4    conduct, and how --
5              THE COURT:  Let's consider all that.  Aren't those
6    regulations laws?
7              MR. VILLACASTIN:  Absolutely, your Honor.
8              THE COURT:  Isn't the only expert on the laws the
9    Court?
10             MR. VILLACASTIN:  On the law, yes, your Honor, but
11   perhaps you are not an expert on how sex trafficking ventures
12   structure their withdrawals or, you know, pick the number of
13   bank accounts in order to evade those regulations.  So
14   familiarity with policies, procedures, and how, you know,
15   financial institutions structure their policies and procedures
16   to comply with those laws and how, on top of that, sex
17   trafficking ventures would evade that, that's not an issue of
18   law.  That's an issue of fact, your Honor.
19             THE COURT:  Where does she state that she is being
20   offered as an expert in banking practices?
21             MR. VILLACASTIN:  I read, again, in the report on page
22   12, and we summarize it --
23             THE COURT:  Hold on.  Just let me take a look at it.
24   Page 12.
25             All right.  Here's what I think you're referring to.
```

NFQDDOE1

1    Paragraph --

2            MR. VILLACASTIN:  Thirty-nine.

3            THE COURT:  -- 39, yes.  "In this matter, I am

4    offering my expert testimony regarding human trafficking,

5    specifically sex trafficking, and how the necessary financial

6    infrastructure can facilitate and support the sex trafficking

7    enterprise, including, one, the common factual issues

8    concerning the application of the chapter 77 statutes,

9    including what issues will likely be raised in assessing the

10   plaintiffs' claims and what are typical, common, and reasonable

11   responses of victims to direct and structural forms of

12   coercion, especially in situations involving sex trafficking,

13   sexual abuse and assault, and other chapter 77 offenses.

14   Additionally, the factual issues concerning the financial

15   institutions' federal, state, and regulatory obligations that

16   facilitated and supported the Epstein sex trafficking network,

17   including the bank's due diligence, know your customer, and

18   other risk protocols."

19           Now, most of that is, such as all the reference to

20   chapter 77, to sex trafficking, but where she says how the

21   necessary financial infrastructure can facilitate and support

22   the sex trafficking enterprise, is she saying that because it

23   was necessary, the bank had no choice?

24           MR. VILLACASTIN:  I missed that.  Which sentence were

25   you reading, your Honor?

NFQDDOE1

