# EXHIBIT 6

Confidential Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 2

    GOVERNMENT OF THE UNITED      )
 3  STATES VIRGIN ISLANDS         )
                                  )
 4         Plaintiff,             )
                                  )
 5  vs.                           ) 1:22-cv-10904-JSR
                                  )
 6  JPMORGAN CHASE BANK, N.A.,    )
                                  )
 7         Defendant/Third-       )
           Party Plaintiff.       )
 8  _____)
    JPMORGAN CHASE BANK, N.A.     )
 9                                )
           Third-Party            )
10         Plaintiff,             )
                                  )
11  vs.                           )
                                  )
12  JAMES EDWARD STALEY,          )
                                  )
13         Third-Party            )
           Defendant.             )
14
                 FRIDAY, MAY 26, 2023
15
       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16

17                      - - -
18             Videotaped deposition of James
    Dimon, held at the offices of JPMorgan Chase,
19  383 Madison Avenue, New York, New York,
    commencing at 9:02 a.m. Eastern, on the above
20  date, before Carrie A. Campbell, Registered
    Diplomate Reporter and Certified Realtime
21  Reporter.
22
23                      - - -
24           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

Confidential Pursuant to Protective Order

```
 1          regulations have changed, requirements
 2          have changed.
 3   QUESTIONS BY MR. BOIES:
 4          Q.     Who were the experts at the
 5   time that you're referring to?
 6          A.     Steve Cutler would be the
 7   primary one that I would refer to, and he had
 8   a whole team of people, some of whom had been
 9   for -- in the prosecutor's and the Department
10   of Justice.  He had been the SEC enforcement
11   chief, and very many capable people in
12   compliance and experts in AML sanctions, et
13   cetera.
14          Q.     Is it fair to say that you
15   believe the bank should have done what
16   Mr. Cutler concluded was the appropriate
17   thing to do?
18                 MR. BUTTS:  Objection.  Same
19          instruction.
20                 You may answer.
21                 THE WITNESS:  Cutler was the
22          ultimate authority.  It didn't mean
23          that because he didn't like something
24          he wouldn't allow a businessperson to
25          make a different judgment call.
```

Confidential Pursuant to Protective Order

```
 1                If he had felt that it had gone
 2        over the line, he would have kicked it
 3        out, and he had the authority to do
 4        it.
 5                So, yes.
 6   QUESTIONS BY MR. BOIES:
 7        Q.    Well, I'm not sure I understand
 8   that answer.
 9                You said that the experts were
10   the people in charge when Jeffrey Epstein was
11   a customer of the bank.
12                Correct?
13        A.    Yes.
14        Q.    And I asked you who those
15   experts were, and you said Mr. Cutler.
16                Correct?
17        A.    A team of experts.
18        Q.    What?
19        A.    A team of experts.  I said
20   compliance, legal, AML, people who would have
21   been in enforcement, people who would have
22   been out of the DOJ prosecution.  He was the
23   most senior of them --
24        Q.    Okay.
25                MR. BUTTS:  Let him finish.
```

Confidential Pursuant to Protective Order

```
 1         A.      He had the right to do the
 2   second, and he had the right to do the first.
 3         Q.      Okay.  So there is --
 4              MR. BUTTS:  David, please let
 5         him finish.
 6              THE WITNESS:  In his judgment,
 7         he would make that decision.
 8   QUESTIONS BY MR. BOIES:
 9         Q.      Okay.  So he could --
10              MR. BUTTS:  Are you finished?
11              THE WITNESS:  Yes.
12              MR. BUTTS:  Okay.  Now your
13         turn.
14   QUESTIONS BY MR. BOIES:
15         Q.      So he could decide to let the
16   businessperson make the call not to terminate
17   Mr. Epstein, even though he believed that
18   Mr. Epstein should be terminated; is that
19   fair?
20              MR. BUTTS:  Objection.  Asked
21         and answered.
22              THE WITNESS:  I think it was
23         quite clear because you're kind of
24         changing my meaning.
25              If he thought it rose to the
```

