# EXHIBIT 13

```
 1        UNITED STATES DISTRICT COURT FOR THE
             SOUTHERN DISTRICT OF NEW YORK
 2                       - - -

 3   GOVERNMENT OF THE UNITED          : Case Number:
     STATES VIRGIN ISLANDS             : 1:22-cv-
 4          Plaintiff,                 : 10904-JSR
            v.                         :
 5   JPMORGAN CHASE BANK, N.A.         :
            Defendant/Third-Party      :
 6          Plaintiff.                 :
     _____
 7   JPMORGAN CHASE BANK, N.A.         :
            Third-Party Plaintiff,     :
 8          v.                         :
     JAMES EDWARD STALEY               :
 9          Third-Party Defendant.     :

10
                         - - -
11                  APRIL 28, 2023
                  HIGHLY CONFIDENTIAL
12                       - - -

13            Videotaped deposition of

14   KEVIN McCLEEREY, taken pursuant to

15   notice, was held at the law offices of

16   Porzio, Bromberg & Newman, P.C., 100

17   Southgate Parkway, 3rd Floor, Morristown,

18   New Jersey 07960, commencing at

19   9:13 a.m., on the above date, before

20   Amanda Dee Maslynsky-Miller, a Certified

21   Realtime Reporter and Notary Public in

22   and for the State of New York.

23                       - - -
          GOLKOW LITIGATION SERVICES, INC.
24        877.370.3377 ph| 917.591.5672 fax
```

```
1              Q.   Given your experience in
2    risk management, did you believe that
3    Mr. Epstein presented an intolerably high
4    reputational risk to the bank?
5              MR. BUTTS:  Objection to
6         form.
7              You may answer.
8              THE WITNESS:  Mr. Epstein
9         represented a reputational risk to
10        the firm.  My group did not have
11        any responsibility for onboarding
12        or exiting any clients.  That was
13        the business's role.
14   BY MS. OLIVER:
15             Q.   I think my question was a
16   little different, which was, did you
17   personally believe that Mr. Epstein
18   presented an intolerably high
19   reputational risk to the firm?
20             MR. BUTTS:  Objection to
21        form.
22             You may answer.
23             THE WITNESS:  I don't know
24        what "intolerable" means.  People
```

1  relationship approach.

2          Q.   Got it.  Thank you.

3          A.   That's how I interpret it.

4          Q.   Did you have an
5  understanding as to why Ms. Keating and
6  Ms. Verdon wanted to escalate the
7  relationship up the chain to more senior
8  officers within the asset and wealth
9  management group?

10         A.   He had pled guilty.  They
11 wanted to make sure that senior
12 management was fully aware of the current
13 status of Mr. Epstein.

14         Q.   Why would senior management
15 need to be aware of Mr. Epstein's current
16 status?

17         A.   Well, he was now considered
18 a felon.  According to the sponsorship
19 policy, Mr. Staley and Mr. -- the head of
20 the legal department at the time, I
21 believe Mr. Cutler, had to approve the
22 relationship to keep the relationship, as
23 he was now a convicted felon.

24              So it was important

1  before -- the people who were below the
2  level of Mr. Staley and Mr. Cutler were
3  fully informed as to the current status
4  of his guilty plea.
5      Q.   If Ms. Keating had wanted to
6  exit Mr. Epstein from the bank at this
7  point, did she have the authority to do
8  so?
9      A.   Yes.  She was in charge of
10 the business, yes.
11     Q.   And if Ms. Casey had wanted
12 to exit Mr. Epstein from the bank at this
13 point, did she have the authority to do
14 so?
15     A.   Yes.
16     Q.   Was it your understanding
17 that Ms. Casey wanted to keep Mr. Epstein
18 as a client of the bank at this point?
19     A.   I don't recall any
20 conversations from Mary Casey at any
21 meeting about that.
22     Q.   Is there a reason that
23 you're aware of that Ms. Casey would have
24 chosen to escalate the decision to more

1  wanted to exit the client, she had the
2  authority to do so, correct?
3           MR. BUTTS:  Objection.
4           You may answer.
5           THE WITNESS:  If the
6      people -- if the head of the
7      business at the time, Catherine
8      Keating, agreed to exit the
9      relationship, then the client
10     would have been exited.
11 BY MS. OLIVER:
12     Q.    So Mary Casey did not have
13 the authority to exit a client?
14     A.    She could recommend the
15 exiting of a client, but most likely she
16 would elevate the discussion to her
17 market manager and the head of the
18 business.
19     Q.    Well, you said "most
20 likely."
21          Was she required to escalate
22 the decision to the market manager?
23     A.    I think that would be normal
24 course of a supervisor, manager role -- a

Kevin McCleerey - Highly Confidential

1          her recommendation.
2     BY MS. OLIVER:
3          Q.   And if at the end of that
4     meeting she said, I do not approve and
5     accept sponsorship of Jeffrey Epstein,
6     what would have happened?
7          A.   It would have been escalated
8     up.  She was --
9          Q.   To whom?
10         A.   Catherine Keating.  She was
11    the head of the business.
12         Q.   So Catherine Keating had the
13    ability to say, Mary Casey, I don't care
14    whether you approve and accept
15    sponsorship of Jeffrey Epstein, we're
16    retaining him as a client and you're
17    going to be compelled to continue to
18    affirm sponsorship of him?
19              MR. BUTTS:  Objection to
20         form.  Objection.
21              You may answer.
22              THE WITNESS:  I don't think
23         Catherine Keating would assign a
24         banker to a client if the banker

1      was not comfortable with that
2      client.  I think Catherine Keating
3      would try to understand what was
4      the nature of Mary Casey's
5      concerns and whether she agreed
6      with those concerns or not.
7               She was the head of the U.S.
8      business.  She was responsible for
9      all the clients within the
10     business.  And she would make the
11     decision.
12              Deciding to exit and then
13     how you execute the exit is
14     another process, too.  Clients
15     have complex investments, assets.
16     It's not just a banking account,
17     send a person a letter and they go
18     to another bank.  So it involved
19     some discussion about how to do
20     that as well.
21  BY MS. OLIVER:
22     Q.   So supposing Catherine
23  Keating agreed with Mary Casey and
24  believed that Mr. Epstein should be

Kevin McCleerey - Highly Confidential

1  exited from the bank, did Jes Staley have
2  the authority to retain him as a
3  client --
4        A.    Well, Jes --
5        Q.    -- despite that?
6        A.    Jes Staley was in charge of
7  asset and wealth management.  He was the
8  senior-most person heading that line of
9  business.  From what we understood, Jes
10 Staley had a business relationship with
11 Mr. Epstein, and he weighed on whether to
12 keep the client or exit.
13       Q.    Are you aware that at a
14 certain point in time Mr. Staley left
15 asset and wealth management and became
16 the head of the investment bank?
17       A.    Yes.
18       Q.    Do you know when that
19 happened?
20       A.    I believe sometime in 2009.
21       Q.    September 2009 sound about
22 right?
23       A.    Yes.
24       Q.    Mr. Morris was Mr. Epstein's