# EXHIBIT 14

Confidential Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 4    GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS,
 5              Plaintiff,
 6      vs.            Case No. 1:22-cv-10904-JSR
 7    JPMORGAN CHASE BANK, N.A.,
 8              Defendant/Third-Party Plaintiff.
 9
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10
      JPMORGAN CHASE BANK, N.A.,
11
                Third-Party Plaintiff,
12
          vs.
13
14    JAMES EDWARD STALEY,
15              Third-Party Defendant.
16      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
17
       **** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER  ****
18
19    VIDEOTAPED DEPOSITION OF WILLIAM MARCUS SHERIDAN
20       TAKEN AT: Greenbaum, Rowe, Smith & Davis
              LOCATED AT: 75 Livingston Avenue
21                    Roseland, NJ
22                   July 12, 2023
                 9:01 a.m. to 3:00 p.m.
23
                REPORTED BY ANITA KORNBURGER
24            REGISTERED PROFESSIONAL REPORTER
25
```

Confidential Pursuant to Protective Order

```
 1         Q.   And then it says, "The banker and the
 2   senior manager must approve the updated DDR."
 3              So when you have an updated DDR before
 4   you --
 5         A.   Yep.
 6         Q.   -- and if you saw information that was
 7   concerning, have you ever had an instance where you
 8   just refused to sign the DDR?
 9         A.   I can't -- I actually don't recall.
10         Q.   If you had refused to sign a DDR, would
11   that have required more meetings, do you think,
12   before a client had been exited?
13         A.   Wait.  Can you say that again?
14         Q.   If you had refused to sign the DDR, do
15   you think that would have necessitated more
16   meetings with others, or there would have been more
17   activity about the client?
18         A.   There could --
19              MR. CONERY:  Object to form.  Go ahead.
20              THE WITNESS:  You have to understand that
21   there's the DDR, which reflects the banker's
22   summary and interpretation of the relationship, but
23   in addition to the KYC, the DDR that would come to
24   me, there's also, as we talked about earlier, a lot
25   of interaction day to day in terms of each client
```

Confidential Pursuant to Protective Order

 1   relationship and what's going on with those
 2   relationships.
 3                So there's -- you know, when
 4   I look at a DDR, I should be aware of and
 5   know -- know clients for -- for each of my bankers,
 6   particularly those that may be more higher profile.
 7   BY MR. BAYERL:
 8        Q.   Okay.  But if you refused -- doesn't have
 9   to be you -- if a senior manager refused to sign a
10   DDR, would that prevent the client from continuing
11   or becoming a client of the bank?
12        A.   I can't speculate what another senior
13   manager would or would not do, or what that
14   consequence would be.
15        Q.   Fair.  If you refused to sign a DDR for a
16   client or a prospective client, would that have
17   meant the client needed to exit the bank?
18        A.   Not necessarily.
19        Q.   Okay:  All right.  Let's move to the page
20   ending in 758.
21        A.   758.
22        Q.   You see at the bottom of the page there's
23   an underlined "convicted felons"?
24        A.   I see that.
25        Q.   Okay.  And the first sentence says, "The

Confidential Pursuant to Protective Order

1                THE WITNESS:  So my involvement was as a
2    banker.  So this was a referral from a well-known
3    client that I work with who I onboarded.  And then,
4    as public information became available with respect
5    to his tax evasion and conviction, I talked with
6    the -- with my client who provided the referral and
7    suggested this was not -- not the right profile for
8    me as a banker to have this individual as a client
9    given the circumstances, and that we offloaded
10   them -- or offboarded them.
11   BY MR. BAYERL:
12       Q.   Okay.  So you can tell me if I'm
13   misunderstanding what you said.  You learned
14   through public sources that this referral was
15   convicted of tax evasion or alleged to have engaged
16   in tax evasion?
17       A.   Through public sources, but which was
18   provided to me through the apparatus I described
19   earlier.
20       Q.   Right.  And then you went to the
21   client's -- to the referral source to discuss the
22   facts of the tax evasion?
23       A.   Right, to make sure that we had the right
24   understanding.
25       Q.   And then you, the banker, made the

1  decision that you did not want to continue business
2  with that client?
3       A.   This was a -- an individual that was not
4  known to anyone else within the firm.  They did not
5  have business with anyone else in the firm.  Had
6  they had had other connections or connectivity with
7  people in the firm or other lines of business in
8  terms of their doing business with them, I
9  absolutely would have had a conversation.
10           So it -- what I want to make clear is
11  that no banker will make a rogue decision without
12  clearly thinking through the touch points with that
13  individual or family.  Again, what I said earlier
14  is many of our clients are high profile and have
15  multiple touch points.  So it's -- perhaps it's not
16  written in black and white in any kind of policy,
17  but the -- you know, in terms of -- of doing your
18  job and being smart about doing your job, you're
19  going to talk to the appropriate people or not
20  within your organization, if that makes sense to
21  you.
22       Q.   Right.  So the takeaway, then, is for
23  some clients, it is within the banker's discretion
24  to exit them unilaterally, and other clients who
25  are perhaps more high profile, it requires a larger

