# EXHIBIT 15

Confidential - Pursuant to Protective Order

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF NEW YORK
2
       GOVERNMENT OF THE        :
3      UNITED STATES VIRGIN     :
       ISLANDS,                 :  CASE NO.
4                               :  1:22-CV-10904
       Plaintiff,               :  -JSR
5                               :
            v.                  :
6                               :
       JPMORGAN CHASE BANK,     :
7      N.A.,                    :
                                :
8      Defendant/Third Party    :
       Plaintiff.               :
9      _____  :
       JPMORGAN CHASE BANK,     :
10     N.A.,                    :
                                :
11     Third Party Plaintiff,   :
                                :
12          v.                  :
                                :
13     JAMES EDWARD STALEY,     :
                                :
14     Third Party Defendant.   :
15      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
                     -  -  -
16               July 13, 2023
                     -  -  -
17
                 Videotaped deposition of
18     JOHN R. DUFFY, taken pursuant to notice,
       was held at Wilmer Hale, Seven World
19     Trade Center, New York, New York,
       beginning at 9:17 a.m., on the above
20     date, before Michelle L. Gray, a
       Registered Professional Reporter,
21     Certified Shorthand Reporter, Certified
       Realtime Reporter, and Notary Public.
22
                GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24

Confidential - Pursuant to Protective Order

1          A.    Personal relationship, as --

2     as you are posing the question, to me,

3     feels like something beyond business.

4               And rapport is an

5     understanding and a dialogue that flows

6     freely where you understand that person,

7     they understand you, and it helps in

8     business to be well understood and to

9     understand the person you're trying to

10    serve.

11         Q.    Did you have any personal

12    relationships with any of your clients

13    at -- while you were at JPMorgan?

14         A.    I had rapport with many

15    clients.

16         Q.    Did you have any personal

17    relationships with them?

18         A.    I would -- I'd probably say

19    I don't have relationships that I would

20    have called personal.  I think all was

21    business.

22         Q.    Did you ever have a social

23    dinner with a client?

24         A.    Not that I can think of.

Confidential Pursuant to Protective Order

1    anybody else?

2          A.    Not that I recall.

3                Jes was the senior person on

4    that relationship, and for me, that was

5    the right person to raise that with.

6          Q.    What do you mean "senior

7    person on that relationship"?

8          A.    Jes was involved with, to my

9    knowledge, Mr. Epstein's relationship

10   with JPMorgan right from the very

11   beginning, whenever that was.

12               And to my knowledge, it

13   continued after he was outside of the

14   Private Bank.  And Jes kept in touch with

15   many clients in the Private Bank, post

16   his days in the Private Bank.

17         Q.    Do you know whether Jes had

18   a formal role in approving Mr. Epstein's

19   retention by the bank as a client when he

20   was in charge of the Private Bank?

21               MR. JOHNSON:  Objection.

22               THE WITNESS:  Sorry, can you

23        say that again.

24   BY MR. SCHIFFMANN:

Confidential Pursuant to Protective Order

1    Q.    Sure.

2          As far as you know, did

3    Mr. Staley have any formal role in

4    deciding whether Mr. Epstein should

5    remain a client of the Private Bank while

6    he was in charge of the investment bank?

7          MR. JOHNSON:  Objection.

8          THE WITNESS:  As a senior

9          member of the firm and a member of

10         the operating committee, who

11         continued to work on that account

12         in some way or fashion, some of it

13         visible to me, some of it not

14         visible to me, Jes was a part of

15         that relationship.  And I would

16         have expected, if there was

17         something that I should have

18         known, he would have told me.

19         We relied upon Jes, in this

20         instance and in -- and in others,

21         as it related to his judgment

22         about an account.  And in this

23         case we're talking about

24         Mr. Epstein's account.

Confidential - Pursuant to Protective Order

1    BY MR. SCHIFFMANN:

2          Q.    And you say "we."  Who do

3    you mean by "we"?

4          A.    Broadly speaking, the

5    Private Bank.  Coverage team, CEO of the

6    asset and wealth management business,

7    myself.

8          Q.    There were other people also

9    responsible for the relationship with

10   Mr. Epstein, right?

11         A.    Oh, for sure.  There are

12   people who are doing the work, day in and

13   day out.

14         Q.    So at most, Mr. Staley was

15   part of a broader team that was in charge

16   of deciding whether Mr. Epstein should

17   remain a client?

