# EXHIBIT 18

Confidential Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     GOVERNMENT OF THE UNITED     )
 3   STATES VIRGIN ISLANDS        )
                                  )
 4        Plaintiff,              )
                                  )
 5   vs.                          ) 1:22-cv-10904-JSR
                                  )
 6   JPMORGAN CHASE BANK, N.A.,   )
                                  )
 7        Defendant/Third-        )
          Party Plaintiff.        )
 8   _____    )
     JPMORGAN CHASE BANK, N.A.    )
 9                                )
          Third-Party             )
10        Plaintiff,              )
                                  )
11   vs.                          )
                                  )
12   JAMES EDWARD STALEY,         )
                                  )
13        Third-Party             )
          Defendant.              )
14
               WEDNESDAY, JULY 12, 2023
15
       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                      - - -
17            Videotaped deposition of
     Mary Erdoes, held at the offices of
18   Williams & Connolly, 650 Fifth Avenue, Suite
     1500, New York, New York, commencing at
19   9:04 a.m. Eastern Time, on the above date,
     before Carrie A. Campbell, Registered
20   Diplomate Reporter and Certified Realtime
     Reporter.
21
22
                         - - -
23
              GOLKOW LITIGATION SERVICES
24        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
25
```

Confidential Pursuant to Protective Order

1     Q.   So you're talking about
2 documents that you've reviewed with your
3 lawyers in connection with this litigation.
4 That's where you're getting the vouching
5 from?
6     MR. JOHNSON: Objection.
7     THE WITNESS: No. You asked me
8    about my testimony, and I was
9    responding to the conversa -- the --
10   what we were reviewing.
11    I am not aware, because I was
12   not in any of the discussions that I
13   recall, about the review of Mr. Staley
14   and Mr. Epstein, and the relationship
15   that Mr. Epstein had with the firm.
16 QUESTIONS BY MR. WOHLGEMUTH:
17     Q.   So let me put it this way. No
18 one was there in 2013 to vouch for
19 Mr. Epstein, correct?
20     A.   No one had a senior
21 relationship with Mr. Epstein like Mr. Staley
22 did.
23     Q.   Okay.
24     A.   And when Mr. Staley left the
25 firm, there was no one there to give the

Confidential Pursuant to Protective Order

1  reasons why we would want to keep Mr. Epstein
2  as a client of the firm.
3         Q.   But you don't know whether
4  Mr. Staley in fact gave those reasons prior
5  to 2013, because you were not a part of the
6  discussions, correct?
7         A.   I don't recall being part of
8  the reviews of Mr. Epstein's relationship.
9         Q.   You used the word "vouch."
10 That's an interesting word.
11              Have you used that word to
12 describe Mr. Staley's conduct vis-à-vis
13 Mr. Epstein at any time prior to your
14 deposition?
15        A.   I don't know what you mean.
16        Q.   Okay.  Can you recall ever
17 saying to anyone, outside of your deposition,
18 prior to the time you started preparing for
19 your deposition, Mr. Epstein was vouched for
20 by Mr. Staley?
21        A.   I don't recall any discussions.
22        Q.   And are you aware that
23 Mr. Cutler happened to use the same word,
24 "vouch," in his testimony?
25              MR. JOHNSON:  Objection.

Confidential Pursuant to Protective Order

1      Q.     Okay.  Are you -- you're aware
2   that Mr. Staley actually told JPMorgan's
3   legal team that they should talk to Epstein
4   and Epstein's lawyers; isn't that correct?
5      A.     I am not aware of that.
6      Q.     So you've said, I think a
7   couple times, Mr. Staley was Mr. Epstein's
8   client coverage person or client sponsor; is
9   that correct?
10     A.     He was --
11            MR. JOHNSON:  Objection.
12            THE WITNESS:  I --
13            MR. JOHNSON:  You can answer.
14            THE WITNESS:  Sorry.
15  QUESTIONS BY MR. WOHLGEMUTH:
16     Q.     You can answer.
17     A.     Mr. Staley was the most-senior
18  representative and relationship person for
19  Mr. Epstein.
20     Q.     So that's what I want to probe.
21  I want to probe exactly what you mean by
22  client coverage person or client sponsor.
23            I understand what you just said
24  to be that Mr. Staley was the most-senior
25  person at JPMorgan who was closest to

```
 1   bank, correct?
 2        A.   I did.
 3        Q.   And so here's the general
 4   counsel -- strike that.
 5             Mr. Cutler at this time was the
 6   general counsel of JPMorgan?
 7        A.   Yes.
 8        Q.   So here's the general counsel
 9   of JPMorgan telling you, head of asset and
10   wealth management, there's a private
11   client -- there's a private banking client
12   that we should not do business with, period,
13   and you didn't take any action because you
14   were not his client coverage person?
15             MR. JOHNSON:  Objection.
16             THE WITNESS:  I don't know what
17        that means.
18   QUESTIONS BY MR. WOHLGEMUTH:
19        Q.   Okay.  Well, when you -- when
20   Mr. Cutler told you, as the head of asset and
21   wealth management business, Mr. Epstein is
22   not a person we should do business with,
23   period, why didn't you, as the overseer of
24   the private bank, throw him out of the bank?
25        A.   I wasn't responsible for
```

1    Mr. Epstein's relationship with the bank.
2        Q.    But you were responsible for
3    the private bank, correct, ma'am?
4        A.    Correct.
5        Q.    And so why, as the person
6    responsible for the private bank, wouldn't
7    you execute on Mr. Cutler, who is the general
8    counsel of the bank's, wishes?
9        A.    I don't know what Mr. Cutler's
10   wishes were.
11       Q.    Okay.
12       A.    None of us wanted to do
13   business after having a lawsuit with someone
14   who sues you.  And there's a process by which
15   people review accounts, and I'm not
16   responsible for his account, and I don't
17   recall being part of those discussions.
18       Q.    Well, after Mr. Cutler -- well,
19   strike that.
20             Do you take -- did you
21   understand Mr. Cutler's point about putting
22   Mr. Epstein behind us and him, Mr. Epstein,
23   not being a person we should do business
24   with, as a commentary on Mr. Cutler not
25   wanting to do business with someone who had

Confidential Pursuant to Protective Order

```
 1   threatened to sue JPMorgan?
 2        A.    Again, I don't know what
 3   Mr. Cutler was thinking.  I don't remember
 4   talking to Mr. Cutler about it.
 5        Q.    Okay.  Well, I'm asking what
 6   you understood about Mr. Cutler's words here.
 7              Did you understand that
 8   Mr. Cutler was just referring to the somewhat
 9   lengthy and difficult settlement process with
10   Mr. Epstein?
11        A.    I didn't -- I don't know what I
12   was thinking at the time.
13        Q.    Okay.  Well, I take it -- well,
14   strike that.
15              (Erdoes Exhibit TX89 marked for
16         identification.)
17   QUESTIONS BY MR. WOHLGEMUTH:
18        Q.    I'm going to show you what I'm
19   going to mark as TX89.
20              Okay.  TX89 is an e-mail string
21   with the top e-mail from you to Mr. Epstein
22   in July of 2011, correct?
23        A.    Correct.
24        Q.    And it's actually July 26,
25   2011, correct?
```