# EXHIBIT 113

```
  1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
  2
       GOVERNMENT OF THE             :
  3    UNITED STATES VIRGIN          :
       ISLANDS,                      :  CASE NO.
  4                                  :  1:22-CV-10904
            Plaintiff,                :  -JSR
  5                                  :
                 v.                  :
  6                                  :
       JPMORGAN CHASE BANK,          :
  7    N.A.,                         :
                                     :
  8    Defendant/Third Party         :
       Plaintiff.                    :
  9    _____         :
       JPMORGAN CHASE BANK,          :
 10    N.A.,                         :
                                     :
 11    Third Party Plaintiff,        :
                                     :
 12              v.                  :
                                     :
 13    JAMES EDWARD STALEY,          :
                                     :
 14    Third Party Defendant.        :

 15       CONFIDENTIAL - ATTORNEYS' EYES ONLY
                       -  -  -
 16                 May 3, 2023
                       -  -  -
 17
                        Videotaped deposition
 18    of WILLIAM D. LANGFORD, taken pursuant to
       notice, was held at the law offices of
 19    Boies Schiller Flexner LLP, 55 Hudson
       Yards, New York, New York, and remotely,
 20    beginning at 9:37 a.m., on the above
       date, before Michelle L. Gray, a
 21    Registered Professional Reporter,
       Certified Shorthand Reporter, Certified
 22    Realtime Reporter, and Notary Public.

 23            GOLKOW LITIGATION SERVICES
           877.370.3377 ph| 917.591.5672
 24               deps@golkow.com
```

1  that -- that is a fair characterization
2  of the initiative?
3         A.    Yes.
4         Q.    Okay.  Okay.  You can put
5  that aside.
6               In looking at the
7  transactional activity associated with
8  human trafficking.  Would you agree that
9  cash is an important red flag of
10 potential trafficking?
11              MR. KRAUSE:  Objection.
12              THE WITNESS:  So, again, I
13        need to go back to what we were
14        looking at.  The cash components
15        of it, we were focused,
16        appropriately so, on the business
17        of trafficking.  That is, people
18        who set up the criminal enterprise
19        to capture, imprison, move, and
20        sell the services, right, and
21        generate the criminal proceeds,
22        just like drug trafficking.
23              So what we -- what we
24        focused on, you know, it wasn't --

1          the cash usage actually wasn't all
2          that helpful, but it was, rather,
3          other indicia that we actually
4          found where you could start to
5          link it to people who were
6          promoting the trafficking, the
7          prostitution for example, using
8          otherwise benign retail accounts.
9                That was really the focus -- ended
10         up finding, I should say.
11   BY MS. SINGER:
12         Q.    Okay.  And so, again, I want
13   to focus not just on what you were doing,
14   what you were implementing at JPMorgan in
15   the human trafficking initiative, but
16   kind of the learnings that cash is
17   specifically suggestive of human
18   trafficking.
19               Do you agree with that
20   statement?
21               MR. KRAUSE:  Objection.
22               THE WITNESS:  So again,
23         partially.  What we were looking
24         for, what I really wanted to find,

1         know.
2              But at the end of the day,
3         withdrawal of cash is a withdrawal
4         of cash.  And so especially small
5         dollars, wealthy people withdraw
6         cash.  They do a lot of different
7         things.
8              So it's in contrast,
9         perhaps, to the receipt of
10        information, the criminal
11        enterprise like we talked about.
12        So it presents more of a
13        challenge.
14             MS. SINGER:  So move to
15        strike that answer.
16   BY MS. SINGER:
17        Q.   I appreciate it.  But I
18   think it was different than my question.
19             And I want to ask the
20   question again, which is, the fact that
21   Jeffrey Epstein, from whatever source,
22   right, The New York Times article, the
23   supporting documents, was known to pay
24   cash to girls who he was sexually abusing

