**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.<br><br>       Defendant/Third-Party Plaintiff,<br><br>v.<br><br>JAMES EDWARD STALEY<br><br>       Third-Party Defendant. | Case Number: 1:22-cv-10019-JSR |
| GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS,<br><br>       Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.<br><br>       Defendant/Third-Party Plaintiff,<br>v.<br><br>JAMES EDWARD STALEY<br><br>       Third-Party Defendant. | Case Number: 1:22-cv-10904-JSR |

**THIRD-PARTY DEFENDANT JAMES STALEY'S BRIEF**
**IN SUPPORT OF HIS MOTION TO EXCLUDE**
**JPMORGAN CHASE BANK'S PROFFERED EXPERT OPINIONS**

## <u>TABLE OF CONTENTS</u>

Page

ARGUMENT ...................................................................................................................1

I.      JPMORGAN'S EXPERT OPINION ON SETTLEMENT AMOUNT .............................1

      A.      Ms. Wong Has No Expertise in Class Action Settlements. ....................................3

      B.      Ms. Wong's Opinion on the Reasonableness of the Jane Doe Settlement Is Based on an Outcome-Driven Methodology. ...........................................................4

            1.      Ms. Wong's Skewed Selection of "Comparables." ....................................5

            2.      Ms. Wong's Determination of the "Per-Victim" Amount. .........................8

            3.      Ms. Wong's "Average-of-the-Averages" Comparison. ............................10

II.      JPMORGAN'S EXPERT OPINION ON LEGAL FEES. ..................................................12

III.      JPMORGAN'S EXPERT OPINION ON INCOME SUBJECT TO CLAWBACK. ........21

CONCLUSION ............................................................................................................23

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600 (S.D.N.Y. 2014) .....................................3, 4, 21

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) .....................................5

*Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18 (2d Cir. 1996)....................................................9

*Claar v. Burlington N. R.R. Co.,* 29 F.3d 499 (9th Cir. 1994)......................................................19

*Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
2021 WL 4170757 (D. Conn. Sept. 14, 2021) ..........................................................................17

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .................................................1, 3, 4

*Degelman Indus. Ltd. v. Pro-Tech Welding & Fabrication, Inc.*,
2011 WL 6754051 (W.D.N.Y. May 27, 2011)...........................................................................18

*Dinsmore & Shohl LLP v. Gray*, 2016 WL 11784514 (S.D. Ohio Apr. 5, 2016) ........................17

*Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357 (S.D. Fla. 2009) .......................................20

*Echon v. Sackett*, 2019 WL 8275344 (D. Colo. Feb. 12, 2019) ...................................................11

*Faulkner v. Arista Recs. LLC*, 46 F.Supp.3d 365 (S.D.N.Y. 2014)..............................................10

*Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268 (E.D. La. 2014).....................................20

*In re GSC Grp., Inc.*, 502 B.R. 673 (Bankr. S.D.N.Y. 2013) ..................................................14, 18

*In re Navidea Biophamaceuticals Litig.*, 2021 WL 2323380 (S.D.N.Y. Apr. 21, 2021) .............12

*In re Navidea Biopharmaceuticals Litig.*, 2021 WL 2156276 (S.D.N.Y. May 27, 2021).............12

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ......................................................5

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...........................1, 11, 21

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) .............................................................................20

*Inventio Ag v. Otis Elevator Co.*, 2011 WL 3359705 (S.D.N.Y. June 23, 2011)...................17, 18

*King v. Wang*, 2021 WL 5237195 (S.D.N.Y. Nov. 9, 2021).....................................................6, 19

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................19

*Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57 (2d Cir. 2020)................................................7

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ............................4, 21

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) ..............................................7, 19

*McLeod v. Dollar Gen.*, 2014 WL 4634962 (E.D. Pa. 2014) ........................................20

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ...........................................17

*Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90 (2d Cir. 2006) ....................1

*Treadway v. Otero*, 2022 WL 17729256 (S.D. Tex. June 9, 2022) ...............................11

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ...............................................3

*United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008) .....................................1

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ...........................................3

*United States v. Zolot*, 968 F. Supp. 2d 411 (D. Mass. 2013) ......................................20

**STATE CASES**

*Culpepper v. Allstate Ins. Co.*, 31 A.D.3d 490 (2d Dep't 2006) ..................................11

*In re Est. of Passuello*, 591 N.Y.S.2d 542 (3d Dep't 1992) .........................................18

*Jemal v. Lucky Ins. Co.*, 687 N.Y.S.2d 717 (2d Dep't 1999) .......................................1

*Klein v. Robert's Am. Gourmet Food, Inc.*, 808 N.Y.S.2d 766 (2d Dep't 2006) .........18