```
 1              THE COURT:  The very first sentence in paragraph 39.
 2   "In this matter, I am offering my expert testimony regarding
 3   human trafficking, specifically sex trafficking, and how the
 4   necessary financial infrastructure can facilitate and support
 5   the sex trafficking enterprise."  I'm saying, is she saying
 6   there that -- what does she mean by "necessary financial
 7   infrastructure?"
 8              MR. VILLACASTIN:  Right.  Every sex trafficking
 9   operation needs a way to move cash in order to finance the sex
10   trafficking operation.  You know, I understand perhaps the word
11   "necessary" is a little redundant when the balance of the
12   sentence says "can facilitate and support the sex trafficking
13   enterprise," but certainly a large component of this case,
14   perhaps the crux of this case is JPMorgan's actions, and how he
15   was able to use his accounts with JPMorgan to --
16              THE COURT:  No, but so if the issue that you're
17   referring to, which is, of course, a central issue in this
18   case, is whether, when they gave him money in various
19   arrangements, JPMorgan knew or should have known, because
20   there's a negligence count here as well, that he was using that
21   money to facilitate his sex trafficking venture, where does her
22   expertise bear on that at all?
23              MR. VILLACASTIN:  It's precisely to the "knowingly
24   benefited," your Honor.  In, for example, the TVPA claim,
25   certainly you'll have a number of deposition witnesses, for
```

NFQDDOE1

example, that will throw their hand in the air and say, there's

no way I could have known until, for example, a news article

hit, or he was arrested, but her expertise in actually combing

through the filings that were made, or weren't made, whether or

not currency transaction reports were issued, suspicious

activity reports were or weren't issued, and the underlying

activity within her accounts, that is all within a matter of

expertise that is beyond that of a lay person.

          THE COURT:  I thought I saw in one of your briefs the

notion -- the suggestion that the Court could not possibly know

about suspicious activity reports.  Is that because I've been

asleep during the 99 cases or so that have referred to those?

          MR. VILLACASTIN:  Certainly we all -- again, it's

not -- the standard isn't necessary, and certainly you're a

very experienced and intelligent judge.  However, it's still

helpful to you --

          THE COURT:  You ought to talk to my wife, and she'll

give you the contrary view, but go ahead.

          MR. VILLACASTIN:  No, and perhaps a lot of the things

that come before you are after a suspicious activity report had

already been filed.  Her expertise is before a suspicious

activity report has been filed, before a currency transaction

report has been filed.  In the absence of that, when people

have been structuring their activity to evade such reports, her

ability to ferret out that information through a meticulous

NFQDDOE1

1    review of the financial data, which is beyond the abilities of

2    the normal lawyer --

3              (Continued on next page)

N5QGdoe2

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | THE COURT:  No, but just to break that down -- and                     |
| 2  | maybe I'm missing your point -- so you could well have evidence         |
| 3  | at trial and at this stage as well, that if they had followed           |
| 4  | the legally binding requirements, they would have filed the             |
| 5  | suspicious activity report, but they didn't -- although there           |
| 6  | are plenty of times when they did, and that's another part of           |
| 7  | your argument as to why they knew what was going on -- but              |
| 8  | those are two separate points.  If your further point is that           |
| 9  | not only did they not file a suspicious activity report when            |
| 10 | the regulations said they should have, but they disguised it in         |
| 11 | such a way to avoid that obligation, that's an interesting              |
| 12 | factual matter, but I don't see where her expertise brings              |
| 13 | anything additional to that discussion.                                 |
| 14 | MR. VILLACASTIN:  I didn't know who the subject of                      |
| 15 | your sentence was, in terms of who disguised it.  For example,          |
| 16 | it could have been Epstein and his cohorts who structured their         |
| 17 | financial transactions.  But specific to the conduct of                 |
| 18 | JPMorgan, their employees, we allege, should often have picked          |
| 19 | up on this suspicious activity or on ways in which they were --         |
| 20 | THE COURT:  Right.  But that sounds like, at a                          |
| 21 | minimum, a question of negligence.  Where is her expertise?  I          |
| 22 | know what the law of negligence is, and I'll be able to apply           |
| 23 | it in resolving this motion and in instructing the jury.  Where         |
| 24 | is her expertise, anything other than just telling me what I            |
| 25 | learned in first year tort class?                                       |

N5QGdoe2

 1          MR. VILLACASTIN:  I mean, negligence would be for

 2    JPMorgan and its employees to say that they had no idea and

 3    they took reasonable care and couldn't detect it.  Her

 4    expertise and her experience looking at financial transactions

 5    and how they're structured by sex trafficking ventures would

 6    assist in that determination, did they really not know, is that

 7    really what happened?  Or is it that they turned a blind eye

 8    when they had sufficient indicia to either terminate Epstein

 9    from his customer relationship with JPMorgan or, again, file or

10    alert the authorities, do anything that would have stopped at

11    any year in our class period --

12          THE COURT:  Well, even on that -- and I'm not sure she

13    is giving that information -- but that goes to the credibility

14    of a particular witness.  That's not what she's offering her

15    expertise here.  She's offering her expertise on class

16    certification.

17          MR. VILLACASTIN:  Right.  First of all, there is

18    common evidence concerning the bank's knowledge -- what I think

19    my colleague, Ms. McCawley, will get into later -- but from her

20    review of the records, she can identify the same employees at

21    JPMorgan who looked at the same documents or the same