Confidential Pursuant to Protective Order

```
 1          level -- an excess level, he would
 2          have said, you can't.
 3                  If he didn't, sometimes he
 4          said, my advice is you shouldn't do
 5          it, but it's your call.
 6   QUESTIONS BY MR. BOIES:
 7          Q.      And what this excess level is
 8   that you refer to is not anything that's
 9   written down; that's just a question of
10   judgment, right?
11          A.      There's a group of people who
12   review these things, and they all -- I think
13   they all know at the end of the day that if
14   there's a dispute, he is the final arbiter.
15          Q.      Didn't you just tell me that he
16   might think somebody ought to be terminated,
17   but he had the right to say to the
18   businessperson, it's your call, if you don't
19   want to terminate him, let him continue to be
20   a customer?
21                  MR. BUTTS:  Objection.  Asked
22          and answered.
23                  THE WITNESS:  It's the weight
24          of the scale.  People disagree, and he
25          doesn't think it hit the level where
```

Confidential Pursuant to Protective Order

```
 1         A.    You've got to read the stuff
 2   that's come out.  That's --
 3              MR. BUTTS:  Yeah, I think you
 4        have the record.  He's not here to
 5        translate what he's learned from us.
 6              MR. BOIES:  Well --
 7              THE WITNESS:  Maybe he doesn't
 8        know.
 9              MR. BUTTS:  Yeah.  I -- either
10        you or your team has the same
11        discovery we have.
12              MR. BOIES:  Well, but he's --
13              THE WITNESS:  There are
14        terrible -- there are terrible --
15              MR. BOIES:  He's the chief
16        executive, and I'm not.
17              THE WITNESS:  There are
18        terrible allegations, which, if true,
19        meant that he knew a lot of things
20        sometime during that period that we
21        didn't.  And I would include in that
22        Steve Cutler and Mary Erdoes.
23   QUESTIONS BY MR. BOIES:
24         Q.    But what I'm trying to get at
25   is, what are those serious allegations?
```

1   it was in January of 2013 that JPMorgan
2   entered into a cease and desist consent order
3   with the Office of the Comptroller of
4   Currency?
5        A.   I don't recall the date, but,
6   yes, I do remember the consent order, yeah.
7        Q.   And does that refresh your
8   recollection in any way as to whether this
9   report to you may have been related to that
10  consent cease and desist order?
11            MR. BUTTS:  Objection to form.
12            You may answer.
13            THE WITNESS:  I don't remember,
14       but it may have been what prompted me
15       to ask.
16  QUESTIONS BY MS. SINGER:
17       Q.   Okay.  We can put that document
18  aside.
19            All right.  Were you aware,
20  Mr. Dimon, of efforts at JPMorgan to launch a
21  donor-advised fund with Bill Gates and The
22  Gates Foundation?
23       A.   Only as a result of this --
24  these lawsuits.
25       Q.   Okay.  So at no time --

```
 1        A.    Or what came out with Epstein
 2   before.
 3        Q.    So prior to 2015, were you
 4   aware of efforts at JPMorgan to launch a
 5   donor-advised fund with Bill Gates through
 6   The Gates Foundation?
 7        A.    I don't -- I was not, no.
 8        Q.    Okay.  So I take it you also
 9   were not aware that Jeffrey Epstein played a
10   role in those discussions?
11             MR. BUTTS:  Objection.
12             You may answer.
13             THE WITNESS:  Oh, absolutely I
14        was not aware.  Nor do we need Jeff
15        Epstein to talk to Bill Gates.
16   QUESTIONS BY MS. SINGER:
17        Q.    Were you aware that Mary Erdoes
18   and Jes Staley had regular communications
19   with Jeffrey Epstein about that donor-advised
20   fund?
21        A.    I am now.
22             MR. BUTTS:  Objection.
23   QUESTIONS BY MS. SINGER:
24        Q.    And were you aware that the
25   hope was that donor-advised fund would reach
```