```
 1    familiar with this document, but you're familiar
 2    with this policy in general; right?
 3         A.   The policy and the content -- and
 4    the -- the nature of high risk in general, yes.
 5         Q.   Okay.  And this is also a policy that you
 6    would have discussed or gone over with your bankers
 7    that you were supervising?
 8         A.   That's correct.
 9         Q.   Okay.  Let's flip to the page that ends
10    in 566.  And at the bottom of the page, there's a
11    paragraph that starts with "high profile figure."
12    Do you see that?
13         A.   Uh-huh.
14         Q.   It says, "For purposes of this procedure,
15    a high profile figure is a person who is identified
16    in the course of normal account opening maintenance
17    or compliance procedures, to be a person of
18    prominence, e.g., a national celebrity such as an
19    actor/actress, athlete, a business figure, and who
20    has received the controversial so-supposed
21    additional reputation risk to the firm."  Do you
22    see that?
23         A.   I do.
24         Q.   What did you understand the phrase
25    "reputation risk" to mean?
```

1  What was your basis for that?

2      A.  I mean, Jes was intimately involved in
3  really every aspect of what we did with Jeffrey
4  Epstein, and was viewed as the senior banker by
5  virtue of the things that they did with respect to
6  certain introductions of prospects, involvement in
7  the high bridge transaction.

8          I'm sure in those folders you've got
9  plenty of material that showed Jes's interaction
10 and dialogue with people in the private bank, with
11 Steve Cutler around Epstein as a high risk client
12 and whether or not he should be a client.

13         And as I said earlier, there are going
14 to be multiple people who were involved in that
15 discussion.  But in this instance, and with this
16 client, Jes called the shots in terms of our
17 business dealings with Epstein and the decision to
18 retain him as a client.

19     Q.  Okay.

20     A.  And that's been documented in DDRs.

21     Q.  Okay.  Well, we should break this down a
22 little bit.

23         Did you speak to Jes Staley about
24 Jeffrey Epstein?

25     A.  I don't believe I did.

1  our part to exit this relationship given the
2  circumstances that had been noted here.
3      Q.   Uh-huh.
4      A.   I would say a very strong preference to
5  exit this relationship.  But that -- that was out
6  of our hands.  And that -- that -- that decision
7  rested largely with Jes Staley.
8      Q.   Okay.  And do you recall saying
9  that -- all of that happening within this meeting?
10          MR. CONERY:  Objection.
11          THE WITNESS:  I don't recall -- I don't
12  recall if I was at that meeting.
13 BY MR. BAYERL:
14     Q.   Okay.  So you can't recall anything of
15 what you said at this particular meeting if you
16 attended it?
17     A.   That's correct.
18     Q.   Okay.
19     A.   But it's clear from reading this that
20 there were a number of people involved in reviewing
21 this situation, multiple times.
22     Q.   Uh-huh.
23     A.   And I suspect that that only became
24 heightened after the '08 sentencing.
25     Q.   Right.  And can you just flip back for me