18         A.    Most senior member,

19   operating committee member.  Little bit

20   different than everybody else on the

21   team.

22         Q.    What do you mean by that?

23         A.    Most senior person and, you

24   know, a person who you look up to, to

Confidential - Pursuant to Protective Order

1   hold up the code of conduct of the firm,

2   and fiduciary responsibility to clients

3   and shareholders.

4          Q.     Do you think other members

5   of the team also had an obligation to

6   uphold the code of conduct?

7          A.     Well, everyone does.

8          Q.     Do you think other members

9   of that team also had a fiduciary

10  responsibility to clients and

11  shareholders?

12         A.     Yes, I do.

13         Q.     And as you said, those other

14  members of the team were doing the work,

15  day in and day out, right?

16         A.     Yes.

17         Q.     And those other members of

18  the team were closer to Mr. Epstein's

19  actual account activity, right?

20         A.     Yes.

21         Q.     And you'd agree that those

22  other members of the team also had an

23  important role in the decision of whether

24  Mr. Epstein should remain a client?

Confidential - Pursuant to Protective Order

1  time frame, situation.

2           It's just not that cut and

3  dry.  It was a heavy influence.

4      Q.    What was the basis for that

5  influence?

6      A.    Seniority, history with the

7  client.

8      Q.    Going to your next

9  conversation with Mr. Staley about

10  Mr. Epstein, I think you testified that

11  in -- you had another conversation with

12  him in 2011 after you became CEO of the

13  investment bank?

14      A.    Of the Private Bank.

15      Q.    Yes, sorry, Private Bank.

16      A.    Yes, that's correct.

17      Q.    And do you remember how long

18  after your elevation to CEO of the

19  Private Bank you had that conversation?

20      A.    Yeah.  It was pretty quickly

21  after.  Weeks.

22      Q.    And where was that

23  conversation?

24      A.    In his office at the

Confidential Pursuant to Protective Order

1    investment bank, arranged by his

2    assistant.

3        Q.   Did he arrange that meeting

4    or did you?

5        A.   I did.  I asked for it.  And

6    it was in follow-up to discussions with

7    colleagues.

8        Q.   What --

9        A.   Concerns for Mr. Epstein's

10   reputation and, again, looking to raise

11   the question with Jes.  Don't understand

12   why -- why we are retaining him, on a

13   reputational basis, as a client.

14       Q.   And what did you say to

15   Mr. Staley at that meeting?

16       A.   I said, Jes, I really don't

17   understand why Mr. Epstein is still a

18   client at the bank.  From a reputational

19   perspective, it just doesn't fit.  And

20   like, you know, we had previously talked

21   a couple years back, probably, whenever

22   that last was.  I said, this feels to me

23   like it's time.

24       Q.   Do you remember anything

1  else that you said to him?

2       A.    I do.

3       Q.    What else did you say to

4  him?

5       A.    So Jes rebuffed me, said,

6  don't see the need for that.  I would

7  trust Jeffrey with members of my family,

8  his daughters.

9            And the last thing I said to

10 Jes about it was, well, Jes, if I were

11 asked why is Jeffrey Epstein a client of

12 the bank at this stage, I would have to

13 answer, because of Jes Staley.

14      Q.    Do you remember anything

15 else that Mr. Staley said to you during

16 that meeting?

17      A.    No.

18      Q.    What was Mr. Staley's

19 reaction to your statement that, if

20 you -- if you were asked why Mr. Epstein

21 is a client of the bank, your answer

22 would be Jes Staley?

23      A.    The meeting was over.  Jes

24 was on to other things.  That was it.  It

Confidential    Pursuant to Protective Order

1    was kind of the last word in that

2    meeting, that I recall.

3         Q.   Do you remember whether you

4    gave Mr. Staley additional detail about

5    your specific concerns for Mr. Epstein's

6    reputation?

7         A.   I shared with you what I

8    recall.

9         Q.   Do you recall giving him any

10   details about Mr. Epstein's account

11   activity?

12        A.   I do not recall that.  The

13   basis of the conversation was reputation.

14        Q.   Did you write any of --

15   well, withdrawn.

16             Did you ever write down what

17   happened in that meeting?

18        A.   I don't recall.

19        Q.   Did you tell anybody about

20   that conversation?