1  customer, shortly before the break.
2          So if corporate compliance
3  or AML Ops wanted -- wanted Epstein
4  terminated, and the Private Bank
5  disagreed, what would happen?
6      A.   So to answer that question,
7  we need to distinguish.
8          In the context of a question
9  of reputational risk, I -- my view is,
10 and doctrine, I would have a vote but
11 would not be a decisive vote.
12         To the extent it involved
13 active ongoing violations of law and
14 someone disagreed with me, then I would
15 escalate above that line of business up
16 to CEO, up to board of directors, up to
17 and including resignation, if it didn't
18 resolve as I thought it should.
19     Q.   Okay.  And by CEO, you mean
20 CEO of JPMorgan, Jamie Dimon?
21     A.   If that were the case, yes.
22     Q.   Okay.  And who would -- what
23 would be the chain of escalating?  So
24 before you got to Jamie Dimon, who would

```
 1   you go to?
 2        A.    So, again, that wasn't this
 3   case.
 4        Q.    Yep.
 5        A.    But if I ever had a
 6   situation where I had said it's time to
 7   exit, the line of business said no, I
 8   would first go to Steve Cutler, who would
 9   have been my boss at the time.  If Steve
10   Cutler disagreed and didn't convince me
11   otherwise, then I would push it up
12   further, probably to Jamie at that point.
13   And then if I still felt like I wasn't
14   getting heard and it was an active
15   ongoing issue, then I would go to the
16   board.
17
18
19
20
21
22
23
24
```

1  there was such a meeting, that there
2  would be documents about it, correct?
3       A.   I would expect there would
4  be documents, yeah.
5       Q.   Okay.  All right.  So the
6  conclusion reports, "Further meetings
7  held with Jes Staley to discuss LOB
8  decision for re-approval."
9            Do you know what Jes
10 Staley's position was within JP -- within
11 JPMorgan as of January 7, 2011?
12      A.   Yes.
13      Q.   What was his position?
14      A.   He was the head of the
15 investment bank.
16      Q.   So why was Jes Staley being
17 consulted about Jeffrey Epstein when Jes
18 Staley was the head of the investment
19 bank?
20      A.   I can only say what I
21 understood and was told.  I was told, as
22 I mentioned, that Epstein was Jes
23 Staley's client.
24      Q.   And it says, "Banker Paul

1        Q.   In any other context had
2   anyone explained it to you?
3        A.   Not -- in terms of why we
4   didn't terminate?
5        Q.   That's right.
6        A.   Well, here, it was to refer
7   to Jes, to have that discussion.
8   Speaking with Jes at the later time
9   was -- Jes's view was he didn't do it,
10  shouldn't have pled guilty, et cetera,
11  wasn't responsible for it.  So that's --
12  that's what I was told, in the context of
13  the retention or decision not to
14  terminate, I should say.
15       Q.   Okay.  So in -- prior to
16  this meeting on January 7th, because the
17  conversation, I think, with Jes Staley
18  and Epstein was after this meeting.
19  Prior to this meeting, did you have an
20  understanding why Private Bank didn't
21  want to exit or hadn't exited Jeffrey
22  Epstein?
23       A.   I don't -- I don't recall
24  specifically, no.

1  transactions enlightening as compared to
2  countless stories related to his
3  escapades.  Lots of salon, lingerie
4  shops, drug stores, NY, Palm Beach, and
5  in St. Thomas (his place of residence).
6  Plus lots of videos like Girls Gone Wild
7  and some other shops not fit for my good
8  Catholic upbringing.  The transactions
9  are old, '05 to '08.  Besides frequent,
10 frequent spa like charges it has died
11 down.  Surprised she was never
12 subpoenaed."
13          Have I read that correctly?
14     A.   Yes.
15     Q.   Based on your understanding
16 of human trafficking and the knowledge
17 you had gained through the initiative,
18 you recognized those charges may not have
19 been escapades but, potentially, human
20 trafficking, correct?
21          MR. KRAUSE:  Objection.
22          THE WITNESS:  Yeah, well, in
23     many respects it's inconsistent
24     with the types of things that we

1           saw in human trafficking.  You
2           know, having her own account,
3           providing money, providing
4           documented expenses.
5                The human trafficking
6           enterprises that we were focused
7           on were designed to traffic the
8           individuals, keep them down, do --
9           do the business and keep it off
10          the radar.
11               This was different.  I mean,
12          it's -- it's pretty -- I don't
13          like the behavior.  But it's
14          different from the typology of
15          human trafficking that we had been
16          focused on.
17     BY MS. SINGER:
18          Q.   Right.  Those enterprises
19     that you were looking at on the retail
20     side, correct?
21          A.   No, no, no.  No.  The
22     accounts were on the retail side.  It was
23     the enterprise of criminal enterprise,
24     right.