*Ousmane v. City of New York*, 880 N.Y.S.2d 874 (Sup. Ct. 2009) ..............................18

**STATUTES**

CPLR § 5001(c) ..............................................................................................................22

**OTHER AUTHORITIES**

Federal Rule of Evidence 702 .............................................................................*passim*

The one constant in these related cases has been JPMorgan's attempt to pin the entirety of its problems with Jeffrey Epstein on its former executive Jes Staley.  Consistent with this theme, the three experts whom the bank has retained to support its third-party claims against Mr. Staley are focused on a single question: How much should Mr. Staley have to pay?  That is, the three of them assume liability and then divide up the economic terrain as follows: (1) Edith Wong, an accountant, opines that JPMorgan's $290 million settlement with the Jane Doe class was "reasonable," (2) Shelley Chapman, a retired bankruptcy judge, opines that JPMorgan's █████████ ██████ legal fees in the Jane Doe and USVI cases was "reasonable," and (3) Carlyn Irwin, also an accountant, adds up how much Mr. Staley earned at JPMorgan to assess the potential amount(s) that might be clawed back under a disgorgement remedy.  None of these experts' opinions meets the *Daubert* standard of admissibility, and each of them must therefore be excluded.

## ARGUMENT

Federal Rule of Evidence 702 allows testimony in the form of expert opinion if, among other things, the opinion (i) will assist the trier of fact to determine a fact in issue, and (ii) is the product of reliable principles and methods.  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *United States v. Glynn*, 578 F. Supp. 2d 567, 570 (S.D.N.Y. 2008).  The party offering the expert opinion—here, JPMorgan—bears the burden to show that it meets every element of these standards, including that the opinion is both relevant and reliable.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004).

## I.    JPMORGAN'S EXPERT OPINION ON SETTLEMENT AMOUNT.

To foist the cost of its settlement with the Jane Doe class onto Mr. Staley, JPMorgan must show, among other things, that $290 million was a reasonable price to pay to be released from liability in that lawsuit.  *See Jemal v. Lucky Ins. Co.*, 687 N.Y.S.2d 717, 717 (2d Dep't 1999); *accord Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90, 95 (2d Cir. 2006).  On this point,

1

the bank starts on its back foot, for at least two reasons.  First, in both absolute and per-claimant terms, JPMorgan has agreed to pay an amount far greater than the other settlements arising out of Epstein's abuse, including those paid by the abuser himself.  Ex. 1 ("Wong Depo.") at 71-74.[1]

Second, given the number of Epstein-related settlements that have already occurred—e.g., the settlement in *Jane Doe v. Deutsche Bank*, 23-cv-10019—the bank will be compensating victims who have already been compensated for the same harm, in some cases multiple times.  Wong Depo. at 70-71.

> To make the case that its extraordinary (and cumulative) settlement payment meets the test of reasonableness, the bank proffers the opinions of Edith Wong, a forensic accountant employed by the advisory firm FTI Consulting.  To arrive at her opinions, Ms. Wong states that she (i) researched sex-abuse settlements to find ones that were, in her view, "comparable" to JPMorgan's settlement, (ii) grouped the settlements into like "types" of her own fashioning, and then (iii) determined the average per-victim payment for each type.  Ex. 2 ("Wong Report") ¶¶ 32-35.  As her final step, Ms. Wong averaged the averages, arriving at an "average" per-victim settlement payment of $1.7 million, which—by her calculations—happened to be an exact match for the JPMorgan settlement.  Wong Depo. at 138; Wong Report ¶ 35.

> None of Ms. Wong's analysis was informed by any expertise in class action settlements, and each stage of her analysis was marked by outcome-driven judgment calls of an entirely subjective nature, which she was not qualified to make.  Given Rule 702's requirement that opinion testimony must come from a "qualified" expert, and result from the application of "reliable principles and methods," a failing of either expertise *or* reliability will render an expert's testimony inadmissible.  Fed. R. Evid. 702.  The opinions of Ms. Wong fail on both points.

---

[1] "Ex. __" refers to the exhibits to the accompanying Declaration of John M. McNichols.

### A.    Ms. Wong Has No Expertise in Class Action Settlements.

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  A court must "ensure that the expert will actually be testifying on issues or subject matter within his or her area of expertise."  *523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) (internal quotation marks omitted).  "When an expert is no longer applying [her] extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded." *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (citation omitted).