22    transactions and should have reached perhaps different

23    conclusions, based on what was available to them at any point

24    in time in the class period.

25          Again, this is not something that would not benefit

from an expert with expertise in reviewing financial records,
years prosecuting and assisting in the prosecution of money
laundering operations.

THE COURT:  All right.  Anything else you wanted to
cover?

MR. VILLACASTIN:  Just small things.  They kind of
impugn her qualifications by saying she was not part of the
human trafficking unit.  I refer to her report in our brief,
she worked closely with that unit.  Ms. Ellsworth mentioned
that their experts were psychologists and psychiatrists.
Certainly, that's not a requirement at any point for rule 702,
just like a plumber could be qualified based on an expertise,
so should Ms. Khodarkovsky, where her expertise is far more
relevant than anything that can be provided by an advanced
legal degree.

One other issue that came up, again, is the amount of
materials that she reviewed in the course of issuing either of
her two reports; her opening and her reply.  I do think the
Court has to be aware of the schedule that was in place.  She
submitted her opening report on March 1st, which is when only
two productions from JPMorgan had been made, no depositions had
taken place.  She has of course since caught up with her review
of the materials, but even when her reply report was issued on
April 24th, we still did not have access to the EVCP material.
She reviewed that because it was produced a day or two before

N5QGdoe2

1     her deposition.  And to correct Ms. Ellsworth, she did review

2     the spreadsheet, for example, she did review the productions

3     from the Epstein Victims Compensation Fund, but the fact of the

4     matter is, it doesn't change her opinion.  I'm not aware of

5     your familiarity with what was produced, but it was in heavily

6     redacted form, it was --

7              THE COURT:  I'm not particularly bothered by that.

8     But a different point is the reason it usually doesn't even

9     matter what discovery has been provided is that an expert is

10    providing general principles and methodologies, that's what

11    rule 702 requires, a reliable methodology.  I'm not seeing here

12    what her methodology was, I'm not seeing here what her error

13    rate is, I'm not seeing here compliance with any of the aspects

14    of Daubert.  Now, it's true that Daubert says that those four

15    or five factors, depending how you count them, are not

16    absolutely required and that the Court has to apply a flexible

17    approach, but nevertheless, it's relevant to look at those

18    factors and it doesn't look like she complied with any of them.

19             MR. VILLACASTIN:  As the Court noted, those factors

20    are flexible.  In terms of whether or not an error rate would

21    exist in this type of analysis, it just doesn't apply.  Here,

22    certainly, she has sufficient facts, she was able to review the

23    discovery that was in place at the time, and she relied on her

24    experience, which is certainly a basis for qualifying an

25    expert.  The methodology would be relying on --

N5QGdoe2

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | THE COURT:  Daubert and its progeny changed all that.                  |
| 2  | It used to be that all you had to show was that you were               |
| 3  | testifying to something that was not within the common                 |
| 4  | experience of the finder of fact -- query whether she even             |
| 5  | qualifies there, but let's assume for the moment that she              |
| 6  | does -- then the law was dramatically changed by Daubert and           |
| 7  | its progeny.  Daubert, of course, was directed at scientific           |
| 8  | evidence, and it got then extended in Kumho Tire and other             |
| 9  | cases, but to say that it's just sufficient to say she's got           |
| 10 | some relevant experience from a time that she looked at some of        |
| 11 | these other cases when she was at DOJ is, I think, not in              |
| 12 | keeping with the kind of, quote, rigorous analysis, close              |
| 13 | quote, that the Supreme Court has repeatedly said that a judge         |
| 14 | must exercise in a Daubert analysis.                                   |
| 15 | MR. VILLACASTIN:  Certainly, the case law repeats that                 |
| 16 | Daubert is a rigorous inquiry.  However, it is still the case          |
| 17 | that, under Second Circuit precedent, rule 702 embodies a              |
| 18 | liberal standard of admissibility.  And especially at class            |
| 19 | action classification, the inquiry is cabined by the purpose,          |
| 20 | which is looking for whether or not you can establish the              |
| 21 | requirements of rule 23.                                               |
| 22 | I do think the nature of the expertise differs.  This                  |
| 23 | is not a damages expert doing regression analysis where the           |
| 24 | typical factors of Daubert or Kumho would apply.  Here, again,        |
| 25 | using a flexible approach, she reliably based her opinions on         |

N5QGdoe2

her expertise and on her practical experience and then reached
the conclusions that she did.

THE COURT:  Thank you very much.

Anything else that defense counsel wanted to say,
because I do want to move on.

MS. ELLSWORTH:  No.  Thank you, your Honor.

THE COURT:  So let's turn to class certification in
general.  While it's ultimately the plaintiffs' burden, I want
to go back to defense counsel first.

Your colleague has just acknowledged, as indeed
JPMorgan has repeatedly, that they do not dispute, you do not
dispute that Mr. Epstein was engaged in a longtime sex
trafficking venture that involved enumerable young women and
that required money to make it work.  And I also don't believe
you dispute that, during the relevant period -- or at least
part of the relevant period -- that money was coming from
JPMorgan.  And therefore, one would think that this easily
satisfies class certification for any of the victims of
Mr. Epstein and that the only real question is whether JPMorgan
knew or should have known what Mr. Epstein was up to.

MR. SCHOENFELD:  Certainly, your Honor.  So I think
the indictments are actually a great place to start with that.
The Epstein indictment, even though it was issued in 2019,
covers only the period 2002 to 2005.

THE COURT:  Yes, that's true.  And why does that not

N5QGdoe2