```
 1   to Exhibit 52?
 2           MR. CONERY:  This is --
 3           MR. BAYERL:  51 --
 4           THE WITNESS:  51.
 5   BY MR. BAYERL:
 6       Q.   -- please.  Sorry.  And I just want you
 7   to look at that e-mail, the first page.
 8       A.   Oh, okay.
 9       Q.   And so we talked about this is the e-mail
10   where Bonnie is sending materials for that rapid
11   response meeting in 2008; right?
12       A.   Uh-huh.
13       Q.   Can you just look through the To field
14   and tell me if you see Jes Staley's name appearing
15   there?
16       A.   I don't.
17       Q.   And do you recall at all whether Jes
18   Staley attended the 2008 meeting?
19       A.   I do not.
20       Q.   And do you recall whether Jes was
21   consulted in July of 2008, prior to this meeting,
22   about what to do with Epstein?
23       A.   There were no substantive decisions made
24   with respect to Jeffrey Epstein without Jes's
25   input.
```

 1      A.   I do.
 2      Q.   Okay.  Then it says, "Mr. Epstein is
 3 currently serving out his house arrest.  Our view
 4 is that Mr. Epstein has served his time and
 5 completed his duties to society.  We are assessing
 6 the situation closely and monitoring the occasional
 7 news stories regarding Mr. Epstein and civil
 8 lawsuits."  Do you see that?
 9      A.   I do.
10      Q.   And do you recall seeing that statement
11 when you reviewed the DDR?
12      A.   I would have.
13      Q.   And do you agree with the statement, "our
14 view is that Mr. Epstein has served his time and
15 has completed his duties to society"?
16      A.   I do not.
17      Q.   Did you ask anyone at this time to revise
18 that entry?
19      A.   No, because it was discussed amongst a
20 number of my private bank colleagues, including
21 Catherine Keating and John Duffy.  And I think we
22 all felt fairly strongly, going back to 2008, we
23 never should have been in this position in 2011.
24 That the correct decision would have been to
25 offboard him as a client in 2008.  But that -- that

1  was not done because of one individual named Jes
2  Staley.
3      Q.  I understand.  But you did, in fact, sign
4  off on this DDR; right?
5      A.  Yes.
6      Q.  We saw that.  And you didn't insist on a
7  revision to this language before you signed off on
8  this?
9      A.  No, because this was a conclusion reached
10 by senior management.
11     Q.  Were you at all concerned that you would
12 be looped into the word "our view" --
13         MR. CONERY:  Objection.
14 BY MR. BAYERL:
15     Q.  -- in that sentence?
16     A.  I probably should have been.
17     Q.  Okay.  Let's flip to page 579.  Do you
18 recognize this type of document?
19     A.  I don't.  What is this?
20     Q.  It says "relationship annual activity
21 summary" at the top.  Do you see that?
22     A.  I do.
23     Q.  And then it seems to be -- banker name is
24 Paul V. Morris.  Customer name is Jeffrey Epstein.
25 Do you see that?

```
 1   parents in order to keep ▓▓▓▓▓ as his "sex
 2   slave."  Do you see that?
 3       A.   I do.
 4       Q.   Do you remember earlier today we were
 5   looking at a relationship list and there was a
 6   woman with the last name ▓▓▓▓▓ that appeared
 7   in that list?
 8       A.   In the relationship summary list?
 9       Q.   Yeah.
10       A.   Yes.
11       Q.   There was a list that listed all the
12   entities associated with Epstein.  And you recall
13   that her name appeared there?
14       A.   I believe so.
15            MR. CONERY:  Objection.
16   BY MR. BAYERL:
17       Q.   Did you have -- would you have expected
18   someone to flag this type of allegation of abuse by
19   one private bank client to another?
20            MR. CONERY:  Objection.
21            THE WITNESS:  The content of this article
22   is very disturbing and troubling.  And it troubled
23   a number of people internally.  And again, as I
24   said earlier, our recommendations were to fire this
25   client in 2008, but we were unable to execute on
```

Confidential Pursuant to Protective Order

```
 1   that because of Jes's stated comfort level with his
 2   client, and that somehow he had turned the corner,
 3   and that he would be comfortable in monitoring
 4   business activity closely.  So, unfortunately, this
 5   is why we are where we are in 2010 or '11.
 6   BY MR. BAYERL:
 7        Q.   Okay.  Let's look down at the paragraph
 8   that starts with "perhaps most disturbing."  Do you
 9   see that?
10        A.   I do.
11        Q.   Okay.  And it reads, "Perhaps most
12   disturbing in terms of possible sex trafficking was
13   Epstein's relationship with Jean Luc Brunel, owner
14   of the MC2 modeling agency.  According to a
15   complaint filed in the US District Court for the
16   Southern District of Florida, an alleged victim
17   said that Epstein's assistant and girlfriend
18   Ghislaine Maxwell, Burnel, house manager Alfredo
19   Rodriguez and ████████, 'deliberately engaged in
20   a pattern of racketeering that involved luring
21   minor children through MC2, mostly girls under the
22   age of 17, to engage in sexual play for money.'"
23   Do you see that?
24        A.   I do.
25        Q.   Okay.  Do you recall we also discussed
```