21        A.   Colleagues in the Private

22   Bank.

23        Q.   Who -- which colleagues?

24        A.   We -- I had an obligation to

Confidential - Pursuant to Protective Order

1  go back to the due diligence committee

2  and report back on the conversation with

3  Jes.

4       Q.    And you did that orally?

5       A.    I did that orally.

6       Q.    Did you send any follow-up

7  e-mails, based on this --

8       A.    Not that I recall.

9       Q.    Just again, I'd ask you to

10  try to let me finish my sentence.

11       A.    Sure.

12       Q.    Did -- in your view, did

13  Mr. Staley hear out your concerns?

14       A.    Well, he heard them.

15       Q.    Did he try to get you to

16  stop sharing your concerns?

17       A.    No.  He tried to convince me

18  that he was right, briefly.

19       Q.    Do you remember anything

20  else about his statement that he would

21  trust Mr. Epstein with members of his

22  family?

23       A.    No.

24       Q.    What was your reaction to

Confidential    Pursuant to Protective Order

1    hearing him say that he would trust

2    Mr. Epstein with members of his family?

3          A.    I was surprised and felt

4    like this conversation was going the same

5    way as the previous, so I was frustrated.

6          Q.    Did you believe -- well,

7    withdrawn.

8                Did he succeed in changing

9    your mind about whether Mr. --

10   Mr. Epstein should remain a client of the

11   Private Bank?

12         A.    No.

13         Q.    So after this meeting it was

14   still your opinion that Mr. Staley --

15   that Mr. Epstein should no longer be a

16   member of the Private Bank -- or a client

17   of the Private Bank?

18         A.    Correct.  And it was also

19   clear that Jes wanted him to remain a

20   client.

21         Q.    Did Jes order you to

22   continue approving Mr. Epstein as a

23   client?

24         A.    I shared with you what I

Confidential     Pursuant to Protective Order

1   recall.

2        Q.    So you don't remember him

3   ordering you to retain him as a client?

4        A.    I shared with you what I

5   recall.

6        Q.    And you don't recall that?

7        A.    Those specific words, I do

8   not recall.

9        Q.    Do you recall anything to

10  that effect?

11       A.    I've -- I've shared with you

12  what I recall.

13       Q.    So you don't recall him

14  saying anything to the effect of, I'm

15  ordering you to --

16       A.    I don't recall.

17       Q.    I'm sorry, I just --

18       A.    Okay.

19       Q.    -- I just want to make my

20  record clear.

21       A.    Yeah.  Sorry.  Go ahead.

22       Q.    I understand this can be

23  frustrating.  Sometimes I have to ask the

24  question multiple times to get it clear.

Confidential   Pursuant to Protective Order

1          A.     Yes.

2          Q.     So you don't recall him

3    saying anything to the effect of, I'm

4    ordering you to keep Mr. Epstein as a

5    client?

6          A.     I don't recall those words.

7          Q.     Or anything to that effect?

8          A.     I don't recall hearing words

9    like that.

10         Q.     Okay.

11                MR. JOHNSON:  Is this a good

12         time for a break?

13                THE WITNESS:  I do --

14                MR. JOHNSON:  Sorry, John.

15                THE WITNESS:  Yeah, yeah.

16                MR. SCHIFFMANN:  Yeah, we

17         can -- we can go off the record --

18                MR. BOUCHOUX:  John, do you

19         have something to add?

20                THE WITNESS:  Yeah, I

21         said -- well --

22                MR. BOUCHOUX:  He was in the

23         middle of his answer.

24                THE WITNESS:  What I do

Confidential    Pursuant to Protective Order

1          recall, it was very clear from

2          that conversation with Jes, Jes

3          wanted Mr. Epstein to remain a

4          client.

5               And it wasn't in Jes's

6          nature to order anybody anything,

7          to do anything.  That's just not

8          the way he conducted business.

9               He just said this shouldn't

10         change.

11    BY MR. SCHIFFMANN:

12         Q.    Did you understand him to be

13    implicitly telling you what you should

14    do?

15         A.    Basically.  Retain Jeffrey

16    as a client.  Yes.  That's how -- that's

17    what I left that meeting with.

18    Mr. Epstein remains a client.

19         Q.    Did you leave that -- well,

20    withdrawn.

21               MR. SCHIFFMANN:  We can take

22         a break now.

23               THE VIDEOGRAPHER:  The time

24         right now is 10:13 a.m.  We're off

Confidential   Pursuant to Protective Order

1    Q.    Did Mr. Staley ever say

2    anything else to you, similar to that he

3    would trust Mr. Epstein with his family?