1  e-mail that Jes would be deciding the
2  next steps, correct?
3          A.   Yes.
4          Q.   Was it your understanding
5  that Jes Staley was the decisionmaker as
6  to whether Jeff Epstein would be exited
7  from the bank?
8          A.   So, again, I was escalating
9  my -- my position, my view, we should
10 exit Epstein, and told that Jes owned the
11 client relationship.
12              So from that perspective, I
13 suppose he would be the one to help make
14 that decision or to make that decision.
15         Q.   Do you know whether anybody
16 else at the bank, John Duffy or Mary
17 Erdoes, whether any of them said that it
18 shouldn't be Jes Staley's decision?
19         A.   I'm not aware of anybody
20 saying that, no.
21         Q.   All right.  And then if we
22 turn to the front page of this e-mail.
23 This is the part of the chain from Phil
24 DeLuca to Nina Nichols, cc'ing you.  And

1  to Phil DeLuca back on January 10th?
2       A.    To Phil, Nina, and Maryanne,
3  yeah.
4       Q.    Okay.  And just an
5  understanding what you meant here.  Is it
6  fair to say that you were -- that
7  modeling agencies was one piece of the
8  puzzle, but that you would want to know
9  more or -- tell me what you were saying.
10      A.    You know, so to frame the
11 entire context, one, I didn't need any of
12 this to recommend kicking him out of our
13 bank, period.
14            What I was asking for, is
15 there anything else we can point to.  Are
16 there any other linkages to ongoing
17 activity that could make this decision
18 even easier, ████████████████████████
██████████████████, that sort of thing.
20            The modeling agency is just
21 that it didn't tell us anything, and our
22 ability as a bank to know what's really
23 going on in a modeling agency is
24 extremely limited.  Especially, he is a

1  when he -- when he responded.  I don't
2  recall anybody else articulating a view
3  on exit at that time.
4           Q.    Did Catherine Keating speak
5  at all?
6           A.    I don't remember her
7  speaking.
8           Q.    And you said Jes Staley
9  responded.  What did he say?
10          A.    So Jes's response was, with
11 regard to the conviction, no, that was
12 not accurate, his lawyers are working to
13 get the conviction thrown -- or excuse
14 me, the plea, the plea, get the plea
15 thrown out, he didn't actually do that,
16 and that we should be talking to his
17 lawyers.
18          Q.    And how were things left --
19 and did you respond to Jes Staley, by the
20 way, when he said that?
21          A.    I don't remember specific
22 responses, but the takeaways were that we
23 would go and speak with Mr. Epstein's
24 attorney.

```
 1              reputational component, would
 2              include this, but not as specific
 3              as that was the discussion and
 4              Steve said no change.  I don't --
 5              I don't know that that was
 6              accurate or right.  I can't -- I'm
 7              not aware of that, put it that
 8              way.
 9     BY MS. SINGER:
10          Q.   Were any -- was the
11     conversation that you had with Steve
12     Cutler, the one that you recall, did that
13     include any piece that was about legal
14     advice, ████████████████████████████████
15     ████████████████████████████████████████
16     any of those issues, or was it -- was it
17     entirely on the reputational side?
18          A.   My recollection, it was
19     based on the reputational side, because
20     that's what my point was.
21          Q.   Did you ever reach out to
22     outside counsel about how to handle
23     Jeffrey Epstein's accounts?
24          A.   I don't believe I ever did,
```