Here, the subject matter of Ms. Wong's opinion is the reasonableness of a price paid to settle a class-action lawsuit.  Ms. Wong readily admits that she is not an expert in class action settlements, and has never before provided an opinion on the reasonableness of a civil settlement or one comparing civil settlements.  Wong Depo. at 44-45.  None of her expertise in forensic accounting—█████████████████████████████████████████████████ *id.* at 44—is of anything more than general relevance, and all of her previous work as a testifying expert has been in criminal matters.  Although it is true that Ms. Wong's work in such criminal matters has involved calculating restitution to individual victims of sex trafficking, her opinions in those cases have been victim-specific and based on personal factors like age, earning capacity, and the extent of personal trauma.  Wong Depo. at 62-63.  She did not apply that methodology in this case—she could not, as she did not have any personal information for the victims in the Jane Doe class—and thus none of her prior experience calculating restitution lends itself to expertise in the subject matter of her opinion here.  *Id.* at 63-65.

The closest that Ms. Wong could come to identifying a prior engagement analogous to this one was a single project involving sex abuse claims against a religious entity.  Wong Depo. at 42-

43, 48.  In that matter (which is still ongoing), she helped to quantify an appropriate settlement proposal on the entity's behalf, and her work included reviewing class action sex-abuse settlements for comparison purposes.  *Id.* As she admitted, however, the settlements she considered for that matter were ones that she expressly *excluded* from her analysis in this case, *id.* at 54-55, and her methodology there boiled down to a victim-specific restitution analysis akin to what she has done in criminal cases:



Wong Depo. at 57.  That methodology was, of course, not the one she used for her assignment here.   As she testified, ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋
▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ *Id.* at 60.

### B.     Ms. Wong's Opinion on the Reasonableness of the Jane Doe Settlement Is Based on an Outcome-Driven Methodology.

Under *Daubert* and its progeny, the hallmark of a reliable methodology is analytical rigor, meaning the expert's reliance on objective standards.  *Daubert*, 509 U.S. at 594 ("the existence and maintenance of standards controlling the technique's operation").  Thus, whenever an expert's opinion boils down to the expert's own subjective views, the court must exclude it.  *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242(SAS), 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (a court may not "simply 'tak[e] the expert's word for it.'" (quoting Fed. R. Evid. 702 Advisory Committee's Note)); *see 523 IP LLC*, 48 F. Supp. 3d at 649 ("'mere ipse dixit' assertions . . .

should be excluded" (citation omitted)).  This requirement applies to every step in the expert's analysis, and thus "*any* step that renders the analysis unreliable . . . *renders the expert's testimony inadmissible*."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis in original) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). These principles are fatal to the admissibility of Ms. Wong's opinions.

> 1.     **Ms. Wong's Skewed Selection of "Comparables."**

By Ms. Wong's calculation, the average per-victim payment by Epstein's estate was well below the $1.7 million that she calculated for the JPMorgan settlement, and the average for the *Jane Doe v. Deutsche Bank* settlement was lower still.  Wong Report ¶ 33 & Exhibit 3.  When selecting "comps" for her reasonableness analysis, therefore, Wong did not limit herself to lawsuits based on abuse by Epstein, or even to ones under the Trafficking Victims Protection Act.  Wong Depo. at 91-92.  Instead, ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████    Wong Report ¶¶ 18-20, 27-28.  These additional settlements had significantly higher average payments than the ones based on Epstein's abuse, raising the overall average for Ms. Wong's comparison.  Wong Report ¶ 33 & Exhibit 3.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Wong Depo. at 101-02.  ████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



███████████████ Wong Depo. at 104. ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████ Wong Depo. at 115.  And she also observed that, ████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████ Wong Report ¶ 35. ███████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████ Wong Depo. at 112-

14 ███████████████████████████████████████ Wong Depo. at 119, 122.

Ms. Wong's universe of comparables was also noteworthy for the settlements that she decided to exclude.  Chief among her exclusions were 39 settlements by victims of Harvey Weinstein, the per-victim average of which was just $437,000, roughly one-quarter of Ms. Wong's average.  Wong Report ¶ 30.  Although Weinstein was a serial abuser—and in that regard a closer match to Epstein than Prince Andrew—Ms. Wong nevertheless claimed that it was proper to exclude the Weinstein settlements because (i) the Weinstein Company was in bankruptcy proceedings at the time, which could have reduced the claimants' leverage, and (ii) Weinstein's victims were reputedly older than Epstein's, which, as noted above, would have reduced the potential liability.  Wong Depo. at 107, 109.  As was the case with Epstein's victims, however, Ms. Wong possessed no data on the ages of Weinstein's victims, and thus had no way to quantify the purported average age difference.  Wong Depo. at 110.