```
 1    cut against you?  Because it shows -- for example, you attack
 2    via your papers, numerosity -- it shows that even during that
 3    short period, there were dozens of victims.
 4              MR. SCHOENFELD:  So I'll get to the victims in one
 5    moment.  I don't think it says dozens.  In any event --
 6              THE COURT:  Excuse me.  Let's look at the indictment.
 7              The first sentence, "As set forth herein, over the
 8    course of many years, Jeffrey Epstein, the defendant, sexually
 9    exploited and abused dozens of minor girls."
10              MR. SCHOENFELD:  Your Honor, I think the critical
11    point is --
12              THE COURT:  So it does say dozens?
13              MR. SCHOENFELD:  It does, but it says --
14              THE COURT:  Thank you.
15              MR. SCHOENFELD:  So I take your point.  But it also
16    says "sexually exploited and abused," and I think one of the
17    critical elements of the indictment is that there's only one
18    sex trafficking charge, and it's not as to all of the victims
19    identified in the indictment; it is only as to Minor Victim 1.
20    Even though many of the --
21              THE COURT:  Dozens of minor victims.
22              MR. SCHOENFELD:  Dozens of minor victims, again --
23              THE COURT:  In a short period of time, whereas the
24    complaint raises a much longer period of time.
25              MR. SCHOENFELD:  It does.  And so I would like to make
```

N5QGdoe2

1    two points on that.

2            First, the period, 2002 to 2005, which again, in 2019,

3    the Southern District of New York chose to charge Mr. Epstein

4    on, is clearly time barred.  There's a ten-year statute of

5    limitations under the TVPA.  With respect to that period, I

6    think it's critical that the indictment talks a lot about

7    different victims of Mr. Epstein's sexual exploitation and

8    sexual abuse, but then it only makes one sex trafficking charge

9    and only as to MV-1.

10           It's also important that the victims in this

11   indictment are minors.  Minors do not require a showing of

12   fraud, coercion or force, which is an important individualizing

13   factor.  If you look at -- and of course, the plaintiff in this

14   case was not a minor during any time that she was abused by

15   Mr. Epstein.

16           If you look at the Maxwell indictment, which is also

17   in the record, it's even more stark.  That indictment was

18   issued in 2020.  It covers even an earlier period, 1994 to

19   2004, and while it recites a number of victims, MV-1, MV-2,

20   MV-3, MV-4 and has conspiracy charges about taking women

21   outside the United States for purposes of -- I think it refers

22   to -- sexual assault, there's again only one sex trafficking

23   charge, and that's as against MV-4, so --

24           THE COURT:  Wait a minute.  Didn't I hear your

25   colleague about ten minutes ago say that you do not dispute

N5QGdoe2