4    A.    I just recall that one

5    instance.

6    Q.    Did you consider escalating

7    your concerns about Mr. Epstein to other

8    senior leaders at JPMorgan?

9    A.    That's what I was doing when

10   I went to see Jes.

11   Q.    But after Mr. Staley

12   disagreed with you, did you consider

13   raising your concerns about Mr. Epstein

14   with other senior leaders at the bank?

15   A.    I -- I felt like Jes was the

16   final word on that.

17   Q.    Did you raise your

18   concerns -- well, withdrawn.

19   At the time that you were

20   CEO of the U.S. Private Bank, who did you

21   report to?

22   A.    Phil Di Iorio.

23   Q.    Who did he report to?

24   A.    Mary Erdoes.

Confidential -- Pursuant to Protective Order

1        Q.    And you, as CEO of the U.S.

2   Private Bank, ultimately were the final

3   approver on the -- in the KYC process,

4   right?

5        A.    On the last step of the

6   process.

7        Q.    And as part of that process,

8   you have to grant your approval to the

9   retention of the relationship, right?

10       A.    I would have to give an

11  answer, yes.

12       Q.    And -- okay.  If you did not

13  approve a high-risk client for retention,

14  what would happen to that client account?

15       A.    It would probably get

16  debated again.

17       Q.    And, ultimately, if you

18  still did not approve the retention of

19  the -- of that client, would the client

20  then be exited?

21       A.    No, not necessarily.

22       Q.    So a client could be

23  retained even if you refused to approve

24  the KYC on the client?

Confidential  -  Pursuant  to  Protective  Order

1          A.     I don't know what the rules
2    say on that.
3          Q.     Are you aware of any
4    situation in which the CEO of the U.S.
5    Private Bank refused to approve a client
6    retention KYC and, yet, the account
7    remained open?
8          A.     I wouldn't have enough
9    information to answer that.
10          Q.     Well, when you were CEO of
11    the U.S. Private Bank, did you ever
12    refuse to approve a high-risk client's
13    retention?
14          A.     I don't recall.  But I do
15    recall wanting to exit clients, other
16    clients, and they were not exited.
17          Q.     And do you recall whether,
18    in those situations, you ultimately
19    approved the retention of the client
20    through the KYC process?
21          A.     I can't recall whether, at
22    that point in time, I had KYC
23    responsibility.
24          Q.     Well, do -- when you were --

Confidential    Pursuant to Protective Order

1   to continue to have Mr. Epstein as a

2   client.

3              MR. BOUCHOUX:  John --

4   BY MR. SCHIFFMANN:

5        Q.    You mean Mr. Staley --

6        A.    Mr. -- sorry, Mr. Staley.

7   Thank you.

8        Q.    Yeah.

9              But ultimately you were the

10  one who had to give approval?

11       A.    The way the process works, I

12  had to -- in order for Mr. Epstein to

13  remain a client, I had to be part of that

14  process, and part of that process, for

15  me, was talking to Mr. Staley.  And the

16  basis of my approving that DDR was my

17  conversation with Mr. Staley.

18       Q.    But you could have decided

19  not to approve a DDR?

20       A.    Any DDR I could have -- I

21  could decide not to approve, yes.

22       Q.    So you may not always like a

23  client, but that doesn't necessarily mean

24  that you're going to refuse to sign their

Confidential - Pursuant to Protective Order

1    DDR?

2          A.    It means I'm going to follow

3    through on, to the best of my abilities,

4    on understanding that client, raising

5    concerns about that client, as I did with

6    Mr. Staley as it relates to Mr. Epstein.

7                And in the case of

8    Mr. Epstein, I felt like Mr. Staley was

9    the final court of appeal on that.

10          Q.    So --

11          A.    So my -- my signing off on

12   that DDR reflects my conversations with

13   Mr. Staley as an operating committee

14   member and someone who has a fiduciary

15   responsibility to the bank, its clients,

16   its shareholders.

17          Q.    You testified earlier that

18   your conversation with Mr. Staley was

19   about reputational risk, right?

20          A.    Correct.

21          Q.    As part of the KYC process,

22   though, you have access to other

23   information about Mr. Epstein's accounts,

24   right?

Confidential   Pursuant to Protective Order

1      Q.    But you were the one signing

2  the DDR, were you not?