1  JPMorgan's line of business tried to
2  dissuade any of your colleagues from
3  filing a SAR relating to a customer?
4  　　　　A.　No.
5  　　　　Q.　At any point during your
6  time at JPMorgan, did you ever come to
7  believe that a SAR should be filed in a
8  particular instance, but where you
9  decided not to do so because the customer
10 was particularly large or valuable?
11 　　　　A.　No.
12 　　　　Q.　Are you aware of any
13 instance where anyone at JPMorgan thought
14 a SAR should be filed but failed to do so
15 because the client was particularly large
16 or valuable?
17 　　　　A.　No.
18 　　　　Q.　You testified earlier that
19 you never discussed ███████████████
20 ███████████ between, I think it
21 was, 2008 and then your departure from
22 the bank.  Do you recall that?
23 　　　　A.　Yes.
24 　　　　Q.　Do you believe that Epstein,

```
 1   to use your words, should go, because you
 2   believed he was engaging in continued
 3   illegal activity after his 2008 plea?
 4         A.    No.
 5   ████       ██████████████████████████████
 6   ████████████████████████████████████████
 7   ████████████████████████████████████████
 8   ███████████████████████
 9       ████  ██████████████████████████████
10   ██████████████████████████████████████
11   ██████  ██████████████████████████████
12   ████████████████████████████████████████
13   ████████████████████████████████████████
14   ████████████████████████████████████
15   █████████████████████████████████  ██████
16   ████████████████████████████████████
17   ████████████████████████████████████
18   ██████████████████████████
19         Q.    Fair to say your focus was
20   on the reputational risk of keeping
21   Epstein, ███████████████████████████████
22   ████████████████████████████████████████
23   you'd have focused on that, had you
24   thought there was, yes?
```

```
 1         A.    Yes.
 2         Q.    ████████████████████████
 3   ███████████████████████████████████
 4   ███████████████████████████████████
 5   ███████████  why were you discussing
 6   Epstein with others at JPMorgan?
 7         A.    Because I believed he should
 8   not be a client of the bank because of
 9   his plea and his reputational risk,
10   period.
11         Q.    Okay.  We've seen work
12   relating to Epstein by Maryanne Ryan.
13   You did or did not develop a good
14   understanding of Maryanne Ryan's
15   temperament and skills during your time
16   at JPMorgan?
17         A.    I did.
18         Q.    How skilled was Maryanne as
19   an investigator?
20         A.    One of the best.
21         Q.    You did or did not develop a
22   good understanding of Maryanne Ryan's
23   temperament through your time working
24   with her at JPMorgan?
```

1  DeLuca, with the most recent e-mail dated
2  January 14, 2011.
3           Have I got that right?
4      A.   Yes.
5      Q.   Let's take a look at
6  Ms. Ryan's e-mail to you on January 13th,
7  I think in the beginning of the page.
8           Do any of Ms. Ryan's
9  findings indicate that JPMorgan is
10 participating in a sex trafficking ring?
11          MS. SINGER:  Objection.
12          THE WITNESS:  That JPMorgan
13      is?
14 BY MR. GAIL:
15     Q.   Yeah.
16     A.   No.
17     Q.   Why not?
18          MS. SINGER:  Objection.
19          THE WITNESS:  Again, she
20      outlines what she finds, right.
21      It doesn't establish a link
22      between JPMorgan and the operation
23      by Epstein of a sex trafficking
24      ring through the bank, on its

1       face, in my opinion.
2  BY MR. GAIL:
3       Q.   Do any of Ms. Ryan's
4  findings, as you see them there, indicate
5  that as of 2011 Epstein was using the
6  bank to perpetrate sex trafficking?
7            MS. SINGER:  Objection.
8            THE WITNESS:  So, again, the
9       findings that she cites are old.
10      In 2004, et cetera, she notes
11      that.  And notes, though, the
12      activity not continuing,
13      necessarily.
14 BY MR. GAIL:
15      Q.   You testified that you had a
16 call with Ken Starr following your
17 conversation with Jes Staley.  Do you
18 recall that?
19      A.   Yes.
20      Q.   Now, counsel for the U.S.
21 Virgin Islands referred to Epstein's
22 criminal defense attorney.  What was Ken
23 Starr's position at the time you were
24 speaking to him?