None of the above will fly under *Daubert*.  For any comparative analysis to satisfy Rule 702's rigorous reliability requirements, the expert must justify the comparator used.  *See King v.*

*Wang*, 2021 WL 5237195, at *11 (S.D.N.Y. Nov. 9, 2021) ("In each context, the analysis requires criteria for the identification of comparable[s] . . .  and the making of appropriate adjustments to account for differences between the comparable and the [thing] being appraised."). Ms. Wong's inclusion of sex-abuse settlements involving perpetrators other than Epstein, with no knowledge of how the sued-upon acts compared to Epstein's beyond their basic sexual nature, is fundamentally non-rigorous.  And it is completely unjustifiable to treat those settlements as comparable when, in both Prince Andrew's case and the hotel chain case, additional factors were present which—by Ms. Wong's own assessment—would have increased the victims' leverage and driven up the settlement cost.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003) ("Expert testimony is inadmissible if it makes no effort to account for major variables.").

But even more problematic than Ms. Wong's non-rigorous comparability criteria was her selective application of that criteria when deciding which settlements were in or out.  The reasons that Ms. Wong gave to exclude the lower-valued Weinstein settlements—reduced victim leverage and increased victim age—were one-way drivers of settlement value that did not trouble her greatly in the case of the settlements that raised her average.  Simply put, if *reduced* victim leverage suffices to exclude the Weinstein settlements, then certainly *increased* victim leverage suffices to exclude the settlements of Prince Andrew and the hotel chain.  And if a *higher* average victim age suffices to exclude the Weinstein settlements, then certainly a *lower* one suffices to exclude the hotel chain's.  On both points, Ms. Wong was trying to have it both ways, applying her criteria rigorously when the settlements would lower her average but not when they did not.  That is nothing more than "cherry-picking," and it is the antithesis of a sound methodology.  *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) ("[C]herry-picking data to artificially generate a particular result may render a model so unreliable that it is inadmissible.").

2.      **Ms. Wong's Determination of the "Per-Victim" Amount.**

In order to allow apples-to-apples comparison, Ms. Wong reduced all settlements in her analysis to their per-victim average.  Wong Report ¶ 35 & Exhibit 3; Wong Depo at 66-67.  In most cases, this was not difficult, as the number of claimants was a known quantity.  For the JPMorgan and Deutsche Bank settlements, however, the underlying lawsuits were class actions, so Ms. Wong had to estimate the number of potential claimants to derive her denominator.  Ms. Wong's approach in the former case was adequate and in the latter preposterous.

As to the JPMorgan settlement, Ms. Wong's approach was straightforward: she totaled the number of victims who had settled with Epstein's estate, either directly or through the Epstein Victims Compensation Program, and then used the sum—one hundred seventy-one (171)[2]—as a proxy for the Jane Doe settlement class.  Wong Report ¶ 13.  Ms. Wong's rationale was that the bank's relationship with Epstein was of such duration that essentially anyone who could recover from the estate could also recover from JPMorgan.  Wong Depo. at 67-69.

As to the Deutsche Bank case, however, Ms. Wong's approach bordered on the Byzantine. In that case, plaintiff's counsel had publicly estimated the size of his client class at 125 persons.[3]

███████████████████████████████████████████████████████

██████████████████████████████    Wong Report ¶ 24.   ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[2]  Wong Report ¶ 13.  The estimate of 171 was what Ms. Wong used to derive the above-mentioned $1.7mm per-claimant amount for JPMorgan's $290 million settlement.  *Id.*

[3]  Wong Report ¶ 24 (citing Matthew Goldstein, *Deutsche Bank Will Pay $75 Million to Victims of Jeffrey Epstein,* N.Y. Times (May 17, 2023), https://www.nytimes.com/2023/05/17/business/deutsche-bank-jeffrey-epstein.html ).



*Id.* ¶ 25.

*Id.*; Wong Depo. at 127-28.

*Id.*

Wong Report ¶¶ 26, 33.  This was less than half of her $1.7 million average for the JPMorgan settlement, but still significantly greater than the $600,000 average that would result from the 125-person estimate by class counsel.  *Id.*

Merely to describe Ms. Wong's process is to criticize it.  It is simply bizarre to contend that an unsworn statement describing events from fourteen years earlier—by a person who was a high-school teenager at the time—would provide a more reliable estimate of class size than a statement by class counsel.  And Ms. Wong fares no better in her theorizing that victims from the early 2000s would have escaped Epstein's abuse by 2013 simply based on anecdotal reports of his desire for teenagers.  (Jane Doe's relationship with Epstein, for example, lasted well into her 20s.)  Such analytical choices are indistinguishable from guesswork and conjecture.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural.").  But even more problematic, they were in no way random:  Every aspect of Ms. Wong's analysis was geared to decrease the Deutsche Bank class size in order to inflate its per-victim average and thereby make the JPMorgan settlement look less exorbitant.  Such an outcome-driven approach is the opposite of a reliable one.  *See*

*Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) ("[M]ethodology . . . aimed at achieving one result" is "unreliable, and . . . must be excluded.").