```
 1   that Mr. Epstein was engaged for many years in a sex

 2   trafficking venture?  Did I mishear that?

 3           MR. SCHOENFELD:  I don't recall the specific words she

 4   used.

 5           I think the critical point -- and I don't mean to

 6   argue with the Court or my colleague -- I think the critical

 7   point --

 8           THE COURT:  Well, if you want to argue with a

 9   colleague, you can go outside.

10           MR. SCHOENFELD:  I think the critical point for class

11   certification is that the sex trafficking statute is very

12   particularly written and there are very specific requirements.

13   It needs to be a commercial sex act, as defined in the statute,

14   not any other form of sexual abuse, no matter how odious; not

15   sexual exploitation, not all forms of sexual abuse.  And for

16   victims who were 18 or older, there needs to be a showing of

17   force, fraud and coercion.

18           I think the class certification record is clear here

19   that those gating elements, what establishes whether someone is

20   a victim and whether they have a TVPA claim at all are

21   individualized.

22           I would also emphasize that both indictments talk

23   about the fact that there were phases to the conspiracy that

24   Maxwell and Epstein participated in.  That's absolutely true

25   and that defeats commonality.  There is no common, class-wide
```

N5QGdoe2

1    proof -- which is the language of Dukes and Comcast -- that

2    could establish liability across the class period here.

3            Plaintiffs' counsel decided to name this class from

4    1998 to 2019.  There is no evidence in the record that runs the

5    gamut between 1998 to 2019.  It is episodic.

6            THE COURT:  I want to hear your adversary on that

7    point.  But all that would mean is I would narrow the years

8    covered by the class certification.  I wouldn't eliminate class

9    certification.

10           MR. SCHOENFELD:  So I have thought a lot about this

11   point.  I think that is true.  The Court could obviously

12   shorten the class period.

13           But here is the problem, if you shorten the class

14   period, you still need to figure out whether every class member

15   has a TVPA claim relative to however you shorten the class

16   period.  So if the Court were to determine or a jury determined

17   that JPMC had actual or constructive knowledge as of 2006 --

18   which again is time barred and which again precedes the

19   enactment of the operative TVPA --

20           THE COURT:  Those are separate issues.

21           MR. SCHOENFELD:  Separate issues, bracketing those.

22           But let's say the jury finds that JPMC had actual or

23   constructive knowledge as of 2006, that does the jury, in a

24   class action case, no good because every single putative class

25   member then needs to establish through individual proof when

N5QGdoe2

1    she was victimized.  And so it defeats the purpose of a class

2    action to have individual mini trials on all of the gating

3    elements that would establish who is a member of the class in

4    the first place.  And so there is no efficiency.  You are

5    grimacing, so I want to answer that question.

6           THE COURT:  Maybe I'm missing the force of that

7    argument.

8           So let's say we had a garden-variety securities class

9    action involving anyone who purchased or sold the stock of the

10   widget company between such and such a date and such and such a

11   date, the fact that there are a lot of people out there who

12   might think they're members of the class but couldn't meet

13   those requirements would never defeat class certification.

14   What would happen is that, if there was a recovery, it would be

15   limited to people who meet that class definition, and then they

16   would have to put in -- this is what typically does happen --

17   there's a distribution agent and, before he will pay out any

18   money, you have to put in your brokerage records that show,

19   yes, indeed, you bought within that class period or you sold

20   within that class period and otherwise, you can't recover.  Why

21   is that any different from here?

22          MR. SCHOENFELD:  So in that case, you have everyone

23   who purchased or sold shares in widget company between the

24   issuance of the prospectus on September 1st, 2019 and the date

25   of the announcement of some investigation that led to a stock

N5QGdoe2

1  drop in 2022, you know who those people are; there are records

2  and there are common questions.

3      THE COURT:  You don't have to know who those people

4  are.  All you have to know is that there are a lot of people,

5  for sure who fit that bill, and that's enough to have class

6  certification.  And then if they don't fit the bill, they won't

7  be able to qualify for recovery.

8      MR. SCHOENFELD:  In those circumstances, there's no

9  predominance issue.  The identification of those individual

10  class members doesn't predominate over the common questions of

11  whether a misrepresentation was made.

12      Here, however, let's say you established that common

13  proof for some period of the class established JPMC's actual or

14  constructive knowledge, that's all you have, that's one element

15  of an incredibly complex statute that starts at identifying

16  victims.  Each victim needs to demonstrate that they were

17  caused to engage in a commercial sex act through force, fraud

18  or coercion.  You have no idea who those class members are, and

19  that can't be determined unless a jury decides.

20      And your Honor has seen enough cases that involve

21  sexual abuse or sexual assault to know the complexity of all of

22  those issues in one case, let alone over what plaintiffs claim

23  is dozens or hundreds of the victims who compose the class.

24      So this is nothing like a securities case where you

25  can engage with transactional data at the end of the case, you

N5QGdoe2

1        find a firm that's able to just process things --

2                THE COURT:  With respect to those who are minors, none

3        of that would be true; right?

4                MR. SCHOENFELD:  With respect to minors, they still

5        need to have been caused to engage in a commercial sex act.

6        There's no requirement of force, fraud or coercion.

7                But again, I remind the Court, those indictments talk

8        about minor victims and don't allege sex trafficking as to all