3      A.    Yes.

4      Q.    You could have declined to

5  sign it?

6      A.    I don't know what would have

7  happened after that, to be honest.  I

8  don't know what the process does after

9  the CEO of the business declines it.

10          But I know I signed that,

11  based upon Jes wanting the client to be

12  retained.

13     Q.    But you could have declined

14  to sign it.  You say you do not know what

15  would have happened, but you could have

16  declined to sign it, right?

17     A.    There are one of two answers

18  here, yes or no, on the DDR form.

19     Q.    And you could have answered

20  no?

21     A.    I suppose.

22     Q.    As CEO of the U.S. Private

23  Bank, did you have authority to fire a

24  client from the Private Bank?

1        A.    I don't know that any one

2   person has the authority to fire a client

3   from the bank.  That's not been my

4   experience.

5        Q.    Well, if you refused to

6   approve a client's retention in the

7   Private Bank, that client would be

8   exited, right?

9        A.    No.  The process of

10  retaining a client or exiting a client is

11  never that simple.

12       Q.    So, in your view, a -- you,

13  as the CEO, could have refused to approve

14  the retention of Mr. Epstein and

15  Mr. Epstein still could have remained a

16  client of the Private Bank?

17       A.    It's possible.  Like I said,

18  as it relates to exiting clients, no one

19  person holds that authority.

20            These relationships with

21  clients span different businesses, and as

22  a result of that, there's usually a

23  widening of the circle and a broader

24  team-based decision about exiting a

Confidential   Pursuant to Protective Order

1    client.

2        Q.   But I'm saying, if you stuck

3    to your guns and refused to approve

4    Mr. Epstein for retention as a client of

5    the Private Bank, your testimony is that

6    he might have just remained?

7             MR. JOHNSON:  Objection.

8             THE WITNESS:  I don't know.

9        That would be speculation on my

10       part.  I don't know.

11   BY MR. SCHIFFMANN:

12       Q.   Well, why didn't you --

13   well, withdrawn.

14            If -- if you could have

15   declined to sign the DDR and initiated a

16   broader conversation about whether to

17   keep Mr. Epstein as a client, why didn't

18   you do that?

19       A.   We felt like we had that

20   conversation.  I felt like I had that

21   conversation with Jes.

22       Q.   Mr. Staley didn't convince

23   you that Mr. Epstein was a good

24   reputational bet for JPMorgan, did he?

Confidential    Pursuant to Protective Order

1        A.     Rephrase that, please.

2        Q.     At the end of your

3   conversation with Mr. Staley, you still

4   thought Mr. Epstein should be exited.

5        A.     I was of the opinion his

6   reputational risk was not worth having

7   him as an account, that's correct.

8        Q.     And, nevertheless, you

9   signed the DDR allowing him to remain.

10        A.     I did.

11        Q.     And if you had declined to

12   sign that, a widening of the circle would

13   have occurred, at which more people would

14   have discussed what to do with this

15   business, right?

16        A.     The -- I felt like that had

17   already happened.

18        Q.     Did you involve the CEO of

19   the entire Private Bank in that

20   conversation?

21        A.     I don't recall.

22        Q.     Did you involve Phil

23   Di Iorio in that conversation?

24        A.     They are one and the same.

1    angry call from Jeffrey?"

2              Do you see that?

3         A.    I do.

4         Q.    What -- do you know what

5    Mr. Schlakman is referring to when he

6    refers to a "usual angry call from

7    Jeffrey"?

8              MR. JOHNSON:  Objection.

9              THE WITNESS:  I do not know

10         what he means by that.

11              But the first part of that

12         paragraph, "the only sensitivity

13         is his relationship with Jes,"

14         that is simply consistent with

15         what we all believe, which was Jes

16         was the senior relationship person

17         with Mr. Epstein.

18    BY MR. SCHIFFMANN:

19         Q.    But Mr. Schlakman wasn't

20    suggesting that because of that

21    relationship you would make an exception

22    to the callback policy, right?

23         A.    He wasn't, I don't believe

24    that.

1    A F T E R N O O N   S E S S I O N

2                      -  -  -

3              THE VIDEOGRAPHER:   The time

4        right now is 12:37 p.m.   We're

5        back on the record.

6                      -  -  -

7              CONTINUED EXAMINATION

8                      -  -  -

9    BY MR. SCHIFFMANN:

10       Q.    Mr. Duffy, at any point

11   during your time as CEO of the U.S.