### 3.     Ms. Wong's "Average-of-the-Averages" Comparison.

The last stage of Ms. Wong's analysis was her derivation of the per-victim "average" from the universe of comparables, which she then used for comparison to the JPMorgan settlement.  Of all the steps in Ms. Wong's analysis, her approach to this one was perhaps the most tendentious.

The most straightforward way to determine the average payment, of course, would be simply to sum the settlement payments and divide by the number of victims, giving equal weight to each victim's case.  ████████████████████████████████████████ ████████████████████  Wong Report ¶ 33; Wong Depo. at 139-40.  Ms. Wong therefore replaced that approach with one in which she first categorized the settlements, determined the per-victim average for each category, and then averaged the averages.  Her chart to this effect is below:



---

4 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

Wong Report ¶ 33. █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ This methodological choice was, again, entirely outcome-driven.

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████ Wong Report ¶ 34.  As applied to the Deutsche Bank settlement, this was an

absurd rationale.  As noted above, the *Jane Doe v. Deutsche Bank* lawsuit was premised on the

*same* theory of liability as the one against JPMorgan and compensated victims for the *same* harm.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ Wong Report ¶ 26. ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ *In re*

[5] Under New York law, prejudgment interest is not available for personal injury claims, *see Culpepper v. Allstate Ins. Co.*, 31 A.D.3d 490, 492 (2d Dep't 2006), and undersigned counsel has located no case where a New York court has awarded prejudgment interest under the New York Adult Survivors Act or any other statute invoked by the Jane Doe plaintiffs.  There is no Second Circuit precedent addressing prejudgment interest under the Trafficking Victims Protection Act, and courts in other jurisdictions are split on this issue. *Compare Treadway v. Otero*, 2022 WL 17729256, at *6 (S.D. Tex. June 9, 2022) (awarding prejudgment interest), *with Echon v. Sackett*, 2019 WL 8275344, at *9 (D. Colo. Feb. 12, 2019) (denying prejudgment interest for "non-economic" damages as "fundamentally at odds" with the purpose of such interest).

*Rezulin*, 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties . . . lie outside the bounds of expert testimony.").

Moreover, even if one were to credit Ms. Wong's fear of over-weighting the Deutsche Bank settlement, the idea that it should be given *less* weight on a per-victim basis than the settlements in the outlier categories is, again, absurd. ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Wong Depo. at 141-42.  Absent a reason to think that Prince Andrew's case was also 48 times more analogous than the Deutsche Bank one—and Ms. Wong gave no such reason—any methodology that would weight it as such cannot be deemed reliable.

## II.   JPMORGAN'S EXPERT OPINION ON LEGAL FEES.

As was the case with its $290 million settlement payment, the bank must show that its ███████████ legal fees was "reasonable" before it can recover them from Jes Staley.  *See In re Navidea Biophamaceuticals Litig.*, 19cv1578 (VEC) (DF), 2021 WL 2323380, at *6 (S.D.N.Y. Apr. 21, 2021), *R & R adopted sub nom. In re Navidea Biopharmaceuticals Litig.*, 2021 WL 2156276 (S.D.N.Y. May 27, 2021).  As was also the case with its settlement payment, JPMorgan again starts off on its back foot, as it must justify, among other things, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Ex. 3 ("Chapman Report") ¶¶ 25, 41, 67. ████████████████

████████████████████████████████████████████████████████

The bank's burden to show the reasonableness of its expenditures is only made heavier by the fact that its law firms' invoices are redacted so heavily that any attempt to review particular attorney tasks—or the duplication of tasks across the law firms involved—is effectively impossible:

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

Ex. 4 (WilmerHale Invoice (Exhibit 2 to Chapman Depo.)); *see also* Ex. 5 ("Chapman Depo.") at

149 (Judge Chapman agreeing that ████████████████████████████████████

████████████████████████████████

To address the reasonableness issue, JPMorgan retained Shelley Chapman, a former

bankruptcy judge.  For her engagement, Judge Chapman evaluated the bank's legal fees in a

"holistic" manner from a "top-down" perspective.  Chapman Depo. at 47, 71, 79.  As she described

her methodology, ████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

████████████████████████  *Id.* at 39, 90, 225-26.