9        of them.  And I haven't gone back just now and read the Maxwell

10       one, but I think it refers specifically to sexual abuse and

11       sexual exploitation with respect to some of those documents.  I

12       only emphasize the point because I think it underscores the

13       nuance in reaching this determination.  The TVPA does not cover

14       every form of sexual abuse or assault or exploitation, no

15       matter how heinous.  It is very particular.

16               And again, I would just remind the Court, because I

17       think that this is a critical issue for typicality, for

18       adequacy and also for all of the commonality and predominance

19       issues we're talking about, the statute of limitations is ten

20       years.  The complaint was filed November 24th, 2022, so we go

21       back to November 24th, 2012.  There is strong evidence on the

22       record that Jane Doe has no claim that postdates that period.

23       And everything we have talked about so far in terms of --

24               THE COURT:  Again, I'm not sure what you are saying

25       there.

N5QGdoe2

1          Are you saying that if I limited the class to people

2     who had sex with Mr. Epstein whose last sexual episode with

3     Mr. Epstein was beyond the statute of limitations that I still

4     couldn't certify the class?

5          MR. SCHOENFELD:  Absolutely.  You don't have Jane Doe

6     as a member of that class, so you have no class representative.

7          Number two, there's no demonstration, number one, of

8     numerosity; number two, of any common conduct by JPMorgan

9     Chase.  The bank exited the relationship eight months later,

10    after the non-time barred period began.  If the Court were to

11    reach that conclusion, which is the only available conclusion

12    under the law, there's a class representative issues; it fails

13    at 23A.  There's a typicality issue, of course, a person who is

14    not a member of the class can't be typical of the class,

15    there's a numerosity issue, and I don't think there's any

16    proof -- and this is plaintiffs' burden -- of commonality or

17    predominance for that non-time barred period.

18         We have gotten a ways away from the indictments, so

19    I'm very happy to continue, but I just want to make sure --

20         THE COURT:  Well, why don't I put you on pause for a

21    minute and hear what your adversary has to say about the

22    matters we have just discussed.

23         MS. MCCAWLEY:  Thank you, your Honor.

24         There can be no case more worthy of class

25    certification than this case, where these groups of victims

N5QGdoe2

1    were viciously harmed by JPMorgan's conduct of facilitating

2    Jeffrey Epstein's sex trafficking scheme.  And what has gotten

3    lost here in the dialogue this morning by my colleague is the

4    fact that this focuses on the bank's conduct.

5           Of course, JPMorgan would love to have you focus on

6    individual issues and create this parade of foibles that you

7    won't be able to decide this, your Honor.  But the class

8    certification at issue here is the bank's conduct, their course

9    of conduct; that was common as to all class members.  What did

10   the bank do here?  The bank engaged in a number of --

11          THE COURT:  So you are saying, if I understand, the

12   real question, even from a class certification, is did the bank

13   know -- or under the negligence claim, should it have known --

14   within the statutory period that Mr. Epstein was engaging in an

15   exploitive sexual venture in violation of the sex trafficking

16   statute and did it nevertheless continue to do business with

17   him, indeed facilitate his misconduct by disguising

18   transactions to be something other than they were or failing to

19   act on a duty to report, et cetera, et cetera.

20          MS. MCCAWLEY:  Correct, your Honor.

21          THE COURT:  So I understand that argument.  I think

22   it's a strong argument.

23          My question, though, is, then, to whom under that

24   theory is the bank liable in this civil lawsuit?

25          MS. MCCAWLEY:  To whom?  The bank is liable to the

N5QGdoe2

class members, because their course of conduct allowed Epstein
to run this sex trafficking scheme for many, many years.
Without JPMorgan's conduct, he would have had to stop.  He
needed the obscene amounts of cash that were withdrawn from
JPMorgan.  He needed them to be turning a blind eye and not
reporting to regulators.  He needed them --

THE COURT:  Forgive me for interrupting, but I'm
incorrigible in that respect.

Let's say, taking it most favorably to the plaintiff,
JPMorgan didn't know or should have known by no earlier than
year X, then shouldn't the class period begin with year X,
rather than -- even assuming we have a class -- rather than go
back to earlier?

MS. MCCAWLEY:  No, your Honor.  With respect to the
class period -- and I want to be a little careful here; at some
point I may need a sidebar to address some of the material
related to some of the reporting that they should have been
doing -- but there is clear evidence in the record that our
class period is covered.  There's clear evidence in the record
that the bank knew about Epstein's conduct and was failing to
do the things that they should have done and that allowed
Epstein's conduct to continue.

THE COURT:  Starting when?

MS. MCCAWLEY:  Starting in the early 2000s.

THE COURT:  And what's your evidence of that?

N5QGdoe2

          MS. MCCAWLEY:  The evidence, your Honor -- and I'm

just a little uncertain, I'm trying to be cautious here,

whether I need to have a sidebar to --

          THE COURT:  Because of reference to the suspicious

activity reports that were filed that may be subject to some

provision of the Bank Secrecy Act?

          Although, in this little contretemps that's been going

on over the last week involving a document that was filed, if I

recall, none of the specifics were set forth, there is just a

number of suspicious activity reports, which I'm not so sure is

covered by the Bank Secrecy Act.  But in any event, if you feel

you need a sidebar, of course, come up with your adversary.

          But why don't you tell me, before you do that, what

evidence, other than the suspicious activity reports, do you

rely on to show that JPMorgan knew what Epstein was up to on

the year you just referenced.

          MS. MCCAWLEY:  Yes, your Honor.

          So that is a big piece of it.  The account activity,