12   Private Bank, did you become concerned by

13   Mr. Epstein's use of cash from his

14   JPMorgan accounts?

15       A.    I wasn't concerned about his

16   use of cash.  Large clients use cash in

17   different ways.  They are different than,

18   you know, the average person on Main

19   Street.

20              But I did speak with

21   Mr. Epstein about his use of cash and

22   what it was for and made suggestions to

23   him as it related to his response, which

24   was for aviation fuel, to use his

1   aviation account.

2        Q.    So your answer is no, you

3   were not concerned about his use of cash?

4        A.    It wasn't -- it wasn't

5   outsized in relation to what clients of

6   Mr. Epstein's net worth or asset base

7   has.  And it wasn't unusual, as it

8   related to what was expected in that

9   account, and he was pretty consistent in

10  the use of that.

11            So we are always concerned

12  about people who use cash and might be

13  carrying cash around, because it's a

14  liability for them.

15       Q.    So other than the size of --

16  well, strike that.

17            So you've just testified

18  that you weren't concerned about the size

19  of the withdrawals.  Did anything else

20  about the cash withdrawals concern you

21  while you were CEO of the U.S. Private

22  Bank?

23            MR. JOHNSON:  Objection.

24            THE WITNESS:  We -- clients

Confidential   Pursuant to Protective Order

1          who take out cash regularly, we

2          look for it to be consistent with

3          what was expected for that

4          account.  And the DDR is the

5          mechanism for setting the

6          expectation of activity in an

7          account.  And Mr. Epstein's cash

8          withdrawals were consistent with

9          the expectations as set by his

10         DDR.

11    BY MR. SCHIFFMANN:

12         Q.    So to answer my question,

13    you did not -- you were not concerned

14    about any aspect of his cash usage while

15    you were CEO of the U.S. Private Bank?

16         A.    I was curious about it.  I

17    asked him about it.

18         Q.    But you were not concerned

19    about it?

20         A.    No.  We spoke about it.  He

21    gave me an answer, which was it was for

22    jet fuel.  I took him at his word and

23    felt like I covered that with him.

24         Q.    And when he told you that,

```
1    you believed him?

2         A.    I did.

3         Q.    Did you ever think he was

4    being dishonest with you?

5         A.    No, I did not.

6         Q.    So did you always take

7    Mr. Epstein at his word?

8         A.    We didn't talk that often.

9    But on that -- on that matter in

10   particular, yes.

11        Q.    Do you remember ever not

12   taking him at his word during any of your

13   conversations?

14        A.    They were limited, so no.

15        Q.    Did you ever discuss your

16   concerns -- well, withdrawn.

17             Did you ever discuss

18   Mr. Epstein's use of cash with Mary

19   Erdoes?

20        A.    Yes.

21        Q.    And what do you remember

22   about -- well, when was that

23   conversation?

24        A.    I don't recall.
```

1    didn't think that it was appropriate?

2         A.    If I thought there was

3    something inappropriate that Mr. Epstein

4    was doing, then I wouldn't have approved

5    it.

6         Q.    If it was your

7    responsibility to continue the

8    relationship, why did you initially

9    decline to approve the account?

10        A.    In this review?

11        Q.    Yes.

12        A.    More information, from my

13   perspective, since we had -- I had a

14   discussion with Mr. Epstein about his use

15   of cash to pay for fuel out of a Hyperion

16   account.  I was looking for consistency.

17        Q.    And if you found out more

18   information that made you think that

19   approving Mr. Epstein's account was

20   inappropriate, you would have declined to

21   approve it, right?

22        A.    If I thought there was

23   anything he was doing that was wrong, a

24   crime, illicit, I would not have approved

1   e-mail, do you remember between --

2   whether between 6:03 p.m. on March 27th

3   and 6:25 p.m. on March 27th you had a

4   conversation with Mr. Epstein about this

5   particular cash withdrawal?

6            MR. JOHNSON:  Objection.

7            THE WITNESS:  I did not have

8       a conversation with him that I

9       recall on that day.

10  BY MR. SCHIFFMANN:

11      Q.   So it stands to reason that

12  when you wrote, "I previously spoke with

13  Jeffrey Epstein about this activity,"

14  what you're referring to is his overall

15  pattern of cash withdrawals, not this

16  particular cash withdrawal?

17      A.   I don't -- I had a

18  conversation with him about his cash

19  withdrawals and aviation fuel.  That's

20  what I'm referring to there.