As the above description suggests, Judge Chapman's methodology did not involve detailed review of the law firm invoices.  That is, she reviewed only the redacted versions (which, she conceded, could be opaque), and she did not review them to evaluate particular attorney tasks or the time spent thereon:



Chapman Depo. at 142.

*Id.* at 141-42.

---

[6] "Spidey sense," of course, refers to the preternatural ability of the superhero Spiderman—from the Marvel Comics Universe—to detect impending threats or hazards that are otherwise imperceptible to regular humans.  *See* https://en.wiktionary.org/wiki/Spidey-sense.

[7] *In re GSC Grp., Inc.*, 502 B.R. 673 (Bankr. S.D.N.Y. 2013) (Chapman, J.).

████████████████████████████████████████████████

*Id.* at 159-60.

Consistent with her approach to the invoices, Judge Chapman relied principally on her personal perspective in her overall evaluation of the legal fees and hours claimed by JPMorgan.

████████████████████████████████ *Id.* at 62, 68. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.* at 125-26.   But as for how those bankruptcy cases were analogous to JPMorgan's—or how the WilmerHale fees would stack up against billings in non-bankruptcy cases—she undertook no analysis.  *Id.* at 136.

On the equally fundamental question of why the additional 6,000 hours billed by Massey & Gail were necessary at all—in other words, why JPMorgan needed more than one law firm—Judge Chapman was quite candid that her opinion was not based on any objective standard:

████████████████████████████████████████████████

*Id.* at 196.   But rather than rely on her personal insight to assess the reasonableness of hiring Massey & Gail, Judge Chapman was clear that she relied on JPMorgan's judgment:

████████████████████████████████████████████████



*Id.* at 189.

The same was true of her opinions on the reasonableness of counsel's staffing decisions and potential duplication of effort: Judge Chapman simply deferred to JPMorgan's judgment in reviewing the bills, without independent analysis:



*Id.* at 185, 187-88.

*Id.* at 229.

None of Judge Chapman's analysis comes close to meeting the *Daubert* standard.

16

*First*, Judge Chapman's opinion "does not aid the jury in making a decision" as required by Rule 702; rather, "it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (cleaned up).  Judge Chapman's testimony will not provide the jury with the tools needed to assess the reasonableness of the legal fees—for example, guidance on how to evaluate excessive staffing, duplication of work, or the number of hours needed to prepare a motion.  The Judge acknowledged that she did not perform that analysis herself, notwithstanding her own view that doing so is necessary in some instances:

Chapman Depo. at 80-81 (emphasis added).  Without such analysis, Judge Chapman's testimony boils down to asking the jury to find the fees reasonable simply because she says they are—or, as noted above, simply because JPMorgan decided to pay them.  That sort of testimony does not help the factfinder at all.  *See, e.g.*, *Conn. Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 3:19cv839 (JBA), 2021 WL 4170757, at *18-19 (D. Conn. Sept. 14, 2021) (excluding opinion about reasonableness of legal fees); *Dinsmore & Shohl LLP v. Gray*, No. 1:14-cv-900, 2016 WL 11784514, at *5 (S.D. Ohio Apr. 5, 2016) (same).

*Second*, Judge Chapman did not apply a reliable methodology.  A reliable methodology requires application of the proper standard.  *See, e.g.*, *Inventio Ag v. Otis Elevator Co.*, No. 06 Civ. 5377(CM), 2011 WL 3359705, at *6 (S.D.N.Y. June 23, 2011) ("By articulating the wrong standard, Dr. Mangum's use of the entire market value rule to calculate damages is independently

flawed and cannot be presented to the trier of fact."); *Degelman Indus. Ltd. v. Pro-Tech Welding & Fabrication, Inc.*, No. 06-CV-6346, 2011 WL 6754051, at *8 (W.D.N.Y. May 27, 2011) (precluding expert from opining on ultimate issue [e.g., reasonableness] where expert applied incorrect standard).  Insofar as Judge Chapman purported to apply any standard for reasonableness at all, it was not New York state law, which governs JPMorgan's request for indemnification of its legal fees.  *See* Mot. To Dismiss Op. & Order at 19-20, ECF No. 293.  ██████████

████████████████████████████████████

████████████████████████████████████

███████████████████████  Chapman Report ¶¶ 21-24.