as well, is a big piece of that.  Looking at that account

activity, looking at the cash withdrawals, looking at the

structuring that was going on.  We also have, of course, victim

testimony.  There are individuals that were given money from

various accounts that are relevant to this inquiry.  So there's

a number of things from a factual perspective that we contend

cover our class period.

N5QGdoe2

1            THE COURT:  Well, notwithstanding what you just said,

2    I think maybe we do need a sidebar on this one issue.

3            One counsel for each side.  The court reporter will

4    place this under seal.

5            (Continued on next page)

6            (Pages 46through 47 SEALED)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N5QGdoe2

1            (In open court)

2            MS. MCCAWLEY:  So, your Honor, with respect to the

3    class certification issue, this conduct of the bank was common.

4    So you, in the class certification context, can decide a number

5    of issues all at once.  They pertain to the class in its

6    entirety.  Those issues include, for example:  Whether JPMorgan

7    was providing nonroutine banking services; whether JPMorgan set

8    forces in motion that caused the class members harm; whether

9    JPMorgan knew or should have known that they were helping and

10   benefiting from a sex trafficking venture; when JPMorgan knew

11   about Epstein's crimes; whether JPMorgan obstructed the

12   government's investigation; whether JPMorgan failed or

13   obfuscated certain filings that they should have been making.

14   All of those issues are common to the class as a whole, and

15   they can be decided by the Court and they all affect the class

16   as a whole.  So in this case, when your Honor is charged with

17   looking at things like numerosity, typicality, commonality,

18   adequacy and, of course, whether those issues predominate,

19   clearly, it does here.  All of those issues are relevant to the

20   trial, all of those issues will need to be decided in one fell

21   swoop by the jury.

22            And I submit to you, in a case like this, where we are

23   talking about hundreds of victims, it's inherently unfair to

24   have them have to proceed individually in trials.  We're

25   against one of the largest banks in the world, and the

1    discovery here, as you have seen, has been overwhelming, I

2    mean, unheard of, right, so to have individuals have to --

3            THE COURT:  I'm not sure unheard of, but --

4            MS. MCCAWLEY:  Yes.

5            THE COURT:  I'm not really sure overwhelming.  Let's

6    just put it this way, there's been a substantial amount of

7    discovery, and that's why I'm glad I gave you all so much time

8    to get through it.

9            MS. MCCAWLEY:  Thank you, your Honor.

10           Yes, well, I submit that this is really a case where

11   class certification is so well suited.

12           And you have some guidance here, your Honor.  There

13   are other cases in the TVPA context where classes have been

14   certified just like this.  The case that we cite in our papers,

15   the Tenedo case v. Baton Rouge, those are cases where under the

16   TVPA classes have been certified.  And all of these issues that

17   the defendants are raising here, where they're claiming there

18   are individual issues that would preclude you from doing that,

19   those were all dismissed in those cases.  If you focus on the

20   common practice of the bank, that applies to everybody.  And

21   that's appropriate here for class certification.  It's the most

22   efficient way to run this case, it's the most efficient way to

23   get justice for these victims.  So we believe we have met the

24   elements.

25           I know your Honor has questions.  I'm happy to walk

1      through the elements, the prerequisites, if you would like, or

2      handle the argument however --

3              THE COURT:  No.  In a moment of weakness, I have

4      taught the seminar on class actions at NYU Law School for the

5      last four years, so I am at least modestly aware of the

6      individual requirements.  So I don't think we need to go

7      through all of them.

8              MS. MCCAWLEY:  Okay, great.

9              Well, the main issue for the Court to grapple with is

10     the predominance issue, whether these issues predominate.  And

11     not only do those core issues that I talked about apply to all

12     the class members, but the same conduct of the bank applies to

13     all the class members:  Whether they were giving these

14     obscenely large cash withdrawals appropriately; whether they

15     should have been investigating Epstein's accounts; whether they

16     had coconspirators being given money, known coconspirators that

17     were in indictments and other materials, and still allowing

18     them to set up accounts and give money to those individuals;

19     whether they should have been making certain reports.  All of

20     those things apply to the class members as a whole, so that's

21     why the case, the common issues clearly predominate in this

22     instance.

23             THE COURT:  Let me hear any rebuttal from your

24     adversary and anything else he wanted to say.

25             MR. SCHOENFELD:  Certainly, your Honor.

N5QGdoe2

1          I'll try to be brief.  I do want to address the case

2     law that plaintiffs' counsel relies on.  There's not a single

3     class action certified in a sex trafficking case that

4     plaintiffs have identified.  But here, again, one of the --

5          THE COURT:  Have there been cases where it's been

6     turned down?

7          MR. SCHOENFELD:  I'm not aware of either.

8          THE COURT:  So it's -- oh, my gosh, I'm getting

9     nervous -- it's a new issue.

10          MR. SCHOENFELD:  I don't want to overstate the

11     novelty, I know that wouldn't interest the Court.

12          I think the point that I want to make is the cases

13     where class actions have been certified under the TVPA arise

14     under a different provision on labor trafficking that has no

15     requirement of force, fraud or coercion.  And if you look at

16     those cases, to the one, they involve written policies, written

17     into parties' contracts.  Paquirigan involved a uniform fee

18     that was standard in all of the defendant's contracts.  Menical

19     involved uniform policies.  So we're just talking about a

20     different statutory regime and factual distinctions that I