21      Q.   Do you remember ever

22  speaking with him specifically about the

23  August 1st -- sorry, about the one

24  payment that Ms. Perry references?

1          A.     It was.

2          Q.     And, obviously, it was

3     before this -- these events transpired,

4     right?

5          A.     It would -- it would have.

6     Yes.

7          Q.     Did you -- do you remember

8     if it was a long time before or had you

9     just had that conversation?

10          A.     I don't recall.

11          Q.     What prompted you to speak

12     to Mr. Epstein about his cash usage?

13          A.     Cash is a funny asset.  It

14     brings liability to clients when they

15     carry it around.  Large clients often

16     take large cash at different times of the

17     year.  Sometimes it's for household

18     staff.  Sometimes it's for holiday gifts.

19     Sometimes it's for building personnel.

20               So it's not uncommon to talk

21     to a client about their cash.

22               And with Mr. Epstein, as

23     I've said to you previously, in gaining a

24     broader picture of his account, I asked

Confidential  Pursuant to Protective Order

1  him about his cash and its usage, and he

2  mentioned aviation fuel, particularly in

3  parts of the world that can be a little

4  bit more difficult to travel through.

5  And where a U.S. bank card would

6  typically not be accepted for payment,

7  hence the OFAC.

8         And as I previously

9  mentioned, I took him at his word for

10  that.

11     Q.    So after this deep dive by

12  Ms. Perry, why did you think you needed

13  to speak to him again about the cash

14  withdrawals?

15     A.    I don't recall.  And I don't

16  think we did.  That's my recollection.

17     Q.    The last long sentence in

18  this e-mail is, "Perhaps the best next

19  step is for us to speak with Harry, who

20  we know, and ask Harry about the cash

21  withdrawals."

22         Do you see that?

23     A.    I do.

24     Q.    And this is Harry Beller?

1          Q.    Mr. Staley --

2          A.    Which is what happened after

3    Mr. Staley left JPMorgan.

4          Q.    Did it happen while

5    Mr. Staley was there?

6          A.    No, it happened after

7    Mr. Staley left JPMorgan.

8          Q.    You still could have chosen

9    not to approve any of these KYCs, right?

10         A.    True.

11         Q.    And in your prior testimony,

12   that would have kicked off a process of

13   additional conversations about what to do

14   with Mr. Epstein's account, right?

15         A.    Yes.

16         Q.    And you chose to approve

17   these accounts?

18         A.    Based upon having had a

19   conversation with Mr. Staley about his

20   wishes to retain Mr. Epstein.

21         Q.    So your testimony is

22   Mr. Staley did not order you to maintain

23   the relationship, correct?

24         A.    Mr. Staley did not order me.

Confidential - Pursuant to Protective Order

1        Q.    And you had discretion to
2   refuse to approve these account retention
3   requests, right?
4        A.    I'm sorry, the account
5   retention requests?
6        Q.    Yeah.  You had discretion to
7   decline to approve these KYCs.
8        A.    Oh.  In light of
9   Mr. Staley's request to keep Mr. Epstein
10  as a client, I didn't see that I had --
11  there was a -- there was another avenue
12  there.
13             And that would appear, as we
14  just looked at, a conversation about
15  Mr. Staley and Mr. Cutler, that that was
16  another affirmation by Mr. Staley that
17  Mr. Epstein remains a client at JPMorgan.
18       Q.    When you say Mr. Staley's
19  request to keep Mr. Epstein as a client,
20  what do you mean?
21       A.    When I said to Jes at the
22  end of our conversation, if I'm asked why
23  Mr. Epstein is a client, my response is,
24  because of Jes Staley.

1          Q.    Do you see in the next

2    e-mail you write, "Okay"?

3          A.    Yes.

4          Q.    So Mr. Walden was asked to

5    approve a $50 million line of credit for

6    Mr. Epstein, right?

7          A.    He was.

8          Q.    And he raised reputational

9    concerns, right?

10         A.    He did.

11         Q.    And Mr. Nelson asked you

12   whether you were okay moving forward,

13   based on the reputational concerns,

14   right?

15         A.    Correct.

16         Q.    And then you said okay?

17         A.    I did.

18         Q.    And by this time, Mr. Staley

19   was out of JPMorgan?

20         A.    Yes.

21         Q.    Who was Kevin McCleerey?

22         A.    Kevin was part of the risk

23   and control team.