Judge Chapman also failed to apply the governing standard reliably.  Under New York law, the reasonableness of attorneys' fees must be assessed by examining billing records that specify, among other things, the amount of time spent on specific tasks and projects.  *See, e.g.*, *Klein v. Robert's Am. Gourmet Food, Inc.*, 808 N.Y.S.2d 766, 776 (2d Dep't 2006).  A factfinder assessing the reasonableness of attorneys' fees must evaluate various distinct factors, such as whether (i) the work performed was necessary, (ii) there was duplication of work, (iii) the case was overstaffed, and (iv) the work performed was legal in nature.  *See, e.g.*, *In re Est. of Passuello*, 591 N.Y.S.2d 542, 544 (3d Dep't 1992); *Ousmane v. City of New York*, 880 N.Y.S.2d 874 (Sup. Ct. 2009).  None of that can be assessed without examination of the time records—as Judge Chapman's own judicial opinions have acknowledged.  *In re GSC Grp., Inc.*, 502 B.R. at 748.  Yet Judge Chapman's assessment was not based on that sort of analysis, and, indeed, she admitted that she *could not* perform any such analysis given the extensive redactions to the invoices.  Chapman Depo. at 147-51.  Judge Chapman's methodology therefore fails to apply even her own standards, much less the proper standards, and is unreliable.  *Inventio Ag*, 2011 WL 3359705, at *6.

As noted above, the only ostensibly "objective" aspect of Judge Chapman's opinion was her top-line comparison of JPMorgan's fees to those in the handful of bankruptcy fee applications that she reviewed.  But on that point, Judge Chapman made no attempt to assess whether the underlying bankruptcy cases were comparable to JPMorgan's on any index relevant to cost of litigating, e.g., complexity of legal issues, quantity of documents, number of witnesses, or extent of potential liability.  Absent a showing of comparability on those fronts, the fact that the top-line fees were "in the same ballpark" is meaningless, and any opinion based thereon is inherently unreliable.  *See King*, 2021 WL 5237195, at *11 (noting need for "appropriate adjustments to account for differences between the comparable and the [thing] being appraised."); *Lippe*, 288 B.R. at 686 ("Expert testimony is inadmissible if it makes no effort to account for major variables.").

*Third*, the fact that Judge Chapman came to her conclusion *first*—based solely on "looking at" the top-line numbers—and only *afterward* looked at a subset of the heavily redacted invoices to see whether they supported her conclusion, is the hallmark of an unreliable methodology.  *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it" is "the antithesis of" a reliable approach.).  Indeed, by her own account, she did not review the fee applications from her previous bankruptcy cases—which were her only extrinsic point of comparison—until *after* she had already submitted her expert report declaring the fees reasonable.  Chapman Depo. 11-12, 37-38.  In addition, it is a dead giveaway of unreliability that Judge Chapman applied none of the rigor that she applied as a judge when undertaking the identical task.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").  ████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Chapman Depo. at

153-54.  If only her technique had been quite so involved.

*Finally*, on many of the critical issues bearing on reasonableness, Judge Chapman does not provide opinions of her own.  As noted above, she expressly relied on *JPMorgan's* judgment in hiring counsel and reviewing their invoices.  This is a fatal failing.  Even more important than the requirement that an expert's opinion be "based on sufficient facts or data" is the requirement that it be an *independent* examination of the facts or data, as that is the whole point of bringing in an otherwise uninvolved person to explain complex issues to the trier of fact.  Fed. R. Evid. 702.  For this reason, it is *ipso facto* disqualifying for an expert simply to rely on and repeat the conclusions of others, particularly when the conclusions are not even those of another expert, but rather those *of the party that retained her*.  *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014) (excluding expert who did not "independently evaluate[] or verif[y] the opinions upon which he relies"); *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999), *amended* 199 F.3d 158 (3d Cir. 2000); *see also United States v. Zolot*, 968 F. Supp. 2d 411, 426 n.27 (D. Mass. 2013) (collecting cases).[8]  Yet that is exactly what Judge Chapman did.  In doing so, she converted the question from "what *would* a client *reasonably* pay?" to "what *did* this client pay?"  That is not the right question, and it will serve no purpose for Judge Chapman to tell the jury that the claimed fees are reasonable simply because JPMorgan saw fit to pay them.

---

[8]  *See, e.g.*, *McLeod v. Dollar Gen.*, No. 13-3113, 2014 WL 4634962, at *6 (E.D. Pa. 2014) (explaining that Rules of Evidence do not "authorize experts to merely 'parrot' the ideas and opinions of other experts" (citation omitted)); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (excluding testimony and explaining that an "expert must make some findings and not merely regurgitate another expert's opinion").

### III.   JPMORGAN'S EXPERT OPINION ON INCOME SUBJECT TO CLAWBACK.

The final element of JPMorgan's damages that is the subject of expert testimony is its claim to claw back Mr. Staley's compensation.  To quantify this claim, JPMorgan plans to rely upon the opinions of Carlyn Irwin, a forensic accountant, who tallied up Mr. Staley's compensation by JPMorgan over the last twenty years.