21     think obliterate any of the issues we're talking about here.

22          I don't want to belabor any of these points.  I think

23     I have talked about predominance and commonality.

24          But one of the things I think is surprising here, is

25     that, given what I think everyone recognizes are some really

N5QGdoe2

fundamental individualized issues going to who has a claim

under the TVPA, going to the calculation or determination of

damages, going to some of the negligence elements, the fact

that there's no trial plan here, which is precisely what the

rule 23 committee advises in complex cases like that, the Court

is left with no idea what this trial would look like.  I'm sure

the Court has done lots of creative things in class actions and

bilateral litigation.  But here, you have a limited number of

issues that plaintiffs say are common, not as to the entire

class period, but for part of the class period.  What then?

         You have to have individualized hearings on virtually

every aspect of this case.  Any issue that plaintiffs say is

common and a jury or the Court determine may be common with

respect to some part of the class, all of them require some

fundamentally individualized inquiry to see whether that common

determination ultimately matters, whether any particular class

member has a TVPA claim or a negligence claim.  I'm happy to

leave it there.

         THE COURT:  That's an interesting point.  I don't

think it's relevant, but I'll note for the record that one of

the reasons that how to handle some of these issues at trial

have not resulted in a great deal of legal precedent is because

the great majority of class actions settle, so the Court never

had the chance to figure out how it would handle those kinds of

situations.  But that's really just a side issue.  That's not

1    an answer to your point.

2              MR. SCHOENFELD:  Yes, absolutely.

3              And if I might just make one point that's sort of

4    orthogonal to that.  The release question here is important and

5    I just want to cite one distinction.

6              In evaluating the release in the Deutsche Bank case,

7    the Court said that the language of that release could not be

8    read to reach financial institutions that provided services to

9    Jeffrey Epstein.  That is exactly what the EVCP release does

10   cover.  It specifically says it covers persons and entities

11   that provided services to Jeffrey Epstein.  The vast majority

12   of the class that the plaintiffs assert here signed those

13   releases through the EVCP.

14             So between the release issue and the statute of

15   limitations issue, there are serious numerosity issues in this

16   case, and they become even more profound as you start kind of

17   gerrymandering the case to get around the 2008 enactment date

18   of the TVPA provisions on the front end, the statute of

19   limitations on the back end.  And that's in addition to all the

20   commonality and predominance issues we have been discussing.

21             THE COURT:  Thank you very much.

22             And we'll hear, finally, from plaintiffs' counsel.

23             MS. MCCAWLEY:  Thank you, your Honor.  Just to

24   address, very quickly, a response to those points.

25             On the release issue, certainly, your Honor can deal

1    with that in one fell swoop as to anybody who has a particular

2    release, because that release was all the same.  But I would

3    direct your attention -- I think I heard my colleague say that

4    the language was different -- and I believe if you compare the

5    EVCP release with the release that you reviewed in Deutsche

6    Bank, the language mirrors it with the exception of the

7    additional language that was sort of the carve-out language in

8    a subsequent paragraph.  But nevertheless, that language, if

9    you look at it, clearly was not intended to cover financial

10   institutions.  They were not mentioned, they weren't

11   contemplated.  But irrespective, to the extent that was

12   presented to the Court at summary judgment or otherwise, you

13   could decide that issue in one fell swoop.  So we don't believe

14   that's preclusive of class certification.

15           And I would just like to finish, your Honor, by saying

16   that, again, the focus is on the bank's activity, that's common

17   as to everybody.  Epstein could not have facilitated these

18   crimes without the help of JPMorgan.  And that should be put

19   before a jury on a class-wide basis.

20           Again, just looking at the fairness of this process,

21   our Jane Doe has already had to undertake depositions, all

22   kinds of discovery, et cetera, for herself.  She's done that on

23   the behalf of the class.  This is an instance that would allow

24   those claims to be heard in that manner.

25           THE COURT:  This, of course, is related to the

N5QGdoe2

predominance inquiry, but what you are saying is that the big,

glaring, central issue that's out there is did JPMorgan know or

should have known what was going on and why should that be the

subject of a hundred separate lawsuits when that's the critical

question.

              (Continued on next page)

N5QDDOE3

```
 1              (In open court)

 2              MS. MCCAWLEY:  Correct, your Honor.

 3              So that goes to the superiority piece of that

 4     predominance analysis as well, and so we do firmly believe that

 5     this is the superior method for handling all of these claims.

 6              THE COURT:  Okay.

 7              MS. MCCAWLEY:  Thank you, your Honor.

 8              THE COURT:  So I am very grateful to counsel for both

 9     sides.  I will take the matter, all the aspects that we've

10     discussed today, under advisement.

11              I really am going to try to get you the full opinion,

12     not just the bottom line order.  Sometimes I have to go the

13     bottom line order route just because of other things that are

14     going on in my court, but hopefully the opinion and at least

15     the bottom line order by June 20th.

16              MS. MCCAWLEY:  Great.  Thank you, your Honor.

17              THE COURT:  Anything else we need to take up today?

18              Very good.  Your friends are calling me at 5:00 from

19     the Diamond deposition, so I'll screw up my courage and take

20     their call.

21              Very good.  Thanks a lot.

22              MS. MCCAWLEY:  Thank you, your Honor.

23              (Adjourned)

24

25
```