24         Q.    Did you have any

1  received the cash for fuel explanation --

2  or you never looked into whether or not

3  that explanation made sense, given that

4  he had spent a considerable number of

5  years in jail and then on house arrest?

6          MR. JOHNSON:  Objection.

7          THE WITNESS:  Could you

8       repeat your question, please.

9          MS. LIU:  Can I have that

10      question read back.

11          (Whereupon, the court

12      reporter read back the requested

13      portions of the transcript.)

14          THE WITNESS:  That

15      explanation, to me, was taken at

16      face value and post the

17      conversation with Mr. Epstein.

18      Many of his cash activities, as

19      recommended to him for his

20      aviation fuel needs, were switched

21      to his aviation account, Hyperion.

22  BY MS. LIU:

23      Q.   Taken at face value, meaning

24  you didn't do any digging into whether or

Confidential — Pursuant to Protective Order

1   not that explanation made sense?  You

2   just took Mr. Epstein at his word,

3   correct?

4        A.    I took Mr. Epstein at his

5   word.  And then following that, his cash

6   activity for fuel came out of the

7   Hyperion account, and that made sense.

8        Q.    It came out of the Hyperion

9   account at your suggestion, correct?

10       A.    Well, it came -- if he is

11  using money, his money for aviation

12  purposes, it's common sense and good

13  advice to give a client advice to make

14  sure that money comes out of your

15  aviation account so that when you're

16  accounting for your aviation expenses,

17  they are well documented.

18       Q.    But you knew that the money

19  was simply being transferred into the

20  aviation account a few days before it was

21  then taken out of the aviation account,

22  correct, Mr. Duffy?  That's what the

23  documents in this case show?

24            MR. JOHNSON:  Objection.

Confidential   Pursuant to Protective Order

1    trafficking business?

2              MR. JOHNSON:  Objection.

3              THE WITNESS:  I had no

4         reason to believe that

5         Mr. Epstein -- and at no point in

6         time did I believe Mr. Epstein was

7         committing criminal acts through

8         JPMorgan, such as sex trafficking.

9    BY MS. LIU:

10        Q.   So, therefore, you didn't

11   look or have any of the people working

12   for you at the Private Bank look at his

13   transactions to see if any might have

14   matched up with the allegations of sex

15   trafficking; is that fair?

16        A.   No, that's not fair.  Our

17   risk and control teams monitor client

18   cash activity.  ████████████████████████

█    ████████████████████████████████

20        Q.   All right.  So let's pull up

21   Tab 12, please.

22             THE COURT REPORTER:  Is that

23        something you're putting in the

24        chat?

1    from my own position on that.

2              Mr. Staley had left the

3    bank.  He was no longer a sponsor or

4    vouching for Mr. Epstein.  And we chose

5    to terminate the relationship at that

6    point in time.

7              MR. SCHIFFMANN:  Objection,

8         and move to strike.

9    BY MS. LIU:

10        Q.   What were the reputational

11   risks that you had about Mr. Epstein,

12   including when you exited him in 2013?

13        A.   Sorry?

14        Q.   What were the reputational

15   risks that had been known about

16   Mr. Epstein for a long time by the time

17   you exited him in 2013, Mr. Duffy?

18             MR. JOHNSON:  Objection.

19             THE WITNESS:  The two

20        specific elements of Mr. Epstein's

21        life, of being a felon and a sex

22        offender, were the points of focus

23        for me.

24   BY MS. LIU:

Confidential - Pursuant to Protective Order

1          Q.    And the bank had known he

2    was a felon and sex offender since 2008,

3    correct?

4          A.    If that was when he was

5    convicted, yes.  I don't recall.

6          Q.    And, yet, the bank waited

7    until sometime in 2013 to exit

8    Mr. Epstein's account from the bank; is

9    that correct?

10         A.    That's factual.

11         Q.    Why did it take you almost a

12   year from the time Mr. Staley left and

13   clearly could no longer be vouching, as

14   you said, for Mr. Epstein to exit his

15   accounts from the bank?

16              MR. JOHNSON:  Objection.

17              THE WITNESS:  There was a

18         process.  It takes time.  And

19         that's what it became.

20   BY MS. LIU:

21         Q.    But Mr. Staley had already

22   been demoted from his position as CEO of

23   the investment bank in early 2012 related

24   to the London-Wales scandal, correct,