Ms. Irwin's methodology and analysis were mechanical, in that she (i) reviewed JPMorgan's payroll records for Mr. Staley, (ii) manually entered every instance of compensation into an Excel spreadsheet, (iii) checked her work against Mr. Staley's W-2s and the year-end totals within the payroll records, and (iv) summed the total.  Ex. 6 ("Irwin Report") ¶¶ 15-16.  She then assumed three potential dates of breach—dates that were given to her by counsel—and calculated Mr. Staley's net compensation after each date to determine amounts potentially subject to clawback.  *Id.*  ¶¶ 18-19; Ex. 7 ("Irwin Depo.") at 66-67.  In addition, Ms. Irwin calculated prejudgment interest on the amounts clawed back, using the 9% simple rate prescribed by New York law running from the date of each clawed-back payment.  Irwin Report ¶¶ 20-22.

None of the above is the stuff of expert testimony.  An express requirement for the admissibility of expert testimony under Rule 702 is that, by bringing specialized knowledge to bear on the evidence, the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Inherent in this "helpfulness" requirement is the idea that the subject matter of the expert testimony lies beyond the ken of lay jurors.  *In re Rezulin*, 309 F. Supp. 2d at 541 ("Rule 702 ensures that expert witnesses will not testify about 'lay matters which a jury is capable of understanding and deciding without the expert's help.'").  Thus, where an expert performs calculations or provides analysis that the jury is equally capable of performing on its own, the testimony is not helpful and therefore should not be admitted.  *See 523 IP LLC*, 48 F. Supp. 3d at 644; *LinkCo, Inc.*, 2002 WL 1585551, at *4.

By this standard, Ms. Irwin's proposed testimony is inadmissible.  The mere transposition of numbers from JPMorgan's payroll to an Excel spreadsheet, and the performance of simple arithmetic thereon, are tasks well within the competence of the ordinary person.  Ms. Irwin's accounting skills were completely unnecessary for those tasks:  even the deductions necessary to convert "gross" income into "net" were already present in the payroll run that served as Ms. Irwin's starting point.  Irwin Depo. at 99-101.  ████████████████████████

████████████████████████████████████████████████

████████████████████████  *Id.*  All she did was figure out how much Mr. Staley had been paid.  That is information that can be obtained with reasonable accuracy simply by reference to Mr. Staley's W-2s, a type of document that every juror is familiar with.

Even more difficult to justify is Ms. Irwin's opinion calculating pre-judgment interest.  Simple interest is not called "simple" for no reason, and it is well within the grasp of any person with a calculator—which, given the ubiquity of smartphones, means everyone.  But even more fundamentally, the jury needs no instruction on pre-judgment interest because the calculation of such interest is not a jury task:  Under the very statute that Ms. Irwin cites as providing for pre-judgment interest in the first place, interest is "computed by the clerk of the Court," not the trier of fact:

> **(c) Specifying date; computing interest**.  The date from which interest is to be computed shall be specified in the verdict, report or decision.  If a jury is discharged without specifying the date, the court upon motion shall fix the date, except that where the date is certain and not in dispute, the date may be fixed by the clerk of the court upon affidavit.  **The amount of interest shall be computed by the clerk of the court**, to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded.

N.Y. CPLR § 5001(c) (emphasis added) (cited at Irwin Report ¶ 21 n.14).  There is no need for the jury to be educated on a task that it will not be asked to perform.

## CONCLUSION

For the foregoing reasons, Mr. Staley respectfully requests that the exclude JPMorgan's expert opinions, identified above.


Date:  September 20, 2023                           Respectfully submitted,


                                                    By: */s/ John M. McNichols*

                                                    Brendan V. Sullivan Jr.
                                                    John M. McNichols
                                                    Zachary K. Warren
                                                    Eden Schiffmann
                                                    WILLIAMS & CONNOLLY LLP
                                                    680 Maine Avenue SW
                                                    Washington, DC 20024
                                                    Tel: (202) 434-5252
                                                    Fax: (202) 434-5029
                                                    bsullivan@wc.com

                                                    Stephen L. Wohlgemuth
                                                    WILLIAMS & CONNOLLY LLP
                                                    650 Fifth Avenue, Suite 1500
                                                    New York, NY 10019
                                                    Tel: (202) 434-5390
                                                    Fax: (202) 434-5029
                                                    swohlgemuth@wc.com

                                                    *Counsel for Third-Party Defendant*
                                                    *James Edward Staley*